1 | Joseph R. Saveri (State Bar No. 130064)
Andrew M. Purdy (State Bar No. 261912)
2 | James G. Dallal (State Bar No. 277826)
Ryan J. McEwan (State Bar No. 285595)
3 | JOSEPH SAVERI LAW FIRM, INC.
505 Montgomery Street, Suite 625
4 | San Francisco, California 94111
Telephone:    (415) 500-6800
5 | Facsimile:    (415) 395-9940
jsaveri@saverilawfirm.com
6 | apurdy@saverilawfirm.com
jdallal@saverilawfirm.com
7 | rmcewan@saverilawfirm.com

8 | *Attorneys for Individual and Representative Plaintiffs*
*Chip-Tech, Ltd., Dependable Component Supply Corp.*
9 | *and eIQ Energy, Inc.*

10

11 | UNITED STATES DISTRICT COURT

12 | NORTHERN DISTRICT OF CALIFORNIA

13 | IN RE CAPACITORS ANTITRUST      Master File No. 3:14-cv-03264-JD
14 | LITIGATION
                                  **DECLARATION OF JOSEPH R. SAVERI IN**
15 |                               **SUPPORT OF DIRECT PURCHASER**
                                  **PLAINTIFFS' OPPOSITION TO MOTION**
16 |                               **FOR APPOINTMENT OF PEARSON, SIMON**
                                  **& WARSHAW, LLP AND LOCKRIDGE**
17 | THIS DOCUMENT RELATES TO:      **GRINDAL NAUEN P.L.L.P. AS INTERIM CO-**
ALL DIRECT PURCHASER CLASS ACTIONS  **LEAD CLASS COUNSEL**
18
                                  Date:       October 29, 2014
19 |                               Time:       9:30 a.m.
                                  Courtroom:  11, 19th Floor
20

21 | I, Joseph R. Saveri, declare:

22 |         1.      I am the Founding Partner of Joseph Saveri Law Firm, Inc. and an attorney of record for

23 | Direct Purchaser Plaintiffs Chip-Tech, Ltd., Dependable Component Supply Corp. and eIQ Energy Inc.

24 | in their respective antitrust class actions now consolidated before the Court in *In re Capacitors Antitrust*

25 | *Litigation*, Master File N.D. Cal. Case No. 3:14-cv-03264-JD. I submit this Declaration in support of

26 | Direct Purchaser Plaintiffs' Opposition to Motion for Appointment of Pearson, Simon & Warshaw, LLP

27 | and Lockridge Grindal Nauen P.L.L.P. as Interim Co-Lead Class Counsel and in further support of the

28 | Direct Purchaser Plaintiffs' Unopposed Motion to Appoint Interim Class Counsel Pursuant to Fed. R.

1                                    Master File No. 3:14-cv-03264-JD
Declaration of Joseph R. Saveri ISO Direct Purchaser Plaintiffs' Opposition to Motion for Appointment of Pearson, Simon &
Warshaw, LLP and Lockridge Grindal Nauen P.L.L.P. as Interim Co-Lead Class Counsel

Civ. P. 23(g) (Dkt. 102). I have personal knowledge of the facts set forth in this Declaration, and if called as a witness, I could and would testify competently to them.

2.      As I noted in my Declaration submitted in support of the Direct Purchaser Plaintiffs' Unopposed Motion to Appoint Interim Class Counsel (Dkt. 102-1), I have over 25 years of experience in handling antitrust cases and other complex litigation including many cases in which I have served as Lead Counsel or Co-Lead Counsel. I regularly handle cases involving cartels and other horizontal price-fixing, cases involving vertical restraints and monopolization cases.

### Additional Counsel Support Direct Purchaser Plaintiffs' Unopposed Motion

3.      On October 22, 2014, I learned that an additional direct purchaser action, *Quathimatine Holdings, Inc. v. Elna Co., Ltd. et al.,* Case No. 4:14-cv-04704-KAW, had been filed in this District. Upon learning of the filing, I and Howard J. Sedran of Levin Fishbein Sedran & Berman, consistent with our efforts to work cooperatively and collaboratively for the benefit of the direct purchaser class, reached out to Labaton Sucharow LLP ("Labaton Sucharow"), counsel for Plaintiff Quathimatine Holdings, Inc. ("Quathimatine"), to invite their participation on the Direct Purchaser Plaintiffs team.

4.      On October 24, 2014, attorneys at Labaton Sucharow advised Howard J. Sedran that they accept our invitation to work cooperatively. They further advised that Labaton Sucharow supports Direct Purchaser Plaintiffs' Unopposed Motion to Appoint Interim Class Counsel (Dkt. 102) and the leadership structure contemplated in that Motion and that we are authorized to represent this to the Court.

### The Joseph Saveri Law Firm, Inc.'s Investigation into the Capacitors Price-Fixing Cartel

5.      In April 2014, I and others at my firm became aware of information indicating that there was cartel activity and price-fixing in the capacitors industry. Sources disclosed that antitrust regulators in the United States and abroad had opened investigations into alleged anticompetitive activity including a possible price-fixing cartel in the global market for capacitors, including capacitors sold directly to purchasers in the United States. At that time, my firm immediately began our investigation.

6.      To assist with our investigation, my firm interviewed a wide range of sources possessing specialized knowledge about the capacitors industry, including economists, electrical engineers, business owners, foreign attorneys specializing in competition law in jurisdictions in which price-fixing investigations had been reported, members of the press familiar with the investigation, and industry

1   analysts who report regularly on the market for passive electronic components, including capacitors.

2       7.    I also hired an economics consultancy and commissioned a study of the capacitors

3   industry. The consultancy conducted a months-long investigation and produced a report analyzing

4   reliable economic data on the global capacitors market, predominant distribution channels, prevailing

5   modes of marketing, and primary uses of the various types of capacitor products, their suitability for

6   various applications, market conduct, market structure, pricing and pricing trends, market concentration,

7   and other indicia of conspiratorial cartel activity.

8       8.    At the same time, at my direction and with my guidance, my firm initiated a sustained,

9   systematic program of outreach to and survey of market participants at all levels of distribution. Based on

10   my extensive experience in such outreach, it is necessary to obtain a complete picture of market

11   conditions to determine the likelihood or existence of cartel activity.

12       9.    Between April and July of this year, my associates and I conducted over 400 person-to-

13   person inquiries with capacitor distributors, institutional purchasers and original equipment

14   manufacturers ("OEMs") in the audio-visual, optics, musical instrument, electronics testing, electric

15   power, solar power, automotive, defense, printed circuit board assembly and other product and services

16   sectors. These contacts offered their knowledge both about the operation of the capacitors markets

17   generally and about recent and historic pricing trends and other possible indicators of conspiratorial

18   activity in the industry. Over 50 of these inquiries resulted in extended interviews that produced

19   additional useful information. My firm's investigation, in concert with the other firms supporting Direct

20   Purchaser Plaintiffs' Unopposed Motion to Appoint Interim Class Counsel (Dkt. 102-1), continues.

21       10.    In addition, my firm identified the online forums and discussion channels most popular

22   among purchasers of passive electronic components such as capacitors. Many beneficial contacts with

23   market participants were made from these efforts, and much useful information about market conditions

24   and indicia of capacitor manufacturers' collusion was obtained.

25       11.    In the course of our investigation my firm spoke with a wide array of direct and indirect

26   purchasers of capacitors. The investigation revealed in part that large-scale direct purchasers of capacitors

27   included electronic component distributors, as well as OEMs and contract manufacturers ("CMs") who

28   regularly purchase large volumes of capacitors for incorporation into their products. I therefore concluded

3          Master File No. 3:14-cv-03264-JD

Declaration of Joseph R. Saveri ISO Direct Purchaser Plaintiffs' Opposition to Motion for Appointment of Pearson, Simon &
Warshaw, LLP and Lockridge Grindal Nauen P.L.L.P. as Interim Co-Lead Class Counsel

1     that electronic components distributors, OEMs and CMs who had purchased capacitors covered by the

2     conspiracy from the members of the cartel would have direct purchaser claims for which they would be

3     entitled to seek redress and a large and direct economic interest in the outcome of the instant litigation,

4     and consequently would make excellent representatives for the direct purchaser class.

5           12.     Even prior to my firm's initiation of the first filed capacitors antitrust case in the nation,

6     *Chip-Tech, Ltd. v. Panasonic Corp., et al.*, No. 3:14-cv-03264-JD (N.D. Cal., filed July 18, 2014), my firm's

7     investigation into a global and U.S. capacitors price-fixing cartel was reported in the press.

8           13.     I have reviewed the Declaration of Bruce L. Simon in Support of Plaintiff In Home Tech

9     Solutions, Inc.'s Motion for Appointment of Pearson, Simon & Warshaw LLP and Lockridge Grindal

10     Nauen P.L.L.P. as Interim Co-Lead Class Counsel for Direct Purchaser Plaintiffs (Dkt. 193-3). Mr. Simon

11     relies extensively on his review of news articles, including news articles in Policy and Regulatory Report

12     and MLex, as the basis of his claims regarding his investigation of the case. *Id.* ¶ 7.

13           14.     Attached at <u>Exhibit A</u> is a true and correct copy of the text of an article by David Baumann

14     entitled "Capacitor cartel probe heats up on US civil, criminal sides," published June 26, 2014 in Policy

15     and Regulatory Report. It indicates that as of the date of the article Joseph Saveri Law Firm, Inc. had been

16     investigating the conspiracy for several months. Notably, Mr. Simon fails to reference in his declaration

17     the Policy and Regulatory Report article mentioning my firm and reporting on its investigation.

18         **Assembling a Team and Filing the First Cases**

19           15.     While my investigation was well under way, I began discussions with other experienced

20     antitrust practitioners with whom I have worked in the past on other complex antitrust matters to explore

21     the possibility of forming a team of eminently qualified plaintiffs' attorneys to prosecute this complex

22     multi-year, multi-defendant global antitrust conspiracy. By the beginning of July 2014, I had formed a

23     team of some of the nation's top plaintiffs' antitrust firms ready to take on the capacitors price-fixing

24     cartel: Joseph Saveri Law Firm, Inc.; Berger & Montague, P.C.; Heins Mills & Olson, P.L.C.; and Lite

25     DePalma Greenberg, LLC (together, the "Saveri Group"). These firms agreed to work with my firm to

26     analyze the information obtained to date and outline potential theories that would support the causes of

27     action we ultimately intended to assert against the price-fixing cartel's members. Concurrently with the

28     Saveri Group's formation, I learned that Solomon B. Cera of Gold Bennett Cera & Sidener LLP ("Gold

Declaration of Joseph R. Saveri ISO Direct Purchaser Plaintiffs' Opposition to Motion for Appointment of Pearson, Simon & Warshaw, LLP and Lockridge Grindal Nauen P.L.L.P. as Interim Co-Lead Class Counsel

Bennett") had also initiated an investigation into the capacitors price-fixing cartel and had identified and interviewed numerous market participants who had purchased capacitors. I have had extensive experience working with Mr. Cera, his partner C. Andrew Dirksen, and other members of the Gold Bennett team on previous cases. I am aware that Gold Bennett is known among both the plaintiffs and defense bars as a firm of expert antitrust lawyers. Considering that this case concerns a complex multi-year, multi-defendant global antitrust conspiracy, members of the Saveri Group and I conferred and agreed with Gold Bennett to collaborate in prosecuting antitrust claims against members of the cartel.

16.      In July of this year, Gold Bennett entered into a representation agreement with Chip-Tech, Ltd. ("Chip-Tech"), a capacitor distributor and a direct purchaser of capacitors from many of the named Defendants. Similarly and at approximately the same time, the Joseph Saveri Law Firm, Inc. entered into a representation agreement with Dependable Component Supply Corporation ("Dependable"), a capacitor distributor and a direct purchaser of capacitors from many of the named Defendants.

17.      Chip-Tech and Dependable are capacitor distributors who purchased capacitors directly from Defendants in significant volumes, and in my assessment are well-suited to serve as class representatives for the direct purchaser class.

18.      My firm—with assistance and guidance from the Saveri Group and Gold Bennett—put the finishing touches on a complaint in early July of this year. On behalf of the Saveri Group and Gold Bennett, I filed the first direct purchaser case alleging a global antitrust conspiracy in the capacitors industry, *Chip-Tech, Ltd. v. Panasonic Corp. et al.*, Case No. 3:14-cv-03264-JD ("*Chip-Tech*"), in this District on July 18, 2014 (Dkt. 1); and filed the second direct purchaser case attacking the global capacitors antitrust conspiracy, *Dependable Component Supply Corp. v. Panasonic Corp. et al.*, Case No. 3:14-cv-03300-JD ("*Dependable*"), in this District on July 22, 2014 (Case No. 14-03300-JD, Dkt. 1). These filings were widely reported by the media.

19.      Attached at <u>Exhibit B</u> is a true and correct copy of an article by Vin Gurrieri entitled "Circuit Board Parts Were Artificially Priced, Buyers Claim," published July 21, 2014 by Law360.

20.      Attached at <u>Exhibit C</u> is a true and correct copy of an article by Alissa Wickham entitled "Panasonic, Samsung Accused Of 9-Year Price-Fixing Scheme," published July 22, 2014 by Law360.

21.      Attached at <u>Exhibit D</u> is a true and correct copy of an article by Jack P. Figura and Deirdre

A. McEvoy entitled "Cartel Suits Filed Against Capacitor Manufacturers After Reports of Cooperation With Authorities," published July 30, 2014 by Mondaq.

22.     My firm has expended significant time and resources to advance our investigation into the capacitors price-fixing cartel. As of July 22, 2014, the Joseph Saveri Law Firm, Inc. alone had expended 568.75 hours of attorney time, 224.4 hours of support staff time, and $19,708.13 in costs advanced on behalf of the proposed class.

**A Consensus Team Resolves the Multidistrict Litigation to Move the Case Forward**

23.     On August 1, 2014, I learned that other plaintiffs' class action attorneys led by Howard J. Sedran of Levin Fishbein Sedran & Berman LLP ("Levin Fishbein") had filed a competing case, *eIQ Energy Inc. v. AVX Corp. et al.,* Case No. 2:14-cv-04826-MAH ("*eIQ* New Jersey"), in the District of New Jersey. The other firms joining Levin Fishbein in signing on to the *eIQ* New Jersey case were Fine, Kaplan and Black, R.P.C.; Lum, Drasco & Positan, LLC; and Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. (together with Levin Fishbein, the "Levin Fishbein Group").

24.     The filing of the *eIQ* New Jersey action also garnered press attention.

25.     Attached at <u>Exhibit E</u> is a true and correct copy of an article by Aaron Vehling entitled "Panasonic Accused In Scheme To Fix Capacitor Prices," published August 4, 2014 by Law360.

26.     I am well-acquainted with these firms. Over my 25-year career, I have worked with them on numerous cases. They are well-known and respected by members of both the plaintiffs and defense bar as expert antitrust lawyers, possess excellent credentials and have a demonstrable track record of success in prosecuting such cases.

27.     None of the firms in the Levin Fishbein Group worked with or contacted any member of the Saveri Group or Gold Bennett prior to filing the *eIQ* New Jersey action.

28.     Neither any member of the Saveri Group nor Gold Bennett had any contact with Plaintiff eIQ Energy Inc. prior to the filing of the *eIQ* New Jersey action.

29.     Faced with a competing action concerning the same global cartel conspiracy and seeking much of the same relief as the already-pending *Chip-Tech* and *Dependable* actions, I—along with members of the Saveri Group and Gold Bennett—initiated proceedings before the Judicial Panel on Multidistrict Litigation (the "Panel") on August 7, 2014, to seek consolidation and transfer of all capacitors antitrust

1   class actions to the Northern District of California. That same day the Panel issued a briefing schedule for

2   the multidistrict litigation proceeding captioned as *In re Capacitors Antitrust Litigation,* MDL No. 2574.

3       30.    Attached at <u>Exhibit F</u> is a true and correct copy of the Motion for Transfer of Actions

4   Pursuant to 28 U.S.C. § 1407 filed by Plaintiffs Chip-Tech and Dependable in MDL No. 2574 on August

5   7, 2014 (MDL No. 2574, Dkt. 1).

6       31.    Attached at <u>Exhibit G</u> is a true and correct copy of the Brief in Support of Motion for

7   Transfer of Actions Pursuant to 28 U.S.C. § 1407 filed by Plaintiffs Chip-Tech and Dependable in MDL

8   No. 2574 on August 7, 2014 (MDL No. 2574, Dkt. 1-1).

9       32.    The initiation of multidistrict litigation proceedings before the Panel was reported in the

10   press in sources monitored by antitrust practitioners nationally and globally.

11       33.    Attached at <u>Exhibit H</u> is a true and correct copy of the text of an article by Richard

12   Vanderford entitled "Capacitor plaintiffs ask panel to consolidate price-fixing litigation in California,"

13   published August 8, 2014 by MLex.

14       34.    On August 14, 2014, an attorney at Cohen Milstein Sellers & Toll PLLC ("Cohen

15   Milstein") called me to advise that his firm intended to file in short order an additional case on behalf of

16   direct purchasers of capacitors affected by the conspiracy.

17       35.    Several hours later that same day, attorneys with Cohen Milstein filed *Schuten Electronics,*

18   *Inc. v. AVX Corp. et al.,* Case No. 3:14-cv-03698-JD ("*Schuten*"), in this District on behalf of capacitor

19   distributor direct purchaser Schuten Electronics, Inc. ("Schuten").

20       36.    Other than the telephone call just prior to filing, no one at Cohen Milstein worked with or

21   contacted any member of the Saveri Group prior to filing the *Schuten* action. I am not aware and do not

22   believe that anyone at Cohen Milstein worked with Gold Bennett or any member of the Levin Fishbein

23   Group prior to filing the *Schuten* action.

24       37.    No member of the Saveri Group had any contact with Plaintiff Schuten Electronics, Inc.

25   prior to the filing of the *Schuten* action. I am not aware and do not believe that Gold Bennett or any

26   member of the Levin Fishbein Group had any contact with Plaintiff Schuten Electronics, Inc. prior to the

27   filing of the *Schuten* action.

28       38.    On August 19, 2014, the Panel issued a Notice of Hearing Session advising the parties that

Declaration of Joseph R. Saveri ISO Direct Purchaser Plaintiffs' Opposition to Motion for Appointment of Pearson, Simon & Warshaw, LLP and Lockridge Grindal Nauen P.L.L.P. as Interim Co-Lead Class Counsel

1   Chip-Tech and Dependable's Motion would be heard during the Panel's October 2, 2014 hearing session

2   (MDL No. 2574, Dkt. 10).

3          39.     Attached at Exhibit I is a true and correct copy of the Notice of Hearing Session issued by

4   the Panel on August 19, 2014.

5          40.     On August 28, 2014, the Levin Fishbein Group filed the Response of eIQ Energy Inc. to

6   Motion for Transfer and Coordination Filed by Plaintiffs Chip-Tech, Ltd. and Dependable Component

7   Supply Corp. and Request for Transfer to the District of New Jersey (MDL No. 2574, Dkt. 73).

8          41.     Attached at Exhibit J is a Response of eIQ Energy Inc. to Motion for Transfer and

9   Coordination Filed by Plaintiffs Chip-Tech, Ltd. and Dependable Component Supply Corp. and Request

10  for Transfer to the District of New Jersey, filed on behalf of eIQ Energy by the Levin Fishbein Group on

11  August 28, 2014.

12         42.     None of the firms in the Levin Fishbein Group worked with or contacted any member of

13  the Saveri Group prior to filing the Response of eIQ Energy Inc. to Motion for Transfer and Coordination

14  Filed by Plaintiffs Chip-Tech, Ltd. and Dependable Component Supply Corp. and Request for Transfer to

15  the District of New Jersey. I am also not aware and do not believe that any member of the Levin Fishbein

16  Group worked with or contacted Gold Bennett prior to the filing.

17         43.     No member of the Saveri Group had any contact with Plaintiff eIQ Energy Inc. prior to the

18  filing of the Response of eIQ Energy Inc. to Motion for Transfer and Coordination Filed by Plaintiffs

19  Chip-Tech, Ltd. and Dependable Component Supply Corp. and Request for Transfer to the District of

20  New Jersey. I am not aware and do not believe that Gold Bennett had any contact with Plaintiff eIQ

21  Energy Inc. prior to the filing.

22         44.     On September 4, 2014, on behalf of the Saveri Group and Gold Bennett, the attorneys

23  representing Plaintiffs Chip-Tech and Dependable, I filed Plaintiffs Chip-Tech, Ltd. and Dependable

24  Component Supply Corporation's Reply in Further Support of Their Motion for Transfer of the

25  Capacitors Actions to the Northern District of California Pursuant to § 1407 for Coordinated or

26  Consolidated Pretrial Proceedings (MDL. 2574, Dkt. 87).

27         45.     Attached at Exhibit K is a true and correct copy of Plaintiffs Chip-Tech, Ltd. and

28  Dependable Component Supply Corporation's Reply in Further Support of Their Motion for Transfer of

Case3:14-cv-03264-JD   Document273   Filed10/24/14   Page9 of 26

1    the Capacitors Actions to the Northern District of California Pursuant to § 1407 for Coordinated or

2    Consolidated Pretrial Proceedings.

3          46.     Contrary to any suggestion that the Saveri Group, Gold Bennett, the Levin Fishbein

4    Group and Cohen Milstein are all members of the "same group," each of these sets of attorneys

5    conducted their own investigations separately without input or collaboration from any of the others. And

6    although the Saveri Group and Gold Bennett agreed to work to together prior to filing, each of the three

7    sets of filing attorneys—the Saveri Group with Gold Bennett, the Levin Fishbein Group, and Cohen

8    Milstein—filed their cases separately without input or collaboration from any of the others. Upon filing of

9    the *Chip-Tech* and *Dependable* actions, it had been my firm's intention to pursue a leadership role in any

10    consolidated class action case.

11          47.     Aware that attacking the multi-year, multifaceted global antitrust conspiracy at issue in the

12    instant litigation would benefit from the involvement of multiple law firms—a concern I had already

13    sought to address by entering into an agreement to cooperate with the members of the Saveri Group and

14    Gold Bennett—I reviewed the *eIQ Energy* and *Schuten* complaints and investigated the nature of these

15    new plaintiffs' businesses and the likelihood that they had viable direct purchaser claims against the

16    capacitors manufacturers that, according to our investigation, were members of the global and U.S.

17    capacitors price-fixing cartel. After completing this review I concluded that the differences among the

18    various filings could be synthesized into a single unified theory and that these new plaintiffs had interests

19    aligned with Plaintiffs Chip-Tech and Dependable. The *eIQ Energy* complaint differed from the *Chip-Tech*

20    and *Dependable* complaints primarily in omitting two groups of named Defendants and adding another, in

21    adding film capacitors to the products at issue, and in identifying a shorter class period—starting in 2008

22    rather than 2005—for the start of the conspiracy. The allegations in the *eIQ Energy* complaint were

23    consistent with the allegations in the *Chip-Tech* and *Dependable* complaints. The allegations in the *Schuten*

24    complaint were also consistent with the allegations in the *Chip-Tech* and *Dependable* complaints. I also

25    knew by direct experience the work of both the Levin Fishbein Group and Cohen Milstein, and I knew

26    both groups of attorneys to be talented antitrust practitioners. Finally, during the class period Schuten

27    Electronics was a capacitor distributor who purchased capacitors directly from Defendants in significant

28    volume, and eIQ Energy is a manufacturer of power electronics that make solar photovoltaic systems work

Declaration of Joseph R. Saveri ISO Direct Purchaser Plaintiffs' Opposition to Motion for Appointment of Pearson, Simon &
Warshaw, LLP and Lockridge Grindal Nauen P.L.L.P. as Interim Co-Lead Class Counsel

with optimum efficiency who purchases capacitors directly from Defendants in significant volume. In my assessment both Schuten and eIQ Energy are consequently well-suited to serve as class representatives for the direct purchaser class. I therefore concluded that it could benefit the litigation and the interests of the entire direct purchaser plaintiff class if all the attorneys who had filed complaints on behalf of direct purchasers could reach an amicable and workable agreement on how best to jointly prosecute their separately filed claims as a team. It is my understanding that other members of the Saveri Group, attorneys at Gold Bennett, attorneys among the Levin Fishbein Group, and attorneys at Cohen Milstein conducted similar assessments in the same period and concluded that all the attorneys involved were talented antitrust practitioners capable of contributing valuable insight and experience to the case, and that the differences among the various complaints on file were not so great as to be irreconcilable.

48.     With the Motion to Transfer pending before the Panel and set for hearing on October 2, 2014, I along with Solomon B. Cera of Gold Bennett joined with Howard J. Sedran of Levin Fishbein and Kit A. Pierson of Cohen Milstein to discuss and explore the potential for leadership consensus among our respective clients and firms, as well as those supporting firms that joined in the filing of our respective complaints, that would advance the collective interests of the proposed direct purchaser class. Although there were disagreements and the discussions were at times contentious, the series of teleconferences and email communications exchanged among us eventually produced an agreement in principle to adopt the leadership structure submitted to the Court on September 16, 2014 as a [Proposed] Order Appointing Interim Class Counsel for Direct Purchaser Class Pursuant to Fed. R. Civ. P. 23(g) (Dkt. 102-6). Under the proposed leadership structure, Interim Class Counsel for the Direct Purchaser Plaintiffs would consist of myself; Solomon B. Cera of Gold Bennett; Howard J. Sedran of Levin Fishbein; and Kit A. Pierson of Cohen Milstein; with the same four attorneys to serve as the Direct Purchaser Class Executive Committee ("Executive Committee").

49.     Having achieved this agreement in principle, the Executive Committee attorneys and their firms worked cooperatively to terminate the now unnecessary Motion to Transfer and to eliminate any outstanding procedural hurdles to centralization and consolidation of our respective actions in the Northern District. On September 11, 2014, the Levin Fishbein Group filed a Notice of Voluntary Withdrawal in the *eIQ* New Jersey action (Dkt. 100-1). That same day, in the capacity of Local Counsel

for the Levin Fishbein Group, I filed *eIQ Energy Inc. v. AVX Corp. et al.,* Case No. 3:14-cv-04123-JD, in this District, thereby bringing all of the then-pending actions challenging the conspiracy on behalf of direct purchasers of capacitors to the same District. On September 12, 2014, the District of New Jersey entered the Notice of Voluntary Withdrawal as an order (Dkt. 100-2). That same day, the Levin Fishbein Group filed a Notice of Supplemental Information in the JPML proceeding advising the Panel that because there were no longer any actions pending other than in this District, the Motion under consideration was moot (Dkt. 100-3). On September 16, 2014, the Panel issued an Order Deeming Motion Moot and Vacating the October 2, 2014, Hearing Session Order (MDL No. 2574, Dkt. 102).

50.     Also on September 16, 2014, the Executive Committee attorneys and their firms filed a Notice and Unopposed Motion of Direct Purchaser Plaintiffs to Appoint Interim Class Counsel Pursuant to Fed. R. Civ. P. 23(g) and Memorandum of Points and Authorities in Support Thereof (Dkt. 102). Consistent with appropriate procedures for formally related but not yet consolidated actions, either the papers would have to await consolidation of all cases or they would have to be filed in all of the actions to which they apply. Because an August 14, 2014 Order of the Court (Dkt. 65) had already consolidated the *Chip-Tech* and *Dependable* cases for all pretrial purposes, it was unnecessary to file these papers in the *Dependable* action, and because I filed the *eIQ Energy* case as Local Counsel for the Levin Fishbein Group, I was able to file the papers in the *eIQ Energy* action. As only Cohen Milstein had at that point appeared on behalf of Plaintiff Schuten, Cohen Milstein filed the papers in the *Schuten* action.

51.     Throughout the process of negotiating these arrangements and preparing these filings, the Executive Committee attorneys and their firms worked collaboratively and cooperatively for the benefit of the entire proposed direct purchaser class.

### Coordinated Action by Direct Purchaser Plaintiffs to Advance the Litigation

52.     Both before and after their agreement to work together, the Executive Committee attorneys and their firms, as well as other co-counsel, have worked together amicably, professionally, and cooperatively to advance the litigation to the benefit of the proposed direct purchaser class.

53.     Shortly following filing, the *Chip-Tech* and *Dependable* cases were served on all United States entities and on all foreign Defendants to the extent they could be served in the United States (Dkt. 18-30, 76-79, 84-86; Case No. 3:14-cv-03300-JD, Dkt. 18-24, 45-57).

54.     Chip-Tech and Dependable also negotiated with Defendants and reached numerous stipulations regarding acceptance of service and schedules for responding to the complaints (Dkt. 17, 50-54, 56-60; Case No. 3:14-cv-03300-JD, Dkt. 17, 26, 29-36, 38-39).

55.     On August 15, 2014, Solomon B. Cera and I wrote to Jeffrey Kessler of Winston & Strawn LLP, counsel for the Panasonic Defendants, to advise of our understanding that Panasonic had applied for amnesty under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 ("ACPERA"), Pub. L. No. 108-237, 118 Stat. 665 (codified as 15 U.S.C. § 1 note) and to request that Panasonic offer its cooperation to the direct purchaser class in compliance with the statute.

56.     Attached at Exhibit L is a true and correct copy of an August 15, 2014 letter from Solomon B. Cera and Joseph R. Saveri to Jeffrey Kessler.

57.     Knowing at that time that the Saveri Group, Gold Bennett and the Levin Fishbein Group would ultimately be working together to prosecute the direct purchaser plaintiff class claims at the conclusion of the then-pending Motion to Transfer, Solomon B. Cera and I coordinated with Howard Sedran of the Levin Fishbein Group as part of the Direct Purchaser Plaintiffs' communications with Mr. Kessler. Indeed, Mr. Sedran was copied on the letter Mr. Cera and I sent to Jeffrey Kessler on August 15, 2014. *See* Exhibit L.

58.     On August 21, 2014, Jeffrey Kessler wrote back to state that the Panasonic Defendants would not comment regarding the investigation pending resolution of the then-pending multidistrict litigation and designation of interim lead class counsel. Mr. Kessler responded to Mr. Sedran's letter dated August 22 on that same day with the same response.

59.     Attached at Exhibit M is a true and correct copy of an August 21, 2014 letter from Jeffrey Kessler to Solomon B. Cera and Joseph R. Saveri.

60.     On August 22, 2014, Mr. Sedran also sent a letter to Mr. Kessler, copying Mr. Cera and me, requesting ACPERA cooperation from Mr. Kessler's client.

61.     Attached at Exhibit N is a true and correct copy of the August 22, 2014 letter from Howard J. Sedran to Jeffrey Kessler.

62.     Attached at Exhibit O is a true and correct copy of Mr. Kessler's responsive August 22, 2014 letter to Howard J. Sedran.

63.     Following the conclusion of the Panel proceedings and the Direct Purchaser Plaintiffs'
filing of their Unopposed Motion of Direct Purchaser Plaintiffs to Appoint Interim Class Counsel filing,
the Executive Committee attorneys and their firms organized a meeting of counsel for all parties then
before the Court in the four direct purchaser cases and two indirect purchaser cases then pending and met
and conferred with counsel for Defendants and counsel for indirect purchaser plaintiffs regarding the case
management conference agenda.

64.     Attached at Exhibit P is a true and correct copy of a September 19, 2014 letter from Joseph
R. Saveri to all counsel for Defendants and Indirect Purchaser Plaintiffs then before the Court in the *Chip-
Tech, Dependable, Schuten,* and *eIQ Energy* actions regarding the scheduling and preparation of a detailed
agenda for the Rule 26(f) conference.

65.     The Executive Committee attorneys and their firms have reviewed the Court's Standing
Orders and worked collaboratively to negotiate a comprehensive litigation schedule, identifying areas of
agreement or compromise where possible and narrowing the contested issues for the benefit of all parties.

66.     In addition to having already organized, conducted and completed the parties' Rule 26
conference for all actions related and consolidated as of October 9, 2014, the Executive Committee
attorneys have greatly advanced the litigation by drafting and negotiating the terms of several key
proposed orders necessary for the orderly management of this litigation.

67.     Notably, the Executive Committee attorneys and their firms have negotiated a draft
protective order.

68.     Attached at Exhibit Q is a true and correct copy of a September 22, 2014 email from
Joseph R. Saveri to counsel for all Defendants and Indirect Purchaser Plaintiffs then before the Court
attaching and proposing adoption of this District's model Protective Order along with the attachment,
which is a true and correct copy of the proposed protective order modified to reflect the appropriate case
caption.

69.     Attached at Exhibit R is a true and correct copy of a September 26, 2014 letter from
Jonathan M. Jacobson of Wilson Sonsini Goodrich & Rosati, counsel for the Hitachi Defendants, on
behalf of all Defendants then before the Court to Joseph R. Saveri concerning a preliminary schedule of
proceeding and a proposal regarding the briefing for Defendants' motions to dismiss.

70.     Attached at <u>Exhibit S</u> is a true and correct copy of an October 1, 2014 letter from Joseph R. Saveri to Jonathan M. Jacobson and Jeffrey C. Bank, also of Wilson Sonsini Goodrich & Rosati, regarding scheduling of the Rule 26(f) conference, a draft case management order and a draft stipulated protective order.

71.     Attached at <u>Exhibit T</u> is a true and correct copy of an October 2, 2014 letter from Jonathan M. Jacobson on behalf of all Defendants then before the Court to Joseph R. Saveri regarding the topics of the October 1, 2014 Joseph R. Saveri letter.

72.     After considerable resistance, Defendants eventually agreed to proceed with the Rule 26(f) Conference.

73.     On October 2, 2014, the Court issued a Consolidation and Case Management Order (Dkt. 133) consolidating the *Schuten* and *eIQ Energy* actions with the previously consolidated *Chip-Tech* and *Dependable* actions, resetting the initial case management conference to October 29, 2014, to directly follow a hearing on the unopposed motions to appoint interim class counsel noticed for that date at 9:30 a.m., and directing counsel to be prepared at the conference to suggest procedures to facilitate the expeditious, economical, and just resolution of the litigation.

74.     Attached at <u>Exhibit U</u> is a true and correct copy of an October 3, 2014 follow-up letter from Jonathan M. Jacobson on behalf of all Defendants then before the Court to Joseph R. Saveri regarding the same topics including Defendants' new position in light of the October 2, 2014 Consolidation and Case Management Order (Dkt. 133).

75.     Attached at <u>Exhibit V</u> is a true and correct copy of an October 3, 2014 letter from Joseph R. Saveri to Jonathan M. Jacobson stating Direct Purchaser Plaintiffs' objection to Defendants' position on scheduling, reiterating the request to schedule the Rule 26(f) Conference promptly and advising of the impending deadlines for compliance with this District's ADR Local Rules.

76.     Attached at <u>Exhibit W</u> is a true and correct copy of an October 6, 2014 letter from Jonathan M. Jacobson to Joseph R. Saveri agreeing to the scheduling of an in-person Rule 26(f) Conference at the San Francisco offices of O'Melveny & Myers LLP, counsel for the ROHM Defendants, on October 9, 2014.

77.     That same day, I spoke by telephone with Jeffrey C. Bank regarding the scheduling and

other details for the conference and offered to send an agenda and set of draft materials.

78.     Attached at <u>Exhibit X</u> is a true and correct copy of an October 6, 2014 email from Jeffrey C. Bank to all counsel describing the conversation between him and myself regarding the scheduling and other details for the conference, during which I confirmed the availability of Plaintiffs' counsel to attend a conference on October 9, 2014 as proposed.

79.     On October 8, 2014, after conferring with and receiving input from all counsel for both Direct Purchaser Plaintiffs and Indirect Purchaser Plaintiffs over the previous two days, I sent an email to all counsel for Defendants to which I attached a proposed agenda for the conference, a draft proposed litigation schedule, a draft case management and scheduling order, a draft expert stipulation, and a set of ESI materials maintained by this District including a model stipulated e-discovery order, the District's ESI checklist, and the District's ESI guidelines.

80.     Attached at <u>Exhibit Y</u> is true and correct copy of the October 8, 2014 email from Joseph R. Saveri to all counsel, with all attachments.

81.     Consistent with the efforts described above, on October 9, 2014, the Executive Committee attorneys and their firms, along with counsel for Defendants and counsel for Indirect Purchaser Plaintiffs, met at the offices of O'Melveny & Myers LLP, counsel for the ROHM Defendants, in San Francisco. Attorneys for the Direct Purchaser Plaintiffs, all Defendants then before the Court, all Indirect Purchaser Plaintiffs, and counsel for plaintiffs in the one subsequently-filed direct purchaser case attended either in person or via telephone conference. Because of their prior outreach and communications with counsel, the Executive Committee attorneys and their firms were able to schedule and conduct the Conference within seven days of receiving the Court's October 2, 2014 Consolidation and Case Management Order (Dkt. 133). Without such efforts, it would have been difficult—if not impossible—to do so.

82.     The Executive Committee attorneys and their firms have negotiated a stipulation on the production and handling of electronically stored information (ESI), and have initiated Rule 26 discussions regarding the preservation, maintenance and production of ESI pursuant to the Northern District's guidelines.

83.     Attached at <u>Exhibit Z</u> is a true and correct copy of an October 13, 2014 email chain between Joseph R. Saveri and Michael F. Tubach following up on the Conference and initiating a

1  discussion of ESI issues.

2      84.     On October 14, 2014, the Executive Committee attorneys and their firms, along with

3  counsel for Defendants, counsel for Indirect Purchaser Plaintiffs, and counsel for plaintiffs in the one

4  subsequently-filed direct purchaser case held a follow-up conference call to meet and confer further

5  regarding some of the matters taken up at the October 9, 2014 Rule 26(f) Conference. Bruce L. Simon,

6  Aaron M. Sheanin and W. Joseph Bruckner participated as counsel for Plaintiff In Home Tech Solutions,

7  Inc. ("Home Tech").

8      85.     Although Plaintiffs and Defendants had originally proposed litigation schedules at odds on

9  the timing for nearly every event under consideration, their communications prior to and during the Rule

10  26(f) Conference significantly narrowed the issues in dispute. Appendix A to the Joint Case Management

11  Statement (Dkt. 246-1) demonstrates the progress the parties have made toward an agreement on

12  scheduling. This process has continued.

13      86.     Attached at Exhibit AA is a true and correct copy of an October 16, 2014 letter from

14  Howard J. Sedran to Michael F. Tubach of O'Melveny & Myers LLP concerning outstanding disputes

15  regarding the litigation schedule.

16      87.     Attached at Exhibit BB is a true and correct copy of an October 16, 2014 email from Trey

17  Nicoud to Plaintiffs' counsel attaching Defendants' proposed revised draft protective order and draft

18  stipulation and order regarding expert discovery along with the attachments, which are a true and correct

19  copy of Defendants' proposed revised draft protective order and a true and correct copy of Defendants'

20  proposed stipulation and proposed order regarding expert discovery.

21      88.     Attached at Exhibit CC is a true and correct copy of an October 16, 2014 email chain

22  between Joseph R. Saveri and Michael F. Tubach following up on ESI issues.

23      89.     The Executive Committee attorney and their firms have also negotiated a stipulation and

24  proposed order concerning expert discovery.

25      90.     Attached at Exhibit DD is a true and correct copy of an October 20, 2014 email from Eric

26  Cramer to counsel for Defendants along with the attachment, which is a true and correct copy of the draft

27  stipulation and proposed order concerning expert discovery.

28      91.     Additionally, the Executive Committee attorneys and their firms satisfied their

requirements under the Alternative Dispute Resolution (ADR) Local Rules maintained by the Northern District of California (*see* Dkt. 153, 154, 163, 186), and advised all parties of these requirements.

92.     Consistent with their obligations under Civ. L. R. 3-12(b), the Executive Committee attorneys and their firms have closely monitored court filings and promptly filed Administrative Motions to Consider Whether Cases Should Be Related Pursuant to Civ. L. R. 3-12 and 7-11(Dkt. 16, 66, 83, 99, 142) as new cases concerning the alleged capacitors conspiracy have been filed, resulting in Orders finding cases to be related and reassigning them for coordinated management (Dkt. 31, 82, 94, 121, 204).

93.     In addition to the Executive Committee's significant advancement of case management issues, the Executive Committee attorneys and their firms have, for weeks now, been working together to jointly draft a consolidated complaint that harmonizes the differences between their respective complaints, and incorporates all pertinent information and analysis from investigations conducted by all Executive Committee firms as well as the other members of the Saveri Group and Levin Fishbein Group.

94.     The Executive Committee attorneys and their firms have also drafted interrogatories and document requests in preparation for the opening of written discovery.

95.     On October 22, 2014, the Executive Committee attorneys and their firms made their Rule 26(a)(1) Initial Disclosures.

96.     Throughout the advancement of this litigation, the Executive Committee attorneys and their firms have been in regular dialogue with counsel for the Indirect Purchaser Plaintiffs who brought *Ellis et al. v. Panasonic Corp. et al.,* Case No. 3:14-cv-3815-JD, as well as counsel for the other Indirect Purchaser Plaintiffs.

97.     The Executive Committee attorneys and their firms have also actively sought and initiated discussions to obtain full cooperation from the self-reporting applicant under ACPERA, including via the letters described *supra* and attached at Exhibit L, Exhibit M, Exhibit N and Exhibit O.

98.     On October 8, 2014, counsel for the ACPERA amnesty applicant placed a telephone call to my office to advise of the identity of the ACPERA amnesty applicant and to advise of the ACPERA amnesty applicant's willingness and availability to provide the cooperation contemplated under the statute. I asked that cooperation begin as soon as possible and specifically asked to schedule such discussions the following week.

99.     Through October 8, 2014, including communications with the ACPERA applicant's counsel regarding its intention to provide full cooperation, the Executive Committee attorneys and their firms, along with the additional members of the Saveri Group and the Levin Fishbein Group, had themselves performed all the work, conducted all the investigations, initiated all the correspondence and negotiations, initiated all of the litigation, filed all the papers and taken all other steps to advance the litigation in the recitations above. Up until October 8, 2014, no member of the Executive Committee, nor any other member of the Saveri Group nor of the Levin Fishbein Group, had any awareness that any other firm had performed any work or taken any steps to advance any proceeding challenging antitrust activity in the capacitors industry on behalf of direct purchaser claimants.

100.     On the following Friday, October 17, 2014, the Executive Committee attorneys and their associates met in person with the ACPERA applicant to begin the process of obtaining cooperation under the statute. I and Andrew M. Purdy attended from my firm, as did Solomon B. Cera and C. Andrew Dirksen of Gold Bennett, Howard J. Sedran and Austin B. Cohen of Levin Fishbein, and Kit A. Pierson and Brent W. Johnson of Cohen Milstein. The session with the ACPERA applicant's attorneys lasted more than six hours and will be supplemented with further sessions. Based upon information provided by the ACPERA applicant, the allegations that the conspiracy extended to aluminum electrolytic capacitors, tantalum electrolytic capacitors and film capacitors are correct, but the allegations that the conspiracy extended to supercapacitors appear to be incorrect at this time.

101.     One of the attorneys seeking appointment as co-lead interim counsel on the present motion appeared personally at the ACPERA cooperation session.

102.     The Executive Committee attorneys and their firms have continued their efforts to harmonize allegations and collaborate on the drafting of a consolidated complaint to include the supplemental information learned at the ACPERA cooperation meeting.

103.     Finally, the Executive Committee attorneys and their firms have undertaken efforts to coordinate the instant litigation with related action by the DOJ. During the week of October 13, 2014, I contacted the U.S. Department of Justice ("DOJ") seeking to determine its position on a number of scheduling and case management issues. I received a responsive communication from Jacklin Lem.

104.     On October 16, 2014 I sent Howard Parker of the DOJ a letter enclosing a chart

summarizing the operative competing versions of the proposed litigation schedule as negotiated among the parties.

105.    Attached at Exhibit EE is a true and correct copy of the October 16, 2014 letter I sent to Howard Parker along with the enclosures.

106.    On October 16, 2014, I spoke with Mr. Parker via telephone. I described the status of the litigation, the substantial progress of the litigation and the Plaintiffs' thoughts about an appropriate discovery schedule. During that conversation we discussed the October 8, 2014 filing by Home Tech. We agreed that counsel for Home Tech would be included in future discussions.

107.    That same day, I sent Mr. Parker an email, copying all Plaintiffs' counsel, stating that we were available to speak via telephone the following Monday.

108.    Attached at Exhibit FF is a true and correct copy of my October 16, 2014 email to Howard Parker.

109.    On October 17, 2014, Howard Parker sent an email to all counsel stating the DOJ's proposal for the scope of a stay on discovery in this consolidated civil action during the pendency of the DOJ's criminal investigation.

110.    On October 19, 2014, I and the Executive Committee attorneys conferred to discuss the DOJ's proposal and reached consensus on a prompt response.

111.    On October 20, 2014, I sent an email to Howard Parker presenting a proposed compromise and attaching Plaintiffs' and Defendants' proposed litigation schedules.

112.    Attached at Exhibit GG is a true and correct copy of the email from Joseph R. Saveri to Howard Parker including the attachment.

113.    Later that morning, I and counsel for all Plaintiffs spoke with counsel for the DOJ including Mr. Parker. On that phone call, we discussed ways to accommodate the interest of the civil plaintiffs and those of the DOJ.

114.    On October 21, 2014, counsel for all Plaintiffs and counsel for Defendants spoke on the telephone. We discussed the DOJ's view of discovery and identified matters of importance, including significantly the civil discovery to which the DOJ would have no objection and therefore would not contest. Counsel for Defendants indicated they would object to any such discovery.

**The Disruptive Filing and Conduct by the Pearson Simon Group**

115.   The Executive Committee attorneys' filing of the Unopposed Motion (Dkt. 102) also generated press attention, including in an article in The Recorder—the leading San Francisco daily legal newspaper—describing the motion, identifying the members of the proposed Executive Committee, and announcing the scheduling of the October 29, 2014 motion hearing.

116.   Attached at Exhibit HH is a true and correct copy of an article by Marisa Kendall entitled "Legal Line-up Gels in New Price-Fixing Suits," published in The Recorder on September 30, 2014.

117.   On October 8, 2014, through my receipt of an ECF notice of an Administrative Motion to Consider Whether Cases Should Be Related Pursuant to Local Rule 3-12 (Dkt. 166), I learned of the filing of another direct purchaser capacitors action, *In Home Tech Solutions, Inc. v. Panasonic Corp. et al.*, Case No. 3:14-cv-04514 ("*Home Tech*"). The complaint was filed on behalf of Plaintiff Home Tech, ostensibly by seven law firms: Pearson, Simon & Warshaw, LLP ("Pearson Simon"); Lockridge Grindal Nauen P.L.L.P. ("Lockridge Grindal"); Polsinelli PC; Weinstein Kitchenoff & Asher LLC; Steyer Lowenthal Boodrookas Alvarez & Smith LLP; Criden & Love, P.A.; and Gustafson Gluek PLLC (together, the "Pearson Simon Group").

118.   After the lengthy Rule 26(f) conference the Executive Committee members had organized with the Defendants on Thursday, October 9, 2014, the Executive Committee members agreed to schedule a call for the next day (Friday, October 10, 2014) during which we would discuss the *Home Tech* complaint and the possibility of including the Pearson Simon Group among the attorneys representing the proposed direct purchaser class. During that call, the Executive Committee reached a consensus that, on the Committee's behalf, I would contact the Pearson Simon Group the following Monday, October 13—a federal holiday—to set up a call am between the Executive Committee attorneys and the Pearson Simon Group on October 14, 2014. The Executive Committee reached a further consensus that given the scope and complexity of the case, there would be significant work that would afford the Pearson Simon Group attorneys the opportunity to make substantial contributions, and that we would welcome the participation of the Pearson Simon Group in representing the proposed direct purchaser class.

119.   On October 13, 2014, and before I could reach out to any member of the Pearson Simon Group, Bruce L. Simon sent a letter to all counsel in the instant related and consolidated actions

Declaration of Joseph R. Saveri ISO Direct Purchaser Plaintiffs' Opposition to Motion for Appointment of Pearson, Simon & Warshaw, LLP and Lockridge Grindal Nauen P.L.L.P. as Interim Co-Lead Class Counsel

1    announcing the intention of Pearson Simon and Lockridge Grindal to seek their sole appointment as Co-

2    Lead Interim Class Counsel and to the exclusion of the Executive Committee firms. At that time no one

3    from the Pearson Simon Group had yet contacted anyone among the Executive Committee attorneys.

4         120.    Attached at <u>Exhibit II</u> is a true and correct copy of the October 13, 2014 letter from Bruce

5    L. Simon to all counsel.

6         121.    On the October 14, 2014 telephone conference among the Executive Committee and

7    Defendants to follow up on open issues from the October 9, 2014 Rule 26(f) conference, Bruce L. Simon

8    twice interrupted the proceedings to raise issues of exclusive concern to the Pearson Simon Group—first

9    to seek an agreement among all counsel, in the presence and hearing of all counsel (including counsel for

10   Defendants), agreement to the Pearson Simon Group's demand that it be allowed to submit a leadership

11   motion on shortened time for hearing at the October 29, 2014 case management conference, and again to

12   request that all counsel agree to extend the proposed deadline for submission of a consolidated complaint,

13   previously negotiated among counsel for the Direct Purchaser Plaintiffs, the Indirect Purchaser Plaintiffs

14   and Defendants, so as to give the Pearson Simon Group more time to prepare a consolidated complaint.

15   At that time, other than in the October 13, 2014 Bruce L. Simon letter, no one from the Pearson Simon

16   Group had yet contacted me or anyone among the Executive Committee attorneys, and no one from the

17   Pearson Simon Group had yet raised with me or anyone among the Executive Committee attorneys the

18   possibility of extending the time for submission of a consolidated complaint.

19        122.    Extension of the deadline for submission of a consolidated complaint would disrupt the

20   litigation by undoing painstaking negotiations and coordination among counsel on "both sides of the v."

21   regarding the proposed litigation schedule, particularly in that in the proposed schedule's conception the

22   entry of a consolidated complaint shapes the timing for all events to follow. Extension of the deadline for a

23   submission of a consolidated complaint therefore poses serious risk of introducing further delay

24   throughout the proposed schedule.

25        123.    Constrained to discuss these matters with the Pearson Simon Group on an open line in the

26   presence and hearing of all Defendants on the October 14, 2014 follow-up telephone conference (many of

27   whom had limited availability to discuss these follow-up issues), I proposed and all agreed to discuss them

28   instead on a call among all Plaintiffs' counsel (*i.e.*, the Executive Committee attorneys and Bruce L.

1    Simon) to commence immediately upon conclusion of the follow-up telephone conference.

2         124.    On the call among all Plaintiffs' counsel, I opened the conversation by discussing the

3    advanced stage of the proceedings and the substantial work performed cooperatively for the benefit of the

4    proposed class to date. I described the well-functioning team that had been assembled and the non-

5    duplicative work undertaken to advance the collective interests of the proposed direct purchaser class. I

6    stated the considered opinion among all Executive Committee attorneys that we invited participation by

7    the Pearson Simon Group attorneys and welcomed suggestions for a proposed leadership structure to

8    accommodate all concerned.

9         125.    Bruce L. Simon, purporting to speak on behalf of the Pearson Simon Group, rejected the

10   invitation outright. He stated that he intended to move forward with a motion seeking sole appointment of

11   two of the firms representing Home Tech (*i.e.*, his firm, along with Lockridge Grindal), and no other

12   attorneys, as interim co-lead class counsel.

13        126.    In response to my inquiry regarding why two firms from the Pearson Simon Group should

14   be appointed co-lead counsel to the exclusion of any leadership role for any of the attorneys among the

15   Executive Committee, the Saveri Group, or the Levin Fishbein Group, Mr. Simon stated that such a

16   substitution was warranted in light of his firm's investigation and "resume." He did not state any other

17   reason or explanation for the motion.

18        127.    Since that time the Executive Committee attorneys have attempted to work cooperatively

19   with Mr. Simon, notwithstanding his stated intention to supplant the attorneys who have been working

20   cooperatively to date.

21        128.    The Executive Committee attorneys recently included members of the Pearson Simon

22   Group in the discussions with Defendants and invited their comments on the proposed Joint Case

23   Management Conference Statement, though their involvement did nothing to advance the case. Rather,

24   the Pearson Simon Group's threats to file a separate case management statement if certain of their self-

25   serving, factually inconsistent and incorrect modifications to the Direct Purchaser Plaintiffs' sections

26   were not included were counterproductive and only served to distract from the task at hand and,

27   ultimately, to delay filing of the joint statement on behalf of all other parties.

28        129.    Both Gold Bennett and the Joseph Saveri Law Firm assumed primary responsibility on the

---

22                                                          Master File No. 3:14-cv-03264-JD

composition of the parties' Joint Case Management Conference Statement (Dkt. 246) and on working with the Defendants and the indirect purchaser plaintiff groups to compose a joint filing acceptable to all. The parties' final submission was, by no exaggeration, a document two weeks in the making (it being the memorialization of much of the results from the parties' Rule 26(f) conference), with input coming from all Defendants, as well as two sets of indirect purchaser plaintiffs.

130.   The Pearson Simon Group played no role in composing the draft joint statement, but instead submitted edits to the Executive Committee team. Unlike the other parties, the Pearson Simon Group demanded from the Executive Committee team acknowledgement that their edits were incorporated.

131.   Attached at Exhibit JJ is a true and correct copy of an October 21, 2014 letter from Bruce L. Simon to Joseph R. Saveri.

132.   The final version Joint Case Management Statement filed on October 22, 2014 (Dkt. 246) did not include the "Interim Direct Purchaser Class Counsel" term to which Mr. Simon had voiced objection in his October 21 letter either as a defined term or anywhere else in the document.

133.   Attached at Exhibit KK is a true and correct copy of an October 22, 2014 letter from Bruce L. Simon to Joseph R. Saveri.

134.   Attached at Exhibit LL is a true and correct copy of an October 22, 2014 letter from Joseph R. Saveri to Bruce L. Simon responding to the issues raised in the October 21 and October 22 letters from Bruce L. Simon to Joseph R. Saveri.

135.   Attached as Exhibit MM is a true and correct copy of an October 22, 2014 email chain between Aaron Sheanin of Mr. Simon's firm and Andrew Purdy of my firm. The email shows Mr. Purdy's responsiveness and good faith effort to work with all parties including the Pearson Simon Group.

136.   The Executive Committee attorneys reviewed the Pearson Simon Group's proposed edits and, at the Executive Committee's direction, my firm incorporated the vast majority of them. The only edits by the Pearson Simon Group that were not incorporated into the parties' joint statement were those that either deleted portions of the Direct Purchaser Plaintiffs' sections, suggested that the Executive Committee had no objection to the Pearson Simon Group's Motion for Appointment, or otherwise would have allowed the Pearson Simon Group to incorrectly assert they had performed work they had not done,

as opposed to the Executive Committee attorneys and their firms who had in fact advanced this litigation in the three months prior to the Pearson Simon Group's filing of the *Home Tech* complaint.

137.   On the evening the joint statement had to be filed, the Pearson Simon Group threatened not to join the filing if we did not accept their efforts to claim attribution for work done by others.

138.   Attached at <u>Exhibit NN</u> is a true and correct copy of an October 22, 2014 letter from Aaron Sheanin of Mr. Simon's firm to Joseph R. Saveri.

139.   My firm responded that that we would not make incorrect factual statements to the Court and therefore refused to alter the draft. My firm did, however, advise the Pearson Simon Group that many of their proposed edits were already incorporated in the draft joint statement.

140.   Attached at <u>Exhibit OO</u> is a true and correct copy of an October 22, 2014 email response to Mr. Sheanin's earlier letter by Andrew Purdy of my firm.

141.   In response, the Pearson Simon Group sent an e-mail to all parties stating that they would be filing their own case management conference statement. My firm, which had responsibility for filing the final Joint Case Management Conference Statement, decided to keep all of the Pearson Simon Group's incorporated edits in the final filing so as to provide the most complete picture possible of the parties' various positions.

142.   Attached at <u>Exhibit PP</u> is a true and correct copy of an October 22, 2014 email from Mr. Sheanin on behalf of Plaintiff Home Tech notifying all parties that the Pearson Simon Group would file its own case management statement.

143.   Obtaining approval from the scores of lawyers who have appeared to date was an arduous task. The CMC statement was filed shortly before midnight.

144.   While all other parties consented to filing the Joint Case Management Statement, the Pearson Simon Group ultimately filed their own case management conference statement (Dkt. 247)—one which incorporated by reference sections of the parties' joint filing in several places.

### Bruce L. Simon Selectively Describes the Work of Others in Prominent Antitrust Litigation

145.   Finally, it is regrettable that I must point out that certain assertions made by the Pearson Simon Group in support of its Motion for Appointment are inaccurate and misstate the roles certain counsel in that group had in directing the plaintiffs' prosecution of their claims in *In re TFT-LCD (Flat*

1 | *Panel) Antitrust Litigation* (*TFT-LCD*), N.D. Cal. Case No. 3:07-md-1827. Specifically, Bruce L. Simon's

2 | Declaration (Dkt. 193-3) describes at length the work of his firm on *TFT-LCD* (*see id.* ¶¶ 10-12). Mr.

3 | Simon also notes the contributions of Lieff, Cabraser, Heimann & Bernstein, LLP ("Lieff Cabraser") and

4 | of Lieff Cabraser attorney Richard M. Heimann, and he describes Lieff Cabraser as "Mr. Heimann's

5 | firm." *Id.* ¶ 12.

6 |    146. Mr. Simon's selective presentation of these matters makes no mention of my name or of

7 | my significant contributions while at Lieff Cabraser to the leadership and advancement of the *TFT-LCD*

8 | litigation. To the extent leadership in *TFT-LCD* weighs in the Court's consideration of any group's

9 | appointment to a leadership role in the instant action, it should weigh equally in favor of appointment of

10 | my firm and of the proposed Executive Committee attorneys who have requested appointment via the

11 | Direct Purchaser Plaintiffs' Unopposed Motion to Appoint Interim Class Counsel Pursuant to Fed. R.

12 | Civ. P. 23(g) (Dkt. 102).

13 |    147. In my capacity as founder and Chair of the Antitrust and Intellectual Group at Lieff

14 | Cabraser, and until my departure from the firm in April of 2012 to found the Joseph Saveri Law Firm, I

15 | was involved on a day-to-day basis with all aspects of the *TFT-LCD* litigation. Mr. Heimann of Lieff

16 | Cabraser headed the litigation, but a team of Lieff Cabraser attorneys and support staff I assembled and

17 | helmed worked extensively on the matter. Of the two firms appointed Co-Lead Counsel, Lieff Cabraser

18 | did a majority of the work, as indicated by the billing records submitted in the case. Under my direction,

19 | Lieff Cabraser was the principal author of all major briefs filed in the case, organized the online review of

20 | documents, and developed, prepared for and took a significant number of depositions in the case, both in

21 | the United States and abroad. I played a significant role in all aspects of this case from its inception until

22 | my departure from Lieff Cabraser.

23 |    148. As for Pearson Simon, the depositions were taken in large part by a senior lawyer who is no

24 | longer with the firm, though Mr. Simon did take a number of depositions including those of key witnesses.

25 | Lieff Cabraser and Pearson Simon shared in the development of expert testimony, expert depositions and

26 | other work prior to my departure.

27

28

**Compendium of Prior Decisions Cited in Direct Purchaser Plaintiffs' Opposition**

149.     Attached at Exhibit QQ is a true and correct copy of an Order Appointing Interim Co-Lead Counsel and Liaison Counsel for Direct Purchaser Plaintiffs and Appointing Interim Co-Lead Counsel for Indirect Purchaser Plaintiffs, Dkt. 194 in the Northern District of California case *In re Lithium Ion Batteries Antitrust Litig.,* Case No. 4:13-md-2420-YGR (N.D. Cal. May 17, 2013).

150.     Attached at Exhibit RR is a true and correct copy of an Order Granting (i) Direct Purchaser Plaintiffs' and (ii) Indirect Purchaser Plaintiffs' Applications for Appointment of Plaintiffs' Steering Committees, Dkt. 229 in the Northern District of California case *In re Lithium Ion Batteries Antitrust Litig.,* Case No. 4:13-md-2420-YGR (N.D. Cal. July 10, 2013).

151.     Attached at Exhibit SS is a true and correct copy of Pretrial Order No. 2, Dkt. 572 in the Northern District of California case *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,* Case No. 4:02-md-01486-PJH (N.D. Cal. Sept. 20, 2005).

152.     Attached at Exhibit TT is a true and correct copy of Amended Case Management Order No. 1, Dkt. 85 in *In re Nexium (Esomeprazole) Antitrust Litig.,* Case No. 1:12-md-2409-WGY (D. Mass. Jan. 16, 2013).

153.     Attached at Exhibit UU is a true and correct copy of Case Management Order No. 2, Dkt. 85 in *In re Loestrin 24 FE Antitrust Litig.,* Case No. 1:13-md-2472-S-PAS (D.R.I. Feb. 14, 2014).

154.     Attached at Exhibit VV is a true and correct copy of an Order Appointing Interim Lead Counsel for End-Payor Class, Dkt. 63 in the Northern District of California case *In re Lidoderm Antitrust Litig.,* Case No. 3:14-md-02521-WHO (N.D. Cal. May 23, 2014).

\*          \*          \*          \*

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct to the best of my knowledge and that this declaration was executed in San Francisco, California on October 24, 2014.

By: _____
        Joseph R. Saveri

Declaration of Joseph R. Saveri ISO Direct Purchaser Plaintiffs' Opposition to Motion for Appointment of Pearson, Simon & Warshaw, LLP and Lockridge Grindal Nauen P.L.L.P. as Interim Co-Lead Class Counsel