Joseph R. Saveri (State Bar No. 130064)
Joshua P. Davis (State Bar No. 193254)
Andrew M. Purdy (State Bar No. 261912)
Matthew S. Weiler (State Bar No. 236052)
James G. Dallal (State Bar No. 277826)
JOSEPH SAVERI LAW FIRM, INC.
505 Montgomery Street, Suite 625
San Francisco, California 94111
Telephone:  (415) 500-6800
Facsimile:   (415) 395-9940
Email:     jsaveri@saverilawfirm.com
           jdavis@saverilawfirm.com
           apurdy@saverilawfirm.com
           mweiler@saverilawfirm.com
           jdallal@saverilawfirm.com

*Interim Lead Class Counsel for Direct Purchaser Plaintiffs*

Joseph W. Cotchett (State Bar No. 36324)
Steven N. Williams (State Bar No. 175489)
Adam J. Zapala (State Bar No. 245748)
Elizabeth Tran (State Bar No. 280502)
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (65) 697-0577
Email:     jcotchett@cpmlegal.com
           swilliams@cpmlegal.com
           azapala@cpmlegal.com
           etran@cpmlegal.com

*Interim Lead Class Counsel for Indirect Purchaser Plaintiffs*

[Additional Counsel Listed on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE CAPACITORS ANTITRUST LITIGATION**<br><br>**THIS DOCUMENT RELATES TO ALL ACTIONS** | Master File No. 3:14-cv-03264-JD<br><br>**[REDACTED PUBLIC VERSION OF DOCUMENT SOUGHT TO BE SEALED]**<br><br>PLAINTIFFS' OPPOSITION TO NCC'S MOTION TO DISMISS<br><br>Date:        May 20, 2015<br>Time:       10 A.M.<br>Courtroom: 11, 19th Floor<br>Judge:      Hon. J. Donato |

Master File No. 3:14-cv-03264-JD

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION ...........................................................................................................1

II.   BACKGROUND ............................................................................................................2

    A.    The Complaints Specifically Allege NCC's Central Role in a Global Capacitor Price-Fixing Cartel and Its Connection to the United States. .............................2

    B.    The Limited Evidence Presently Available to Plaintiffs' Confirms NCC's Participation in Cartel Activity, and Activity Aimed at the United States. ........................3

    C.    NCC Uses Its Wholly-Owned Subsidiary, United Chemi-Con, to Support NCC's Own Direct Contacts with the U.S. ...................................................................5

III.  ARGUMENT ..................................................................................................................6

    A.    Legal Standard .........................................................................................................6

    B.    All Three Prongs of the Specific Jurisdiction Test Are Met as to NCC ...............7

        1.    NCC's "Purposeful Availment" Is Manifest. .............................................7

            a.    NCC's price-fixing activity was aimed at the United States. .....................8

            b.    NCC knew that its price-fixing would cause harm to capacitor purchasers in the United States. ..................................................................12

                i.    NCC's Travel to the U.S. Demonstrates an Understanding that U.S. Customers Would Be Impacted. ...........12

                ii.    NCC's Focus on U.S. Markets Demonstrate Understanding that Its Price-Fixing Would Impact U.S. Customers. ..................................................................................... 13

        2.    Plaintiffs' Antitrust Claims Arise Out Of or Relate to NCC's Forum-Related Activities. ..................................................................................... 14

        3.    The Exercise of Jurisdiction Over NCC Is Reasonable. ...................................... 15

            a.    NCC Derives Substantial Revenue from Sales to the U.S. ...................... 16

            b.    NCC's Production Facilities in the U.S. Demonstrate the Strength of Its Connections to the Forum. .............................................. 16

            c.    NCC's Registration with California's Secretary of State Demonstrates It Is Reasonable to Impose Jurisdiction. ............................17

            d.    Miscellaneous Contacts Between NCC and the U.S. Demonstrate Jurisdiction Is Reasonable Here. ...............................................................17

            e.    Harm to Plaintiff Makes Exercise of Jurisdiction Reasonable. ................18

# TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION .................................................................................................1

II.   BACKGROUND ..................................................................................................2

  A.   The Complaints Specifically Allege NCC's Central Role in a Global Capacitor Price-Fixing Cartel and Its Connection to the United States...............................2

  B.   The Limited Evidence Presently Available to Plaintiffs' Confirms NCC's Participation in Cartel Activity, and Activity Aimed at the United States. .........................3

  C.   NCC Uses Its Wholly-Owned Subsidiary, United Chemi-Con, to Support NCC's Own Direct Contacts with the U.S...................................5

III.  ARGUMENT........................................................................................................6

  A.   Legal Standard .........................................................................................6

  B.   All Three Prongs of the Specific Jurisdiction Test Are Met as to NCC ...........................7

    1.   NCC's "Purposeful Availment" Is Manifest. ..............................................7

      a.   NCC's price-fixing activity was aimed at the United States. .....................8

      b.   NCC knew that its price-fixing would cause harm to capacitor purchasers in the United States. ..................................12

        i.   NCC's Travel to the U.S. Demonstrates an Understanding that U.S. Customers Would Be Impacted. ...........12

        ii.  NCC's Focus on U.S. Markets Demonstrate Understanding that Its Price-Fixing Would Impact U.S. Customers. ..................................13

    2.   Plaintiffs' Antitrust Claims Arise Out Of or Relate to NCC's Forum-Related Activities. ..................................14

    3.   The Exercise of Jurisdiction Over NCC Is Reasonable. ...........................15

      a.   NCC Derives Substantial Revenue from Sales to the U.S. .....................16

      b.   NCC's Production Facilities in the U.S. Demonstrate the Strength of Its Connections to the Forum. ..................................16

      c.   NCC's Registration with California's Secretary of State Demonstrates It Is Reasonable to Impose Jurisdiction. ...........................17

      d.   Miscellaneous Contacts Between NCC and the U.S. Demonstrate Jurisdiction Is Reasonable Here................................17

      e.   Harm to Plaintiff Makes Exercise of Jurisdiction Reasonable. ................18

**TABLE OF CONTENTS (cont.)**

C.    Alternatively, NCC Has Sufficient Contacts with the United States Through Its
      Subsidiary, UCC, to Establish Jurisdiction. ...................................................... 18

      1.    Personal Jurisdiction Exists Under an Agency Theory Because UCC is
            the Substituted Presence for NCC in Its "Global Enterprise." ........................ 19

      2.    Personal Jurisdiction Exists Over NCC Because NCC Exerts Total
            Domination Over UCC. ...................................................................................... 20

            a.    NCC Controls UCC's Day-to-Day Operations. ...................................... 21

            b.    UCC Lacks Independent Leadership and Oversight. .............................. 22

            c.    Plaintiffs Would Suffer a Fraud or Injustice Unless UCC is
                  Deemed an Alter Ego of NCC. .............................................................. 24

D.    Alternatively, the Court Should Allow Plaintiffs to Obtain Jurisdictional
      Discovery to Establish NCC's Contacts with the United States. ........................... 25

IV.   CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174 (9th Cir. 2004) ......................6

*Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*,
    751 F.3d 796 (7th Cir. Ind. 2014) ...............................................15

*Bancroft & Masters, Inc. v. August Nat'l Inc.*, 223 F.3d 1082 (9th Cir. 2000) ...................7, 8, 15

*Brainerd v. Governors of the University of Alberta*, 873 F.2d 1257 (9th Cir. 1989) ......................8

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (U.S. 1985) ...............................................15

*Calder v. Jones*, 465 U.S. 783 (1984) ...............................................7

*Chan v. Society Expeditions*, 39 F.3d 1398 (9th Cir. 1994) ...............................................19

*Crystal Cruises, Inc. v. Moteurs Leroy-Somer S.A.*,
    2011 U.S. Dist. LEXIS 73376 (C.D. Cal. July 1, 2011) ...............................................20

*Daimler AG v. Bauman*, 134 S. Ct. 746 (2014) ...............................................7

*Doe v. Unocal*, 248 F.3d 915 (9th Cir. 2001) ...............................................*passim*

*Dole v. Watts*, 303 F.3d 1104 (9th Cir. 2002) ...............................................9

*Dollar Tree Stores Inc. v. Toyama Partners LLC*,
    2011 U.S. Dist. LEXIS 30868 (N.D. Cal. Mar. 11, 2011) ...............................................24

*Gallagher v. Mazda Motor of America, Inc.*, 781 F. Supp. 1079 (E.D. Pa. 1992)......................19

*Gates Learjet Corp. v. Jensen*, 743 F.2d 1325 (9th Cir. 1984) ...............................................15

*Go-Video, Inc. v. Akai Electric Co.*, 885 F.2d 1406 (9th Cir. 1989) ......................................6

*IBM v. Merlin Tech. Solutions, Inc.*, 2007 U.S. Dist. LEXIS 7390 (D. Mass. Feb. 1, 2007) ....................17

*In re Bulk [Extruded] Graphite Prods. Antitrust Litig.*,
    2007 U.S. Dist. LEXIS 54906 (D.N.J. July 30, 2007) ...............................................25

*In re Cathode Ray Tube Antitrust Litig.*,
    2014 U.S. Dist. LEXIS 78902 (N.D. Cal. June 9, 2014)...............................................25

*In re Cathode Ray Tube Antitrust Litig.*, 27 F. Supp. 3d 1002 (N.D. Cal. 2013)...............................*passim*

*In re Cathode Ray Tube CRT Antitrust Litig.*,
    2014 U.S. Dist. LEXIS 35391 (N.D. Cal. Mar. 13, 2014) ...............................................1, 18

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
    2005 U.S. Dist. LEXIS 30299 (N.D. Cal. Nov. 7, 2005)...............................................14, 18

*In re Western States Wholesale Natural Gas Antitrust Litig.*, 715 F.3d 716 (9th Cir. 2013) ...........8, 9, 10, 14

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) ...............................................6

## TABLE OF AUTHORITIES (cont.)

*Kolcraft Enters. v. Artsana USA, Inc.*,
  2014 U.S. Dist. LEXIS 107943 (N.D. Ill. Aug. 6, 2014) .................................................. 21

*Lake v. Lake*, 817 F.2d 1416 (9th Cir. 1987) ............................................................. 7

*Mateer v. Interocean Am. Shipping Corp.*,
  2006 U.S. Dist. LEXIS 22502 (N.D. Cal. Apr. 17, 2006) ................................................ 17

*Northwest Aluminum Co. v. Hydro Aluminum Deutschland GmbH*,
  2003 U.S. Dist. LEXIS 25544 (D. Or. July 3, 2003) .................................................... 15

*NuboNau, Inc. v. NB Labs, Ltd.*, 2012 WL 843503 (S.D. Cal. Mar. 9, 2012) ......................... 14

*Oneok, Inc. v. Learjet, Inc.*, 134 S. Ct. 2899 (2014) ................................................. 8

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797 (9th Cir. 2004) ........................ 7, 11

*Sec. Investor Prot. Corp. v. Vigman*, 764 F.2d 1309 (9th Cir. 1985) .............................. 6

*Sher v. Johnson*, 911 F.2d 1357 (9th Cir. 1990) ...................................................... 18

*Shute v. Carnival Cruise Lines*, 897 F.2d 377 (9th Cir. 1988) .................................. 8, 14

*Walden v. Fiore*, 134 S. Ct. 1115 (2014) ............................................................. 8

*Wells Fargo*, 556 F.2d at 423) ...................................................................... 19

*Yahoo! Inc. v. La Ligue Contre Le Racisme*, 433 F.3d 1199 (9th Cir. 2006) ......................... 7

## Statutes

15 U.S.C. § 22 ........................................................................................ 6

## Other Authorities

Restatement (Third) of Agency, § 1.01 (2005) ........................................................ 18

Simon Vande Walle, "Private Enforcement of Antitrust Law in Japan: An Empirical
  Analysis," 8 *The Competition Law Review* 7, 8-9 (Dec. 2011) ..................................... 18

## I.  INTRODUCTION

Direct Purchaser Plaintiffs ("DPPs") and Indirect Purchase Plaintiffs ("IPPs," and with DPPs, "Plaintiffs") allege in considerable detail facts showing that Defendant Nippon Chemi-Con Corporation ("NCC"), a member of the global capacitor cartel, purposefully directed its price-fixing activities at the United States. NCC knew its anticompetitive conduct would cause purchasers to pay inflated prices for capacitors. NCC's motion to dismiss for lack of personal jurisdiction should be denied because Plaintiffs' allegations, and the evidence they gathered in limited jurisdictional discovery, demonstrate that there is specific jurisdiction over NCC because it expressly aimed its price fixing activity at the U.S., thereby satisfying the "purposeful availment" test; alternatively, there is specific jurisdiction because the acts of United Chemi-Con Corporation ("UCC"), NCC's U.S. subsidiary, may be imputed to NCC.

The Court has specific jurisdiction over NCC because it purposefully directed its illegal cartel activities at the United States. Supreme Court and Ninth Circuit authorities find personal jurisdiction satisfied in such circumstances. Indeed, the Court has specific jurisdiction purely based on Plaintiffs' well-pleaded allegations that NCC conspired to fix prices abroad for capacitors sold in the United States. DP CC ¶¶ 206-208; IP CC ¶¶ 159, 167, 181;[1] *see, e.g.*, *In re Cathode Ray Tube CRT Antitrust Litig.*, 2014 U.S. Dist. LEXIS 35391, *77-78 (N.D. Cal. Mar. 13, 2014) ("*CRT I*") ("In a multinational price-fixing conspiracy … defendants do not have to make the price-fixed product themselves within the bounds of the forum state in order for the state to have jurisdiction."). All that is required for specific jurisdiction in price-fixing cases such as this is that a defendant "**target** intentional acts (e.g., **price-fixing activities**) toward the forum state, knowing the effects of the activity will be felt there." *Id.* (emphasis added). Here, these allegations are supported by evidence that NCC attended cartel meetings where U.S. customers were discussed. *See* Declaration of Joseph R. Saveri ("Saveri Decl."), Ex. 1.

Specific jurisdiction is also established under agency principles here in two ways. First, NCC created and managed a "global operation system" with a U.S. subsidiary to sell and ship capacitors

---

[1] As used here, the Direct Purchaser Plaintiffs' Consolidated Class Action Complaint is "DP CC;" the Indirect Purchaser Plaintiffs' First Consolidated Complaint is "IP CC;" NCC's motion is cited as "Def. Br.;" and the Declaration of Takashi Nakamura (Docket No. 478-1) is "Nakamura Decl."

directly to the U.S., including to a named Plaintiff located in San Jose, California. Second, and independently, NCC closely managed the affairs of its subsidiary, UCC, such that NCC and UCC should be regarded as a single entity for jurisdictional purposes under the Ninth Circuit's "alter ego" test.

The exercise of jurisdiction over NCC is reasonable, and NCC should not be surprised to find itself haled into a court in the United States given that it regularly ships tons of capacitors into the United States, and that the U.S. market comprises between 8-10% of NCC's revenues in recent years, bringing NCC $100 million or more annually. Additionally, NCC has substantial assets located in the United States, including factories where profitable capacitor lines (and key inputs for the same) are manufactured. Indeed, during the relevant time period NCC maintained an office in this District, where it was registered to do business, and had a registered agent for service of process in Los Angeles.

## II.      BACKGROUND

### A.      The Complaints Specifically Allege NCC's Central Role in a Global Capacitor Price-Fixing Cartel and Its Connection to the United States.

Plaintiffs detail the contours of NCC's involvement in the global capacitor price-fixing cartel. As alleged, NCC, together with other cartel members, agreed not to compete with one another. Instead, they agreed to fix, raise and stabilize the prices of capacitors to class members in the United States.[2] DP CC ¶¶ 206-208; IP CC ¶¶ 1, 11, 27, 131, 217, 258. NCC is a leader in the manufacture and sale of capacitors in the United States. During the Class Period NCC manufactured, sold, and distributed aluminum and/or film capacitors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers. DP CC ¶ 44, IP CC ¶ 71. The cartel was illegal and anticompetitive: to bolster capacitor sales, and to resist falling prices from declining demand, NCC agreed to restrain price competition in the U.S. for aluminum, tantalum and film capacitors. DP CC ¶

---

[2] The stay on merits discovery in this case lifted on April 7, 2014. *See* Docket No. 632. While the Court permitted limited discovery prior to that date, Defendants' responses to discovery have been tardy and less than forthcoming. Plaintiffs continue to review NCC's production documents, many of them produced in Japanese without translation, and expect to obtain additional document discovery. NCC's document production goes back only to 2010 for most issues. The allegations of the DP CC and IP CC are discussed at length in Plaintiffs' Opposition to Defendants' Joint and Consolidated Motions to Dismiss, which is incorporated by reference.

10, IP CC ¶¶ 247, 258-59, 261-62. Cartel meeting rosters during the period from 2003 to 2008 reveal that officers, managers, and/or employees of NCC actively participated in or were informed of the cartel's regular meetings. As a leading manufacturer of electrolytic and film capacitors sold in the United States, NCC played a key role in organizing cartel meetings, as well as coordinating—and concealing—the cartel's operations during the Class Period and directing the cartel activity at the United States. DP CC ¶¶ 198-99, 294-313, IP CC ¶¶ 159, 167, 181.

For example, Direct Purchaser Plaintiffs allege that NCC participated in cartel "Overseas Trade Sectional Meetings." DP CC ¶ 206. Those meetings began as early as August 2003. *Id*. The participants in meetings discussed sales of aluminum and tantalum capacitors in the U.S. market and agreed on prices. *Id*. at ¶ 206. Indirect Purchaser Plaintiffs allege that NCC participated in collusive Aluminum Tantalum Capacitor Meetings, Market Study Group Meetings, and Japan Film Capacitor Meeting during the Class Periods. IP CC ¶¶ 159, 167, 181. Direct Purchaser Plaintiffs further allege that NCC personnel also attended cartel meetings held during the 3rd and 4th quarters of 2008, the 2nd, 3rd and 4th quarters of 2009, and the 1st and 2nd quarters of 2010. DP CC ¶ 208. Indirect Purchaser Plaintiffs allege numerous bilateral meetings and discussions between NCC and at least one other Defendant. IP CC ¶¶ 62, 168, 174-78. In concert with other cartel members, NCC representatives disclosed their current sales data, pricing information, and dealings with specific customers; reached agreements about increasing pricing for electrolytic capacitors; suggested cooperation among certain cartel members in broad price negotiations regarding polymer aluminum capacitors; discussed raw material (plastic film) price hikes; discussed market conditions in foreign markets, including North America; discussed their future production intentions with regard to aluminum and tantalum capacitors; and discussed industry and specific customer demands and future production intentions with regard to aluminum and tantalum capacitors. DP CC ¶ 208; IP CC ¶¶ 159, 160, 181.

**B.     The Limited Evidence Presently Available to Plaintiffs' Confirms NCC's Participation in Cartel Activity, and Activity Aimed at the United States.**

Documents produced by the ACPERA applicant in this matter demonstrate NCC was present at

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████ Saveri Decl., Ex. 1. The minutes from the meeting reflect that NCC discussed

███████████████████████████████████████████████████████████

██████ *d.* Following the meeting, personnel from NCC freely exchanged price information with competitors on capacitor products, and reached agreements. DP CC ¶¶ 208(c), (d), (f), (g)-(j); IP CC ¶¶ 62, 168, 174-78.

In furtherance of the cartel, NCC directed its price-fixing activities at the United States. On its own and through UCC, NCC sold and shipped capacitors to the U.S. for sale to U.S. purchasers. NCC's financial filings admit extensive U.S. sales from 2007 to the present. *See* Dkt. No. 478-1, Nakamura Decl. ("Nakamura Decl."),[3] at ¶¶ 18, 21; Saveri Decl. Ex. 2 (2007-08 NCC Consolidated Statement at 25-26); Ex. 3 (2013-14 NCC Consolidated Statement at 35). In its Consolidated Financial Statements, which state NCC's "consolidated financial statements" are based on the accounts of both NCC and its subsidiaries, NCC and its subsidiaries' reported significant sales in the U.S., ranging from $148.8 million from March 2007 to March 2008, to $101.4 million from March 2013 to March 2014. *Id.* In those years, NCC's net sales in the United States represented roughly 10% of its reported overall net sales. *Id.* NCC concedes it that NCC had at least two "possible" sales in the U.S. in April and October 2003.[4] Nakamura Decl., ¶ 7. NCC also admits that, between the years of 2003 and 2007, it had a research and development office in San Jose, California.[5] Nakamura Decl. ¶¶ 7, 11. Indeed, NCC has

---

[3] Mr. Nakamura is not an authoritative or reliable source on these subjects. He merely affirms without elaboration that he is a "Department Manager" and has held that position "since June 2013." *Id.* ¶ 1. He states that his Declaration is based on a review of unidentified "reasonably available documents" and other hearsay "provided to me by employees responsible for and with knowledge of the business and accounting records of NCC." *Id.* The Court has denied Plaintiffs' motion to compel a deposition of Mr. Nakamura, or a knowledgeable NCC corporate designee under Rule 30(b)(6). Mr. Nakamura is not found on any of the organizational charts NCC has produced. The documents produced by NCC suggest many other NCC have traveled extensively to the United States to meet with UCC personnel, but NCC has not offered their declarations. *See* Sections III.B.1.b.i and III.C.2.b, *infra.*

[4] Mr. Nakamura obliquely states he has "no records of any sales into the United States from January 1, 2003, to the present." *Id.* ¶ 7. This is contrary to the voluminous records submitted herewith of sales in the United States by NCC to its subsidiary UCC, and NCC's direct shipment to U.S. customers. *See* Section III.B.1.a, *infra.* Without benefit of Mr. Nakamura's deposition, Plaintiffs have not been allowed to test the basis for this representation. It appears that Mr. Nakamura did not consider materials from UCC, over which NCC maintains control under Rule 34.

[5] Plaintiffs would need additional jurisdictional discovery to ascertain the relationship between NCC's activities regarding its California-based research and development office in the United States and their

1   registered to do business in California, and for some time during the Class Period maintained a

2   registered agent for service of process in Los Angeles. *See* Saveri Decl. Ex. 4. NCC became registered to

3   do business in May 2003; it has since surrendered its registration. *Id.*

4        NCC holds itself out to U.S. customers as a global capacitor business operating in the United

5   States. NCC's website advertises—in English—that "Nippon Chemi-Con has overseas production sites

6   in the United States, South Korea, Taiwan, China, Malaysia, and Indonesia. In close coordination with

7   'mother plants' in Japan, it realizes production at the most suitable location." *See* Saveri Decl. Ex. 5.

8   NCC advertises overseas affiliates in the United States "to cover [that] region[']s sales activities." *Id.*

9   NCC further notes, "By connecting our worldwide production sites and sales offices, Nippon Chemi-

10  Con has built a global operation system that enables us to offer the best proposal to our customers." *Id.*

11       **C.     NCC Uses Its Wholly-Owned Subsidiary, United Chemi-Con, to Support NCC's
            Own Direct Contacts with the U.S.**
12

13       UCC, a wholly-owned subsidiary of NCC, is an Illinois Corporation with its principal place of

14  business in Rosemont, Illinois. DP CC ¶ 45; IP CC ¶ 72. As part of the NCC global enterprise, UCC

15  assists NCC with the sale and/or delivery of its parent's aluminum and film capacitors to U.S.

16  purchasers. DP CC ¶ 123; IP CC ¶¶ 71-72. UCC has not contested that it is subject to personal

17  jurisdiction in this Court. ████████████████████████████████

18  ████████████████████████████████████████████████

19  Saveri Decl. Ex. 7. ████████████████████████████████

20  ████████████████████████████████████████████████

21  ████████████████████████████ (emphasis added). One of NCC's most important

22  plants for the production of large aluminum capacitors—a product for which NCC is the global

23  leader—is in Lansing, North Carolina. *Id.*, Ex. 6 at 3.

24       As indicated by NCC's records of sales and shipping materials, including those sent to Direct

25  Purchaser Plaintiff eIQ, UCC serves as NCC's sales agent in the United States, and NCC ships millions

26  of dollars a year to customers in the United States and to UCC's warehouse in Brea, California. *See*

27

28  antitrust claims, but the existence of such an office for four years of the alleged conspiracy constitutes
    evidence that NCC expressly aimed its business activities at the United States and this forum.

Saveri Decl. Ex. 12; *see also* Section III.B.1.a, *infra*. Among other things, UCC facilitates direct purchaser orders for capacitors with NCC in Japan. NCC manufactures and packs capacitors in Japan, and sends the purchased capacitors *directly* to the United States, often through its subsidiary UCC, and often to customers. Indeed, NCC makes tens of millions of dollars of sales annually to UCC, as part of NCC's "global" business. *See* Saveri Decl. Ex. 8 at 6. UCC status as NCC agent is clear, because ███

██████████████████████████████████████████████████████████████████████

███████████████████████ at 2.

In sum, NCC sells directly to the United States and operates its capacitor business as a single global enterprise with its subsidiaries in the United States, including UCC. Further, UCC and NCC share a website for purchase of capacitors (http://www.chemi-con.co.jp/), have similar logos, sell capacitors under the same brand name, and NCC presents itself as a single governed entity, listing officers and directors for NCC, but none for UCC. *See* Saveri Decl., Exs. 5, 10-11.

## III.     ARGUMENT

### A.     Legal Standard

The Clayton Act, 15 U.S.C. § 22, fulfills the statutory requirement for jurisdiction in this case. The Ninth Circuit applies a "national contacts" method of jurisdictional analysis to Clayton Act claims, holding that "the relevant forum with which a defendant must have 'minimum contacts' in a suit brought under . . . the Clayton Act is the United States." *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004) (citing *Go-Video, Inc. v. Akai Electric Co.*, 885 F.2d 1406, 1414 (9th Cir. 1989)); *Go-Video*, 885 F.2d at 1414, 1415 ("personal jurisdiction may be established in any district [in the United States], given the existence of sufficient national contacts" by the alien defendant). Accordingly, when assessing whether NCC is subject to personal jurisdiction based on its own forum-related conduct, the appropriate "forum" is the United States in accordance with Section 12 of the Clayton Act, 15 U.S.C. § 22.

NCC challenges only whether the exercise of personal jurisdiction in this case would satisfy due process. Def. Br. at 3. Under *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), and its progeny, due process is satisfied when the forum has "minimum contacts" with a defendant. *Sec. Investor Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). *International Shoe* recognized that jurisdiction may

extend over a defendant if a suit "aris[es] out of or relate[s] to the defendant's contacts with the forum, "[a]djudicatory authority . . . [that] is today called 'specific jurisdiction.'" *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014) (internal citations omitted). Plaintiffs need "make only a prima facie showing of jurisdictional facts to withstand [a] motion to dismiss" for lack of personal jurisdiction. *Doe v. Unocal*, 248 F.3d 915, 922 (9th Cir. 2001) (internal citations omitted). For purposes of this demonstration, the court resolves all disputed facts in Plaintiffs' favor. *Id.*

### B.   All Three Prongs of the Specific Jurisdiction Test Are Met as to NCC

Specific jurisdiction exists where the plaintiff can show the following elements: (1) **purposeful availment**: the non-resident defendant has performed some act or consummated some transaction within the forum or otherwise **purposefully availed** itself of the privileges of conducting activities in the forum; (2) **arising out of**: the claim **arises out of or relates to** the defendant's forum-related activities, and (3) **reasonableness**: the exercise of jurisdiction is **reasonable**. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004); *Bancroft & Masters, Inc. v. August Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000). While all three requirements must be met, the Ninth Circuit has stated, in regard to the first two prongs, "[a] strong showing on one axis will permit a lesser showing on the other." *Yahoo! Inc. v. La Ligue Contre Le Racisme*, 433 F.3d 1199, 1210 (9th Cir. 2006) (*en banc*). That means that a single forum contact can establish jurisdiction if the cause of action arises directly out of it. *Id.* (citing *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987)).

Plaintiffs here satisfy all three prongs: (1) Plaintiffs establish NCC's "purposeful availment" by aiming anticompetitive conduct at the U.S.; (2) Plaintiffs harm arises out of this wrongdoing, and (3) NCC does not meet its burden of presenting a "compelling case" of showing the exercise of jurisdiction would be unreasonable.

### 1.   NCC's "Purposeful Availment" Is Manifest.

Following *Calder v. Jones*, 465 U.S. 783 (1984), the Ninth Circuit applies the three-part test for purposeful availment. Purposeful availment is established where a defendant "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Schwarzenegger*, 374 F.3d at 805 (citation omitted). On these issues, NCC relies on its contention that NCC does not itself sell capacitors in the United States. *See*

Def. Br. at 7-8. But a defendant need not have physical contact with the forum for a court to exercise its jurisdiction over it. *Brainerd v. Governors of the University of Alberta*, 873 F.2d 1257, 1260 (9th Cir. 1989). Plaintiffs satisfy the first prong of the specific jurisdiction test by showing that a defendant **purposefully directed** its activities **towards** the forum. *In re Western States Wholesale Natural Gas Antitrust Litig.*, 715 F.3d 716, 743 (9th Cir. 2013).[6] As to the first part of the purposeful availment test, NCC does not dispute it committed an intentional act.

As to the second part of the test, an antitrust defendant "expressly aims" an intentional act at a forum when its allegedly anticompetitive behavior is targeted at a resident of the forum or at the forum itself. *See In re Wholesale Natural Gas Antitrust Litig.*, 715 F.3d at 743; *see also Walden v. Fiore*, 134 S. Ct. 1115, 1124 (2014). As to the third part, Plaintiffs make a prima facie showing where they show that a defendant's United States-directed actions were a "but-for" cause of their claims. *Bancroft*, 223 F.3d at 1088; *Unocal*, 248 F.3d at 924. This "but-for" test requires "some nexus between the cause of action and the defendant's activities in the forum." *Shute v. Carnival Cruise Lines*, 897 F.2d 377, 385 (9th Cir. 1990), *overruled on other grounds*, 499 U.S. 585 (1991).

The allegations of the DP CC and IP CC, supported by evidence provided by NCC's co-conspirator, demonstrate that NCC purposefully directed its price-fixing activities at the U.S., and thus Plaintiffs show purposeful availment. Were it true, NCC's claim that it does not itself sell capacitors in the United States is insufficient to compel a contrary conclusion. In fact, it is false: It is contradicted by voluminous documentary evidence showing that it does sell capacitors in the United States. *See* Saveri Decl. Exs. 13-44 and discussion at 9-10, *infra*.

a.     **NCC's price-fixing activity was aimed at the United States.**

As Plaintiffs allege, NCC, along with other cartel members, participated in the capacitor cartel by attending cartel meetings abroad and conspiring to inflate the prices of capacitors sold in the United States and to U.S. purchasers. The Ninth Circuit has held that such alleged anticompetitive conduct constitutes intentional acts expressly aimed at this forum. *In re Western States Wholesale Natural Gas*

---

[6] The Supreme Court recently granted certiorari and is currently reviewing an appeal on this case regarding an issue of federal preemption in a case that also addressed personal jurisdiction. *See Oneok, Inc. v. Learjet, Inc.*, 134 S. Ct. 2899 (2014). Plaintiffs expect the Supreme Court's review to be limited to issues of preemption and not to address the Ninth Circuit's personal jurisdiction analysis.

*Antitrust Litig.*, 715 F.3d at 743. The DP CC and IP CC allege intentional acts that include NCC representatives' attending cartel meetings during the 4th quarter of 2008. There, attendees discussed implementing film capacitor price increases; current production status; market conditions in foreign markets, including North America; and ending price competition on film capacitors. DP CC at ¶ 208; IP CC ¶ 181. More generally, the DP CC and IP CC allege that the price-fixing conspiracy was **aimed** at the United States, that NCC, along with its co-conspirators, controlled the markets for the sale of aluminum and film capacitors **in the United States,** and that NCC engaged in conduct both inside and outside of the United States that caused anticompetitive effects **in the U.S. market**. DP CC at ¶¶ 122-30; IP CC ¶¶ 331-336. Documents obtained through Government investigations and a co-conspirator's proffers confirm NCC's attendance at and participation in these meetings, where NCC itself discussed capacitor customers ████████ *See, e.g.,* Saveri Decl. Ex. 1.

NCC does not dispute or controvert these allegations. As a result, they must be accepted as true for the purposes of this motion. *See Dole v. Watts*, 303 F.3d 1104, 1108 (9th Cir. 2002). The above allegations establish that NCC aimed its cartel behavior at the United States. *Compare  In re Cathode Ray Tube Antitrust Litig.,* 27 F. Supp. 3d 1002, 1011-13 (N.D. Cal. 2013) ("*CRT II*")  (the district court found insufficient defendant's declaration stating it had no U.S. contacts in light of allegations that defendant participated in cartel activity by sharing market information and coordinating pricing decisions outside the U.S.).

The above allegations are confirmed by evidence. As detailed above, NCC itself admitted to two direct sales in the United States in 2003. The abundant additional evidence produced by NCC, as well as Direct Purchaser Plaintiff eIQ's receipts of purchase and packing slips—for the limited November 2012 through June 2014 time period—show additional sales in the United States. NCC has not provided an explanation for its failure to produce documents for the full Class Period, which one can reasonably expect would evidence additional sales of Capacitors into the forum. NCC's records reflect millions of dollars in sales to UCC in the United States of capacitors earmarked for, and sent to, U.S.-based customers, such as ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ Saveri Decl. Exs. 13-17. Some of these sales were substantial,

including an order of over $483,683 (*id.*, Ex. 18), as well as at least twenty-five sales of over $500,000. *See* Saveri Decl., Ex. 44.[7] Additionally, NCC has publicly represented on its website and in public financial statements that it earns, and has earned during the Class Period, hundreds of millions of dollars from sales of capacitors in the U.S. *See id.* Exs. 2-3.

The above evidence, combined with Plaintiffs' uncontroverted allegations of NCC's intentional acts directed at the United States, establishes a *prima facie* showing of purposeful availment. *In re Wholesale Natural Gas*, 715 F.3d at 743-44 (allegations of intentional acts that defendant "either directly or indirectly through one of its controlled affiliates, engaged in the practice of wash sales, and manipulated market indices through the reporting of false trading information" "intended to have, and did have, a direct, substantial and reasonably foreseeable effect on commerce" in the form were sufficient to establish purposeful availment).

This district has consistently found personal jurisdiction in analogous cartel cases where the participants engaged in conduct abroad that was directed at and harmed U.S. purchasers. *CRT II*, 27 F. Supp. 3d at 1012-13. *CRT II* applied the effects test to a foreign parent defendant alleged to have participated in a global cartel to fix the prices of cathode ray tubes ("CRT"). The Court held that the parent defendant had purposefully directed its conspiracy at the United States and, therefore, personal jurisdiction over the parent comported with due process. *Id.* at *6. The Court found the following facts persuasive: the foreign-parent defendant participated in cartel meetings in China to coordinate pricing decisions in relation to global market conditions, including those in the United States, and discussed CRT prices in U.S. dollars. *Id.* at *5-6. The same facts exist with respect to NCC. *See* Saveri Decl., Ex. 1 (discussing pricing in U.S. dollars).

Similarly, in *In re Wholesale Natural Gas Antitrust Litig.*, with regard to the evidence of significant and regular forum contacts, the Ninth Circuit held that plaintiffs had established that defendants "purposefully directed" their anticompetitive activities toward the forum by alleging that,

---

[7] ████████████████████████████████████████

"either directly or indirectly through one of its controlled affiliates, [defendants] engaged in the practice of wash sales, and manipulated market indices through the reporting of false trading information," actions which were "intended to have, and did have, a direct, substantial, and reasonably foreseeable effect on commerce in" Wisconsin, the relevant forum. *Id.* at 743-44. By alleging acts "intended to have" an effect in Wisconsin, the plaintiffs went beyond alleging acts with a "mere foreseeable effect" in the forum. *Id.*

NCC ignores this governing authority. It argues that because it does not sell capacitors directly in the United States, it is not subject to personal jurisdiction. Def. Br. at 8. Even if this contention is true—and it is not—purposeful availment does not require that NCC have direct sales or perform other acts directly in the forum. It is sufficient that NCC **aims** its conduct at the U.S. and the **effects** are felt in the U.S. Under those circumstances, its acts outside the U.S. are sufficient for purposeful availment. *See generally Schwarzenegger*, 374 F.3d at 803 (explaining that "[a] showing that a defendant purposefully directed his conduct toward a forum state, by contrast, usually consists of evidence of the defendant's actions outside the forum state that are directed at the forum, such as the distribution in the forum state of goods originating elsewhere"). The quality, amount, and duration of the relevant contacts are significant and extensive: Plaintiffs allege NCC was an integral part of a global price fixing cartel aimed at United States customers using NCC's global sales and marketing operation.

In arguing to the contrary, NCC ignores and misconstrues the DP CC and IP CC's allegations. NCC asserts "Plaintiffs focus almost exclusively on the Plaintiffs' contacts with the forum" and injuries suffered in the United States. Def. Br. at 6, 9.[8] Not so. The CC plainly relates to **Defendants'** alleged

---

[8] NCC's reliance on *Walden* for the proposition that Plaintiffs "cannot rely on the fact that they allegedly suffered injury in the United States as a basis for establishing personal jurisdiction" (Def. Br. at 9) is misplaced. Unlike the instant matter, *Walden* did not concern allegations that a defendant had *directed* wrongdoing to the forum (here, the United States). In *Walden*, a Las Vegas plaintiff alleged a Georgia-based drug enforcement agent violated his constitutional rights by seizing cash from him while plaintiff was on a layover in Atlanta. The defendant had no contacts with Nevada, and the Supreme Court held that it was insufficient to find jurisdiction based on a theory that Nevada was the state where plaintiff's injury occurred. In that matter, defendant "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada," and "none of [defendant]'s challenged conduct had anything to do with Nevada itself." *Id.* at 1124-25. The fact that the harm occurred in Nevada was mere happenstance. *Walden* is inapposite because Plaintiffs' basis for jurisdiction relates to the actions taken by NCC to direct capacitor cartel activity towards the United States. Accordingly, basing jurisdiction on the alleged wrongdoing here is supported by *Walden*: "an injury is jurisdictionally

anticompetitive conduct aimed at the United States. *See* DP CC ¶¶ 122-30, IP CC ¶¶ 331-36. Indeed, Plaintiffs explicitly allege that NCC discussed sales of aluminum capacitors in the U.S. market and mutually agreed upon prices among participants directed at the U.S. market. DP CC ¶¶ 206, 208(d); *see also, generally,* IPP CC ¶¶ 319-20. Although it the meetings were conducted abroad, they were directed at pricing of capacitors to customers in the United States.

### b.  NCC knew that its price-fixing would cause harm to capacitor purchasers in the United States.

NCC knew its price-fixed products would be sold in the United States. NCC sold millions of dollars of capacitors to UCC, knowing that they were consigned to U.S. customers, and shipped some to U.S. customers directly itself. It even, admittedly, some sold directly itself to U.S. customers. For purposes of specific jurisdiction, Plaintiffs do not need to show that NCC directed UCC (although that case can be made, *see* Section III.C.2.a, *infra*). It is enough that NCC knew UCC would sell the capacitors in the United States. *See CRT II,* 27 F. Supp. 3d at 1013 ("it is enough for Defendant to have known that Panasonic was going to sell these goods in the United States"). The purpose of UCC, which is wholly owned by NCC and managed by NCC's officers and directors, was to facilitate sales of NCC branded capacitors in the United States. *See* Saveri Decl. Ex. 7; *see also* Section III.C.2, *infra*.

That NCC intended and understood its capacitors would be sold to U.S. customers is demonstrated by its extensive travel to the U.S., to visit U.S. customers, as well as NCC's overall focus on U.S. markets.

### i.  NCC's Travel to the U.S. Demonstrates an Understanding that U.S. Customers Would Be Impacted.

NCC executives and employees' extensive travel to the United States demonstrates that it knew a substantial portion of its customers were located in the U.S. In the last four years alone, NCC officials met with ██████████████████████████████████████████████ ; and other critical U.S. customers of NCC's capacitors:

relevant only insofar as it shows that the defendant has formed a contact with the forum State." *Id.* Plaintiffs' allegations that NCC participated in cartel activity *directed at the United States* is exactly such a "jurisdictionally relevant" contact. It was no mere happenstance that NCC's conduct harmed U.S. purchasers. The goal of the conspiracy was in relevant part to inflate prices in the U.S. market.

- NCC President Uchiyama made frequent trips to the United States to manage UCC personnel in Brea and Lansing, and visit customers. Saveri Decl. Exs. 45-50. NCC Board Members and top officials also made frequent trips to the United States for the purpose of visiting U.S. Customers and attend events. *See e.g.*, ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████

- NCC's records reflect that other executives made frequent visits to the United States to meet with American companies. NCC gave a presentation to ████ concerning aluminum capacitors to get them to ████████ NCC, among other contacts. Saveri Decl. Ex. 59. Rather than entrust UCC personnel with U.S. customer relationships, NCC routinely sent its representatives to companies such as ████████████████████████████████████ ████████████████████████████████ and others. *Id.*, Exs. 60-97.

As well as household brand manufacturers that used capacitors, NCC's U.S. customers included several capacitor distributors. For example, NCC Managing Director Noriaki Kakizaki took business trips to ████████████████████████████████ to meet with customers, such as major capacitor distributor ████████ Saveri Decl., Ex. 98.

        ii.    **NCC's Focus on U.S. Markets Demonstrate Understanding that Its Price-Fixing Would Impact U.S. Customers.**

NCC's records demonstrate that its business was focused on the United States customers. Indeed, it visited a virtual A-Z of U.S. companies (and multi-national corporations with a U.S. presence) that manufacture products with capacitors, and the scope of UCC's operations was purely a function of what NCC wanted its U.S. footprint to be. Saveri Decl., Ex. 59-97. For example, NCC determined that its ████████████████████ in the United States for ████████ a key customer, was

stretched due ████████████████████████████████████

████████████████████ Saveri Decl., Ex. 99. NCC's annual reports prominently displayed

U.S. conditions as important factors in NCC's performance and financial outlook. *Id.*, Exs. 2-3. NCC's

website similarly demonstrates that U.S. markets were a critical target for NCC's global branding

efforts. *Id.*, Ex. 5.

> ### 2. Plaintiffs' Antitrust Claims Arise Out Of or Relate to NCC's Forum-Related Activities.

Plaintiffs also meet the second "arising out of" prong of the personal jurisdiction test. Plaintiffs'

antitrust claims arise directly out of NCC's conduct directed at the United States. Plaintiffs allege that

NCC's cartel participation, along with its co-conspirators, resulted in Plaintiffs paying inflated prices for

capacitors in the U.S. during the Class Period, and that, "[a]s a result of Defendants' anticompetitive

and unlawful conduct," they "have paid more for the aluminum, tantalum and film capacitors that they

purchased during the Class Period than they otherwise would have paid in the absence of Defendants'

conduct." DP CC ¶ 327; IP CC ¶ 356; *see In re Wholesale Natural Gas*, 715 F.3d at 742-43; *CRT II*, 27 F.

Supp. 3d at 1013 (finding that plaintiffs established that defendant's United States-directed actions were

a "but-for" cause of their claims "by pleading that they paid artificially high prices for CRT Products,

directly as a result of Defendant's activities."). The "but-for" test for the "arising out of" prong of the

analysis requires only "some nexus between the cause of action and the defendant's activities in the

forum." *Shute*, 897 F.2d at 387. There is a strong and direct nexus here between Plaintiffs' antitrust

claim based on their purchase of capacitors at inflated prices and NCC's alleged price-fixing activities

directed at the United States.[9] But for NCC's fixing of prices for capacitors for sale in the U.S., U.S.

purchasers of its capacitors would not have paid inflated prices. Indeed, the district court in *Northwest*

---

[9] NCC's authorities are inapposite. *NuboNau, Inc. v. NB Labs, Ltd.*, 2012 U.S. Dist. LEXIS 32963 (S.D. Cal. Mar. 9, 2012), a patent infringement case, concerned allegations where goods never entered the U.S., which is not the case here. *Doe v. Unocal Corp.*, 248 F.3d 915, 923 (9th Cir. 2001), concerned an oil pipeline project that would have gone forward regardless of the purported contacts with the U.S., whereas here Plaintiffs would not have bought capacitors at inflated prices without the price-fixing that is the subject of the CC. Finally, in *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2005 U.S. Dist. LEXIS 30299 (N.D. Cal. Nov. 7, 2005), unlike here, plaintiffs "failed to make a prima facie showing that any minimum contacts exist — under any theory." *Id.* at *26.

*Aluminum Co. v. Hydro Aluminum Deutschland GmbH*, 2003 U.S. Dist. LEXIS 25544 (D. Or. July 3, 2003), cited by NCC, rejected the same arguments NCC makes here, and held that specific jurisdiction could be exercised over a foreign parent corporation that never manufactured or sold products in the U.S., but operated through a U.S. subsidiary. *Id.* at *11-12.[10]

### 3. The Exercise of Jurisdiction Over NCC Is Reasonable.

Plaintiffs establish the third "reasonableness" prong. Once Plaintiff establishes the "purposeful availment" and "arising out of" prongs of specific jurisdiction, the burden is on the defendant to "present a compelling case" that the exercise of jurisdiction would not be reasonable. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 467 (U.S. 1985); *CRT II*, 27 F. Supp. 3d at 1011.[11] In arguing that it would be unreasonable to subject it to jurisdiction, NCC relies on the false premises that NCC has "no meaningful connections" with the U.S., and the *ipse dixit* assertion that it has "not purposefully injected itself into the United States." Def. Br. at 10. These conclusory contentions—at odds with even the limited factual record developed to date—fail to sustain NCC's burden. NCC's numerous, repeated, and regular contacts with the United States constitute "purposeful interjection" demonstrating that exercise of jurisdiction is reasonable here. *See Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1332 (9th Cir. 1984) ("Although not extensive enough to support general jurisdiction, the contacts of LPI, Jensen, and Tomacruz with Arizona are sufficient to demonstrate a purposeful interjection into the forum state.").

---

[10] *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 801 (7th Cir. Ind. 2014), cited by NCC, is inapposite. In that matter, the Seventh Circuit held there was no "litigation-specific conduct of the defendant in the proposed forum state" because there, plaintiff failed to show that any sales by the defendant were related to the wrong-doing, where were alleged statements concerning a pepper-spray ball technology: "We do not know, for example, whether the Indiana residents saw Real Action's post before making their purchases. There is also nothing to suggest that any Indiana purchaser thought that Advanced Tactical had started selling PepperBalls." *Id.* By contrast, NCC's shipments and sales into the U.S. were of capacitors sold at inflated prices during the relevant time period.

[11] The Ninth Circuit uses the following factors to determine whether exercise of jurisdiction is reasonable: "(1) the extent of the defendant's purposeful interjection into the forum state, (2) the burden on the defendant in defending in the forum, (3) the extent of the conflict with the sovereignty of the defendant's state, (4) the forum state's interest in adjudicating the dispute, (5) the most efficient judicial resolution of the controversy, (6) the importance of the forum to the plaintiff's interest in convenient and effective relief, and (7) the existence of an alternative forum." *Bancroft*, 223 F.3d at 1088 (citing *Burger King*, 471 U.S. at 476-77).

**a.     NCC Derives Substantial Revenue from Sales to the U.S.**

Over the last seven years, NCC has obtained roughly 10% of its overall revenues from sales to the U.S., representing an average of over $100 million in annual sales. Saveri Decl., Exs. 2-3. NCC has taken the position that, other than a few admitted direct sales, its sales to the U.S. are through its subsidiary, UCC. *See* Saveri Decl. Ex. 8 at 6. For purposes of this analysis, it is immaterial whether, as NCC claims, it sold capacitors to UCC in the U.S., who in turn sold the capacitors to U.S. customers. The revenue NCC derives from the U.S. is the accumulation of a series of its meetings, sales efforts, and other contacts with U.S. customers, and its management and direction of its subsidiary UCC, along with other contacts with UCC.

**b.     NCC's Production Facilities in the U.S. Demonstrate the Strength of Its Connections to the Forum.**

NCC owns a number of assets in the United States related to its capacitor business, making the exercise of personal jurisdiction in this antitrust action arising from the sale of capacitors reasonable.

Through UCC, NCC owns and operates critical factories for the manufacture of capacitors sold in the U.S. and world-wide located in Illinois and North Carolina, which NCC manages by sending its executives to the United States. *See* Section III.C.2, *infra*. These UCC factories, operated by executives NCC sent to the United States, produce NCC-branded capacitors, including large capacitors that are among NCC's most important products. Saveri Decl., Exs. 7, 101 (at 175), 102 (at 171). Together with NCC's facilities in Malaysia, the U.S. production facilities provide all world-wide demand for these products. *Id.*, Exs. 103 (at 121), 104 (at 42).

NCC admits it also owns an aluminum factory in the United States, through its wholly-owned subsidiary Chemi-Con Materials Corporation ("CMC") that, per CMC's website, "produces anode aluminum foil for electrolytic capacitors." *See* Saveri Decl., Exs. 105-06. This factory is an important asset to NCC, as NCC is a global leader in the manufacture of aluminum of capacitors. *Id.*, Ex. 107 (at 177). Additionally, ███████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████ Saveri Decl. Ex. 105 at 2. Finally, until 2013, NCC manufactured rubber seals in the United States. Saveri Decl. Ex. 108 (at 173).

During the relevant time period, NCC maintained and operated a research and development facility in San Jose, California. *See* Saveri Decl. Ex. 109 ████████████████████. Contrary to Mr. Nakamura's statement that the office closed in 2007, documents produced by NCC show that the San Jose office was referred to internally within the NCC Group as ██████████████████ *Id.*

Finally, as demonstrated *supra,* ████████████████████ constituting both substantial economic activity in the U.S., and an asset of NCC located in the U.S. *See* Saveri Decl. Ex. 110. ████████████████████ *See Id.*, Ex. 117 at 10.

### c.    NCC's Registration with California's Secretary of State Demonstrates It Is Reasonable to Impose Jurisdiction.

Whether a company is registered to do business in California, or has designated an agent for service of process, is relevant to a finding of jurisdiction. *See IBM v. Merlin Tech. Solutions, Inc.*, 2007 U.S. Dist. LEXIS 7390, *22 (D. Mass. Feb. 1, 2007) ("jurisdiction is reasonable in this case" because "IBM is registered to do business" in Massachusetts); *see also Mateer v. Interocean Am. Shipping Corp.*, 2006 U.S. Dist. LEXIS 22502, *13 (N.D. Cal. Apr. 17, 2006) (finding personal jurisdiction where "defendant was registered to conduct business in California and had an agent here for service of process"). NCC became registered to do business in California in May 2003, and had designated an agent for service of process; accordingly, it was registered to do business during the relevant time period. *See* Saveri Decl. Ex. 4.

### d.    Miscellaneous Contacts Between NCC and the U.S. Demonstrate Jurisdiction Is Reasonable Here.

A number of other factors demonstrate the exercise of jurisdiction is reasonable.

First, ████████████████████ ████████████████████ ████████████████

Second, ████████████████████ ████████████████████

████████████████████████████

████████████████

**e.      Harm to Plaintiff Makes Exercise of Jurisdiction Reasonable.**

Reasonableness focuses not only on the interests of the defendant, but also of the plaintiff and the forum. *CRT II*, 27 F. Supp. 3d at 1013-15 This is a lawsuit brought by U.S. entities who were the target of intentional illegal conduct. It is reasonable for Plaintiffs, who are U.S. companies, to have this matter heard in the United States, where at least one Plaintiff is based as well as numerous NCC customers, and thus the forum has an interest in resolving this dispute. *See CRT I* at *85-89 (discussing the *Bancroft* factors). Indeed, NCC does not cite a single case in which defendants directed intentional conduct at and caused harm to U.S. purchasers, and yet the court found it unreasonable to exercise personal jurisdiction over the claims of those purchasers in the U.S. *Cf. DRAM*, 2005 U.S. Dist. LEXIS 30299 at *20 ("uncontroverted testimony offered by defendants demonstrat[ed] that they have never manufactured nor sold any DRAM in any of the forum states, nor do they maintain any business or corporate formalities in the forum states, nor do they receive any substantial revenue from the sale of DRAM (or any other products) in the forum states").[12]

**C.      Alternatively, NCC Has Sufficient Contacts with the United States Through Its Subsidiary, UCC, to Establish Jurisdiction.**

Jurisdiction is also proper over NCC under agency theory. "For purposes of personal jurisdiction, the actions of an agent are attributable to the principal." *Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990). An agency relationship is one in which the agent acts subject to the principal's control, and agrees to such control. Restatement (Third) of Agency, § 1.01 (2005). Using agency, Plaintiffs can establish personal jurisdiction over a parent corporation for conduct by its subsidiary in two ways, under either a substituted presence or an alter ego theory. *Unocal*, 248 F.3d at 928-29. Both

---

[12] Moreover, NCC's suggestion that Plaintiffs may sue elsewhere is unsupported. A recent study of private enforcement of Japanese antitrust laws states, "The contribution of private antitrust litigation to providing redress for those harmed by violations has . . . been quite limited. Although local governments and government agencies have recovered tens of billions of yen, businesses have recovered much less, and consumers virtually nothing." Simon Vande Walle, "Private Enforcement of Antitrust Law in Japan: An Empirical Analysis," 8 *The Competition Law Review* 7, 8-9 (Dec. 2011).

can be shown here because (1) NCC presents itself as a "global enterprise," for purposes of marketing and selling capacitors, such that UCC is the substituted presence in the U.S. for NCC, and (2) NCC managed its subsidiaries—including UCC—so closely that the subsidiaries functioned at NCC's discretion and disposal and existed simply as an instrumentality to perform NCC's bidding. On this record, UCC should be regarded as NCC's agent, and UCC's contacts with the U.S. should be imputed to NCC for the purpose of exercising personal jurisdiction over NCC.

### 1.  Personal Jurisdiction Exists Under an Agency Theory Because UCC is the Substituted Presence for NCC in Its "Global Enterprise."

The test for establishing substituted presence considers whether "in the truest sense, the subsidiaries' presence substitutes for the presence of the parent" in the forum state. *Doe v. Unocal Corp.*, 248 F.3d at 929. Substituted presence is shown when the subsidiary "perform[s] some service or engage[s] in some meaningful activity in the forum state on behalf of its principal." *Id.* at 930; *see also Chan v. Society Expeditions*, 39 F.3d 1398, 1405 (9th Cir. 1994) (performing services "sufficiently important to the [parent] corporation that if it did not have a representative to perform them, the [parent] corporation . . . would undertake to perform substantially similar services.") (internal citation omitted). A subsidiary's contacts may be imputed to the corporate parent for purposes of personal jurisdiction where the subsidiary was "either established for, or is engaged in, activities that, but for the existence of the subsidiary, the parent would have to undertake itself." *Id.* at 1405-6 n.9 (quoting *Gallagher v. Mazda Motor of America, Inc.*, 781 F. Supp. 1079, 1083 (E.D. Pa. 1992)). "Consequently, the question to ask is whether in the truest sense, the subsidiaries' presence substitutes for the presence of the parent." *Unocal*, 248 F.3d at 928-29 (internal quotation marks and citation omitted). NCC does not address the 'substituted presence' test, directing all of its agency arguments to the Ninth Circuit's distinct 'alter ego' test. Def. Br. at 12-13.

UCC served as NCC's agent, performing essential functions in NCC's global capacitor business. UCC does not contest jurisdiction. NCC could have sold its capacitors directly to United States purchasers. In fact it did so on some occasions. But it also chose to sell capacitors through UCC. NCC established UCC as its primary means of conducting commerce with the U.S. market. This was true at the beginning of the Class Period. It remains true today. As demonstrated *infra*, NCC ensures

that ████████████████████████████████████████████

██████████████ hus UCC functions more as an instrumentality than subsidiary. As shown by its

public statements to shareholders, its summary release of its earning, and its website, NCC holds itself

out as a single vertically integrated global enterprise, with an "integrated" American sales and

distribution arm. *See* Saveri Decl. Exs. 2-3, 5-7; *see also Crystal Cruises, Inc. v. Moteurs Leroy-Somer S.A.*,

2011 U.S. Dist. LEXIS 73376, at *13-14 (C.D. Cal. July 1, 2011) (sufficient evidence to establish a

"colorable showing" of personal jurisdiction includes the fact that a parent and subsidiary marketed

themselves as a single corporate entity, and a report listing the parent and subsidiary's combined sales

revenue and combined number of worldwide employees). NCC is, in fact, a vertically-integrated entity,

with factories and a sales force across the world selling capacitors under the single NCC brand. Ex. 114.

Consistent with this strategy, UCC facilitates direct purchaser orders of NCC capacitors from

NCC in Japan—for example, when orders from North or South America are received on NCC's

website they are directed to UCC—and NCC ships capacitors directly to UCC in the United States, or

to U.S. purchasers. *See* Saveri Decl., Exs. 7, 9, 44. There is no question that, but for the establishment of

UCC, NCC would be conducting sales and distribution in the U.S. itself, as evidenced by its direct

delivery sales model, its inclusion of UCC's U.S. sales in its own financial statements, its advertisement

of NCC's production facilities in the United States, and its resale of capacitors to UCC for sale here.

Saveri Decl. Exs. 2-5, 9; Nakamura Decl. at ¶ 21. Finally, consistent with a unitary global identity, NCC

and UCC share a single website for placing orders, as UCC's website simply directs to NCC's, and they

have nearly identical logos. *See* Saveri Decl. Exs. 5-6, 10.

### 2. Personal Jurisdiction Exists Over NCC Because NCC Exerts Total Domination Over UCC.

To satisfy the alter ego exception to the general rule, "the plaintiff must make out a prima facie

case (1) that there is such unity of interest and ownership that the separate personalities [of the two

entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud

or injustice." *Doe v. Unocal Corp.*, 248 F.3d at 926. That UCC is merely NCC's presence in the United

States, rather than a stand-alone subsidiary, is further demonstrated by the degree of control that NCC

exerts over UCC's affairs. NCC offers no affirmative facts to establish that UCC and NCC observe

corporate formalities sufficient to maintain independent identities, but makes general averments that NCC and UCC have nothing but an "ordinary parent-subsidiary relationship."[13] Def. Br. at 12-13; *see* Nakamura Decl. ¶¶ 5-16. Not so.[14]

### a. NCC Controls UCC's Day-to-Day Operations.

NCC requires that ███████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ Saveri Decl., Ex. 115

(emphasis added). These restrictions included a specific set of rules for routine managerial matters,

███████████████████████████████████████████████████████████████ *Id.*

---

[13] Plaintiffs object to the Declaration of Mr. Nakamura because he lacks foundation or personal knowledge to testify on NCC's capacitor business. Mr. Nakamura does not state that he is familiar with NCC's capacitor business whatsoever. Similarly, Mr. Nakamura lacks foundation to opine on UCC in any way. He does not state he ever held a position at UCC, or that he is familiar with UCC's business. If anything, his attempt to speak for UCC underscores that the two entities are an integrated whole. Plaintiffs further object to his declaration on the basis of hearsay. Mr. Nakamura states that he relies on certain documents, but he neither identifies nor describes the documents upon which he relies, and his attempt to assert their contents as the truth is unreliable hearsay. Mr. Nakamura's lack of foundation is evident as it appears he is a non-native English speaker who simply signed a lawyer-drafted representation of facts.

[14] NCC argues that the Supreme Court has overruled *Chan*, *Wells Fargo*, and other cases authorizing the exercise of jurisdiction over a corporate parent by reason of the acts of its agent subsidiaries. Def. Br. at 12. The Supreme Court did not, either explicitly or implicitly, consider specific jurisdiction, as NCC contends. As an initial matter, the facts of *Daimler* concerned "a claim brought by foreign plaintiffs against a foreign defendant based on events occurring entirely outside the United States" related to alleged wrongs that occurred during Argentina's "Dirty War" in the late 1970s and early 1980s. *Id.* at 750,757. Not only is *Daimler* inapplicable factually, but the Supreme Court considered an entirely different issue than exercise of specific jurisdiction under agency principles. *Daimler* did not address principles of specific jurisdiction, or their application. In fact, Plaintiffs there did not plead facts or attempt to establish specific jurisdiction. There, unlike here, "Plaintiffs have never attempted to fit this case into the **specific jurisdiction** category," and the Court reviewed whether **general** jurisdiction was appropriate. *Id.* at 758. In any event, the Court noted "we need not pass judgment on invocation of an agency theory **in the context of general jurisdiction**," found error in the exercise of "all purpose" jurisdiction under the circumstances presented, but observed "[a]gency relationships . . . may be relevant to the **existence of specific jurisdiction**." *Id.* at 760-62, 759 n.13 (emphasis added). Indeed, NCC's reading of *Daimler* has been rejected. *See Kolcraft Enters. v. Artsana USA, Inc.*, 2014 U.S. Dist. LEXIS 107943, at *13 (N.D. Ill. Aug. 6, 2014) ("*Daimler* specifically recognized the relevance of an agent's or subsidiary's contacts to the determination of specific jurisdiction.").

1  Additionally, ███████████████████████████████████████████████████████████

2  ████████████████████████████████ *See*, *e.g.*, Saveri Decl. Ex. 116.

3  Moreover, the documents produced by NCC demonstrate that ██████████████████████

4  ████████████████████████████████████████ *See* Saveri Decl. Ex. 110. From 2006

5  through 2014, ███████████████████████████████████████ strongly suggesting

6  that UCC was entirely dependent on capital infusions from NCC to maintain its day-to-day operations.

7  *Id*. Additionally, ██████████████████████████████████ further demonstrating

8  UCC's dependence on NCC. *See*, *e.g.*, Saveri Decl., Ex. 117 at 10.

9  NCC exerted control over the products UCC manufactured, which were done at NCC's

10  direction, and per the standards NCC set forth. ████████████████████████████████

11  ████████████████████████████████████████████████████████████

12  ████████████████████████████████████████ Saveri Decl., Ex. 118

13  at 5.

14  Finally, although UCC maintains its own financial statements, they demonstrate that UCC

15  ████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████

21  **b.    UCC Lacks Independent Leadership and Oversight.**

22  The extensive travel that NCC officers and directors made to UCC facilities demonstrates that

23  UCC did not have independent leadership, but that UCC instead relied on its parent to make decisions

24  regarding business strategy. Indeed, NCC executives made frequent trips to the US subsidiaries to

25  monitor and control their activities, and manage UCC's operations, ████████████████████████

26  ████████████████████████████████████████████████████████████

27  ██████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████

22



NCC directly managed UCC's affairs by use of "temporary" executives loaned to UCC by NCC. These loaned executives managed UCC employees, held leadership roles, and also continued to have responsibilities to NCC, such that UCC's management were essentially NCC employees.

Additionally, ███████████████████████████ demonstrating that UCC employees were working under NCC's direction. In August 2011, for example, ███████████████

███████████████████████████ *See, e.g.,* Saveri Decl. Ex. 140. ███████████████

---
[15] ███████████████████████████

██████████████████████████████████████████████████████ *Id.*, Exs.

141-154.[16]

For its part, UCC advertises no board of directors independent from NCC. UCC evidently relies on NCC's executives, managers, or directors to fulfill leadership roles, and to manage its operations. NCC's contention that UCC is the "sole Chemi-Con entity responsible for manufacturing, selling or distributing Chemi-Con capacitors in the United States" (Def. Br. at 8) is directly contrary to representations NCC has made elsewhere, where it claims ████████████████████████████████

████████████████████████████████████████████████████████████████████████

█████████████████████████████

**c.      Plaintiffs Would Suffer a Fraud or Injustice Unless UCC is Deemed an Alter Ego of NCC.**

A showing that a company is undercapitalized shows the injustice of disallowing alter ego status. *See Dollar Tree Stores Inc. v. Toyama Partners LLC*, 2011 U.S. Dist. LEXIS 30868, *6 (N.D. Cal. Mar. 11, 2011) (allegations of undercapitalization, including guarantee of loans, meets element of alter ego test).

Plaintiffs, who purchased NCC branded capacitors, would suffer an injustice if they had to rely only on UCC in order to be made whole. ████████████████████████████████████████████ ████████ UCC is totally reliant on NCC to meet is operating expenses, ████████████████████ even though it often has over $100 million in annual sales. Despite these substantial revenues, ████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████ Accordingly, UCC is undercapitalized in relation to

[16] The evidence of ████████████████████████████████████████ is voluminous. In the interests of economy, Plaintiffs have presented only an excerpt.

the scope of its operations, and there is considerable doubt regarding UCC's ability to respond to the judgment in this case. Moreover, ████████████████████ emonstrates that UCC does not present itself to creditors as an independent company, but instead relies on the financial strength of NCC.

**D.      Alternatively, the Court Should Allow Plaintiffs to Obtain Jurisdictional Discovery to Establish NCC's Contacts with the United States.**

If the Court were inclined to grant the motion based on the evidence Plaintiffs are able to provide at this point, Plaintiffs respectfully request that the Court allow them to conduct further jurisdictional discovery concerning Plaintiffs' central allegations that NCC fixed prices for capacitors to be sold in the U.S. This evidence is material to a jurisdictional analysis. *See In re Bulk [Extruded] Graphite Prods. Antitrust Litig.*, 2007 U.S. Dist. LEXIS 54906, *17 (D.N.J. July 30, 2007) (evidence that defendants "were involved in fixing the price of graphite electrodes" and "attended meetings in Europe during which agreements to fix graphite electrode prices were reached" constitutes evidence establishing a basis for personal jurisdiction); *see also In re Cathode Ray Tube Antitrust Litig.*, 2014 U.S. Dist. LEXIS 78902, *101 (N.D. Cal. June 9, 2014) ("*CRT III*") ("participating in price-fixing meetings meant to direct sales of its CRTs into the United States is enough, at this stage, for the Court to find that it has personal jurisdiction"). Further discovery is not only appropriate but necessary, because this Court has only recently ruled that discovery related to the meetings attended by NCC, among other evidence of NCC "expressly aiming" its conduct at the U.S., could not proceed during jurisdictional discovery. *See* Docket No. 582 (discovery requests regarding cartel activity "go beyond the scope of what plaintiffs need for jurisdictional discovery, especially in light of the current posture of this case").

**IV.    CONCLUSION**

Plaintiffs have plead and proven an ample basis for specific jurisdiction over NCC, and notwithstanding this showing, personal jurisdiction exists by virtue of NCC and UCC operating as a single global enterprise. Thus, NCC's motion should be denied.

Dated: April 16, 2015

Respectfully Submitted,

JOSEPH SAVERI LAW FIRM, INC.

By: _____ /s/ Joseph R. Saveri _____
        Joseph R. Saveri

Joseph R. Saveri (State Bar No. 130064)
Joshua P. Davis (State Bar No. 193254)
Andrew M. Purdy (State Bar No. 261912)
Matthew S. Weiler (State Bar No. 236052)
James G. Dallal (State Bar No. 277826)
JOSEPH SAVERI LAW FIRM, INC.
505 Montgomery Street, Suite 625
San Francisco, California 94111
Telephone:  (415) 500-6800
Facsimile:   (415) 395-9940

*Interim Lead Class Counsel for Direct Purchaser Plaintiffs*

Dated: April 16, 2015

COTCHETT, PITRE & McCARTHY, LLP

By: _____ /s/ Steven N. Williams _____
        Steven N. Williams

Joseph W. Cotchett (State Bar No. 36324)
Steven N. Williams (State Bar No. 175489)
Adam J. Zapala (State Bar No. 245748)
Elizabeth Tran (State Bar No. 280502)
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road
Burlingame, California 94010
Telephone: (650) 697-6000
Facsimile: (65) 697-0577

*Interim Lead Class Counsel for Indirect Purchaser Plaintiffs*

I attest that concurrence in the filing of this document has been obtained from each of the other signatories above.

DATED:  April 16, 2015            By: _____ /s/Joseph R. Saveri _____
                                            Joseph R. Saveri