UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE CAPACITORS ANTITRUST LITIGATION. | Master File No.  14-cv-03264-JD<br><br>**ORDER ON MOTIONS TO DISMISS**<br>Re: Dkt. Nos. 474, 475, 479, 480 |

Direct and indirect purchasers in these consolidated antitrust class actions allege price-fixing conspiracies in the capacitor market.  The direct purchaser plaintiffs ("DPPs") allege that defendant manufacturers in Japan, Taiwan, Germany and the United States have participated in a single overarching conspiracy since 2003 to artificially raise prices and suppress price competition for aluminum, tantalum and film capacitors.  In a separate complaint, the indirect purchaser plaintiffs ("IPPs") allege two conspiracies running over different times for the same products.  The defendants are largely the same in the DPP and IPP cases, and include overseas parent companies and United States subsidiaries.  Defendants move to dismiss the DPP complaint mainly for failing to state a plausible price-fixing claim.  They concede the plausibility of the antitrust claim in the IPP complaint, but challenge it on standing and state law grounds.

The Court denies the motions for the most part.  The DPP complaint provides enough factual allegations to state a price-fixing claim.  The IPP complaint also survives defendants' primary challenges.  In both cases, the Court grants defendants' request to dismiss certain entities who were sued because they belong to an alleged family of conspirators rather than on the basis of specific allegations against them individually.  DPPs and IPPs will have an opportunity to amend.

## BACKGROUND

The technology at issue here is straightforward.  As alleged in both complaints, capacitors are one of the most basic functional units in electronic circuits.  While they can vary considerably

United States District Court
Northern District of California

1  in specific application, capacitors generally operate to store energy on a short-term basis, like a

2  temporary battery, and smooth out the flow of energy to avoid surges and deficits.  Capacitors are

3  classified as "passive" components, which means they do not generate power but store and

4  condition it.  At heart, a capacitor consists of two electrical plates, one positively and one

5  negatively charged, that are sandwiched together with a non-conductive insulator called a

6  dielectric between them.  They are used universally in circuits.  As the result, virtually every

7  electronic device we use, from toasters to cellphones, has capacitors in it.

8       Capacitors can be electrolytic or electrostatic.  As the IPPs allege, electrolytic capacitors

9  are "asymmetrical, polarized constructions," while electrostatic capacitors are "symmetrical, non-

10  polarized constructions."  Dkt. No. 400 ¶¶ 128, 129.  Capacitors made with a dielectric of

11  aluminum or tantalum are electrolytic capacitors.  Those made with a plastic film or ceramic

12  dielectric are electrostatic capacitors.

13       The DPPs and IPPs bring their antitrust claims in the context of the global market for these

14  ubiquitous components.  Unsurprisingly, there is a high degree of overlap between the

15  consolidated complaints, although the IPP complaint does a deeper dive into some areas.  *See* Dkt.

16  Nos. 400, 401.  Both complaints allege that the defendant capacitor manufacturers, many of whom

17  are based in Japan, engaged in a multi-year price-fixing conspiracy for electrolytic and film

18  capacitors.  Both complaints trumpet multiple government antitrust investigations underway in the

19  United States and overseas into possible anticompetitive practices in the capacitor industry.  In the

20  United States, the Department of Justice is leading the charge from its San Francisco office.  *See*

21  Dkt. No. 401 ¶¶ 274-93; Dkt. No. 400 ¶¶ 13-18.  And both complaints highlight that one of the

22  defendants, Panasonic Corporation, has applied for leniency under the DOJ's Corporate Leniency

23  Program pursuant to the Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA").

24  Dkt. No. 400 ¶¶ 15-16; Dkt. No. 401 ¶¶ 278-79.

25       But the complaints also have some substantial differences.  The four named direct

26  purchaser plaintiffs -- Chip-Tech, Ltd., a New York corporation; Dependable Component Supply

27  Corporation, a Florida corporation; eIQ Energy, Inc., a California corporation; and Walker

28  Component Group, Inc., a Colorado corporation, Dkt. No. 401 ¶¶ 25-28 -- allege a single,

2

overarching conspiracy "in aluminum, tantalum and film capacitors" with a class period of January 1, 2003 to the present. *Id.* ¶¶ 1, 111. Each DPP states that it "directly purchased capacitors from one or more defendants during the class period." *Id.* Defining the proposed class to comprise "[a]ll persons in the United States that purchased capacitors . . . directly from any of the defendants" during the class period, *id.* ¶ 111, the DPPs assert a single claim for restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. For this claim, the DPPs seek, among other things, treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, and an injunction. *Id.* at 67-68 (Demand for Judgment).

The indirect purchaser plaintiffs, on the other hand, allege two "massive and separate conspiracies" to fix the prices of "electrolytic and film capacitors, respectively." Dkt. No. 400 ¶ 1. The IPPs assert that the "electrolytic class period" has a start date of January 1, 2003, and the "film class period" one of January 1, 2007. *Id.* ¶¶ 2-3. The named IPPs include "First-Level Indirect Purchaser Plaintiffs" -- five named plaintiffs who allege that they purchased capacitors as stand-alone products from one or more distributors, who in turn purchased the capacitors as stand-alone products from defendants. *Id.* ¶¶ 29-34.[1]

The consolidated IPP complaint also included "Consumer Indirect Purchaser Plaintiffs" -- thirty-one plaintiffs hailing from twenty-two states who purchased such varied products as laptops, televisions, tablets, cell phones, printers, game consoles, MP3 players, power tools, dishwashers and auto parts, all of which allegedly contained price-fixed capacitors manufactured by one or more defendants during the respective class periods. *Id.* ¶¶ 35-65. This putative consumer group was the only group to allege claims on the basis of finished goods that included capacitors. In response to the Court's discussion with the interim lead counsel for the putative indirect purchaser plaintiff class at the hearing on the motions to dismiss, counsel filed a Notice of Voluntary Dismissal that dismissed without prejudice all thirty-one of the Consumer Indirect Purchaser

---

[1] One of the named First-Level Indirect Purchaser Plaintiffs is Alfred H. Siegel, the Liquidating Trustee of the Circuit City Stores, Inc. Liquidating Trust. Dkt. No. 400 ¶ 33. Circuit City Stores, Inc. is alleged to have "indirectly purchased capacitors as stand-alone products and as components of products containing electrolytic and/or film capacitors from one or more of the Defendants." *Id.* ¶ 34.

United States District Court
Northern District of California

1   Plaintiffs and their claims from the IPPs' first consolidated complaint.  Dkt. No. 594.  Those

2   plaintiffs and claims are no longer a part of this case and unless otherwise noted, all references to

3   the "indirect purchaser plaintiffs" are references to the "First-Level Indirect Purchaser Plaintiffs"

4   only.  In the event the IPPs amend their complaint in response to this order, they are directed to

5   remove the consumer group parties and allegations from the next version.

6        The IPPs allege different dates and types of conduct by the defendants.  Some defendants

7   are alleged to have participated only in the electrolytic capacitor cartel, some in only the film

8   capacitor cartel, and some in both.  Dkt. No. 400 ¶ 10.  The lengthy cast of the IPP defendants

9   largely matches the DPPs' cast, with some variations.

10        Alleging that each and every capacitor purchased by the IPPs is "traceable to an entity

11   owned and/or controlled by a defendant because it bears the defendant's markings (*e.g.*, name,

12   logo, series)," *id.* ¶ 4, the IPPs assert claims under: (i) the Sherman Act, 15 U.S.C. § 1; (ii) the

13   California Cartwright Act, Cal. Bus. & Prof. Code § 16720; and (iii) the California Unfair

14   Competition Law, Cal. Bus. & Prof. Code § 17200 ("UCL").  *Id.* ¶¶ 349-379.  For the Sherman

15   Act claim, the IPPs seek an injunction only; they seek treble damages under the Cartwright Act

16   and "restitution and/or disgorgement" for the UCL claim.  *Id.* ¶¶ 359, 367, 379.  The complaint

17   seeks nationwide application of California's Cartwright Act and UCL.  *Id.* ¶¶ 368, 379.[2]

18        Before the Court are four separate motions to dismiss the DPP and IPP complaints.  The

19   "joint" motions assert arguments in which all moving defendants join.  Dkt. Nos. 474, 479.  The

20   "consolidated" motions are compilations of various defendants' individual arguments, *i.e.*,

21   arguments that are specific to why the allegations against that moving defendant should be

22   dismissed.  Dkt. Nos. 475, 480.

23

24   _____

25   [2] The complaint also asserts claims for violations of (iv) state antitrust and restraint of trade laws
     ("in the event that the Court does not apply California law on a nationwide basis"); and (v) state
26   consumer protection and unfair competition laws (again "in the event that the Court does not apply
     California law on a nationwide basis").  Dkt. No. 400 ¶¶ 380-412.  Because the First-Level
27   Indirect Purchaser Plaintiffs are two California residents, two California companies and the trustee
     of a trust that was established in connection with the bankruptcy of a Virginia corporation, and
28   because no Virginia state law claim is included in the fourth or fifth claims for relief, the Court
     deems all state claims other than those under California law to have been voluntarily dismissed by
     the indirect purchaser plaintiffs.

United States District Court
Northern District of California

**DISCUSSION**

Well-established standards govern these motions.  To comply with the pleading requirements of Federal Rule of Civil Procedure 8(a)(2) and survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly* at 556).  In evaluating a motion to dismiss, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in his or her favor.  *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the Court need not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  If the Court dismisses a complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (internal quotation marks and citation omitted).

## I.   DIRECT PURCHASER PLAINTIFFS' COMPLAINT

### A.   *Twombly* Plausibility

The defendants' main attack on the DPP complaint is that it falls short of plausibility under *Twombly*.  Specifically, defendants seize upon the one vs. two conspiracy theories in the DPP and the IPP complaints.  Defendants concede that they "as a general matter do not challenge the sufficiency of the IPP Complaint's allegations of two separate conspiracies" for electrolytic and film capacitors. Dkt. No. 479 at 2.  They attack the DPPs because they do not follow the same approach, and argue that the DPPs' "central allegation of a single overarching conspiracy involving both electrolytic and film capacitors is implausible on its face." *Id*. at 6.

The DPPs defend their complaint with heavy reliance on the fact that the Panasonic/SANYO entities have "admitted to the conduct and provided information about it." Dkt. No. 519 at 1.  They say they make highly detailed allegations of conspiracy on the basis of

that information, and that these "direct allegations of a conspiracy must be taken as true and establish, without any need for inference, the key facts of the conspiracy." *Id.*

In essence, defendants argue that the DPPs' single conspiracy is just too big to plead, and DPPs contend that where there's smoke, there's fire. The Court finds that both sides exaggerate their positions but that overall the DPP complaint has sufficient grounding in fact to go forward. Panasonic's "admission" does not have the dispositive weight ascribed to it by the direct purchaser plaintiffs. But more importantly for purposes of this motion, defendants limn far too bleak a picture -- and one that does not fairly reflect the DPPs' complaint -- when they argue that the DPPs' allegations are too "conclusory" and "bare-bones" to satisfy *Twombly*, or that size alone can doom conspiracy allegations. Dkt. No. 479 at 11.

The specific pleading standards stated by the Supreme Court in *Twombly* drive these findings. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555 (internal citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555-56 (same).

The Court has the added benefit that *Twombly* was itself a Sherman Act § 1 antitrust case. In that context, the same as here, the Supreme Court held that a conspiracy claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556. "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.*

These standards were not met in *Twombly* because the complaint left "no doubt that plaintiffs rest[ed] their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement" among defendants. *Id.* at 564. That omission is not true of the DPP complaint. The DPP complaint makes these substantive agreement allegations:

United States District Court
Northern District of California

6

- "Defendants agreed to concertedly fix, raise, maintain and/or stabilize the prices for aluminum, tantalum and film capacitors." Dkt. No. 401 ¶ 183. Defendants shared and exchanged with each other "confidential and competitively sensitive information pertaining to their product pricing" either through correspondence or during in-person meetings. *Id.* Pricing agreements were reached both in "regular, organized meetings" as well as through "ad hoc meetings and correspondence." *Id.* ¶ 185. Defendants also "agreed to quote similar or identical production lead times to purchasers on a concerted basis," as well as "to restrain their output." *Id.* ¶¶ 188-89.

- At least by the beginning of 2003, the defendant cartel members had "formally organized meetings among themselves to serve as a forum for the discussion and exchange of competitively sensitive information." *Id.* ¶ 194. These meetings were known variously as "ATC," "MK" or "JFC" meetings, and they were "generally organized by the types of capacitors to be discussed"; ATC and MK for aluminum and tantalum capacitors, and JFC meetings for film capacitors. *Id.* ¶ 196.

- Defendants generally held "monthly one-day meetings that were usually attended by manager-level employees," as well as "two-day meetings" twice a year that were "generally attended by defendants' more senior officials." *Id.* ¶¶ 201-02. For specific defendant groups such as the film capacitor manufacturers, meetings were held less frequently, *i.e.*, every one to three months. *Id.* ¶ 203.

- "Based on the recommendations and agreements reached at these different cartel meetings, the defendant attendees intended to and did agree to price capacitors collusively, stand united against price reduction demands, and set production and delivery dates to collusively control supply in the aluminum and tantalum capacitors markets." *Id.* ¶ 204.

- The complaint also describes, by way of example, organized "cartel meetings" that took place in ten different time periods, as well as a number of informal meetings among defendants that took place during the class period. *Id.* ¶¶ 208-18. Included are allegations of the identities of the defendants companies whose representatives attended each meeting, and defendant attendees are alleged, among other things, to have discussed "their plans to increase film capacitor prices" at a "cartel meeting" in the 4th quarter of 2007, discussed "implementing film capacitor price increases" at a meeting in the 4th quarter of 2008, and "agreed among themselves to resist price decreases and stabilize their film capacitor prices" at a meeting in the 1st quarter of 2009. *Id.* ¶ 208(a), (d), (e).

- Finally, the complaint alleges -- with specific price data -- that defendants' "concerted and collusive actions . . . artificially inflated the prices of capacitors," and "defendants' conspiracy permitted the defendant manufacturers of aluminum, tantalum and film capacitors to slow, negate and even reverse the market-driven decline in price for their products, and to fix prices at supra-competitive levels." *Id.* ¶ 219-23.

These allegations are enough to avoid dismissal. As an initial matter, they add up to much more than the superficial generalities about the "absence of any meaningful competition" and "parallel course of conduct" that sank the complaint in *Twombly*. 550 U.S. at 564-65. Defendants strongly deny the allegations and attack them as impossible or wrong but that objection clearly is irrelevant to this motion to dismiss. Whether the DPPs will carry their burden of proof on the price-fixing claim is a decidedly different issue from whether they have alleged enough facts

7

under Rule 8 to stay in court.  Like others before them, defendants ask this Court to treat *Twombly* as a license to resolve a Rule 12(b)(6) challenge on an impressionistic assessment of a complaint's merits.  But the task of the district court is not to sustain or dismiss a complaint based on whether the Court feels it is a winner or has curb appeal.  The Court's task is to determine whether the facts alleged in the complaint rise above mere speculation, even if the Court has doubts about them, *Twombly*, 550 U.S. at 555-56, and whether they "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation."  *Star v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011); *see also Twombly*, 550 U.S. at 556 (standard simply calls for "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.").  The DPP complaint passes this test.

In using the IPP complaint against the DPPs', defendants also overstate the differences between the pleadings.  Despite the allegation of two separate conspiracies, the IPPs acknowledge that some defendants (Hitachi, NCC, Rubycon and Panasonic) participated in both, and that "discovery may reveal that there was one overarching conspiracy due to the overlapping defendants and customers."  Dkt. No. 400 at 5 & 1 n.2.  The DPPs similarly acknowledge that "[w]hile there was substantial overlap between and among defendants who participated in discussions, communications and agreements concerning electrolytic (aluminum and tantalum) capacitors, on the one hand, and film capacitors, on the other, much still needs to be discovered."  Dkt. No. 401 ¶ 181.  The DPPs have nevertheless taken the step of alleging one overarching conspiracy, but, like the IPPs, the DPPs identify "Nippon Chemi-Con, Rubycon, Hitachi AIC and Panasonic/SANYO" as having played a "key role" because "each of these defendant companies manufactured both electrolytic capacitors (*i.e.*, aluminum and/or tantalum) and film capacitors and are dominant manufacturers of these capacitors."  *Id.* ¶ 199.

Not only are the factual allegations between the two complaints not as dissimilar as defendants contend, there simply is no requirement that an antitrust plaintiff draw the boundaries of the alleged conspiracy (or conspiracies) in a complaint with the precision of a diamond cutter. *See In re Lithium Ion Batteries Antitrust Litigation* ("*Batteries I*"), No. 13-MD-2420 YGR, 2014 WL 309192, at *2 (N.D. Cal. Jan. 21, 2014) ("The question in this case is not whether any

conspiracy existed, only how far it reached.  That question is ultimately one of fact, and cannot be resolved in the present procedural posture, where the Court tests only the sufficiency of the pleadings.").  And mere size or breadth alone is not a reason to peremptorily jettison a conspiracy allegation.  Defendants cite *In re Optical Disk Drive Antitrust Litigation*, No. 3:10-md-2143 RS, 2011 WL 3894376 (N.D. Cal. Aug. 3, 2011), for the purported rule that "a single overarching conspiracy" is inherently implausible.  Dkt. No. 479 at 7.  But the case does not stand for that proposition at all.  There, the court was reacting to an allegation of conspiracy that stretched from stand-alone disk drives to products that incorporated the drives into other devices.  2011 WL 3894376, at *6.  None of the device makers were named as defendants and they participated in a broad range of markets and marketing channels that the named drive conspirators would somehow need to have controlled.  *Id.*  For that reason, the court expressed plausibility concerns.  But that reason does not, of course, exist in this case, which involves only stand-alone capacitors.  So long as an alleged conspiracy is supported by enough facts to make it plausible, as it is here, it is of no matter whether it involves three conspirators or a score or more.

Significantly, defendants do not attack the plausibility of the IPPs' complaint, which alleges a film capacitor conspiracy beginning in 2007 and an electrolytic capacitor conspiracy beginning in 2003.  While defendants seek to make much of the fact that the DPP complaint puts the starting date of the film capacitor conspiracy at 2003 (because it alleges a single conspiracy from 2003 for all the named products), defendants did not explain in their papers or at the hearing how, if at all, this difference would have any impact on the scope or cost of discovery.  *Cf. Twombly*, 550 U.S. at 559 ("it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive").  The DPPs' allegations "give a defendant seeking to respond to [the] allegations of [] conspiracy an idea of where to begin," and defendants cannot with a straight face claim otherwise.  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).

The Court finds that the DPP complaint has met the bar set by *Twombly* after considering, as it must, the DPPs' complaint as a whole.  The Court makes clear, however, that the government investigations alleged by plaintiffs carry no weight in that holistic analysis.  Dkt. No. 401 ¶¶ 275-

United States District Court
Northern District of California

76, 280-83 (describing investigations by the U.S. DOJ Antitrust Division, the People's Republic of China's National Development and Reform Commission, and Fair Trade Commissions of Japan, South Korea, Taiwan and the European Commission's competition authority). "It is unknown whether the[se] investigation[s] will result in indictments or nothing at all." *In re Graphics Processing Units Antitrust Litigation* ("*GPU*"), 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007). Moreover, at least some, and possibly all, of these investigations are being conducted in secret, and consequently, "the scope of the investigation is pure speculation. It may be broader or narrower than the allegations at issue." *Id*.

Panasonic's leniency application through ACPERA is in the same boat. Dkt. No. 401 ¶¶ 277-79. While substantively different from a mere investigation, the ACPERA application also entails a lack of transparency that vitiates its utility in a pleading. The parties agreed at the hearing that there is no pertinent case law on this issue, and that this case presents a rather unusual factual circumstance in that the ACPERA application (and corresponding assistance to the private plaintiffs) came early in the timeline. DPPs ask the Court to treat Panasonic's application as the equivalent of a guilty plea that admits all facts. They assert that Panasonic must "admit to price fixing" by statute and DOJ policy in order to receive leniency under ACPERA. *Id*. ¶ 279. Panasonic did not dispute this, and further acknowledged that it must sufficiently cooperate with both plaintiff groups in order to avoid both treble damages and joint and several liability pursuant to ACPERA. But as Panasonic pointed out, and plaintiffs agreed, the ACPERA process is not transparent. There is in fact no guilty plea or similar formal acknowledgement of wrongdoing that plaintiffs, and more critically the Court, can see and evaluate. While it is tempting to ascribe a higher value to the application than to an investigation, its contents are unknown and the same concerns about the lack of transparency in investigative proceedings applies here. It is not possible for the Court to delimit the actual scope of Panasonic's alleged admissions and how they map on to the DPP civil complaint. Consequently, Panasonic's ACPERA application is a non-factor in the Court's analysis. The Court understands that Panasonic has proffered facts about its scope of conduct and documents to both groups of plaintiffs, but otherwise the Court finds that it is not particularly different from the other defendants for present purposes. Panasonic's

application certainly is not the be-all and end-all confession that DPPs' motion to dismiss

opposition suggests.

### B.  Statute of Limitations

Defendants also seek dismissal of the DPPs' claim at least "to the extent it accrued

before July 18, 2010," pursuant to the Clayton Act's four-year statute of limitations.  Dkt. No. 479

at 20 (citing 15 U.S.C. § 15b).  Defendants argue that the DPPs' allegation that the statute was

tolled by defendants' fraudulent concealment is insufficient because the DPPs have alleged "no

specific facts that would satisfy Rule 9(b) to support their conclusory allegations," such as the

dates, time or locations of any "secret discussions" or when, how, where and why any "coded

language" was used.  *Id*. at 21.

To toll the statute of limitations under a fraudulent concealment theory, a plaintiff "must

plead facts showing that [defendants] affirmatively misled it, and that [plaintiff] had neither actual

nor constructive knowledge of the facts giving rise to its claim despite its diligence in trying to

uncover those facts."  *Conmar Corp. v. Mitsui & Co. (U.S.A.)*, 858 F.2d 499, 502 (9th Cir. 1988).

Conclusory statements are not enough, and plaintiffs must instead "plead with particularity the

circumstances of the concealment and the facts supporting [their] due diligence."  *Id*.  "[I]t is

generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the

motion to dismiss stage, particularly when the proof relating to the extent of the fraudulent

concealment is alleged to be largely in the hands of the alleged conspirators."  *In re Cathode Ray

Tube (CRT) Antitrust Litigation*, 738 F. Supp. 2d 1011, 1024 (N.D. Cal. 2010).

The Court finds that the DPPs have made specific allegations of fraudulent concealment.

They allege that defendants generally "agreed not to discuss publicly the nature of the scheme"

and "did not take or distribute official minutes or record" the meetings alleged.  Dkt. No. 401

¶¶ 295-96.  And plaintiffs quote from a 2006 e-mail from a SANYO employee, stating:

"[E]xchanging information is useful . . . .  However, it maybe [*sic*] become a double-edged sword

at times.  To the extent possible, try to exchange verbally so that no evidence is left behind.

Especially pricing figures and important presentation materials."  *Id*. ¶297.  Plaintiffs also allege a

SANYO employee's comments in an e-mail requesting "utmost care in handling" reports attached

United States District Court
Northern District of California

to the e-mail because the "gathering[s] should not be disclosed to the public." *Id*. ¶ 299.  Other e-mails among SANYO employees and NEC-TOKIN employees are alleged to have included the instruction, "Once you read this email, please delete it." *Id*. ¶ 300.

These allegations are sufficiently particularized to support the allegation of fraudulent concealment at this stage.  The Court denies defendants' request to dismiss plaintiffs' claim to the extent it accrued before July 18, 2010.

## C. SUFFICIENCY OF ALLEGATIONS FOR EACH DEFENDANT'S MEMBERSHIP AND ROLE

Defendants' third and final "joint" argument is that the direct purchaser plaintiffs have not sufficiently alleged each defendant's membership and role in the alleged conspiracy.  Dkt. No. 479 at 16.  Defendants make this argument in two ways.

Defendants argue that the DPPs "ignore corporate separateness and fail to sufficiently allege the involvement of the U.S. subsidiaries." *Id*. at 17.  Defendants say the DPP complaint "does not contain a single, solitary allegation linking the majority of the defendant U.S. subsidiaries to the alleged conspiracy." *Id*.  The Court agrees with the general principle that, while detailed "'defendant by defendant' allegations" are not necessary, an antitrust complaint "must allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it." *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008).  But this case involves twenty-two different defendant groups, Dkt. No. 491 ¶¶ 7-107, and defendants have done little to identify who is in the "majority" they reference.  The Court declines the invitation to do the heavy lifting on its own time and resources to figure out which defendants fall into the "majority" and which do not.  The Court resolves the separate motions to dismiss brought by individual defendants and defendant groups below, but it denies defendants' joint motion to dismiss the "majority" of the defendant U.S. subsidiaries for lack of specificity.

Defendants also argue that "[e]qually fatal to the DPPs' complaint is its failure to identify the role each defendant played in the alleged conspiracy."  Dkt. No. 479 at 19.  This argument, too, is made on behalf of all moving defendants with no further specification. *Id*. at 19-20.  But

12

1    not only is there no particularity requirement akin to Rule 9(b) to explain each defendant's own,

2    unique role, defendants have identified no basis for dismissing all defendants for this alleged

3    failure.  The Court denies this request as well.

### D.  Individual Defendants' Motions

5            The Court turns to the twelve separate motions brought by individual defendants and

6    defendant groups.  Dkt. No. 480.  The Court grants these motions in part and denies them in part.

#### a.  AVX Corporation

8                The Court grants AVX Corporation's motion to dismiss with leave to amend.

9    AVX Corporation is not alleged to have participated in or even been informed of the "cartel's

10   regular meetings," Dkt. No. 401 ¶ 198, nor is it alleged to have participated in any cartel "sub-

11   groups" or in any specific cartel meetings.  The only substantive allegation against AVX is that it

12   "worked to coordinate pricing strategy" with other defendants, *id.* ¶¶ 215-16, but these allegations

13   fall short of alleging "an agreement and a conscious decision" by AVX to join it.  *TFT-LCD*, 586

14   F. Supp. 2d at 1117.

15           Also insufficient are the allegations about AVX's February 2013 acquisition of

16   "Nichicon's tantalum capacitor production facilities in Japan and China."  Dkt. No. 401 ¶ 64.

17   Plaintiffs assert that the acquired facility is a "mere continuation of" the unit as it was organized

18   and operated by Nichicon, and that AVX is consequently the "successor in interest" to all assets

19   and liabilities, including those arising from the unit's alleged violations of § 1 of the Sherman Act.

20   *Id.* ¶ 65.  However, "[a] purchaser of a company does not assume the seller's liabilities unless:

21   (1) there is an express or implied agreement of assumption; (2) the transaction amounts to a

22   merger or consolidation of the corporations; (3) the purchasing corporation is a mere continuation

23   of the seller; or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping

24   liability for the seller's debts."  *GPU*, 527 F. Supp. 2d at 1031 (citing *Ray v. Alad Corp.*, 19 Cal.

25   3d 22, 28 (1977)).  Here, plaintiffs have made nothing but the conclusory allegation of "mere

26   continuation."  That is not enough.  *See, e.g.*, *No Cost Conf., Inc. v. Windstream Commc'ns., Inc.*,

27   940 F. Supp. 2d 1285, 1299 (S.D. Cal. 2013) (finding that even though liberal requirements of

28   Rule 8(a)(2) apply to successor-in-interest allegations, conclusory allegation that defendant

United States District Court
Northern District of California

13

1    assumed all rights and responsibilities as result of merger was insufficient, because plaintiff "must

2    plead the existence of a contract [and] its terms which establish the obligation [in] issue") (internal

3    quotation marks omitted).

### b.   EPCOS AG, EPCOS Inc., TDK-EPC Corporation and TDK U.S.A. Corporation

6          The Court denies the motion to dismiss by EPCOS AG, but grants the motions of

7    EPCOS Inc., TDK-EPC Corporation and TDK U.S.A. Corporation with leave to amend.

8          Plaintiffs filed a chart identifying the specific paragraphs in their consolidated complaint

9    for each defendant.  *See* Dkt. No. 520-2.  For EPCOS AG, the chart shows that the only

10   substantive allegations are paragraphs 213 and 214 of the consolidated complaint.  Paragraph 213,

11   however, alleges that during the class period, "SANYO and EPCOS met at a trade show to discuss

12   their tantalum capacitors, conducted an exchange of competitively sensitive information, [and]

13   *agreed to make such exchanges in the future so that they could cooperate on future pricing*."  Dkt.

14   No. 401 ¶ 213 (emphasis added).  This allegation is enough to meet the *Twombly* pleading

15   standard, and EPCOS AG's motion is denied.  *See In re Citric Acid Litig.*, 191 F.3d 1090, 1103

16   (9th Cir. 1999) (Supreme Court held in *U.S. v. Container Corp. of America*, 393 U.S. 333 (1969)

17   that "the reciprocal exchange of price information pursuant to an agreement by the defendants was

18   concerted action sufficient to establish a price-fixing conspiracy.").

19         As plaintiffs' chart shows, paragraph 213 is not identified as applying to EPCOS AG's

20   subsidiary companies, *i.e.*, EPCOS Inc., TDK-EPC Corporation and TDK U.S.A. Corporation.

21   *See* Dkt. No. 520-2.  The allegations that do relate to those companies are too paltry to go forward

22   and those companies are dismissed with leave to amend.

### c.   Fujitsu Components America, Inc.

24         The Fujitsu family of defendants includes three entities, but only Fujitsu

25   Components America, Inc. ("FCA") has filed a separate motion to dismiss.  FCA argues that the

26   DPP complaint fails to allege that it joined the conspiracy and played a role in it.  The Court

27   agrees.  Plaintiffs' chart acknowledges that paragraphs 54 and 123 of the consolidated complaint

28   are the only ones that mention FCA.  Paragraph 54 generally alleges that FCA "sold and

United States District Court
Northern District of California

14

distributed to United States purchasers aluminum and/or tantalum and/or film capacitors manufactured by business units . . . of its corporate parent, Fujitsu."  Dkt. No. 401 ¶ 54.  Paragraph 123 alleges in a vague and conclusory manner that FCA is one of the defendants that "assisted its respective corporate parent defendants with the sale and/or delivery to United States purchasers of the parents' respective aluminum, tantalum and film capacitors to United States purchasers."  *Id.* ¶ 123.

Plaintiffs argue that they are not required to "plead the precise role in the conspiracy of each individual company in each corporate family," and try to rely on their general allegations against the "larger Fujitsu corporate family."  Dkt. No. 519 at 38-39.  That is not a sound approach.  An antitrust complaint "must allege that each individual defendant joined the conspiracy and played some role in it."  *TFT-LCD*, 586 F. Supp. 2d at 1117.  The cases that found adequate pleading against subsidiaries contained much more than is present here.  *See CRT*, 738 F. Supp. 2d at 1019 (noting allegations that "employees engaged in conspiratorial meetings on behalf of members of their corporate families, that participants did not always know the corporate affiliation of their counterparts and did not distinguish between the entities within a corporate family," and finding as a result that "the entire corporate family was represented in meetings and discussions . . . and was a party to the agreements reached in them."); *see also In re Lithium Ion Batteries Antitrust Litig.* ("*Batteries II*"), No. 13-MD-2420 YGR, 2014 WL 4955377, at *34 (N.D. Cal. Oct. 2, 2014) (plausible to infer "that generic references to NEC in documents generated by defendants themselves implicate both NEC Corp. and NEC Tokin").  FCA is dismissed from the direct purchaser plaintiffs' complaint with leave to amend.

### d.  Holy Stone Enterprise Co., Ltd. and HolyStone International

Defendants Holy Stone Enterprise Co., Ltd. and HolyStone International (who refer to themselves collectively as "Holy Stone") move for dismissal "for failure to offer facts plausibly suggesting that Holy Stone joined and participated in the alleged 'global' conspiracy."  Dkt. No. 480 at 19.  But while Holy Stone argues that the DPPs' complaint offers "only a single, conclusory allegation regarding Holy Stone" in paragraph 208(j), the complaint mentions Holy Stone in at least one other substantive paragraph.  In paragraph 198, the complaint alleges that

United States District Court
Northern District of California

1  "meeting rosters during the period from 2003 to 2008 indicate that officers, managers and/or

2  employees of the following defendant companies participated in or were informed of the cartel's

3  regular meetings:  . . . Holy Stone . . . ."  Dkt. No. 401 ¶ 198.  The complaint further alleges that

4  "[b]ased on the recommendations and agreements reached at these different cartel meetings, the

5  defendant attendees intended to and did agree to price capacitors collusively, stand united against

6  price reduction demands, and set production and delivery dates to collusively control supply in the

7  aluminum and tantalum capacitors markets."  *Id.* ¶ 204.  In addition to these allegations, the

8  consolidated complaint alleges that "[r]epresentatives of NEC TOKIN, Nippon Chemi-Con,

9  Rubycon, Matsuo, ELNA, ROHM and Holy Stone attended cartel meetings held in the 2nd

10  Quarter of 2010."  *Id.* ¶ 208(j).

11  The Court finds that the allegations against Holy Stone are sufficient under *Twombly*, and

12  denies Holy Stone's motion to dismiss.

13  **e.   KEMET Corporation and KEMET Electronics Corporation**

14  Like Holy Stone, KEMET Corporation is named in paragraph 198 of the

15  consolidated complaint and in at least one of the subparagraphs of paragraph 208.  Dkt. No. 401

16  ¶¶ 198, 208(c).  In addition, KEMET Corporation is specifically alleged to have "joined the

17  conspiracy at least by 2008 and perhaps by 2005, if not earlier."  *Id.* ¶ 217.  Although KEMET

18  Corporation argues that "[i]t does not make sense that KEMET, an American company, was

19  invited to attend or attended" meetings which were presumably "conducted in Japanese," this

20  argument misunderstands the standards that apply at this stage of the proceedings.  KEMET

21  Corporation's motion to dismiss is denied.

22  Its subsidiary, KEMET Electronics Corporation ("KEC"), is a different story.  The four

23  paragraphs that plaintiffs identify as relating to KEC -- paragraphs 38 through 41 of the

24  consolidated complaint -- establish only that KEC acquired a controlling majority voting interest

25  in NEC TOKIN and as a result, "KEC has, since early 2012, sold and distributed NEC TOKIN's

26  aluminum and/or tantalum capacitors, directly or through its business units, subsidiaries, agents or

27  affiliates, to United States purchasers."  Dkt. No. 401 ¶¶ 38-41.  These allegations do nothing to

28  establish that KEC itself joined the conspiracy.  KEC is dismissed with leave to amend.

16

**f.  Nichicon Corporation and Nichicon (America) Corporation**

The allegations against Nichicon Corporation are sufficient and its motion to dismiss is denied.  Among other things, Nichicon Corporation is alleged to have participated in the "cartel's regular meetings"; the defendant attendees are alleged to have "intended to and did agree to price capacitors collusively [and] stand united against price reduction demands"; and representatives from "Nichicon" are alleged to have attended at least four separate "cartel meetings."  Dkt. No. 401 ¶¶ 198, 204, 208 (f)-(i).  These are enough.

Nichicon (America) Corporation ("Nichicon America"), however, is dismissed with leave to amend.  Plaintiffs' chart shows that paragraphs 58 and 123 of the consolidated complaint are the only ones that relate to Nichicon America.  Dkt. No. 250-2 at 2.  As discussed, these allegations are insufficient.

**g.  Okaya Electric Industries Co., Ltd. and Okaya Elec tric America Inc.**

Okaya Electric America Inc. ("Okaya America") is similarly situated to Nichicon America.  *See* Dkt. No. 520-2 at 2 (identifying only paragraphs 93 and 123 of the consolidated complaint as relating to Okaya America).  The Court grants its motion to dismiss with leave to amend.

Okaya Electric Industries Co., Ltd., on the other hand, impermissibly re-argues a point already raised in defendants' joint motion.  *See* Dkt. No. 480 at 31 (attacking plausibility of one overarching conspiracy encompassing both film capacitors and electrolytic capacitors).  It is denied for the same reasons the Court has denied defendants' joint motion.

**h.  ROHM Co., Ltd. and ROHM Semiconductor U.S.A., LLC**

ROHM Semiconductor U.S.A. LLC is in the same boat as defendants Okaya America and Nichicon America.  *See* Dkt. No. 520-2 at 2 (identifying only paragraphs 85 and 123 of the consolidated complaint as relating to ROHM Semiconductor U.S.A.).  It is dismissed with leave to amend for the same reasons.

Its parent company, ROHM Co., Ltd., presents a closer call.  While the allegations against it are thin, and the Court finds that reference to its membership in trade associations (Dkt. No. 401 ¶¶ 268-69) adds nothing to the analysis here, the Court concludes plaintiffs have alleged enough to

United States District Court
Northern District of California

get past the *Twombly* pleadings bar.  ROHM is alleged to be included in "[m]eeting rosters during the period from 2003 to 2008" for "cartel meetings," and its representatives are alleged to have attended at least one meeting in the 2nd quarter of 2010.  *Id.* ¶¶ 198, 208(j).

### i.   Shinyei Kaisha, Shinyei Capacitor Co., Ltd. and Shinyei Corporation of America, Inc.

Defendants Shinyei Capacitor Co., Ltd. and Shinyei Corporation of America are identified as having only one and two allegations, respectively, in the consolidated complaint that relate to them.  Dkt. No. 520-2 at 2-3 (identifying paragraph 99 for Shinyei Capacitor Co., Ltd. and paragraphs 100 and 123 for Shinyei Corporation of America).  These paragraphs have no substance -- certainly none that shows these defendants as having joined the conspiracy -- and these defendants are dismissed with leave to amend.

Shinyei Kaisha is similarly situated as ROHM Co., Ltd. and Holy Stone, discussed above, except that it is alleged to have participated in at last four meetings (which, it should be noted, are described by way of example and not as constituting an exhaustive list of all cartel meetings).  *See* Dkt. No. 401 at ¶ 208(b), (c), (d), (e).  Its motion to dismiss is denied.

### j.   Soshin Electric Co., Ltd. and Soshin Electronics of America, Inc.

The allegations against Soshin Electronics of America, Inc. (*see* Dkt. No. 520-2 at 3, identifying only paragraphs 105 and 123) are insufficient to show that it joined the conspiracy.  The Court grants Soshin Electronics of America, Inc.'s motion to dismiss with leave to amend.

Soshin Electric Co., Ltd.'s motion otherwise repeats arguments made in the defendants' joint motion, which the Court declined.  While the Court has some concern that Soshin is not alleged to have participated in a single, specific meeting (Dkt. No. 520-2 at 3, identifying only paragraphs 104, 198, 208 and 268), the list of specific meetings is intended to be a sampling only.  The Court consequently concludes that plaintiffs have pled enough to proceed as against Soshin Electric Co., Ltd. and denies its motion to dismiss.

### k.  United Chemi-Con, Inc.

United Chemi-Con, Inc. ("UCC"), a U.S. subsidiary of Nippon Chemi-Con Corporation, is the only defendant in its corporate family to seek dismissal.  Dkt. No. 401 ¶ 45.

As with the other U.S. subsidiaries dismissed above, plaintiffs' chart shows that only paragraphs 45 and 123 relate to UCC.  Dkt. No. 520-2 at 3.  That is not enough, and UCC is dismissed with leave to amend.

### l.   Vishay Intertechnology, Inc.

Plaintiffs' chart identifies six paragraphs of the consolidated complaint that relate to Vishay Intertechnology, Inc. ("Vishay").  Dkt. No. 520-2 at 3.  Two of these can be dispensed with easily.  Paragraph 269 alleges membership in a trade association, and paragraph 307 alleges that "in 2010 and 2011, defendants Vishay and Panasonic each made a number of public statements to industry and technology media attributing supply limitations and pricing adjustments for their tantalum electrolytic capacitors to raw materials supply issues."  Dkt. No. 401 ¶¶ 269, 307.  Neither of these allegations advances the ball in the slightest towards alleging Vishay's participation in the alleged conspiracy.

The other four paragraphs, 76, 79, 80 and 82, all relate to Vishay's acquisition of Holy Stone Polytech -- Hitachi AIC's tantalum and niobium capacitors division, which was acquired by Holy Stone -- on or about June 11, 2014.  Dkt. No. 401 ¶¶ 76, 80.  The division was renamed "Vishay Polytech Co., Ltd." and Vishay Polytech is alleged to be a successor in interest to Holy Stone Polytech's liabilities, including those alleged under § 1 of the Sherman Act.  *Id.* ¶ 81.  Vishay itself, however, is not alleged to be such a successor in interest.  Although Vishay Polytech is itself named as a defendant, it does not seek dismissal.

For Vishay, it is alleged to have "effectively purchased a participant in the unlawful cartel alleged herein and [to have] thereby joined and participated in defendants' conspiracy through Vishay Polytech's acts taken in furtherance of the conspiracy."  Dkt. No. 401 ¶82.  But a parent corporation "is not liable for the acts of its subsidiaries."  *In re Cal. Title Ins. Antitrust Litig.,* No. C 08-01341 JSW, 2009 WL 1458025, at *7 (N.D. Cal. May 21, 2009) (quoting *U.S. v. Bestfoods*, 524 U.S. 51, 61 (1988)).  Plaintiffs have identified no reason why this "general principle of corporate law deeply ingrained in our economic and legal systems" is inapplicable here.  Defendant Vishay Intertechnology, Inc. is dismissed with leave to amend.

## II.  INDIRECT PURCHASER PLAINTIFFS' COMPLAINT

Also pending before the Court are "joint" and "consolidated" motions to dismiss the indirect purchaser plaintiffs' complaint.  Dkt. Nos. 474, 475.  Those motions are easier to resolve because defendants do not contest the plausibility of the indirect purchaser plaintiffs' allegations, and because plaintiffs voluntarily dismissed the indirect consumer purchaser plaintiffs after the hearing.  Dkt. No. 594.

### A.  Article III Standing

Defendants make two standing arguments under Article III of the United States Constitution.  They argue that the indirect purchaser plaintiffs lack standing because they have "failed to allege the necessary pass through of injury down the complicated distribution and product chains applicable to the different IPPs," and because they "fail to allege facts sufficient to show that their claimed injury is traceable to *any* defendant."  Dkt. No. 474 at 5-6.

If the multi-level consumer IPPs were still in the case, defendants' arguments might have some punch.  But the consumers have been voluntarily dismissed, and so the thrust of these arguments has been substantially blunted.  To the extent they are applicable at all to the remaining "first-level" IPPs, they are unpersuasive.  These IPPs allege that "[e]lectrolytic and film capacitors are discrete and identifiable component parts that pass through the chain of distribution in substantially the same form from defendants to consumers when purchased as part of electronic products."  Dkt. No. 400 ¶ 151.  Moreover, "[a] capacitor is traceable to an entity owned and/or controlled by a defendant because it bears the defendant's markings (*e.g.*, name, logo, series)."  *Id*.  The first-level indirect purchaser plaintiffs further allege that they "purchased electrolytic and/or film capacitors as stand-alone products from one or more distributors that purchased such capacitors as stand-alone products from one or more defendants during the respective class periods," *id*. ¶ 29, and paid supracompetitive prices for them, *id*. ¶¶ 286-87.  These allegations are sufficient to establish injury in fact fairly attributable to the defendants for standing purposes.  *See TFT-LCD*, 586 F. Supp. 2d. at 1122-23 (sustaining IPP claims on similar allegations).  Defendants' reliance on *Easter v. American West Financial*, 381 F.3d 948 (9th Cir. 2004), in no way undercuts this conclusion.  That case involved a summary judgment motion under

20

1    Washington state laws on usury in bank loan agreements where the "borrowers presented no

2    evidence that their alleged injuries were the result of a conspiracy or concerted scheme between

3    the trust defendants."  *Id*. at 962.  It has no application here.

4          Defendants also argue under Article III that the complaint "lacks representative plaintiffs

5    for the Consumer IPPs' Michigan claim and the First-Level IPPs' claims for all states other than

6    California, and the Consumer IPPs have also failed to allege facts that they purchased products

7    affected by either of the claimed conspiracies."  Dkt. No. 474 at 5.  Obviously, these arguments

8    are mostly mooted by the voluntary dismissal of the Consumer IPPs.  The four remaining first-

9    level IPPs hail from only two states, California and Virginia, and the IPPs' complaint does not

10   assert any claim under Virginia state law.  Consequently, the Court finds that the only live

11   question is whether California law can be applied nationwide, which the Court resolves shortly.[3]

12        **B.  *AGC***

13          Defendants spent substantial effort attacking standing under the prudential

14   considerations in *Associated General Contractors of California v. California State Council of*

15   *Carpenters*, 459 U.S. 519 (1983) ("*AGC*").  They argued that "[a]ccording to the legislatures or

16   courts of eighteen of the nineteen states at issue here, *AGC* or analogous principles apply to

17   determine standing under their respective antitrust laws," and the claims brought under those

18   states' laws should therefore be dismissed.  Dkt. No. 551 at 5.  But now that the Consumer IPPs

19   are no longer a part of the case and no Virginia state law claim has been asserted, the only state

20   whose laws can be invoked is California.

21          The application of *AGC* to California state antitrust claims has recently become murky,

22   and that murkiness persuades the Court *AGC* should not be applied.  As an initial matter, *AGC* is a

23   creature of federal law and sets out standards for federal antitrust standing.  *See AGC*, 459 U.S. at

24   521 ("question presented is whether the complaint sufficiently alleges that the unions have been

25   'injured in [their] business or property by reason of anything forbidden in the antitrust law' and

26

27   ───────────────

     [3] For these same reasons, the Court finds as inapplicable defendants' state-specific arguments
28   (which do not relate to either California or Virginia), and denies those arguments on that basis.
     Dkt. No. 474 at 27-31.

United States District Court
Northern District of California

may therefore recover treble damages under § 4 of the Clayton Act"). Defendants include California in their list of states where the legislature or highest court has "indicated that federal antitrust law should be followed in determining standing." Dkt. No. 474 at 10. This is a mighty overstatement of California law. Defendants fail to cite any California statute showing that the California legislature has made that indication. Defendants' characterization of a decision by the California Supreme Court is equally shaky. Defendants cite *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758 (2010), for the proposition that the California Supreme Court applies and follows *AGC*. But that case did not involve a question of standing under the California antitrust laws, and the court's reference to *AGC* was at most a passing one made in discussing an intermediate appellate court's opinion. *Id.* at 774. *Clayworth* is not at all a definitive decision holding that *AGC* applies to California antitrust claims.

To the contrary, since *Clayworth*, the California Supreme Court has been careful to emphasize that the state's antitrust laws are not mere clones of federal law subject to federal court opinions. "Interpretations of federal antitrust law are at most instructive, not conclusive, when construing the Cartwright Act, given that the Cartwright Act was modeled not on federal antitrust statutes but instead on statutes enacted by California's sister states around the turn of the 20th century." *Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185, 1195 (2013). The California Supreme Court just reiterated that teaching in a very recent decision on reverse payment settlement agreements. *See In re Cipro Cases I & II*, No. S198616, 2015 WL 2125291, at *10 (Cal. May 7, 2015).

The Ninth Circuit has recognized this development in California law. *Samsung Electronics Co. v. Panasonic Corp.*, 747 F.3d 1199, 1205 (9th Cir. 2014) (finding that it is "no longer the law in California" that "the interpretation of California's antitrust statute [is] coextensive with the Sherman Act."). Defendants do not cite any persuasive authority calling this fact into question. The Ninth Circuit case cited by defendants, *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000), pre-dates both *Aryeh* and *Samsung* by more than a decade, and the Court disregards it for that reason. The Court also disregards defendants' cite to a California Court of Appeals case, *Vinci v. Waste Management, Inc.*, 36 Cal. App. 4th 1181, 1814

1    (Ct. App. 1995), because it was issued neither by California's legislature or highest court.  *See*

2    *GPU*, 540 F. Supp. 2d at 1097 (finding it proper to apply *AGC* to those states where the supreme

3    court had "explicitly endorsed using the test," but finding the law "less clear cut" in California

4    where the "Cartwright Act contains a harmonization provision, and some California appellate

5    courts have used the *AGC* test as well").

6           Consequently, the Court joins the other courts in this district that have concluded that the

7    federal standing test under *AGC* has not been clearly applied by the California Supreme Court to

8    claims brought under California's Cartwright Act.  *See*, *e.g.*, *TFT-LCD*, 586 F. Supp. 2d at 1123

9    ("inappropriate to broadly apply the *AGC* test" to states like California); *Batteries II*, 2014 WL

10   4955377, at *10-11 (stating after detailed analysis that "the Court cannot conclude on the

11   authorities now before it that California applies *AGC* in the manner urged by defendants").

12   Defendants' arguments under *AGC* are therefore denied.

13          **C. Nationwide Claims Under California Law**

14          The IPPs' complaint does allege claims under California law, specifically the

15   Cartwright Act and the UCL, and seeks to assert these claims on behalf of a nationwide class.

16   Dkt. No. 400 ¶¶ 360-379.  Defendants argue that a national application of California law would be

17   unconstitutional and impermissible under *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821-22

18   (1985).  Dkt. No. 474 at 22-23.  As was the case in *GPU*, the Court finds that defendants "in effect

19   move to strike all references to a nationwide class in these claims because extraterritorial

20   application of California's antitrust law would violate due process."  527 F. Supp. 2d at 1027.

21   Under *Shutts*, the law of any particular state may not be applied to a nationwide class unless

22   (1) the chosen state's law does not conflict with the law of another jurisdiction that has an interest

23   in the case, and (2) the chosen state has a significant contact or significant aggregation of contacts

24   to claims asserted by each member of the plaintiff class such that the choice of that state's law is

25   not arbitrary or unfair.  *Id*. (citing *Shutts*, 472 U.S. at 821-22).

26          Here, as in *GPU*, the Court finds that the potential conflict with the laws of other states

27   (which surely would have an interest in this case if the Court were to certify a nationwide class)

28   "looms large."  527 F. Supp. 2d at 1027.  This is because "some states allow their citizens to sue

United States District Court
Northern District of California

23

United States District Court
Northern District of California

for antitrust injuries as indirect purchasers (like California) and some do not." *Id*.  Furthermore, "[e]ach state had the ability to repeal *Illinois Brick* as to its local law.  Some chose yes.  Some chose no." *Id*.  As in *GPU*, here, too, plaintiffs have not shown that California has a greater interest in applying its law than any other state, and consequently, any Cartwright Act class that may ultimately be certified would, at most, have to be limited to states with laws like California's.

On the significant contacts question as well, the IPPs' complaint alleges hardly any contacts at all with the state of California.  Most of the defendants are headquartered abroad, and the meetings and conduct at issue are also mostly alleged to have taken place outside of the United States.

Although plaintiffs argue that it would be "premature for this Court to rule on the application of California law to a nationwide class," Dkt. No. 516 at 27, the Court finds "merit in disposing of this issue at an early stage of the litigation, particularly where the issue of whether the different state's laws conflict will not change significantly as this action progresses." *GPU*, 527 F. Supp. 2d at 1028.  Defendants' motion is granted in this regard, and all references to a nationwide class in indirect purchasers' claims under California's Cartwright Act and Unfair Competition Law are stricken.

### D.  Unjust Enrichment

Both sides agree, correctly, in the Court's view, that unjust enrichment is a remedy, and not an independent claim.  Dkt. No. 474 at 31-32; 516 at 37-38 ("unjust enrichment is a remedy and is properly pled in the Prayer for Relief").  The Court has previously held that unjust enrichment is not a claim.  *See*, *e.g.*, *Callaghan v. BMW of N. Am., LLC*, No. 13-CV-04794-JD, 2014 WL 6629254, at *4 (N.D. Cal. Nov. 21, 2014) (finding that "to the extent plaintiffs are seeking to rely on California law, the claim must be dismissed for the separate and additional reason that unjust enrichment is not an independent cause of action").  To the extent the complaint can be read to allege a stand-alone claim for unjust enrichment, that claim is dismissed with prejudice.

United States District Court
Northern District of California

### E.  Statute of Limitations

Defendants argue that the IPPs' complaint, too, is "barred by the applicable statutes of limitations for any injuries that took place outside the limitation periods," and that plaintiffs' "allegations regarding fraudulent concealment are insufficient under Rule 9(b)."  Dkt. No. 474 at 32.  But as was the case with the DPPs' complaint, the IPPs' complaint, too, includes specific allegations that are enough to satisfy the pleading standards for fraudulent concealment.  *See*, *e.g.*, Dkt. No. 400 ¶¶ 170 ("In a Spring 2009 e-mail from a SANYO employee to other SANYO employees, he began with:  'Once you read this email, plead delete it.'"; sender also used "Company N" as code name to refer to NEC TOKIN); 172 (again using code name and asking recipient to "please discard this e-mail").  The Court denies defendants' motion on this issue.

### F.  Individual Defendants' Arguments

For the IPPs' complaint, there are five separate motions to dismiss in addition to the joint motion.  Dkt. No. 475.

#### a.  U.S. Subsidiaries

The IPPs' complaint names fewer defendants overall, and fewer U.S. subsidiaries, than its DPP counterpart.  For example, the IPPs have not named the KEMET or Fujitsu groups of companies at all, and in the case of Taitsu, Shinyei and Soshin, have not named the U.S. subsidiary.  In the first separately-filed motion, five U.S. subsidiaries which were named in the IPPs' complaint jointly seek dismissal for the same reason.  The five subsidiaries are ELNA America Inc., Hitachi Chemical Co. America, Ltd., NEC TOKIN America, Inc., Nichicon (America) Corp., and Rubycon America, Inc.  Dkt. No. 475 at 1.  Their joint argument for dismissal is that the IPPs have "fail[ed] to make any non-conclusory factual allegations whatsoever about the involvement of any of them in either" the film conspiracy or the electrolytic conspiracy.  *Id*.  The subsidiaries assert that "[t]here is not a single factual allegation in the complaint that any particular U.S. subsidiary engaged in any collusive conduct."  *Id*.

Plaintiffs respond that their allegations are sufficient, and point in particular to paragraphs 152 to 187, and paragraph 368 of their complaint.  Dkt. No. 517 at 5.  Paragraphs 152 to 186, however, generically refer to defendant corporate groups on a family basis, without distinguishing

between parent and subsidiary.  *See*, *e.g.*, Dkt. No. 400 ¶ 158 ("The Elna, NCC, Nichicon, Panasonic, Rubycon defendants generally attended these other pre-ATC meetings.").

Neither paragraph 187 nor 368 helps supply the missing link.  Paragraph 187 alleges that "defendants' Japanese parent companies" generally "attended the conspiratorial meetings," but defendants' U.S. subsidiaries "also engaged in some bilateral discussions that included exchanges of sensitive information."  Paragraph 368 alleges merely that "four of the eight U.S.-based defendants (Hitachi Chemical Co. America, Ltd., SANYO Electronic Device (U.S.A.) Corp., Elna America Inc., NEC TOKIN America Inc.), are headquartered in California, conspiratorial acts occurred in California, and the conspirators targeted their price-fixing activities at large purchasers . . . in California, such as Apple Inc., Intel Corp., and Hewlett Packard Co."

These paragraphs contain no allegation that these five U.S. subsidiaries joined the conspiracy and played some role in it.  As was the case with many of the U.S. subsidiaries who were named by the DPPs' complaint, there is a large gap between the IPPs' allegations and the allegations in those cases where the allegations against subsidiaries were found to be sufficient. *See CRT*, 738 F. Supp. 2d at 1019 (noting allegations that "employees engaged in conspiratorial meetings on behalf of members of their corporate families, that participants did not always know the corporate affiliation of their counterparts and did not distinguish between the entities within a corporate family," and finding as a result that "the entire corporate family was represented in meetings and discussions . . . and was a party to the agreements reached in them."); *see also Batteries II*, 2014 WL 4955377, at *34 (plausible to infer "that generic references to NEC in documents generated by defendants themselves implicate both NEC Corp. and NEC Tokin").

The U.S. subsidiaries who have moved for dismissal are dismissed with leave to amend.

### b.  Nichicon Corporation

Nichicon Corporation, the Japanese parent company of Nichicon (America) Corporation (who is one of the five moving U.S. subsidiaries discussed directly above), moves separately for dismissal.  Dkt. No. 475 at 6-8.  Nichicon Corporation argues that the IPPs' allegations are insufficient either to establish "that Nichicon Japan entered into an agreement with

United States District Court
Northern District of California

1    any other defendant" or that Nichicon Japan bears liability as a successor based on its acquisition

2    of a capacitor business from Fujitsu Media Devices (Suzhou) Ltd.  *Id.*

3          Nichicon argues that it is alleged to have participated in "only" five types of meetings:

4    "ECC meetings; KCC/Hananoki meetings; 'other' meetings 'similar to industry gatherings or

5    trade association meetings;' ATC meetings; and Shimotsuki Kai meetings."  *Id.* at 6.  But this is

6    just about every type of meeting identified by the IPPs, whose complaint defendants have not

7    challenged on *Twombly* grounds.  The Court finds that most importantly, Nichicon is alleged to

8    have participated in ATC meetings, which are alleged to have been "conspiratorial in nature."

9    Dkt. No. 400 ¶ 158.  Nichicon is specifically alleged to have been listed as a member of these

10   meetings in a "Summer 2003 ATC Meeting Roster," and the ATC meetings are at the core of the

11   IPPs' complaint for the electrolytic conspiracy, as these meetings are alleged to have served as the

12   "regular conspiratorial meetings."  *Id.* ¶¶ 10, 159.

13         These allegations alone are enough to defeat Nichicon's motion, but the Court further

14   notes that Nichicon is not alleged simply to have taken on successor liability as a result of its

15   acquisition from FMD.  Rather, the IPPs' complaint alleges that "[t]he Nichicon defendants joined

16   [Marketing Study Group] meetings in 2008 when it acquired FMD."  *Id.* ¶ 167.  These meetings

17   are alleged to have been "conspiratorial [in] nature" and to have consisted of high-level employees

18   attending to "agree upon prices."  *Id.* ¶¶ 160, 166.

19         Nichicon's motion is denied.

20         **c.   Shinyei Technology Co., Ltd. and Shinyei Capacitor Co., Ltd.**

21              Shinyei Technology Co., Ltd. and Shinyei Capacitor Co., Ltd. separately seek

22   dismissal.  Dkt. No. 475 at 10-11.  The Court denies the request.

23         Both are Japanese corporations.  Shinyei Technology Co., Ltd. is alleged to have

24   established Shinyei Capacitor Co., Ltd. on February 3, 2011, to take over Shinyei Technology Co.,

25   Ltd.'s capacitor business.  Dkt. No. 400 ¶¶ 103-05.  The Court will therefore refer to both

26   defendants collectively as "Shinyei," as defendants themselves do.  Dkt. No. 475 at 10.

27         Shinyei is alleged only to have participated in the film capacitor conspiracy.  The Japan

28   Film Capacitor (JFC) meetings are alleged to have been the foundational, "regular conspiratorial

1   meetings" for that conspiracy.  Dkt. No. 400 ¶ 10.  The Shinyei defendants are alleged to have

2   "generally attended the JFC meetings," at which "[m]embers often shared price intentions that

3   resulted in price agreements."  *Id.* ¶ 181.  Shinyei is even alleged to have been included in a fall

4   2008 chart created by Panasonic which stated that each listed defendant "discussed negotiating for

5   price increases," and at the bottom of which "Panasonic wrote, 'We decided to accept the film

6   price hike effective on April 1.'"  *Id.* ¶ 183.

7        Based on these allegations, the Court finds that Shinyei Technology Co., Ltd. and Shinyei

8   Capacitor Co., Ltd. do "belong in this case," Dkt. No. 475 at 10, and their motion to dismiss is

9   denied.

10             **d.   Soshin Japan**

11             Defendant Soshin Electric Co., Ltd. ("Soshin Japan") separately moves for

12   dismissal on the ground that the complaint "does not give fair notice of the claims made against

13   Soshin Japan" and because the complaint "fails to adequately allege that Soshin Japan entered into

14   the allegedly conspiracy."  Dkt. No. 475 at 13.

15        The first argument rests on the premise that the IPPs have insufficiently alleged "what

16   [Soshin] did, to whom, where and when."  *Id.*  The Court finds that this level of detail is not

17   required, and in any event, it is inconsistent with defendants' joint position that the IPPs'

18   complaint generally passes the *Twombly* pleading standard, a view the Court agrees with.  The

19   argument is rejected.

20        The second argument, too, is denied.  Like Shinyei discussed above, Soshin Japan, too, is

21   alleged to have been a participant of the foundational JFC meetings at which price agreements

22   were entered into.  Dkt. No. 400 ¶ 181.  This is enough for now.  Soshin Japan's motion is denied.

23             **e.   United Chemi-Con, Inc.**

24             The final separate motion was brought by United Chemi-Con, Inc. ("UCC").  Dkt.

25   No. 475 at 16-17.  UCC is the U.S. subsidiary of Nippon Chemi-Con.  Dkt. No. 400 ¶ 72.

26        UCC is generally situated similarly to the other U.S. subsidiaries which are discussed

27   above, but the one way in which it is different -- and, the Court suspects, the reason it is moving

28   separately -- is that there is one substantive paragraph in the complaint that addresses UCC

United States District Court
Northern District of California

28

United States District Court
Northern District of California

1  directly.  That paragraph is paragraph 186 and it figures largely in both UCC's motion and

2  plaintiffs' response to it.  Dkt. Nos. 475 at 16-17; 517 at 15-16.

3      The question, then, is whether that paragraph alone is enough to compel a different

4  conclusion as to UCC than the other U.S. subsidiaries.  The Court concludes the answer is no.

5  Paragraph 186 alleges that "[t]here were bilateral meetings and discussions involving film

6  capacitor cartel members during the Film Class Period, including those: (1) involving the NEC

7  TOKIN, Panasonic, Rubycon, and United Chemi-Con, Inc. defendants from 2002 to 2013

8  regarding film capacitors sold to Dell Inc. . . . ."  Dkt. No. 400 ¶ 186.  The alleged participation in

9  "meetings and discussions" about "film capacitors sold to Dell" does not establish that UCC

10  joined the conspiracy.  The Court dismisses UCC with leave to amend.

11                              **CONCLUSION**

12      Defendants' motions are denied in part and granted in part.

13      For the DPPs' complaint, the following defendants are dismissed for the reasons stated

14  above, with leave to amend:  AVX Corporation; EPCOS Inc.; TDK-EPC Corporation; TDK

15  U.S.A. Corporation; Fujitsu Components America, Inc.; KEMET Electronics Corporation;

16  Nichicon (America) Corporation; Okaya Electric America Inc.; ROHM Semiconductor U.S.A.

17  LLC; Shinyei Capacitor Co., Ltd.; Shinyei Corporation of America; Soshin Electronics of

18  America, Inc.; United Chemi-Con, Inc.; and Vishay Intertechnology, Inc.  Defendants' motions to

19  dismiss the DPPs' complaint are denied in all other respects.

20      For the IPPs' complaint, the Court strikes all references to a nationwide class in indirect

21  purchasers' claims under California's Cartwright Act and Unfair Competition Law.  In addition,

22  the following defendants are dismissed with leave to amend:  ELNA America Inc.; Hitachi

23  Chemical Co.; NEC TOKIN America, Inc.; Nichicon (America) Corp.; Rubycon America, Inc.;

24  and United Chemi-Con, Inc.  Defendants' motions to dismiss the IPPs' complaint are denied in all

25  other respects.

26  //

27  //

28  //

1    The DPPs and IPPs are each directed to file either an amended complaint that conforms to

2    this order or a notice of intent not to amend by June 16, 2015.

3        **IT IS SO ORDERED.**

4    Dated:  May 26, 2015

5    _____

6                    James Donato
                United States District Judge