Joseph W. Cotchett (36324)
Steven N. Williams (175489)
Adam J. Zapala (245748)
Elizabeth Tran (280502)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
jcotchett@cpmlegal.com
swilliams@cpmlegal.com
azapala@cpmlegal.com
etran@cpmlegal.com

*Interim Lead Counsel for the Putative Indirect Purchaser Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE CAPACITORS ANTITRUST LITIGATION** | **Master File No. 14-cv-03264-JD** |
| | **INDIRECT PURCHASER PLAINTIFFS' SECOND CONSOLIDATED COMPLAINT** |
| **THIS DOCUMENT RELATES TO:** | |
| **ALL INDIRECT PURCHASER ACTIONS** | **JURY DEMAND** |

**\*\*REDACTED - PUBLIC VERSION\*\***

# TABLE OF CONTENTS

Page

I.     NATURE OF ACTION ............................................................................................. 1

II.    GOVERNMENT INVESTIGATIONS ..................................................................... 5

III.   JURISDICTION AND VENUE ............................................................................... 7

IV.    PARTIES ................................................................................................................ 10

       A.     Plaintiffs ...................................................................................................... 10

       B.     Defendants ................................................................................................... 11

              1.     Defendants Involved in Both Electrolytic and Film Capacitor
                     Conspiracies ...................................................................................... 11

                     a.     Hitachi Defendants ................................................................. 11

                     b.     Nippon Chemi-Con Defendants .............................................. 12

                     c.     Rubycon Defendants ............................................................... 13

                     d.     Panasonic Defendants ............................................................. 13

              2.     Defendants Involved in Electrolytic Capacitor Conspiracy ............. 14

                     a.     Elna Defendants ...................................................................... 14

                     b.     Defendant Matsuo Electric Co., Ltd. ...................................... 15

                     c.     NEC TOKIN Defendants ........................................................ 15

                     d.     Nichicon Defendants .............................................................. 16

              3.     Defendants Involved in Film Capacitor Conspiracy ........................ 17

                     a.     Defendant Nissei Electric Co., Ltd. ........................................ 17

                     b.     Defendant Nitsuko Electronics Corp. ..................................... 17

                     c.     Defendant Okaya Electric Industries Co., Ltd. ...................... 17

                     d.     Shinyei Defendants ................................................................. 17

                     e.     Defendant Soshin Electric Co., Ltd. ....................................... 18

                     f.     Defendant Taitsu Corp. ........................................................... 18

                     g.     Defendant Toshin Kogyo Co., Ltd. ......................................... 18

V.     AGENTS AND CO-CONSPIRATORS .................................................................. 19

VI.    INTRODUCTION TO CAPACITORS .................................................................. 19

       A.     Background on Capacitors ........................................................................... 19

       B.     Capacitor Structure ..................................................................................... 22

       C.     Capacitor Technologies ............................................................................... 23

D.    Aluminum Electrolytic Capacitors .................................................... 25

E.    Tantalum Electrolytic Capacitors ..................................................... 27

F.    Film Capacitors .................................................................................. 30

G.    Capacitors Are Traceable Through the Chain of Distribution .............. 31

VII.   FACTUAL ALLEGATIONS .................................................................... 32

A.    Defendants Conspired to Unlawfully Fix and Artificially Raise the Prices of Electrolytic and Film Capacitors .................................................................. 32

1.    Electrolytic Capacitor Conspiracy ............................................ 32

a.    Group Meetings and Discussions ...................................... 33

i.    Pre-ATC Meetings ................................................ 33

ii.   ATC Meetings ...................................................... 34

iii.  Marketing Study Group Meetings ...................... 34

b.    Bilateral Meetings and Discussions ................................... 36

c.    Film Capacitor Conspiracy ................................................ 38

d.    Group Meetings and Discussions ...................................... 38

i.    JFC Meetings ...................................................... 38

ii.   Singapore Meetings .............................................. 39

e.    Bilateral Meetings and Discussions ................................... 39

f.    Illustrative Examples of U.S. Subsidiaries Engaging in Conspiratorial Conduct ...................................................... 40

B.    Defendants' Corporate Families Acted as Single Enterprises. Defendant Parent Companies Exercised Substantial Control over Their U.S. Subsidiaries. ............. 41

1.    Defendants' High-Level Employees Organized the Conspiracies and Their Subordinate Employees—Including Those of Their U.S. Subsidiaries—Executed the Conspiracies .................................... 43

2.    Defendants' Representatives who Attended Conspiratorial Meetings and Engaged in Collusive Conduct Participated in Discussions on Behalf of Entire Corporate Families and Failed to Distinguish Between Corporate Entities in the Same Corporate Family. ................... 45

3.    Each Defendant Parent Company, Along With Its U.S. Subsidiary, Hold Themselves Out as a Single Integrated Enterprise. .................. 47

a.    Elna Corporate Family ...................................................... 47

b.    Hitachi Corporate Family .................................................. 47

c.    NEC TOKIN Corporate Family........................................ 48

d.    Nichicon Corporate Family.............................................. 48

e.    Nippon Chemi-Con Corporate Family............................. 51

f.    Panasonic/Sanyo Corporate Family................................. 53

g.    Rubycon Corporate Family.............................................. 54

4.    The Nature of the Capacitor Industry Required Foreign Companies Named As Defendants Herein to Use Their U.S. Subsidiaries As Sales Arms for Price-Fixed Capacitors....................................................... 55

C.    Capacitor Industry Trends............................................................... 56

1.    Aluminum Electrolytic Capacitors ................................................ 58

2.    Tantalum Electrolytic Capacitors ................................................. 59

3.    Film Capacitors ............................................................................ 59

D.    The Characteristics of the Electrolytic and Film Capacitor Market Render Collusion More Plausible................................................................. 59

1.    The Electrolytic and Film Capacitor Industry Has High Barriers to Entry.  60

2.    The Demand for Electrolytic and Film Capacitors Is Inelastic.................. 63

3.    The Electrolytic and Film Capacitor Industry Is Highly Concentrated. ..................................................................................... 64

4.    Electrolytic and Film Capacitors Are Homogenous and Commoditized Products............................................................... 65

5.    Defendants Had Ample Opportunities to Conspire. ...................... 67

6.    Indirect Purchasers of Capacitors Lacked Buying Power........................... 71

7.    falling Demand for Capacitors Over Time. ................................... 72

a.    Demand for Capacitors in the Americas ........................ 74

b.    Demand for Capacitors Over Time................................. 74

E.    Capacitor Manufacturers Had Relationships in Other Price-Fixed Markets. ....... 76

VIII.    DEFENDANTS COLLUDED TO KEEP THE PRICE OF ELECTROLYTIC AND FILM CAPACITORS ELEVATED DURING THE CLASS PERIOD........................................ 76

A.    Defendants Had a Motive to Conspire..................................................... 77

B.    The Price Movements of Electrolytic and Film Capacitors During the Respective Class Periods Are Consistent with Collusion, Not Competition. ........................... 79

1.    Pricing Behavior Was Inconsistent with Cost. ........................... 80

2.    Pricing Behavior Was Inconsistent with Demand. ..................... 81

C.   Defendants Conspired to Constrain Supply. ...................................................82

D.   Guilty Pleas in Related Markets ....................................................................82

    1.   Hitachi 83

    2.   Panasonic/SANYO ....................................................................83

    3.   NEC TOKIN ............................................................................83

IX.   ANTITRUST INJURY ...........................................................................................84

X.   THE STATUTE OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS ..............84

A.   The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Their Claims ...........................................................84

B.   Fraudulent Concealment Tolled the Statute of Limitations ..................................87

    1.   False Representations Regarding Raw Material Shortages .......................87

    2.   False Representations Regarding Production Delays ...............................88

XI.   AFFECTED TRADE AND COMMERCE .................................................................90

A.   Defendants' Conduct Involved Import Trade or Import Commerce ....................91

B.   Defendants' Conduct Had a Direct, Substantial, and Reasonably Foreseeable Effect on U.S. Domestic and Import Trade or Commerce That Gave Rise to Plaintiffs' Antitrust Claims ...........................................................92

C.   The Capacitor Cartel Targeted the United States. ....................................................94

XII.   CLASS ACTION ALLEGATIONS .........................................................................97

XIII.   VIOLATIONS ALLEGED .......................................................................................103

FIRST CLAIM FOR RELIEF ...........................................................................................103
(Violations of Sherman Act, 15 U.S.C. § 1) ....................................................................103
(On Behalf of All Plaintiffs Against All Defendants) .....................................................103
SECOND CLAIM FOR RELIEF .......................................................................................104
(Violations of State Antitrust and Restraint of Trade Laws) ..........................................104
(On Behalf of Plaintiffs Against All Defendants) ...........................................................104
THIRD CLAIM FOR RELIEF ...........................................................................................123
(Violations of State Consumer Protection and Unfair Competition Laws) ....................123
(On Behalf of All Plaintiffs Against All Defendants) .....................................................123
XIV.   REQUEST FOR RELIEF ......................................................................................141

JURY DEMAND ...............................................................................................................147

Indirect Purchaser Plaintiffs ("Plaintiffs"), on behalf of themselves and all others similarly situated ("Classes" as defined below), upon personal knowledge as to the facts pertaining to them and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action for damages, injunctive relief and other relief pursuant to federal antitrust laws and state antitrust, unfair competition, and consumer protection laws. Plaintiffs demand a trial by jury and allege as follows:

## I.   NATURE OF ACTION

1.      This lawsuit is brought against defendants[1], the leading manufacturers of capacitors sold in the United States, for engaging in two massive and separate conspiracies to unlawfully inflate, fix, raise, maintain or artificially stabilize the prices of electrolytic and film capacitors, respectively.[2] Defendants' conspiracies successfully targeted various industries in the United States, raising prices for direct and indirect purchasers of electrolytic and film capacitors alike.

2.      Plaintiffs seek to represent all persons and entities in the United States who purchased one or more electrolytic capacitor(s) from a capacitor distributor, which a defendant, its current or former subsidiary, or any of its co-conspirators sold from January 1, 2003 through such time as the anticompetitive effects of defendants' conduct ceased ("Electrolytic Class Period").

---

[1] Elna Co., Ltd., Elna America Inc., Hitachi Chemical Co., Ltd., Hitachi Chemical Co. America, Hitachi AIC Inc., Ltd., Ltd., Matsuo Electric Co., Ltd., NEC TOKIN Corp., Nichicon Corp., Nippon Chemi-Con Corp., United Chemi-Con, Inc., Matsuo Electric Co., Ltd., NEC TOKIN Corp., NEC TOKIN America Inc., Nichicon Corp., Nichicon America Corp., Nissei Electric Co., Ltd., Nitsuko Electronics Corp., Okaya Electric Industries Co., Ltd., Panasonic Corp., Panasonic Corp. of North America, Rubycon Corp., Rubycon America Inc., SANYO Electric Co., Ltd., SANYO Electronic Device (U.S.A.) Corp., Shinyei Technology Co., Ltd., Soshin Electric Co., Ltd., Taitsu Corp., and Toshin Kogyo Co., Ltd. (collectively, "defendants").

[2] As Plaintiffs are in the early stages of discovery concerning the nature and scope of the electrolytic and film capacitor conspiracies, and as the Court granted the United States Department of Justice's motion to intervene and stayed discovery until April 15, 2015 per its October 30, 2014 Civil Minutes (ECF No. 309), Plaintiffs still have substantial discovery to conduct regarding defendants' meetings, discussions, and agreements. Plaintiffs must be able to significantly advance the inquiry into and analysis of defendants' conspiratorial conduct before we can firmly reach conclusions regarding the nature, scope, and effects of the conspiracies. As such, while the Complaint currently alleges separate meetings and discussions regarding electrolytic and film capacitors, further discovery may reveal that there was one overarching conspiracy due to the overlapping defendants and customers or more than two conspiracies.

**INDIRECT PURCHASER PLAINTIFFS' SECOND CONSOLIDATED COMPLAINT**          1

3.      Plaintiffs also seek to represent all persons and entities in the United States who purchased one or more film capacitor(s) from a capacitor distributor, which a defendant, its current or former subsidiary of, or any of its co-conspirators sold from January 1, 2007 through such time as the anticompetitive effects of defendants' conduct ceased ("Film Class Period").

4.      Plaintiffs purchased electrolytic and film capacitors as a stand-alone product. When purchased as a stand-alone product, electrolytic and film capacitors are traceable to the specific manufacturer. A capacitor is traceable to an entity owned and/or controlled by a defendant because it bears the defendant's markings (*e.g.*, name, logo, series).

5.      Capacitors are one of the most common electronic components in the world today. They store electric charge between one or more pairs of conductors separated by an insulator. Almost all electronic products—from cellphones to personal computers to home appliances—contain them, often hundreds of them. The three basic types of capacitors are ceramic, electrolytic, and film, the latter two of which are the subject of Plaintiffs' Second Consolidated Complaint ("Complaint"). Electrolytic and film capacitors are widely used in a range of industries, such as information and telecommunications, audiovisual, and electronic games.

6.      An "electrolytic capacitor" uses an electrolyte (an ionic conducting liquid) as one of its plates to achieve a relatively larger capacitance per unit volume. As used in this Complaint, electrolytic capacitors include the following: circular polymer aluminum electrolytic capacitors, rectangular polymer aluminum capacitors, rectangular polymer tantalum capacitors, non-polymer aluminum electrolytic capacitors, and non-polymer electrolytic double-layer capacitors ("ELDC"). Manufacturers of polymer electrolytic capacitors compete on shape (*i.e.*, rectangular capacitor manufacturers compete with each other). Electrolytic capacitors can vary significantly by voltage and capacitance.

7.      Applications of circular polymer aluminum electrolytic capacitors include personal computers (PCs), digital audiovisuals (AV), games, and industrial appliances. Applications of rectangular polymer aluminum electrolytic capacitors include notebook PCs, tablets, digital AVs, amusement, servers, and communications. Applications of rectangular polymer tantalum capacitors include notebook PCs, games, cellular phones, smart phones, and digital still cameras. Applications

of non-polymer aluminum electrolytic capacitors include digital AV, information and communications, various power supply circuits, and inverter circuits. ELDC are best suited for the power backup needs of high reliability systems.

**Figure 1: The SANYO defendants manufacture electrolytic capacitors, including circular aluminum polymer capacitors (brand name: OS-CON) and rectangular tantalum polymer capacitors (brand name: POS-CAP).**



Source: http://industrial.panasonic.com/ww/products/capacitors

8.      A "film capacitor" uses insulating plastic film and one of two conductive materials, propylene or polyester. As used in this Complaint, film capacitors include the following four generations: (1) film and aluminum foil capacitors, (2) film and other metal capacitors, (3) layered capacitors, and (4) surface-mount capacitors (*i.e.*, capacitors without leaves). Each generation contains different types of general purpose capacitors and specific purpose capacitors.

9.      Applications of film capacitors include appliances, lighting, power supply, digital AV, communications, games, direct current (DC) link for inverters, snubber for inverters, in battery filters, and in electric compressors.

**Figure 2: The Panasonic defendants manufacture film capacitors.**



Source: http://industrial.panasonic.com/ww/products/capacitors

10.     As hereinafter more fully alleged, the Hitachi, Nippon Chemi-Con ("NCC"), Rubycon, and Panasonic defendants participated in ***two conspiracies***: the ***electrolytic capacitor cartel*** from January 1, 2003 until such time as defendants' unlawful conduct ceased and the ***film capacitor cartel*** from January 1, 2007 until such time as defendants' unlawful conduct ceased. The Elna, Matsuo, NEC TOKIN, and Nichicon defendants participated in the aforementioned ***electrolytic capacitor cartel***. The Nissei, Nitsuko, Okaya, Shinyei, Soshin, Taitsu, and Toshin Kogyo defendant families participated in the aforementioned ***film capacitor cartel***. Defendants frequently discussed confidential and sensitive business information with each other, either at regular conspiratorial meetings, such as the Aluminum Tantalum Capacitor (ATC) meetings and Japan Film Capacitor (JFC) meetings, or through bilateral conspiratorial discussions to raise and stabilize electrolytic and film capacitor prices.

**Figure 3: An illustration of electrolytic and film capacitor cartel memberships.**



11.     Defendants manufacture, market, and sell electrolytic and film capacitors throughout and into the United States. Defendants and other co-conspirators (as yet unknown) agreed, combined, and conspired to inflate, fix, raise, maintain or artificially stabilize prices of electrolytic and film capacitors. The combination and conspiracy engaged in by defendants and other co-conspirators was in violation of the Sherman Act (15 U.S.C. § 1) and various state antitrust, unfair competition, and consumer protection laws.

12.     As a direct result of the anticompetitive and unlawful conduct alleged herein, Plaintiffs and the Classes paid artificially inflated prices for electrolytic and film capacitors during the respective Class Periods and have thereby suffered antitrust injury to their business or property.

## II.     GOVERNMENT INVESTIGATIONS

13.     Competition authorities in the United States, Asia, and Europe have been coordinating their investigations into the electrolytic and film capacitor cartels since March 2014 or earlier. The coordinated investigation between the United States Department of Justice ("DOJ") and the China National Development and Reform Commission ("China NDRC") *could be a first for both agencies*.

14.     Several competition authorities in Asia have already conducted dawn raids on capacitor manufacturers. The China NDRC raided NEC TOKIN and non-defendant Taiyo Yuden[3] in

---

[3] Taiyo Yuden manufactures ceramic capacitors only. Plaintiffs have not named it as a defendant in this Complaint but reserve the right to do so upon further investigation.

March 2014. The South Korea Fair Trade Commission raided a Panasonic sales office in South Korea in early May 2014. And the Japan Fair Trade Commission ("JFTC") raided nine companies on June 24, 2014 suspected of forming *a cartel extending overseas from Japan*. These companies were Elna Co., Ltd., Hitachi Chemical Co., Ltd., Matsuo Electric Co., Ltd., NEC TOKIN Corp., Nichicon Corp., Nippon Chemi-Con Corp., Panasonic Corp., Rubycon Corp., and SANYO Electric Co., Ltd. These companies collectively control either a large share of the Japanese market for electrolytic capacitors or the Japanese market for film capacitors. The JFTC alleges that these companies formed cartels in Japan, China, and the United States, and their sales executives and other officials coordinated the amount and timing of price increases in the last several years. The JFTC stated that the conspiracies intensified after the 2008 economic crisis and again after the 2011 Great East Japan Earthquake when defendants aggressively controlled supply and coordinated price hikes to ensure supra-competitive prices for their products.

15.     The DOJ investigation is originating out of its San Francisco office, which has been investigating cartels in the computer parts industry for the past decade, resulting in hundreds of millions of dollars in criminal fines against manufacturers of memory, liquid crystal displays, optical disc drives, and lithium-ion batteries. A capacitor manufacturer had approached the DOJ and China NDRC with news of anticompetitive conduct in the worldwide capacitor industry, launching what the DOJ's Antitrust Division acknowledged as its *latest international cartel investigation*. The capacitor manufacturer also applied to the DOJ's Corporate Leniency Program pursuant to the Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA"), which limits the civil liability of a leniency applicant to the actual damages attributable to the entity's conduct rather than the usual joint and several and trebled damages faced by antitrust defendants.

16.     The DOJ investigation into the capacitor industry stemmed from a "leniency plus" situation in the DOJ investigation into the automotive parts industry. A leniency plus situation arises when a company unable to obtain leniency for one conspiracy can be given a lighter sentence by reporting its involvement in a separate, as yet undiscovered conspiracy. Plaintiffs believe that the leniency applicant is Panasonic Corp, which is a named defendant in three automotive parts cases in *In re Automotive Parts Antitrust Litigation*, MDL No. 2311 (E.D. Mich.), including *In re Switches*

(Case No. 2:13-cv-01300), *In re Steering Angle Sensors* (Case No. 2:13-cv-01600), and *In re High Intensity Discharge Ballasts* (Case No. 2:13-cv-01700). Plaintiffs believe Panasonic Corp. approached the DOJ and China NDRC about the electrolytic and film capacitor conspiracies after the DOJ charged and penalized it for participating in the switches, steering angle sensors, and high intensity discharge ballasts conspiracies.

17.   Notably, the defendants' anticompetitive behavior is the subject of a DOJ criminal grand jury investigation. According to the Antitrust Division's Manual, last revised in 2009, to institute a grand jury investigation, "staff should prepare a memorandum on behalf of the section or field office chief to the Director of Criminal Enforcement detailing the information forming the basis of the request." Following a review of that memorandum, the request for a grand jury investigation must be approved by the Assistant Attorney General for the Antitrust Division based on the standard that a criminal violation may have occurred. Furthermore, the fact that the DOJ investigation is criminal, as opposed to civil, is significant. The Manual's "Standards for Determining Whether to Proceed by Civil or Criminal Investigation" provides, "In general, current Division policy is to proceed by criminal investigation and prosecution in cases involving horizontal, *per se* unlawful agreements such as price fixing, bid rigging and horizontal customer and territorial allocations." The existence of a criminal investigation into the electrolytic and film capacitor markets therefore support the existence of the conspiracies alleged in this Complaint.

18.   "***This has the hallmarks of a major international cartel investigation***," said Philip Giordano, counsel at Kaye Scholer LLP and a 15-year veteran of the DOJ's Antitrust Division (emphasis added). "The DOJ and its foreign counterparts are conducting ***parallel investigations***. Many of the manufacturers under investigation are ***international conglomerates*** that sell into ***global markets***" (emphasis added).

## III.   JURISDICTION AND VENUE

19.   Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against defendants for violating the Sherman Act (15 U.S.C. § 1). Plaintiffs also assert claims for actual and exemplary damages and injunctive relief pursuant to state antitrust, unfair competition, and consumer protection laws, and seek to obtain restitution,

recover damages, and secure other relief against defendants for violation of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state laws.

20.     This Court has subject matter jurisdiction pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and 28 U.S.C. §§ 1331 and 1137. This Court also has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. § 1332(d) and 1367, in that: (i) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Classes are citizens of a state different from some defendants; and (ii) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

21.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391(b)-(d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

22.     This Court has *in personam* jurisdiction over each of the defendants because each defendant, either directly or through the ownership and/or control of its United States subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of electrolytic and/or film capacitors throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; or (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

23.     In fact, the DOJ's investigation into the capacitor industry is originating out of its San Francisco office, which has been investigating cartels in the computer parts industry for the past

decade, leading to hundreds of millions of dollars in fines against manufacturers of memory, liquid crystal displays, optical disc drives, and lithium-ion batteries. Although a former DOJ prosecutor stated that the DOJ is in the early stages of its investigation and there is some time before plea deals or indictments, the DOJ has empaneled a criminal grand injury in the Northern District of California to investigate anticompetitive conduct by capacitor manufacturers. The grand jury issued subpoenas to several capacitor manufacturers earlier this year. The DOJ has requested a stay of discovery in this action to protect its investigation.

24.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

25.     The activities of defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce in the United States. Defendants' products are sold in the flow of interstate commerce.

26.     Electrolytic and film capacitors manufactured abroad by defendants and sold as stand-alone products that were either manufactured in the United States or manufactured abroad and sold in the United States, are goods brought into the United States for sale and therefore constitute import commerce. To the extent any electrolytic or film capacitors are purchased in the United States, and such capacitors do not constitute import commerce, defendants' unlawful conduct with respect thereto, as more fully alleged herein during the respective Class Periods, had and continues to have a direct, substantial, and reasonably foreseeable effect on United States commerce. The anticompetitive conduct, and its effect on United States commerce described herein, caused antitrust injury to Plaintiffs and members of the Classes in the United States.

27.     By reason of the unlawful activities hereinafter alleged, defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes. Defendants, directly and through their agents, engaged in activities affecting all states, to fix, raise, maintain and/or stabilize prices, and allocate market shares for electrolytic and film capacitors, which conspiracies unreasonably restrained trade and adversely affected the market for such capacitors.

28.     Defendants' conspiracy and wrongdoing described herein adversely affected individuals and entities in the United States, including Plaintiffs and members of the Classes, who indirectly purchased electrolytic and/or film capacitors as stand-alone products.

## IV.     PARTIES

### A.     Plaintiffs

29.     Plaintiff **Michael Brooks** is a California resident who purchased electrolytic and/or film capacitors as stand-alone products from one or more distributors that purchased such capacitors as stand-alone products from one or more defendants during the respective Class Periods. Plaintiff has been injured and is threatened with further injury as a result of the violations alleged in this Complaint.

30.     Plaintiff **CAE Sound** is a California company with its principal place of business in California. Plaintiff purchased electrolytic and film capacitors as stand-alone products from one or more distributors that purchased such capacitors as stand-alone products from one or more defendants during the respective Class Periods. Plaintiff has been injured and is threatened with further injury as a result of the violations alleged in this Complaint.

31.     Plaintiff **Steve Wong** is a California resident who purchased electrolytic and/or film capacitors as stand-alone products from one or more distributors that purchased such capacitors as stand-alone products from one or more defendants during the respective Class Periods. Plaintiff has been injured and is threatened with further injury as a result of the violations alleged in this Complaint.

32.     Plaintiff **Toy-Knowlgy Inc.** is a California company with its principal place of business in California. Plaintiff purchased electrolytic and film capacitors as stand-alone products from one or more distributors that purchased such capacitors as stand-alone products from one or more defendants during the respective Class Periods. Plaintiff has been injured and is threatened with further injury as a result of the violations alleged in this Complaint.

33.     Plaintiff **Alfred H. Siegel** is the Liquidating Trustee of the Circuit City Stores, Inc. Liquidating Trust ("Trust"). The Trust was established on or around November 1, 2010 in connection with the bankruptcy proceedings of Circuit City Stores, Inc. and its affiliates in the United States

Bankruptcy Court, Eastern District of Virginia (Case No. 08-35653). Pursuant to the Second Amended Joint Plan of Liquidation of Circuit City Stores, Inc. and Its Affiliated Debtors and Debtors in Possession and Its Official Committee of Creditors Holding General Unsecured Claims (Dkt. No. 8252), and the Circuit City Stores, Inc. Liquidating Trust Agreement (Dkt. No. 8864), the Liquidating Trustee has the authority to pursue claims on behalf of the Trust for the benefit of the Trust's beneficiaries.

34.     At all times relevant herein, Circuit City Stores, Inc. was incorporated in Virginia and had its principal place of business in Richmond, Virginia. Prior to the initiation of Chapter 11 bankruptcy proceedings on November 10, 2008, Circuit City Stores, Inc. was one of the largest consumer electronics retailers in the United States with over 500 retail locations nationwide. Circuit City Stores, Inc. purchased electrolytic and film capacitors as stand-alone products from one or more national service parts vendors that purchased such capacitors as stand-alone products from one or more defendants during the respective Class Periods. Defendants shipped such capacitors to Circuit City Stores, Inc.'s service centers in every state. Circuit City Stores, Inc. has been injured as a result of the violations alleged in this Complaint.

### B.     Defendants

35.     This section identifies each of the defendants and describes the relationship of ownership or control between each defendant conspirator and its divisions, subsidiaries, or affiliates that sold capacitors to Plaintiffs and members of the Class. The relationships between the conspirators and sellers are characterized by the ability to exercise restraint or direction; to dominate, regulate, or command; and/or to have the power or authority to guide or manage.

### 1.     Defendants Involved in Both Electrolytic and Film Capacitor Conspiracies

#### a.     Hitachi Defendants

36.     Defendant Hitachi Chemical Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan. Hitachi Chemical Co. is one of the world's leading manufacturers of capacitors. Hitachi Chemical Co., Ltd.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold electrolytic capacitors and film

capacitors that were purchased throughout the United States, including in this District, during the respective Class Periods. The JFTC raided Hitachi Chemical Co., Ltd. in June 2014 in connection with its investigation of the capacitor industry.

37. Defendant Hitachi AIC Inc. is a Japanese corporation with its principal place of business in Tochigi, Japan. It is a subsidiary of and wholly owned and/or controlled by its Japanese parent, Hitachi Chemical Co., Ltd. Hitachi AIC Inc. manufactured, marketed, and/or sold electrolytic capacitors and film capacitors that were purchased throughout the United States, including in this District, during the respective Class Periods.

38. Defendant Hitachi Chemical Co. America, Ltd. is a New York corporation with its principal place of business in Cupertino, California. It is a subsidiary of and wholly owned and/or controlled by its Japanese parent, Hitachi Chemical Co., Ltd. Hitachi Chemical Co. America, Ltd. manufactured, marketed, and/or sold electrolytic and film capacitors that were purchased throughout the United States, including in this District, during the respective Class Periods.

39. Defendants Hitachi Chemical Co., Ltd., Hitachi AIC Inc., and Hitachi Chemical Co. America, Ltd. are herein referred to as "Hitachi."

**b. Nippon Chemi-Con Defendants**

40. Defendant Nippon Chemi-Con Corp. is a Japanese corporation with its principal place of business in Tokyo, Japan. Nippon Chemi-Con Corp. is one of the world's leading manufacturers of capacitors. Nippon Chemi-Con Corp.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold electrolytic and film capacitors that were purchased throughout the United States, including in this District, during the respective Class Periods. The JFTC raided Nippon Chemi-Con Corp. in June 2014 in connection with its investigation of the capacitor industry.

41. Defendant United Chemi-Con, Inc. is an Illinois corporation with its principal place of business in Rosemont, Illinois. It is a subsidiary of and wholly owned and/or controlled by its Japanese parent, Nippon Chemi-Con Corp. United Chemi-Con, Inc. manufactured, marketed, and/or sold electrolytic and film capacitors that were purchased throughout the United States, including in this District, during the respective Class Periods.

42.     Defendants Nippon Chemi-Con Corp. and United Chemi-Con, Inc. are herein collectively referred to as "Nippon Chemi-Con."

### c.     Rubycon Defendants

43.     Defendant Rubycon Corp. is a Japanese corporation with its principal place of business in Nagano, Japan. Rubycon Corp. is one of the world's leading manufacturers of capacitors. Rubycon Corp.—directly and/or through its subsidiaries, which it wholly owned and/or controlled— manufactured, marketed, and/or sold electrolytic and film capacitors that were purchased throughout the United States, including in this District, during the respective Class Periods. The JFTC raided Rubycon Corp. in June 2014 in connection with its investigation of the capacitor industry.

44.     Defendant Rubycon America Inc. is an Illinois corporation with its principal place of business in Gurnee, Illinois. It is a subsidiary of and wholly owned and/or controlled by its Japanese parent, Rubycon Corp. Rubycon America Inc. manufactured, marketed, and/or sold electrolytic and film capacitors that were purchased throughout the United States, including in this District, during the respective Class Periods.

45.     Defendants Rubycon Corp. and Rubycon America Inc. are herein collectively referred to as "Rubycon."

### d.     Panasonic Defendants

46.     Defendant Panasonic Corp. is a Japanese corporation with its principal place of business in Osaka, Japan. Panasonic Corp. is one of the world's leading manufacturers of capacitors. Panasonic Corp.—directly and/or through its subsidiaries, which it wholly owned and/or controlled— manufactured, marketed, and/or sold electrolytic and film capacitors that were purchased throughout the United States, including in this District, during the Film Class Period. The JFTC raided Panasonic Corp. in June 2014 in connection with its investigation of the capacitor industry. The DOJ, China NDRC, Korea FTC, and EC are also investigating Panasonic Corp. Panasonic Corp. has applied for the DOJ's and China NDRC's leniency programs, meaning it will likely receive amnesty from criminal prosecution in return for full cooperation with government antitrust authorities.

47.     Defendant Panasonic Corp. of North America is a Delaware corporation with its principal place of business in Newark, New Jersey. It is a subsidiary of and wholly owned and/or

controlled by its Japanese parent, Panasonic Corp. Panasonic Corp. of North America manufactured, marketed, and/or sold electrolytic and film capacitors that were purchased throughout the United States, including in this District, during the Film Class Period.

48.     Defendant SANYO Electric Co., Ltd. is a Japanese corporation with its principal place of business in Osaka, Japan. SANYO Electric Co., Ltd.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold electrolytic capacitors that were purchased throughout the United States, including in this District, during the Electrolytic Class Period.

49.     Defendant SANYO Electronic Device (U.S.A.) Corp. is a Delaware corporation with its principal place of business in San Diego, California. It is a subsidiary of and wholly owned and/or controlled by its Japanese parent, SANYO Electric Co., Ltd. SANYO Electronic Device (U.S.A.) Corp. manufactured, marketed, and/or sold electrolytic capacitors that were purchased throughout the United States, including in this District, during the Electrolytic Class Period.

50.     Panasonic Corp. acquired a majority of shares of SANYO Electric Co., Ltd. on December 10, 2009 and the remaining shares of SANYO Electric Co., Ltd. on April 1, 2011.

51.     Defendants SANYO Electric Co., Ltd. and SANYO Electronic Device (U.S.A.) Corp. are herein collectively referred to as "SANYO" for allegations pertaining to them before December 10, 2009.

52.     Defendants Panasonic Corp., Panasonic Corp. of North America, SANYO Electric Co., Ltd., and SANYO Electronic Device (U.S.A.) Corp. are herein collectively referred to as "Panasonic" for allegations pertaining to them after December 10, 2009.

## 2.     Defendants Involved in Electrolytic Capacitor Conspiracy

### a.     Elna Defendants

53.     Defendant Elna Co., Ltd. is a Japanese corporation with its principal place of business in Yokohama, Japan. Elna Co., Ltd.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold electrolytic capacitors that were purchased throughout the United States, including in this District, during the Electrolytic Class Period. The

JFTC raided Elna Co., Ltd. in June 2014 in connection with its investigation of the capacitor industry. The DOJ and China NDRC are also investigating Elna Co., Ltd.

54.     Defendant Elna America Inc. is a California corporation with its principal place of business in Gardena, California. It is a subsidiary of and wholly owned and/or controlled by its Japanese parent, Elna Co., Ltd. Elna America Inc. manufactured, marketed, and/or sold electrolytic capacitors that were purchased throughout the United States, including in this District, during the Electrolytic Class Period.

55.     Defendants Elna Co., Ltd. and Elna America Inc. are herein collectively referred to as "Elna."

### b.     Defendant Matsuo Electric Co., Ltd.

56.     Defendant Matsuo Electric Co., Ltd. is a Japanese corporation with its principal place of business in Osaka, Japan. Matsuo Electric Co., Ltd.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold electrolytic capacitors that were purchased throughout the United States, including in this District, during the Electrolytic Class Period.

57.     Defendant Matsuo Electric Co., Ltd. is herein referred to as "Matsuo."

### c.     NEC TOKIN Defendants

58.     Defendant NEC TOKIN Corp. is a Japanese corporation with its principal place of business in Miyagi, Japan. NEC TOKIN Corp.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold electrolytic capacitors that were purchased throughout the United States, including in this District, during the Electrolytic Class Period. The China NDRC raided NEC TOKIN Corp. in March 2014 in connection with its investigation of the capacitor industry. The DOJ, Korea FTC, and EC are also investigating NEC TOKIN Corp.

59.     Defendant NEC TOKIN America Inc. is a California corporation with its principal place of business in San Jose, California. It is a subsidiary of and wholly owned and/or controlled by its Japanese parent, NEC TOKIN Corp. NEC TOKIN America Inc. manufactured, marketed, and/or

sold electrolytic capacitors that were purchased throughout the United States, including in this District, during the Electrolytic Class Period.

60.     Defendants NEC TOKIN Corp. and NEC TOKIN America Inc. are herein collectively referred to as "NEC TOKIN."

### d.     Nichicon Defendants

61.     Defendant Nichicon Corp. is a Japanese corporation with its principal place of business in Kyoto, Japan. Nichicon Corp.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold electrolytic capacitors that were purchased throughout the United States, including in this District, during the Electrolytic Class Period. The JFTC raided Nichicon Corp. in June 2014 in connection with its investigation of the capacitor industry. The DOJ is also investigating Nichicon Corp.

62.     Defendant Nichicon America Corp. is an Illinois corporation with its principal place of business in Schaumburg, Illinois. It is a subsidiary of and wholly owned and/or controlled by its Japanese parent, Nichicon Corp. Nichicon America Corp. manufactured, marketed, and/or sold electrolytic capacitors that were purchased throughout the United States, including in this District, during the Electrolytic Class Period.

63.     Fujitsu Media Devices, Ltd. was a Japanese corporation with its principal place of business in Yokohama, Japan. Fujitsu Media Devices, Ltd.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold electrolytic capacitors that were purchased throughout the United States, including in this District, during the Electrolytic Class Period. On October 30, 2008, Nichicon Corp. acquired Fujitsu Media Devices (Suzhou), Ltd.'s conductive polymer aluminum solid electrolytic capacitor business.

64.     On February 6, 2013, Nichicon Corp. sold its solid tantalum electrolytic capacitors business to AVX Corp.[4] Nichicon Corp. continued to manufacture, market, and/or sell other electrolytic capacitors (*e.g.*, polymer aluminum electrolytic capacitors) after the sale.

---

[4] Plaintiffs have not named AVX Corp. as a defendant in this Complaint but reserve the right to do so upon further investigation.

65.     Defendants Nichicon Corp., Nichicon America Corp., and Fujitsu Media Devices, Ltd. are herein collectively referred to as "Nichicon."

### 3.     Defendants Involved in Film Capacitor Conspiracy

#### a.     Defendant Nissei Electric Co., Ltd.

66.     Defendant Nissei Electric Co., Ltd. is a Japanese corporation with its principal place of business in Shizuoka, Japan. Nissei Electric Co., Ltd.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold film capacitors that were purchased throughout the United States, including in this District, during the Film Class Period.

67.     Defendant Nissei Electric Co., Ltd. is herein referred to as "Nissei."

#### b.     Defendant Nitsuko Electronics Corp.

68.     Defendant Nitsuko Electronics Corp. is a Japanese corporation with its principal place of business in Nagano, Japan. Nitsuko Electronics Corp.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold film capacitors that were purchased throughout the United States, including in this District, during the Film Class Period.

69.     Defendant Nitsuko Electronics Corp. is herein referred to as "Nitsuko."

#### c.     Defendant Okaya Electric Industries Co., Ltd.

70.     Defendant Okaya Electric Industries Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan. Okaya Electric Industries Co., Ltd.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold film capacitors that were purchased throughout the United States, including in this District, during the Film Class Period.

71.     Defendant Okaya Electric Industries Co., Ltd. is herein referred to as "Okaya."

#### d.     Shinyei Defendants

72.     Defendant Shinyei Technology Co., Ltd. is a Japanese corporation with its principal place of business in Kobe, Japan. Shinyei Technology Co., Ltd.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold film capacitors that were purchased throughout the United States, including in this District, during the Film Class Period.

73.     Defendant Shinyei Capacitor Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan. Shinyei Capacitor Co., Ltd.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold film capacitors that were purchased throughout the United States, including in this District, during the Film Class Period.

74.     On February 3, 2011, Shinyei Technology Co., Ltd. established Shinyei Capacitor Co., Ltd. to take over Shinyei Technology Co., Ltd.'s capacitor business. Shinyei Capacitor Co., Ltd. began to manufacture, market, and/or sell film capacitors in April 2011, at which time Shinyei Technology Co., Ltd. ceased to manufacture, market, and/or sell such capacitors.

75.     Defendants Shinyei Technology Co., Ltd. and Shinyei Capacitor Co., Ltd. are herein collectively referred to as "Shinyei."

### e.     Defendant Soshin Electric Co., Ltd.

76.     Defendant Soshin Electric Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan. Soshin Electric Co., Ltd.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold film capacitors that were purchased throughout the United States, including in this District, during the Film Class Period.

77.     Defendant Soshin Electric Co., Ltd. is herein referred to as "Soshin."

### f.     Defendant Taitsu Corp.

78.     Defendant Taitsu Corp. is a Japanese corporation with its principal place of business in Kanagawa, Japan. Taitsu Corp.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold film capacitors that were purchased throughout the United States, including in this District, during the Film Class Period.

79.     Defendant Taitsu Corp. is herein refered to as "Taitsu."

### g.     Defendant Toshin Kogyo Co., Ltd.

80.     Defendant Toshin Kogyo Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan. Toshin Kogyo Co., Ltd.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold film capacitors that were purchased throughout the United States, including in this District, during the Film Class Period. The

JFTC raided Toshin Kogyo Co., Ltd. in June 2014 in connection with its investigation of the capacitor industry.

81.    Defendant Toshin Kogyo Co., Ltd. is herein refered to as "Toshin Kogyo."

## V.    AGENTS AND CO-CONSPIRATORS

82.    Each defendant acted as the principal of or agent for the other defendant with respect to the acts, violations, and common course of conduct alleged herein.

83.    Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with the defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy, or in furtherance of the anticompetitive conduct. Plaintiffs reserves the right to name some or all of these persons and entities as defendants at a later date.

84.    Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

## VI.    INTRODUCTION TO CAPACITORS

### A.    Background on Capacitors

85.    Capacitors are devices used to store electricity and are fundamental electronic components that influence electronic circuits. Although the form of capacitors varies widely (Figure 3), a typical capacitor consists of two or more parallel, but not touching, electrical conductors (plates), which are electrically separated by a dielectric (insulator). Capacitors have applications in both analog and digital circuits, and have voltages from less than one volt to several thousand volts. When connected to an alternating current (AC) circuit, a capacitor allows current to flow through it with little or no resistance. When connected to a direct current (DC) circuit, a capacitor blocks the flow of current through it and charges up to its supply voltage because the dielectric is a non-conductive

insulator. A capacitor therefore has the capacity to store energy in the form of an electrostatic field between its plates and is used as part of electrical circuits in many common electronic devices.

**Figure 3: A Few Forms of Capacitors**



Source: http://industrial.panasonic.com/ww/products/capacitors/

86.     Capacitors are similar to batteries in that both store electrical energy. A battery has two terminals, one that produces electrons through chemical reactions and another that absorbs electrons. A capacitor is simpler than a battery in that it only stores electrons and does not produce them.

87.     A capacitor is analogous to a water tower hooked to a pipe. A capacitor stores electrons much like a water tower "stores" water pressure. When the water system pumps more water than a town needs, the excess is stored in the water tower. Then, at times of high demand, the excess water flows out of the tower to keep the pressure up. A capacitor stores electrons in the same way and can then release them later.[5]

88.     Capacitors occur naturally. Lightning is a natural capacitor: The cloud and the ground are plates, and the lightning is the charge releasing between the two plates (Figure 4). Capacitors can also occur inadvertently: Two parallel wires on a printed circuit board form a capacitor and can have unintended effects on the circuit's behavior.

---

[5]  Marshall Brain and Charles W. Bryant, *How Capacitors Work.* HOWSTUFFWORKS, at http://electronics.howstuffworks.com/capacitor1.htm (2007).

**Figure 4: Natural Capacitor**



Source: http://www.cabrillo.edu/~jmccullough/Applets/Other_Applet_Images/Electricty_Magnetism/Lightning.JPG

89.   Forbes, a leading source for business news and financial information, reported: "Capacitors are ***ubiquitous electronic components*** found in a vast array of electronic devices, from consumer electronics to heavy machinery. ***Manufacturers produce trillions of them a year***" (emphasis added). There can be hundreds or thousands of them in a single electronic product. A 2013 technical paper called *Introduction to Capacitor Technologies: What is a Capacitor?* by a capacitor manufacturer, Kemet Corporation, stated, "[T]hese often tiny devices can have a significant effect on product performance, end-of-line production yield, reliability and lifetime in the field, and in some cases, safety." Figure 5 shows a motherboard mounted with hundreds of capacitors.

**Figure 5: Capacitor Motherboard**



Source: http://www.legitreviews.com/asrock-releases-first-12g-sas-3-motherboard_132574

90.     Capacitors can be manufactured to serve many purposes—from the smallest plastic capacitor in a calculator to a supercapacitor that powers a commuter bus. NASA relies on glass capacitors to wake up space shuttle circuitry and deploy space probes. Indeed, capacitors are found in almost every electronic device and are one of the most ubiquitous passive components. Capacitors have numerous essential applications in circuit design—providing flexible filter options, noise reduction, power storage, and sensing capabilities, among others.

91.     Capacitors are a mainstay in our fast-paced, technology-driven world and have had exponentially increasing applications over the last several decades. They are extensively used in nearly all electronic products. For example, the capacitive touch screen—once cost-prohibitive and rare—is in game consoles, personal computers, tablet computers, and smartphones today. Apple Inc.'s iPad contains about 700 capacitors, and its iPhone contains about 500 capacitors. The iPhone market alone has spurred the production of billions, if not trillions, of capacitors.

**B.     Capacitor Structure**

92.     A capacitor is a passive electronic component that stores energy as an electric field. A basic capacitor consists of two conductors (plates) separated by the dielectric (insulator). When a voltage exists between the two conductors, an electric field is present in the dielectric, which stores energy.

93.     While capacitors are just one type of electronic component, there are many types of capacitors. The dielectric material primarily differentiates the variety of capacitor. A capacitor's ***capacitance*** (storage potential) is measured in farads[6] and is directly proportional to the ***surface area*** of the plates, inversely proportional to the ***distance*** between the plates, and ***dependent*** on the ***dielectric material***. In other words, larger plates mean more storage potential; a shorter distance between plates means more storage potential; and a larger dielectric constant[7] of the insulator material means more storage potential. Figure 6 illustrates the structure of a capacitor.

---

[6] The unit of electrical capacitance, equal to the capacitance of a capacitor in which one coulomb of charge causes a potential difference of one volt.
[7] A quantity measuring the ability of a substance to store electrical energy in an electric field.

**INDIRECT PURCHASER PLAINTIFFS' SECOND CONSOLIDATED COMPLAINT**                    22

**Figure 6: Capacitor Structure**



Source: http://industrial.panasonic.com/jp/i/29880/TAL_E/TAL_E.pdf

94.     The dielectric dictates the form and function of a capacitor. The dielectric can be made of any non-conductive substance. Some capacitors are better for high-frequency uses while others are better for high-voltage applications depending on the material and size of the dielectric. In terms of material, for example, an air dielectric is commonly used in radio tuning circuits and a ceramic dielectric in high-frequency applications, such as antennas, x-rays, and magnetic resonance imaging. And regarding size, for example, small capacitors can be used in clocks and large capacitors, in power supply.

95.     At the most basic level, capacitors must be able to: (1) store electric energy, (2) separate different DC voltages from each other, and (3) conduct AC current. An ideal capacitor has the desired capacitance and is the perfect insulator.

**C.     Capacitor Technologies**

96.     Capacitors can be divided into two basic groups: electrolytic capacitors and electrostatic capacitors. Electrolytic capacitors and film capacitors—a type of electrostatic capacitors—are the subjects of this Complaint.

97.     ***Electrolytic capacitors*** are asymmetrical, polarized constructions. The dielectric, or insulator, is made of materials like aluminum, tantalum, niobium, or zircon while the conductors are made of a variety of metals. Aluminum, tantalum, or other metal foils or powders create the positive connection (anode). Electrolytic capacitors use an electrolyte that creates a negative connection (cathode). The dielectric layer is created by forming a thin oxide film on the metal anode and may be maintained by the electrolyte. For example, in aluminum electrolytic capacitors, the anode is

aluminum, the dielectric is the aluminum oxide, and the liquid electrolyte is the cathode. Figure 7 depicts the layers of an electrolytic capacitor. The type of electrolytic capacitor depends on the material of the oxide film that forms the dielectric. Because electrolytic capacitors are polarized, they must be carefully designed and correctly inserted into circuits. Electrolytic capacitors are generally used for relatively large capacitance values in a reasonable size.

**Figure 7: Electrolytic Capacitor Structure**



Source: http://industrial.panasonic.com/jp/i/29880/TAL_E/TAL_E.pdf

98.    ***Electrostatic capacitors*** are symmetrical, non-polarized constructions. The dielectric is made of materials like plastic film and ceramic while the conductors are made of a variety of metals. Because electrostatic capacitors are not polarized, they can generally be inserted into a circuit without regard to which points the terminals are connected. Electrostatic capacitors are generally used for small or precision capacitance values.

99.    The electrolytic and film capacitor markets include different types of capacitors. Concerning electrolytic capacitors, the allegations in this Complaint relate to polymer aluminum electrolytic capacitors, polymer tantalum electrolytic capacitors, non-polymer aluminum electrolytic capacitors, and non-polymer ELDC. Companies manufacture electrolytic capacitors in different shapes, such as circular and rectangular. Figure 8 provides a basic breakdown of electrolytic capacitors. Concerning film capacitors, which are less complex than electrolytic capacitors, the allegations in this Complaint relate to four generations: film and aluminum foil capacitors, film and

other metal capacitors, layered capacitors, and surface-mount capacitors (*i.e.*, capacitors without leaves).

**Figure 8: Electrolytic Capacitors**



Source: http://industrial.panasonic.com/www-data/pdf/ABA0000/ABA0000TE2.pdf

100.    Defendants manufactured, marketed, and/or sold electrolytic and/or film capacitors in and into the United States during the respective Class Periods. Defendants and other co-conspirators (as yet unknown) agreed, combined and conspired to fix, raise, maintain and/or stabilize prices, and to allocate market shares for electrolytic and film capacitors.

**D.    Aluminum Electrolytic Capacitors**

101.    Aluminum electrolytic capacitors are made of two aluminum foils and a paper spacer soaked in electrolyte. One of the two aluminum foils is covered with an oxide layer, and that foil acts as the anode, while the uncoated one acts as a cathode. The anode, electrolyte-soaked paper and cathode are stacked. The stack is rolled, placed into a cylindrical enclosure and connected to the circuit using pins (*see* Figure 9).

102.    Aluminum capacitors are highly reliable and have a long life. They also have characteristics like high capacitance, low electrical impedance, low profile, and low cost. They are used in home appliances, information communication devices, and industrial devices. TVs and computers are critical end-use markets for aluminum capacitors because flat panel TVs and desktop and notebook computers are aluminum capacitor-intensive.

**Figure 9: Basic Structure of Aluminum Electrolytic Capacitor**



Source: http://www.chemi-con.co.jp/e/ir/per_condenser.html

103.    Aluminum electrolytic capacitors are an essential electronic component of our lives—each home uses about 1,000 of them. Aluminum electrolytic capacitors are incorporated into products of various sizes because they can store large amounts of electricity. Aluminum capacitors are typically used in large electronic devices, such as televisions, computers, consumer audio and video devices, video game consoles, and navigation systems. Figure 10 shows the many applications of aluminum electrolytic capacitors as well as the amount of said capacitors in each product. The market for aluminum capacitors has been negatively impacted by the rise of the tablet computer and corresponding slowdown in sales of desktop and notebook computers.

**Figure 10: Applications of Aluminum Electrolytic Capacitors**

| Flat-Screen TV | Personal Computer | Home Video Game Machine | Inverter Driven Air Conditioner | Inverter Driven Washing Machine | PV Power Conditioner |
|---|---|---|---|---|---|
| 10 - 60 pcs | 10 - 60 pcs | 10 - 30 pcs | 20 - 30 pcs | 20 - 30 pcs | 30 - 50 pcs |

Source: http://www.chemi-con.co.jp/e/ir/per_condenser.html

104.    Other uses include lighting applications (*e.g.*, crane lighting, lighted buoys, barge lights, highway maintenance, lighting for construction equipment, emergency airport lighting, bridge

lighting) and renewable energy generating systems (*e.g.*, geothermal systems, solar energy systems, windmills, wave generation systems).

105.   Aluminum electrolytic capacitors are a specialty component compared to ceramic capacitors, a trillion plus of which are manufactured a year, but are essential to electronic products that require a higher capacitance than ceramic capacitors can offer. Aluminum capacitors provide a combination of high capacitance and high voltage without the constraints of volumetric inefficiency.

### E.   Tantalum Electrolytic Capacitors

106.   Tantalum is a rare, hard, blue-gray metal and a "conflict mineral" per the United Nations and the Dodd-Frank Act. The tantalum market is therefore subject to frequent supply and price fluctuations. Key hard and soft rock mining operations for tantalum have either closed or idled in Australia, Canada, Ethiopia, and Mozambique, leaving artisan sources in South America and Central Africa to meet the demand from recycled metal or existing stockpiles. Despite the challenging supply chain, high production costs, and being considerably more expensive than aluminum, the demand for tantalum capacitors remains because it offers the highest capacitance in the smallest form, relative longevity, and known reliability. Applications requiring high reliability include engine management, avionics, and safety and military equipment.

107.   Tantalum electrolytic capacitors are made of tantalum metal which acts as an anode, covered by a layer of oxide which acts as the dielectric, surrounded by a conductive. The use of tantalum allows for a very thin dielectric layer. A thin dielectric layer results in a higher capacitance value per volume, superior frequency characteristics compared to many other types of capacitors, and excellent stability over time. Figure 11 is an exploded view of a basic tantalum electrolytic capacitor. Technological advances allow tantalum capacitors to be used in a wide variety of circuits, often found in laptops, cell phones, and others, most often in the form of surface mounted devices. Surface mount tantalum capacitors claim much less space on the printed circuit board and allow for greater packing densities.

**Figure 11: Basic Structure of Tantalum Electrolytic Capacitor**



Source: http://powerelectronics.com/sitefiles/powerelectronics.com/files/archive/ powerelectronics.com/images/tantalum-capacitors-dscc-93026-Figure01.jpg

108. Applications using tantalum electrolytic capacitors take advantage of their low leakage current, high capacity and long term stability, and reliability. For example, they are used in sample and hold circuits which rely on low leakage current to achieve long hold duration. They are also commonly used for power supply filtering on computer motherboards and cellphones due to their small size and long term stability, most often in surface mount form. Tantalum electrolytic capacitors are also available in military specifications versions, which offer tighter tolerances and a wider operating temperature range. Medical electronics also rely on tantalum electrolytic capacitors because of their high stability. Audio amplifiers sometimes use tantalum capacitors where stability is a critical factor. Tantalum capacitors are typically used in small electronic devices in which small size and high capacitance are required, such as smartphones, small personal computers and tablets and devices used by the defense, medicine, and oil and gas industries. Due to tantalum capacitors' small size and high capacitance, they are indispensable in the growing area of portable electronics. Figure 12 depicts the various shapes and applications of tantalum capacitors.

**Figure 12: Applications of Tantalum Electrolytic Capacitors**



Source: http://www.kemet.com/Tantalum%20Capacitors

109.    It is important to note that although there are different types of capacitors, all types of capacitors have the same basic form and function. The surface area of the conductors, the distance between them, and the dielectric material may give each type of capacitor its characteristics and applications, but every type of capacitor is essentially a device used to store an electric charge, consisting of one or more pairs of conductors separated by an insulator.

110.    The aluminum electrolytic capacitors market has annual global sales of over $4 billion, while the tantalum electrolytic capacitors market has annual global sales of over $1.5 billion.

111.    While the inception of multi-layer ceramic capacitors ("MLCC") have begun replacing more expensive electrolytic and film capacitors in some applications, capacitor manufactures cannot simply transition from one type of capacitor to another because circuit board designs require specific types of capacitors. As products and their circuit boards undergo redesign, however, MLCC will continue to replace electrolytic and film capacitors.

112.    Between 2003 and 2013, almost all growth in capacitor sales has been attributable to ceramic capacitors due to the introduction of MLCC. The market share of ceramic capacitors rose from 85 to 90 percent, while the market shares fell from 10 to eight percent for aluminum capacitors and two to one percent for tantalum capacitors. Still, capacitor manufacturers could not simply switch from manufacturing electrolytic and/or film capacitors to manufacturing MLCC due to heavy, sunk financial investments in specialized facilities, complex equipment, and raw materials. As the

1   increasing demand for ceramic capacitors decreased the demand for electrolytic and film capacitors,

2   defendants conspired to fix the prices of the latter capacitors to maintain profits.

3       **F.     Film Capacitors**

4       113.    Film capacitors are electrostatic capacitors, which are distinct from electrolytic

5   capacitors in that electrolytic capacitors are polarized capacitors while electrostatic capacitors are

6   non-polarized capacitors. Film capacitors are electrostatic capacitors with a plastic film or insulating

7   paper as the dielectric. For plastic film capacitors, the dielectric plastic films, depending on the

8   desired dielectric strength, are drawn in a special process to an extremely thin thickness. The process

9   for creating super thin plastic films is highly sophisticated, and it is difficult and expensive to develop

10  or obtain the technology for such a process. Once the film reaches the desired width, it is cut into

11  ribbons. The width of the ribbons impacts the capacitance of the capacitor being produced. Two

12  ribbons of plastic film are wound together into a roll. Electrodes are later added by connecting each

13  of the two electrodes to one of the films. Voltage is used to burn out any imperfections in the film.

14  The case which holds the plastic film is sealed using silicon oil to protect the film roll against

15  moistures, and then hermetically sealed. Film capacitors can also be made with paper being used as

16  the dielectric. The plates of a film capacitor may be metallized aluminum or zinc applied directly to

17  the surface of the plastic film, or a separate metallic foil overlying the film.

18      114.    There are many types of film capacitors, including polyester film, metallized film,

19  polypropylene film, polytetrafluoroethylene ("PTFE") film and polystyrene film. The primary

20  difference between these types of film capacitors is the material used as the dielectric.

21      115.    As electrostatic capacitors, film capacitors have properties that are distinct from

22  electrolytic capacitors. In general, film capacitors have lower internal ohmic loss ("ESR") and

23  parasitic inductance ("ESL") values. Film capacitors are generally physically larger and more

24  expensive that electrolytic capacitors but have higher surge and pulse load capabilities. Film

25  capacitors are larger than aluminum, tantalum and ceramic capacitors that share similar performance

26  characteristics. As a result, film capacitors are poorly suited for miniaturized consumer electronics,

27  such as modern smartphones and music players, which require surface-mounted capacitors with small

28

form factors and high volumetric efficiency. With the market moving towards miniaturized consumer electronics, the demand for film capacitors has remained stagnant or shrunk.

116.     Film capacitors are commonly used in electronic equipment and are used in many AC and DC microelectronics and electronics circuits. Film capacitors are reliable and can be developed for a wide range of different capacitance values. Film capacitors offer the advantages of stability of electrical values over sustained usage, reliability (low self-inductance and ESR), and low cost. The reliability and stability of film capacitors make them useful for many industrial applications and general-purpose applications in electronics.

### G.     Capacitors Are Traceable Through the Chain of Distribution

117.     Electrolytic and film capacitors are component parts installed in electronic products as part of the electronic manufacturing process. They are also installed in electronic products to replace damaged, defective, or worn out capacitors. For new electronic products, tier one Original Equipment Manufacturers ("OEMs")—the world's largest electronic manufacturers, like Apple Inc., Hewlett-Packard Co., and IBM Corp.—directly purchase electrolytic and film capacitors from defendants due to their massive order volume. Plaintiffs and other OEMs—the rest of the world's electronic manufacturers (e.g., small businesses in Silicon Valley)—must indirectly purchase capacitors from a small number of distributors.

118.     When purchasing capacitors for their electronic products, tier one OEMs either choose existing capacitors from defendants' catalogs or issue requests for quotations ("RFQs") for new capacitors to defendants. Defendants submit quotations or bids to OEMs in response to RFQs, and OEMs typically award the business to the selected defendant. Plaintiffs and other OEMs must purchase existing capacitors from distributors' catalogs.

119.     Plaintiffs purchased electrolytic and film capacitors as a stand-alone product from distributors. When a capacitor is sold as a stand-alone product, the capacitor may be traceable to the specific manufacturer through the name, logo, and/or capacitor series printed on it that permits tracing. Some manufacturers print their name or logo on their capacitors, while others will only print the capacitor series. Plaintiffs who purchase electrolytic and film capacitors from capacitor distributors can typically trace capacitors to their manufacturers.

120.    As stated earlier in the Complaint, Plaintiffs purchased electrolytic and film capacitors as stand-alone products. Electrolytic and film capacitors are traceable to the specific manufacturer when purchased as stand-alone products. A capacitor is traceable to an entity owned and/or controlled by a defendant because it bears the defendant's markings (*e.g.*, name, logo, series).

## VII.    FACTUAL ALLEGATIONS

### A.    Defendants Conspired to Unlawfully Fix and Artificially Raise the Prices of Electrolytic and Film Capacitors

121.    The Hitachi, Nippon Chemi Con ("NCC"), Rubycon, and Panasonic defendants participated in *two conspiracies*: the *electrolytic capacitor cartel* from January 1, 2003 until such time as defendants' unlawful conduct ceased and the *film capacitor cartel* from January 1, 2007 until such time as defendants' unlawful conduct ceased. The Elna, Matsuo, NEC TOKIN, and Nichicon defendants participated in the aforementioned *electrolytic capacitor cartel*. The Nissei, Nitsuko, Okaya, Shinyei, Soshin, Taitsu, and Toshin Kogyo defendants participated in the aforementioned *film capacitor cartel*. Defendants executed the electrolytic and film capacitors conspiracies as follows:

#### 1.    Electrolytic Capacitor Conspiracy

122.    Electrolytic capacitor cartel members engaged in both *group and bilateral discussions* involving electrolytic capacitors. Group discussions occurred at group meetings that began in 2003 and continued until at least 2011, though the information available to Plaintiffs strongly suggests the conspiracy continued beyond 2011. The initial purpose of the group meetings was for electrolytic capacitor manufacturers to discuss overall market demand and exchange past production data on a monthly basis. The group meetings, however, evolved into a forum for electrolytic capacitor manufacturers to discuss future production data, such as price, cost, volume, and profit. Bilateral discussions about specific prices for specific electrolytic capacitors occurred after such group meetings.

### a. Group Meetings and Discussions

123. Electrolytic capacitor cartel members attended the following group meetings: ***Electrolytic Capacitor (ECC) meetings***, ***Tantalum Capacitor (TC) meetings, and KCC/Hananoki meetings*** from 1999 to 2003, ***Aluminum Tantalum Capacitor (ATC) meetings*** (also referred to as AT Statistics Group meetings) from 2003 through 2005, and ***Marketing Study Group meetings*** beginning in 2005.

### i. Pre-ATC Meetings

124. ECC meetings concerned electrolytic capacitors *without tantalum*. ECC meetings consisted of monthly meetings in Tokyo attended by mid-level managers to exchange information (though not related to prices or profits) and semi-annual meetings attended by high-level employees to share production data. Members anonymously submitted their data, which a third-party then collected and aggregated. Social events occasionally followed the semi-annual meetings. ECC meetings were the predecessor to the ATC meetings. The Elna, Nichicon, Nippon Chemi-Con ("NCC"), Rubycon, and SANYO defendants generally attended the ECC meetings.

125. TC meetings concerned electrolytic capacitors *with tantalum*. TC meetings were related to the ECC meetings and followed the same format as the ECC meetings. Members discussed increasing and maintaining prices at TC meetings. The Elna, FMD, Hitachi, Matsuo, NCC, NEC TOKIN, Rubycon, and SANYO defendants generally attended the TC meetings.

126. KCC/Hananoki meetings began in 1999 and were regional meetings focused on domestic sales of non-polymer electrolytic capacitors. KCC meetings were held in the Kansai region, whereas Hananoki meetings were held in the Nagoya region. The Elna, NCC, Nichicon, Rubycon, and Panasonic defendants generally attended the KCC/Hananoki meetings.

127. In addition to ECC, TC, and KCC/Hananoki meetings, electrolytic capacitor cartel members held other group meetings in Japan before establishing ATC meetings in 2003. Such meetings lacked an official name but were similar to industry gatherings or trade association meetings. These meetings began in the 1980s (if not earlier), continued through 2003, and focused on domestic sales of non-polymer aluminum electrolytic capacitors. Attendees exchanged demand and production data for the Japan market. The Elna, NCC, Nichicon, Panasonic, and Rubycon

defendants generally attended these other pre-ATC meetings. The ECC, TC, KCC/Hananoki, and other pre-ATC meetings laid the foundation for the ATC meetings which were conspiratorial in nature.

### ii.      ATC Meetings

128.     ATC meetings consisted of one-day monthly meetings in Tokyo attended by mid-level managers to exchange production volume and prices and two-day semi-annual meetings (in May/June and November) attended by high-level managers to exchange sensitive information on the first day and to participate in a social event (*e.g.*, golf at a resort) on the second day. The Elna, Nichicon, NCC, Rubycon, and SANYO defendants generally attended the ATC meetings. A summer 2003 ATC Meeting Roster confirms that these defendants were members and lists each defendant's regular and associate members.

### iii.      Marketing Study Group Meetings

129.     Marketing Study Group meetings consisted of ***MK meetings*** and ***Shimotsuki Kai meetings***. MK meetings included one-day monthly meetings and general meetings attended by mid-level managers. At the one-day monthly meetings, mid-level managers engaged in global discussions involving both domestic and overseas electrolytic capacitor markets and exchanged demand and production trend information (*e.g.*, competitors informed each other of any percentage increase or decrease in their electrolytic capacitor sales since the last meeting). They also discussed future production volume and prices for different electrolytic capacitors for different time periods at MK meetings. At the general meetings, mid-level managers typically discussed increasing prices, maintaining prices, or fighting price reductions. Dinner or social events occasionally followed such meetings. After the general meetings, bilateral discussions occurred about specific electrolytic capacitors, specific prices, and specific customers (*e.g.*, competitors discussed avoiding price decreases for polymer electrolytic capacitors). The bilateral discussions generally involved exchanging prices and coordinating responses to requests for quotations ("RFQs") from customers. The following e-mails highlight the conspiratorial nature of the MK meetings:

130.     In a summer 2008 e-mail from a SANYO employee to other employees, he admitted that "each company is negotiating a price increase of E-CAP/manganese Ta (*sic*)" and that ***"each of***

*the companies will take actions to maintain the price as far as possible."* Furthermore, "[a] request for cooperation has been made in relation to price rise of, and the markup (differences between the domestic and international prices) of, halogen-compatible ECAP/OS-CON (*sic*)."

131. The same e-mail thread describes a cooperative relationship between NCC and SANYO: "In relation to polymer chips, NCC has dealt with Sanyo well until now. However, as the price has recently started falling, *it wants to cooperate with Sanyo well*, in order to avoid making the same mistake as it had regarding leads . . . as Sanyo's price is the same, demands of clients are tough. NCC feels like pleading for mercy."

132. The same e-mail thread further describes a cooperative environment between defendants involved in the electrolytic capacitor conspiracy. Concerning Elna, SANYO's notes reflect that "[r]egarding aluminum-wound conductive ones, *[Elna] estimates its price as it checks the prices of other companies*."

133. Other e-mails from a SANYO employee to other personnel in late 2009 and early 2010 contain tables of defendants' reported increases and decreases in sales from the prior time period. Each e-mail cautions the recipients to *"please take utmost care in handling this report."*

134. In a summer 2010 e-mail from a SANYO employee to other employees, he wrote "to report market information." Following that, he asked, *"Will this be my last time?"*, suggesting his awareness that these meetings were inappropriate.

135. Shimotsuki Kai ("November" in Japanese) meetings were annual or semi-annual meetings in November attended by high-level employees to exchange, discuss, and agree upon prices. High-level employees also discussed electrolytic capacitor demand using detailed statistical reports by third-parties on the demand for electronic products (*e.g.*, computers, cellphones, AV products). Electrolytic capacitor cartel members eventually hired Fuji Chimera Research Institute, Inc. to create similar reports for use at Shimotsuki Kai meetings.

136. The Elna, NEC TOKIN, NCC, and SANYO defendants were the first to attend the Marketing Study Group meetings. The FMD, Hitachi, Matsuo, and Rubycon defendants were the next to join such meetings. The Nichicon defendants joined such meetings in 2008 when it acquired FMD.

### b. Bilateral Meetings and Discussions

137. There were bilateral meetings and discussions involving electrolytic capacitor cartel members during the Electrolytic Class Period, including those: (1) involving the NEC TOKIN and SANYO defendants from 2000 to 2013 regarding electrolytic capacitors sold to Apple Inc., Fujitsu, Ltd., Nokia Oyj, BlackBerry Ltd. (formerly known as Research In Motion Ltd.), Toshiba Corp., Samsung Electronics Co., Ltd., Sony Corp., many China/Taiwanese customers (*e.g.*, ASUSTeK Computer Inc., Comta, Foxconn Technology Group, Gigabyte Technology), and other Asia-based customers; (2) involving the FMD, NCC, and SANYO defendants from 2004 to 2007 regarding electrolytic capacitors sold to Dell Inc. and Intel Corp.; (3) involving the NCC and SANYO defendants from 2000 to 2013 regarding electrolytic capacitors sold to Micro-Star Int'l Co., Ltd., Sharp Corp., Sony Corp., Toshiba Corp., and other Asia-based customers; (4) involving the Matsuo and SANYO defendants in or around April 2011 regarding electrolytic capacitors sold to HTC Corp.; and (5) irregular bilateral discussions involving SANYO defendants and AVX Corp., K-Net, and Epcos AG, among others. The following e-mails are examples of bilateral discussions between defendants:

138. In a summer 2007 e-mail, a SANYO employee stated, "***I have exchange information with [an employee] at NEC-TOKIN*** Taiwan and the details follow" (*sic*).

139. In a spring 2009 e-mail from a SANYO employee to other SANYO employees, he began with: ***"Once you read this email, please delete it."*** The e-mail goes on to describe prices offered by SANYO to date and by an employee from NEC TOKIN who had many price discussions with SANYO. ***In the e-mail, the sender used "Company N" as a code name to refer to NEC TOKIN.*** The sender also admitted that he had stated, "[L]et's share by two companies" (*sic*) with regard to pricing.

140. ***In the days prior to this e-mail, defendants sent multiple e-mails back and forth discussing and reaching price agreements ("understood… it will be 0.232, 0.165.").***

141. In a summer 2009 e-mail from a SANYO employee describing the "situation of N-company," the sender prefaced the e-mail with a cautionary ***"please discard this e-mail…*** I had a telephone call from [an employee], N." ***Again, the sender used "N." as a code name to refer to NEC***

**TOKIN.** The e-mail stated that NEC TOKIN revealed the prices it would offer to Apple Inc., and in turn, SANYO revealed the prices that it would be offering to Apple Inc.

142.   The following e-mails illustrate acts of coordination by defendants as they relate to electrolytic capacitors sold to Dell Inc. and Intel Corp.:

143.   In a winter 2006 e-mail from a SANYO employee with the subject "OS-CON **3-company meeting**," he described a discussion with FMD and possibly NCC. He indicated that **SANYO "agreed to increase the overall demand** by expanding the market for the flat TV (LCD/plasma), but **we will have to proceed by and between 2 companies**, as Fujitsu Media Devices does not have the V-chips capacity."

144.   In a spring 2006 e-mail from a SANYO employee, he described his meeting with a FMD employee and an NCC employee to discuss how to collectively respond to pressure from Intel Corp. to lower prices. Another SANYO employee replied, "[Y]esterday and today, I had a word with NCC and FP respectively." The reply further stated that **"if we have to create a huge noise for this Intel matter, then Sanyo will also have to make a huge noise."**

145.   In a spring 2006 e-mail between SANYO employees, one of them stated that **NCC disclosed their pricing to SANYO and has in turn asked "what Sanyo will do"** with respect to polymer capacitor pricing. He further wrote, **"I reported to [an employee] of NCC Taiwan over a call, and told him that Sanyo is also said the same thing (sic). Therefore, let us proceed while exchanging information so that we are not taken for a ride by customers."** Furthermore, "[I]t seems that he has conveyed my discussion with him to [an employee] as well. **I think he understood that we have not proposed low prices."**

146.   In a spring 2006 e-mail between an FMD employee and a SANYO employee, *the former* **admitted he "had a word with Chemi-con's [employee]** regarding Intel's Addendum distributed today (*sic*)." The FMD employee asked the SANYO employee **to confirm SANYO's capacitor pricing, warning him that "if we continue like this, prices will keep on declining. It would be a great help if you could give some ballpark figures for the above."**

147.   In summer 2006, FMD, NCC, and SANYO met to discuss Intel Corp. and each company's pricing strategy. For example, NCC instructed other defendants how to respond by stating

1  that "aluminum is short, so ***set the target and raise the price (more than 10%)***" and ***"[i]f the price***

2  ***increase is not accepted, do not accept the share up."***

3  ### c.  Film Capacitor Conspiracy

4  148.  Film capacitor cartel members engaged in both ***group and bilateral discussions***

5  involving electrolytic capacitors. Group discussions occurred at group meetings that began in 1999

6  and continued until at least 2009. The initial purpose of the group meetings was for film capacitor

7  manufacturers to discuss film capacitor market trends and exchange film capacitor sales. The group

8  meetings, however, evolved into a forum for film capacitor manufacturers to reach price agreements

9  and talk about resisting price reductions. Bilateral discussions about film capacitors sold to Dell Inc.,

10  JMC Electronics Co., Ltd., and other customers in Japan and China markets occurred throughout this

11  period.

12  ### d.  Group Meetings and Discussions

13  149.  Film capacitor cartel members attended the following group meetings: ***Japan Film***

14  ***Capacitor (JFC) meetings*** beginning in 2007, ***Singapore meetings*** beginning in 1999, ***Kuala***

15  ***Lumpur (KL) meetings*** beginning in 2004, and ***FF meetings*** beginning in 2008.

16  ### i.  JFC Meetings

17  150.  JFC meetings were formal meetings held every three months. Members contributed

18  financially to operations. Members discussed new film capacitor products, exchanged production

19  volume information, and talked about resisting price reduction requests from customers at such

20  meetings, which were occasionally followed by social events. Members often shared price intentions

21  that resulted in price agreements. From 2007 through 2009, members agreed upon price increases

22  during periods of raw material cost increases. The Hitachi, NCC, Nissei, Nitsuko, Okaya, Panasonic,

23  Rubycon, Shinyei, Soshin, Taitsu, and Toshin Kogyo defendants generally attended the JFC

24  meetings. The following documents illuminate the JFC meeting functions:

25  151.  winter 2008 notes by a Panasonic employee confirm these defendants attended a JFC

26  meeting where they discussed increasing prices. Each defendant shared sales data and forecasts. At

27  the conclusion of this meeting, the defendants agreed to partial price increases.

28

152.    In fall 2008, Panasonic created a chart title, "Status of Production of Other Companies," that detailed pricing information for competitors, including Hitachi, Nissei, Nisuko, Okaya, Rubycon, Shinyei, Taitsu, and Toshin Kogyo. The chart states that each defendant discussed negotiating for prices increases. At the bottom of the chart, Panasonic wrote, ***"We decided to accept the film price hike effective on April 1."***

### ii.    Singapore Meetings

153.    Singapore meetings were meetings attended by Japanese companies owning Singapore facilities from 1999 until at least 2009. From 1999 to 2004, the purpose of these meetings was to determine market trends by exchanging data for product sales in Southeast Asia. Companies also exchanged electronic product demand information to predict film capacitor demand. When a customer issued a RFQ for a film capacitor, companies would discuss responses. From 2005 to 2009, the Singapore meetings occurred bimonthly, and attendees continued to exchange production and demand data. They also discussed price increases along with price reduction requests from customers, such as Sony Corp., Sharp Corp., Victor Company of Japan, Ltd. (JVC), Panasonic Corp., and Mitsumi Electric Co., Ltd. The Elna, NCC, Panasonic, and Rubycon defendants generally attended the Singapore meetings.

154.    KL meetings concerned the Japanese electronics industry and occurred in Malaysia from 2004 to 2009. Sellers and purchasers of electronic components attended such meetings. FF meetings were the golf outings of KL meetings that occurred in Taiwan from 2008 to 2013. Such meetings presented additional opportunities for competitors to interact with each other off the record.

### e.    Bilateral Meetings and Discussions

155.    There were bilateral meetings and discussions involving film capacitor cartel members during the Film Class Period, including those: (1) involving the NEC TOKIN, Panasonic, Rubycon, and United Chemi-Con, Inc. ("UCC")[8] defendants from 2002 to 2013 regarding film capacitors sold

---

[8] UCC is a subsidiary of and wholly owned and/or controlled by its Japanese parent, NCC.

to Dell Inc.[9]; and (2) involving Nissen and Panasonic defendants from 2007 to 2010 regarding film capacitors sold in Japan and China markets, possibly to JMC Electronics Co., Ltd.

156.    Generally, in both electrolytic and film capacitor conspiracies, defendants' Japanese parent companies attended the conspiratorial meetings. Defendants' U.S. subsidiaries, however, also engaged in some bilateral discussions that included exchanges of sensitive information.

       **f.**      **Illustrative Examples of U.S. Subsidiaries Engaging in Conspiratorial Conduct**

157.

158.

---

[9]The SANYO defendants, Taiyo Yuden Co., Ltd., and TDK Corp. were also involved in these discussions, though Plaintiffs have not alleged that they participated in the film capacitor conspiracy.

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP



159.

160.

161.

162.

**B.**     **Defendants' Corporate Families Acted as Single Enterprises. Defendant Parent Companies Exercised Substantial Control over Their U.S. Subsidiaries.**

163.     When defendants reached agreement on fixing, raising, maintaining, and/or stabilizing prices of capacitors—whether as a result of formal or informal cartel meetings, or during ad hoc

bilateral or tri-lateral meetings arranged to enforce, implement or effectuate cartel purposes and agreements—each of the defendants meant for their collusive agreements to impact the pricing for all capacitors subject to the cartel's anticompetitive efforts, regardless of where they were sold.

164.    As part of a single, integrated global enterprise, defendants sell market and distribute capacitors. Each defendant sells its capacitors around the world, including in the United States. Accordingly, to achieve the cartel's anticompetitive aims, defendants effectuated the cartel by establishing pricing on their capacitors in all markets—including the United States—in which they compete.

165.    Japan-based defendants with U.S. subsidiaries (*e.g.*, Elna, Hitachi, NEC TOKIN, Nichicon, Nippon Chemi-Con, Panasonic/SANYO) established those subsidiaries not only to market, sell, and distribute their capacitors in the United States but also to effectuate and achieve the cartel's aims and purposes. Without doing so, these corporate entities would have had to perform such functions themselves. These corporate entities chose not to do so and instead established corporate subsidiaries and affiliates that perform functions at the direction of and are controlled by their officers and managers in Japan.

166.    These U.S. subsidiaries have no authority to set prices below the prices for capacitors agreed to among the cartel's members, though it may be true that, from time to time, U.S.-based personnel had authority to charge higher prices that those set by the cartel. For these U.S. subsidiaries, pricing authority largely was held by their Japan-based defendant corporate parent, or the defendant parent's designated representative in the United States.

167.    Because their Japan-based defendant parents had significant control over all aspects of their business (*e.g.*, capacitor supply, pricing authority, business strategy, customer development and relations, sales, personnel decisions), many of the U.S. subsidiaries (as described more fully below) operated as little more than sales offices in the U.S. for their respective Japan-based defendant parents. Indeed, as is set forth below, many of the Japan-based defendant parents named their own employees directors, officers or managers of their U.S. subsidiaries, and many of these employees held these positions without ever even leaving Japan. As a result, these U.S. subsidiaries were—as intended—able to advance the cartel aims in the United States.

1.   **Defendants' High-Level Employees Organized the Conspiracies and Their Subordinate Employees—Including Those of Their U.S. Subsidiaries—Executed the Conspiracies.**

168.   The conspiracies were organized at a high level within the defendant corporate families. The conspiracies were carried out by both executives and subordinate employees. Further, given the nature of the industry, the conspiratorial agreements were implemented by the subsidiaries and distributors within the respective corporate families.

169.   Each of the corporate families alleged herein operate not as separate corporate entities but as a single enterprise. As the following allegations demonstrate, each corporate family holds itself out to the public as a single, integrated enterprise. Each of the parent and/or Japanese entities named in this case operate a hierarchical corporate structure wherein they treat subsidiaries not as separate corporate entities under their own control but as mere divisions of the corporate parent.

170.   Each corporate parent alleged herein also coordinates and manages the finances and meetings between managers from each of the different subsidiaries to facilitate an integrated enterprise to link the various supply chains to the corporate families' clients. The parent defendants dominate and control the finances, policies, and business practices of their various subsidiaries, including the U.S. subsidiaries.

171.   In light of the fact that the U.S. subsidiaries named in this Complaint were treated as mere sales offices of the Japanese parent companies, they were generally kept informed about the competitor meetings occurring in Japan and elsewhere and were not permitted to undercut the pricing agreements reached at those meetings.

172.   By virtue of their integrated enterprises, and by virtue of the other allegations in this complaint, each defendant individually entered into the conspiracies alleged herein on behalf of, and reported these meetings and discussions to, their respective corporate family and U.S. subsidiaries. In fact, defendant parent companies often provided pricing instructions to their U.S. subsidiaries, which acted as their U.S. sales arms.

173.

LAW OFFICES
Cotchett, Pitre
& McCarthy, LLP



174.

175.

176.

2.   **Defendants' Representatives who Attended Conspiratorial Meetings and Engaged in Collusive Conduct Participated in Discussions on Behalf of Entire Corporate Families and Failed to Distinguish Between Corporate Entities in the Same Corporate Family.**

177.   In many instances of meetings and communications between and among Defendants in furtherance of their conspiracies alleged in this Complaint, Plaintiffs allege which corporate family was represented in a particular meeting or communications. This is because, as documents reviewed to this date demonstrate, the individual participants in the conspiratorial meetings and discussions did not distinguish between entities within a particular corporate family, referring to themselves or others, for example, merely as "NEC," "Nichicon," "Panasonic," or "Sanyo." Indeed, the employees from Defendants appear to have attended the conspiratorial meetings on behalf of their entire corporate families, including their respective U.S. subsidiaries. Further, because of their generic uses of Defendants' names, individual participants in the conspiratorial meetings and discussions did not always know the specific corporate affiliation of their counterparts, nor did they distinguish between entities within the respective corporate families. Participants in the conspiratorial meetings entered into agreements on behalf of, and reported these meetings and discussions to their respective corporate families and U.S. affiliates. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in those meetings.

178.   Further, defendants knew the individuals at the conspiratorial meetings represented their entire respective corporate family; otherwise, defendants would not have entered into the illegal agreements if affiliate companies could simply undercut the agreements reached.



179.

180.

181.

182.

183.

184.

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

3.     **Each Defendant Parent Company, Along With Its U.S. Subsidiary, Hold Themselves Out as a Single Integrated Enterprise.**

a.     **Elna Corporate Family**

185.    Elna America Inc. ("Elna America")'s website (www.elna-america.com/) demonstrates a lack of corporate separation between Elna Co., Ltd. ("Elna Japan") and Elna America. Elna America's "About Us" webpage asserts that it (a) has been a "wholly-owned subsidiary of ELNA Co. Ltd." for over 35 years; (b) is "responsible for sales, service, and support to customers in North and South America"; and (c) has customers in "all market segments of the electronics industry." The "Locations" webpage depicts a global network of Elna Japan's worldwide offices. The "Products" and "News" webpages directly link to the "Capacitors" and "News release" webpages of Elna Japan's website, respectively.

186.    Elna Japan's website (www.elna.co.jp/en/) likewise shows a lack of corporate separation between parent and subsidiary corporations. Elna Japan's "Corporate profile & History" webpage states that it established "sales company ELNA AMERICA INC." in March 1977. The "News release" webpage has posted quarterly consolidated balance sheets for Elna Japan and its consolidated subsidiaries (which would include wholly-owned Elna America) since 2003.

187.    Unlike Elna Japan's website, Defendant Elna America's website does not list an independent Board of Directors.

b.     **Hitachi Corporate Family**

188.    Similarly, there is a lack of corporate separation between Hitachi Chemical Co., Ltd. ("Hitachi Japan") and Hitachi Chemical Co. America, Ltd. ("Hitachi America"). Hitachi Japan's website (www.hitachi-chem.co.jp/english/) lists Hitachi America on its "Hitachi Chemical Group [Overseas]" webpage. Hitachi America is the "[r]egional head quarter for Hitachi Chemical group companies in the U.S.A" and is responsible for "[s]ales & marketing of functional materials and advanced components and systems R&D in biotechnology." The "Hitachi Chemical Group Identity" is a "globally shared structure of our philosophy and values" per Hitachi Japan.'s website with a corporate slogan ("Working on Wonders") and a corporate brand logo. Hitachi Japan posted

consolidated financial reports for itself and its consolidated subsidiaries (including Hitachi America) in its Annual Report 2014.

189.   Furthermore, Hitachi America's website (www.hitachi-chemical.com/) features the Hitachi Chemical Group's corporate brand logo and a link to Hitachi Japan's website.

### c.   NEC TOKIN Corporate Family

190.   NEC TOKIN Corp. ("NEC TOKIN" and NEC TOKIN America Inc. ("NEC TOKIN America") lack corporate separation. NEC TOKIN America, for example, lacks its own web domain (*e.g.*, www.company.com/); its homepage is merely a webpage within NEC TOKIN Japan's website (www.nec-tokin.com/america/). NEC TOKIN America's "Careers" webpage provides that it is "a subsidiary of NEC TOKIN Corp." that "markets and sells innovative passive electronic components in the Americas - North, Central, and South." NEC TOKIN America's "Product Information" webpage directly links to the "Products" website of NEC TOKIN Japan.

191.   NEC TOKIN Japan's website (www.nec-tokin.com/english) suggests that it wholly owns and/or controls NEC TOKIN America/ NEC TOKIN's "Compliance" webpage describes itself as a "global manufacturer," and its "Network" webpage list NEC TOKIN America as an overseas subsidiary with sales offices in San Jose, Chicago, and Austin. The "Corporate Outline" webpage reported consolidated net sales (which would include NEC TOKIN America) for Fiscal Year 2014. Interestingly, NEC TOKIN Japan delinked its "Financial Data" webpage, which contains consolidated financial data (*e.g.*, balance sheets, income statements, cash flow statements) for NEC TOKIN Japan and its consolidated subsidiaries (which would include NEC TOKIN America) since 2001, though the webpage remains available through web search engines (*e.g.*, www.google.com/).

192.   Defendant NEC TOKIN Japan's website similarly lists its U.S. subsidiary, NEC TOKIN America as a mere "sales office." Unlike NEC TOKIN Japan's website, NEC TOKIN America's website does not list an independent Board of Directors.

### d.   Nichicon Corporate Family

193.   Nichicon Corp. ("Nichicon Japan") and Nichicon America Corp. ("Nichicon America") also lack corporate separation. Nichicon America has neither its own web domain nor a webpage within Nichicon Japan's website (www.nichicon.co.jp/english/index.html/). Nichicon

Japan's "Overseas Network" webpage illustrates a global network of its worldwide offices. The "Company History" webpage indicates that Nichicon Japan established Nichicon America in September 1970 for "sales of the company's products." The "Consolidated Subsidiaries" webpage lists Nichicon America, and the "IR Library" webpage has posted consolidated financial reports since 2000. Nichicon Japan's Integrated Report 2014 indicates that it has been "responding to customer needs and undertaking business development and marketing through core sales offices established worldwide" and refers to Nichicon America as one such core sales office. Nichicon Japan describes its business strategy as a "Global Strategy" and remarks that its "sales networks have expanded to the US," among other countries.

194.    All of Nichicon Japan's capacitors sold in the U.S. are sold through Nichicon America. Nichicon America does not manufacture any of Nichicon Japan's electrolytic and film capacitors sold in the U.S.; they are all manufactured overseas. Accordingly, Nichicon America is dependent on Nichicon Japan to provide it with the capacitors it markets, sells, or delivers in the U.S.

195.    Through Nichicon America, Nichicon Japan sells its capacitors to companies in the U.S. automotive industry, as well as U.S.-based technology companies such as Bose Corp., Sanmina Corp., Philips Consumer Electronics, Universal Lighting Technologies, and Kimball Electronics Group, among others. Nichicon Japan also sells its capacitors to U.S.-based electronic components distributors, TTI, Avnet, Arrow Electronics, Digi-Key Corp., and Mouser Electronics.

196.    Nichicon America's sales to these U.S.-based businesses are largely directed and supervised by Nichicon Japan's sales department personnel resident in Japan. Accordingly, all sales planning, strategy and pricing decisions relating to Nichicon capacitors sold in the U.S. are made by Nichicon Japan's sales and management personnel, and Nichicon America employees have limited to no discretion or authority to conduct business without authorization from Nichicon Japan's sales department leadership.

197.    Because its U.S. sales are important to Nichicon Japan's overall business, Nichicon Japan has regularly assigned key sales and management personnel to positions at Nichicon America. Personnel assigned to Nichicon America positions either perform those duties concurrently with their Nichicon Japan duties, though sometimes they may move to the U.S. for a limited time to carry out

their duties there. Those Nichicon Japan employees who work for Nichicon America in the U.S. typically return to Nichicon Japan after a set number of years, and often receive a promotion upon their return. Nichicon personnel that have been co-listed between Nichicon Japan and Nichicon America include:

a.    Ippei Takeda—Nichicon Japan's current Chairman and CEO, who has worked in various positions at the company over the last 52 years—served as Nichicon America's Representative Director at various times from 1978 to 2006.

b.    Russell Edwards—Nichicon Japan's current Director of its Overseas Sales Department—has served in various positions with Nichicon America over the last 42 years, including its Vice President of Sales. Mr. Edwards has, since 2005, served as Nichicon America's President.

c.    Hideki Isobe—Nichicon Japan's current Deputy General Manager of Business Strategy for the Capacitors Business—served in Nichicon America's Engineering and Sales Departments at various times between 2001 and 2004.

d.    Daisuke Ono—Nichicon Japan's current Manager of the West Japan Sales Division—served in various sales positions at Nichicon America between 2001 and 2008.

198.   Nichicon Japan's personnel holding positions at Nichicon America, supervising and overseeing Nichicon America sales staff, or doing business with the company's U.S. customers, were knowledgeable about the existence of defendants' cartel as well as the cartel's aims and purpose.

199.   Information regarding the cartel's agreements regarding pricing and sales were disseminated to the Nichicon Japan personnel that were holding positions at Nichicon America, supervising and overseeing Nichicon America sales staff, or doing business with the company's U.S. customers by those who participated in cartel meetings. The Nichicon Japan personnel that participated in cartel meetings and activities held positions of authority within Nichicon Japan's management and sales departments. For example, Mr. Takeda—Nichicon Japan's current Chairman and CEO—attended cartel meetings and participated in the ATC meeting's Presidents Committee starting in 2003 while concurrently serving as Nichicon America's President and CEO and Representative Director.

200.    Nichicon Japan's oversight and direction of Nichicon America's sales operations permitted it to effectuate cartel pricing and sales strategies in the U.S.

### e.    Nippon Chemi-Con Corporate Family

201.    Nippon Chemi-Con Corp. ("NCC") and United Chemi-Con Corp. ("UCC") hold themselves out as a single corporation. According to the "Company Profile" webpage of NCC's website (www.chemi-con.co.jp/), NCC lists UCC as an "overseas affiliate" that is 100 percent owned by NCC whose main business is the "manufacturing and selling of capacitors." NCC established UCC as a "U.S. based corporation for overseas sales" in June 1970 and United Chemi-Con Manufacturing Inc. (now UCC) in the United States to "serve as a local production base for electrolytic capacitors in June 1992. NCC's "Global Business" webpage also states that it has "overseas affiliates in the United States," among other countries, "to cover each regions' sales activities." NCC refers to its "global network of production and sales," "connecting [its] worldwide production sites and sales offices," and "manag[ing] order information, production information and inventory information on materials and finished products in an integrated way to optimize our businesses."

202.    The Nippon Chemi-Con Group, which refers to NCC and its affiliates (including UCC), are governed by a single Charter of Corporate Behavior, Business Conduct Guidelines, Information Security Policy, and Privacy Policy. NCC has posted consolidated financial results for its corporate family since fiscal year 2003.

203.    UCC's homepage (www.chemi-con.com/) contains a link to NCC's website ("Connect to Our Parent Company") and states that it is a "wholly-owned subsidiary" of NCC. UCC's "Products Document" webpage directly links to NCC's "Product Information" webpage. UCC's website does not contain any corporate information, such as the identity of or any other information about its corporate officers and directors. UCC holds itself out as part of NCC rather than as an independent entity. For example, on the News and Events section of UCC's homepage, it links to a press release regarding the DLCAP (Ultracapacitor). That press release, although hosted on UCC's website, is a NCC press release, which prominently displays the NCC logo and repeatedly refers to

NCC's development and production of the DLCAP product; it does not refer to UCC even once but refers to NCC by name at least 12 times.[10]

204.    NCC was responsible for the business relationships with the majority of the customers who purchased capacitors from UCC, or from NCC through UCC. NCC directors traveled to the U.S. to meet with large U.S.-based technology companies, including Apple and Bose, and electronic component distributors such as Digi-Key Corp. NCC's customers do not distinguish between NCC and UCC. Often, customers referred to UCC as NCC, and UCC personnel field inquiries about NCC's products. In certain instances, NCC sold capacitors to UCC and shipped them to the United States with the understanding that the capacitors would then be purchased (or had already been purchased) by customers in the United States.

205

206.

_____

[10] See Press Release, Nippon Chemi-Con Corp., *Nippon Chemi-Con to Increase Production of Low-Resistance Electric Double Layer Capacitors DLCAP™ for Passenger Vehicles* (Sep. 6, 2013), *available at* http://www.chemi-con.com/upload/media/pdfs/DLCAPPressRelease.pdf.

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

### f.      Panasonic/Sanyo Corporate Family

207.      Panasonic Corp., Panasonic Corp. of North America, SANYO Electric Co., Ltd., and SANYO Electronic Device (U.S.A.) Corp. likewise hold themselves out as an integrated corporation. "The Panasonic Group is comprise primarily of the parent Panasonic Corp. and 504 consolidated subsidiaries in and outside of Japan, operating *in close cooperation* with each other."[11] Panasonic Corp. has a streamlined governance structure that runs from the top down. "[T]he Board of Directors has the ultimate responsibility for administration of the Company's affairs and monitoring of the execution of business by the Directors. . . . At the same time, the Company employs an Executive Officer system to provide for the execution of business at its various domestic and overseas Group companies. This system facilitates the development of optimum corporate strategies that integrate the Group's comprehensive strengths."[12] The Executive Officers include all the heads of regional subsidiaries, including Joseph Taylor, the CEO of Panasonic Corp. of North America.[13] In its Annual Reports, Panasonic Corp. presents a consolidated financial statement for "Panasonic Corp. and Subsidiaries."[14] Panasonic also presents employee data in its Annual Report on a consolidated basis.[15]

---

[11] Panasonic Corp., Annual Securities Report for the fiscal year ended March 31, 2014, at 6 (107th Business Term) (hereinafter "Annual Securities Report"), June 27, 2014 (emphasis added), *available at* http://www.panasonic.com/global/corporate/ir/pdf/AnnualSecuritiesReport2014.pdf; *see also IR Summary*, Panasonic, http://www.panasonic.com/global/corporate/ir/pdf/ panasonic_summary_en.pdf (last visited June 15, 2015) (noting number of subsidiaries).
[12] Panasonic Corp., 2014 Annual Report at 37, *available at* http://www.panasonic.com/global/ corporate/ir/pdf/panasonic_ar2014_e.pdf.
[13] *Id.* at 41.
[14] *Id.* at 3–4; *see also* Press Release, Panasonic Corp., *Panasonic Announces Voluntary Adoption of International Financial Reporting Standards* (April 28, 2015), *available at* http://news.panasonic .com/press/news/data/2015/04/en150428-6/en150428-6-1.pdf.
[15] Annual Securities Report at 11.

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

208.     Panasonic Corp. acts a single entity. It issues releases, for example, of all changes to the membership of the Board of Directors and Executive officers, across all divisions and subsidiaries, including Panasonic Corp. of North America and SANYO Electric Co., Ltd.[16] In its annual report, Panasonic Corp. lists key dates in its history, including the founding of Matsushita Electric Corp. of America, which went on to become Panasonic Corp. of North America.[17] "Panasonic Corp. of North America, based in Newark, NJ, is the principal North American subsidiary of Osaka, Japan-based Panasonic Corp. and the hub of its branding, marketing, sales, service, product development and R&D operations in the U.S. and Canada."[18] Panasonic Corp. controls 100 percent of "voting rights interests" in Panasonic Corp. of North America.[19] Panasonic Corp. of North America maintains a webpage (shop.panasonic.com/home) that is nested within the Panasonic Corp. domain name. The "Investor Relations" tab on the Panasonic Corp. of North America website links back to Panasonic Corp.'s investor relations page at http://www.panasonic.com/global/corporate/ir.html.

209.     SANYO North America Corp. is a subsidiary of SANYO Electric Co., Ltd. SANYO Electric Co., Ltd. is a wholly-owned subsidiary of Panasonic Corp..[20] In its last annual report, SANYO lists its total number of consolidated employees and total subsidiaries, and all financial data is consolidated across the entire group.[21] Panasonic Corp. controls 100% of "voting rights interests" in SANYO Electric Co., Ltd.[22]

### g.     Rubycon Corporate Family

210.     Rubycon Corp. ("Rubycon Japan") and Rubycon America Inc. ("Rubycon America") similarly lack corporate separation. Rubycon America. has neither its own web domain nor a webpage within Rubycon Japan's website (www.rubycon.com/; www.rubycon.co.jp/en/). Rubycon Japan's "Contact" webpage shows a global network of Rubycon Japan's "Overseas Sales Bases" that includes

---

[16] *See* Press Release, Panasonic Corp., *Panasonic Announces Proposed Senior Management Changes, Panasonic* (February 26, 2014), *available at* http://www.panasonic.com/content/panasonic/global/en/corporate/ir/pdf/en140226.pdf.
[17] Annual Securities Report at 3.
[18] *Company Profile*, Panasonic, http://www.panasonic.com/about/overview.asp (last visited June 15, 2015).
[19] Annual Securities Report at 9.
[20] *SANYO's IR Library*, Panasonic, http://panasonic.net/sanyo/corporate/ir_library/ (last visited June 15, 2015).
[21] *Id.*
[22] Annual Securities Report at 8.

1  Rubycon America. The "History" webpage provides that Rubycon Japan established Rubycon

2  America in June 1979 and established Rubycon America's "San Jose Representative Office" in April

3  2002. Interestingly, Rubycon America's e-mail is inq_rai@rubycon.co.jp, which belongs to the

4  Japanese    web    domain    (www.rubycon.jo.co.jp)—not    the    American    web    domain

5  (www.rubycon.com/).

6       211.    Rubycon Japan and Rubycon America have at least one overlapping director/corporate

7  officer based on public information. Rubycon lists Shintaro Tonouchi as one of its Directors.[23]

8  Rubycon America's latest annual corporate filing with the State of Illinois lists Shintaro Tonouchi as

9  President of Rubycon America.[24] Rubycon Japan's website includes a list of North America

10  distributors.[25] This list pairs Rubycon Japan's name and logo with a Rubycon America business

11  address. The document does not explicitly mention Rubycon America but rather holds out the Illinois

12  address to be that of Rubycon Japan.

13       **4.    The Nature of the Capacitor Industry Required Foreign Companies
          Named As Defendants Herein to Use Their U.S. Subsidiaries As Sales**

14       **Arms for Price-Fixed Capacitors.**

15       212.    Defendants' U.S. subsidiaries are wholly-owned and/or controlled by their parent

16  companies. As part of each Defendant's global enterprise, its U.S. subsidiary assists the parent

17  company with the sale and/or delivery of electrolytic and film capacitors to U.S. purchasers. In most

18  cases, the U.S. subsidiaries carry out the sales of capacitors to customers in the United States after

19  obtaining products manufactured at the parent company's factories located in Japan and/or the United

20  States. In some instances, U.S. subsidiaries are also involved in the sale of products from Defendants'

21  U.S. plants to Defendants' sales companies abroad as part of an integrated management system.

22  Generally, U.S. subsidiaries facilitate direct purchaser orders for capacitors with parent companies

23  overseas. That is, the parent company manufactures and packs capacitors in Japan and sends the

24  purchased capacitors directly to the United States, often through its U.S. subsidiaries. Indeed,

25

26  _____

[23] *See* http://www.rubycon.co.jp/en/profile/company.html

27  [24] *See* http://www.ilsos.gov/corporatellc/ (search for "Rubycon," view the information for
    Rubycon America, Inc.)

28  [25] *See* http://www.rubycon.co.jp/en/profile/pdf/DISTRIBUTORS.AMERICAS.pdf .

Defendant parent companies make millions—if not, billions—off dollars of sales annually to their U.S. subsidiaries as part of their global business.

213.     Defendants' U.S. subsidiaries typically act as the sales arm of their respective parent companies. For example, Elna America, Inc.'s "About Us" webpage provides that it is "responsible for sales, service, and support to customers in North and South America through a sales channel of independent representatives & authorized distributors." Elna America Inc.'s "Distributors" webpage lists Digi-Key Corp. and Mouser Electronics, among others, from whom Plaintiffs purchased electrolytic and film capacitors. Hitachi Chemical Co. America, Ltd. is the "[r]egional head quarter for Hitachi Chemical group companies in the U.S.A" and is responsible for "[s]ales & marketing of functional materials and advanced components and systems R&D in biotechnology." NEC TOKIN America Inc.'s "Careers" webpage provides that it is "a subsidiary of NEC TOKIN Corp." that "markets and sells innovative passive electronic components in the Americas - North, Central, and South." Nichicon Corp.'s Integrated Report 2014 indicates that it has been "responding to customer needs and undertaking business development and marketing through core sales offices established worldwide" and refers to Nichicon America Corp. as one such core sales office. NCC originally established UCC as a "U.S. based corporation for overseas sales" in June 1970. UCC's "Distributors and Representatives" webpage lists Digi-Key Corp. and Mouser Electronics, among others, from whom Plaintiffs purchased electrolytic and film capacitors. And Panasonic Corp. of North America is the hub of Panasonic Corp.'s branding, marketing, sales, service, product development and R&D operations in the U.S. and Canada. And Rubycon Corp.'s "Contact" webpage shows a global network of Rubycon Corp.'s "Overseas Sales Bases" that includes Rubycon America Inc. Rubycon Corp.'s "Distributor/Rep North America" webpage lists Digi-Key Corp., among others, from whom Plaintiffs purchased electrolytic and film capacitors.

214.     In sum, defendants sells directly to the United States and operates its capacitor business as a single global enterprise with its subsidiaries in the United States.

## C.     **Capacitor Industry Trends**

215.     Consumer electronics is the largest end-use for capacitors and according to market analysts who specialize in the capacitors industry, consumer electronics constitute approximately

90% of the total market for capacitors. In 2014, the North and South American market for capacitors constituted approximately 12 percent of the overall global market for capacitors. The total dollar value of the North and South American markets for capacitors in 2014 was approximately $2.2 billion. In North and South America, aluminum capacitors constitute approximately 17 percent of the total capacitor consumption, while tantalum capacitors constitute approximately 14 percent. Film capacitors constitute approximately 15 percent of the total capacitor consumption for both North and South America.

216.    Leading market analysts in the capacitors industry have determined that overall global consumption of aluminum, tantalum and film capacitors has been declining for over a decade. Consumption of tantalum capacitors dropped from approximately 2.4 percent of global volume for fiscal year 2003 to an estimated 1.1 percent for 2014. Consumption of aluminum capacitors dropped from approximately 10.2 percent for fiscal year 2003 to an estimated 6.8 percent for fiscal year 2014. Consumption of film capacitors dropped from approximately 2.5 percent for fiscal year 2003 to an estimated 1.1 percent for fiscal year 2014.

217.    Leading market analysts predict growth in the general capacitor market, however, which includes electrolytic and film capacitors. In 2013, global sales of capacitors exceeded 1.3 trillion units and global revenue for capacitors was more than $16 billion. A report from Research and Markets, an industry research firm, forecasts that the *capacitor market will reach $20.2 billion in revenue by 2018*. The report also predicts a 2.5 percent compound annual growth rate for capacitors worldwide, driven by overall electronic industry trends, including demand for compact, portable, and more complex electronic devices and the accompanying need for better, smaller, and more efficient component solutions. The key forces driving growth in the capacitor market long term are the increasing demand for consumer electronics, such as notebooks, ultrabooks, and smartphones.

218.    In fact, one report—Global Capacitor Industry 2013-2018: Trend, Profit, and Forecast Analysis—predicts that both industry revenue and industry revenue by region will increase steadily across the world, which was grouped into four regions: North America ("NA"), Europe, Asia-Pacific ("APAC"), and the rest of the world ("ROW") (Figure 13).

**Figure 13: Global Capacitor Industry Revenue**





Source: Research and Markets

### 1.   Aluminum Electrolytic Capacitors

219.    Aluminum electrolytic capacitors account for 6.5 percent of the global capacitor market in terms of volume but 22 percent of it in terms of dollar value. In North America, aluminum electrolytic capacitors are 20 percent of the $1.5 billion annual market for capacitors, or $300 million.

220.    Currently, the largest end-use market for aluminum electrolytic capacitors is consumer electronics. However, demand from other end-use markets, such as medical instruments, defense, space and mining instruments, and electronic applications, is the leading source of growth in the aluminum electrolytic capacitor market. For example, the increasing demand for inverters, which use aluminum electrolytic capacitors, in the energy and environmental industries is spurring growth in this market.

221.    The aluminum capacitor market hit a low point in FY 2013. Market analysts believe that the market will rebound in the short-term because of a number and variety of markets that will drive the demand for aluminum capacitors, including commercial aircraft, communications infrastructure, electric rail, medical devices, and oil and gas industries. Market analysts also predict that the growth in global renewable energy markets—specifically, inverter applications in wind and solar energy will further increase the demand for aluminum capacitors. Although the demand for aluminum capacitors is expected to rebound from its lowest point in FY 2013, aluminum electrolytic

LAW OFFICES
COTCHETT, PITRE
& MCCARTHY, LLP

manufacturers still faced and continue to face substantial market and technology headwinds that led to the creation of a price-fixing conspiracy.

### 2. Tantalum Electrolytic Capacitors

222. Multiple industries have continued to use tantalum for the past few decades due to its reliability despite the emergence of metal alternatives. Consumer electronics drove 50 to 70 percent of the demand for tantalum over the past 20 years. Tantalum capacitors are in cell phones, portable electronics equipment, and communications infrastructure.

223. In recent years, though, three tantalum-alternative capacitors have emerged as substitutes for tantalum capacitors: (1) multi-layered ceramic chip capacitors, (2) aluminum electrolytic capacitors, and (3) the niobium oxide molded chip capacitors. As such, the supply and demand for tantalum capacitors are expected to fall. These potential substitutes have impacted the profit margins of manufacturers of tantalum electrolytic capacitors, which necessitated the formation of a price-fixing conspiracy to protect those profit margins.

### 3. Film Capacitors

224. According to market researchers, the global market for paper and plastic film capacitors is forecast to reach USD$2.6 billion by the year 2018. Film capacitors are used in automobiles, home appliances and products that enable greater connectivity and mobility such as mobile computing devices and smartphones. Improvements in metalizing techniques are enhancing the efficient use of new ultra thin dielectric substrates. AC Film Capacitors, which are primarily used for heat pumps, awning drives, compressors, pumps, domestic appliances, air conditioning, and asynchronous motors represent the larger and faster growing market segment.

### D. The Characteristics of the Electrolytic and Film Capacitor Market Render Collusion More Plausible.

225. The characteristics of the electrolytic and film capacitor industry in the United States are conducive to price-fixing and have rendered collusion plausible. Industry characteristics are critically important to determining the likelihood of collusion in that industry. Collusion is more plausible in industries where: (1) high barriers to entry exist; (2) demand is inelastic; (3) the market is highly concentrated; (4) the products are homogenous; (5) there are ample opportunities to

conspire; (6) capacitor purchasers lack buying power; (7) demand is falling; and (8) there is a history of collusive behavior.

1.     The **Electrolytic and Film Capacitor Industry Has High Barriers to Entry.**

226.    The electrolytic and film capacitor industry has high barriers to entry that facilitate the formation and maintenance of a cartel. Collusion between manufacturers that effectively increases product prices above competitive levels would attract new entrants seeking to benefit from supra-competitive pricing. New entrants are less likely, however, where there are significant barriers to entry.

227.    There are substantial barriers that preclude, reduce, or make more difficult entry into the electrolytic capacitor market. A potential new entrant faces costly and lengthy start-up costs, including multi-million dollar costs associated with research and development, manufacturing plants and equipment, energy, distribution infrastructure, skilled labor, and long-standing customer relationships with existing manufacturers.

228.    Both electrolytic and film capacitors are expensive to manufacture. Aluminum electrolytic capacitors are generally more expensive than other capacitors (*e.g.*, ceramic capacitors, which are the most commonly manufactured capacitor in the electronics industry) due to the numerous raw materials required, such as foil and paper, liquid or solid electrolyte, tab, can, leads, stoppers, and end seals. No other dielectric, except perhaps film capacitors, has so many different raw materials and required disciplines to produce a capacitor. Tantalum electrolytic capacitors are also considerably more expensive than any other commonly used type of capacitor because tantalum is a rare element of erratic supply with high demand.

229.    Film capacitors require advanced technology needed to manufacture the different components, including the super thin dielectric plastic film. Special equipment is also required to manufacture film capacitors, which would impact the ability of new companies to enter the market. In order to compete, new entrants would need access to equally efficient production technology as established firms. The cost of obtaining or developing such production technology is extremely high. Furthermore, film capacitors have become increasingly more difficult to produce because

manufacturers have encountered greater difficulty in securing the necessary input materials. Because of the high volume of plastic film material needed for a production run of film capacitors, it is generally not profitable for chemical companies to manufacture the plastics. As a result, five types of plastic material now account for over 90% of film capacitor dielectrics: polypropylene, polyester, polyphenylene sulfide, polyethylene naphthalate, and PTFE. A limited number of dielectric grade resin manufacturers control the global production of these plastics (*e.g.*, principally DuPont, Teijin, Toray, Mitsui, and Borealis) and they make them in large batches only a few times a year. Likewise, the converters who apply special conductive coatings to the resin usually only run large batches a few times a year, and for some specialty film coatings, batches are run only once a year. New entrants would lack the market or economic power to gain access to the inputs needed at a low enough cost to effectively compete with the defendants and other established market participants.

230. Electrolytic and film capacitors are protected by patents. Patents provide a firm the legal right to stop other firms producing a product for a given period of time, restricting entry into a market. According to the United States Patent and Trademark Office, defendants own hundreds of active patents for various capacitors. For example, Panasonic and NEC TOKIN each have about 100 capacitor patents. One capacitor manufacturer acknowledged that patents present a barrier to entering the capacitors market. Non-defendant Maxwell Technologies attributes its "technology leadership" to its "investments in research and development . . . protected by more than 100 issued U.S. patents and pending patent applications." Patents place a significant and costly burden on new entrants, which must avoid infringing on patents when entering the electrolytic capacitor market.

231. In addition, given the nature of the materials used in capacitors, any new entrant must comply with various environmental regulations in whatever jurisdiction where a plant is built. Compliance with such regulations requires extensive testing and obtaining government approval, all of which can take many years. These issues are particularly problematic for tantalum capacitors, for which its key ingredient, tantalite, is often sourced from conflict zones. Under U.S. law, tantalum is a "conflict mineral" and therefore, there are substantial regulatory issues regarding the mining and sale of tantalum, which is the essential component in tantalum electrolytic capacitors

232.    For instance, in connection with its recent acquisition of NEC TOKIN, KEMET reported, "In the short period since receiving regulatory approval and closing the transaction, we signed and began the execution of both a Private Label Agreement and a Development and Cross-Licensing Agreement so that we can take advantage of both KEMET and NEC TOKIN's extraordinary synergies. These agreements expand market and product offerings for both companies and allow us to achieve true scale in operations to manage raw material sourcing, as well as maximize efficiencies and best practices in manufacturing and product development."

233.    KEMET noted in its 2013 Annual Report that "[a] majority of [KEMET's] tantalum needs are now met through our direct sourcing of conflict free tantalum ore or tantalum scrap reclaim, which is then processed into the intermediate product potassium heptafluorotantalate (commonly known as K-salt) at [KEMET's] own facility in Mexico or at a subcontractor site in South Africa, before final processing into tantalum powder at Blue Powder." It would be nearly impossible for a new entrant to have the political and economic power to obtain the same access to raw materials that established companies possess in order to compete successfully with them.

234.    In connection with its recent acquisition of NEC TOKIN, KEMET reported, "In the short period since receiving regulatory approval and closing the transaction, we signed and began the execution of both a Private Label Agreement and a Development and Cross-Licensing Agreement so that we can take advantage of both KEMET and NEC TOKIN's extraordinary synergies. These agreements expand market and product offerings for both companies and allow us to achieve true scale in operations to manage raw material sourcing, as well as maximize efficiencies and best practices in manufacturing and product development." Again, established firms have built up an infrastructure that are essentially cost prohibitive to new entrants.

235.    One industry expert described the barriers to entry in the capacitor market as high, especially for tantalum capacitors. The production technology required for this sub-type, particularly stacking, metallization, firing and creating anodes, is expensive and difficult to master.

236.    AVX noted in its 2013 Annual Report that its February 2013 acquisition of Nichicon's Tantalum Components Division "add[ed] the capabilities of the production facilities," "g[ave] [AVX]

a larger presence in the smartphone product sector," and "with AVX's tantalum material purchasing leverage, . . . the integration and profitability of these operations can quickly become beneficial."

### 2.   The Demand for Electrolytic and Film Capacitors Is Inelastic.

237.   "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

238.   For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

239.   Demand for capacitors is highly inelastic because there are no close substitutes for these products. The demand for capacitors will continue to rise due to increasing use of PCs, notebooks, ultrabooks, smartphones, and other consumer and electronic products that meet basic requirements in day-to-day life. No other type of passive electrical component (*e.g.*, inductors and resistors) can serve as a substitute or a functional equivalent to a capacitor in an electric circuit. Accordingly, a purchaser that is either an OEM or an Electronic Manufacturing Services ("EMS") Provider cannot design quickly an electric circuit to bypass its need for a capacitor with a certain capacitance, dielectric and form factor.

240.   Demand for capacitors by sub-type (*e.g.*, electrolytic and film) is also inelastic because electronics are designed specifically for a specific type of capacitor of a specific level of capacitance. For instance, tantalum capacitors are desired for their small size and high capacitance, particularly for use in small electronics, such as mobile phones, smart phones and tablet computers. They cannot be easily replaced by other capacitors that do not have these features. Although ceramic capacitors are cheaper than tantalum capacitors, due to differences in size and capacitance values, they cannot immediately replace circuits that use tantalum or other capacitors. Similarly, film capacitors have

different characteristics, such as lower ESR and ESL values than electrolytic capacitors that make them better suited for certain functions. For example, because film capacitors are not polarized, they can be used in certain applications that electrolytic capacitors cannot. Substituting one sub-type of capacitor for another would require redesigning and reengineering a product's electrical circuits, a process that cannot be accomplished quickly. Depending on the electronic product at issue, it may not even be possible to redesign or reengineer the product given the capacitance needs of the product at issue. Thus, purchasers of capacitors have no choice but to purchase the specific type of capacitor for which their products were designed.

### 3.    The Electrolytic and Film Capacitor Industry Is Highly Concentrated.

241.    Market concentration facilitates collusion. Collusive agreements are easier to implement and sustain when there are few firms controlling a large portion of the market. Practical matters such as coordinating cartel meetings and exchanging information are much simpler with a small number of players. If the participants can coordinate pricing decisions, their control over total industry output may result in prices that are elevated across the industry. Moreover, their high degree of control also simplifies their coordination issues because there is little outside competitive presence to undermine the cartel. With fewer firms in the market, the transitory bump in profits that could be achieved by undercutting the cartel price and gaining a transitory increase in market share would be outweighed by the greater long-term market share for a colluding firm in a concentrated industry.

242.    By contrast, if an industry is divided into a large number of small firms, the current gain from cheating on a cartel (profits from sales captured from other cartel members through undercutting of the cartel-fixed price in the current time period, which risks causing the cartel to fall apart in the future) is large relative to the firm's possible gains from the cartel's continuing future success (the firm's future share of the total cartel profits if collusion were to continue successfully).

243.    The electrolytic and film capacitors markets are amongst the two most concentrated submarkets of the overall capacitors market, with a handful of companies dominating the aluminum electrolytic capacitor market and another handful dominating the tantalum electrolytic capacitors market. These companies are also geographically centralized, making collusion easy to accomplish. The nine companies under investigation are believed to have secured illegal and unlawful profits by

uniformly passing the increases in material procurement costs through to product prices, citing shrinking demand after the collapse of Lehman Brothers in 2008 as well as the rising costs of aluminum and tantalum after the 2008 economic crisis.

244.   As the electrolytic and film capacitor markets are dominated by a few companies who control the lion's share of these markets, the continuing agreements, understandings, combinations or conspiracies to fix, raise, maintain and/or stabilize prices, and to allocate market shares for electrolytic and film capacitors are effective at setting the prices of electrolytic and film capacitors at artificially high, supra-competitive prices.

245.   A concentrated market is more susceptible to collusion and other anticompetitive practices. The electrolytic and film capacitor market were concentrated during the respective Class Periods. In fact, throughout the Class Period, defendants collectively maintained high market shares. Defendants used acquisitions to further reduce the number of capacitor manufacturers in the world.

### 4.   Electrolytic and Film Capacitors Are Homogenous and Commoditized Products.

246.   Electrolytic and film capacitors are homogenous products or commodities because their characteristics and qualities are essentially uniform across different manufacturers. Although different sub-types of capacitors are not interchangeable, within each category, capacitors are designed to be interchangeable. Homogenous products enhance collusion because they enable manufacturers to more easily negotiate agreement on prices and/or quantities and facilitate monitoring.

247.   The homogenization of capacitors is aided by industry-standard product specifications. The principal dimensions of product differentiation in capacitors are well known and easily quantifiable. Indeed, manufacturers and distributors maintain very detailed product catalogs and substitution guides that outline rules for swapping out capacitors made by other defendants based on their common characteristics.

248.   In economics, a commodity is a basic good used in commerce that is interchangeable with other commodities of the same type. Commodities are most often used as inputs in the production of other goods or services. Product homogeneity facilitates collusion more than product differentiation. Examples of traditional commodities are sugar, wheat, and rubber. Examples of

1    emerging commodities are wind and solar power and greenhouse gas offsets, for which the market is

2    developing but not yet mature. As technologies and markets for a good mature, it is more likely to be

3    considered a commodity, at least in its more basic implementations.

4         249.    Electrolytic and film capacitors straddle the line between traditional commodities and

5    emerging commodities because the capacitor market has not reached maturity yet and is still

6    developing. As capacitors are in almost every electronic device—and as the electronic device market

7    is expanding due to the exponential growth in computing technology per Moore's Law[26]—the

8    established electrolytic and film capacitor markets are still evolving.

9         250.    The United Nations ("UN") Commodity Trade Statistics Database, the largest

10   depository of international trade data, includes electrical capacitors, which encompass electrolytic

11   and film capacitors, on its Commodity List (Figure 14). Over 170 reporter countries provide the UN

12   Statistics Division with their annual international trade statistics data detailed by commodities and

13   partner countries. The UN and UN member countries therefore consider capacitors as commodities.

**Figure 14: Capacitors Are Commodities.**



14

15

16

17

18

19

20

21

22

23       Source: http://comtrade.un.org/db/mr/rfCommoditiesList.aspx?px=H1&cc=8532

24       251.    Further, according to some market analysts, the ubiquity of smartphones and the

25   consistency of features from one brand to another means that the products are becoming commodities.

26   The commoditization of smartphones has increased the commoditization of capacitors.

27   ────────────────────

28   [26] Moore's Law states that processor speeds, or overall processing power for computers will double
     approximately every two years.

252.    Markets for commodity products are conducive to collusion. Typically, when a product is characterized as a commodity, competition is based principally on price, as opposed to other attributes such as product quality or customer service. This factor facilitates coordination because firms wishing to form a cartel can more easily monitor and detect defections from a price-fixing agreement where any observed differences in prices are more likely to reflect cheating on the conspiracy than any other factor which might affect pricing, such as special product characteristics, service or other aspects of the transaction.

253.    As electrolytic and film capacitors are commodities, price is the most obvious differentiation among them for purchasers. In a market of this nature, with trillions of components being manufactured and sold a year at relatively inexpensive individual prices, there is a huge incentive to fix, stabilize, maintain and raise the prices of the components to supra-competitive levels through illegal conspiratorial agreements. By foregoing competition, each manufacturer could still guarantee themselves massive profits in such a high volume market. This anticompetitive conspiracy causes substantial harm to purchasers, to competition, and to United States commerce.

### 5.    Defendants Had Ample Opportunities to Conspire.

254.    Trade associations provided opportunities for defendants to meet frequently and exchange information to facilitate collusion. Defendants are members of a number of trade associations in the United States, Asia and Europe. Their overlapping membership in various trade associations also provided incentive for cartel members to stay within the illegally agreed upon price framework, as they could monitor one another's activities in the capacitor market and punish non-compliance. Defendants' participation in trade associations, as described above, helped facilitate their collusion.

255.    Defendants attended industry events where they had the opportunity to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary for the operation and furtherance of the conspiracy. For example, defendants NEC TOKIN, Nippon Chemi-Con, Panasonic, and their co-conspirators have regularly attended meetings worldwide, including the World Electronics Forum, International Information Industry Conference and World Semiconductor Council.

256.     Trade associations and other common forums facilitated defendants' collusion. Trade association meetings provide an excellent cover for meeting and communicating about the pricing of electrolytic and film capacitors and to conspire to fix, raise, maintain and/or stabilize prices, and to allocate market shares for electrolytic and/or film capacitors.

257.     **World Capacitor Trade Statistics Meeting**: The World Capacitor Trade Statistics Meeting is a worldwide information exchange meeting held every two years, and defendants who have attended these meetings include NCC, Nissei, and Panasonic. During these meetings, groups around the world gather aggregate statistics for their countries and submit the statistics to the world meeting. The U.S. group of the meeting was called The Components Group of the EIA (EICA).

258.     A Panasonic employee attended this meeting in spring 2012, where participants supplied monthly statistics to the group and numbers were regionally reported on a quarterly basis. Another Panasonic attended the meeting in 2007 and 2008, and was a member of a capacitors working group. The group met every three months and exchanged information on the capacitor business.

259.     **Japan Electronics and Information Technology Industries Association (JEITA)-Related Meetings:** Defendants NEC Corp., Nippon Chemi-Con, and Panasonic are members of the Japan Electronics and Information Technology Industries Association ("JEITA"), a Japanese trade association for the electronics and information technology industries.

260.     Defendants' executives held key leadership positions within JEITA. JEITA's directors include NEC, Nippon Chemi-Con, and Panasonic executives. Presidents and Chief Executive Officers ("CEO") of defendants Nippon Chemi-Con and Nichicon hold officer positions in JEITA's Electronic Components Group Subcommittee. The President and CEO of defendant Nippon Chemi-Con, Ikuo Uchiyama, is currently the Chairman of the Subcommittee's Policy Steering Committee. The President and CEO of defendant Nichicon, Shigeo Yoshida, is currently the Chairman of the Subcommittee's Technology and Standard Strategy Committee.

261.     Defendants Panasonic, Hitachi Chemical, NEC TOKIN, Nichicon, Nippon Chemi-Con, and Rubycon, met regularly under the auspices of JEITA to exchange sensitive market information. Additionally, all JEITA members gather annually for a conference that serves as the industry's premier decision-making forum.

262.   The JEITA was established in 2000 through the merger of two trade associations, the Electronic Industries Association of Japan and the Japan Electronic Industries Development Association. The objective of JEITA is to promote the wellbeing of Japanese electronics companies, including those that make capacitors. JEITA members gather annually for a conference that is described by the organizers as the "industry's premier decision-making forum." The stated goals of JEITA include:

(a)   "Collecting, organizing and analyzing statistics from within and outside of the industry";

(b)   "Publishing and distributing reports and reference materials on trends in and analyses of the industry, production forecasts, technological trends in a variety of fields, and mid- to long-range projections";

(c)   "Exchanging statistics and information with trade associations in other countries"; and

(d)   "Improving understanding of the status of electronics and information technology industries worldwide through the dispatching of study missions and other activities."

263.   JEITA's activities include "promoting international cooperation" and "implementing surveys and analyzing statistics." Specifically, JEITA interacts with overseas trade associations by arranging and participating in international conferences and related events; releases industry-related information globally; collects, organizes, and analyzes statistics from within and outside of the industry; publishes and distributes reports and reference materials on trends in, and analyses of, the industry, production forecasts, technological trends in a variety of fields, and mid- to long-range projections; and exchanges statistics and information with trade associations in other countries.

264.   Defendants NEC Corp., Nippon Chemi-Con, and Panasonic employed the JEITA and its affiliated and related organizations to exchange prices and other sensitive business data, encouraging more uniform prices than otherwise would exist in the capacitor market. Specifically, these defendants used the JEITA to facilitate price increases for capacitors and prevent new entrants into the capacitor market.

265.   **Japan Electronics Shows Association ("JESA"):** Defendants Panasonic, NEC TOKIN, Nippon Chemi-Con, and Nichicon, and non-defendant Taiyo Yuden are members of JESA,

based in Tokyo, Japan. JESA promotes and operates trade shows that have been organized by JEITA. Defendants' executives hold leadership positions within JEITA. The Chairman of defendant Panasonic, Shusaku Nagae, is an Executive Director of JESA. Similarly, the Chairman of the Board of defendant NEC Corp., Kaoru Yano, is an Executive Director in JESA. JESA puts on several trade shows each year, including the Cutting-edge IT & Electronics Comprehensive Exhibition (CEATEC Japan), the International Broadcast Equipment Exhibits (Inter BEE) and the Electronic Design and Solution Fair (EDSFair). JESA's organizing activities prior to these trade shows, and the shows themselves, provide defendants ample opportunity to exchange information and fix artificial prices.

266.  **European Industry Meetings:** Defendants attended numerous different European industry meetings (ZVI Meetings) during which information regarding trends and raw material costs was exchanged. These meetings, which provided opportunity for direct competitor contact, are currently the subject of investigation by European antitrust authorities. Defendants also attended meetings called ADER Meetings, during which defendants shared information regarding lead times, pricing, and price trends. The European Union antitrust authorities are investigating these meetings as well.

267.  Defendants Panasonic and Nichicon are members of European Passive Components Industry Association ("EPCIA") based in Brussels, Belgium. The goal of the EPCIA is to "promote the common interests of the Passive Components Manufacturers" in Europe, including electrolytic and film capacitors. The EPCIA gathers at least once annually to:

(e)  "Provide members and Institutions with general market data for the Passive Components Industry in Europe as well as forecasts and 'Management overviews' on economies, markets, production values and labor forces in Europe";

(f)  "Facilitate the exchange of data with neighboring component sectors like Semiconductors, Electro-mechanics, Printed circuit boards, etc.";

(g)  "Organize Meetings and Forums on important issues of the Passive Components Industry"; and

(h)  "Facilitate worldwide networking between Passives Component Manufacturers at expert / management level."

268. **Technology Group:** Defendants Panasonic and SANYO were both part of a technology group called the Functional Macros Molecular Capacitor Research Meeting, providing yet another opportunity for defendants to exchange information. Panasonic began attending in 2008 and SANYO began in 2011.

269. **TIC Group:** Defendants also attended meetings held by the Tantalum Niobium International Studies Center (TIC Group). The TIC Group handles products that use tantalum and niobium, including capacitors. During these meetings, defendants exchanged industry information about products, including the availability of tantalum. Defendant SANYO attended these meetings through 2008.

270. There are also industry news sources that defendants can use to monitor compliance with the conspiracy. For example, Capacitor Industry News is an industry website that provides industry news, information about trends in the capacitor industry, and technical specifications about different types of capacitors being manufactured, including those being manufactured by the defendants. This exchange of information allows defendants to share information about their products and prices to both maintain the conspiracy but also to monitor the cartel members and ensure that all of them are complying with the terms of the illegal agreement.

### 6. Indirect Purchasers of Capacitors Lacked Buying Power.

271. Standard economics holds that when there are many buyers in a market for a particular good, that good is more susceptible to effective cartel behavior. The incentive for cartel members to undercut the conspiracy is lower when there are many smaller purchasers because while each potential sale is small, disrupting the cartel can carry large penalties. A cartel member, thus, is incentivized to avoid the collapse of the entire price-setting agreement, and the loss of the supra-competitive profits on all sales in that market when there are many buyers. Conversely, a cartel's ability to raise prices can be thwarted in markets where buyers have significant negotiating power with sellers.

272. Capacitor manufacturers sell their products to companies in audio-visual, communications, computers, peripherals, and home electronics businesses. The largest consumer of

capacitors is the telecommunications industry (38 percent), followed by the Computers and Consumer Audio-Video industries.

273.    Direct purchasers of capacitors are generally distributors. OEMs and EMS providers that make equipment for OEMs generally buy capacitors from distributors. Therefore, indirect purchasers in the capacitor market lacked substantial buying power. For example, AVX states in its 2013 Annual Report that "[d]uring the fiscal year ended March 31, 2014, no single customer accounted for more than 10% of our sales."

274.    Direct purchasers of capacitors are generally distributors. Except for a few tier 1 OEMs, most OEMs and EMS providers that make equipment for OEMs generally buy capacitors from distributors. There are very few large OEMs who possess buying power and as to those companies, defendants were motivated conspire amongst themselves to keep bid prices high to avoid cutthroat price competition that would harm them all. For example, AVX states in its 2013 Annual Report that "[d]uring the fiscal year ended March 31, 2014, no single customer accounted for more than 10% of our sales." Large numbers of buyers with little buying power was the general rule in the capacitors industry.

275.    As set forth above, buyers in the capacitor market lacked buying power. Since there were many purchasers of capacitors, it would have been easier to form and maintain the cartel. This is true because a large number of buyers would have made it less likely that defendant manufacturers would have cheated on the agreement to artificially inflate prices, because the loss of supra-competitive profits on their sales of capacitors outweighed the potential additional profits of raising sales to a handful of modestly-sized customers.

### 7.    falling Demand for Capacitors Over Time.

276.    Because capacitors are indispensable components in consumer electronics, the market for capacitors is very large. In 2013, the size of global capacitor industry overall was estimated at just over $16 billion.

277.    Despite this large market, defendants have faced declining demand and profits from capacitor sales. As shown in Figures 15 and 16 below, the economic downturn of 2008 and 2009

negatively impacted the capacitor market. Global revenues fell by 16 percent in 2009 relative to the year before. The market recovered in 2011, but sales slipped again in 2013.

### Figure 15: Global Capacitor Market Revenue



Source: Paumanok Publications, Inc.

### Figure 16: Global Capacitor Shipments



Source: Paumanok Publications, Inc.

278.    For aluminum capacitors, global annual revenues fell by about 8 percent from 2012 to 2013. For tantalum capacitors, global annual revenue fell by about 11.5 percent from 2012 to 2013.

a.    **Demand for Capacitors in the Americas**

279.    The Americas market (led by the United States and Mexico) accounts for a significant portion of the global capacitor market. It is currently estimated at about $2.3 billion, down from $2.6 billion in 2007. The Americas therefore account for about 12 percent of the global market at present. The demand in the Americas market for different capacitor types is roughly the same as global demand, although tantalum and film capacitors account for a somewhat larger share of the Americas market relative to the global market, as shown in Figure 17. About 17 percent of capacitor consumption in the Americas market is for aluminum capacitors and 14 percent is for tantalum capacitors.

**Figure 17: Capacitor Consumption Globally and in the Americas**



b.    **Demand for Capacitors Over Time**

280.    In the 2000s, there was a gradual shift in favor of ceramic capacitors. The major technological development that led to this shift towards ceramic capacitors was the development of multi-layer ceramic capacitors ("MLCC"). MLCCs are the most produced capacitors with a quantity of approximately 1 trillion devices being manufactured a year. A MLCC capacitor, as its name suggests, is a capacitor which is manufactured with multiple layers of ceramic which serve as the

dielectric which are alternated with metal objects which serve as the plates. MLCC capacitors are frequently used in power management systems, including DC and DC converter input and output filters. The growth over the decade of ceramic capacitors has caused other capacitors, such as electrolytic and film capacitors, to experience declining demand over this period.

281.   While capacitor types are not interchangeable in the short-term because circuits and products are designed for specific types of capacitors, over a longer time horizon engineers can re-design products so that they use more cost effective components. Advances in technology have also led to the creation of smaller, more efficient ceramic capacitors. Thus, demand for ceramic capacitors has soared as designers have substituted away from expensive and intermittently scarce tantalum, aluminum, and film capacitors and replaced them with much cheaper ceramic capacitors. Figure 18 below shows the overlap in capacitor consumption through end use products. For certain end-use products, there is substantial overlap in the kind of capacitor that can be used.

**Figure 18: Capacitor Consumption by Type and End-Use Market Segment**

| Capacitor Type | Consumer AV Imaging | Telecommunications (Customer and Infrastructure) | Computer & Business Machines | Power & Industrial Infrastructure |
|---|---|---|---|---|
| Aluminum | x | | x | x |
| Ceramic | x | x | x | |
| Film | x | | | x |
| Tantalum | | x | x | x |

282.   Additionally, demand for capacitors tracks demand for electronic products that use them. Thus, declining demand for laptops, desktops and audio-visual equipment (which use tantalum and aluminum capacitors) has resulted in declining demand for tantalum and aluminum capacitors. For instance, Nichicon, which produces aluminum, tantalum and film capacitors, stated in its 2013 Annual Report that its capacitor sales decreased by 21.7 percent from the previous year, which was "attributed to declining demand for digital home electronics and inverter equipment."

283.   By contrast, demand for smaller, more portable and multifunctional electronic devices, such as tablets, smartphones and personal music devices, have led to increased demand for ceramic capacitors, which are key components in tablets, smartphones and personal music devices.

**E.     Capacitor Manufacturers Had Relationships in Other Price-Fixed Markets.**

284.    Most of the capacitor manufacturers also produce several other types of components, not just capacitors. For instance, NEC TOKIN, Panasonic, and SANYO produced lithium ion rechargeable batteries. NEC TOKIN, Panasonic, and SANYO also produced optical disk drives. Both optical disk drives and lithium ion batteries have been the subject of price-fixing investigations.

**VIII.     DEFENDANTS COLLUDED TO KEEP THE PRICE OF ELECTROLYTIC AND FILM CAPACITORS ELEVATED DURING THE CLASS PERIOD**

285.    As alleged in this Complaint, defendants engaged in a conspiracy to fix, raise, stabilize, and maintain the price of electrolytic and film capacitors throughout the Class Period. Defendants' acts, practices, and course of conduct in furtherance of their conspiracy evolved over time and included, but were not limited to the following: coordinating prices for specific customers and products; engaging in continuous communications on confidential and proprietary business matters to eliminate price competition; allocating market shares; restricting supply of capacitors; using input costs as a pretext for industry-wide pricing formulas; and concocting mechanisms to nullify competitive sales processes to their customers.

286.    Defendants effectively moderated and even negated the downward pressure on capacitor prices caused by price competition, oversupply, technological advancements, and demand reduction.

287.    Overall, from approximately 2005 to 2013, there was an overall decline in demand of electrolytic and film capacitors. Part of this decrease in demand is the result of a general decrease in demand for capacitors caused by a shift from large consumer electronic devices to smaller devices. This decrease is also the result in a shift to cheaper and more effective capacitors, such as MLCC ceramic capacitors. The market for electrolytic and film capacitors is nevertheless still very large. Industry analysts report that global revenues for electrolytic capacitors were approximately $5.74 billion in 2013. In 2013, global revenues for film capacitors were approximately $1.9 billion.

288.    To slow down the loss of profitability from such decline during the 2000s, however, defendants agreed to end price competition among themselves.

### A.  Defendants Had a Motive to Conspire.

289.     Over the last decade, the demand for capacitors has been impacted by declining revenue and demand. Defendants formed, maintained, enforced and concealed a global cartel in the electrolytic capacitors market, spurred on by economic changes in the early 2000s. Defendants have faced declining demand for electrolytic and film capacitors. Global revenues for these capacitors were $5.74 billion for fiscal year 2013, though this was a $570 million decline from 2012 and a $1.1 billion drop from 2005. To mitigate the fall in demand and the impact to profits, defendants agreed that cease price competition among themselves for electrolytic and film capacitors.

290.     The market for aluminum electrolytic capacitors in particular began to shrink during this period because of the unique characteristics of aluminum electrolytic capacitors. Aluminum electrolytic capacitors have historically been used in a number of electronic devices, such as televisions, stereos, and desktop computers, but they were always limited in terms of capacitance, especially at smaller sizes. In other words, with the growth in smaller electronic devices, such as tablets and smartphones, aluminum electrolytic capacitors could not be used to meet that demand since they could not maintain sufficient capacitance to fit those types of devices. To protect their profits in this shrinking market, defendants entered into a conspiracy to manipulate the price of aluminum electrolytic capacitors.

291.     Overall, demand for capacitors has shifted away from aluminum and tantalum electrolytic capacitors and film capacitors in favor of ceramic capacitors. Advances in technology have led to the creation of smaller, more efficient ceramic capacitors, which are also cheaper to produce. Consequently, purchasers of capacitors gradually redesigned their products to substitute away from expensive aluminum and tantalum capacitors in favor of cheaper ceramic capacitors. This shift in demand is shown most clearly in Figure 19, which shows ceramic capacitors increasing their share of the capacitor market from 35% in 2004 to 52% in 2012 and the steady decrease in global market share of aluminum and tantalum electrolytic capacitors. This shift in demand created a crisis within the aluminum and tantalum capacitor industry in which aluminum and tantalum electrolytic capacitor producers have tried to wrest as much remaining profit from aluminum and tantalum electrolytic capacitor production before these capacitors are phased out by new designs and

technology. Film capacitors faced similar market issues but the shift to ceramic capacitors impacted the electrolytic capacitors more significantly.

**Figure 19: Global Market Share by Capacitor**



292.    The global recession of 2008 and 2009 created a drop in demand for electronic consumer goods that employ capacitors as key components. This drop in demand created a crisis within the industry in which revenue fell dramatically, particularly for tantalum capacitors, as opposed to cheap aluminum or ceramic capacitors, because they require substantial investment of labor and resources. Due to the size of the investment necessary to successfully mass manufacture tantalum capacitors, declining demand for tantalum capacitors can substantially impact a manufacturer, who cannot easily shift to the manufacture of different capacitors due to market conditions. Instead, when market demand falls, tantalum capacitor manufacturers are highly motivated to enter into an illegal agreement to fix, stabilize, maintain and raise the price of tantalum electrolytic to ensure continuing profitability. Given the small number of manufacturers who dominate this market, such agreements are easy to enter into between defendants. Defendants had a motive to conspire to stem the revenue losses from the global recession.

293.    Demand for capacitors overall has decreased over time, with demand for capacitors in 2013 less than demand for capacitors at pre-recession 2008 levels. This decrease in

demand has been more substantial in the market for aluminum and tantalum capacitors and film capacitors, as opposed to other types of capacitors. This drop in demand is tied to a drop in demand for older consumer electronics, such as desktop computers. Globally and in the United States, consumer demand has shifted in favor of smartphones and tablet computers. These devices contain functions that formerly were provided through other consumer electronic products. For instance, the smartphone is making devices, such as digital video cameras, game consoles, GPS devices, and MP3 players (all of which use capacitors as key electronic components), redundant. The decline in product sales in this segment of the consumer electronic product market had and continues to have a strong negative impact on aluminum and tantalum electrolytic capacitor sales. Similarly, in the computer market, the continued growth of smaller tablet computers negatively impacted demand for notebook and desktop computers. Because traditional consumer audio and video imaging products and notebook and desktop computers typically consume more capacitors than smartphones and tablet computers, the demand shift towards smartphones and tablet computers has resulted in a net decrease in demand for capacitors. The long-term slowing of demand for capacitors generally also provided a motive for defendants to reduce production and raise prices above competitive levels to maintain price stability, increase profitability and decrease the erosion of pricing in the capacitor market.

**B.** **The Price Movements of Electrolytic and Film Capacitors During the Respective Class Periods Are Consistent with Collusion, Not Competition.**

294. Defendants' regular, collusive communications, agreements, and other conduct over more than a decade, as alleged above, describe defendants' acts in furtherance of their conspiracy. Pricing behavior, capacity utilization, and the structural and other characteristics of the capacitor market further demonstrate the existence of defendants' conspiracy.

295. There are several econometric techniques that can be used for detecting collusion and determining its impact. In the absence of adequate data for a fully specified regression model of the relationship between prices and market supply and demand factors, one can examine broad market outcomes for patterns that may suggest collusive activity (*i.e.*, patterns that occur rarely under ordinary competitive conditions). Here, as explained below, during the conspiracy periods, pricing of electrolytic and film capacitors was inconsistent with cost and demand. Many analysts predicted that,

given technological changes and the economics of the marketplace, capacitor prices would fall during the respective Class Periods. In fact, prices not only failed to decline throughout most of the Class Period, they rose.

### 1.   Pricing Behavior Was Inconsistent with Cost.

296.   Price insensitivity to costs can therefore be indicative of market power or anticompetitive activity. This insensitivity can be seen as either periods when prices are flat despite changes in important costs or periods when prices increase substantially despite there being no substantial change in demand factors or costs.

297.   During the conspiracy period, capacitor industry pricing patterns did not follow cost variables.

298.   For example, as shown in Figure 20, tantalite ore prices were flat for most of the Class Period, even though the prices of tantalum capacitors were generally rising. Tantalite ore is the main ingredient in tantalum that is used in tantalum capacitors. Tantalum and other raw materials compose 57% of the cost of a tantalum capacitor. It does not make economic sense that the price of tantalum capacitors was rising, given diminished demand and flat input costs.

### Figure 20: Tantalite Ore Price



## 2.   Pricing Behavior Was Inconsistent with Demand.

299.   Another important relationship is that between price and quantity sold. Rising prices in the face of declining demand can be another indicator of collusive actions or market power.

300.   While capacitor types are not interchangeable in the short-term due to the aforementioned specifications that called for specific types of capacitors, over a longer time horizon engineers can re-design products so that they use more cost effective components. That is exactly what has been happening in the capacitor industry. Demand for ceramic capacitors has soared as designers substituted away from expensive and intermittently scarce tantalum and aluminum capacitors and replaced them with much cheaper ceramic capacitors.

301.   Other factors have contributed to the soft demand for capacitors. In late 2007 and 2008, the global economy crashed. Additionally, the consumer preference for smartphones and tablet computers has led to decreased demand in consumer audio and visual equipment and notebook and desktop computers, equipment that use more capacitors. This shift towards smartphones and tablet computers had caused a net decrease in demand for capacitors.

302.   Despite decreased demand, including the Great Recession, prices for capacitors have not decreased proportionally. Instead, the prices for capacitors have remained relatively stable or even increased. As shown in Figure 21 below, despite sharply diminishing demand for aluminum capacitors, aluminum capacitor prices decreased less than they would have absent the conspiracy to stabilize prices and shield defendants from the full effects of diminished demand. Similarly, tantalum capacitor prices increased or stabilized during the conspiracy period, despite the economic crisis and long-term diminishing demand for tantalum capacitors

**Figure 21: Average Global Pricing Trends**





### C. Defendants Conspired to Constrain Supply.

303. Defendants have reduced production and capacity during the conspiracy period in order to create an artificial shortage of supply. For example, there have been several capacitor plant closures reported in recent years. In 2010, Panasonic closed down a production facility in East Knox County, Tennessee that used to produce 3 million capacitors a month.

### D. Guilty Pleas in Related Markets

304. Three defendant families and their affiliates have a history of collusion and are either currently involved in worldwide competition authority investigations into other technology-related markets, or have been convicted of participating in price-fixing cartels involving technology-

related products. Much of the illegal conduct to which defendants or their affiliates have admitted took place during the two Class Periods identified in this Complaint.

### 1.   Hitachi

305.      In July 2008, defendant Hitachi Chemical was fined ¥165.37 million by the JFTC for price-fixing of cross-linked foam polyethylene sheets. This price-fixing activity took place during the same approximate time period—March 2004 to September 2006—as the beginning of the alleged capacitor cartel.

306.      In 2009, the JFTC fined Hitachi Chemical ¥165 million for price-fixing resin during this same time period.

### 2.   Panasonic/SANYO

307.      On September 30, 2010, defendant Panasonic agreed to plead guilty and to pay a $49.1 million criminal fine for its participation in a conspiracy to price-fix refrigerant compressors from October 14, 2004 through December 31, 2007.

308.      On July 18, 2013, Panasonic agreed to plead guilty and to pay a $45.8 million criminal fine for its participation in a conspiracy to price-fix switches, steering angle sensors and automotive high intensity discharge ballasts installed in cars sold in the United States and elsewhere from at least as early as September 2003 until at least February 2010.

309.      That same day, Panasonic's subsidiary, SANYO Electric Co., Ltd., agreed to plead guilty and to pay a $10.731 million criminal fine for its participation in a conspiracy to fix the prices of cylindrical lithium-ion battery cells sold worldwide for use in notebook computer battery packs from about April 2007 until about September 2008. The production and sale of both lithium ion batteries and capacitors were often overseen by the same departments and personnel that were involved in fixing lithium ion battery prices.

### 3.   NEC TOKIN

310.      Defendant NEC TOKIN is currently a named defendant in another lawsuit concerning the price-fixing of lithium-ion batteries. *See In re Lithium Ion Batteries Antitrust Litig.*, Case No. 12-cv-5129 (N.D. Cal.). NEC TOKIN has also been implicated—though not charged or penalized by regulators—in cartels involving liquid crystal displays, optical disk drives, and lithium-

ion batteries. Defendant NEC Electronics America Inc. was a named defendant in a lawsuit concerning the price-fixing of dynamic random-access memory chips. *See In re DRAM Antitrust Litig.*, Case No. 4:02-md-01486 (N.D. Cal.).

311.     The foregoing pattern of anticompetitive practices in various technology-related markets is illustrative of defendants' corporate conduct, which has included illegal activity aimed at generating profits at the expense of their customers.

## IX.    ANTITRUST INJURY

312.     Defendants' price-fixing conspiracy had the following effects, among others:

(a)     Price competition has been restrained or eliminated with respect to electrolytic and film capacitors;

(b)     The prices of electrolytic and film capacitors have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)     Indirect purchasers of electrolytic and film capacitors have been deprived of free and open competition; and

(d)     Indirect purchasers of electrolytic and film capacitors, including Plaintiffs, paid artificially inflated prices.

313.     During the respective Class Periods, Plaintiffs and the Classes paid supra-competitive prices for electrolytic and film capacitors.

314.     By reason of the alleged violations of the antitrust laws, Plaintiffs and the Classes have sustained injury to their businesses or property, having paid higher prices for capacitors than they would have paid in the absence of defendants' illegal contract, combination, or conspiracy, and as a result have suffered damages. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## X.    THE STATUTE OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.    The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Their Claims

315.     Plaintiffs and Members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth

herein, until (at the earliest) March 2014, when reports of the investigations into anticompetitive conduct concerning electrolytic and film capacitors were first publicly disseminated. Even then, these reports lacked detail and were not widely disseminated.

316.   Plaintiffs and Members of the Classes are purchasers who indirectly purchased electrolytic and film capacitors manufactured by a defendant. They had no direct contact or interaction with any of the defendants in this case and had no means from which they could have discovered the combination and conspiracy described in this Complaint before March 2014, when reports of the investigations into anticompetitive conduct concerning electrolytic and film capacitors were first publicly disseminated.

317.   No information in the public domain was available to Plaintiffs and the Members of the Classes prior to the public announcements of the government investigations beginning in March 2014 that revealed sufficient information to suggest that any one of the defendants was involved in a criminal conspiracy to fix prices for electrolytic and film capacitors.

318.   Publicly, defendants repeatedly and expressly stated throughout the respective Class Periods, including on their public Internet websites, that they maintained antitrust / fair competition policies which prohibited the type of collusion seen in this litigation. For example:

**SANYO**   •   SANYO Electric Co., Ltd., in its "Code of Conduct and Ethics," listed with an establishment date of April 1, 2006, publicly stated: "Free Competition and Fair Commercial Transactions – We will conduct our business activities lawfully and with fairness and transparency.

We will not unfairly limit free competition which would include not making arrangements with others in the same trade about product prices, volumes, manufacturing facilities, and market share.

We will not involve ourselves in bid-rigging to decide the winning bidder and contract price in bidding."

•   SANYO further publicly stated that "We will carry on our business activities in compliance with the laws regulations and rules of each country and region in which we operate and those prescribed specifically for respective business categories."

**Panasonic**   •   Panasonic, in its "Panasonic Code of Conduct," in place through the respective Class Periods, publicly stated that "No matter how severe the competition may be, we will pursue fair and ethical marketing activities in compliance with all applicable laws and regulations. In other words, we

will never violate any laws, regulations or social norms in pursuit of greater sales or profit.

We will not engage in bribery, collusion on bids, price fixing or other cartel activities."

- Panasonic further publicly stated that "we will respect free and fair competition, and abide by all applicable antitrust (competition law) and other laws and regulations" and that "We will fulfill our tasks by always observing not only applicable laws and regulations, but also the highest standards of business ethics" and "We will conduct business with integrity, a law-abiding spirit, and the highest ethical standards."

**NCC** • Nippon Chemi-Con, in its "Nippon Chemi-Con Group Business Conduct Guidelines," hold themselves to participate in fair and free competition. Nippon Chemi-Con publically states on their website that "[w]e shall observe applicable laws and regulations in the respective countries and engage in business activities to promote fair and free competition worldwide."

- Furthermore, "[w]e shall engage in fair transactions without soliciting any suppliers and/or customers money, gifts an entertainment for self-interested purposes…"

**Rubycon** • Rubycon, in its "Rubycon Group Code of Conduct," listed with an establishment date of April 2013, publicly stated: "The purpose of Rubycon Code of Conduct is to define business activities of the employees complying with laws and observing environmental responsibility and corporate ethics, under safe labor environment." Under the "Fair Trade and Ethics" headline, Rubycon listed "no anticompetitive act" as one of their commitments.

- Furthermore, Rubycon emphasizes their commitment to competition under their "Fair Business Practices" on their website. Rubycon states that they are "compliant regarding relevant statutes, internal regulations, social norms and ethics, and excluding relations with antisocial forces, so as to promote business activities through fair and good competition…" Rubycon also commits themselves to "observing all statutes relating to business, and as well as conducting fair business and transactions."

- Rubycon has published Rubycon Group Code of Conduct conforming to EICC (Electronic Industry Citizenship Coalition), and provided it to all employees and group companies.

319. It was reasonable for members of the Classes who may have been exposed to these public policies to believe that the defendants were enforcing the policies.

320. For these reasons, the statute of limitations as to Plaintiffs and the Classes' claims did not begin to run, and has been tolled with respect to the claims that Plaintiffs and Members of the Classes have alleged in this Complaint.

**B.**    **Fraudulent Concealment Tolled the Statute of Limitations**

321.    In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Classes. Plaintiffs and members of the Classes had no knowledge of the combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on inquiry notice of their claims, until news sources first reported in April 2014 that the DOJ was collaborating with NDRC on a joint probe into anticompetitive conduct among capacitor manufacturers. Prior to April 2014, no information in the public domain or available to the Plaintiffs and the Classes suggested that any defendant was involved in a criminal conspiracy to fix prices for capacitors.

322.    In an effort to further conceal their conspiracy, defendants misrepresented market conditions to explain price changes and output reductions caused by extended lead times.

**1.**    **False Representations Regarding Raw Material Shortages**

323.    Defendants falsely attributed price hikes and production lead times to a shortage of certain raw materials needed to manufacture aluminum electrolytic capacitors. For example, in 2010, defendants Nichicon, Nippon Chemi-Con, and Panasonic released several public statements in which they claimed supply limitations and price quote adjustments were caused by shortages of aluminum foil and increasing costs of the requisite raw materials.

324.    Such false representations are negated by industry reports and supportive data that reflect aluminum foil to be a widely available raw material and aluminum electrolytic capacitors to be among those products that are less susceptible to raw material price hikes.

325.    Defendants falsely represented that price hikes and increased production lead times were the result of difficulties procuring tantalum, the raw material necessary in manufacturing electrolytic capacitors. Defendants represented to industry experts and analysts, as well as to purchasers, that there were concerns with the supply of tantalum in 1997, 2000, 2008, and 2011, claiming that issues surrounding the purported closing of certain tantalum mines, the inability of certain tantalum mines to produce sufficient tantalum, and the inability to access sufficient tantalum due to the designation of tantalum as a "conflict mineral" under Section 1502 of the 2010 Dodd-Frank

Wall Street Form and Consumer Protection Act ("Dodd-Frank") would affect defendants' access to cheap tantalum, which thereafter would result in higher prices for tantalum electrolytic capacitors.

326.    Such false representations are negated by industry and media reports that criticize the lack of transparency within the tantalum market where exclusive agreements and business arrangements between manufactures and tantalum mining operations occur in conjunction with the desire of manufacturers to process raw materials in-house.

327.    Plaintiffs alleges, upon information and belief, that these explanations did not provide the whole story and helped conceal the illegal conspiracy entered into by the defendants to fix, stabilize, maintain and raise the price of electrolytic and film capacitors to inflated, supra-competitive levels.

## 2.    False Representations Regarding Production Delays

328.    Defendants also issued several non-market related excuses for price hikes and output reductions, some of which included labor shortages and Asian weather shipping delays. Additionally, in 2011 to 2013, defendants Hitachi, Nippon Chemi-Con, Nichicon, Rubycon, and Elna blamed capacitor production delays on the aftermath of the 2011 Tohoku earthquake and tsunami in eastern Japan. In 2011, defendant NEC TOKIN and non-defendant ROHM Co., Ltd. faulted flooding in Thailand for causing production delays.

329.    Through their misleading, deceptive, false, and fraudulent statements, defendants effectively concealed their unlawful control over the electrolytic and film capacitor markets which enabled them to manipulate supplies and pricing, thereby causing economic harm to Plaintiffs and the Class. The misrepresentations made by defendants regarding price changes and extended production lead times were intended to lull Plaintiffs and the Classes into accepting the price hikes and extended production lead times as a normal result of competitive and economic market trends rather than the consequences of defendants' collusive acts. The public statements made by defendants were designed to blatantly mislead Plaintiffs and the Classes into paying unjustifiably higher prices for capacitors.

330.   Defendants' misrepresentations for price changes and extended lead times were pretextually false, deceptive, materially false or misleading, and served only to conceal defendants' conspiracy and collusive activity from being realized by Plaintiff.

331.   Because defendants kept their conspiracy secret until April 2014, Plaintiffs and members of the Classes did not know before then that they were paying supra-competitive prices for electrolytic and film capacitors.

332.   Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Electrolytic and film capacitors are not exempt from antitrust regulation, and thus, before April 2014, Plaintiffs reasonably considered the capacitors industry to be a competitive one. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of defendants' capacitor prices before April 2014.

333.   Plaintiffs exercised reasonable diligence. Plaintiffs and the Classes could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by defendants and their co-conspirators to conceal their combination.

334.   Therefore, the running of any statute of limitations has been tolled for any claims alleged by Plaintiffs and the Classes as a result of defendants' anticompetitive and unlawful conduct.

335.   Before that time, Plaintiffs and Members of the Classes were unaware of defendants' unlawful conduct, and did not know before then that they were paying supracompetitive prices for electrolytic and film capacitors throughout the United States during the respective Class Periods. No information, actual or constructive, was ever made available to Plaintiffs that even hinted to Plaintiffs that they were being injured by defendants' unlawful conduct.

336.   The affirmative acts of defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

337.   Plaintiffs have detailed herein the defendants' use of mechanisms designed to conceal their collusion, such as covert meetings, use of code words or terms to refer to competitors and/or customers, use of pretexts to mask the true purpose of collusive communications, use of non-company phones, and instructions to destroy emails evidencing collusive activities.

338.   By its very nature, defendants' anticompetitive conspiracy was inherently self-concealing. Electrolytic and film capacitors are not exempt from antitrust regulation, and thus, before March 2014, Plaintiffs reasonably considered it to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of defendants' electrolytic and film capacitor prices before March 2014.

339.   Plaintiffs and Members of the Classes could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.

340.   Because the alleged conspiracy was both self-concealing and affirmatively concealed by defendants and their co-conspirators, Plaintiffs and Members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until March 2014, when reports of the investigations into anticompetitive conduct concerning electrolytic and film capacitors were first publicly disseminated.

341.   For these reasons, the statute of limitations applicable to Plaintiffs' and Members of the Classes' claims was tolled and did not begin to run until, at the earliest, March 2014.

## XI.   AFFECTED TRADE AND COMMERCE

342.   During the respective Class Periods, defendants collectively controlled the vast majority of the market for electrolytic and film capacitors, both globally and in the United States.

343.   Defendants sold electrolytic and/or film capacitors to manufacturers and purchasers located in numerous states in the United States other than states in which defendants are located. Substantial quantities of electrolytic and film capacitors are shipped from outside the United States into the United States, and are shipped interstate in a continuous and uninterrupted flow of interstate and foreign trade and commerce.

344.   In addition, substantial quantities of equipment and supplies necessary to the production and distribution of electrolytic and film capacitors as well as payments for electrolytic and film capacitors sold by defendants traveled in interstate and foreign trade and commerce. The

business activities of defendants in connection with the production and sale of electrolytic and film capacitors that were the subject of the charged conspiracy were within the flow of, and substantially affected, interstate and foreign trade and commerce.

### A. Defendants' Conduct Involved Import Trade or Import Commerce

345. Defendants' illegal conduct involved U.S. import trade or import commerce. Defendants knowingly and intentionally sent price-fixed electrolytic and film capacitors into a stream of commerce that they knew led directly into the United States, one of their most important markets and a major source of their revenues. In this respect, they directed their anticompetitive conduct at imports into the United States with the intent of causing price-fixed electrolytic and film capacitors to enter the United States market and inflating the prices of electrolytic and film capacitors destined for the United States. Such conduct was meant to produce and did in fact produce a substantial effect in the United States in the form of higher prices.

346. The U.S. electrolytic and film capacitor market is enormous and was a major focus of and very important to the conspiracy. Defendants and others shipped millions of electrolytic and film capacitors into the United States during the respective Class Periods for ultimate resale to U.S. purchasers. As a result, a substantial portion of defendants' revenues were derived from the U.S. market. Defendants spent hundreds of millions of dollars on advertising their products in the United States.

347. Because of the importance of the U.S. market to defendants and their co-conspirators, electrolytic and film capacitors intended for importation into and ultimate consumption in the United States were a focus of defendants' illegal conduct. Defendants knowingly and intentionally sent price-fixed electrolytic and film capacitors into a stream of commerce that led directly into the United States. This conduct by defendants was meant to produce and did in fact produce a substantial effect in the United States in the form of artificially-inflated prices for electrolytic and film capacitors.

348. During the respective Class Periods, every defendant shipped electrolytic and film capacitors directly into the United States.

349. When high-level executives based at defendants' Asian headquarters agreed on prices, they knew that their price-fixed electrolytic and film capacitors would be sold in the United States.

Many defendants manufactured products containing electrolytic and film capacitors and sold them in the United States.

350. For the reasons set forth above, defendants' illegal conduct involved import trade or import commerce into the United States.

**B.** **Defendants' Conduct Had a Direct, Substantial, and Reasonably Foreseeable Effect on U.S. Domestic and Import Trade or Commerce That Gave Rise to Plaintiffs' Antitrust Claims**

351. Plaintiffs and Members of the Classes are located all across the United States, including Arizona, Arkansas, California, Florida, Iowa, Kansas, Maine, Michigan, Minnesota, Missouri, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Vermont, and West Virginia.

352. Defendants' illegal conduct had a direct, substantial, and reasonably foreseeable effect on U.S. domestic and import trade or commerce in the form of higher prices for electrolytic and film capacitors that Plaintiffs and Members of the Classes paid. These prices, tainted by collusion, directly and immediately impacted Plaintiffs and Members of the Classes in the United States. In this respect, the U.S. effects of defendants' illegal conduct gave rise to Plaintiffs' and Members of the Classes' antitrust claims and were the proximate cause of the injury that Plaintiffs and Members of the Classes suffered.

353. A number of facts demonstrate that defendants' price-fixing conspiracy had a direct, substantial and reasonably foreseeable effect on domestic commerce.

354. Defendants are the dominant suppliers of electrolytic and film capacitors to the major U.S.-based computer manufacturers, such as Hewlett-Packard Co., Dell Inc., and Apple Inc., as well as other massive computer manufacturers whose products are leading brands in the U.S.

355. The leading portable computer manufacturers, many of whom are listed above, dominate the United States market. The following chart illustrates their market shares of laptop sales as well as estimates the percentage of sales of portable computers within each company's market share:

**Figure 22**

**Laptop PC US Market Share Estimate, 2010**

| Company | Total PCs (IDC) | Est. Portable PCs | Value of Shipments | Share |
|---------|-----------------|-------------------|--------------------|-------|
| HP | 19,488,000 | 12,878,178 | $8,464,182,308 | 26.0% |
| Dell | 17,352,000 | 11,466,653 | $7,536,457,892 | 23.1% |
| Acer | 8,012,000 | 5,294,538 | $3,479,835,214 | 10.7% |
| Apple | 6,571,000 | 4,342,288 | $2,853,968,696 | 8.8% |
| Toshiba | 6,623,000 | 4,376,651 | $2,876,553,747 | 8.8% |
| Others | 16,964,000 | 11,210,253 | $7,367,938,663 | 22.6% |
| Total | 75,010,000 | 49,568,561 | $32,578,936,521 | |

| | |
|---|---|
| 2010 Portable PCs as Percent of US PC Sales | 66.1% |
| 2010 Average Notebook Price: | $657.25 |

Notes:
Portable PCs estimated as 66.1% of total PC shipments as per IDC forecast.
Value of Shipments based on NPD's average notebook price for 2010.

Sources:
http://blog.laptopmag.com/average-windows-laptop-costs-456-down-14-percent-in-24-months
http://www.idc.com/getdoc.jsp?containerId=prUS23261412
http://techcrunch.com/2010/06/15/idc-sees-pc-market-grow-by-19-8-in-2010/

356.     With respect to cell phones and smart phones, in 2011, CTIA, an international trade association that represents the wireless communications industry, reported that wireless device penetration in the U.S. was 102.2 percent, meaning the "# of active units divided by the total U.S. and territorial population (Puerto Rico, Guam and the U.S. Virgin Islands)."[27] It calculated the number of wireless devices in the United States to be approximately 316,000,000. It defined wireless devices as including "smartphones, feature phones, tablets, hotspots, etc."

357.     The following chart estimates the U.S. market shares of the leading cell and smart phone manufacturers:

---

[27] *50 Wireless Quick Facts*, CTIA, http://www.ctia.org/advocacy/research/index.cfm/aid/10323 (last visited June 30, 2013).

**Figure 23**

Mobile Phone US Market Share Estimate, 2010

|  | Jan - Mar | Mar - May | July - Sep | Oct - Dec | Average Share |
|---|---|---|---|---|---|
| Samsung | 21.9% | 22.4% | 23.5% | 24.8% | 23.2% |
| Mot | 21.9% | 21.2% | 18.4% | 16.7% | 19.6% |
| LG | 21.8% | 21.5% | 21.1% | 20.9% | 21.3% |
| RIM | 8.3% | 8.7% | 9.3% | 8.5% | 8.7% |
| Nokia | 8.3% | 8.1% | 7.4% | 7.0% | 7.7% |
| Other | 17.8% | 18.1% | 20.3% | 22.1% | 19.6% |

| Total US Revenue | $10,700,000,000 |
|---|---|

Notes:
Shares are based on subscribers. Three month average for Apr - Jun was not available, so Mar - May average was used instead.

Sources:
http://www.comscore.com/Insights/Press_Releases/2010/5/comScore_Reports_March_2010_U.S._Mobile_Subscriber_Market_Share
http://www.comscore.com/Insights/Press_Releases/2010/7/comScore_Reports_May_2010_U.S._Mobile_Subscriber_Market_Share
http://www.comscore.com/Insights/Press_Releases/2010/11/comScore_Reports_September_2010_U.S._Mobile_Subscriber_Market_Share
http://www.comscore.com/Insights/Press_Releases/2011/2/comScore_Reports_December_2010_U.S._Mobile_Subscriber_Market_Share
http://www.reuters.com/article/2012/01/06/idUS33079+06-Jan-2012+BW20120106

**Figure 24**

Smartphone Market US Market Share Estimate, 2010

|  | Market Share | Sales |
|---|---|---|
| HTC | 19.0% | $1,597,596,000 |
| Motorola | 11.0% | $924,924,000 |
| Samsung | 7.0% | $588,588,000 |
| Apple | 27.0% | $2,270,268,000 |
| RIM BlackBerry | 27.0% | $2,270,268,000 |
| HP | 1.0% | $84,084,000 |
| Nokia | 2.0% | $168,168,000 |
| Other | 6.0% | $504,504,000 |
| Total | 100.0% | $8,408,400,000 |

| Estimate of Total Smartphone Units sold in U.S.[1] | 58.8 million |
|---|---|
| Estimate of Average Selling Price (ASP): | $143 |
| Estimate of Total U.S. Smartphone Market Value: | $8,408,400,000 |

Notes:
[1]C analyis reported that the U.S. smartphone market consisted of 14.7m units in Q2-2010. Yearly estimate is calculated by multiplying by 4.

Sources:
Market Share: Ziegler, Chris. "Visualized: US smartphone market share, by manufacturer and platform, made pretty."
Engadget. 3-Mar-11. Accessed 21-Jun-13. http://www.engadget.com/2011/03/03/visualized-us-smartphone-market-share-by-manufacturer-and-plat/.
Units Sold: "Android smart phone shipments grow 886% year-on-year in Q2 2010." C analys. 2-Aug-2010. Accessed 21-Jun-13.
http://www.canalys.com/newsroom/android-smart-phone-shipments-grow-886-year-q2-2010.
ASP: Gonsalves, Antone. "Android Takes Lead In U.S. Smartphone Market." InformationWeek. 4-Aug-2010. Accessed 21-Jun-13.
http://www.informationweek.com/software/operating-systems/android-takes-lead-in-us-smartphone-mark/226500293.

### C.    The Capacitor Cartel Targeted the United States.

358.        Because of the small size of capacitors, transportation costs are relatively minor
and there is substantial international trade in these electronic components. As shown in Figure 28, the
major capacitor manufacturers sell throughout the world, including in the Americas

**Figure 25: Capacitor Revenues by Vendor and Region**

**Capacitor Revenues by Vendor and Region**
**FY 2014**

| | Region | | | | | Percent of |
|---|---|---|---|---|---|---|
| Vendor | China and Asia | Japan | Europe | Americas | Total Revenue | Total |
| | (Million USD) | | | | | (Percent) |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| Murata | $ 1,795 | $ 369 | $ 290 | $ 185 | $ 2,639 | 14 % |
| SEMCO | 1,397 | 0 | 170 | 174 | 1,741 | 10 |
| TDK-EPC | 858 | 174 | 161 | 148 | 1,341 | 7 |
| Kyocera/AVX | 419 | 300 | 218 | 236 | 1,173 | 6 |
| Taiyo Yuden | 684 | 249 | 62 | 42 | 1,037 | 6 |
| NCC | 550 | 265 | 98 | 69 | 982 | 5 |
| Nichicon | 358 | 393 | 51 | 52 | 854 | 5 |
| KEMET | 306 | 0 | 281 | 240 | 827 | 5 |
| Vishay | 161 | 0 | 165 | 115 | 441 | 2 |
| Yageo | 261 | 0 | 85 | 7 | 353 | 2 |
| Walsin | 206 | 0 | 18 | 5 | 229 | 1 |
| Others | 3,865 | 769 | 1,120 | 880 | 6,634 | 36 |
| **Total** | **$ 10,860** | **$ 2,519** | **$ 2,719** | **$ 2,153** | **$ 18,251** | |
| Percent of Total | 59.5 % | 13.8 % | 14.9 % | 11.8 % | | |

Source: Paumanok Publications, Inc

359.     In 2012, the United States Census reported roughly $1.4 billion in United States capacitor exports and $1.09 billion in imports. As depicted in Figure 26, both exports and imports had experienced a downturn in 2009 following the United States financial crisis and have since recovered.

1
2
3
4
5
6
7
8
9
10
11
12



**Figure 26: United States Capacitor Trade Revenue**

13    360.    Japan is a major exporter of capacitors to the United States. The Japanese Ministry

14  of Finance data indicates that capacitor exports to the United States currently account for 10% of

15  Japanese capacitor export revenue.

16    361.    During the period this Complaint covers, defendants manufactured and sold

17  substantial quantities of electrolytic and film capacitors shipped from outside the United States and

18  from other states in a continuous and uninterrupted flow of interstate and foreign trade and commerce.

19  In addition, substantial quantities of equipment and supplies necessary to the production and

20  distribution of electrolytic and film capacitors, as well as payments for capacitors and related products

21  sold by defendants, traveled in interstate and foreign trade and commerce. The business activities of

22  defendants in connection with the production and sale of electrolytic and film capacitors that were

23  the subject of the charged conspiracy were within the flow of, and affected substantially, interstate

24  and foreign trade and commerce.

25    362.    Defendants engaged in conduct both inside and outside the United States that

26  caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon

27  interstate commerce within the United States.

28

363.    Defendants, directly and through their agents, engaged in a conspiracy to fix or inflate prices of electrolytic and film that restrained trade unreasonably and affected adversely the market for capacitors. Defendants affected commerce, including import commerce, substantially throughout the United States, proximately causing injury to Plaintiffs and members of the Classes.

## XII.    CLASS ACTION ALLEGATIONS

364.    Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure ("Rules") 23(a) and (b)(2), seeking equitable and injunctive relief on behalf of the following classes ("Injunctive Classes"):

**Electrolytic Injunctive Class:** All persons and entities in the United States who, during the period from January 1, 2003 to the present, purchased one or more electrolytic capacitor(s) from a capacitor distributor that a defendant manufactured.

**Film Injunctive Class:** All persons and entities in the United States who, during the period from January 1, 2007 to the present, purchased one or more film capacitor(s) from a capacitor distributor that a defendant manufactured.

365.    Plaintiffs will seek certification of state electrolytic damages classes and a film damages classes, asserting claims of damages under (1) the antitrust and restraint of trade laws of Arizona, California, District of Columbia, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin;[28] and (2) the unfair competition and consumer protection laws of Arkansas, California, District of Columbia, Florida, Hawaii, Massachusetts, Missouri, Montana, Nebraska, New Mexico, New Hampshire, New

---

[28] *See* Arizona Revised Statutes, §§ 44-1401, *et seq.*, California Business and Professions Code, §§ 16700, *et seq.*, District of Columbia Code Annotated §§ 28-4501, *et seq.*, Illinois Antitrust Act, Illinois Compiled Statutes, §§ 740 Ill. Comp. Stat. 10/1, *et seq.*, Iowa Code §§ 553.1, *et seq.*, Kansas Statutes Annotated §§ 50-101, *et seq.*, Maine Revised Statutes, 10 M.R.S. §§ 1101, *et seq.*, Michigan Compiled Laws §§ 445.773, *et seq.*, Minnesota Statutes §§ 325D.49, *et seq.*, Mississippi Code §§ 75-21-1, *et seq.*, Nebraska Revised Statutes §§ 59-801, *et seq.*, Nevada Revised Statutes §§ 598A.010, *et seq.*, New Hampshire Revised Statutes §§ 356:1, *et seq.*, New Mexico Statutes §§ 57-1-1, *et seq.*, New York General Business Laws §§ 340, *et seq.*, North Carolina General Statutes §§ 75-1, *et seq.*, North Dakota Century Code §§ 51-08.1-01, *et seq.*, Oregon Revised Statutes §§ 646.705, *et seq.*, South Dakota Codified Laws §§ 37-1-3.1, *et seq.*, Tennessee Code §§ 47-25-101, *et seq.*, Utah Code Annotated §§ 76-10-911, *et seq.*, Vermont Stat. Ann. 9 §§ 2453, *et seq.*, West Virginia Code §§ 47-18-1, *et seq.*, Wisconsin Statutes §§ 133.01, *et seq.*

York, North Carolina, Rhode Island, South Carolina, Utah, and Vermont ("State Damages Classes").[29]

366.    Plaintiffs bring the State Damages Classes on behalf of all persons similarly situated pursuant to Rule 23, on behalf of all members of the following classes:

a.    **Arizona:** All persons and entities that, as residents of Arizona, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("Arizona Damages Classes").

b.    **Arkansas:** All persons and entities that, as residents of Arkansas, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("Arkansas Damages Classes").

c.    **California:** All persons and entities that, as residents of California, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("California Damages Classes").

d.    **District of Columbia:** All persons and entities that, as residents of the District of Columbia, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("District of Columbia Damages Classes").

e.    **Florida:** All persons and entities that, as residents of Florida, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("Florida Damages Classes").

f.    **Hawaii:** All persons and entities that, as residents of Hawaii, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("Hawaii Damages Classes").

---

[29] Arkansas Code Annotated, § 4-88-101., *et seq.*, California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, District of Columbia Code § 28-3901, *et seq.*, Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*, Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*, Massachusetts Consumer and Business Protection Act, M.G.L. c. 93A, § 1, *et seq.*, Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*, Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq.*, Nebraska Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601, *et seq.*, New Mexico Stat. § 57-12-1, *et seq.*, New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. §§ 358-A:2, *et seq.*, New York General Business Law, N.Y. Gen. Bus. Law § 349, *et seq.*, North Carolina Gen. Stat. § 75-1.1, *et seq.*, Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws §§ 6-13.1-1, *et seq.*, South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*, Utah Code §§ 76-10-911, *et seq.*, Vermont Consumer Fraud Act, 9 Vt. Stat. Ann. § 2451, *et seq.*

g.  **Illinois:** All persons and entities that, as residents of Illinois, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("Illinois Damages Classes").

h.  **Iowa:** All persons and entities that, as residents of Iowa, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("Iowa Damages Classes").

i.  **Kansas:** All persons and entities that, as residents of Kansas, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("Kansas Damages Classes").

j.  **Maine:** All persons and entities that, as residents of Maine, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("Maine Damages Classes").

k.  **Massachusetts:** All persons and entities that, as residents of Massachusetts, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("Massachusetts Damages Classes").

l.  **Michigan:** All persons and entities that, as residents of Michigan, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("Michigan Damages Classes").

m.  **Minnesota:** All persons and entities that, as residents of Minnesota, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("Minnesota Damages Classes").

n.  **Missouri:** All persons and entities that, as residents of Missouri, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("Missouri Damages Classes").

o.  **Mississippi:** All persons and entities that, as residents of Mississippi, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("Mississippi Damages Classes").

p.  **Montana:** All persons and entities that, as residents of Montana, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("Montana Damages Classes").

q.  **Nebraska:** All persons and entities that, as residents of Nebraska, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("Nebraska Damages Classes").

r.  **Nevada:** All persons and entities that, as residents of Nevada, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-

conspirator manufactured during the respective Class Periods ("Nevada Damages Classes").

s.   **New Hampshire:** All persons and entities that, as residents of New Hampshire, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("New Hampshire Damages Classes").

t.   **New Mexico:** All persons and entities that, as residents of New Mexico, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("New Mexico Damages Classes").

u.   **New York:** All persons and entities that, as residents of New York, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("New York Damages Classes").

v.   **North Carolina:** All persons and entities that, as residents of North Carolina, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("North Carolina Damages Classes").

w.   **North Dakota:** All persons and entities that, as residents of North Dakota, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("North Dakota Damages Classes").

x.   **Oregon:** All persons and entities that, as residents of Oregon, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("Oregon Damages Classes").

y.   **Rhode Island:** All persons and entities that, as residents of Rhode Island, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("Rhode Island Damages Classes").

z.   **South Carolina:** All persons and entities that, as residents of South Carolina, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("South Carolina Damages Classes").

aa.   **South Dakota:** All persons and entities that, as residents of South Dakota, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("South Dakota Damages Classes").

bb.   **Tennessee:** All persons and entities that, as residents of Tennessee, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("Tennessee Damages Classes").

cc.   **Utah:** All persons and entities that, as residents of Utah, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("Utah Damages Classes").

dd. **Vermont:** All persons and entities that, as residents of Vermont, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("Vermont Damages Classes").

ee. **West Virginia:** All persons and entities that, as residents of West Virginia, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("West Virginia Damages Classes").

ff. **Wisconsin:** All persons and entities that, as residents of Wisconsin, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods ("Wisconsin Damages Classes").

367.    The Injunctive Classes and the State Damages Classes are collectively referred as the "Classes" unless otherwise indicated. Excluded from the Classes are defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, defendants' attorneys in this case, federal government entities and instrumentalities, states and their subdivisions, all judges assigned to this case, all jurors in this case, and all persons and entities who directly purchased electrolytic and/or film capacitors from defendants.

368.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are millions of members in each of the Classes.

369.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of defendants' conspiracy, which was applicable to all of the members of the Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a)    Whether defendants engaged in a combination and conspiracies among themselves to fix, raise, maintain, and/or stabilize the prices of electrolytic and film capacitors sold in the United States;

(b)    The identity of the participants of the alleged conspiracies;

(c)    The duration of the alleged conspiracies and the acts carried out by defendants in furtherance of the conspiracies;

(d)    Whether the alleged conspiracies violated the Sherman Act;

(e)    Whether the alleged conspiracies violated the antitrust and restraint of trade laws of the following states: Arizona, California, District of Columbia, Illinois,

Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin;

(f)     Whether the alleged conspiracies violated the unfair competition and consumer protection laws of the following states: Arkansas, California, District of Columbia, Florida, Hawaii, Massachusetts, Missouri, Montana, Nebraska, New Mexico, New Hampshire, New York, North Carolina, Rhode Island, South Carolina, Utah, and Vermont;

(g)     Whether the conduct of defendants, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and members of the Classes;

(h)     The effect of the alleged conspiracy on the prices of electrolytic and film capacitors sold in the United States during the respective Class Periods;

(i)     The appropriate injunctive and related equitable relief for the Injunctive Classes; and

(k)     The appropriate class-wide measure of damages for the State Damages Classes.

370.   Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and all members of the Classes are similarly affected by defendants' wrongful conduct in that they paid artificially inflated prices for electrolytic and film capacitors purchased indirectly from defendants.

371.   Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust, unfair competition, and class action litigation.

372.   The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

373.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

374.   The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

375.   Plaintiffs bring the Damages Classes on behalf of all persons similarly situated pursuant to Rule 23, on behalf of all persons and entities that, as residents of various states, indirectly purchased one or more electrolytic or film capacitors that a defendant or co-conspirator manufactured during the respective Class Periods.

## XIII.   <u>VIOLATIONS ALLEGED</u>

**FIRST CLAIM FOR RELIEF**
**(Violations of Sherman Act, 15 U.S.C. § 1)**
**(On Behalf of All Plaintiffs Against All Defendants)**

376.   Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

377.   Defendants and unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

378.   Beginning as early as 2003 and continuing through the present, the exact starting date being unknown to Plaintiffs and exclusively within the knowledge of defendants, defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably

restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

379. In particular, defendants have combined and conspired to raise, fix, maintain, or stabilize the prices of electrolytic and film capacitors.

380. As a result of defendants' unlawful conduct, prices for electrolytic and film capacitors were raised, fixed, maintained, and stabilized in the United States.

381. The contract, combination or conspiracy among defendants consisted of a continuing agreement, understanding, and concerted action among defendants and their co-conspirators.

382. For purposes of formulating and effectuating their contract, combination, or conspiracy, defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

        (a)     exchanged information on prices charged for electrolytic and film capacitors;

        (b)     agreed to raise, fix, and maintain prices for electrolytic and film capacitors;

        (c)     raised, fixed, and maintained prices for electrolytic and film capacitors; and

        (d)     sold electrolytic and film capacitors into and throughout the U.S. at non-competitive prices.

383. As a result of defendants' unlawful conduct, Plaintiffs and members of the Classes have been injured in their businesses and property in that they have paid more for electrolytic and film capacitors than they otherwise would have paid in the absence of defendants' unlawful conduct.

384. The alleged contract, combination or conspiracy is a per se violation of the federal antitrust laws.

385. These violations are continuing and will continue unless enjoined by this Court.

386. Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs and members of the Classes seek the issuance of an injunction against defendants, preventing and restraining the violations alleged herein.

## SECOND CLAIM FOR RELIEF
### (Violations of State Antitrust and Restraint of Trade Laws)
### (On Behalf of Plaintiffs Against All Defendants)

387. Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

388.  Plaintiffs allege violations of the following states' antitrust and restraint of trade laws: Arizona, California, District of Columbia, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.[30]

389.  Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2003, and continuing thereafter through the present, defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of various state antitrust and restraint of trade laws. Defendants, and each of them, have acted in violation of such laws to fix, raise, stabilize, and maintain prices of, and allocate markets for electrolytic and film capacitors at supra-competitive levels.

390.  In particular, defendants have combined and conspired to raise, fix, maintain or stabilize the prices of electrolytic and film capacitors sold in the United States.

391.  As a result of defendants' unlawful conduct, prices for electrolytic and film capacitors were raised, fixed, maintained, and stabilized in the United States.

392.  The contract, combination or conspiracy among defendants consisted of a continuing agreement, understanding, and concerted action among defendants and their co-conspirators.

393.  For purposes of formulating and effectuating their contract, combination, or conspiracy, defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

---

[30] *See* Arizona Revised Statutes, §§ 44-1401, *et seq.*, California Business and Professions Code, §§ 16700, *et seq.*, District of Columbia Code Annotated §§ 28-4501, *et seq.*, Illinois Antitrust Act, Illinois Compiled Statutes, §§ 740 Ill. Comp. Stat. 10/1, *et seq.*, Iowa Code §§ 553.1, *et seq.*, Kansas Statutes Annotated §§ 50-101, *et seq.*, Maine Revised Statutes, 10 M.R.S. §§ 1101, *et seq.*, Michigan Compiled Laws §§ 445.773, *et seq.*, Minnesota Statutes §§ 325D.49, *et seq.*, Mississippi Code §§ 75-21-1, *et seq.*, Nebraska Revised Statutes §§ 59-801, *et seq.*, Nevada Revised Statutes §§ 598A.010, *et seq.*, New Hampshire Revised Statutes §§ 356:1, *et seq.*, New Mexico Statutes §§ 57-1-1, *et seq.*, New York General Business Laws §§ 340, *et seq.*, North Carolina General Statutes §§ 75-1, *et seq.*, North Dakota Century Code §§ 51-08.1-01, *et seq.*, Oregon Revised Statutes §§ 646.705, *et seq.*, South Dakota Codified Laws §§ 37-1-3.1, *et seq.*, Tennessee Code §§ 47-25-101, *et seq.*, Utah Code Annotated §§ 76-10-911, *et seq.*, Vermont Stat. Ann. 9 §§ 2453, *et seq.*, West Virginia Code §§ 47-18-1, *et seq.*, Wisconsin Statutes §§ 133.01, *et seq.*

a.      Participating in meetings and conversations to discuss the prices and supply of electrolytic and film capacitors;

b.      Communicating in writing and orally to fix prices of electrolytic and film capacitors;

c.      Agreeing to manipulate prices and supply of electrolytic and film capacitors sold in the United States in a manner that deprived direct and indirect purchasers of free and open competition;

d.      Issuing price announcements and price quotations in accordance with the agreements reached;

e.      Selling electrolytic and film capacitors to customers in the United States at non-competitive prices; and

f.      Providing false statements to the public to explain increased prices for electrolytic and film capacitors.

394.   As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Classes have been injured in their business and property in that they paid more for electrolytic and film capacitors than they otherwise would have paid in the absence of defendants' unlawful conduct. As a result of defendants' violation of state antitrust and restraint of trade laws, Plaintiffs and members of the Classes seek treble damages and their cost of suit, including a reasonable attorneys' fees, pursuant to said laws.

395.   Plaintiffs allege the following violations of state antitrust and restraint of trade laws:

396.   <u>Arizona:</u> By reason of the foregoing, defendants have violated Arizona Revised Statutes, §§ 44-1401, *et seq.* Arizona Plaintiff on behalf of the Arizona Damages Classes alleges as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for electrolytic and film capacitors was restrained, suppressed, and eliminated throughout Arizona; (2) prices for electrolytic and film capacitors were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Arizona Plaintiff and members of the Arizona Damages Classes were deprived of free and open competition; and (4) Arizona Plaintiff and members

of the Arizona Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film capacitors;

b. During the Class Periods, defendants' illegal conduct substantially affected Arizona commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Arizona Plaintiff and members of the Arizona Damages Classes have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, defendants entered into agreements in restraint of trade in violation of Arizona Revised Statutes §§ 44-1401, *et seq.* Accordingly, Arizona Plaintiff and the members of the Arizona Damages Classes seek all forms of relief available under Arizona Revised Statutes §§ 44-1401, *et seq.*

397. <u>California:</u> By reason of the foregoing, defendants have violated California Business and Professions Code, §§ 16700, *et seq.* California Plaintiffs on behalf of the California Damages Classes allege as follows:

a. Defendants' contract, combination, trust or conspiracy was entered in, carried out, effectuated and perfected mainly within the State of California, and Defendants' conduct within California injured all members of the class throughout the United States. Therefore, this claim for relief under California law is brought on behalf of the California Damages Class.

b. Beginning at a time currently unknown to California Plaintiffs, but at least as early as January 1, 2003, and continuing thereafter at least up to 2014, defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of section 16720, California Business and Professions Code. Defendants, and each of them, have acted in violation of section 16720 to fix, raise, stabilize, and maintain prices of electrolytic and film capacitors at supra-competitive levels.

c. The aforesaid violations of section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of electrolytic and film capacitors.

d.    For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but not in any way limited to the acts, practices and course of conduct set forth above and fixing, raising, stabilizing, and pegging the price of electrolytic and film capacitors.

e.    The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition in the sale of electrolytic and film capacitors has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for electrolytic and film capacitors have been fixed, raised, stabilized, and pegged at artificially high, noncompetitive levels in the State of California; and (3) those who purchased electrolytic and film capacitors directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

f.    As a direct and proximate result of Defendants' unlawful conduct, California Plaintiffs and the members of the California Damages Classes have been injured in their business and property in that they paid more for electrolytic and film capacitors than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, California Plaintiffs and the California Damages Classes seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to section 16750(a) of the California Business and Professions Code.

398.    <u>District of Columbia:</u> By reason of the foregoing, defendants have violated District of Columbia Code Annotated §§ 28-4501, *et seq*. District of Columbia Plaintiff on behalf of the District of Columbia Damages Classes alleges as follows:

a.    Defendants' combination or conspiracy had the following effects: (1) price competition for electrolytic and film capacitors was restrained, suppressed, and eliminated throughout the District of Columbia; (2) prices for electrolytic and film capacitors were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) District of Columbia Plaintiff and members of the District of Columbia Damages Classes were deprived of free and open competition; and (4) District of Columbia Plaintiff and members of the District of Columbia Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film capacitors.

b.      During the Class Periods, defendants' illegal conduct substantially affected District of Columbia commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, District of Columbia Plaintiff and the District of Columbia Damages Classes have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Annotated §§ 28-4502, *et seq.* Accordingly, District of Columbia Plaintiff and the District of Columbia Damages Classes seek all forms of relief available under District of Columbia Code Annotated §§ 28-4503, *et seq.*

399.   <u>Illinois:</u> By reason of the foregoing, defendants have violated the Illinois Antitrust Act, Illinois Compiled Statutes, §§ 740 Ill. Comp. Stat. 10/1, *et seq.* Illinois Plaintiff on behalf of the Illinois Damages Classes alleges as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for electrolytic and film capacitors was restrained, suppressed, and eliminated throughout Illinois; (2) prices for electrolytic and film capacitors were raised, fixed, maintained and stabilized at artificially high levels throughout Illinois; (3) Illinois Plaintiff and members of the Illinois Damages Classes were deprived of free and open competition; and (4) Illinois Plaintiff and members of the Illinois Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film capacitors.

b.      During the Class Periods, defendants' illegal conduct substantially affected Illinois commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Illinois Plaintiff and members of the Illinois Damages Classes have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, defendants entered into agreements in restraint of trade in violation of Illinois Compiled Statutes, §§ 740 Ill. Comp. Stat. 10/1, *et seq.* Accordingly, Illinois Plaintiff and the members of the Illinois Damages Classes seek all forms of relief available under Illinois Compiled Statutes, §§ 740 Ill. Comp. Stat. 10/1, *et seq.*

400.   <u>Iowa:</u> By reason of the foregoing, defendants have violated Iowa Code §§ 553.1, *et seq.* Iowa Plaintiff on behalf of the Iowa Damages Classes alleges as follows:

a.      Defendants' combinations or conspiracies had the following effects: (1) electrolytic and film capacitor price competition was restrained, suppressed, and eliminated throughout Iowa; (2) electrolytic and film capacitor prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Iowa Plaintiff and members of the Damages Classes were deprived of free and open competition; and (4) Iowa Plaintiff and members of the Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film capacitors.

b.      During the Class Periods, defendants' illegal conduct substantially affected Iowa commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Iowa Plaintiff and members of the Damages Classes have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Iowa Plaintiff and members of the Damages Classes seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

401.   <u>Kansas:</u> By reason of the foregoing, defendants have violated Kansas Statutes, §§ 50-101, *et seq.* Kansas Plaintiff on behalf of the Kansas Damages Classes alleges as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for electrolytic and film capacitors was restrained, suppressed, and eliminated throughout Kansas; (2) prices for electrolytic and film capacitors were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Kansas Plaintiff and the Kansas Damages Classes were deprived of free and open competition; and (4) Kansas Plaintiff and the Kansas Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film capacitors.

b.      During the Class Periods, defendants' illegal conduct substantially affected Kansas commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Kansas Plaintiff and the Kansas Damages Classes have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Kansas Statutes §§ 50-101, *et seq.* Accordingly, Kansas Plaintiff and the Kansas Damages Classes seek all forms of relief available under Kansas Statutes §§ 50-101, *et seq.*

402.      <u>Maine:</u> By reason of the foregoing, defendants have violated the Maine Revised Statutes, 10 M.R.S. §§ 1101, *et seq.* Maine Plaintiff on behalf of the Maine Damages Classes alleges as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for electrolytic and film capacitors was restrained, suppressed, and eliminated throughout Maine; (2) prices for electrolytic and film capacitors were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Maine Plaintiff and the Maine Damages Classes were deprived of free and open competition; and (4) Maine Plaintiff and the Maine Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film capacitors.

b.      During the Class Periods, defendants' illegal conduct substantially affected Maine commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Maine Plaintiff and the Maine Damages Classes have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Maine Revised Statutes 10, §§ 1101, *et seq.* Accordingly, Maine Plaintiff and the Maine Damages Classes seek all relief available under Maine Revised Statutes 10, §§ 1101, *et seq.*

403.      <u>Michigan:</u> By reason of the foregoing, defendants have violated Michigan Compiled Laws §§ 445.773, *et seq.* Michigan Plaintiff on behalf of the Michigan Damages Classes alleges as follows:

a.   Defendants' combination or conspiracy had the following effects: (1) price competition for electrolytic and film capacitors was restrained, suppressed, and eliminated throughout Michigan; (2) prices for electrolytic and film capacitors were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Michigan Plaintiff and the Michigan Damages Classes were deprived of free and open competition; and (4) Michigan Plaintiff and the Michigan Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film capacitors.

b.   During the Class Periods, defendants' illegal conduct substantially affected Michigan commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, Michigan Plaintiff and the Michigan Damages Classes have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Michigan Compiled Laws §§ 445.773, *et seq.* Accordingly, Michigan Plaintiff and the Michigan Damages Classes seek all relief available under Michigan Compiled Laws §§ 445.73, *et seq.*

404.   <u>Minnesota:</u> By reason of the foregoing, defendants have violated Minnesota Statutes §§ 325D.49, *et seq.* Minnesota Plaintiff on behalf of the Minnesota Damages Classes alleges as follows:

a.   Defendants' combination or conspiracy had the following effects: (1) price competition for electrolytic and film capacitors was restrained, suppressed, and eliminated throughout Minnesota; (2) prices for electrolytic and film capacitors were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Minnesota Plaintiff and the Minnesota Damages Classes were deprived of free and open competition; and (4) Minnesota Plaintiff and the Minnesota Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film capacitors.

b.   During the Class Periods, defendants' illegal conduct substantially affected Minnesota commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Minnesota Plaintiff and the Minnesota Damages Classes have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Minnesota Statutes §§ 325D.49, *et seq.* Accordingly, Minnesota Plaintiff and the Minnesota Damages Classes seek all relief available under Minnesota Statutes §§ 325D.49, *et seq.*

405.    <u>Mississippi:</u> By reason of the foregoing, defendants have violated Mississippi Code §§ 75-21-1, *et seq.* Mississippi Plaintiff on behalf of the Mississippi Damages Classes alleges as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for electrolytic and film capacitors was restrained, suppressed, and eliminated throughout Mississippi; (2) prices for electrolytic and film capacitors were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Mississippi Plaintiff and the Mississippi Damages Classes were deprived of free and open competition; and (4) Mississippi Plaintiff and the Mississippi Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film capacitors.

b.      During the Class Periods, defendants' illegal conduct substantially affected Mississippi commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Mississippi Plaintiff and the Mississippi Damages Classes have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Mississippi Code §§ 75-21-1, *et seq.*

e.      Accordingly, Mississippi Plaintiff and the Mississippi Damages Classes seek all relief available under Mississippi Code § 75-21-1, *et seq.*

406.   <u>Nebraska:</u> By reason of the foregoing, defendants have violated Nebraska Revised Statutes §§ 59-801, *et seq*. Nebraska Plaintiff on behalf of the Nebraska Damages Classes alleges as follows:

a.   Defendants' combination or conspiracy had the following effects: (1) price competition for electrolytic and film capacitors was restrained, suppressed, and eliminated throughout Nebraska; (2) prices for electrolytic and film capacitors were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Nebraska Plaintiff and the Nebraska Damages Classes were deprived of free and open competition; and (4) Nebraska Plaintiff and the Nebraska Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film capacitors.

b.   During the Class Periods, defendants' illegal conduct substantially affected Nebraska commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, Nebraska Plaintiff and the Nebraska Damages Classes have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation Nebraska Revised Statutes §§ 59-801, *et seq*. Accordingly, Nebraska Plaintiff and the Nebraska Damages Classes seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq*.

407.   <u>Nevada:</u> By reason of the foregoing, defendants have violated Nevada Revised Statutes §§ 598A.010, <u>*et seq.*</u> Nevada Plaintiff on behalf of the Nevada Damages Classes alleges as follows:

a.   Defendants' combination or conspiracy had the following effects: (1) price competition for electrolytic and film capacitors was restrained, suppressed, and eliminated throughout Nevada; (2) prices for electrolytic and film capacitors were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Nevada Plaintiff and the Nevada Damages Classes were deprived of free and open competition; and (4) Nevada Plaintiff and the Nevada Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film capacitors.

1    b.    During the Class Periods, defendants' illegal conduct substantially affected

2 Nevada commerce.

3    c.    As a direct and proximate result of Defendants' unlawful conduct, Nevada

4 Plaintiff and the Nevada Damages Classes have been injured in their business and property and are

5 threatened with further injury.

6    d.    By reason of the foregoing, defendants have entered into agreements in

7 restraint of trade in violation of Nevada Revised Statutes §§ 598A.010, *et seq*. Accordingly, Nevada

8 Plaintiff and the Nevada Damages Classes seek all relief available under Nevada Revised Statutes §§

9 598A.010, *et seq*.

10    408.    <u>New Hampshire:</u> By reason of the foregoing, defendants have violated New

11 Hampshire Revised Statutes §§ 356:1, *et seq*. New Hampshire Plaintiff on behalf of the New

12 Hampshire Damages Classes alleges as follows:

13    a.    Defendants' combination or conspiracy had the following effects: (1) price

14 competition for electrolytic and film capacitors was restrained, suppressed, and eliminated throughout

15 New Hampshire; (2) prices for electrolytic and film capacitors were raised, fixed, maintained and

16 stabilized at artificially high levels throughout New Hampshire; (3) New Hampshire Plaintiff and the

17 New Hampshire Damages Classes were deprived of free and open competition; and (4) New

18 Hampshire Plaintiff and the New Hampshire Damages Classes paid supra-competitive, artificially

19 inflated prices for electrolytic and film capacitors.

20    b.    During the Class Periods, defendants' illegal conduct substantially affected

21 New Hampshire commerce.

22    c.    As a direct and proximate result of Defendants' unlawful conduct, New

23 Hampshire Plaintiff and the New Hampshire Damages Classes have been injured in their business

24 and property and are threatened with further injury.

25    d.    By reason of the foregoing, defendants have entered into agreements in

26 restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Accordingly, New

27 Hampshire Plaintiff and the New Hampshire Damages Classes seek all relief available under New

28 Hampshire Revised Statutes §§ 356:1, *et seq*.

409.   <u>New Mexico:</u> By reason of the foregoing, defendants have violated New Mexico Statutes §§ 57-1-1, *et seq.* New Mexico Plaintiff on behalf of the New Mexico Damages Classes alleges as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for electrolytic and film capacitors was restrained, suppressed, and eliminated throughout New Mexico; (2) prices for electrolytic and film capacitors were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) New Mexico Plaintiff and the New Mexico Damages Classes were deprived of free and open competition; and (4) New Mexico Plaintiff and the New Mexico Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film capacitors.

b.      During the Class Periods, defendants' illegal conduct substantially affected New Mexico commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, New Mexico Plaintiff and the New Mexico Damages Classes have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of New Mexico Statutes §§ 57-1-1, *et seq.* Accordingly, New Mexico Plaintiff and the New Mexico Damages Classes seek all relief available under New Mexico Statutes §§ 57-1-1, *et seq.*

410.   <u>New York:</u> By reason of the foregoing, defendants have violated New York General Business Laws §§ 340, *et seq.* New York Plaintiff on behalf of the New York Damages Classes alleges as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for electrolytic and film capacitors was restrained, suppressed, and eliminated throughout New York; (2) prices for electrolytic and film capacitors were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) New York Plaintiff and the New York Damages Classes were deprived of free and open competition; and (4) New York Plaintiff and the New York

1  Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film

2  capacitors.

3          b.      During the Class Periods, defendants' illegal conduct substantially affected

4  New York commerce.

5          c.      As a direct and proximate result of Defendants' unlawful conduct, New York

6  Plaintiff and the New York Damages Classes have been injured in their business and property and

7  are threatened with further injury.

8          d.      By reason of the foregoing, defendants have entered into agreements in

9  restraint of trade in violation of New York General Business Laws §§ 340, *et seq.* Accordingly, New

10 York Plaintiff and the New York Damages Classes seek all relief available under New York General

11 Business Laws §§ 340, *et seq.*

12         411.   <u>North Carolina:</u> By reason of the foregoing, defendants have violated North Carolina

13 General Statutes §§ 75-1, *et seq.* North Carolina Plaintiff on behalf of the North Carolina Damages

14 Classes alleges as follows:

15         a.      Defendants' combination or conspiracy had the following effects: (1) price

16 competition for electrolytic and film capacitors was restrained, suppressed, and eliminated throughout

17 North Carolina; (2) prices for electrolytic and film capacitors were raised, fixed, maintained and

18 stabilized at artificially high levels throughout North Carolina; (3) North Carolina Plaintiff and the

19 North Carolina Damages Classes were deprived of free and open competition; and (4) North Carolina

20 Plaintiff and the North Carolina Damages Classes paid supra-competitive, artificially inflated prices

21 for electrolytic and film capacitors.

22         b.      During the Class Periods, defendants' illegal conduct substantially affected

23 North Carolina commerce.

24         c.      As a direct and proximate result of Defendants' unlawful conduct, North

25 Carolina Plaintiff and the North Carolina Damages Classes have been injured in their business and

26 property and are threatened with further injury.

27         d.      By reason of the foregoing, defendants have entered into agreements in

28 restraint of trade in violation of North Carolina General Statutes §§ 75-1, *et seq.* Accordingly, North

Carolina Plaintiff and the North Carolina Damages Classes seek all relief available under North Carolina General Statutes §§ 75-1, *et seq.*

412.  <u>North Dakota:</u> By reason of the foregoing, defendants have violated North Dakota Century Code §§ 51-08.1-01, *et seq.* North Dakota Plaintiff on behalf of the North Dakota Damages Classes alleges as follows:

a.  Defendants' combination or conspiracy had the following effects: (1) price competition for electrolytic and film capacitors was restrained, suppressed, and eliminated throughout North Dakota; (2) prices for electrolytic and film capacitors were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) North Dakota Plaintiff and the North Dakota Damages Classes were deprived of free and open competition; and (4) North Dakota Plaintiff and the North Dakota Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film capacitors.

b.  During the Class Periods, defendants' illegal conduct had a substantial effect on North Dakota commerce.

c.  As a direct and proximate result of Defendants' unlawful conduct, North Dakota Plaintiff and the North Dakota Damages Classes have been injured in their business and property and are threatened with further injury.

d.  By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of North Dakota Century Code §§ 51-08.1-01, *et seq.* Accordingly, North Dakota Plaintiff and the North Dakota Damages Classes seek all relief available under North Dakota Century Code §§ 51-08.1-01, *et seq.*

413.  <u>Oregon:</u> By reason of the foregoing, defendants have violated Oregon Revised Statutes §§ 646.705, *et seq.* Oregon Plaintiff on behalf of the Oregon Damages Classes alleges as follows:

a.  Defendants' combination or conspiracy had the following effects: (1) price competition for electrolytic and film capacitors was restrained, suppressed, and eliminated throughout Oregon; (2) prices for electrolytic and film capacitors were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Oregon Plaintiff and members of the Oregon

1  Damages Classes were deprived of free and open competition; and (4) Oregon Plaintiff and members

2  of the Oregon Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and

3  film capacitors.

4          b.      During the Class Periods, defendants' illegal conduct had a substantial effect

5  on Oregon commerce.

6          c.      As a direct and proximate result of Defendants' unlawful conduct, Oregon

7  Plaintiff and members of the Oregon Damages Classes have been injured in their business and

8  property and are threatened with further injury.

9          d.      By reason of the foregoing, defendants have entered into agreements in

10  restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.* Accordingly, Oregon

11  Plaintiff and members of the Oregon Damages Classes seek all relief available under Oregon Revised

12  Statutes §§ 646.705, *et seq.*

13       414.   <u>South Dakota:</u> By reason of the foregoing, defendants have violated South Dakota

14  Codified Laws §§ 37-1-3.1, *et seq.* South Dakota Plaintiff on behalf of the South Dakota Damages

15  Classes alleges as follows:

16          a.      Defendants' combinations or conspiracies had the following effects: (1)

17  electrolytic and film capacitor price competition was restrained, suppressed, and eliminated

18  throughout South Dakota; (2) electrolytic and film capacitor prices were raised, fixed, maintained

19  and stabilized at artificially high levels throughout South Dakota; (3) South Dakota Plaintiff and

20  members of the Damages Classes were deprived of free and open competition; and (4) South Dakota

21  Plaintiff and members of the Damages Classes paid supra-competitive, artificially inflated prices for

22  electrolytic and film capacitors.

23          b.      During the Class Periods, defendants' illegal conduct had a substantial effect

24  on South Dakota commerce.

25          c.      As a direct and proximate result of Defendants' unlawful conduct, South

26  Dakota Plaintiff and members of the Damages Classes have been injured in their business and

27  property and are threatened with further injury.

28

d.      By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq*. Accordingly, South Dakota Plaintiff and members of the Damages Classes seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

415.    <u>Tennessee:</u> By reason of the foregoing, defendants have violated Tennessee Code §§ 47-25-101, *et seq*. Tennessee Plaintiff on behalf of the Tennessee Damages Classes alleges as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for electrolytic and film capacitors was restrained, suppressed, and eliminated throughout Tennessee; (2) prices for electrolytic and film capacitors were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Tennessee Plaintiff and the Tennessee Damages Classes were deprived of free and open competition; and (4) Tennessee Plaintiff and the Tennessee Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film capacitors.

b.      During the Class Periods, defendants' illegal conduct had a substantial effect on Tennessee commerce as electrolytic and film capacitors were sold in Tennessee.

c.      As a direct and proximate result of Defendants' unlawful conduct, Tennessee Plaintiff and the Tennessee Damages Classes have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Tennessee Code §§ 47-25-101, *et seq*. Accordingly, Tennessee Plaintiff and the Tennessee Damages Classes seek all relief available under Tennessee Code §§ 47-25-101, *et seq*.

416.    <u>Utah:</u> By reason of the foregoing, defendants have violated Utah Code Annotated §§ 76-10-3101, *et seq*. Utah Plaintiff on behalf of the Utah Damages Classes alleges as follows:

a.      Defendants' combinations or conspiracies had the following effects: (1) electrolytic and film capacitor price competition was restrained, suppressed, and eliminated throughout Utah; (2) electrolytic and film capacitor prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Utah Plaintiff and members of the Damages

1  Classes were deprived of free and open competition; and (4) Utah Plaintiff and members of the

2  Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film

3  capacitors.

4       b.    During the Class Periods, defendants' illegal conduct had a substantial effect

5  on Utah commerce.

6       c.    As a direct and proximate result of Defendants' unlawful conduct, Utah

7  Plaintiff and members of the Damages Classes have been injured in their business and property and

8  are threatened with further injury.

9       d.    By reason of the foregoing, defendants have entered into agreements in

10  restraint of trade in violation of Utah Code Annotated §§ 76-10-3101, *et seq.* Accordingly, Utah

11  Plaintiff and members of the Damages Classes seek all relief available under Utah Code Annotated

12  §§ 76-10-3101, *et seq.*

13      417.  <u>Vermont:</u> By reason of the foregoing, defendants have violated Vermont Stat. Ann. 9

14  §§ 2453, *et seq.* Vermont Plaintiff on behalf of the Vermont Damages Classes alleges as follows:

15       a.    Defendants' combination or conspiracy had the following effects: (1) price

16  competition for electrolytic and film capacitors was restrained, suppressed, and eliminated throughout

17  Vermont; (2) prices for electrolytic and film capacitors were raised, fixed, maintained and stabilized

18  at artificially high levels throughout Vermont; (3) Vermont Plaintiff and the Vermont Damages

19  Classes were deprived of free and open competition; and (4) Vermont Plaintiff and the Vermont

20  Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film

21  capacitors.

22       b.    During the Class Periods, defendants' illegal conduct had a substantial effect

23  on Vermont commerce.

24       c.    As a direct and proximate result of Defendants' unlawful conduct, Vermont

25  Plaintiff and the Vermont Damages Classes have been injured in their business and property and are

26  threatened with further injury.

27       d.    By reason of the foregoing, defendants have entered into agreements in

28  restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.* Accordingly, Vermont Plaintiff

and the Vermont Damages Classes seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq.*

418. <u>West Virginia:</u> By reason of the foregoing, defendants have violated West Virginia Code §§ 47-18-1, *et seq.* West Virginia Plaintiff on behalf of the West Virginia Damages Classes alleges as follows:

a. Defendants' combination or conspiracy had the following effects: (1) price competition for electrolytic and film capacitors was restrained, suppressed, and eliminated throughout West Virginia; (2) prices for electrolytic and film capacitors were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) West Virginia Plaintiff and the West Virginia Damages Classes were deprived of free and open competition; and (4) West Virginia Plaintiff and the West Virginia Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film capacitors.

b. During the Class Periods, defendants' illegal conduct had a substantial effect on West Virginia commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, West Virginia Plaintiff and the West Virginia Damages Classes have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq.* Accordingly, West Virginia Plaintiff and the West Virginia Damages Classes seek all relief available under West Virginia Code §§ 47-18-1, *et seq.*

419. <u>Wisconsin:</u> By reason of the foregoing, defendants have violated Wisconsin Statutes §§ 133.01, *et seq.* Wisconsin Plaintiff on behalf of the Wisconsin Damages Classes alleges as follows:

a. Defendants' combination or conspiracy had the following effects: (1) price competition for electrolytic and film capacitors was restrained, suppressed, and eliminated throughout Wisconsin; (2) prices for electrolytic and film capacitors were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Wisconsin Plaintiff and the Wisconsin Damages Classes were deprived of free and open competition; and (4) Wisconsin Plaintiff and the Wisconsin

Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film capacitors.

b.      During the Class Periods, defendants' illegal conduct had a substantial effect on Wisconsin commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Wisconsin Plaintiff and the Wisconsin Damages Classes have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Wisconsin Statutes §§ 133.01, *et seq.* Accordingly, Wisconsin Plaintiff and the Wisconsin Damages Classes seek all relief available under Wisconsin Statutes §§ 133.01, *et seq.*

## THIRD CLAIM FOR RELIEF
### (Violations of State Consumer Protection and Unfair Competition Laws)
### (On Behalf of All Plaintiffs Against All Defendants)

420.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

421.    Plaintiffs allege violations of the following states' consumer protection and unfair competition laws: Arkansas, California, District of Columbia, Florida, Hawaii, Massachusetts, Missouri, Montana, Nebraska, New Mexico, New Hampshire, New York, North Carolina, Rhode Island, South Carolina, Utah, and Vermont.[31]

---

[31] Arkansas Code Annotated, § 4-88-101., *et seq.*, California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, District of Columbia Code § 28-3901, *et seq.*, Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*, Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*, Massachusetts Consumer and Business Protection Act, M.G.L. c. 93A, § 1, *et seq.*, Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*, Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq.*, Nebraska Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601, *et seq.*, New Mexico Stat. § 57-12-1, *et seq.*, New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. §§ 358-A:2, *et seq.*, New York General Business Law, N.Y. Gen. Bus. Law § 349, *et seq.*, North Carolina Gen. Stat. § 75-1.1, *et seq.*, Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws §§ 6-13.1-1, *et seq.*, South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*, Utah Code §§ 76-10-911, *et seq.*, Vermont Consumer Fraud Act, 9 Vt. Stat. Ann. § 2451, *et seq.*

422.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of these states' consumer protection and unfair competition laws by engaging in a conspiracy to fix and stabilize the price of electrolytic and film capacitors as described above.

423.    Defendants' acts, omissions, misrepresentations, practices and non-disclosures constitute a common and continuing course of conduct of unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices within the meaning of these states' consumer protection and unfair competition laws.

424.    Defendants' acts, omissions, misrepresentations, practices and nondisclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or these states' consumer protection and unfair competition laws.

425.    Defendants' acts or practices are fraudulent or deceptive within the meaning of these states' consumer protection and unfair competition laws.

426.    Defendants' conduct was carried out, effectuated, and perfected within these states. Defendants maintained offices in some of these states where their employees engaged in communications, meetings and other activities in furtherance of defendants' conspiracy.

427.    By reason of the foregoing, Plaintiffs and the Classes are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as result of such business acts and practices described above.

428.    Plaintiffs allege the following violations of state unfair competition and consumer protection laws:

429.    <u>Arkansas:</u> By reason of the foregoing, defendants have violated Arkansas's laws by engaging in unfair competition or unconscionable, unfair or deceptive acts or practices in violation of AR ST §4-88-101 *et seq.*

430.    <u>California:</u> By reason of the foregoing, defendants have violated California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* California Plaintiffs on behalf of the California Damages Classes alleges as follows:

a.      Defendants committed acts of unfair competition, as defined by section 17200, *et seq.*, by engaging in a conspiracy to fix and stabilize the price of electrolytic and film capacitors as described above.

b.      The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as described above, constitute a common and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of section 17200, *et seq.*, including, but not limited to (1) violation of Section 1 of the Sherman Act; (2) violation of the Cartwright Act.

c.      Defendants' acts, omissions, misrepresentations, practices and nondisclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

d.      Defendants' acts or practices are fraudulent or deceptive within the meaning of section 17200, *et seq.*

e.      Defendants' conduct was carried out, effectuated, and perfected within the State of California. Defendants maintained offices in California where their employees engaged in communications, meetings and other activities in furtherance of Defendants' conspiracy.

f.      By reason of the foregoing, California Plaintiffs and the California Damages Classes are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as result of such business acts and practices described above.

431.    <u>District of Columbia:</u> By reason of the foregoing, defendants have violated District of Columbia Code § 28-3901, *et seq.* District of Columbia Plaintiff on behalf of the District of Columbia Damages Classes alleges as follows:

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which electrolytic and film capacitors were sold, distributed or obtained in the District of Columbia.

b.      The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. District of Columbia Plaintiff was not aware of Defendants' price-

fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for electrolytic and film capacitors. Defendants had the sole power to set that price and District of Columbia Plaintiff had no power to negotiate a lower price. Moreover, District of Columbia Plaintiff lacked any meaningful choice in purchasing electrolytic and film capacitors because they were unaware of the unlawful overcharge and there was no alternative source of supply through which District of Columbia Plaintiff could avoid the overcharges. Defendants' conduct with regard to sales of electrolytic and film capacitors, including their illegal conspiracy to secretly fix the price of electrolytic and film capacitors at supra-competitive levels and overcharge purchasers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of District of Columbia Plaintiff and the public. Defendants took grossly unfair advantage of District of Columbia Plaintiff. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for electrolytic and film capacitors.

c.   Defendants' unlawful conduct had the following effects: (1) electrolytic and film capacitors price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) electrolytic and film capacitor prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) District of Columbia Plaintiff and members of the Damages Classes were deprived of free and open competition; and (4) District of Columbia Plaintiff and members of the Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film capacitors.

d.   As a direct and proximate result of Defendants' unlawful conduct, District of Columbia Plaintiff and members of the Damages Classes have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, District of Columbia Plaintiff and members of the Damages Classes seek all relief available under that statute.

432. <u>Florida:</u> By reason of the foregoing, defendants have violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.* Florida Plaintiff on behalf of the Florida Damages Classes alleges as follows:

a. Defendants' unlawful conduct had the following effects: (1) price competition for electrolytic and film capacitors and electrolytic and film capacitors was restrained, suppressed, and eliminated throughout Florida; (2) prices for electrolytic and film capacitors and electrolytic and film capacitors were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Florida Plaintiff and the Florida Damages Classes were deprived of free and open competition; and (4) Florida Plaintiff and the Florida Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film capacitors and electrolytic and film capacitors.

b. During the Class Periods, defendants' illegal conduct substantially affected Florida commerce and purchasers.

c. As a direct and proximate result of Defendants' unlawful conduct, Florida Plaintiff and the Florida Damages Classes have been injured and are threatened with further injury.

d. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. §§ 501.201, *et seq.*, and, accordingly, Florida Plaintiff and the Florida Damages Classes seek all relief available under that statute.

433. <u>Hawaii:</u> By reason of the foregoing, defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.* Hawaii Plaintiff on behalf of the Hawaii Damages Classes alleges as follows:

a. Defendants' unlawful conduct had the following effects: (1) electrolytic and film capacitors and electrolytic and film capacitors price competition were restrained, suppressed, and eliminated throughout Hawaii; (2) electrolytic and film capacitors and electrolytic and film capacitors prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Hawaii Plaintiff and members of the Damages Classes were deprived of free and open competition; and (4) Hawaii Plaintiff and members of the Damages Classes paid supracompetitive, artificially inflated prices for electrolytic and film capacitors and electrolytic and film capacitors.

b.      During the Class Periods, defendants' illegal conduct substantially affected Hawaii commerce and purchasers.

c.      As a direct and proximate result of Defendants' unlawful conduct, Hawaii Plaintiff and members of the Damages Classes have been injured and are threatened with further injury.

d.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480, *et seq.*, and, accordingly, Hawaii Plaintiff and members of the Damages Classes seek all relief available under that statute.

434.    <u>Massachusetts:</u> By reason of the foregoing, defendants have violated the Massachusetts Consumer and Business Protection Act, M.G.L. c. 93A, § 1, *et seq.* Massachusetts Plaintiff on behalf of the Massachusetts Damages Classes alleges as follows:

a.      Defendants were engaged in trade or commerce as defined by M.G.L. c. 93A, § 1.

b.      Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts, by affecting, fixing, controlling and/or maintaining at artificial and noncompetitive levels, the prices at which electrolytic and film capacitors and electrolytic and film capacitors were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from the Massachusetts Plaintiff and members of the Massachusetts Damages Classes.

c.      Defendants' unlawful conduct had the following effects: (1) price competition for electrolytic and film capacitors and electrolytic and film capacitors was restrained, suppressed, and eliminated throughout Massachusetts; (2) the prices of electrolytic and film capacitors and electrolytic and film capacitors were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Massachusetts Plaintiff and members of the Massachusetts Damages Classes were deprived of free and open competition; and (4) Massachusetts Plaintiff and members of the Massachusetts Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film capacitors and electrolytic and film capacitors.

d.     As a direct and proximate result of Defendants' unlawful conduct, Massachusetts Plaintiff and members of the Massachusetts Damages Classes were injured and are threatened with further injury.

e.     Each of the Defendants or their representatives have been served with a demand letter in accordance with M.G.L. c. 93A, § 1, or such service of a demand letter was unnecessary due to the defendant not maintaining a place of business within the Commonwealth of Massachusetts or not keeping assets within the Commonwealth. More than thirty days has passed since such demand letters were served, and each Defendant served has failed to make a reasonable settlement offer.

f.     By reason of the foregoing, defendants engaged in unfair competition and unfair or deceptive acts or practices, in violation of M.G.L. c. 93A, § 2. Defendants' and their co-conspirators' violations of Chapter 93A were knowing or willful, entitling the Massachusetts Plaintiff and the Massachusetts Damages Classes to multiple damages.

435.   <u>Missouri:</u> By reason of the foregoing, defendants have violated Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020. Missouri Plaintiff on behalf of the Missouri Damages Classes alleges as follows:

a.     Missouri Plaintiff and members of the Missouri Damages Classes purchased electrolytic and film capacitors and/or electrolytic and film capacitors.

b.     Defendants engaged in the conduct described herein in connection with the sale of electrolytic and film capacitors and electrolytic and film capacitors in trade or commerce in a market that includes Missouri.

c.     Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which electrolytic and film capacitors and electrolytic and film capacitors were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Missouri Plaintiff and the members of the Missouri Damages Class.

d.      Defendants concealed, suppressed, and omitted to disclose material facts to Missouri Plaintiff and the members of the Missouri Damages Classes concerning Defendants' unlawful activities and artificially inflated prices for electrolytic and film capacitors and electrolytic and film capacitors. The concealed, suppressed, and omitted facts would have been important to Missouri Plaintiff and the members of the Missouri Damages Classes as they related to the cost of electrolytic and film capacitors and electrolytic and film capacitors that they purchased.

e.      Defendants misrepresented the real cause of price increases and/or the absence of price reductions in electrolytic and film capacitors and electrolytic and film capacitors by making public statements that were not in accord with the facts.

f.      Defendants' statements and conduct concerning the price of electrolytic and film capacitors and electrolytic and film capacitors were deceptive as they had the tendency or capacity to mislead Missouri Plaintiff and the members of the Missouri Damages Classes to believe that they were purchasing electrolytic and film capacitors and electrolytic and film capacitors at prices established by a free and fair market. Defendants' unlawful conduct had the following effects: (1) electrolytic and film capacitors and electrolytic and film capacitors price competition was restrained, suppressed, and eliminated throughout Missouri; (2) electrolytic and film capacitors and electrolytic and film capacitors prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Missouri Plaintiff and members of the Missouri Damages Classes were deprived of free and open competition; and (4) Missouri Plaintiff and members of the Missouri Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film capacitors and electrolytic and film capacitors.

g.      The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act.

h.      As a direct and proximate result of the above-described unlawful practices, Missouri Plaintiff and members of the Missouri Damages Classes suffered ascertainable loss of money or property.

i.      Accordingly, Missouri Plaintiff and members of the Missouri Damages Classes seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev.

Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

436.    <u>Montana:</u> By reason of the foregoing, defendants have violated Montana's Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103 *et seq.* Montana Plaintiff on behalf of the Montana Damages Classes alleges as follows:

a.    Defendants' unlawful conduct had the following effects: (1) electrolytic and film capacitors and electrolytic and film capacitors price competition was restrained, suppressed, and eliminated throughout Montana; (2) electrolytic and film capacitors and electrolytic and film capacitors prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Montana Plaintiff and the Montana Damages Classes were deprived of free and open competition; and (4) Montana Plaintiff and the Montana Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film capacitors and electrolytic and film capacitors.

b.    During the Class Periods, defendants' illegal conduct substantially affected Montana commerce and purchasers.

c.    As a direct and proximate result of Defendants' unlawful conduct, Montana Plaintiff and the Montana Damages Classes have been injured and are threatened with further injury.

d.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Montana's Unfair Trade Practices and Consumer Protection Act, Mont. Code, §§ 30-14-103 *et seq.* and, accordingly, Montana Plaintiff and the Montana Damages Classes seek all relief available under that statute.

437.    <u>Nebraska:</u> By reason of the foregoing, defendants have violated Nebraska's Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601, *et seq.* Nebraska Plaintiff on behalf of the Nebraska Damages Classes alleges as follows:

a.      Defendants' unlawful conduct had the following effects: (1) electrolytic and film capacitors and electrolytic and film capacitors price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) electrolytic and film capacitors and electrolytic and film capacitors prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Nebraska Plaintiff and the Nebraska Damages Classes were deprived of free and open competition; and (4) Nebraska Plaintiff and the Nebraska Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film capacitors and electrolytic and film capacitors.

b.      During the Class Periods, defendants' illegal conduct substantially affected Nebraska commerce and purchasers.

c.      As a direct and proximate result of Defendants' unlawful conduct, Nebraska Plaintiff and the Nebraska Damages Classes have been injured and are threatened with further injury.

d.      Defendants' actions and conspiracy have had a substantial impact on the public interests of Nebraska and its residents.

e.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nebraska's Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601, *et seq.* and, accordingly, Nebraska Plaintiff and the Nebraska Damages Classes seek all relief available under that statute.

438.   <u>New Hampshire:</u> By reason of the foregoing, defendants have violated New Hampshire's Consumer Protection Act, N.H. Rev. Stat. Ann. §§ 358-A:2, *et seq.* New Hampshire Plaintiff on behalf of the New Hampshire Damages Classes alleges as follows:

a.      Defendants' unlawful conduct had the following effects: (1) electrolytic and film capacitors and electrolytic and film capacitors price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) electrolytic and film capacitors and electrolytic and film capacitors prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) New Hampshire Plaintiff and the New Hampshire Damages Classes were deprived of free and open competition; and (4) New Hampshire Plaintiff and the New Hampshire Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film capacitors and electrolytic and film capacitors.

1          b.      During the Class Periods, defendants' illegal conduct substantially affected

2  New Hampshire commerce and purchasers.

3          c.      As a direct and proximate result of Defendants' unlawful conduct, New

4  Hampshire Plaintiff and the New Hampshire Damages Classes have been injured and are threatened

5  with further injury.

6          d.      Defendants' actions and conspiracy have had a substantial impact on the

7  public interests of New Hampshire and its residents.

8          e.      Defendants have engaged in unfair competition or unfair or deceptive acts or

9  practices in violation of New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. §§ 358-

10  A:2, *et seq.* and, accordingly, New Hampshire Plaintiff and the New Hampshire Damages Classes

11  seek all relief available under that statute.

12       439.    <u>New Mexico:</u> By reason of the foregoing, defendants have violated New Mexico Stat.

13  § 57-12-1, *et seq.* New Mexico Plaintiff on behalf of the New Mexico Damages Classes alleges as

14  follows:

15          a.      Defendants and their co-conspirators agreed to, and did in fact, act in restraint

16  of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and

17  artificially inflated levels, the prices at which electrolytic and film capacitors were sold, distributed

18  or obtained in New Mexico and took efforts to conceal their agreements from New Mexico and

19  members of the Damages Class.

20          b.      The aforementioned conduct on the part of Defendants constituted

21  "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter*

22  *alia*, resulted in a gross disparity between the value received by New Mexico Plaintiff and the

23  members of the Damages Classes and the prices paid by them for electrolytic and film capacitors as

24  set forth in N.M.S.A., § 57-12-2E. New Mexico Plaintiff was not aware of Defendants' price-fixing

25  conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There

26  was a gross disparity of bargaining power between the parties with respect to the price charged by

27  Defendants for electrolytic and film capacitors. Defendants had the sole power to set that price and

28  New Mexico Plaintiff had no power to negotiate a lower price. Moreover, New Mexico Plaintiff

lacked any meaningful choice in purchasing electrolytic and film capacitors because they were unaware of the unlawful overcharge and there was no alternative source of supply through which New Mexico Plaintiff could avoid the overcharges. Defendants' conduct with regard to sales of electrolytic and film capacitors, including their illegal conspiracy to secretly fix the price of electrolytic and film capacitors at supra-competitive levels and overcharge purchasers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of New Mexico Plaintiff and the public. Defendants took grossly unfair advantage of New Mexico Plaintiff. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for purchasers so that there was a gross disparity between the price paid and the value received for S electrolytic and film capacitors.

c.        Defendants' unlawful conduct had the following effects: (1) electrolytic and film capacitor price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) electrolytic and film capacitor prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) New Mexico Plaintiff and the members of the Damages Classes were deprived of free and open competition; and (4) New Mexico Plaintiff and the members of the Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film capacitors.

d.        During the Class Periods, defendants' illegal conduct substantially affected New Mexico commerce and purchasers.

e.        As a direct and proximate result of the unlawful conduct of Defendants, New Mexico Plaintiff and the members of the Damages Classes have been injured and are threatened with further injury.

f.        Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, New Mexico Plaintiff and the members of the Damages Classes seek all relief available under that statute.

440.    <u>New York:</u> By reason of the foregoing, defendants have violated New York's General Business Law, N.Y. Gen. Bus. Law § 349, *et seq.* New York Plaintiff on behalf of the New York Damages Classes alleges as follows:

a.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and noncompetitive levels, the prices at which electrolytic and film capacitors and electrolytic and film capacitors were sold, distributed or obtained in New York and took efforts to conceal their agreements from New York Plaintiff and the New York Damages Class.

b.    The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

c.    Defendants made certain statements about electrolytic and film capacitors and electrolytic and film capacitors that they knew would be seen by New York residents and these statements either omitted material information that rendered the statements they made materially misleading or affirmatively misrepresented the real cause of price increases for electrolytic and film capacitors and electrolytic and film capacitors.

d.    Defendants' unlawful conduct had the following effects: (1) electrolytic and film capacitors and electrolytic and film capacitors price competition was restrained, suppressed, and eliminated throughout New York; (2) electrolytic and film capacitors and electrolytic and film capacitors prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) New York Plaintiff and the New York Damages Classes were deprived of free and open competition; and (4) New York Plaintiff and the New York Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film capacitors and electrolytic and film capacitors.

e.    During the Class Periods, defendants' illegal conduct substantially affected New York commerce and purchasers.

f.    During the Class Periods, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed electrolytic and film capacitors and electrolytic and film capacitors in New York.

g.      New York Plaintiff and the New York Damages Classes seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Without prejudice to their contention that Defendants' unlawful conduct was willful and knowing, New York Plaintiff and the New York Damages Classes do not seek in this action to have those damages trebled pursuant to N.Y. Gen. Bus. Law § 349(h).

441.    <u>North Carolina:</u> By reason of the foregoing, defendants have violated North Carolina Gen. Stat. § 75-1.1, *et seq.* North Carolina Plaintiff on behalf of the North Carolina Damages Classes alleges as follows:

(a)      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which electrolytic and film capacitors were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from North Carolina Plaintiff and members of the Damages Class.

(b)      Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which North Carolina Plaintiff could not possibly have been aware. Defendants and their co-conspirators publicly provided pre-textual and false justifications regarding their price increases. Defendants' public statements concerning the price of electrolytic and film capacitors created the illusion of competitive pricing controlled by market forces rather than supra-competitive pricing driven by Defendants' illegal conspiracy. Moreover, defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders, conducting meetings and conversations in secret, confining the plan to a small group of higher-level officials at each company and avoiding the creation of documents which would reveal the antitrust violations.

(c)      The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North

1  Carolina purchasers in an honest marketplace in which economic activity is conducted in a

2  competitive manner.

3            (d)      Defendants' unlawful conduct had the following effects: (1) electrolytic and

4  film capacitor price competition was restrained, suppressed, and eliminated throughout North

5  Carolina; (2) electrolytic and film capacitor prices were raised, fixed, maintained, and stabilized at

6  artificially high levels throughout North Carolina; (3) North Carolina Plaintiff and members of the

7  Damages Classes were deprived of free and open competition; and (4) North Carolina Plaintiff and

8  members of the Damages Classes paid supra-competitive, artificially inflated prices for electrolytic

9  and film capacitors.

10           (e)      During the Class Periods, defendants' marketed, sold, or distributed

11  electrolytic and film capacitors in North Carolina, and Defendants' illegal conduct substantially

12  affected North Carolina commerce and purchasers.

13           (f)      During the Class Periods, each of the Defendants named herein, directly, or

14  indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed

15  electrolytic and film capacitors in North Carolina.

16           (g)      North Carolina Plaintiff and members of the Damages Classes seek actual

17  damages for their injuries caused by these violations in an amount to be determined at trial and are

18  threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive

19  acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, North

20  Carolina Plaintiff and members of the Damages Classes seek all relief available under that statute.

21       442.   <u>Rhode Island:</u> By reason of the foregoing, defendants have violated Rhode Island

22  Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws §§ 6-13.1-1, *et seq.* Rhode Island

23  Plaintiff on behalf of the Rhode Island Damages Classes alleges as follows:

24           (a)      Members of this Damages Classes purchased electrolytic and film capacitors.

25           (b)      Defendants agreed to, and did in fact, act in restraint of trade or commerce in

26  a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial

27  and non-competitive levels, the prices at which electrolytic and film capacitors were sold, distributed,

28  or obtained in Rhode Island.

(c)     Defendants deliberately failed to disclose material facts to Rhode Island Plaintiff and members of the Damages Classes concerning Defendants' unlawful activities and artificially inflated prices for electrolytic and film capacitors. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average purchaser, defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Periods that electrolytic and film capacitors prices were competitive and fair.

(d)     Defendants' unlawful conduct had the following effects: (1) electrolytic and film capacitor price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) electrolytic and film capacitor prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Rhode Island Plaintiff and members of the Damages Classes were deprived of free and open competition; and (4) Rhode Island Plaintiff and members of the Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film capacitors.

(e)     As a direct and proximate result of the Defendants' violations of law, Rhode Island Plaintiff and members of the Damages Classes suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

(f)     Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of electrolytic and film capacitors, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing electrolytic and film capacitors at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Rhode Island Plaintiff and members of the Damages Classes as they related to the cost of electrolytic and film capacitors they purchased.

(g)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Rhode Island Plaintiff and members of the Damages Classes seek all relief available under that statute.

443.   <u>South Carolina:</u> By reason of the foregoing, defendants have violated South Carolina's Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq*. South Carolina Plaintiff on behalf of the South Carolina Damages Classes alleges as follows:

a.   Defendants' unlawful conduct had the following effects: (1) electrolytic and film capacitors and electrolytic and film capacitors price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) electrolytic and film capacitors and electrolytic and film capacitors prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) South Carolina Plaintiff and the South Carolina Damages Classes were deprived of free and open competition; and (4) South Carolina Plaintiff and the South Carolina Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film capacitors and electrolytic and film capacitors.

b.   During the Class Periods, defendants' illegal conduct substantially affected South Carolina commerce and purchasers.

c.   As a direct and proximate result of Defendants' unlawful conduct, South Carolina Plaintiff and the South Carolina Damages Classes have been injured and are threatened with further injury.

d.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of South Carolina Revised Statutes Annotated §§ 480-1, *et seq.*, and, accordingly, South Carolina Plaintiff and the South Carolina Damages Classes seek all relief available under that statute.

444.   <u>Utah:</u> By reason of the foregoing, defendants have violated Utah Code §§ 76-10-911, *et seq*. Utah Plaintiff on behalf of the Utah Damages Classes alleges as follows:

a.   Defendants' combinations or conspiracies had the following effects: (1) price competition for electrolytic and film capacitors was restrained, suppressed, and eliminated throughout Utah; (2) prices for electrolytic and film capacitors were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Utah Plaintiff and the Utah Damages Classes were deprived of free and open competition; and (4) Utah Plaintiff and the Utah Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film capacitors.

b.      During the Class Periods, defendants' illegal conduct had a substantial effect on Utah commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Utah Plaintiff and the Utah Damages Classes have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of violated Utah Code §§ 76-10-911, *et seq*. Accordingly, Utah Plaintiff and the Utah Damages Classes seek all relief available under violated Utah Code §§ 76-10-911, *et seq*.

445.   <u>Vermont:</u> By reason of the foregoing, defendants have violated Vermont's Consumer Fraud Act, 9 Vt. Stat. Ann. § 2451, *et seq*. Vermont Plaintiff on behalf of the Vermont Damages Classes alleges as follows:

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and noncompetitive levels, the prices at which electrolytic and film capacitors and electrolytic and film capacitors were sold, distributed, or obtained in Vermont.

b.      Defendants deliberately failed to disclose material facts to Vermont Plaintiff and the Vermont Damages Classes concerning Defendants' unlawful activities and artificially inflated prices for electrolytic and film capacitors and electrolytic and film capacitors. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average purchaser, defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Periods that Defendants' electrolytic and film capacitors and electrolytic and film capacitors prices were competitive and fair.

c.      Defendants' unlawful conduct had the following effects: (1) electrolytic and film capacitors and electrolytic and film capacitors price competition was restrained, suppressed, and eliminated throughout Vermont; (2) electrolytic and film capacitors and electrolytic and film capacitors prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Vermont Plaintiff and the Vermont Damages Classes were deprived of free and open

competition; and (4) Vermont Plaintiff and the Vermont Damages Classes paid supra-competitive, artificially inflated prices for electrolytic and film capacitors and electrolytic and film capacitors.

d. As a direct and proximate result of the Defendants' violations of law, Vermont Plaintiff and the Vermont Damages Classes suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

e. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of electrolytic and film capacitors and electrolytic and film capacitors, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing electrolytic and film capacitors and electrolytic and film capacitors at prices born by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vt. Stat. Ann. § 2451, *et seq.*, and, accordingly, Vermont Plaintiff and the Vermont Damages Classes seek all relief available under that statute.

## XIV. REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that:

1. The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to each and every member of the Classes;

2. The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed:

(a) An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(b) A *per se* violation of Section 1 of the Sherman Act;

1           (c)      An unlawful combination, trust, agreement, understanding, and/or concert of

2                     action in violation of various states' antitrust and unfair competition laws as

3                     set forth herein; and

4           (d)      Acts of unjust enrichment by defendants as set forth herein.

5         3.      Plaintiffs and members of the Classes recover damages, to the maximum extent

6   allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members

7   of the Damages Classes be entered against defendants in an amount to be trebled to the extent such

8   laws permit;

9         4.      Plaintiffs and members of the Classes recover damages, to the maximum extent

10  allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained

11  from them;

12        5.      Defendants, their affiliates, successors, transferees, assignees and other officers,

13  directors, partners, agents and employees thereof, and all other persons acting or claiming to act on

14  their behalf or in concert with them, be permanently enjoined and restrained from in any manner

15  continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from

16  entering into any other conspiracy or combination having a similar purpose or effect, and from

17  adopting or following any practice, plan, program, or device having a similar purpose or effect;

18        6.      Plaintiffs and members of the Classes be awarded restitution, including disgorgement

19  of profits defendants obtained as a result of their acts of unfair competition and acts of unjust

20  enrichment;

21        7.      Plaintiffs and members of the Classes recover their costs of suit, including reasonable

22  attorneys' fees, as provided by law; and

23        8.      Plaintiffs and members of the Classes have such other and further relief as the case

24  may require and the Court may deem just and proper.

25

26  Dated: June 16, 2015                Respectfully submitted,

27                                       */s/ Joseph W. Cotchett*

28                                       Joseph W. Cotchett (36324)
                                                  Steven N. Williams (175489)

Adam J. Zapala (245748)
Elizabeth Tran (280502)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: 650-697-6000
Facsimile: 650-697-0577
jcotchett@cpmlegal.com
swilliams@cpmlegal.com
azapala@cpmlegal.com
etran@cpmlegal.com

*Interim Lead Counsel for the Putative Indirect*
*Purchaser Class*

**DUNCAN FIRM, P.A.**
Phillip Duncan (Admitted *Pro Hac Vice)*
Richard Quintus (Admitted *Pro Hac Vice*)
Justin Zachary (Admitted *Pro Hac Vice*)
W. Rob Pointer (Admitted *Pro Hac Vice*)
900 South Shackleford, Suite 725
Little Rock, AR 72211
Telephone: (701) 228-7600
Facsimile: (701) 228-0415
phillip@duncanfirm.com
richard@duncanfirm.com
justin@duncanfirm.com
rob@duncanfirm.com

**GUSTAFSON GLUEK PLLC**
Daniel E. Gustafson (Admitted *Pro Hac Vice*
Daniel C. Hedlund (Admitted *Pro Hac Vice*)
Sara J. Payne (*Pro Hac Vice* to be submitted)
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
spayne@gustafsongluek.com

**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
Richard M. Heimann (63607)
Eric B. Fastiff (182260)
Brendan P. Glackin (199643)
Dean M. Harvey (250298)
Lin Y. Chan (255027)
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
rheimann@lchb.com
efastiff@lchb.com
bglackin@lchb.com
dharvey@lchb.com
lchan@lchb.com

**MEREDITH & NARINE**
Krishna B. Narine (*Pro Hac Vice* to be
submitted)
Joel C. Meredith (*Pro Hac Vice* to be submitted)
100 S. Broad Street, Suite 905
Philadelphia, PA 19110
Telephone: (215) 564-5182
knarine@m-npartners.com
jmeredith@m-npartners.com

**MINAMI TAMAKI, LLP**
Jack W. Lee (71626)
Derek G. Howard (118082)
Aron K. Liang (228936)
Sean Tamura-Sato (254092)
360 Post Street, 8th Floor
San Francisco, CA 94108
Telephone: (415) 788-9000
Facsimile: (415) 398-3887
jlee@minamitamaki.com
dhoward@minamitamaki.com
aliang@minamitamaki.com
seant@minamitamaki.om

**ROBINS, KAPLAN, MILLER & CIRESI
L.L.P.**
Hollis Salzman (*Pro Hac Vice* to be submitted)

Kellie Lerner (*Pro Hac Vice* to be submitted)
Bernard Persky (*Pro Hac Vice* to be submitted)
601 Lexington Avenue, Suite 3400
New York, NY 10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
hsalzman@robinskaplan.com
klerner@robinskaplan.com
bpersky@robinskaplan.com

**ROBINSON CALCAGNIE ROBINSON
SHAPIRO DAVIS, INC.**
Daniel S. Robinson (244245)
19 Corporate Plaza Drive
Newport Beach, CA 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

**SAVERI & SAVERI, INC.**
Guido Saveri (22349)
R. Alexander Saveri (173102)
Lisa Saveri (112043)
Melissa Shapiro (242724)
706 Sansome Street
San Francisco, CA 94111
Telephone: (888) 787-8681
Facsimile: (415) 217-6813
guido@saveri.com
rick@saveri.com
lisa@saveri.com
melissa@saveri.com

**SUSMAN & GODFREY LLP**
Marc M. Seltzer (54534)
Steven G. Sklaver (237612)
Vineet Bhatia (*Pro Hac Vice* to be submitted)
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com
vbhatia@susmangodfrey.com

**GRAY PLANT MOOTY**
Daniel R. Shulman (Admitted *Pro Hac Vice*)
500 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 632-3335
Facsimile: (612) 632-4335
daniel.shulman@gpmlaw.com

**HEATON & MOORE, P.C.**
William W. Heaton (Admitted *Pro Hac Vice*)
Robert Moore (Admitted *Pro Hac Vice*)

44 North Second Street, Suite 1200
Memphis, TN 38103
Telephone: (901) 526-5975
Facsimile: (901 527-3633
wheaton@heatonandmoore.com
rmoore@heatonandmoore.com

**LANGDON & EMISON**
J. Kent Emison (Admitted *Pro Hac Vice*)
Brett Emison (Admitted *Pro Hac Vice*)
1828 Swift, Suite 303
N. Kansas City, MO 64116
Telephone: (660) 259-6175
Facsimile: (660) 259-4571
kent@lelaw.com
brett@lelaw.com

**LAW OFFICES OF**
**ALEXANDER M. SCHACK**
Alexander M. Schack (99126)
Natasha Naraghi (284711)
16870 West Bernardo Drive, Suite 400
San Diego, CA 92127
Telephone: (858) 485-6535
Facsimile: (858) 485-0608
alexschack@amslawoffice.com
natashanaraghi@amslawoffice.com

**SHAFFER LOMBARDO SHURIN**
Richard Lombardo (Admitted *Pro Hac Vice*)
Kathy Woods (Admitted *Pro Hac Vice*)
911 Main Street, Suite 2000
Kansas City, MO 64105
Telephone: (816) 931-0500
Facsimile: (816) 931-5775
RLombardo@sls-law.com
KWoods@sls-law.com

**SPRETER LEGAL SERVICES, APC**
Geoffrey J. Spreter (257707)
601 3rd Street
Coronado, CA 92118
Telephone: (619) 865-7986
spreterlegalservices@gmail.com

1

**JURY DEMAND**

2

      Pursuant to Federal Rule of Civil Procedure 38(b), Indirect Purchaser Plaintiffs demand a jury

3

trial of all issues so triable.

4

Dated: June 16, 2015              Respectfully submitted,

5

                    */s/ Joseph W. Cotchett*
6
                    Joseph W. Cotchett (36324)
                    Steven N. Williams (175489)
7
                    Adam J. Zapala (245748)
                    Elizabeth Tran (280502)
8
                    **COTCHETT, PITRE & McCARTHY, LLP**
                    840 Malcolm Road, Suite 200
9
                    Burlingame, CA 94010
                    Telephone: (650) 697-6000
10
                    Facsimile: (650) 697-0577
                    jcotchett@cpmlegal.com
11
                    swilliams@cpmlegal.com
                    azapala@cpmlegal.com
12
                    etran@cpmlegal.com

13
                    *Interim Lead Counsel for the Putative Indirect*
                    *Purchaser Class*

14
                    **DUNCAN FIRM, P.A.**
                    Phillip Duncan (Admitted *Pro Hac Vice)*
15
                    Richard Quintus (Admitted *Pro Hac Vice*)
                    Justin Zachary (Admitted *Pro Hac Vice*)
16
                    W. Rob Pointer (Admitted *Pro Hac Vice*)
                    900 South Shackleford, Suite 725
17
                    Little Rock, AR 72211
                    Telephone: (701) 228-7600
18
                    Facsimile: (701) 228-0415
                    phillip@duncanfirm.com
19
                    richard@duncanfirm.com
                    justin@duncanfirm.com
20
                    rob@duncanfirm.com

21
                    **GUSTAFSON GLUEK PLLC**
                    Daniel E. Gustafson (Admitted *Pro Hac Vice*
22
                    Daniel C. Hedlund (Admitted *Pro Hac Vice*)
                    Sara J. Payne (*Pro Hac Vice* to be submitted)
23
                    120 South Sixth Street, Suite 2600
                    Minneapolis, MN 55402
24
                    Telephone: (612) 333-8844
                    Facsimile: (612) 339-6622
25
                    dgustafson@gustafsongluek.com
                    dhedlund@gustafsongluek.com
26
                    spayne@gustafsongluek.com

27
                    **LIEFF CABRASER HEIMANN &**
                    **BERNSTEIN, LLP**
28

**INDIRECT PURCHASER PLAINTIFFS' SECOND CONSOLIDATED COMPLAINT**       

Richard M. Heimann (63607)
Eric B. Fastiff (182260)
Brendan P. Glackin (199643)
Dean M. Harvey (250298)
Lin Y. Chan (255027)
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
rheimann@lchb.com
efastiff@lchb.com
bglackin@lchb.com
dharvey@lchb.com
lchan@lchb.com

**MEREDITH & NARINE**
Krishna B. Narine (*Pro Hac Vice* to be submitted)
Joel C. Meredith (*Pro Hac Vice* to be submitted)
100 S. Broad Street, Suite 905
Philadelphia, PA 19110
Telephone: (215) 564-5182
knarine@m-npartners.com
jmeredith@m-npartners.com

**MINAMI TAMAKI, LLP**
Jack W. Lee (71626)
Derek G. Howard (118082)
Aron K. Liang (228936)
Sean Tamura-Sato (254092)
360 Post Street, 8th Floor
San Francisco, CA 94108
Telephone: (415) 788-9000
Facsimile: (415) 398-3887
jlee@minamitamaki.com
dhoward@minamitamaki.com
aliang@minamitamaki.com
seant@minamitamaki.om

**ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**
Hollis Salzman (*Pro Hac Vice* to be submitted)
Kellie Lerner (*Pro Hac Vice* to be submitted)
Bernard Persky (*Pro Hac Vice* to be submitted)
601 Lexington Avenue, Suite 3400
New York, NY 10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
hsalzman@robinskaplan.com
klerner@robinskaplan.com
bpersky@robinskaplan.com

**ROBINSON CALCAGNIE ROBINSON SHAPIRO DAVIS, INC.**
Daniel S. Robinson (244245)
19 Corporate Plaza Drive

Newport Beach, CA 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

**SAVERI & SAVERI, INC.**
Guido Saveri (22349)
R. Alexander Saveri (173102)
Lisa Saveri (112043)
Melissa Shapiro (242724)
706 Sansome Street
San Francisco, CA 94111
Telephone: (888) 787-8681
Facsimile: (415) 217-6813
guido@saveri.com
rick@saveri.com
lisa@saveri.com
melissa@saveri.com

**SUSMAN & GODFREY LLP**
Marc M. Seltzer (54534)
Steven G. Sklaver (237612)
Vineet Bhatia (*Pro Hac Vice* to be submitted)
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com
vbhatia@susmangodfrey.com

**GRAY PLANT MOOTY**
Daniel R. Shulman (Admitted *Pro Hac Vice*)
500 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 632-3335
Facsimile: (612) 632-4335
daniel.shulman@gpmlaw.com

**HEATON & MOORE, P.C.**
William W. Heaton (Admitted *Pro Hac Vice*)
Robert Moore (Admitted *Pro Hac Vice*)
44 North Second Street, Suite 1200
Memphis, TN 38103
Telephone: (901) 526-5975
Facsimile: (901) 527-3633
wheaton@heatonandmoore.com
rmoore@heatonandmoore.com

**LANGDON & EMISON**
J. Kent Emison (Admitted *Pro Hac Vice*)
Brett Emison (Admitted *Pro Hac Vice*)
1828 Swift, Suite 303
N. Kansas City, MO 64116
Telephone: (660) 259-6175
Facsimile: (660) 259-4571

kent@lelaw.com
brett@lelaw.com

**LAW OFFICES OF
ALEXANDER M. SCHACK**
Alexander M. Schack (99126)
Natasha Naraghi (284711)
16870 West Bernardo Drive, Suite 400
San Diego, CA 92127
Telephone: (858) 485-6535
Facsimile: (858) 485-0608
alexschack@amslawoffice.com
natashanaraghi@amslawoffice.com

**SHAFFER LOMBARDO SHURIN**
Richard Lombardo (Admitted *Pro Hac Vice*)
Kathy Woods (Admitted *Pro Hac Vice*)
911 Main Street, Suite 2000
Kansas City, MO 64105
Telephone: (816) 931-0500
Facsimile: (816) 931-5775
RLombardo@sls-law.com
KWoods@sls-law.com

**SPRETER LEGAL SERVICES, APC**
Geoffrey J. Spreter (257707)
601 3rd Street
Coronado, CA 92118
Telephone: (619) 865-7986
spreterlegalservices@gmail.com

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP