Joseph R. Saveri (State Bar No. 130064)
Andrew M. Purdy (State Bar No. 261912)
Matthew S. Weiler (State Bar No. 236052)
James G. Dallal (State Bar No. 277826)
Ryan J. McEwan (State Bar No. 285595)
JOSEPH SAVERI LAW FIRM, INC.
505 Montgomery Street, Suite 625
San Francisco, California 94111
Telephone:     (415) 500-6800
Facsimile:     (415) 395-9940
Email:         jsaveri@saverilawfirm.com
               apurdy@saverilawfirm.com
               mweiler@saverilawfirm.com
               jdallal@saverilawfirm.com
               rmcewan@saverilawfirm.com

*Interim Direct Purchaser Class Counsel and
Attorneys for Plaintiffs Chip-Tech, Ltd., Dependable
Component Supply Corp., eIQ Energy Inc. and
Walker Component Group, Inc.*

[Additional Counsel Listed on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE CAPACITORS ANTITRUST LITIGATION** | Master File No. 3:14-cv-03264-JD |
| | **FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| **THIS DOCUMENT RELATES TO:**<br><br>**ALL DIRECT PURCHASER ACTIONS** | JURY TRIAL DEMANDED |

I.      NATURE OF THE ACTION ................................................................................ 1

II.     JURISDICTION AND VENUE ........................................................................... 5

III.    PARTIES ............................................................................................................. 6

        A.      Plaintiffs ................................................................................................. 6

        B.      Defendants .............................................................................................. 7

                1.      Panasonic/SANYO ....................................................................... 7

                2.      NEC TOKIN .................................................................................. 8

                3.      KEMET .......................................................................................... 8

                4.      Nippon Chemi-Con ....................................................................... 9

                5.      Hitachi ......................................................................................... 10

                6.      Fujitsu ......................................................................................... 11

                7.      Nichicon ...................................................................................... 11

                8.      AVX ............................................................................................. 12

                9.      Rubycon ...................................................................................... 13

                10.     ELNA ........................................................................................... 14

                11.     Matsuo ......................................................................................... 14

                12.     TOSHIN KOGYO ....................................................................... 14

                13.     Holy Stone ................................................................................... 14

                14.     Vishay Polytech .......................................................................... 16

                15.     ROHM .......................................................................................... 16

                16.     Okaya ........................................................................................... 17

                17.     Taitsu ........................................................................................... 17

                18.     Shinyei ......................................................................................... 18

                19.     Nitsuko ........................................................................................ 19

                20.     Nissei ........................................................................................... 19

                21.     Soshin .......................................................................................... 19

                22.     Shizuki ......................................................................................... 19

IV.     CO-CONSPIRATORS AND AGENTS ............................................................ 20

V.     CLASS ALLEGATIONS ................................................................................ 21

VI.    TRADE AND COMMERCE ......................................................................... 24

VII.   FACTUAL ALLEGATIONS ......................................................................... 25

       A.   What Capacitors Do and How They Work ...................................... 25

       B.   Types of Capacitors and Their Uses ............................................... 26

            1.   Electrolytic Capacitors ........................................................ 27

                 a.   Aluminum Capacitors .............................................. 27

                 b.   Tantalum Capacitors ................................................ 28

            2.   Electrostatic Capacitors ...................................................... 29

                 a.   Film Capacitors ........................................................ 29

                 b.   Ceramic Capacitors .................................................. 30

       C.   The Market Conditions in Which Defendants' Conspiracy Originated and
            Operated .......................................................................................... 32

       D.   Defendants' Collusive Anticompetitive Practices .......................... 33

       E.   Defendants' Cartel ........................................................................... 36

       F.   Meetings Among the Defendant Cartel Members During the Class Period .................... 38

            1.   The Cartel's Regular Meetings ............................................ 38

            2.   Specific Cartel Meetings ...................................................... 42

            3.   Other Meetings and Conspiratorial Communications Among Defendants .......... 51

                 a.   SANYO's Meetings and Communications With Other
                      Defendants ............................................................... 51

                 b.   AVX's Meetings and Communications With Other Defendants .............. 52

                 c.   KEMET's Meetings and Dealings With Defendant Cartel
                      Members ................................................................... 54

                 d.   FMD's Meetings and Dealings With Cartel Members .................... 59

       G.   Defendants' U.S.-Based Subsidiaries Marketed, Sold and Delivered Their
            Defendant Corporate Parents' Price-Fixed Capacitors in Furtherance of the
            Capacitors Cartel's Aims and Purposes ........................................... 59

            1.   UCC Advanced the Cartel's Aims and Purposes in the United States for
                 Nippon Chemi-Con ............................................................... 60

            2.   Nichicon America advanced the Cartel's Aims and Purposes in the
                 United States for Nichicon. ................................................. 63

3. ROHM USA advanced the Cartel's Aims and Purposes in the United States for ROHM ..................................................................................65

4. Okaya America advanced the Cartel's Aims and Purposes for in the United States for Okaya .................................................................66

5. Shinyei America advanced the Cartel's Aims and Purposes in the United States for Shinyei ..............................................................69

6. Soshin America advanced the Cartel's Aims and Purposes in the United States for Soshin Co. .........................................................70

H. Anticompetitive Effects of Defendants' Capacitors Cartel ..............................72

VIII. INDUSTRY CHARACTERISTICS INDICATING AND FACILITATING DEFENDANTS' CONSPIRACY .................................................................73

A. Market Concentration ........................................................................74

B. High Barriers to Entry .......................................................................76

C. Mutual Interchangeability of Defendants' Capacitors............................78

D. Inelastic Demand ..............................................................................79

E. Commoditization ...............................................................................80

F. Weak Demand ...................................................................................80

G. Excess Manufacturing Capacity ..........................................................81

H. Large Number of Purchasers With Limited Purchasing Power .................82

I. Ease of Information Sharing Among Defendants ....................................82

IX. CURRENT U.S. AND INTERNATIONAL ANTITRUST INVESTIGATIONS INTO ANTICOMPETITIVE PRACTICES IN THE CAPACITORS INDUSTRY ..........................84

X. FRAUDULENT CONCEALMENT...................................................................87

XI. EFFECTS OF DEFENDANTS' CONSPIRACY ON U.S. SALES OF ALUMINUM, TANTALUM AND FILM CAPACITORS AND INJURY TO THE DIRECT PURCHASER CLASS ...................................................................................90

XII. CLAIM FOR RELIEF ..................................................................................91

XIII. DEMAND FOR JUDGMENT .......................................................................93

Plaintiffs Chip-Tech, Ltd. ("Chip-Tech"), Dependable Component Supply Corp. ("Dependable"), eIQ Energy, Inc. ("eIQ Energy") and Walker Component Group, Inc. ("Walker," and together with Chip-Tech, Dependable, and eIQ, "Plaintiffs") each bring this action on behalf of itself and on behalf of a class of all persons and entities similarly situated (the "Class" or the "Direct Purchaser Class"), for damages and injunctive relief under the antitrust laws of the United States against defendants Panasonic Corporation; Panasonic Corporation of North America; SANYO Electric Co., Ltd.; SANYO North America Corporation; NEC TOKIN Corporation; NEC TOKIN America, Inc.; KEMET Corporation; KEMET Electronics Corporation; Nippon Chemi-Con Corporation; United Chemi-Con, Inc.; Hitachi Chemical Co., Ltd.; Hitachi AIC Inc.; Hitachi Chemical Co. America, Ltd.; Fujitsu Ltd.; Nichicon Corporation; Nichicon (America) Corporation; AVX Corporation; Rubycon Corporation; Rubycon America Inc.; ELNA Co., Ltd.; ELNA America Inc.; Matsuo Electric Co., Ltd.; TOSHIN KOGYO Co., Ltd.; Holy Stone Enterprise Co., Ltd.; Milestone Global Technology, Inc. (D/B/A HolyStone International); Vishay Polytech Co., Ltd.; ROHM Co., Ltd.; ROHM Semiconductor U.S.A., LLC; Okaya Electric Industries Co., Ltd.; Okaya Electric America Inc.; Taitsu Corporation; Taitsu America, Inc.; Shinyei Kaisha; Shinyei Technology Co., Ltd.; Shinyei Capacitor Co., Ltd.; Shinyei Corporation of America, Inc.; Nitsuko Electronics Corporation; Nissei Electric Co., Ltd.; Soshin Electric Co., Ltd.; Soshin Electronics of America, Inc.; Shizuki Electric Co., Ltd.; and American Shizuki Corporation (collectively, the "Defendants"). Plaintiffs allege facts regarding themselves based on their personal knowledge, and on information and belief as to all other factual allegations, as follows:

## I.   NATURE OF THE ACTION

1.   This civil antitrust class action seeks damages and injunctive relief for the collusive and concerted restraint of trade in aluminum, tantalum and film capacitors (together, "Capacitors") orchestrated by the Defendants—all of which are leading manufacturers and direct competitors in the global Capacitors industry—at least as early as January 1, 2002 to present (the "Class Period").

2.   Capacitors are one of the fundamental components found in electrical circuits. All electronic devices in common use today—from the cheapest household appliances to personal computers to multi-million dollar computerized machinery—employ various electrical circuits working

in concert to perform their functions. By electrical current (*i.e.*, the aggregate effect of moving electrical charge) flowing through a circuit, the path for which is usually defined by a printed circuit board ("PCB"), electronic signals can be amplified, simple and complex computations can be performed, data can be moved from one place to another, and other tasks can be executed.

3.      Without the flow of electrical current, circuit boards—as well as the electronic devices that contain them—will not operate. Accordingly, circuits must not only have a source for current, but also means for storing and regulating the flow of that current. While either a battery or a connection to an external power supply typically provides current to a circuit, capacitors are integrated into electrical circuits primarily to store charge and govern its flow so that the tasks and applications of electrical devices have sufficiently available and immediately dischargeable electrical charge to perform when commanded to do so.

4.      As society's dependence on and consumption of technology has grown, so too has the demand of electronic device manufacturers for the components. Given that capacitors are fundamental to the operation of practically all electronic devices, the market for capacitors is enormous. Capacitors are commodity products sold in large volumes. Indeed, global revenues for all manufacturers in the capacitor industry in 2013 totaled approximately $16 billion based on the sales of trillions of capacitors. Industry analysts estimate that global revenues from the sale of capacitors will reach over $18 billion for the fiscal year 2014 and over $20 billion by 2016.

5.      Capacitors, however, tend to be relatively inexpensive on a per unit basis. The vast majority of Capacitors cost well under a dollar per unit, and typically cost as low as a fraction of a cent. Accordingly, the cost of Capacitors is usually only a relatively small (albeit potentially significant) part of the overall cost of the products containing them.

6.      The multi-billion dollar market for capacitors is susceptible to anticompetitive manipulation. Given, as alleged in detail below, the significant high barriers to entering the already mature and consolidation-prone capacitors manufacturing industry and achieving the large volume of sales required to reach sufficient economies of scale and profitability on a per unit basis, global sales of capacitors are dominated by a limited number of large manufacturers. These would-be competitors— specifically the Defendants named herein—sell mutually interchangeable commoditized products and

adjust the prices and market availability of their products in concert and based on an overarching agreement to fix, raise, maintain, and/or stabilize prices as described in detail below. These facts indicate that competition between the global sellers of aluminum, tantalum and film capacitors has been suppressed.

7.     Capacitors of like capacitance, dielectric and form factor are generally mutually interchangeable. Price is therefore the chief differentiation among these products for purchasers. Accordingly, any agreement among Capacitors manufacturers to fix, raise, maintain or stabilize prices, or to reduce the supply of Capacitors, is highly likely to be effective in artificially inflating prices above those that would prevail in a competitive market to the detriment of purchasers both worldwide and in the United States.

8.     The threat of anticompetitive manipulation for the sales of aluminum, tantalum and film capacitors is not a hypothetical concern. Defendant Panasonic Corporation, on behalf of itself and its wholly owned subsidiaries (Panasonic Corporation of North America, SANYO Electric Co., Ltd., and SANYO North America Corporation), has admitted to the United States Department of Justice ("DOJ") that Defendants engaged in price fixing at least as early as January 1, 2003, and Defendants' cartel activities were undertaken for the purpose of artificially maintaining and inflating prices of aluminum, tantalum and film capacitors sold to United States purchasers and purchasers worldwide. Records of cartel meetings, however, indicate that Defendants' conspiracy started as early as 2002.

9.     Defendants took these unlawful steps because: (1) prior to the outset of the conspiracy, competition was reducing margins on Capacitors; and (2) demand for certain types of Capacitors began to wane starting in the early 2000s.

10.     To bolster the profitability of their respective Capacitors sales, and to slow, negate and reverse the impact on price caused by declining demand, Defendants agreed prior to the beginning of the Class Period to curtail price competition among themselves for their respective mutually interchangeable aluminum, tantalum and film capacitors.

11.     Given the weak demand for aluminum, tantalum and film capacitors the Defendants manufactured and the decline in sales and profits they each were facing across their respective

Capacitors product lines, Defendants further agreed to collusively set prices for all the Capacitors they produce.

12.     Accordingly, at least as early as January 1, 2002, Defendants conspired by directly and indirectly communicating with each other to implement and effectuate an overarching scheme to control and set the prices of their aluminum, tantalum and film capacitors sold to United States purchasers and purchasers worldwide. Defendants also agreed, as part of the cartel, to combine and perform the various acts necessary to achieve the anticompetitive purposes of this scheme, as well as to conceal their activity from public view and regulatory oversight.

13.     The Defendants' conspiracy was furthered and facilitated by a course of anticompetitive conduct and overt acts, such as making numerous agreements (both written and oral) and reaching understandings among themselves—largely developed during regular monthly, annual and/or bi-annual meetings among themselves throughout the Class Period—that they would in concert fix, raise, maintain and stabilize prices for aluminum, tantalum and film capacitors.

14.     Defendants also agreed to restrain their respective Capacitors manufacturing output through extending product lead times and other subterfuge.

15.     As part of the conspiracy alleged herein, and to assist in achieving its ends, Defendants exchanged amongst themselves nonpublic and commercially sensitive information concerning, among other things, purchaser-specific Capacitors pricing requests, current industry-specific Capacitors pricing requests, current and future Capacitors pricing intentions, timing of pricing changes, production capacity, costs, availability and cost of raw materials, product distribution, and other data that Defendants used to assist in the implementation and enforcement of their conspiracy.

16.     Defendants concealed their anticompetitive and unlawful conduct from the public and their customers, including Plaintiffs and the Direct Purchaser Class, from the inception of the conspiracy until the spring of 2014, when law enforcement and competition authorities around the globe first publicly acknowledged their respective investigations into anticompetitive conduct in the capacitors industry.

17.     Defendants' cartel has been successful in achieving the anticompetitive and unlawful ends for which it was formed. Through their concerted actions, Defendants—the dominant players in

the global and U.S. markets for aluminum, tantalum and film capacitors—fixed, raised, maintained and/or stabilized prices of Capacitors during the entirety of the time that the Defendants' conspiracy has existed. Defendants were effective in moderating, negating and reversing the normal competitive pressures on prices for Capacitors caused by price competition, reduction of demand, technological change and oversupply.

18.     Defendants' anticompetitive and unlawful conduct proximately caused the increase or slowed the decrease of prices for Capacitors sold to United States and worldwide purchasers during the Class Period.

19.     As a result, Plaintiffs and the Direct Purchaser Class paid artificially inflated prices for Capacitors. By paying higher prices for Capacitors than those that would have prevailed in a competitive market, Plaintiffs and the Direct Purchaser Class have been injured in their business and property and continue to suffer such injuries as a direct and proximate result of Defendants' actions.

## II.     JURISDICTION AND VENUE

20.     Plaintiffs bring this action on behalf of themselves, as well as on behalf of the Direct Purchaser Class, to recover damages, including treble damages, costs of suit, and reasonable attorney's fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1), as well as any and all equitable relief afforded them under the federal laws pleaded herein.

21.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

22.     Jurisdiction and venue are proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. § 1391(b), (c) and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants reside in this District, is licensed to do business in this District, and/or transacts business in this District.

23.     In addition, the DOJ's Antitrust Division is conducting an investigation into the capacitors industry out of the United States Attorney's Office for the District of Northern California. A federal criminal grand jury has been empaneled in the Northern District of California to hear the DOJ's evidence derived from its investigation and ultimately to decide on whether to indict any Capacitors

manufacturers (such as one or more of the Defendants in this antitrust class action) criminally. The DOJ's San Francisco-based Capacitors industry investigation and the empanelment of a grand jury in this District both confirm the propriety of the Northern District of California as the venue for this antitrust class action.

24.     Pursuant to Civil Local Rule 3.2 (c) and (e), assignment of this case to the San Francisco Division of the United States District Court for the Northern District of California is proper because the interstate trade and commerce involved and affected by Defendants' violations of the antitrust laws action was substantially conducted with, directed to or impacted Plaintiffs and members of the Direct Purchaser Class in counties located within the Division.

## III.     PARTIES

### A.     Plaintiffs

25.     Plaintiff Chip-Tech, Ltd. is a New York corporation with its principal place of business located at 6 Dubon Court, Farmingdale, New York 11735. Chip-Tech directly purchased Capacitors from one or more Defendants during the Class Period, and has suffered injury as a result of Defendants' anticompetitive and unlawful conduct.

26.     Plaintiff Dependable Component Supply Corporation is a Florida corporation with its principal place of business located at 1003 East Newport Center Drive, Deerfield Beach, Florida 33442. Dependable directly purchased Capacitors from one or more Defendants during the Class Period, and has suffered injury as a result of Defendants' anticompetitive and unlawful conduct.

27.     Plaintiff eIQ Energy, Inc. is a California corporation with its principal place of business at 294 Brokaw Road, Santa Clara, California 95050. eIQ Energy directly purchased certain types of Capacitors from one or more Defendants during the Class Period, and has suffered injury as a result of Defendants' anticompetitive and unlawful conduct.

28.     Plaintiff Walker Component Group, Inc. is a Colorado corporation with its principal place of business located at 420 East 58th Avenue, Denver, Colorado 80216. Walker directly purchased Capacitors from one or more Defendants during the Class Period, and has suffered injury as a result of Defendants' anticompetitive and unlawful conduct.

**B.     Defendants**

**1.     Panasonic/SANYO**

29.     Defendant Panasonic Corporation is a Japanese corporation with its principal place of business located at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. Until October 1, 2008, Panasonic Corporation operated under the name of Matsushita Electric Industrial Co., Ltd. ("Matsushita"). During the Class Period, Matsushita and Panasonic (together, "Panasonic Corp.") manufactured, sold and distributed aluminum, tantalum and film capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

30.     Defendant Panasonic Corporation of North America ("PCNA"), a wholly owned subsidiary of Panasonic Corporation, is a Delaware corporation with its principal place of business located at Two Riverfront Plaza, Newark, New Jersey 07102. During the Class Period, PCNA—either directly or through its business units, subsidiaries, agents or affiliates (including, without limitation, Panasonic Industrial Sales Company)—sold and distributed to United States purchasers aluminum, tantalum, and film capacitors manufactured by business units, subsidiaries, agents or affiliates of its corporate parent, Panasonic Corporation.

31.     Defendant SANYO Electric Co., Ltd. ("SANYO Co."), a Japanese corporation, is, as of December 2009, a wholly owned subsidiary of Panasonic Corporation, with its principal place of business located at 15-5, Keihan-Hondori, 2-Chome, Moriguchi City, Osaka 570-8677, Japan. During the Class Period, SANYO Co. manufactured, sold and distributed aluminum and tantalum capacitors, either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers. Prior to its acquisition by Panasonic in December 2009, SANYO had no corporate affiliation with Panasonic Corporation or its business units, subsidiaries, agents or affiliates.

32.     Defendant SANYO North America Corporation ("SANYO NA"), a Delaware corporation, is a wholly owned subsidiary of SANYO Co., with its principal place of business located at 2055 Sanyo Avenue, San Diego, California 92154. During the Class Period, SANYO NA—either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers aluminum and tantalum capacitors manufactured by business units, subsidiaries, agents or affiliates of its corporate parent, SANYO Co.

33.     Defendants Panasonic Corp. and PCNA are together referred to herein as "Panasonic." Defendants SANYO Co. and SANYO NA are together referred to herein as "SANYO," and, together with Panasonic, the entities are referred to herein as "Panasonic/SANYO."

## 2.     NEC TOKIN

34.     Defendant NEC TOKIN Corporation ("NEC TOKIN Corp."), a Japanese company currently partially owned by both Defendant KEMET Electronics Corporation and non-party NEC Corporation, has its principal place of business located at 7-1, Kohriyama 6-chome, Taihaku-ku, Sendai-shi, Miyagi 982-8510, Japan. During the Class Period, NEC TOKIN Corp. manufactured, sold, and distributed aluminum and tantalum capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

35.     Defendant NEC TOKIN America, Inc. ("NEC TOKIN America"), a California corporation, is a wholly owned subsidiary of NEC TOKIN Corp. with its principal place of business located at 2460 North First Street, Suite 220, San Jose, California 95131. During the Class Period, NEC TOKIN America—either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers aluminum and tantalum capacitors manufactured by business units, subsidiaries, agents or affiliates of its corporate parent, NEC TOKIN Corp..

36.     Defendants NEC TOKIN Corp. and NEC TOKIN America are together referred to herein as "NEC TOKIN."

## 3.     KEMET

37.     Defendant KEMET Corporation ("KEMET Corp.") is a Delaware corporation with its principal place of business located at 2835 Kemet Way, Simpsonville, South Carolina 29681. During the Class Period, KEMET Corp. manufactured, sold and distributed aluminum, tantalum or film capacitors either directly or through its business units, subsidiaries, agents or affiliates—including, without limitation, KEMET Electronics Corporation—to purchasers throughout the United States.

38.     Defendant KEMET Electronics Corporation ("KEC"), a Delaware corporation, is a wholly owned subsidiary of KEMET Corp. with its principal place of business located at 2835 Kemet Way, Simpsonville, South Carolina 29681. During the Class Period, KEC—either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to purchasers throughout the

United States aluminum, tantalum or film capacitors manufactured by certain of its own business units, subsidiaries, agents or affiliates or those of its corporate parent, KEMET Corp.

39.     KEMET Corp. is the holding company of KEC and, accordingly, has no business of its own. KEC is the alter ego of KEMET Corp. Although separate corporate entities, KEMET Corp. and KEC are functionally a single economic and operational entity.

40.     KEMET Corp. and KEC are managed by a single set of officers. The following individuals, for example, hold the same position with both KEMET Corp. and KEC: Mr. Per-Olof Loof (CEO and Director), Mr. William M. Lowe (Executive Vice President and Chief Financial Officer), Mr. R. James Assaf (Senior Vice President, General Counsel and Secretary), Ms. Susan B. Barkal (Senior Vice President and Chief of Staff), Mr. John Powers (Senior Vice President, Global Supply Chain & Chief Procurement), and Ms. Monica Highfill (Vice President Sales – Americas). And, as detailed below, KEMET Corp. did not recognize the corporate distinction between KEMET Corp. and KEC and frequently used those corporate names interchangeably to refer to the signatory of particular agreements, often simply referring to the company as "KEMET." The "History of KEMET" webpage, for example, (http://www.kemet.com/History; (Last accessed June 16, 2015)) refers to "KEMET" without distinguishing between KEMET Corp. or KEC.

41.     KEMET Corp. and KEC are therefore referred to herein together as "KEMET."

**4.     Nippon Chemi-Con**

42.     Defendant Nippon Chemi-Con Corporation ("NCC") is a Japanese corporation with its principal place of business located at 5-6-4, Osaki, Shinagawa-ku, Tokyo 141-8605, Japan. During the Class Period, NCC manufactured, sold, and distributed aluminum and film capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

43.     Defendant United Chemi-Con, Inc. ("UCC"), an Illinois Corporation, is a wholly owned subsidiary of NCC with its principal place of business located at 9801 West Higgins Road, Rosemont, Illinois 60018. During the Class Period, UCC—either directly or through certain of its business units, subsidiaries, agents or affiliates, or those of its corporate parent, NCC—manufactured, sold and distributed aluminum and film capacitors to United States purchasers.

44.     Defendants NCC and UCC are together referred to herein as "Nippon Chemi-Con."

### 5.    Hitachi

45.    Defendant Hitachi Chemical Co., Ltd. ("Hitachi Chemical"), is a Japanese corporation with its principal place of business located at Grantokyo South Tower, 1-9-2, Marunouchi, Chiyoda-ku, Tokyo 100-6606, Japan. During the Class Period, Hitachi Chemical manufactured, sold, and distributed aluminum, tantalum and film capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

46.    Defendant Hitachi AIC Inc. ("Hitachi AIC"), a Japanese corporation, is a wholly owned subsidiary of Hitachi Chemical with its principal place of business located at 1065, Kugeta, Moka-Shi Tochigi 321-4521, Japan. During the Class Period, Hitachi AIC—either directly or through its divisions, business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers aluminum, tantalum, and film capacitors manufactured by its own business units, subsidiaries, agents or affiliates, or those of its corporate parent, Hitachi Chemical.

47.    In or about December 2009, Hitachi AIC sold its tantalum and niobium capacitors division to Defendant Holy Stone Enterprise Co., Ltd. The acquisition was completed by or about April 1, 2010, and the tantalum and niobium capacitors division was renamed Holy Stone Polytech Co., Ltd., a Japanese corporation and wholly owned subsidiary of Defendant Holy Stone Enterprise Co., Ltd. To the extent that any of the assets or liabilities of Hitachi AIC's tantalum and niobium capacitors division remain, in whole or in part, with Hitachi AIC subsequent to the tantalum and niobium division's sale to Holy Stone Enterprise Co., Ltd., Plaintiffs also intend to hold Hitachi AIC liable for any of this business division's violations of Sherman Act § 1 that occurred during the Class Period.

48.    Defendant Hitachi Chemical Co. America, Ltd. ("Hitachi Chemical America"), a New York corporation, is a wholly owned subsidiary of Hitachi Chemical with its principal place of business located at 10080 North Wolfe Road, Suite SW3-200, Cupertino, California 95014. During the Class Period, Hitachi Chemical America—either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers aluminum and tantalum capacitors manufactured by business units, subsidiaries, agents or affiliates of its corporate parent, Hitachi Chemical (including, without limitation, Hitachi AIC).

49.     Defendants Hitachi Chemical, Hitachi AIC and Hitachi Chemical America are together referred to herein as "Hitachi."

**6.     Fujitsu**

50.     Defendant Fujitsu Ltd. ("Fujitsu") is a Japanese corporation with its principal place of business located at Shiodome City Center, 1-5-2 Higashi-Shimbashi, Minato-ku, Tokyo 105-7123, Japan. During the Class Period and until in or about April 2009, Fujitsu, either directly or through its business units, subsidiaries, agents or affiliates (including, without limitation, the now-dissolved Fujitsu Media Devices, Ltd. ("FMD") for which Fujitsu or certain of its business units, subsidiaries or affiliates is now a successor in interest), manufactured, sold and distributed conductive polymer aluminum solid electrolytic capacitors to United States purchasers. FMD was a wholly owned subsidiary of Fujitsu Ltd. formed in or about October 1998 by Fujitsu and Fujitsu Towa Electron Limited (a 38.5% affiliate of Fujitsu) ("Towa") following the consolidation of Fujitsu's media device division with Towa. Even after the consolidation of FMD and Towa, FMD was sometimes referred to as Towa by capacitor industry participants.

51.     After April 2009, FMD's wholly owned business unit responsible for manufacturing, selling and distributing these types of capacitors, Fujitsu Media Devices (Suzhou) Ltd. ("FMD Suzhou"), was acquired in whole by Defendant Nichicon Corporation. To the extent that the assets and liabilities of FMD or FMD Suzhou remain, in whole or in part, with Fujitsu (as FMD's successor in interest), Plaintiffs intend to hold Fujitsu liable for any of FMD's violations of Sherman Act § 1 that occurred during the Class Period.

**7.     Nichicon**

52.     Defendant Nichicon Corporation ("Nichicon Corp.") is a Japanese corporation with its principal place of business located at Karasumadori Oike-agaru, Nakagyo-ku, Kyoto 604-0845, Japan. During the Class Period, Nichicon Corp. manufactured, sold and distributed aluminum and film capacitors, either directly or through its business units, subsidiaries, agents or affiliates, to United States purchasers.

53.     In or about April 2009, Nichicon Corp. acquired FMD's conductive polymer aluminum solid electrolytic capacitor business division (*i.e.*, FMD Suzhou), which was thereafter renamed FPCAP

Electronics (Suzhou) Co., Ltd. ("FPCAP"). From in or about April 2009 to date, FPCAP manufactured, sold and distributed aluminum capacitors to United States purchasers, either directly or through its business units, subsidiaries, agents or affiliates, or those of its corporate parent, Nichicon Corp. To the extent that Nichicon Corp. assumed, in whole or in part, the assets and liabilities of FMD or FMD Suzhou, Plaintiffs also intend to hold Nichicon Corp. liable for any violations of Sherman Act § 1 by FMD or FMD Suzhou that occurred during the Class Period.

54.     During the Class Period and until the company's sale of its tantalum capacitors division to Defendant AVX Corporation in or about February 2013, Nichicon Corp. manufactured, sold, and distributed tantalum capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers. To the extent that the assets and liabilities of Nichicon's tantalum capacitors division remain, in whole or in part, with Nichicon Corp. subsequent to the tantalum capacitors division's sale to AVX, Plaintiffs also intend to hold Nichicon Corp. liable for any of the tantalum capacitors division's violations of Sherman Act § 1 that occurred during the Class Period.

55.     Defendant Nichicon (America) Corporation ("Nichicon America"), an Illinois corporation, is a wholly owned subsidiary of Nichicon Corp. with its principal place of business located at 927 East State Parkway, Schaumburg, Illinois 60173. During the Class Period and until Nichicon Corp.'s sale of its tantalum capacitors division to Defendant AVX Corporation in or about February 2013, Nichicon America— either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers tantalum capacitors manufactured by business units, subsidiaries, agents or affiliates of its corporate parent, Nichicon Corp. During the entire Class Period, Nichicon America—either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers aluminum and film capacitors manufactured by business units, subsidiaries, agents or affiliates of its corporate parent, Nichicon Corp.

56.     Defendants Nichicon Corp. and Nichicon America are together referred to herein as "Nichicon."

**8.     AVX**

57.     Defendant AVX Corporation ("AVX") is a Delaware corporation with its principal place of business located at One AVX Boulevard, Fountain Inn, South Carolina 29644. It is a subsidiary of

1    non-party Kyocera Corporation, a Japanese corporation that owns approximately 72% of AVX's

2    outstanding common stock. During the Class Period, AVX manufactured, sold, and distributed tantalum

3    and film capacitors either directly or through its business units, subsidiaries, agents or affiliates to

4    United States purchasers.

5            58.     In or about February 2013, AVX acquired Nichicon's tantalum capacitor production

6    facilities in Japan and China, thereby expanding AVX's global tantalum capacitor manufacturing

7    operations. Accordingly, after February 2013, AVX—either directly or through its business units,

8    subsidiaries, agents or affiliates—manufactured, sold and distributed tantalum capacitors produced by

9    Nichicon's former tantalum electrolytic capacitors division to United States purchasers. These sales

10   were in addition to the tantalum capacitors AVX already had been manufacturing, selling and

11   distributing to United States Purchasers during the Class Period. To the extent that AVX assumed, in

12   whole or in part, the assets and liabilities of Nichicon's former tantalum capacitors division, Plaintiffs

13   also intend to hold AVX liable for any violations of Sherman Act § 1 by Nichicon's former tantalum

14   capacitors division that occurred during the Class Period.

15   **9.       Rubycon**

16           59.     Defendant Rubycon Corporation ("Rubycon Corp.") is a Japanese corporation with its

17   principal place of business located at 1938-1, Nishi-Minowa, Ina-City, Nagano 399-4593, Japan. During

18   the Class Period, Rubycon manufactured, sold, and distributed aluminum and film capacitors either

19   directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

20           60.     Defendant Rubycon America Inc. ("Rubycon America"), an Illinois corporation, is a

21   wholly owned subsidiary of Rubycon with its principal place of business located at 4293 Lee Avenue,

22   Gurnee, Illinois 60031. During the Class Period, Rubycon America—either directly or through its

23   business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers

24   aluminum and film capacitors manufactured by business units, subsidiaries, agents or affiliates of its

25   corporate parent, Rubycon.

26           61.     Defendants Rubycon Corp. and Rubycon America are together referred to herein as

27   "Rubycon."

28

**10. ELNA**

62.     Defendant ELNA Co., Ltd. ("ELNA Co."), is a Japanese corporation with its principal place of business located at 3-8-11 Shin-Yokohama, Kohoku-ku, Yokohama, Kanagawa Prefecture 222-0033, Japan. During the Class Period, ELNA Co. manufactured, sold, and distributed aluminum and film capacitors either directly or through its business units, subsidiaries, agents or affiliates, to United States purchasers.

63.     Defendant ELNA America Inc. ("ELNA America") a California corporation, is a wholly owned subsidiary of ELNA Co. with its principal place of business located at 879 West 190th Street, Suite 100, Gardena, California 90248. During the Class Period, ELNA America—either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers aluminum and film capacitors manufactured by business units, subsidiaries, agents or affiliates of its corporate parent, ELNA Co.

64.     Defendants ELNA Co. and ELNA America are together referred to herein as "ELNA."

**11. Matsuo**

65.     Defendant Matsuo Electric Co., Ltd. ("Matsuo") is a Japanese corporation with its principal place of business located at 3-5- Sennari-cho, Toyonaka-shi, Osaka 561-8558, Japan. During the Class Period, Matsuo manufactured, sold and distributed aluminum, tantalum and film capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

**12. TOSHIN KOGYO**

66.     Defendant TOSHIN KOGYO Co., Ltd. ("TOSHIN KOGYO") is a Japanese corporation with its principal place of business at Tsukasa Bldg. 2-15-4, Uchikanda Chiyoda-ku, Tokyo, Japan. During the Class Period, TOSHIN KOGYO manufactured, sold, and distributed aluminum, tantalum and film capacitors either directly or through its business units, subsidiaries, agents or affiliates, to United States purchasers.

**13. Holy Stone**

67.     Defendant Holy Stone Enterprise Co., Ltd. ("Holy Stone Enterprise") is a Taiwanese corporation with its principal place of business at 1 Floor, No. 62, Sec. 2, Huang Shan Road, Nei Hu District, Taipei, Taiwan. From in or about December 2009 until on or about June 11, 2014, Holy Stone

Enterprise manufactured, sold and distributed tantalum capacitors, either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

68.     In or about December 2009, Holy Stone Enterprise publicly announced its acquisition of Hitachi AIC's tantalum and niobium capacitors division. The acquisition was completed by or about April 1, 2010, and the tantalum and niobium capacitors division was renamed Holy Stone Polytech Co., Ltd. ("HPC"), a Japanese corporation and wholly owned subsidiary of Holy Stone Enterprise with its principal place of business located at Ohdaira, Miharu, Fukushima 963-7704, Japan. From in or about December 2009 until on or about June 11, 2014, HPC—either directly or through its business units, subsidiaries, agents or affiliates, or those of its corporate parent, Holy Stone Enterprise—manufactured, sold and distributed tantalum capacitors to United States purchasers. To the extent that Holy Stone Enterprise assumed, in whole or in part, the assets and liabilities of Hitachi AIC's tantalum and niobium capacitors division, Plaintiffs also intend to hold Holy Stone Enterprise liable for any violations of Sherman Act § 1 by Hitachi AIC's tantalum and niobium capacitors division that occurred during the Class Period.

69.     On or about June 11, 2014, Vishay Intertechnology, Inc. announced its acquisition of HPC from Holy Stone Enterprise. To the extent that the assets and liabilities of HPC remain in whole or in part with Holy Stone Enterprise subsequent to its sale to Vishay, Defendants intend to hold Holy Stone Enterprise liable for any of HPC's violations of Sherman Act § 1 that occurred during the Class Period.

70.     Defendant Milestone Global Technology, Inc. ("Milestone")—which does business as HolyStone International ("HolyStone International"), an entity Holystone Enterprise publicly claims to be a "subsidiary company" of Holy Stone Enterprise and its "direct sales office for North America"—is a California corporation with its principal place of business located at 27475 Ynez Road #288, Temecula, California 92591.

71.     From in or about December 2009 until on or about June 11, 2014, Milestone, doing business as HolyStone International— either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers tantalum capacitors manufactured by

business units, subsidiaries, agents or affiliates of its corporate parent, Holy Stone Enterprise (including, without limitation, HPC).

72.     Holy Stone Enterprise and Milestone are together referred to herein as "Holy Stone."

**14.     Vishay Polytech**

73.     On or about June 11, 2014, Vishay Intertechnology, Inc. ("Vishay") announced its acquisition of HPC from Holy Stone through a Stock Purchase Agreement. HPC, now renamed as Defendant Vishay Polytech Co., Ltd. ("VPC"), is a Japanese corporation and a wholly owned subsidiary of Vishay Israel Limited ("Vishay Israel," a wholly-owned subsidiary of Vishay) with its principal place of business located at Ohdaira, Miharu, Fukushima 963 7704, Japan. From on or about June 11, 2014 to date, VPC— either directly or through the business units, subsidiaries, agents or affiliates of its corporate parent, manufactured, sold and distributed tantalum capacitors to United States purchasers.

74.     Pursuant to the terms of the June 11, 2014 Stock Purchase Agreement among Vishay, Vishay Israel, Holy Stone Enterprise, Holy Stone Holding Co., Ltd., Holy Stone Enterprise agreed to hold the Vishay entities harmless from and against any and all losses that may be arising out of, based upon or resulting from any claims relating to "the investigations, which began in March 2014 in the U.S., the Republic of China, the People's Republic of China and Japan and in April 2014 in the European Union . . . into alleged or actual violation of, or non-compliance with, any Applicable Law relating to antitrust, unfair competition, or similar matters."

75.     To the extent that VPC is found liable for any violations of Sherman Act § 1 by HPC committed at any time during the Class Period up to and including June 11, 2014, Plaintiffs also intend to seek recovery of damages from Defendant Holy Stone.

**15.     ROHM**

76.     Defendant ROHM Co., Ltd. ("ROHM Co.") is a Japanese corporation with its principal place of business located at 21 Saiin Mizosaki-cho, Ukyo-ku, Kyoto 615-8585, Japan. During the Class Period, ROHM manufactured, sold, and distributed tantalum and film capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

77.     Defendant ROHM Semiconductor U.S.A., LLC ("ROHM USA"), a Delaware limited liability corporation, is a subsidiary of ROHM Co. with its principal place of business located at 2323

Owen Street, Suite 150, Santa Clara, California 95054. During the Class Period, ROHM USA— either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers tantalum and/or film capacitors manufactured by certain business units, subsidiaries, agents or affiliates of its corporate parent, ROHM Co.

78.    Defendants ROHM Co. and ROHM USA are together referred to herein as "ROHM."

**16.    Okaya**

79.    Defendant Okaya Electric Industries Co., Ltd. ("Okaya Co.") is a Japanese corporation with its principal place of business located at 16-9, Todoroki 6 chome, Setagaya-ku, Tokyo 158-8543, Japan. During the Class Period, Okaya Co. manufactured, sold and distributed film capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

80.    Defendant Okaya Electric America Inc. ("Okaya America"), an Indiana corporation, is a wholly owned subsidiary of Okaya Co. with its principal place of business located at 52 Marks Road, Suite 1, Valparaiso, Indiana 46383. During the Class Period, Okaya America— either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers film capacitors manufactured by business units, subsidiaries, agents or affiliates of its corporate parent, Okaya Co.

81.    Defendants Okaya Co. and Okaya America are together referred to herein as "Okaya."

**17.    Taitsu**

82.    Defendant Taitsu Corporation ("Taitsu Corp.") is a Japanese corporation with its principal place of business located at 2-23-20, Kizuki, Nakahara-ku, Kawasaki, Kanagawa 211-0025, Japan. During the Class Period, Taitsu Corp. manufactured, sold and distributed film capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

83.    Defendant Taitsu America, Inc. ("Taitsu America"), a California corporation, is a wholly owned subsidiary of Taitsu Corp. with its principal place of business located at 6160 Mission Gorge Road, Suite 100, San Diego, California 92120. During the Class Period, Taitsu America— either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers film capacitors manufactured by business units, subsidiaries, agents or affiliates of its corporate parent, Taitsu Corp.

84. Defendants Taitsu Corp. and Taitsu America are together referred to herein as "Taitsu."

**18. Shinyei**

85. Defendant Shinyei Kaisha ("Shinyei Kaisha") is a Japanese corporation with its principal place of business located at 77-1 Kyomachi, Chuo-ku, Kobe 651-0178, Japan. During the Class Period, Shinyei Kaisha manufactured, sold and distributed film capacitors either directly or through its business units, subsidiaries, agents or affiliates to United States purchasers.

86. Defendant Shinyei Technology Co., Ltd. ("Shinyei Tech") is a Japanese corporation and a corporate affiliate of Shinyei Kaisha with its principal place of business located at 77-1 Kyomachi, Chuo-ku, Kobe 651-0178, Japan. Until in or about February 2011, Shinyei Tech—either directly or through its business units, subsidiaries, agents or affiliates—manufactured, sold and distributed to United States purchasers film capacitors manufactured by its own business units, subsidiaries, agents or affiliates, or those of Shinyei Kaisha.

87. Defendant Shinyei Capacitor Co., Ltd. ("Shinyei Capacitor") is a Japanese corporation and a corporate "affiliate" of Shinyei Kaisha with its principal place of business located at Shinagawa Crystal Square 11F, 1-6-41 Konan, Minato-ku, Tokyo 108-0075, Japan. Starting in or about February 2011, Shinyei Capacitor was established by Shinyei Kaisha to take over the film capacitors business of Shinyei Tech. After in or about February 2011, Shinyei Capacitor—either directly or through its business units, subsidiaries, agents or affiliates—manufactured, sold and distributed to United States purchasers film capacitors manufactured by its own business units, subsidiaries, agents or affiliates, or those of Shinyei Kaisha (including, without limitation, Shinyei Tech).

88. Defendant Shinyei Corporation of America, Inc. ("Shinyei America") is a Delaware corporation and a wholly owned subsidiary of Shinyei Kaisha with its principal place of business located at 1120 Avenue of the Americas, 4th Floor, New York, New York 10036. During the Class Period, Shinyei America—either directly or through its own business units, subsidiaries, agents and affiliates or those of Shinyei Kaisha—sold and distributed to United States purchasers film capacitors manufactured either directly by Shinyei Kaisha or through Shinyei's business units, subsidiaries, agents and affiliates (including, without limitation, Shinyei Capacitor and Shinyei Tech).

89.     Defendants Shinyei Kaisha, Shinyei Tech, Shinyei Capacitor and Shinyei America are together referred to herein as "Shinyei."

**19.    Nitsuko**

90.     Defendant Nitsuko Electronics Corporation ("Nitsuko") is a Japanese corporation with its principal place of business located at 2031-1, Ogawara, Suzaka-shi, Nagano-ken, 382-0071, Japan. During the Class Period, Nitsuko either directly or through its business units, subsidiaries and affiliates, manufactured, sold and distributed film capacitors to United States purchasers.

**20.    Nissei**

91.     Defendant Nissei Electric Co. Ltd. ("Nissei") is a Japanese corporation with its principal place of business located at 201, Motodate, Hanamaki, Iwate, 025-0061, Japan. During the Class Period, Nissei either directly or through its business units, subsidiaries agents and affiliates, manufactured, sold and distributed film capacitors to United States purchasers.

**21.    Soshin**

92.     Defendant Soshin Electric Co., Ltd. ("Soshin Co.") is a Japanese corporation with its principal place of business located at 3-13-16, Mita, Minato-ku, Tokyo 108-8322, Japan. During the Class Period, Soshin Co. either directly or through its business units, subsidiaries, agents and affiliates, manufactured, sold or distributed film capacitors to United States purchasers.

93.     Defendant Soshin Electronics of America Inc. ("Soshin America"), a California corporation, is a wholly owned subsidiary of Soshin Co. with its principal place of business located at 2520 Mission College Boulevard #104, Santa Clara, California 95054. During the Class Period, Soshin America— either directly or through its business units, subsidiaries, agents or affiliates—sold and distributed to United States purchasers film capacitors manufactured by business units, subsidiaries, agents or affiliates of its corporate parent, Soshin Co.

94.     Defendants Soshin Co. and Soshin America are referred to collectively herein as "Soshin."

**22.    Shizuki**

95.     Defendant Shizuki Electric Co., Ltd. ("Shizuki") is a Japanese corporation with its principal place of business located at 10-45 Taisha-cho, Nishinomiya, Hyogo 662-0867, Japan. During

the Class Period, Shizuki manufactured, sold and distributed film capacitors either directly or through its business units, subsidiaries, agents or affiliates, to United States purchasers.

96.     Defendant American Shizuki Corporation ("ASC") is a Nebraska corporation with its principal place of business located at 301 West O Street, Ogallala, Nebraska 69153. During the Class Period, ASC —either directly or through its own business units, subsidiaries, agents and affiliate— sold and distributed to United States purchasers film capacitors it manufactured or that were manufactured by the business units, subsidiaries, agents and affiliates of its corporate parent, Shizuki Co.

97.     Defendants Shizuki Co. and ASC are referred to collectively herein as "Shizuki."

98.     Collectively, the parties named in paragraphs 29 to 96 are referred to herein as "Defendants."

## IV.    CO-CONSPIRATORS AND AGENTS

99.     The anticompetitive and unlawful acts alleged against the Defendants in this class action complaint were authorized, ordered or performed by Defendants and their respective directors, officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' businesses or affairs.

100.    Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

101.    Each Defendant acted as the principal, agent or joint venturer of, or for other Defendants with respect to the acts, violations, and common course of conduct alleged herein. In particular and as alleged more fully below, each Defendant headquartered outside the United States relied on their agents in the United States (be they wholly owned subsidiaries or otherwise) to implement, enforce and conceal the cartel in the United States as part of their respective global sales and marketing systems. Defendants' subsidiaries were aware of an agreement to keep prices for capacitors high, and they sold, or distributed, capacitors to customers in the United States; the subsidiaries charged supracompetitive cartel prices as set by their foreign parents; the subsidiaries assisted their parents in concocting and

disseminating pretexts for price increases; and in many instances the subsidiaries communicated with cartel members individually to help implement and conceal the price-fixing scheme.

102.   The agency relationships formed among the Defendants with respect to the acts, violations, and common course of conduct alleged herein were consensually formed between the Defendant principals and agents. Defendants' agents acted in the United States and abroad within the scope of their agency relationship with their own principals. Defendants' agents acted under the explicit authority, implied authority or apparent authority of their principals. These acts include, but are not limited to, subsidiaries selling, distributing, or shipping film and electrolytic capacitors at the request of their parent companies. Further, Defendants acted on behalf of and were subject to the control of their principals, and they acted within the scope of authority or power delegated by their principals. Defendants' agents performed their duties with appropriate care and diligence, within the scope of their agency, in selling, distributing, or shipping capacitors that had been sold at supracompetitive prices.

103.   Accordingly, the Defendant principals are liable for the acts of their agents. Likewise, the Defendant agents are liable for the acts of their principals conducted by the agents within the scope of their explicit, implied or apparent authority.

## V.   CLASS ALLEGATIONS

104.   Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), on behalf of a similarly situated Class, which is defined as follows:

> All persons in the United States that purchased Capacitors (including through controlled subsidiaries, agents, affiliates or joint-ventures) directly from any of the Defendants, their subsidiaries, agents, affiliates or joint ventures from January, 1, 2002 through the present (the "Class Period").

105.   The Direct Purchaser Class definition encompasses those who purchased aluminum and/or tantalum and/or film capacitors directly from any of the Defendants, even if the Capacitors purchased were manufactured, sold or distributed by a given Defendant's predecessors, parents, business units, subsidiaries, affiliated entities, principals, agents or co-conspirators.

106.   This definition of the Direct Purchaser Class specifically excludes the following persons or entities:

a.   Any of the Defendants named herein;

b.   Any of the Defendants' co-conspirators;

c.   Any of Defendants' parent companies and their subsidiaries, agents or affiliates;

d.   Any of Defendants' officers, directors, management, employees, subsidiaries, agents or affiliates;

e.   All governmental entities; and

f.   The judges and chambers staff in this case, as well as any members of their immediate families.

107.   Plaintiffs do not know the exact number of Direct Purchaser Class members, because such information is in the exclusive control of Defendants. Plaintiffs are informed and believe that, due to the nature of the trade and commerce involved, there are thousands of Direct Purchaser Class members geographically dispersed throughout the United States and elsewhere, such that joinder of all Class members in the prosecution of this action is impracticable.

108.   Plaintiffs' claims are typical of the claims of their fellow Class members because Plaintiffs directly purchased aluminum, tantalum and film capacitors from certain of the Defendants named herein, Plaintiffs and all Direct Purchaser Class members were damaged by the same wrongful conduct of Defendants as alleged herein, and the relief sought herein is common to all members of the Class.

109.   Numerous questions of law or fact common to the entire Direct Purchaser Class—including, but not limited to those identified below—arise from Defendants' anticompetitive and unlawful conduct:

a.   Whether Defendants combined and/or conspired to fix, raise, maintain, or stabilize prices of aluminum, tantalum and film capacitors sold to purchasers in the United States at any time during the Class Period;

b.   Whether Defendants concertedly fixed, raised, maintained or stabilized prices of aluminum, tantalum, and film capacitors sold to purchasers in the United States at any time during the Class Period, or committed other conduct in furtherance of the conspiracy alleged herein;

c.   The duration and the extent of Defendants' conspiracy;

d. Whether Defendant fraudulently concealed their conspiracy from Capacitors purchasers in the United States;

e. Whether the actions of Defendants in so conspiring violated Section 1 of the Sherman Act;

f. Whether Defendants' conduct caused the prices of aluminum, tantalum and film capacitors sold at any time during the Class Period to purchasers in the United States to be artificially fixed, raised, maintained or stabilized at noncompetitive prices;

g. Whether Plaintiffs and the other members of the Direct Purchaser Class were injured by Defendants' conduct and, if so, the appropriate Class-wide measure of damages; and

h. Whether Plaintiffs and other members of the Direct Purchaser Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

110. These and other questions of law and fact are common to the Direct Purchaser Class and predominate over any questions affecting the Class members individually.

111. Plaintiffs will fairly and adequately represent the interests of the Direct Purchaser Class because they directly purchased Capacitors from one or more Defendants and they have no conflicts with any other members of the Class. Furthermore, Plaintiffs have retained sophisticated and competent counsel who are experienced in prosecuting antitrust class actions, as well as other complex litigation.

112. Defendants have acted on grounds generally applicable to the Direct Purchaser Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

113. This class action is superior to alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution of the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

114. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VI.    TRADE AND COMMERCE

115.    During the Class Period, each Defendant, directly or through one or more of its respective parents, subsidiaries, business units, agents or affiliates, sold or delivered to United States purchasers aluminum, tantalum, or film capacitors in a continuous and uninterrupted flow of interstate commerce, including through and into this District.

116.    By way of example and not limitation, and as detailed more fully below, the following Defendants each assisted their respective corporate parent Defendants with the sale or delivery to United States purchasers of the parents' respective aluminum, tantalum or film capacitors to United States purchasers: PCNA; SANYO NA; NEC TOKIN America; UCC; Hitachi Chemical America; Nichicon America; Rubycon America; ELNA America; Milestone (D/B/A HolyStone International); ROHM USA; Okaya America; Taitsu America; Shinyei America; Soshin America; and ASC.

117.    During the Class Period, Defendants collectively controlled the respective markets for the sale of aluminum, tantalum and film capacitors, both globally and also in the United States.

118.    Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

119.    Capacitors manufactured abroad by the Defendants and sold in the United States constitute domestic or import commerce.

120.    To the extent any Capacitors have been or purchased by Direct Purchaser Class members and these purchases do not constitute domestic or import commerce, the Defendants' unlawful activities with respect thereto, as more fully alleged herein, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce that gives rise to the claims asserted herein.

121.    Defendants also sold Capacitors overseas directly to members of the Direct Purchaser Class (including through the Class members' controlled subsidiaries, agents or affiliates), some of which were incorporated into products manufactured overseas that were imported into the United States. These sales by Defendants involved import commerce and had a substantial, direct and reasonable foreseeable effect on United States import commerce that gives rise to the claims asserted herein.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

122.     By reason of the unlawful activities hereinafter alleged, Defendants substantially and foreseeably affected commerce throughout the United States, causing injury to Plaintiffs and members of the Direct Purchaser Class. Defendants, directly and through their respective parents, subsidiaries, business units, agents, affiliates, successors and predecessors knowingly and intentionally engaged in activities affecting all states, to fix, raise, maintain and/or stabilize prices in the United States for Capacitors, which conspiracy unreasonably restrained trade and artificially inflated the prices for Capacitors and manufactured products incorporating Capacitors imported into the United States.

123.     The anticompetitive conduct described herein, and its effect on United States commerce, proximately caused antitrust injury to Plaintiffs and members of the Direct Purchaser Class in the United States and gives rise to their claims. The anticompetitive conduct caused Plaintiffs and members of the Direct Purchaser Class to pay supra-competitive prices for Capacitors. The anticompetitive conduct also caused persons in the United States to pay supra-competitive prices for manufactured products imported by members of the Direct Purchaser Class that incorporate Capacitors purchased from the Defendants. In each of these categories, the resulting price increases amounted to hundreds of millions of dollars or more and should have been or were, in fact, anticipated by Defendants, as they are the natural and predictable consequence of Defendants' anticompetitive conduct.

## VII.   FACTUAL ALLEGATIONS

### A.   What Capacitors Do and How They Work

124.     Capacitors are electronic components that serve as one of the fundamental building blocks of all types of electrical circuits. Virtually every electrical circuit contains one or more capacitors. In the taxonomy of electrical components, capacitors are categorized as "passive" components. That is, capacitors do not require electrical power to operate. Instead, the physical properties of the materials that compose a passive component cause it to perform the task for which it is employed.

125.     Generally, capacitors serve as reservoirs of electrical charge that smooth out inconsistencies in both source current available (*i.e.*, current from batteries or electrical outlets) and the load current demanded by a device requiring the current. Most primary electrical sources have slowly varying current delivery, but many electrical devices will require changing load current demands in

fractions of a second. Capacitors insure that the load current demands for the circuits and devices in which they are installed are met. The amount of charge the capacitor can hold at a given voltage defines its capacitance.

126.     In its basic form, a capacitor consists of two or more parallel conductive metal plates that are not connected to or touching each other, but are electrically separated by some form of insulating, non-conductive material. The insulating layer between a capacitor's plates is commonly called the dielectric. When a voltage is applied to the two plates, an electric field is created between them; positive charge will collect on one plate and negative charge on the other. The dielectric, a non-conductive material, does not permit the electric current to flow between the metal plates.

127.     The most commonly used dielectrics used in capacitors are aluminum or tantalum plates covered by a dielectric metallic oxide layer, insulating plastic film and ceramic materials.

**B.     Types of Capacitors and Their Uses**

128.     Capacitors are usually distinguished from each other by whether they are electrolytic or electrostatic. Electrolytic capacitors are polarized, meaning that they have positive and negative leads that must be positioned the correct way in an electric circuit (*i.e.*, the positive lead, or cathode, must go to the positive side of the power source, and the negative lead, or anode, must go to the negative side). In contrast, electrostatic capacitors are not polarized (*i.e.*, they do not have a positive and negative leads) and therefore can be installed in either direction with respect to the flow of current in an electrical circuit.

129.     Electrolytic capacitors have historically offered higher capacitance than electrostatic capacitors. Because of their ability to hold larger charges, electrolytic capacitors have typically been used for power filtering, coupling or buffering in sophisticated electronic devices, such as televisions, computers, mobile phones, smart phones, tablets, and technology used by the medical, military industrial and aerospace industries.

130.     Electrolytic and electrostatic capacitors are further distinguished within these two categories by the material from which their dielectrics are made. The majority of electrolytic capacitors sold contain aluminum or tantalum dielectrics, whereas ceramic capacitors and film capacitors are electrostatic.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1.    **Electrolytic Capacitors**

    a.    **Aluminum Capacitors**

131.    Aluminum capacitors use aluminum foil for their anodes and cathodes. Aluminum capacitors are differentiated from each other by the type of electrolyte they employ.

132.    Conventional, or "wet" aluminum capacitors are composed of two aluminum foils and a paper spacer soaked in a liquid electrolyte. The anode aluminum foil is covered with an aluminum oxide layer that serves as the dielectric, while the uncoated foil acts as a cathode. The anode, electrolyte-soaked paper and cathode are stacked together, and the stack is then wound up, placed into a cylindrical enclosure usually made of aluminum and connected to an electric circuit through being surface mounted on PCBs or attached by radial or axial leads.

133.    Polymer aluminum capacitors differ from conventional aluminum capacitors in that they contain a solid conductive polymer in place of an electrolyte-soaked paper spacer. Polymer aluminum capacitors are either stacked and wound in the same fashion as conventional aluminum capacitors, or they are layered and packaged in a molded resin to be used as compact surface mount devices.

134.    In both conventional and polymer aluminum capacitors, the thinness of the aluminum oxide layer dielectric on the anode foil allows for high capacitance, though their capacitance can only increase by increasing the surface area covered by the dielectric. This, however, requires additional stacking and/or winding of the foil layers, thus increasing the capacitors' physical size. As a result, aluminum capacitors may have lower volumetric efficiency in comparison to many tantalum, ceramic or film capacitors.

135.    The polymer electrolytes used in polymer aluminum capacitors typically have higher conductivity than the liquid electrolyte used in conventional aluminum capacitors, resulting in lower equivalent series resistance (*i.e.*, an obstruction in the flow of electric charge in and out of a capacitor) ("ESR"). Additionally, because the polymer electrolyte used in a polymer aluminum capacitor is a solid and therefore cannot dry out, polymer aluminum capacitors typically have longer service lives than conventional aluminum capacitors. Polymer aluminum capacitors also have the ability to self-heal, *i.e.*, the conductive polymer electrolyte can prevent the component's failure after a short circuit caused by a dielectric defect by essentially melting to form a barrier against any current leaking from the electrode.

136.     Both types of aluminum capacitors frequently are used in a variety of electronic devices, such as consumer audio and video devices, televisions, video game consoles, desktop and laptop computers, automotive electronics and power inverters. Conventional aluminum capacitors have been used for decades and are therefore prevalent in the electric circuits found in older electronic devices. In contrast, polymer aluminum capacitors first became available in the mid-1980s and, due to the attributes identified above, are frequently found in newer electronic devices.

137.     Conventional aluminum capacitors and polymer aluminum capacitors are together referred to herein as "aluminum capacitors."

**b.     Tantalum Capacitors**

138.     Tantalum capacitors exploit the tendency of tantalum metal to form a non-conductive protective tantalum oxide surface layer. They consist of tantalum powder sintered (*i.e.*, formed by high pressure) together—often called a "pellet"—as the anode of the capacitor, with tantalum oxide forming on the pellet's surface serving as the dielectric. The tantalum pellet is very porous, and therefore has more surface area for the dielectric oxide layer to cover, thereby increasing the capacitors' capacitance.

139.     Like aluminum capacitors, tantalum capacitors are differentiated from each other by the materials they employ. Conventional "wet" and "dry" slug tantalum capacitors use a sintered tantalum metal pellet as an anode on which the dielectric oxide layer is formed. The cathode is formed from a manganese dioxide layer separated from the dielectric by either liquid or solid electrolyte. A polymer tantalum capacitor instead forms the cathode from a conductive polymer.

140.     Conventional tantalum capacitors are typically attached to an electric circuit through radial or axial leads. However, certain types of "dry slug" tantalum capacitors and polymer tantalum capacitors are available in both leaded and surface mount models. Surface mount capacitors are usually composed of layered tantalum and the oxide dielectric packaged in a compact molded resin case.

141.     The dielectric layer in both conventional and polymer tantalum capacitors can be very thin—thinner than the similar layer in, for instance, comparable aluminum capacitors. Accordingly, both types of tantalum capacitors can have high capacitance in a small volume (about four-fold the capacitance for a given geometry), and thus can have high volumetric efficiency.

142.     Further, both types of tantalum capacitors have high resistance to leaking charge and have lower ESR than aluminum capacitors of the same capacitance rating. Accordingly, both types of tantalum capacitors frequently are used in complex electronic devices in which both small size and high capacitance are both required, *e.g.*, mobile phones, smart phones, personal computers, tablet devices and automotive electronics.

143.     Between the two types of tantalum capacitors, polymer tantalum capacitors have a lower ESR. This allows polymer tantalum capacitors to withstand higher ripple currents during normal operation. A ripple current is the AC component that causes the internal resistance of a capacitor to dissipate power and thus heat up the capacitor. The ESR of polymer tantalum capacitors is nearly constant within its operating temperature range, while the ESR of a conventional tantalum capacitor noticeably changes with temperature. High temperatures in conventional tantalum capacitors can tend to dry up or dissipate the liquid electrolytic contained within them.

144.     Conventional tantalum capacitors can be susceptible to short-circuiting or catastrophic ignition failure and destruction by fire if subject to excess voltage, reverse voltage, or current surges. These occurrences can cause localized breakdown of the magnesium dioxide cathode, starting a reaction in which both metal oxides break down into both fuel and oxygen. Catastrophic failure is less likely with polymer tantalum capacitors as the polymer cathode is much less oxygen rich.

145.     Conventional tantalum capacitors and polymer tantalum capacitors are together referred to herein as "tantalum capacitors."

**2.     Electrostatic Capacitors**

**a.     Film Capacitors**

146.     Film capacitors are non-polarized capacitors typically comprised of two pieces of plastic film. This film is made extremely thin using a sophisticated film drawing process. Once the film is manufactured, it may be metallized or left untreated, depending on the needed properties of the capacitor. After the film is drawn to the desired thickness, the film is cut into ribbons. The width of the ribbons depends on the capacity of the capacitor being produced. Two ribbons of film are wound together into a roll, which is often pressed into an oval shape so that it can fit into a rectangular case. This is important because rectangular components save precious space on the printed circuit board.

Electrodes are added by connecting each of the two electrodes to one of the films. A voltage is applied to burn out any imperfections using the self-healing property of film capacitors. The case is then sealed using silicon oil to protect the film roll against moisture, and dipped in plastic to hermetically seal the interior.

147.     There are many types of film capacitors, including polyester film, metallized film, polypropylene film, polytetrafluoroethylene film and polystyrene film. The primary difference between these types of film capacitors is the material used as the dielectric.

148.     Film capacitors offer the advantages of stability of electrical values over sustained usage, reliability (low self-inductance and ESR), and low cost. The reliability and stability of film capacitors make them useful for many industrial applications and general-purpose applications in electronics. However, their larger size in comparison to aluminum, tantalum and ceramic capacitors with similar performance characteristics limit the ability of original equipment manufacturers ("OEMs"), contract electronic manufacturing service providers ("CMs") and other product manufacturers from using film capacitors in surface-mount technology. Because miniaturized consumer electronics—which mostly require surface-mounted capacitors with small form factors and superior volumetric efficiency—have grown in demand, the demand for film capacitors has become stagnant.

### b.     Ceramic Capacitors

149.     A ceramic capacitor is a non-polarized capacitor made out of two or more alternating layers of ceramic and metal in which the ceramic material acts as the dielectric and the metal acts as the capacitor's electrodes. The ceramic dielectric is a mixture of finely ground granules of paraelectric or ferroelectric materials, modified by mixed oxides that are necessary to achieve the capacitor's desired characteristics.

150.     The great plasticity of ceramic raw material enables manufacturers to produce an enormous diversity of styles, shapes and dimensions of capacitors. Because the thickness of the ceramic dielectric layer can be easily controlled and produced by the desired application voltage, ceramic capacitors are available with rated voltages up to the 30 kV range. Currently, the smallest discrete ceramic capacitor is about the physical size of the head of a pin, though advances in materials science

and refinement of manufacturing processes may eventually permit fabrication of even smaller components.

151.     The most prevalent form of ceramic capacitor is known as a multilayer ceramic capacitor ("MLCC"). Industry analysts report that for fiscal year 2014, MLCCs are estimated to account for approximately 95% of the global ceramic market in terms of volume and approximately 94% in terms of value. MLCCs are constructed with alternating layers that result in single capacitors connected in parallel. This method, called "stacking" increases the component's capacitance because its surface area is increased by stacking up multiple layers of ceramic dielectric materials and metal electrode materials.

152.     Technological and material advancements have permitted manufacturers to increase the number of layers in MLCCs while at the same time miniaturizing the components. The result of these improvements is that MLCCs tend to have greater volumetric efficiency than aluminum, tantalum, and film capacitors, and can also compete with tantalum capacitors in small form factor applications. Generally speaking, aluminum, tantalum and film capacitors must increase in physical size to increase capacitance. The capacitance of aluminum and film capacitors can be increased only through tightly winding or layering the foils and films used in the respective products, thereby increasing the surface area as well as the total size of a component. In similar fashion, the capacitance of tantalum capacitors is increased only by expanding the size of the tantalum pellet found in the capacitor, which in turn increases the total size of the capacitor.

153.     Currently, the price of MLCCs is, on average, only a fraction of the price of aluminum, tantalum and film capacitors—a current average per unit price of approximately $0.006. The average price of MLCCs has declined year-over-year throughout the Class Period. In contrast, even some of the lowest price aluminum, tantalum and film capacitors can be 100 times more expensive than MLCCs on a per unit basis.

154.     Electric circuits are designed to accommodate specific types of active and passive components with specific technical and operational characteristics. Therefore, ceramic capacitors cannot immediately be integrated by OEMs, CMs and other product manufacturers into PCBs or other types of electrical circuits that require aluminum, tantalum or film capacitors without a lengthy, resource-intensive redesign and re-engineering effort.

155.     OEMs and CMs would have to undertake this product redesign and reengineering all while still working to meet ongoing demand for their finished products. Ultimately, the cost (*e.g.*, impact to short term profits or supply chain structure, etc.) versus the benefit of redesigning and reengineering products to use ceramic capacitors may serve to dissuade some OEMs, CMs and other product manufacturers from undertaking the effort to redesign and reengineer their products to incorporate different types of capacitors.

**C.     The Market Conditions in Which Defendants' Conspiracy Originated and Operated**

156.     Generally, there are three principal types of Direct Purchasers of Capacitors, including: (1) OEMs who incorporate Capacitors into their finished products, (2) CMs who manufacture and assemble PCBs and other electric circuit products containing Capacitors that ultimately are incorporated into finished products manufactured by OEMs and other product manufacturers, and (3) electronic component distributors who buy Capacitors directly from manufacturers and resell them.

157.     According to a leading capacitors industry analyst, the North and South American markets for capacitors collectively account for approximately $2.2 billion for fiscal year 2014, or roughly 12 percent of the global market. Aluminum capacitors account for approximately 17% of current capacitors consumption in North and South America, followed by film capacitors with 15% and tantalum capacitors with 14%.

158.     According to a leading capacitors industry analyst, global consumption of aluminum, tantalum and film capacitors has been declining for over a decade. Consumption of tantalum capacitors dropped from approximately 2.4% of global volume for fiscal year 2003 to an estimated 1.1% for 2014. Consumption of aluminum capacitors dropped from approximately 10.2 % for fiscal year 2003 to an estimated 6.8% for fiscal year 2014. Consumption of film capacitors dropped from approximately 2.5% for fiscal year 2003 to an estimated 1.1% for fiscal year 2014.

159.     Though capacitors are used in all types of electrical circuits, the demand for all types of capacitors for at least the last decade has been largely tied to the demand for consumer electronics, which currently accounts for approximately 90% of global unit demand.

160.     The computer end-use market segment historically has accounted for a significant portion of global capacitor consumption, but that segment has experienced decreasing sales of high-

passive component content laptops and desktops since the early 2000s. Industry analysts have indicated that declining demand for these products has negatively impacted the demand for aluminum and tantalum capacitors. Aluminum and tantalum capacitors manufacturers have historically derived close to 50% of their revenues from the computer market.

161.     In addition, the consumer audio-video segment, which has also historically accounted for a significant portion of global capacitor consumption, has also faced significant decreasing sales over the last decade (*i.e.*, since approximately the beginning of the Class Period) because portable music devices, tablets and smart phones have replaced them in meeting consumers' audio-visual needs. The fall-off of the audio-visual market had a significant impact on the demand for aluminum and film capacitors.

162.     Also during the Class Period, OEMs and CMs—over a number of product manufacturing and component procurement cycles—have (over great time and at great cost) redesigned the electrical circuits in the products they produce to incorporate ceramic capacitors instead of aluminum, tantalum or film capacitors. This product shift has further contributed to the decline in demand for aluminum, tantalum and film capacitors during the Class Period. As discussed herein, ceramic capacitors—specifically MLCCs—have exponentially increased in capacitance and volumetric efficiency since the 1990s, while at the same time decreased in price per unit. Though neither interchangeable nor substitutable with aluminum, tantalum or film capacitors, the improvements in cost-effective MLCC technology caused many OEMs and CMs, over time and at great expense, to redesign the electric circuits employed in their products to incorporate ceramic capacitors.

163.     For a number of reasons (*e.g.*, technological advancement of new generations of Capacitors; cost versus benefit of circuit redesign by OEMs and CMs; product familiarity; product loyalty; product preference; established and reliable procurement channels, etc.), the sales, both globally and in the United States, of aluminum, tantalum and film capacitors of all types remain sizeable. Leading capacitors industry analysts report that, for fiscal year 2013, global revenues for aluminum and tantalum capacitors were approximately $5.74 billion and approximately $1.9 billion for film capacitors.

**D.     Defendants' Collusive Anticompetitive Practices**

164.     Faced with increased requests by purchasers for price reductions and an overall decline in demand for their aluminum, tantalum and film capacitors, before and during the Class Period,

Defendants feared that price competition would reduce, if not eliminate, profitability for Defendants' Capacitor manufacturing operations.

165.    Before and during the Class Period, Defendants—both individually and collectively— held significant shares in already-mature markets for aluminum, tantalum and film capacitors, thereby producing a significant amount of the Capacitors available to United States purchasers and purchasers worldwide.

166.    Before and during the Class Period, Defendants were aware that fringe non-party capacitor manufacturers with smaller market shares in the aluminum, tantalum and film capacitor markets faced capacity, technology, and resources constraints that would render them unable to successfully compete against Defendants by meeting and/or capturing market demand for Capacitors should Defendants artificially control prices in these three product markets.

167.    Aluminum, tantalum and film capacitors of like capacitance, dielectric and form factor are, in most instances, mutually interchangeable for each other. For example, one manufacturer's aluminum capacitors of a given capacitance and form factor often can be substituted for another manufacturer's aluminum capacitors with the same capacitance and form factor. The same goes for tantalum and film capacitors produced by different manufacturers with the same capacitance and form factor. Aluminum capacitors, however, are not mutually interchangeable with tantalum capacitors or with film capacitors, nor are film capacitors and tantalum capacitors mutually interchangeable with each other.

168.    Before and during the Class Period, Defendants were aware of the interchangeability of their respective aluminum, tantalum and film capacitors having like capacitance, dielectric and form factors, and had concerns that purchasers' understanding of this interchangeability could drive Defendants to compete against themselves on price for sales.

169.    Capacitors are components fundamentally necessary for the function of electric circuits. Other types of passive electrical components (*e.g.*, inductors, resistors) cannot serve as a substitute for or a functional equivalent to an aluminum, tantalum or film capacitor.

170.    Before and during the Class Period, Defendants were aware of their customers' inability to substitute other passive electronic components to take the place of the Capacitors they required. This

fact emboldened Defendants to set prices for their aluminum, tantalum and film capacitors collusively during the Class Period because, without any feasible substitutes for capacitors on the market, Defendants would not lose anything close to sufficient sales to make the cartel pricing unprofitable.

171.   All types of Capacitors purchasers—OEMs, CMs and third-party distributors—are almost always committed to inflexible production or delivery deadlines to their respective customers, and therefore are likely to accept collusively set price increases on the Capacitors they require to avoid the usually greater cost of production delays or customer dissatisfaction.

172.   Before and during the Class Period, Defendants were aware that, because Capacitors are necessary, non-substitutable, and generally inexpensive, collusively set price increases would face little to no opposition from purchasers.

173.   In their collective and individual consideration of these market conditions and product characteristics, Defendants agreed to operate as a cartel to suppress price competition among them for their respective competing aluminum, tantalum and film capacitors. This agreement was reached through both oral and written communications among directors, executives, officers, business unit managers, sales representatives and employees of the Defendant companies. These communications occurred in person through both regular and impromptu meetings, electronic or paper correspondence, text messaging and/or telephonic or video communications in the period before and during the Class Period.

174.   Discovery regarding the nature and scope of the cartel and conspiratorial activity alleged is just beginning. The material facts are in the possession of the cartel members. Cartel members did not know the identities of all the cartel's participants or even the identities of all of its participants. While there was substantial overlap between and among Defendants who participated in discussions, communications and agreements concerning electrolytic (aluminum and tantalum) capacitors, on the one hand, and film capacitors, on the other, much still needs to be discovered about their contacts, communications and agreements. Further, expert economic analysis of the impact of the cartel is in its earliest stage. The inquiry into and analysis of Defendants' collusive practices must be substantially more advanced before reliable conclusions about the nature, scope and effects of the capacitors cartel can be reached.

**E.    Defendants' Cartel**

175.    Defendants intended to restrain trade in aluminum, tantalum and film capacitors primarily in two ways.

176.    First, Defendants agreed to concertedly fix, raise, maintain and/or stabilize the prices for aluminum, tantalum and film capacitors.

177.    As part of the Defendants' cartel, Defendants shared and exchanged with each other—either through correspondence or during in-person meetings among their respective officers, executives (as detailed below), and other employees with authority to enter into contracts and bind their employers—confidential and competitively sensitive information pertaining to their product pricing. By way of illustration and not limitation, Defendants shared with each other, among other things, information pertaining to the fixed and variable input costs that impacted their product pricing (*e.g.*, raw materials costs, labor costs), current and future price intentions, capacity and production statistics, and their suggestions and reactions regarding market and customer demand.

178.    Defendants colluded, maintained and enforced the concerted pricing on their aluminum, tantalum and film capacitors and other cartel activity through, *inter alia*, regular interactions and agreements reached among members of the cartel—both in regular, organized meetings and through ad hoc meetings and correspondence—and through communications and agreements on current and future pricing intentions and related topics.

179.    Defendants monitored the prices of their fellow cartel members during the Class Period and punished those who, on rare occasions, sought to stray from the agreed pricing. Once the cartel members learned of any deviation from coordinated pricing, pricing for the product at issue would either adjust back to the price collusively determined by the cartel's members, or the Defendant who sought to benefit individually from pricing information obtained through its membership in the cartel would face retribution from the cartel's members, such as exclusion from the cartel and its collusive discussions for a period of time.

180.    For example, Nichicon and Nippon Chemi-Con were punished by the cartel and excluded at times from cartel discussions regarding price fixing in the aluminum and tantalum capacitors markets. Additionally, at times during the Class Period, Nichicon and Nippon Chemi-Con, as well as

certain other Defendants, were subject to harsh criticism by other cartel members during the cartel's regular meetings and were reprimanded for pursuing their individual interests over those of the cartel by cheating on the cartel's agreements or for failing to keep their sales operations in line with the cartel's price-fixing aims.

181.     Aside from setting non-competitive prices for their aluminum, tantalum or film capacitors in concert, Defendants also agreed to quote similar or identical production lead times to purchasers on a concerted basis. These agreements permitted Defendants to meter out the supply of their products, thereby artificially restricting supply and creating the perception of a supply shortage. This situation prevented natural competitive forces from pressing prices lower.

182.     Defendants further agreed to restrain their output, in part, to curb the practice of certain purchasers such as third-party distributors buying large quantities of products from Defendants when prices were relatively low, but would abstain when prices were higher. Defendants intended their practice of quoting similar production lead times for their mutually interchangeable products to smooth out the inconsistent volume of purchases by these purchasers and create the perception of balanced supply and demand. At the same time, Defendants intended this practice to complement their efforts to artificially fix, raise, stabilize and maintain non-competitive prices for Capacitors.

183.     To achieve the cartel's goal of quoting uniform production lead times to purchasers, Defendants regularly interacted, communicated and agreed with other Defendants in the cartel on production lead times. Defendants concertedly coordinated to quote lengthened production lead times unjustifiably in order to foster the cartel's scheme to maintain noncompetitive prices for the Defendants' aluminum, tantalum and film capacitors.

184.     Defendants regularly provided to purchasers and the public pretextual excuses for the increase of production lead times, such as problems obtaining raw materials (*e.g.*, tantalum ore and powder, aluminum foil, plastic film, dielectric resins) necessary for production, shipping delays, and production delays caused by natural disasters (*e.g.*, the 2011 Tohoku earthquake and tsunami, typhoons in Asia, flooding in Thailand and other countries where Defendants' capacitor manufacturing facilities are located). Defendants' pretextual justifications misled purchasers about the real reasons for the long production lead times.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

**F.    Meetings Among the Defendant Cartel Members During the Class Period**

185.    Defendants together reached an agreement to form a cartel for the purpose of concertedly fixing prices of and reducing output on their respective aluminum, tantalum and film capacitors at least as early as January 1, 2002.

186.    At least by the beginning of 2002, Defendants had already agreed and organized among themselves regular meetings for the purpose of fixing, raising, and maintaining prices, including by sharing competitively sensitive information regarding, among other things, intentions on future pricing for Capacitors, production costs, current (*i.e.,* not historical) demand, and for organizing concerted responses to customer and market demands for price reductions for Capacitors. These meetings frequently resulted in Defendants agreeing to artificially fix, raise, stabilize, or maintain Capacitors prices.

**1.    The Cartel's Regular Meetings**

187.    Starting at least as early as January 1, 2002, the Defendant cartel members formally organized meetings among themselves to serve as a forum for the discussion and exchange of competitively sensitive information. As one attendee of these meetings noted around this time, the purpose of the cartel meetings was to "exchange information by market and by capacitor category so that each company will be able to enjoy profits and that healthy market prices will be maintained."

188.    These meetings were an outgrowth of regular meetings conducted among certain Defendants dating back to the 1990s in which the participants exchanged historical summary pricing and sales data.

189.    The cartel's meetings were known by Defendants at various times within the Class Period as the "ATC," "MK" or "JFC" meetings. The meetings were generally organized by the types of Capacitors to be discussed by the Defendant attendees. ATC and MK meetings were usually held among the Defendant manufacturers of aluminum and tantalum capacitors, and the JFC meetings were usually held among the Defendant manufacturers of film capacitors (although pricing for aluminum and tantalum capacitors was often discussed at JFC meetings). A number of Defendants attended all the cartel meetings, as they were significant manufacturers of all Capacitors subject to the cartel. Certain

Defendants took leaves of absence from JFC meetings of varying lengths after their personnel expressed concerns that participation in JFC meetings raised antitrust concerns.

190.   Each of these meetings constituted overt acts in furtherance of Defendants' conspiracy.

191.   Meeting rosters and records dating from 2002 to 2012 indicate that officers, managers and/or employees of the following Defendant companies participated in or were informed of the cartel's regular meetings: ELNA; FMD; Hitachi; Holy Stone; KEMET; Matsuo; NEC TOKIN; Nichicon; Nippon Chemi-Con; Nissei; Nitsuko; Okaya; Panasonic; ROHM; Rubycon; SANYO; Shinyei; Shizuki; Soshin; Taitsu and TOSHIN KOGYO.

192.   The Defendant participants at these cartel meetings represented their respective corporate families and did not make known to the other participants any distinctions between the corporate entities within their corporate families whose interests they were representing. For example, records of meetings throughout the Class Period do not make or recognize corporate formalities or distinctions between entities or officers within a single corporate enterprise or corporate family. Those who attended generally represented the entire corporate enterprise on whose behalf they participated in cartel meetings and other cartel activities. Correspondingly, they understood that other participants represented the corporate enterprise on whose behalf those other participants attended.

193.   All participants understood that other participants in cartel activities entered into agreements and understandings with each other on behalf of all entities within their respective corporate enterprises on whose behalf they attended and participated, such as ELNA; FMD; Hitachi; Holy Stone; KEMET; Matsuo; NEC TOKIN; Nichicon; Nippon Chemi-Con; Nissei; Nitsuko; Okaya; Panasonic; ROHM; Rubycon; SANYO; Shinyei; Shizuki; Soshin; Taitsu; and TOSHIN KOGYO.

194.   In some situations, certain participants in these cartel meetings held multiple positions with both their Defendant parent companies the parent's subsidiaries. For example:

a. ████████████████████████████████████
████████████████████████████████████████████
██████████████

b. █████████████████████████████████████
█████████████████████████████████████

c. ██████████████████████████████
████████████████████████████████████████████
██████

195.    Nippon Chemi-Con, Rubycon, Hitachi, Panasonic/SANYO, Nichicon and Matsuo each played a key role in organizing the cartel's regular meetings and coordinating the operation of the cartel during the Class Period, because each of these Defendant companies manufactured both electrolytic capacitors (*i.e.*, aluminum or tantalum) and film capacitors and are globally dominant manufacturers of these capacitors. Nippon Chemi-Con, Rubycon, Hitachi and Panasonic/SANYO regularly attended cartel meetings where attendees fixed prices for both electrolytic and film capacitors. Nichicon and Matsuo regularly attended cartel meetings where attendees fixed prices for electrolytic capacitors and were "associate members" of a group of companies that met regularly to fix prices for film capacitors. This overlap of membership between the electrolytic and film capacitors groups allowed the Defendants involved in the cartel to integrate and coordinate their collusive efforts.

196.    The cartel membership invited to these meetings would, on limited occasions, change when cartel members resolved to exclude from the meetings, at least for a time, certain Defendants that were suspected of cheating on the cartel through using the competitively sensitive information they received through the cartel's operation for their own individual benefit.

197.    The Defendants generally held monthly one-day meetings that were usually attended by manager-level employees. These meetings focused on the exchange of competitively sensitive data such as production volumes, current and future excess capacity, current and future pricing, raw material pricing and access issues, as well as various statistical data. Representatives for each Defendant in attendance, one by one, would present to the other cartel members regarding his company's competitively sensitive information. After the one-day meetings, the attendees frequently socialized with each other, during which time, on information and belief, they conducted business in furtherance of the conspiracy.

198.    The Defendants also held two-day meetings, which were generally attended by Defendants' more senior officers. These meetings took place twice a year, with one usually in the spring (typically May or June), and another usually in November. The first day of the two-day meetings

consisted of business discussions in which officials from each of the Defendants in attendance would make formal presentations to the group as a whole. In this forum, representatives for each Defendant in attendance, one by one, addressed the other cartel meeting members to discuss competitively sensitive information regarding the environment their respective Capacitors businesses faced, such as current and historic sales performance in both Japanese and overseas markets, current customer demands and customer industry trends, future intentions concerning pricing and production with regard to significant types of Capacitors at different times. Defendants would frequently recommend cartel pricing to the other cartel members. Defendants also used these two-day meetings to discuss and agree on the uniform denial of certain price reduction requests, as well as the uniform adjustment of prices to account for raw materials costs, among other things. The second day of the two-day meetings provided the participants the opportunity to socialize informally—usually on the golf course—and discuss business, during which time, on information and belief, Defendants conducted business in furtherance of the conspiracy.

199.    For specific Defendant groups such as the film capacitor manufacturers, meetings were held less frequently (*i.e.*, every one to three months), and in them the Defendant attendees addressed more targeted issues, such as the cartel's facilitation of uniform price increases on film capacitors because materials costs had increased, thereby threatening Defendants' profitability if they had to compete against each other.

200.    Based on the recommendations and agreements reached at these different cartel meetings, the Defendant attendees intended to and did agree to price Capacitors collusively, stand united against price reduction demands, and set production and delivery dates to collusively control supply in the aluminum and tantalum capacitors markets. The discussions among Defendants regarding their respective Capacitors informed and facilitated cartel members' price coordination with each other across different types of Capacitors.

201.    The cartel's meetings at times focused discussions on specific topics of concern, and cartel meeting sub-groups were formed to discuss, address, and resolve these issues.

202.    For example, an "Overseas Trade Sectional Meeting" of the "ATC Group" was formed among certain Defendants at least as early as August 2003 and held meetings in which sales of aluminum and tantalum capacitors in non-Japanese markets (*i.e.*, the United States, Chinese and

Taiwanese markets) were discussed and prices were mutually agreed upon among the participants. At a minimum, representatives from NEC TOKIN, ELNA, Nippon Chemi-Con, Nichicon, Rubycon, FMD, Matsuo, SANYO, and Hitachi AIC participated in the "Overseas Trade Sectional Meeting" discussions.

203.    The reports from these meetings identify participants as representatives of single corporate enterprises, usually by the name of the ultimate corporate parent or by shorthand indicating an attendee's affiliation with or representation of a single corporate family or enterprise.

204.    The reports from these meetings do not distinguish between or among the entities within a single corporate entity because the representative attendees held themselves out as, and were agents of the companies they represented. Such representatives and agents made commitments for the integrated corporate entities on whose behalf the attended.

205.    The discussions, exchange of information, and agreements reached at each of these meetings constituted overt acts in furtherance of Defendants' conspiracy.

**2.    Specific Cartel Meetings**

206.    A full inventory and accounting of the cartel meetings attended by Defendants and what was discussed and agreed to among Defendants at these meetings is in the exclusive possession of the Defendants in attendance. Plaintiffs are informed and believe that collusive activity and actions in support of the cartel occurred at multiple meetings attended by many of the Defendants during the Class Period, including as follows:

a.    Representatives from at least Nitsuko, Nichicon, FMD ("Towa"), Rubycon, Taitsu, TOSHIN KOGYO, Shizuki, Hitachi, Soshin, Shinyei, and SANYO attended cartel meetings held during the 3rd Quarter of 2002. At the meetings, the Defendant attendees discussed, among other things, demand for film capacitors in the United States, and exchanged competitively sensitive, non-public information concerning volumes of sales and shipments for products that used film capacitors. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

b.    Representatives from at least Nitsuko, Soshin, Nippon Chemi-Con, Panasonic, Nichicon, FMD ("Towa"), Shizuki, TOSHIN KOGYO, Okaya, Hitachi, NEC TOKIN and SANYO

attended cartel meetings held during the 4th Quarter of 2002. At these meetings, the Defendant attendees discussed, among other things, specific Defendants' recent and historical pricing for tantalum capacitors and their strategies regarding price increases. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

c.   Representatives from at least Nitsuko, Soshin, FMD ("Towa"), Rubycon, Nippon Chemi-Con, Nichicon, TOSHIN KOGYO, Shizuki, Taitsu, Nissei, and Hitachi attended cartel meetings held during the 1st Quarter of 2003. At these meetings, the Defendant attendees discussed, among other things, business conditions in the United States, and competitively sensitive, non-public information concerning demand for film and electrolytic capacitors. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

d.   Representatives from at least Nitsuko, Soshin, Taitsu, Nissei, Panasonic, TOSHIN KOGYO, Nippon Chemi-Con, FMD ("Towa"), Shizuki, and Hitachi attended cartel meetings held during the 2nd Quarter of 2003. At these meetings, the Defendant attendees discussed, among other things, the volumes of film capacitor they had shipped and the prices per unit, and anticipated increases in Capacitor prices. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

e.   Representatives from at least SANYO, NEC TOKIN, Nippon Chemi-Con, Hitachi, Nichicon, Rubycon, ELNA, and Matsuo attended cartel meetings held during the 3rd Quarter of 2003. At these meetings, the Defendant attendees discussed, among other things, their common goals to maintain high prices for Capacitors, and prices of Capacitors for U.S. automotive manufacturers. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

f.   Representatives from at least Panasonic, Hitachi, Nissei, Soshin, Taitsu, Nitsuko, FMD ("Towa"), TOSHIN KOGYO, Shinyei, SANYO, Nippon Chemi-Con, and Nichicon attended cartel meetings held during the 2nd Quarter of 2004. At these meetings, the Defendant attendees discussed, among other things, specific Defendants' anticipated price increases to export customers.

The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

g.   Representatives from at least SANYO, Nichicon, ELNA, Rubycon, Okaya, Panasonic, Nissei, Hitachi, Nippon Chemi-Con, and Taitsu attended cartel meetings held during the 3rd Quarter of 2004. At these meetings, the Defendant attendees discussed, among other things, the quanta of increase they had seen in costs, ███████████████████████████████ ███████████████████████████ The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

h.   Representatives from at least Taitsu, TOSHIN KOGYO, Nissei, Nitsuko, Panasonic, FMD ("Towa"), SANYO, Nippon Chemi-Con, and Hitachi attended cartel meetings held during the 4th Quarter of 2004. At these meetings, the Defendant attendees discussed, among other things, overseas conditions for the market for film capacitors. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

i.   Representatives from at least Nippon Chemi-Con, Soshin, TOSHIN KOGYO, Nitsuko, Nissei, Taitsu, Panasonic, and Okaya attended cartel meetings held during the 1st Quarter of 2005. At these meetings, the Defendant attendees discussed, among other things, a████████████ ███████████████████████████████ The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

j.   Representatives from at least SANYO, Hitachi, Rubycon, FMD, ELNA, Matsuo, Taitsu, Panasonic, Nippon Chemi-Con, Nissei, Nitsuko, Soshin, TOSHIN KOGYO, and Shinyei attended cartel meetings held during the 2nd Quarter of 2005. At these meetings, the Defendant attendees discussed, among other things, certain Defendants' refusal to lower prices in response to a request from large customers ███████. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

k.   Representatives from at least Nissei, Nitsuko, Soshin, Panasonic, Nippon Chemi-Con, Taitsu, TOSHIN KOGYO, Shinyei, Hitachi, Nichicon, Rubycon, Matsuo and SANYO attended cartel meetings held during the 3rd Quarter of 2005. At these meetings, the Defendant attendees discussed, among other things, coordinating pricing for Capacitors in the 3rd and 4th Quarters of 2005. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

l.   Representatives from at least SANYO, Nippon Chemi-Con, ELNA and Matsuo attended cartel meetings held during the 4th Quarter of 2005. At these meetings, the Defendant attendees discussed, among other things, coordinating their activities at the highest levels through regular meetings of senior officials in charge of Capacitors sales. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

m.   Representatives from at least Panasonic, Hitachi, TOSHIN KOGYO, Okaya, Taitsu, Shinyei, Nitsuko, Nissei, and Soshin attended cartel meetings held during the 1st Quarter of 2006. At these meetings, the Defendant attendees discussed, among other things, market conditions, pricing intentions, plans with respect to entering or not entering specific market sectors, and information shared at trade association meetings. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

n.   Representatives from at least SANYO, Nippon Chemi-Con, Hitachi, ELNA and Matsuo attended cartel meetings held during the 2nd Quarter of 2006. At these meetings, the Defendant attendees discussed, among other things, coordinating their activities at the highest levels through regular meetings of senior officials in charge of Capacitors sales. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

o.   Representatives from at least SANYO, Nippon Chemi-Con, ELNA and Matsuo attended cartel meetings held during the 3rd Quarter of 2006. At these meetings, the Defendant attendees discussed, among other things, coordinating their activities at the highest levels through

regular meetings of senior officials in charge of Capacitors sales. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

p.   Representatives from at least Okaya, Panasonic, Taitsu, Nissei, Hitachi, Nippon Chemi-Con, Soshin, SANYO, ELNA and Matsuo attended cartel meetings held during the 4th Quarter of 2006. At these meetings, the Defendant attendees discussed, among other things, domestic and global capacitor market share and conditions. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

q.   Representatives from at least SANYO, Nippon Chemi-Con, ELNA, Matsuo, Rubycon, Okaya, Soshin, Taitsu, Nissei, Nitsuko, Hitachi, Panasonic, Shinyei and TOSHIN KOGYO attended cartel meetings held during the 2nd Quarter of 2007. At these meetings, the Defendant attendees discussed, among other things, market conditions for film capacitors by appliance. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

r.   Representatives from at least SANYO, NEC TOKIN, Rubycon, Matsuo, Panasonic, Nissei, Nippon Chemi-Con, Nitsuko, Hitachi, Soshin, TOSHIN KOGYO and Shinyei attended cartel meetings held during the 3rd Quarter of 2007. At these meetings, the Defendant attendees discussed, among other things, the cartel's agreement to increase prices following ███████████ ████████████████████████. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

s.   Representatives from at least SANYO, NEC TOKIN, Nippon Chemi-Con, Rubycon, ELNA, Panasonic, Taitsu, Nitsuko, Okaya, Hitachi, Soshin, TOSHIN KOGYO, Shinyei and Nissei attended cartel meetings held during the 4th Quarter of 2007. At these meetings, the Defendant attendees discussed, among other things, their plans to increase film capacitor prices, despite customer requests for price reductions. The Defendant attendees also discussed specific pricing intentions regarding specific customers. The reports from these meetings do not identify which specific members

of the participating Defendant corporate families had their interests represented in these cartel discussions.

t.   Representatives from at least TOSHIN KOGYO, Hitachi, Soshin, Nitsuko, Nissei, Okaya, Taitsu, and Shinyei attended cartel meetings held during the 2nd Quarter of 2008. In these meetings, the Defendant attendees discussed, among other things, customer pricing, including implementing price hikes and non-Japan market conditions. Specifically, certain of the Defendant attendees agreed to stabilize prices and resist customer efforts to request price reductions. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

u.   Representatives from at least NEC TOKIN, Nippon Chemi-Con, Matsuo, Rubycon, ELNA, Hitachi, Nissei, Okaya, Taitsu, Nitsuko, Shinyei, TOSHIN KOGYO, Soshin, Panasonic, KEMET, and SANYO attended cartel meetings held during the 3rd Quarter of 2008. At these meetings, the Defendant attendees addressed their current sales data and pricing information, and their business with specific customers. Specifically, the Defendant attendees, among other things, reached agreements about increasing pricing for electrolytic capacitors; suggested cooperation among certain cartel members in broad price negotiations regarding polymer aluminum capacitors; discussed raw materials (plastic film) price hikes; and adopted a price increase ███████████. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

v.   Representatives from at least Nissei, Panasonic, Taitsu, Shinyei, Rubycon, Okaya, Soshin, NEC TOKIN, Nippon Chemi-Con, Matsuo, FMD, ELNA, Hitachi, and SANYO attended cartel meetings during the 4th Quarter of 2008. At these meetings, the Defendant attendees discussed, among other things, implementing film capacitor price increases; current production status; market conditions in foreign markets, including North America; and ending price competition on film capacitors. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

w.   Representatives from at least Panasonic, Okaya, Nissei, Shinyei, Soshin, Taitsu, Nitsuko, and TOSHIN KOGYO attended cartel meetings during the 1st Quarter of 2009. At these

meetings, the Defendant attendees discussed, among other things, customer requests for price reductions and agreed among themselves to resist price decreases and stabilize their film capacitor prices. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

x.    Representatives from at least Nichicon, Rubycon, Nippon Chemi-Con, Matsuo, ELNA, Hitachi, FMD, and SANYO attended cartel meetings during the 2nd Quarter of 2009. At these meetings, the Defendant attendees discussed, among other things, their current sales data, current pricing information, industry and specific customer demands, and raw materials pricing. Specifically, the Defendant attendees also discussed their future production intentions with regard to aluminum and tantalum capacitors; sales trends for aluminum capacitors; cost of raw materials; and the impact of decreasing prices for ceramic capacitors. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

y.    Representatives from at least Nichicon, Rubycon, Nippon Chemi-Con, Matsuo, Hitachi, ELNA, SANYO, Okaya, TOSHIN KOGYO, Taitsu, Nissei, and Shinyei attended cartel meetings during the 3rd Quarter of 2009. At these meetings, the Defendant attendees discussed, among other things, current sales data, current pricing information, industry and specific customer demands, and future production intentions with regard to aluminum and tantalum capacitors. Specifically, the Defendant attendees discussed increasing sales through decreasing production of tantalum capacitors and holding back shipments; avoiding price competition among the cartel members; meeting demand for aluminum and tantalum capacitors; excess capacity; and cartel members' punishment for and criticism of another cartel member for making sales that undercut the cartel's collusive pricing. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

z.    Representatives from at least Nichicon, Rubycon, Nippon Chemi-Con, Matsuo, Hitachi, ELNA, SANYO, Okaya, Taitsu, Nissei, Shinyei and TOSHIN KOGYO attended cartel meetings during the 4th Quarter of 2009. At these meetings, the Defendant attendees discussed, among other things, their current sales data; current pricing information; industry and specific customer

demands; future Capacitors production intentions; price increases for polymer aluminum capacitors, tantalum capacitors, and other electrolytic products. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

aa.  Representatives from at least NEC TOKIN, Nichicon, Rubycon, Nippon Chemi-Con, Hitachi, ELNA, SANYO, Okaya, TOSHIN KOGYO, Taitsu, Nissei and Shinyei attended cartel meetings during the 1st Quarter of 2010. At these meetings, the Defendant attendees discussed, among other things, their current sales data; current pricing information; industry and specific customer demands; future production intentions with regard to aluminum and tantalum capacitors; and raising prices for aluminum and tantalum capacitors. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

bb.  Representatives of at least NEC TOKIN, Nippon Chemi-Con, Rubycon, Matsuo, ELNA, ROHM, Holy Stone, Okaya, Taitsu, Nissei, TOSHIN KOGYO, Shinyei, and Nissei attended cartel meetings held in the 2nd Quarter of 2010. At these meetings, the Defendant attendees discussed, among other things, their current sales data; current pricing information; industry and specific customer demands and trends; capacity; future Capacitors production intentions; and costs of raw materials. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

cc.  Representatives from at least SANYO, NEC TOKIN, Nippon Chemi-Con, Rubycon, ELNA, Matsuo, Okaya, Taitsu, TOSHIN KOGYO, and Shinyei attended cartel meetings held in the 3rd Quarter of 2010. At these meetings, the Defendant attendees discussed, among other things, drastic price increases in prices of capacitors. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

dd. Representatives from at least SANYO, NEC TOKIN, Nippon Chemi-Con, Rubycon, ELNA, Matsuo, Okaya, Taitsu, TOSHIN KOGYO, and Shinyei attended cartel meetings held in the 4th Quarter of 2010. At these meetings, the Defendant attendees discussed, among other things, large

increases in the prices of film capacitors, and refusing to do business with customers who did not accept the increase. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

ee.  Representatives from at least SANYO, NEC TOKIN, Nippon Chemi-Con, Rubycon, ELNA, Matsuo, Okaya, Taitsu, TOSHIN KOGYO, and Shinyei attended cartel meetings held in the 1st Quarter of 2011. At these meetings, the Defendant attendees discussed, among other things, industry trends, information shared at JEITA meetings, and coordinating their activities at the highest levels through regular meetings of senior officials in charge of Capacitors sales. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

ff.  Representatives from at least SANYO, NEC TOKIN, Nippon Chemi-Con, Rubycon, ELNA, Matsuo, Okaya, Taitsu, TOSHIN KOGYO, and Shinyei attended cartel meetings held in the 2nd Quarter of 2011. At these meetings, the Defendant attendees discussed, among other things, implementing price increases. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

gg.  Representatives from at least Okaya, Nippon Chemi-Con, Taitsu, TOSHIN KOGYO, and Shinyei attended cartel meetings held in the 3rd Quarter of 2011. At these meetings, Defendant attendees discussed, among other things, order flow for film and aluminum capacitors, and price increases imposed for film capacitors used in televisions. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

hh. Representatives from Okaya, Nippon Chemi-Con, Taitsu, TOSHIN KOGYO, Shinyei, Nissei, and Nitsuko attended cartel meetings held in the 4th Quarter of 2011. At these meetings, Defendant attendees discussed, among other things, profits obtained due to higher prices imposed over the last year, and vowed to each other to not cut prices despite competition from Taiwanese and Korean capacitor manufacturers. The reports from these meetings do not identify which specific members of

the participating Defendant corporate families had their interests represented in these cartel discussions.

ii.   Representatives from at least Okaya, Hitachi, Nippon Chemi-Con, Nissei, Taitsu, TOSHIN KOGYO, Shinyei, and Soshin attended cartel meetings held in the 1st Quarter of 2012. At these meetings, Defendant attendees discussed proposed increases in prices of film capacitors, and demand for products that utilize film and aluminum capacitors. The reports from these meetings do not identify which specific members of the participating Defendant corporate families had their interests represented in these cartel discussions.

207.   The cartel meetings among Defendants identified above are in no way an exhaustive listing of all the meetings held among Defendants during the Class Period. Cartel meetings have regularly been held from at least January 1, 2002 to present.

208.   The discussions, exchange of information, and agreements reached at each of these meetings constituted overt acts in furtherance of Defendants' conspiracy.

**3.      Other Meetings and Conspiratorial Communications Among Defendants**

209.   Both during and after the organized cartel meetings, as well as through ad hoc bilateral or multilateral meetings and communications, Defendants met, discussed and coordinated on how to avoid competing among themselves with regard to Capacitors as well as how best to put their agreements into effect. By way of example and not limitation, Defendants discussed and agreed among themselves on how to concertedly price their competing Capacitors in order to increase profitability and how to coordinate and convey their concerted manufacturing, delivery and pricing changes to customers and the market.

210.   The discussions, exchange of information, and agreements reached at each of these other meetings and through communications among certain Defendants constituted overt acts in furtherance of Defendants' conspiracy.

**a.      SANYO's Meetings and Communications With Other Defendants**

211.   At various times throughout the Class Period, SANYO had meetings and discussions following the Defendants' regular meetings with two of its primary competitors in the aluminum and tantalum capacitors markets, *i.e.*, NEC TOKIN and Nippon Chemi-Con. During much of the Class

Period, NEC TOKIN was SANYO's primary competitor for its POSCAP polymer tantalum capacitors, and Nippon Chemi-Con was SANYO's primary competitor for its OS-CON polymer aluminum capacitors. These frequent discussions, usually conducted by email or personal communication among employees of these companies, concerned eliminating price competition or artificially setting concerted prices for their respective competing products with regard to customers. At various times during the Class Period, agreements were reached between SANYO and these competitors to fix prices for their aluminum and tantalum capacitors.

**b.    AVX's Meetings and Communications With Other Defendants**

212.    AVX's involvement with the cartel and its members began much earlier than the company's purchase of Nichicon's tantalum capacitors production division in or about February 2013. During the Class Period, AVX executives met and conducted information exchanges with SANYO, KEMET, NEC TOKIN, as well as other Defendants, about their respective Capacitors businesses and market conditions and circumstances and worked to coordinate pricing strategy among its competitors. For example:

a.    █████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████
███████████████████████████████████████
██████████████████████████████████████

b.

213.    Evidence of anticompetitive information exchanged by cartel members indicates that AVX participated in such exchanges with cartel members. For example:

a.

b.

c.

d.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1 ████████████████████████████████████████████████████████

2 ██████████████████████████████████

3     **c.**       **KEMET's Meetings and Dealings With Defendant Cartel Members**

4     214.    KEMET joined the conspiracy by 2003, if not earlier.

5     215.    Evidence of anticompetitive information exchanged by cartel members indicates that

6 KEMET participated in such exchanges with cartel members. For example:

7         a.   Cartel meeting notes and reports dating from July 2003 show other cartel members

8 discussing competitively sensitive, non-public information about KEMET, such as price increases,

9 production capacity, and customers.

10         b.   ████████████████████████████████

11 ████████████████████████████████████████████████

12 ██████

13         c.   ████████████████████████████████

14 ████████████████████████████████████████████████

15 ████████████████████

16         d.   ██████████████████████████

17 ██████████████████████████████████████████████████████

18 ████████████████████████████████████████████████

19 ████████████████████████

20         e.   ██████████████████████████████

21 ██████████████████████

22         f.   ████████████████████████████████

23 ████████████████████████████████████████████████████████

24 ████████████████████

25         g.  A████████████████████████████

26 ██████████████████████████████

27         h.   ████████████████████████████████

28 ██████████████████████████████████████.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

i. ███████████████████████████████
███████████████████████████████████████
█████████████████████████████████████
████████████

216.    KEMET directly participated in meetings with cartel members in which confidential

non-public information related to capacitors was discussed. For example:

a. ████████████████████████████
████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████████
█████████████████████

b. ██████████████████████████████
███████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
████████

217.    KEMET has a long history of dealings with Defendant NEC TOKIN, as well as NEC

TOKIN's former corporate parent and current minority shareholder, NEC Corporation. Since at least

1998, KEMET and NEC TOKIN have had many opportunities to communicate regarding cartel

activities and to coordinate their actions. For example:

a. ████████████████████████████████
██████████████████████████████████████
███████████████████████████████████████

1  press release issued by NEC Corporation referred to the agreements as a "technical and promotional

2  alliance."

3  b. ████████████████████████████████████████████

4  ████████████████████████████████████████

5  ████████████████████████████████████████████

6  ████████████████████████████████████████

7  ████████████████████████████████████████

8  c. ████████████████████████████████████████████

9  ████████████████████████████████████████████

10 ████████████████████████████████████████████

11 ████████████████████████████████████████████

12 ████████████████████████████████████████████

13 ████████████████████████

14     218.   KEMET's acquisition of a controlling voting interest in NEC TOKIN not only

15 facilitated more opportunities for these two Defendants to exchange non-public, confidential

16 information between themselves in furtherance of the cartel's aims, but also placed KEMET in a

17 position of knowledge and control over NEC TOKIN's participation in cartel activities.

18     219.   On or about March 12, 2012, KEC, NEC TOKIN, and NEC Corporation entered into a

19 Stock Purchase Agreement under which KEC acquired a 34% economic interest and a 51% voting

20 interest in NEC TOKIN, with the remainder of the voting and economic interests being held by NEC

21 Corporation. KEMET paid a purchase price of $50 million, which was used by NEC TOKIN to repay a

22 debt to NEC Corporation. NEC Corporation and KEC also entered into an Option Agreement that

23 provided KEC with two call options that, if exercised, would allow it to purchase all of NEC

24 Corporation's economic interests and voting rights in NEC TOKIN. Pursuant to a concurrently

25 executed Stockholders' Agreement—also entered by KEC, NEC TOKIN, and NEC Corporation—

26 KEC was given the power to immediately appoint four of the seven members of NEC TOKIN's Board

27 of Directors and nominate the Chairman of the Board. KEMET was also required to perform certain

28 management services for NEC TOKIN and its subsidiaries.

220.     Underscoring the lack of corporate distinction between KEC and KEMET Corp., a press release issued by KEMET on March 12, 2012, stated that "KEMET Corporation [not KEC]" acquired the controlling voting interest in NEC TOKIN Corporation. KEMET's website also stated that "KEMET" acquired the interest in NEC TOKIN, without distinguishing between KEMET Corp. and KEC. A February 1, 2013, KEMET press release announcing the closing of KEMET's purchase of NEC TOKIN stock collectively referred to KEC and KEMET Corp. as "KEMET," and referred to the cooperation among KEMET and NEC TOKIN as an "alliance" and a "partnership."

221.     On June 7, 2012, KEC, NEC Corporation, and NEC TOKIN notified the European Commission on Competition of the transaction under the Commission's merger regulations. The decision issued by the Commission stated that, as a result of the transaction, KEC and NEC Corporation "will have the power to exercise decisive influence over the commercial policy of NEC TOKIN and thus jointly control NEC TOKIN." The Commission also referred to NEC TOKIN as a "merged entity" consisting of Defendants NEC Corporation and KEC.

222.     On May 3, 2013, KEC and NEC TOKIN entered into a Development and Cross-Licensing Agreement. Under this agreement, KEC and NEC TOKIN were to collaborate on the design, production, manufacture, packaging, and distribution of capacitors. In a second agreement—the Amended and Restated Private Label Agreement—KEC and NEC TOKIN agreed to make available to each other, for resale to end-use customers, all of the products that each company manufactures. In a press release, KEMET stated that KEMET Corporation entered into these two agreements "through [KEMET Corporation's] wholly-owned subsidiary [KEC]."

223.     KEMET's interest in NEC TOKIN allows KEMET to sell certain of NEC TOKIN's aluminum or tantalum capacitors. KEMET has shipped NEC TOKIN-manufactured tantalum capacitors directly from NEC TOKIN factories, for example, and these capacitors were sold using KEMET part numbers, labeled with KEMET labels, and invoiced through KEMET. KEMET publicly announced in January 2014 that it had "completed the integration of advanced components from NEC TOKIN" into its sales structure, thereby allowing KEMET to sell certain of NEC TOKIN's aluminum or tantalum capacitors.

224. Accordingly, in addition to selling and distributing their own aluminum, tantalum or film capacitors to purchasers throughout the world, as well as in the United States, KEMET and NEC TOKIN have, since early 2012, also sold and distributed each other's aluminum or tantalum capacitors to purchasers throughout the world and in the United States. This includes KEMET and NEC TOKIN outsourcing to one another the production of these capacitors.

225. In addition to cross-selling capacitor products, KEMET and NEC TOKIN often purchase raw materials from one another, work collaboratively on non-capacitor products such as electromagnetic compatibility devices, and exchange sensitive corporate information.

226. From 2012 to present, NEC TOKIN—while under KEMET's control—has continued to participate in the cartel's collusive actions to fix, raise, maintain, or stabilize prices for Capacitors. KEMET had knowledge of NEC TOKIN's participation in the cartel not only from its oversight of NEC TOKIN, but also as a result of KEMET's own collusive dealings with cartel members, including NEC TOKIN. During this period, neither the managing officers or directors of KEMET nor the managing officers or directors of NEC TOKIN instructed or directed NEC TOKIN to withdraw from Defendants' price fixing cartel and the conspiracy.

227. Having acquired and maintained a controlling voting interest in NEC TOKIN from NEC, KEMET has, since at least March 2012, had the authority to manage and operate NEC TOKIN, including but not limited to its corporate strategy and its Capacitors business. NEC had the same authority over NEC TOKIN until KEMET acquired its controlling interest in the company. From 2012 to present, NEC TOKIN—while under KEMET's control and still under NEC's oversight—has continued to participate in the cartel's collusive actions to fix, raise, maintain, or stabilize prices for Capacitors. During this period, neither the managing officers or directors of KEMET nor of the managing officers or directors of NEC instructed or directed NEC TOKIN to withdraw from Defendants' price fixing cartel and the conspiracy.

228. By knowingly acquiescing in NEC TOKIN's continued cartel activity, failing to disclose or otherwise concealing NEC TOKIN's cartel activity, failing to cause NEC TOKIN to terminate its cartel activity and failing to cause NEC TOKIN to withdraw from the cartel, both NEC and KEMET

1   joined and actively participated in Defendants' conspiracy and committed overt acts in furtherance of

2   the conspiracy.

3        229.    KEMET's overcharges of U.S. customers should not be insulated from liability by

4   hiding behind the veil of corporate separateness where KEMET Corp. is directing and controlling the

5   actions of KEC and using KEC to implement the conspiracy.

6       **d.**    **FMD's Meetings and Dealings With Cartel Members**

7        230.

8

9

10

11

12   **G.**    **Defendants' U.S.-Based Subsidiaries Marketed, Sold and Delivered Their Defendant**
13          **Corporate Parents' Price-Fixed Capacitors in Furtherance of the Capacitors Cartel's Aims and Purposes**

14        231.    When Defendants reached agreement on fixing, raising, maintaining or stabilizing prices

15   of Capacitors—whether as a result of formal or informal cartel meetings, or during ad hoc bilateral or

16   tri-lateral meetings arranged to enforce, implement or effectuate cartel purposes and agreements—each

17   of the Defendants meant for their collusive agreements to impact the pricing for all Capacitors subject

18   to the cartel's anticompetitive efforts, regardless of where they were sold.

19        232.    As part of a single, integrated global enterprise, Defendants sell market and distribute

20   Capacitors. Each Defendant sells its capacitors around the world, including in the United States.

21   Accordingly, to achieve the cartel's anticompetitive aims, Defendants effectuated the cartel by

22   establishing pricing on their Capacitors in all markets—including the United States—in which they

23   compete.

24        233.    The Japan-based Defendants having U.S. subsidiaries (*e.g.*, Nippon Chemi-Con, ELNA,

25   Hitachi, Holy Stone, NEC TOKIN, Nichicon, Okaya, Panasonic, ROHM, SANYO, Shinyei, Soshin,

26   Taitsu) established those subsidiaries not only to market, sell and distribute their capacitors in the

27   United States, but also to effectuate and achieve the cartel's aims and purposes. Without doing so,

28   these corporate entities would have had to perform such functions themselves. These corporate entities

chose not to do so and instead established corporate subsidiaries and affiliates that perform functions at the direction of and are controlled by their officers and managers in Japan.

234.    These U.S. subsidiaries have no authority to set prices below the prices for Capacitors agreed to among the cartel's members. For these U.S. subsidiaries, pricing authority largely was held by their Japan-based Defendant corporate parent, or the Defendant parent's designated representative in the United States.

235.    Because their Japan-based Defendant parents had significant control over all aspects of their business (*e.g.*, capacitor supply, pricing authority, business strategy, customer development and relations, sales, personnel decisions), many of the U.S. subsidiaries (as described more fully below) operated as little more than sales offices in the U.S. for their respective Japan-based Defendant parents. Indeed, as is set forth below, many of the Japan-based Defendant parents named their own employees directors, officers or managers of their U.S. subsidiaries, and many of these employees held these positions without ever even leaving Japan. As a result, these U.S. subsidiaries were—as intended—able to advance the cartel aims in the United States.

1.    **UCC Advanced the Cartel's Aims and Purposes in the United States for Nippon Chemi-Con**

236.    UCC, NCC's wholly owned U.S. subsidiary, sells NCC-branded aluminum and film capacitors to customers in North and South America, including in the United States.

237.    █████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
██████████████████████████

238.    ████████████████████████████████████████
███████

239.    ████████████████████████████████████████████
███████████████████████████████████



240.

241.

242.

243.

244.

245.

246.

247.



248.

249.

250.

251.

252.

253.

254.

255.

al

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

256. ████████████████████████████████████

257. ████████████████████████████████████

**2.    Nichicon America advanced the Cartel's Aims and Purposes in the United States for Nichicon.**

258.    Nichicon America, Nichicon Corp.'s wholly owned U.S. subsidiary, sells Nichicon Corp.'s aluminum and film capacitors to customers in the United States. Prior to Nichicon Corp.'s sale of its tantalum capacitor division to AVX in February 2013, Nichicon America also sold the company's tantalum capacitors in the United States.

259.    All of Nichicon Corp.'s capacitors sold in the United States are sold through Nichicon America.

260.    Nichicon America does not manufacture any of Nichicon's aluminum and film capacitors sold in the United States; they are all manufactured overseas. Accordingly, Nichicon America is dependent on Nichicon Corp. to provide it with the capacitors it markets, sells or delivers in the United States.

261.    Nichicon Corp. conducts significant business in the United States. Through Nichicon America, Nichicon Corp. sells its capacitors to companies in the U.S. automotive industry, as well as

U.S.-based technology companies such as ███████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████

262.    Nichicon's sales to these U.S.-based businesses are largely directed and supervised by Nichicon Corp.'s sales department personnel resident in Japan. Accordingly, all sales planning, strategy and pricing decisions relating to Nichicon capacitors sold in the United States are made by Nichicon Corp. sales and management personnel in Japan and Nichicon America employees have limited to no discretion or authority to conduct business without authorization from Nichicon Corp.'s Japan-based sales department leadership.

263.    Because its U.S. sales are important to Nichicon Corp.'s overall business, Nichicon Corp. has regularly assigned key sales and management personnel to positions at Nichicon America.

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████Nichicon personnel that have been co-listed between Nichicon Corp. and Nichicon America include the following:

a.    ██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

b.    ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

c.    ████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████

d. ████████████████████████████████████

████████████████████████████████████████

264.    Nichicon Corp.'s personnel holding positions at Nichicon America, supervising and overseeing Nichicon America sales staff, or doing business with the company's U.S. customers were knowledgeable about the existence of Defendants' cartel, as well as the cartel's aims and purpose.

265.    Information regarding the cartel's agreements regarding pricing and sales were disseminated to the Nichicon Corp. personnel who were holding positions at Nichicon America, supervising and overseeing Nichicon America sales staff, or doing business with the company's U.S. customers by those who participated in cartel meetings. The Nichicon personnel who participated in cartel meetings and activities held positions of authority within Nichicon Corp.'s management and sales departments. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████

266.    Nichicon Corp.'s oversight and direction of Nichicon America's sales operations permitted it to effectuate cartel pricing and sales strategies in the United States.

**3.    ROHM USA advanced the Cartel's Aims and Purposes in the United States for ROHM**

267.    ROHM USA—ROHM Co.'s wholly owned U.S. subsidiary identified on Soshin's web site as one of its "Overseas Operations"—sells ROHM Co.'s tantalum capacitors to customers in the United States.

268.    Essentially all of ROHM Co.'s capacitors sold into the United States are sold through ROHM USA.

269.    ROHM USA does not manufacture any of ROHM Co. capacitors sold in the United States; they are all manufactured overseas. Accordingly, ROHM USA is dependent on ROHM Co. for the capacitors it markets, sells or delivers in the United States.

270.    ROHM Co. closely oversees sales of its capacitors in the United States. ROHM Co.'s Euro-American Sales Department is one of its top-level departments within the company, and it

oversees ROHM USA. Accordingly, sales planning, strategy and pricing decisions relating to ROHM's capacitors sold in the United States are directed and overseen by sales and management personnel at ROHM Co. in Japan.

271. Sales to U.S.-based customers are important to ROHM's overall business. Its Sales Department, for example, has dedicated significant sales resources to making sales to ████ .

272. ROHM Co. has regularly assigned its key sales and management personnel to positions at ROHM USA. Personnel assigned to ROHM USA positions regularly perform those duties concurrently with their ROHM Co. duties. Some such personnel perform their ROHM USA duties from ROHM Co. offices in Japan and therefore are not physically present in the United States. Others work in the United States for a period of time, but eventually return to Japan to continue working for ROHM Co. For example:

a. ███████████████████████████████████████████████████████████████████

b. ███████████████████████████████████████████████████

c. ██████████████████████████████████

273. During the Class Period, both ROHM Co. and ROHM USA sales staff had meetings with cartel participants and senior sales and management officials at the U.S.-based subsidiaries of the other Japan-based Defendants, such as ██████████████████.

274. ROHM Co.'s control of ROHM USA's sales operations permitted it to effectuate cartel pricing and sales strategies in the United States.

**4. Okaya America advanced the Cartel's Aims and Purposes for in the United States for Okaya**

275. Okaya America—Okaya Co.'s U.S.-based wholly owned subsidiary—sells Okaya branded film capacitors to customers in the United States.

276.     Okaya America does not manufacture any of Okaya's film capacitors sold in the United States; they are all manufactured overseas by other Okaya entities. Accordingly, Okaya America is dependent on Okaya Co. to provide it with the capacitors it markets, sells or delivers in the United States.

277.     All of Okaya's capacitors sold in the United States are sold through Okaya America.

278.     Okaya's capacitors sales in the United States are directed and supervised by Okaya Co.'s sales department personnel resident in Japan. For example, materials outlining Okaya's company-wide internal process controls indicate that any price quotations must be approved by the Okaya Co. Overseas Sales Group Leader. Accordingly, all sales planning, strategy and pricing decisions relating to Okaya's capacitors sold in the United States ██████████████████████████████████ ██████████████████████████████████████ ██████████████████████████

279.     Okaya Co.'s oversight of Okaya America's sales efforts and product pricing is in line with its overall close management of the U.S.-based subsidiary as one of its domestic sales offices. ███ ██████████████████████████████████████ ██████████████████████████████

280.     Okaya Co. has regularly assigned its key sales and management personnel to positions at Okaya America. Personnel assigned to Okaya America positions regularly perform those duties concurrently with their Okaya Co. duties. Some such personnel perform their Shinyei America duties from Shinyei offices in Japan and therefore are not physically present in the United States. Others work in the United States for a period of time, but eventually return to Japan to continue working for Okaya Co. For example:

a.     ████████████████████████████ ████████████████████████████ ██████████████████

b.     ████████████████████████████ ██████████████████████████ ████████████████

c. ██████████████████████████

███████████████████████

d. ████████████████████████████

█████████████████████████

██████████████████████████

██████████████████████████

█████████

281.     Okaya Co. personnel holding positions at Okaya America or doing business with the company's U.S. customers were knowledgeable about the existence of Defendants' cartel, as well as the cartel's aims and purpose.

282.     Demand for Capacitors in the United States was regularly discussed among cartel members, including Okaya. For example, █████████████████████████████

████████████████████████████████████

███████████████████████████ During these meetings, Okaya's representatives and their fellow cartel members reported on available demand and pricing activity for film capacitors various global regions, including information specific to the North American capacitor market. Okaya used Okaya America to collect the information exchanged at these meetings.

283.     Information regarding the cartel's agreements regarding pricing and sales were disseminated to Okaya Co. personnel holding positions at Okaya America, supervising and overseeing Okaya America sales staff, or doing business with the company's U.S. customers by those who participated in cartel meetings. Okaya's primary representative in cartel meetings and activities for essentially the entire Class Period—█████████████████████████████

█████—had long-standing working relationships not only with those Okaya Co. Sales Department leaders and management officials who oversaw Okaya America's sales and operations, but also with Okaya Co. Sales Department and management personnel assigned to work at Okaya America.

284.     Okaya Co.'s control of Okaya America's sales operations permitted it to effectuate cartel pricing and sales strategies in the United States.

**5. Shinyei America advanced the Cartel's Aims and Purposes in the United States for Shinyei**

285.    Shinyei America—Shinyei Kaisha's U.S.-based wholly owned subsidiary—sells Shinyei branded film capacitors to customers in the United States. Shinyei's capacitors were manufactured by Shinyei Tech until in or about February 2011, after which time Shinyei Capacitor began manufacturing the company's capacitors.

286.    Shinyei America does not manufacture any of Shinyei's film capacitors sold in the United States; they are all manufactured overseas by other Shinyei entities. Accordingly, Shinyei America is dependent on Shinyei Kaisha—through Shinyei Tech/Shinyei Capacitor—to provide it with the capacitors it markets, sells or delivers in the United States.

287.    The vast majority of Shinyei's capacitors sold into the United States are sold through Shinyei America.

288.    Shinyei's capacitors sales in the United States are directed and supervised by Shinyei Tech/Shinyei Capacitor's sales department personnel resident in Japan. Accordingly, all sales planning, strategy and pricing decisions relating to Shinyei's capacitors sold in the United States are made by Shinyei Tech/Shinyei Capacitor sales and management personnel in Japan and Shinyei America employees have little to no discretion or authority to conduct business without authorization from Shinyei Tech/Shinyei Capacitor's Japan-based sales department.

289.    Shinyei Kaisha has regularly assigned key sales and management personnel from subsidiaries such as Shinyei Tech/Shinyei Capacitor to positions at Shinyei America. Personnel assigned to Shinyei America positions regularly perform those duties concurrently with their Shinyei Tech/Shinyei Capacitors duties. Some such personnel perform their Shinyei America duties from Shinyei offices in Japan and therefore are not physically present in the United States.

290.    ███████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

291.     Shinyei Tech/Shinyei Capacitor personnel holding positions at Shinyei America or doing business with the company's U.S. customers were knowledgeable about the existence of Defendants' cartel, as well as the cartel's aims and purpose.

292.     Demand for Capacitors in the United States was regularly discussed among cartel members, including Shinyei. For example, ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████ During these meetings, Shinyei's representatives and their fellow cartel members reported on available demand and pricing activity for film capacitors in various global regions, including information specific to the North American capacitors market. Shinyei Tech/Shinyei Capacitor used Shinyei America to collect the information exchanged at these meetings.

293.     Information about the cartel's agreements regarding pricing and sales was disseminated to the Shinyei Tech/Shinyei Capacitor personnel holding positions at Shinyei America, supervising and overseeing Shinyei America sales staff, or doing business with the company's U.S. customers by those who participated in cartel meetings.

294.     The Shinyei personnel that participated in cartel meetings and activities held positions of authority within Shinyei Tech/Shinyei Capacitor. For example, ███████████████ ████████████████████████████████████████████████ ████████████████████████████

295.     Shinyei's control of Shinyei America's sales operations permitted it to effectuate cartel pricing and sales strategies in the United States.

### 6.     Soshin America advanced the Cartel's Aims and Purposes in the United States for Soshin Co.

296.     Soshin America—Soshin Co.'s wholly owned U.S. subsidiary identified on Soshin's web site as one of its "Overseas Operations"—sells Soshin Co.'s film capacitors to customers in the United States.

297.     The vast majority of Soshin Co.'s capacitors sold into the United States are sold through Soshin America, with a limited amount sold through distributors or other authorized resellers.

298.     Soshin America does not manufacture any of Soshin's film capacitors sold in the United States; they are all manufactured overseas. Accordingly, Soshin America is dependent on Soshin Co. for the capacitors it markets, sells or delivers in the United States.

299.     Soshin America does not have an autonomous sales department. ████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
███████████████████████████

300.     From at least 1999 to 2014, nearly all of Soshin America's directors and officers have concurrently held sales or management positions at Soshin Co. For example:

a.     ████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████

b.     ████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████

c.     ████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████

301.     ████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1  ████████████████████████████████████████████████████████

2  ██████████████████████████████.

3      302.   ████████████████████████████████████████████

4  ████████████████████████████████████████████████████

5  █████████████████████

6      303.   ████████████████████████████████████████████

7  ████████████████████████████████████████████████████████

8  ███████████████████████

9      304.   Demand for Capacitors in the United States was regularly discussed among cartel

10  members, including Soshin. █████████████████████████████████████████

11  ███████████████████████████████████████████████████████

12  ██████████████████████████████████████████████████during

13  which Soshin's representatives and their fellow cartel members reported on available demand and

14  pricing activity for various global regions, including information specific to the North American

15  capacitor market. Soshin Co. used Soshin America to collect the information exchanged at these

16  meetings.

17      305.   Information about the cartel's agreements regarding pricing and sales was disseminated

18  to the Soshin Co. personnel holding positions at Soshin America or doing business with the company's

19  U.S. customers by those who participated in cartel meetings.

20      306.   The Soshin personnel that participated in cartel meetings and activities held positions of

21  authority within Soshin Co.'s sales and planning departments.████████████████████

22  ████████████████████████████████████████████████████████

23  ██████████████████████████████████████.

24      307.   Soshin Co.'s complete control over Soshin America's sales operations permitted it to

25  effectuate cartel pricing and sales strategies in the United States.

26  **H.   Anticompetitive Effects of Defendants' Capacitors Cartel**

27      308.   Defendants' concerted and collusive actions as alleged herein artificially inflated the

28  prices of Capacitors. Capacitor prices stabilizing during the Class Period is contrary to what would be

expected in a competitive market given, among other things, the excess capacity (as alleged below) and decreasing demand for aluminum, tantalum and film capacitors beginning in the early 2000s. Industry and government data suggest that per unit prices for aluminum, tantalum and film capacitors began to noticeably stabilize, or even increase, around 2005, despite falling demand and excess manufacturing capacity among Defendants.

309.     From 2005 to the present, industry data shows that per unit prices for tantalum capacitors increased approximately $0.008, or $8.82 per thousand.

310.     In 2005, aluminum capacitors began to stop their price decline from approximately $55.06 per thousand in 2003. In 2005, industry data shows that the price per unit for aluminum electrolytic capacitors was $46.76 per thousand units, and the per unit prices hovered between approximately $40.00 and $46.00 per thousand until 2013.

311.     In 2005, film capacitors demonstrated a price increase of nearly $ 1.63 per thousand units from 2004, and the per unit price continued to rise on most types of film until at least the beginning of 2009, after which the price of film capacitors declined at times, though this decline was less severe than it would have been in an unfettered market due to the cartel.

312.     Defendants' conspiracy permitted the Defendant manufacturers of aluminum, tantalum and film capacitors to slow, negate and even reverse the market-driven decline in price for their products, and to fix prices at supra-competitive levels.

## VIII.   INDUSTRY CHARACTERISTICS INDICATING AND FACILITATING DEFENDANTS' CONSPIRACY

313.     For at least as long as the Class Period, the aluminum, tantalum and film capacitor industry has been characterized by numerous factors that facilitated Defendants' conspiracy. By way of illustration and not limitation, the industry has exhibited (1) market concentration among a limited number of participants; (2) high barriers to entry; (3) mutual interchangeability of Defendants' products; (4) inelasticity of demand; (5) product commoditization; (6) weak demand in a mature market; (7) excess manufacturing capabilities and capacity; (8) a large number of purchasers with limited purchasing power; and (9) ease of information sharing among Defendants.

### A.    Market Concentration

314.    Global sales for aluminum, tantalum and film capacitors remain large. In 2004, the electrolytic (*i.e.*, aluminum and tantalum) capacitors accounted for approximately 12% of global capacitor consumption, and film capacitors were approximately 2% of global consumption. Consumption for electrolytic capacitors in 2014 is estimated to be approximately 8% of global volume, and for film capacitors it is estimated to be approximately 1% of global volume. These products generated an estimated $8.1 billion in aggregate revenue for fiscal year 2014 alone. Industry data show that electrolytic capacitors together currently account for approximately 31% of North and South American capacitor consumption (most of which are presumably consumed in North America), which is valued at approximately $668 million. Film capacitors currently account for approximately 15%, or $323 million of North and South American capacitor consumption.

315.    Sales in the aluminum, tantalum and film capacitors manufacturing industry are highly concentrated—a fact that is conducive to the type of collusive activity alleged herein.

316.    Though there are a relatively large number of companies that produce aluminum capacitors and sell them both globally and in the United States, most of the sales are made by a small subset of manufacturers named herein as Defendants. In all, industry data show that the 13 largest manufacturers of aluminum capacitors account for approximately 92% of all aluminum capacitor sales. Specifically, industry analysts report that Defendants Nippon Chemi-Con, Nichicon, Rubycon, Panasonic, AVX and ELNA together currently account for approximately 65% of all aluminum capacitors sales. Adding in the smaller sales amounts of Defendants Hitachi AIC, Matsuo and TOSHIN KOGYO, Defendants collectively account for approximately 70% of all aluminum capacitors sales.

317.    Given the relatively small volume of sales (*i.e.*, mostly 3% or less) or less of total global sales of the non-conspirator aluminum capacitor manufacturers, along with their manufacturing and distribution constraints in the global aluminum capacitors market relative to the Defendants' capacities (see "High Barriers to Entry" below), the Defendants' concerted actions have had the ability to, and did, impact pricing on and output of aluminum capacitors during the Class Period. There was not a reasonable threat that these fringe manufacturers, who were not members of the cartel, could undercut

the cartel's concerted pricing and meet all or a significant part of market demand for aluminum capacitors.

318.    Industry data show that the six largest manufacturers of tantalum capacitors—*i.e.*, Defendants KEMET, AVX, Vishay, SANYO, Hitachi AIC, and ROHM—together account for approximately 91% of all tantalum capacitors sales. Adding in the smaller sales amounts of Defendants Matsuo and TOSHIN KOGYO, Defendants collectively account for approximately 95% of all tantalum capacitors sales.

319.    Given the relatively small volume of sales (*i.e.*, mostly 3% or less of total global sales) of the non-conspirator tantalum capacitor manufacturers, along with their manufacturing and distribution constraints in the global tantalum capacitors market relative to the Defendants' capacities (see "High Barriers to Entry" below), the Defendants' concerted actions have had the ability to, and did, impact pricing and output in the global and United States tantalum capacitor markets during the Class Period. There was not a reasonable threat that these fringe manufacturers who were not members of the cartel could undercut the cartel's concerted pricing and meet all or a significant part of market demand for tantalum capacitors.

320.    Industry data show that the five largest manufacturers of film capacitors—Panasonic, KEMET, TDK, Vishay and AVX—together account for approximately 32% of all film capacitors sales. These five manufacturers, along with Defendants Okaya, Nissei, Taitsu, Soshin, Shinyei, Nitsuko, Nippon Chemi-Con, Nichicon, Rubycon, and Hitachi AIC collectively account for approximately 70% of all film capacitors sales.

321.    Given the relatively small volume of sales (*i.e.*, mostly 3% or less) of the non-conspirator film capacitor manufacturers, along with their manufacturing and distribution constraints in the global film capacitors market relative to Defendants' capacities (see "High Barriers to Entry" below), the Defendants' concerted actions are likely to have had the ability to, and did, impact pricing and output in the global and United States film capacitor markets during the Class Period. There was not a reasonable threat that these fringe manufacturers who were not members of the cartel could undercut the cartel's concerted pricing and meet all or a significant part of market demand for film capacitors.

## B.     High Barriers to Entry

322.    In industries characterized by substantial barriers to entry, new entrants are unlikely to be able to compete away supracompetitive cartel pricing. Here, high barriers to entry have prevented entry by sellers of Capacitors despite the artificial inflation of prices.

323.    Companies seeking to manufacture and sell aluminum, tantalum and film capacitors confront various significant barriers to entry.

324.    The capacitors manufacturing industry is a mature one dominated by established corporations, each having multinational operations, global market reach, and diverse product portfolios of all types of passive electrical components. These companies—the Defendants in particular—have significant experience in the global capacitors industry and established reputations with both sellers of raw materials and purchasers of finished capacitors. These companies typically have access to significant financial resources that allow them to commit the capital necessary to bring online new fabrication operations and facilities or to expand/retrofit existing ones to meet and exceed market demand and adjust to technological changes. This readily available access to capital also permits manufacturers like Defendants the ability to establish and secure necessary supply chain commitments for all raw materials they require. Defendants are all established manufacturers in the Capacitors industry.

325.    For a prospective capacitor manufacturer, setting up competitive manufacturing operations and supply chain operations is a significant financial and logistic hurdle to market entry. A new entrant seeking to build electrolytic capacitor and/or film capacitor fabrication operations and facilities faces not only the sizeable cost of building fabrication plants, but also the costs of acquiring the necessary production technology, hiring and retaining skilled and knowledgeable manpower, and securing the raw materials and supply chain commitments necessary to manufacture competitive products. These costs would exceed hundreds of millions of dollars. Many of the Defendant manufacturers have developed internal processing capabilities for raw materials and have established relationships with raw materials producers that all but insure that their requirements will be met.

326.    Moreover, some of the raw materials necessary to manufacture certain types of capacitors are produced in only a limited number of regions around the world or are available from only a limited number of suppliers.

327. For example, tantalum is the principal feedstock used to make tantalum capacitors. Fabrication of tantalum capacitors accounts for over 60% of the global and U.S. demand for tantalum. Tantalum is only mined in a few regions in the world, principally South America (Brazil), central Africa (the Democratic Republic of Congo), and Australia. Because the Congo is rich in ores containing tantalum, rebel factions in the country have mined and sold tantalum to foreigners in order to fund their insurgency. To avoid SEC-reporting companies directly or indirectly funding civil wars and strife abroad when purchasing their tantalum requirements, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act, Section 1502, which designates tantalum as a "conflict mineral" and requires that public companies using tantalum or other conflict minerals to file annual public reports with the SEC regarding the origins of conflict minerals in their supply chains that disclose and represent the source of these minerals. Sourcing concerns led to supply shortages and price shocks. Accordingly, a potential new tantalum capacitor manufacturer not only would have difficulty securing adequate supplies of tantalum in the already competitive global market for the mineral, but would likely have to commit significant time, effort and money to auditing its newly acquired tantalum supply chain.

328. Similarly, the plastic film used to make film capacitors may also be difficult for a new entrant to source. During the Class Period, film capacitors have become more difficult to produce because manufacturers have encountered difficulty in securing the necessary input materials. The volume of plastic film material needed for a production run of film capacitors is generally not large enough to make it profitable for chemical companies to manufacture the plastics. As a result, five types of plastic material now account for over 90% of film capacitor dielectrics: polypropylene, polyester, polyphenylene sulfide, polyethylene naphthalate, and polytetrafluoroethylene. A limited number of dielectric grade resin manufacturers produce control the global production of these plastics (*e.g.*, principally DuPont, Teijin, Toray, Mitsui, and Borealis) and they make them in large batches only a few times a year. Likewise, the converters who apply special conductive coatings to the resin usually only run large batches a few times a year, and for some specialty film coatings, batches are run only once a year.

329. These hurdles, however, are not the only barriers a new market entrant faces. For a new market entrant consistently to manufacture and sell Capacitors competitively and to create and sustain a

diverse product portfolio, it must invest in substantial research and development operations. Additionally, the new entrant must create and maintain global sales, marketing and distribution operations so that its products can reach Capacitor purchasers.

330.    Ultimately, to be competitive, a new market entrant has to commit to significant financial and operational undertakings to establish itself in an industry where—absent price manipulation— profit margins are not large (and are trending lower) and large economies of scale must be achieved in order to reach profitability. A new market entrant seeking financing would need to convince investors or commercial lenders to loan it hundreds of millions of dollars to enter a market for commoditized, low profit margin products where profitability depends on achieving large economies of scale despite waning demand.

331.    No notable new manufacturers have entered the aluminum, tantalum or film capacitors industry in well over a decade—other than through strategic alliances or acquisition of companies or business units already producing specific electrolytic capacitor products (*e.g.*, KEMET's 2012 investment in NEC TOKIN through which KEMET now labels NEC TOKIN tantalum capacitors and other products as their own, and invoices and ships these re-sleeved products direct from NEC TOKIN factories; AVX's acquisition of Nichicon's tantalum capacitor production operations; Hitachi AIC's sale of its tantalum capacitor production operations to Holy Stone in 2009; Holy Stone's sale of the former Hitachi AIC tantalum production operations to Vishay in 2014).

## C.    Mutual Interchangeability of Defendants' Capacitors

332.    As noted earlier, capacitors of like capacitance, dielectric, and form factor are mutually interchangeable. A specific aluminum, tantalum or film capacitor manufactured by one of the Defendants therefore can be exchanged for a product of another Defendant with the same technical and operational specifications. There are no other defining physical characteristics that differentiate Defendants' various aluminum, tantalum or film capacitor products from each other.

333.    Defendants are aware of the fungibility of their specific products. Indeed, Defendants have made product cross-reference materials available through their respective web sites, product catalogs, and/or other materials distributed to Capacitor purchasers. These cross-reference materials

identify a specific competitor's Capacitors by either product number or technical and operational specifications, and then identify their own specific mutually interchangeable Capacitors.

334.    In addition to many of Defendants' products being directly interchangeable, products with differing capacitance and form factor—depending on circuit design and certain technical requirements—can be substituted for each other.

335.    Because Capacitor purchasers are aware of the mutual interchangeability of Defendants' respective Capacitors of like capacitance, dielectric and form factor, along with the possibility that certain products that are not directly fungible (*i.e.*, with differing technical tolerances and ratings) can still replace each other, Defendants present purchasers a broad portfolio of product choices that can meet their needs. Accordingly, absent Defendants' conspiracy, price would be the primary means of competition among Defendants in the aluminum, tantalum and film markets.

**D.    Inelastic Demand**

336.    Inelastic demand means that increases in price result in limited declines in quantity sold in the market. For a cartel to profit from raising prices above competitive levels, demand must be inelastic at competitive prices such that cartel members are able to raise prices without triggering a decline in sales revenue that would make the artificial price increase unprofitable. In simple terms, demand is inelastic when the loss in volume arising from a price increase is small relative to the magnitude of the increase in price, allowing higher prices to increase revenues and profits despite loss of sales.

337.    Demand is inelastic for aluminum, tantalum and film capacitors. When there are few or no substitutes for a product, purchasers have little choice but to pay higher prices in order to purchase these products. As set forth above, capacitors are a fundamental and necessary component in the electric circuits employed to make functional a wide variety of products within different end-markets. Capacitors perform a particular function that generally cannot be replicated through inclusion of other components. No other type of passive electrical component (*e.g.*, inductors, resistors) can serve as a substitute or a functional equivalent to a capacitor in an electric circuit. Accordingly, a purchaser that is either an OEM or an EMS Provider cannot design an electric circuit to bypass its need for a capacitor with a certain capacitance, dielectric and form factor.

338.     Capacitors are also often a comparatively inexpensive cost input in electrical devices, so a purchaser facing higher prices for Capacitors would generally pay that increased price rather than forgo its opportunity to sell the device that includes the Capacitors. Notably, Capacitors bought for import to the United States are often ultimately used in the production of high-cost durable products. Accordingly, U.S. Capacitor purchasers are generally less price-sensitive than Asian purchasers and will pay higher prices for Capacitors in order to sell their final products or (for distributors) to meet demand.

339.     Further, Capacitor purchasers facing strict deadlines tied to promised product delivery dates would pay the increased price for the specific Capacitors needed rather than lose out on the amount already invested in the completed products incorporating the Capacitors or risk losing business permanently by alienating downstream customers through missed deadlines.

340.     Indeed, demand inelasticity for Capacitors is particularly acute when a given electric circuit or an electronic device requires not just a Capacitor, but one with a specific capacitance, dielectric and form factor that specifically fits the circuit's design. In that instance, a purchaser has no choice but to buy a specific Capacitor with the required technical and operational characteristics.

**E.     Commoditization**

341.     When a product is characterized as a commodity, market participants typically compete on the basis of price rather than other attributes such as product quality or customer service. Where competition occurs principally on the basis of price, it is easier to implement and monitor a cartel because price is more often objectively measurable and observable than non-price factors such as service.

342.     Aluminum, tantalum and film capacitors are mass-produced through standardized manufacturing processes. They are designed according to standardized technical and operational characteristics for the various mutually interchangeable models Defendants manufacture.

343.     The Capacitors at the center of Defendants' conspiracy are largely commoditized.

**F.     Weak Demand**

344.     Static or declining demand is one factor that makes the formation of a collusive arrangement more likely. Under normal business conditions, when faced with weak demand conditions, firms will attempt to maintain their sales by taking market share from competitors through decreasing

prices. For this reason, firms faced with static or declining demand have a greater incentive to collude with competitors to avoid price competition and profit erosion.

345.     The overall demand for aluminum, tantalum and film capacitors has declined since the early 2000s. Specifically, demand for aluminum and tantalum capacitors is closely tied to the demand for particular consumer electronics. Over the past decade, declining sales of desktop computers and television sets have weakened demand for passive electronic components and capacitors in particular. In 2012, for example, sales of televisions and desktop computers declined roughly 10% from the previous year, whereas demand for laptop computers declined only 2%. The impact of this decline in demand on Capacitor demand is evident in the static growth observed by the overall market and the negative growth trends reported in some segments by certain Defendants.

346.     For instance, Nichicon's 2013 Annual Report states that the company's 21.7% decrease in capacitor sales "is attributed to declining demand for digital home electronics and inverter equipment." Similarly, AVX Corporation made the same observation in its 2013 Annual Report stating, "[o]verall sales prices for our commodity component products declined during 2013."

**G.     Excess Manufacturing Capacity**

347.     All things equal, if product manufacturers have excess capacity available to meet and exceed demand, prices in an unfettered market will decline. This is all the more so if demand is falling as well.

348.     An economist would expect that in a market in which product manufacturers have excess production capacity and demand is falling, prices would fall as well. If those conditions exist, and yet prices are increasing, economics suggest that cartel behavior could be the cause of his anomaly.

349.     Before and during the Class Period, Defendants had excess manufacturing capacity that allowed them to expand to meet global and U.S. demand for aluminum, tantalum and film capacitors.

350.     During the Defendants' regular cartel meetings, Defendants frequently disclosed to each other data regarding their respective current and projected production levels and manufacturing capacity availability. This information was also regularly shared among Defendants in their informal bilateral and multilateral meetings held in connection with or separate from the regular cartel meetings.

351.     Defendants also regularly disclosed to each other when they had excess capacity available to meet demand for the aluminum, tantalum and film capacitors or when they intended to produce less than the capacity available through their manufacturing facilities.

**H.      Large Number of Purchasers With Limited Purchasing Power**

352.     In the markets for aluminum, tantalum and film capacitors, Defendants each have historically sold and currently sell to a wide number of purchasers around the globe, the vast majority of whom during the Class Period made up no more than 10% of each Defendant's respective annual net sales, year over year.

353.     Defendants therefore had many reasons during the Class Period to coordinate pricing and market supply availability with each other within the auspices of their cartel.

354.     Defendants concertedly priced their respective Capacitors during the Class Period, and also provided lockstep quotation of production lead times to purchasers who tried to shop around for the best deal.

**I.      Ease of Information Sharing Among Defendants**

355.     Because of their common membership in trade associations and interrelated business relationships between certain executives, officers, and employees of the Defendants, there were many opportunities both before and during the Class Period for Defendants to collude by discussing competitive information regarding their respective aluminum, tantalum and film capacitors. The ease of communication was facilitated by the use of meetings, telephone conversations, email messages, written correspondence and text messaging. Defendants took advantage of these opportunities to discuss, and agree upon, their pricing for the various types of capacitors they produce.

356.     Industry trade associations make a market more susceptible to collusive behavior because they can provide a pretext under which conspirators can exchange sensitive company information such as pricing and market allocation.

357.     A number of industry trade associations exist to which many of the Defendant manufacturers are members. The Japan Electronics and Information Technology Industries Association ("JEITA") is a prominent trade organization that claims as members many of the Defendants, *e.g.*, Fujitsu, Hitachi Chemical, Matsuo, Nichicon, Nippon Chemi-Con, NEC TOKIN, Okaya, Panasonic,

ROHM, Rubycon, and Soshin. It was formed in 2000 from two earlier organizations, the Electronic Industries Association of Japan and the Japan Electronic Industries Development Association.

358.    JEITA is not the only industry trade association to which Defendants hold memberships. One of the largest trade associations for the industry, the Electronic Components Industry Association ("ECIA"), claims Defendants AVX, KEMET, Panasonic, and ROHM, among others, as members. According the ECIA, its members are granted access to "industry peers and executive networking," and events where they can be "face-to-face with leaders of the authorized electronic components industry." Likewise, the European Passive Components Industry Association provides similar networking opportunities, and it includes Defendants Nichicon, AVX and Panasonic among its members. KEMET and Panasonic are also members of the Power Sources Manufacturers Association ("PSMA"). Additionally, Defendants regularly attend the yearly Applied Power Electronics Conference and Exposition ("APEC"), which has been held yearly since 1986 and is co-sponsored by other organizations, including the PSMA.

359.    Certain Defendants have, during the Class Period, ▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉

360.    Aside from these formalized means of exchanging information among each other, Defendants have among them numerous informal links between their former and current colleagues, co-venturers, or partners employed by other Defendant companies. These links provided them the means and opportunity to exchange competitively sensitive information. Despite the billions of dollars of revenue generated by the capacitors industry worldwide, it is still a narrow segment of the overall electronic components industry, and the key decision-makers for the major producers had personal access to each other both directly and indirectly.

361.     Many of the Defendants are either Japanese corporations or partially or wholly owned U.S. subsidiaries of Japanese corporations. Those Defendants that are not Japanese corporations have in part become involved in the Capacitors industry and, as a result, Defendants' price fixing conspiracy, by acquiring Capacitors manufacturing operations or business units from Japanese corporations (*e.g.*, AVX) or by co-venturing and/or building strategic Capacitors sales, manufacturing and marketing alliances with Japanese companies or companies with significant Capacitors-related Japanese operations (*e.g.*, KEMET). The geographic proximity of the Japan-based Defendants to each other help facilitate their ability to meet, converse, agree on a course of collusive action and execute on that course of action on a real-time basis.

362.     Defendants can procure relatively detailed competitive information from industry analysts. The capacitor industry is analyzed by a limited number of market research firms that deal in detailed industry data. Each of these firms offers, for a fee, market data on pricing, supply, and other key indicators of market activity as well as market projections. The capacity and pricing information procured by these analysts is provided directly from industry participants, including certain of Defendants. Given the limited number of analysts that cover the capacitors industry, those that do are often provided highly detailed information and direct access to decision-makers for the capacitors manufacturers, including Defendants.

363.     In fact, Defendants engaged in regular and continuous exchanges of confidential information regarding their respective Capacitors businesses throughout the Class Period.

## IX.     CURRENT U.S. AND INTERNATIONAL ANTITRUST INVESTIGATIONS INTO ANTICOMPETITIVE PRACTICES IN THE CAPACITORS INDUSTRY

364.     Defendants' conspiracy to artificially raise, maintain or stabilize prices for aluminum, tantalum and film capacitors, as well as to restrict the output of such Capacitors, has only recently been discovered by law enforcement and regulatory authorities both in the United States and throughout Asia.

365.     In April 2014, the DOJ Antitrust Division confirmed to industry sources that the government has opened an investigation into price fixing in the capacitors industry. The DOJ has

already intervened in this case and has confirmed that its investigation into the capacitors industry is being conducted by the United States Attorney's Office for the Northern District of California.

366.    Media and industry sources have reported that this investigation has been ongoing for some time, and that the DOJ has been coordinating its efforts to investigate the capacitors industry with the People's Republic of China's National Development and Reform Commission ("NDRC"), an agency entrusted with regulating price-related anticompetitive activity by the Chinese State Council. During March 2014, the NDRC conducted several raids on Chinese operations of Japanese capacitors manufacturers.

367.    Defendant Panasonic/SANYO has approached U.S. authorities—and reportedly Chinese authorities—to self-report its involvement in the conspiracy and to request prosecutorial leniency and amnesty.

368.    ACPERA provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily admits its conduct to the DOJ. A November 19, 2008 presentation on the DOJ's website explains that "[a conditional leniency] applicant must admit its participation in a criminal antitrust violation involving price fixing . . . before it will receive a conditional leniency letter." One of the leniency benefits for a conspirator that is accepted into the ACPERA program is that the applicant is not charged with a criminal offense and is not required to plead guilty to criminal charges.

369.    By applying for leniency through ACPERA, Panasonic/SANYO would have had to admit to price fixing in the Capacitors industry.

370.    On or about July 2, 2014, the NDRC publicly confirmed its investigation into the capacitors industry though a report published in the China Price Supervision and Antitrust Journal and written by Xu Kunlin, Director-General of the NDRC's Price Supervision and Antimonopoly Bureau. In this report, Xu revealed that one Japanese capacitor company self-reported its cartel activity in March 2014, and that this company along with other Japanese capacitor manufacturers held regular conferences to exchange market information related to their products. Media and industry sources have quoted Xu as saying that the Japanese manufacturer seeking amnesty would receive complete leniency.

371.    The United States and the PRC are not the only countries investigating price fixing in the capacitors industry.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

372.     Media and industry sources report that the Japan Fair Trade Commission ("JFTC") has been investigating price fixing of aluminum and tantalum capacitors. On or about June 24, 2014, the JFTC conducted raids of approximately eight capacitors manufacturers believed to be members of the cartel, including Panasonic, NEC TOKIN, Hitachi Chemical, Nichicon and Nippon Chemi-Con. According to media reports citing sources close to the JFTC's investigation, sales executives and other officials from the raided companies discussed and agreed upon price increases for capacitors for at least several years during the Class Period.

373.     Since the beginning of 2014, investigations into the capacitors industry also have been opened by the South Korean Fair Trade Commission, the Taiwanese Fair Trade Commission, Brazil's Administrative Council for Economic Defense, and the European Commission's competition authority.

374.     To date, few of the Defendants have commented about their being subject to these raids. Defendant Panasonic/SANYO has confirmed that it was raided by both the JFTC and South Korean authorities.

375.     Defendant NEC TOKIN has confirmed that it has been contacted or raided by American, Chinese and European authorities and has stated that it is cooperating with authorities.

376.     Defendant KEMET—the holder of 34% equity and 51% voting interests in NEC TOKIN, as well as an option to acquire it outright—disclosed the following about NEC TOKIN its 2014 annual report:

> In March and April, 2014, NEC TOKIN and certain of its subsidiaries received inquiries, requests for information and other communications from government authorities in China, the United States, the European Commission, Japan and South Korea concerning alleged anti-competitive activities within the capacitor industry. According to NEC TOKIN, the investigations are at an early stage. As of this date, NEC TOKIN has not recorded an accrual as a result of the investigations.

377.     Defendant TOSHIN KOGYO has confirmed that it has been contacted by Japanese, Chinese and Taiwanese authorities.

378.     For some Defendants—especially Panasonic/SANYO—these investigations are not the first time they have been scrutinized by law enforcement and competition authorities for anticompetitive behavior. These Defendants have a documented history of cartel behavior and antitrust price-fixing recidivism.

379.     Panasonic and SANYO—both before and after Panasonic's acquisition of SANYO—have been investigated by the DOJ in the last several years for participating in price-fixing conspiracies involving automotive parts and lithium ion battery cells.

380.     Panasonic pled guilty for its role in a nearly six and a half year-long conspiracy to fix prices of switches, steering angle sensors, and automotive high intensity discharge ballasts installed in cars sold in the United States and elsewhere.

381.     Panasonic agreed to pay a $45.8 million criminal fine, and a number of its executives pled guilty in exchange for limited fines and imprisonment.

382.     SANYO agreed to plead guilty for its role in a year and a half long conspiracy to fix prices on cylindrical lithium ion battery cells sold worldwide for use in notebook computer battery packs, and agreed to pay a $10.731 million criminal fine.

383.     Additionally, Panasonic has been named as a defendant by the EC Competition Authority in an investigation into CRT televisions and monitors. In related U.S. civil litigation regarding price fixing of CRT televisions and monitors, Panasonic agreed to pay $17.3 million to settle claims brought by direct purchasers. Panasonic is also a defendant in U.S. civil litigation regarding price fixing among TFT-LCD flat panel display manufacturers.

## X.     FRAUDULENT CONCEALMENT

384.     Plaintiffs have had neither actual nor constructive knowledge of the pertinent facts constituting their claims for relief asserted herein, despite their diligence in trying to discover such facts. Plaintiffs and members of the Direct Purchaser Class could not have discovered through the exercise of reasonable diligence the existence of the conspiracy alleged herein until in or about March 2014, when investigations by the DOJ and competition and law enforcement authorities in the People's Republic of China, Japan, Taiwan, South Korea and the European Commission were first made public.

385.     Defendants engaged in a self-concealing conspiracy that did not give rise to facts that would put Plaintiffs or the Direct Purchaser Class on inquiry notice that there was a conspiracy among Defendants to artificially fix, raise, maintain or stabilize prices for aluminum, tantalum and film capacitors, as well as to restrict their respective output by quoting unjustifiably long production lead

times. In fact, Defendants had secret discussions about price and output and, in furtherance of the conspiracy, they agreed not to discuss publicly the nature of the scheme.

386.    Defendants did not take or distribute official minutes or record the secretive cartel meetings discussed herein because they recognized competitively sensitive information was exchanged among themselves during these meetings. Any disclosure of the matters, information and data discussed in the many meetings held among the Defendants over more than a decade could expose the conspiracy, thereby frustrating the cartel's operation and effectiveness and exposing its members to criminal and civil liability in various jurisdictions, including the United States.

387.    A 2006 email from a SANYO employee expressed Defendants' intent to keep their collusive actions secret and how the cartel's members intended to do so: "[E]xchanging information is useful . . . . However, it maybe [*sic*] become a double-edged sword at times. To the extent possible, try to exchange verbally so that no evidence is left behind. Especially pricing figures and important presentation materials."

388.    Defendants' records regarding their secretive cartel meetings exist in the form of emails, summaries and notes taken or drafted by Defendants' employees in attendance at these meetings. These emails, summaries and notes recounting these meetings and Defendants' unlawful agreements were only circulated among a limited number of their fellow employees who were responsible at their respective companies for implementing the cartel's anticompetitive actions. When circulated, these emails, summaries and notes regularly included instructions from their authors to distribute them internally with the utmost sensitivity due to the competitively sensitive information contained within them.

389.    For example, a SANYO employee who regularly took notes at the meetings he attended on this company's behalf circulated these notes via email among SANYO employees and leadership responsible for implementing the cartel's anticompetitive actions by giving the recipients introductory admonitions to take "the utmost care in handling [these] report[s]" because the "gathering[s] [*i.e.*, the cartel's meetings] should not be disclosed to the public."

390.     Similarly, in other communications exchanged internally among SANYO employees coordinating pricing with NEC-TOKIN employees, email recipients were instructed "Once you read this email, please delete it."

391.     Within Defendants' secretive communications, they frequently attempted to conceal details of their collusive discussions and agreements by using coded language to identify the Defendant cartel members and their respective employees involved in discussions had and agreements made in furtherance of the conspiracy.

392.     Defendants also gave pretextual justifications for the pricing changes and the reductions in output that occurred during the Class Period.

393.     Indeed, Defendants relied on a variety of market-based explanations for pricing changes and reductions in output through quoting increased production lead times in order to conceal the conspiracy.

394.     With regard to aluminum and film capacitors, Defendants often attributed price changes and increased production lead times to difficulties procuring the necessary raw materials to manufacture their products.

395.     For example, in 2010, Defendants Nichicon, Nippon Chemi-Con and Panasonic each made a number of public statements to industry and technology media in which they attributed supply limitations and price quote adjustments to shortages of aluminum foil and increasing costs for other raw materials required for manufacturing.

396.     With regard to tantalum capacitors, Defendants often attributed price changes and increased production lead times to difficulties procuring the necessary tantalum to manufacture their products.

397.     For example, in 2010 and 2011, Defendant Panasonic made a number of public statements to industry and technology media attributing supply limitations and pricing adjustments for their tantalum electrolytic capacitors to raw materials supply issues.

398.     These explanations are belied by industry and other media reports that criticize the lack of true visibility into the market for tantalum, highlight tantalum capacitor manufacturers' close ties and

business arrangements with tantalum mining operations, and recognize manufacturers' efforts to process certain raw materials in-house.

399.    Aside from the product-specific explanations noted above, Defendants made numerous misleading excuses to justify their price increases including alleged labor shortages and shipping delays due to weather in Asia.

400.    More specifically, from 2011 to 2013, Defendants Hitachi Chemical, Nippon Chemi-Con, Nichicon, Rubycon and ELNA attributed their production delays to the lasting effects of the 2011 Tohoku earthquake and tsunami in eastern Japan.

401.    Further, 2011, Defendants NEC TOKIN and ROHM attributed production delays to flooding in Thailand.

402.    Defendants' misleading statements were designed to conceal their conspiracy and lull Plaintiff and members of the Direct Purchaser Class into believing that the price changes and extended production lead times were the normal result of competitive and economic market forces, rather than the product of collusive, unlawful efforts.

403.    Defendants' explanations for price changes and extended lead times were pretextual, and materially false or misleading, and served only to cover up Defendants' conspiracy. As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the Direct Purchaser Class members have as a result of the anticompetitive and unlawful conduct alleged herein.

## XI.    EFFECTS OF DEFENDANTS' CONSPIRACY ON U.S. SALES OF ALUMINUM, TANTALUM AND FILM CAPACITORS AND INJURY TO THE DIRECT PURCHASER CLASS

404.    Defendants' combination and conspiracy as set forth herein has had the following effects, among others:

a.    Restraint on price competition among Defendants in the sale of their respective aluminum, tantalum, and film capacitors during the Class Period to United States purchasers;

b.    Prices for aluminum, tantalum, and film capacitors sold by Defendants during the Class Period to United States purchasers have been raised, fixed, maintained, and stabilized at artificial and non-competitive levels;

c.     The supply of Defendants' aluminum, tantalum, and film capacitors available for sale during the Class Period to United States purchasers has been artificially and unjustifiably restrained; and

d.     United States purchasers have been deprived of the benefit of free and open competition on the basis of price in the market for aluminum, tantalum and film capacitors.

405.    As a direct and proximate result of Defendants' anticompetitive and unlawful conduct, Plaintiffs and the Direct Purchaser Class have been injured in their business and property in that, during the Class Period, they paid artificially inflated prices for the aluminum, tantalum and film capacitors they purchased directly from Defendants.

406.    Plaintiffs and the Direct Purchaser Class have been damaged as measured by the full amount of the overcharges that they paid in an amount subject to proof and to be determined at trial.

407.    The foregoing allegations are likely to have evidentiary support after a reasonable opportunity for discovery.

### XII.    CLAIM FOR RELIEF

### RESTRAINT OF TRADE IN VIOLATION OF
### THE SHERMAN ACT § 1
### 15 U.S.C. § 1
### (Alleged against all Defendants)

408.    Plaintiffs hereby repeat and incorporate by reference each proceeding and succeeding paragraph as though fully set forth herein.

409.    This claim is pleaded as to all Defendants.

410.    Beginning at least as early as January 1, 2002, the exact date being unknown to Plaintiffs and the Direct Purchaser Class and exclusively within the knowledge of Defendants, Defendants entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition for the pricing of aluminum, tantalum and film capacitors directly sold to United States purchasers.

411.     In particular, Defendants have combined and conspired to raise, fix, maintain or stabilize the prices of aluminum, tantalum and film capacitors sold to United States purchasers during the Class Period.

412.     Additionally, Defendants have combined and conspired to set artificial and unjustified production lead times to limit available supply of aluminum, tantalum and film capacitors sold to United States purchasers during the Class Period.

413.     As a result of Defendants' and their co-conspirators' unlawful conduct and acts taken in furtherance of their conspiracy, prices for aluminum, tantalum and film capacitors sold to purchasers in the United States during the Class Period were raised, fixed, maintained or stabilized at artificially inflated levels.

414.     The combination or conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their co-conspirators.

415.     For purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators did those things they combined or conspired to do, including:

a.     Participating in meetings and conversations to discuss their respective prices and supply of aluminum, tantalum and film capacitors and how they could effectively coordinate their actions to restrain trade for these products;

b.     Communicating in writing and orally to raise, fix, maintain or stabilize prices for aluminum, tantalum and film capacitors, and to quote artificial and unjustified production lead times to limit available supply of these capacitors;

c.     Agreeing to coordinate and manipulate the prices and available supply of these Capacitors directly sold to United States purchasers in a manner that deprived these purchasers of free and open price competition;

d.     Issuing or signaling to each other price announcements, price quotations and production lead times for specific aluminum, tantalum and film capacitors in accordance with the agreements Defendants reached among themselves;

e.     Selling aluminum, tantalum and film capacitors to United States purchasers at noncompetitive and artificial prices Defendants collusively determined; and

f.      Providing pretextual justifications to purchasers and the public to explain any raises, maintenance, or stabilization of the prices for Defendants' aluminum, tantalum and film capacitors.

416.    Defendants' anticompetitive and unlawful conduct is illegal per se.

417.    As a result of Defendants' anticompetitive and unlawful conduct, Plaintiffs and members of the Direct Purchaser Class have been injured in their businesses and property in that they have paid more for the aluminum, tantalum and film capacitors that they purchased during the Class Period than they otherwise would have paid in the absence of Defendants' conduct.

## XIII.   DEMAND FOR JUDGMENT

**WHEREFORE,** Plaintiffs request that the Court enter judgment on their behalf and on behalf of the Direct Purchaser Class defined herein, by adjudging and decreeing that:

A.      This action may proceed as a class action, with Plaintiffs each serving as a Direct Purchaser Class Representative, and with Interim Direct Purchaser Class Counsel as defined by the Court's October 31, 2014 Order Appointing Interim Direct Purchaser Class Counsel (Dkt. 319) to serve as the Direct Purchaser Class Counsel under Fed. R. Civ. P. 23(g);

B.      Defendants have combined and conspired in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and that Plaintiffs and the Direct Purchaser Class have been injured in their business and property as a result of Defendants' violations;

C.      Plaintiffs and the Direct Purchaser Class are entitled to recover damages sustained by them, as provided by the federal antitrust laws under which relief is sought herein, and that a joint and several judgment in favor of Plaintiffs and the Direct Purchaser Class be entered against Defendants in an amount subject to proof at trial, which is to be trebled in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15;

D.      Plaintiffs and the Direct Purchaser Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal rate from and after the date this class action complaint is first served on Defendants;

E.      Plaintiffs and the Direct Purchaser Class are entitled to equitable relief appropriate to remedy Defendants' past and ongoing restraint of trade, including:

1.     A judicial determination declaring the rights of Plaintiffs and the Direct Purchaser Class, and the corresponding responsibilities of Defendants; and

2.     Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from continuing and maintaining the conspiracy or agreements alleged herein;

F.     Defendants are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification to the Direct Purchaser Class;

G.     Plaintiffs and the Direct Purchaser Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

H.     Plaintiffs and the Direct Purchaser Class receive such other or further relief as may be just and proper.

## <u>JURY TRIAL DEMANDED</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the claims asserted in this complaint so triable.

Dated: June 16, 2015

JOSEPH SAVERI LAW FIRM, INC.

By:      */s/ Joseph R. Saveri*
         Joseph R. Saveri

Joseph R. Saveri (State Bar No. 130064)
Andrew M. Purdy (State Bar No. 261912)
Matthew S. Weiler (State Bar No. 236052)
James G. Dallal (State Bar No. 277826)
Ryan J. McEwan (State Bar No. 285595)
505 Montgomery Street, Suite 625
San Francisco, CA 94111
Telephone:    (415) 500-6800
Facsimile:    (415) 395-9940

*Interim Direct Purchaser Class Counsel and*
*Attorneys for Plaintiffs Chip-Tech, Ltd., Dependable*
*Component Supply Corp., eIQ Energy Inc. and*
*Walker Component Group, Inc.*

CERA LLP


By:      /s/ Solomon B. Cera
                Solomon B. Cera

Solomon B. Cera (State Bar No. 99467)
C. Andrew Dirksen (State Bar No. 197378)
595 Market Street, Suite 2300
San Francisco, CA 94105
Telephone:     (415) 777-2230
Facsimile:     (415) 777-5189
Email:         scera@gbcslaw.com
               cdirksen@gbcslaw.com

*Class Counsel and Attorneys for Plaintiffs Chip-Tech, Ltd. and Dependable Component Supply Corp.*


LEVIN, FISHBEIN, SEDRAN & BERMAN


By:      /s/ Howard J. Sedran
                Howard J. Sedran

Howard J. Sedran, *pro hac vice*
Austin B. Cohen, *pro hac vice*
Keith J. Verrier, *pro hac vice*
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Telephone:     (215) 592-1500
Facsimile:     (215) 592-4663
Email:         hsedran@lfsblaw.com
               acohen@lfsblaw.com
               kverrier@lfsblaw.com

*Class Counsel and Attorneys for Plaintiff eIQ Energy Inc.*


BERGER & MONTAGUE, P.C.

By:      /s/ Eric L. Cramer
                Eric L. Cramer

Eric L. Cramer, *pro hac vice*
Ruthanne Gordon, *pro hac vice*
1622 Locust Street
Philadelphia, PA 19103
Telephone:     (215) 875-3000
Facsimile:     (215) 875-4604
Email:         ecramer@bm.net
               rgordon@bm.net

HEINS MILLS & OLSON, P.L.C.

By: _____/s/ Vincent J. Esades_____
            Vincent J. Esades

Vincent J. Esades, *pro hac vice*
310 Clifton Avenue
Minneapolis, MN 55403
Telephone:    (612) 338-4605
Facsimile:    (612) 338-4692
Email:        vesades@heinsmills.com


LITE DEPALMA GREENBERG, LLC


By: _____/s/ Steven J. Greenfogel_____
            Steven J. Greenfogel

Steven J. Greenfogel, *pro hace vice forthcoming*
1521 Locust Street, 7th Floor
Philadelphia, PA 19102
Telephone:    (267) 519-8306
Facsimile:    (215) 569-0958
Email:        sgreenfogel@litedepalma.com

*Class Counsel and Attorneys for Plaintiffs Chip-Tech,*
*Ltd. and Dependable Component Supply Corp.*


FREED KANNER LONDON & MILLEN LLC

By: _____/s/ William H. London_____
            William H. London

William H. London, *pro hac vice forthcoming*
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone:    (224) 632-4400
Facsimile:    (415) 632-4521
Email:        blondon@fklmlaw.com

*Class Counsel and Attorneys for Plaintiff Dependable*
*Component Supply Corp.*

FINE, KAPLAN AND BLACK, R.P.C.

By:       */s/ Roberta D. Liebenberg*
           Roberta D. Liebenberg

Roberta D. Liebenberg, *pro hac vice*
Donald L. Perelman, *pro hac vice forthcoming*
Gerard A. Dever, *pro hac vice forthcoming*
Paul Costa, *pro hac vice forthcoming*
Ria Momblanco, *pro hac vice forthcoming*
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
Telephone:    (215) 567-6565
Facsimile:     (215) 568-5872
Email:         rliebenberg@finekaplan.com
                 dperelman@finekaplan.com
                 gdever@finekaplan.com
                 pcosta@finekaplan.com
                 rmomblanco@finekaplan.com

BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.

By:       */s/ W. Daniel "Dee" Miles, III*
           W. Daniel "Dee" Miles, III

W. Daniel Miles, III, *pro hac vice forthcoming*
218 Commerce Street
Post Office Box 4160 (36103)
Montgomery, AL 36104
Telephone:    (334) 269-2343
Facsimile:     (334) 954-7555
Email:         dee.miles@beasleyallen.com

LUM, DRASCO & POSITAN, LLC

By:       */s/ Dennis J. Drasco*
           Dennis J. Drasco

Dennis J. Drasco, *pro hac vice forthcoming*
Arthur M. Owens, *pro hac vice forthcoming*
103 Eisenhower Parkway
Roseland, NJ 07068
Telephone:    (973) 403-9000
Facsimile:     (973) 403-9021
Email:         DDrasco@lumlaw.com
                 AOwens@lumlaw.com

*Class Counsel and Attorneys for Plaintiff eIQ Energy Inc.*

GIRARD GIBBS LLP

By:          /s/ Daniel C. Girard
                 Daniel C. Girard

Daniel C. Girard (State Bar No. 114826)
601 California Street, 14th Floor
San Francisco, CA 94118
Telephone:      (415) 981-4800
Facsimile:       (415) 981-4846
Email:            dcg@girardgibbs.com

*Class Counsel and Attorneys for Plaintiff Walker
Component Group, Inc.*

PEARSON, SIMON & WARSHAW, LLP

By:          /s/ Bruce L. Simon
                 Bruce L. Simon

Bruce L. Simon (State Bar No. 96241)
Aaron M. Sheanin (State Bar No. 214472)
Benjamin E. Shiftan (State Bar No. 265767)
Michael H. Pearson (State Bar No. 277857)
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone:      (415) 433-9000
Facsimile:       (415) 433-9008
Email:            bsimon@pswlaw.com
                    asheanin@pswlaw.com
                    bshiftan@pswlaw.com
                    mpearson@pswlaw.com

COHEN MILSTEIN SELLERS & TOLL, PLLC

By:          /s/ Kit A. Pierson
                 Kit A. Pierson

Kit A. Pierson, *pro hac vice*
Brent W. Johnson, *pro hac vice*
1100 New York Ave., N.W. Suite 500, East Tower
Washington, DC 20005
Telephone:      (202) 408-4600
Facsimile:
Email:            kpierson@cohenmilstein.com
                    bjohnson@cohenmilstein.com

LABATON SUCHAROW LLP

By:        /s/ Gregory Asciolla
                Gregory Asciolla

Gregory Asciolla, *pro hac vice forthcoming*
140 Broadway
New York, NY 10005
Telephone:    (212) 907-0700
Facsimile:    (212) 818 0477
Email:          gasciolla@labaton.com


LOCKRIDGE GRINDAL NAUEN P.L.L.P.


By:        /s/ W. Joseph Bruckner
                W. Joseph Bruckner

W. Joseph Bruckner *pro hac vice forthcoming*
Heidi M. Silton, *pro hac vice forthcoming*
Elizabeth R. Odette, *pro hac vice forthcoming*
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone:    (612) 339-6900
Facsimile:    (612) 339-0981
Email:          wjbruckner@locklaw.com
                hmsilton@locklaw.com
                erodette@locklaw.com

*Class Counsel*

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT