Joseph R. Saveri (State Bar No. 130064)
Andrew M. Purdy (State Bar No. 261912)
Matthew S. Weiler (State Bar No. 236052)
James G. Dallal (State Bar No. 277826)
Ryan J. McEwan (State Bar No. 285595)
JOSEPH SAVERI LAW FIRM, INC.
555 Montgomery Street, Suite 1210
San Francisco, California 94111
Telephone:     (415) 500-6800
Facsimile:     (415) 395-9940
E-mails:        jsaveri@saverilawfirm.com
                apurdy@saverilawfirm.com
                mweiler@saverilawfirm.com
                jdallal@saverilawfirm.com
                rmcewan@saverilawfirm.com

*Interim Lead Counsel for Direct Purchaser Plaintiffs*

Joseph W. Cotchett (State Bar No. 36324)
Steven N. Williams (State Bar No. 175489)
Adam J. Zapala (State Bar No. 245748)
Elizabeth Tran (State Bar No. 280502)
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone:     (650) 697-6000
Facsimile:     (650) 697-0577
E-mails:        jcotchett@cpmlegal.com
                swilliams@cpmlegal.com
                azapala@cpmlegal.com
                etran@cpmlegal.com

*Interim Lead Counsel for Indirect Purchaser Plaintiffs*

*[Additional Counsel Listed on Signature Page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE CAPACITORS ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO: ALL ACTIONS | Master File No.: 3:14-cv-03264-JD<br><br>**JOINT STATUS CONFERENCE STATEMENT**<br><br>**Hearing:**<br><br>Date:      September 30, 2015<br>Time:      10:00 a.m.<br>Place:     Courtroom 11, 19th Floor<br>Judge:     Hon. James Donato |

In advance of the Case Status Conference set by the Court for Wednesday, September 30, 2015, at 10:00 a.m., Defendants,[1] Direct Purchaser Plaintiffs ("DPPs"), and Indirect Purchaser Plaintiffs ("IPPs" and, together with DPPs, the "Plaintiffs"), hereby submit this Joint Status Conference Statement.

## I.      DEVELOPMENTS SINCE THE PARTIES' LAST STATUS CONFERENCE

This Court held a previous Status Conference on July 8, 2015 (Dkt. 774). At the July 8, 2015 status conference, and in the Court's subsequent Minute Entry, the Court directed DPPs to file a second amended complaint, with amendments limited to including certain Flextronics' allegations, by July 17, 2015.

On July 15, 2015, this Court entered the parties' Stipulated Order Regarding Electronically Stored Information ("ESI") (Dkt. 782).

On July 16, 2015, Defendants AVX Corporation, Fujitsu Limited, Hitachi Chemical Co. America, Ltd., and the Holy Stone Defendants moved to dismiss DPPs' First Amended Complaint (Dkts. 787, 788, 789, 792).

On the same date, "Certain Defendants"[2] and Hitachi Chemical Co. America, Ltd., filed motions to dismiss the IPPs' Second Consolidated Complaint (Dkts. 791, 793).

---

[1] In keeping with the Court's expressed preference for attendance by lead counsel at status conferences in the October 30, 2014 Minute Order, lead counsel for the undersigned Defendants are making every effort to attend the status conference in person. Lead counsel for Panasonic Corporation, Panasonic Corporation of North America, SANYO Electric Co., Ltd., SANYO North America Corporation, Soshin Electric Co., Ltd., Soshin Electronics of America, Inc., and Nitsuko Electronics Corporation will be unable to attend the conference due to pre-existing obligations; these Defendants will be represented at the hearing by other of their counsel of record who will be fully prepared to address any issues that arise.

[2] ELNA Co. Ltd., ELNA America, Inc., Hitachi Chemical Co., Ltd., Hitachi Chemical Company America, Ltd., Hitachi AIC Incorporated, Matsuo Electric Co., Ltd., NEC TOKIN Corporation, NEC TOKIN America, Inc., Nichicon Corporation, Nichicon (America) Corporation, Nitsuko Electronics Corp., Okaya Electric Industries Co., Ltd., Panasonic Corporation, Panasonic Corporation of North America, SANYO Electric Co., Ltd., SANYO North America Corp., Rubycon Corporation, Rubycon America Inc., Shinyei Technology Co., Ltd., Shinyei Capacitor Co., Ltd., Soshin Electric Co., Ltd., Taitsu Corporation, United Chemi-Con, Inc., and Nippon Chemi-Con Corporation (collectively, "Certain Defendants").

On July 22, 2015, DPPs and Flextronics International USA, Inc. ("Flextronics") filed the DPPs Second Amended Complaint (Dkt. 799-4 (redacted), the "SAC"), into which Flextronics's allegations were incorporated pursuant to the Court's July 9, 2015 Order (Dkt. 774).

On July 29, 2015, Defendants Fujitsu Limited, Hitachi Chemical Co. America, Ltd., and the Holy Stone Defendants all filed supplemental motions to dismiss the DPPs' Second Amended Complaint to address Flextronics's allegations (Dkts. 817, 818, 819). On the date of this status conference, these motions will be fully briefed and argument will be heard on each of them, save Fujitsu Limited's motion (see below).

Also on July 29, 2015, Toshin Kogyo Co., Ltd., without counsel, filed a motion to dismiss the IPPs' complaint (Dkt. 816).  On August 12, 2015, IPPs filed a motion to strike on the basis that Toshin Kogyo is unrepresented (Dkt. 852).  Those motions remain pending before the Court.

On August 6, 2015, all Defendants, save those further moving to dismiss the DPPs' and IPPs' operative complaints, filed their answers.

On August 7, 2015, Plaintiffs and Defendants Shinyei Kaisha, Shinyei Technology Co., Ltd., Shinyei Capacitor Co., Ltd., and Shinyei Corporation of America, Inc. ("Shinyei") submitted a dispute to the Court concerning "defendant-specific" search terms (Dkt. 850). On August 20, 2015, this Court overruled Shinyei's objections to Plaintiffs' proposed "defendant-specific" search terms (Dkt. 857).

On September 2, 2015, Flextronics filed its Motion to Compel and Modify (Dkt. 869). On the date of this status conference, this motion will be fully briefed and argument will be heard.

On September 10, 2015, Defendant Fujitsu Limited filed a stipulation and proposed order seeking a stay of the litigation pending the completion of its settlement with the DPPs (Dkt. 879).

On September 22, 2015, the parties submitted a proposed stipulation regarding the discovery of information from third-parties (Dkt. 887).

Also on September 22, 2015, DPPs and Defendant Nissei Electric Co., Ltd. ("Nissei") filed a Stipulation (Dkt. 888) deeming the SAC served on Nissei via its counsel effective September 21, 2015 and extending the deadline for Nissei to respond to the SAC until November 20, 2015.

## II.      REPORT ON DISCOVERY MATTERS

### A.   Report on Defendants' Transactional Sales Data

#### 1.        Plaintiffs' Statement

**DPPs:** DPPs wish to apprise the Court of the status of DPPs' efforts with respect to the transactional sales data and the impact it will likely have on the litigation schedule. In summary, DPPs have a time consuming, mammoth task with respect to the organization and analysis of Defendants' transaction sales data into a single sales database. DPPs have worked diligently on these data issues and have already expended hundreds of man-hours and hundreds of thousands of dollars in the effort. The work is well underway but will almost assuredly take much longer than originally contemplated to complete. DPPs have been working collaboratively with Defendants[3] to answer questions, but the work is far from complete. DPPS therefore ask the Court to reset the deadlines for class certification to reflect the practical realities of this work to a date approximately six months later than the current February 16, 2016 date. Significantly, DPPs envision no impact to other aspects of the schedule and expect the litigation to continue apace with respect to the completion of briefing on FTAIA issues, the completion of merits discovery and other case deadlines.

Plaintiffs have retained one of the leading econometric firms in the United States, possessing experience in dozens of antitrust cases, including many requiring the kind of effort and expertise required here. DPPs have pursued production of transactional data since the very beginning of the case and indeed requested the production of such material at virtually the first opportunity. Plaintiffs have devoted many hours of attorney time and made a significant financial investment in ensuring this work is done efficiently and effectively. But the volume of the data produced, cost in both time and financial expense of translating these materials, persistent deficiencies in production of reliable product and customer information, and wide variation in the level of cooperation and compliance by Defendants have posed major obstacles to developing a reliable dataset suitable for determining the scope and impact of Defendants' price-fixing activity.

---

[3] Issues with respect to NCC and UCC are discussed *infra*.

Some of the difficulties arise from the nature of the commerce at issue. Capacitors are relatively low-cost, high-volume products, and the cartel that fixed and raised their prices involved over 20 companies, many of them sprawling global corporations, and extended across more than a decade. In raw data, Defendants' transactional data adds up to be 250 GB in total spread across 30,000 files. Among the 21 families of named Defendant companies, 17 have produced transactional data. The datasets cover sales to tens of thousands of customers, and depending on how far back a given Defendants' transactional data is retained, these data sets can cover anywhere from 8 to 14 years for each of these corporate entities. In addition, because most Defendants offer a wide variety of Capacitor products, many of them equivalent across companies but assigned different product codes unique to the particular manufacturer, the datasets presently contain over 400,000 unique product codes across all Defendants which can be grouped or organized by category or type upon receipt of the necessary information regarding the products. So far, in the cases where Defendants have provided product information, as many have, they have generally done so only by supplying TIFF or PDF image files containing catalogs or collections of single-page product specification files pertaining to a single product—formats that prevent analysts from running searches or organizing the information. And more often than not, Defendants have produced customer and product information in languages other than English—mostly Japanese, but also Korean and Chinese. And even where the information is in English or Plaintiffs have translated the material, the information varies significantly in its completeness, accuracy, and accessibility from Defendant-to-Defendant and dataset-to-dataset.

In a June 23, 2015 letter to all Defendants' counsel, DPPs proposed a process for resolving transactional data issues via sets of informal written questions and follow-up conversations directly between Plaintiffs' data experts and people knowledgeable about Defendants' data, with the goal that the parties could avoid expending resources on pointless argument over the basic meaning and contents of the data. DPPs also proposed that they would translate non-English materials in the first instance, after which Defendants would confirm the accuracy of the translations. DPPs meanwhile had presented their first wave of data questions, covering ten Defendants families' transaction-level data, on May 29, 2015. The majority of the Defendants have agreed to proceed in this manner and

have provided good faith responses to questions Plaintiffs' counsel have submitted in writing. In addition, the parties agreed in their June 3, 2015 Joint Statement Regarding Proposed Case Schedule ("Joint Statement," Dkt. 730), adopted by the Court in its June 8, 2015 Amended Scheduling Order (Dkt. 735), that Defendants would by August 1, 2015 answer data questions Plaintiffs submitted by June 19, 2015, and that they would answer data questions posed later "on a rolling basis as soon as the relevant information becomes available without delay, and no later than five weeks after the new transactional data questions were received by Defendants." Jt. Stmt., Dkt. 730, n. 2, p. 1-2.

As is typically the case, answers to questions often beget more questions. Defendants have continued to respond to DPPs' data questions and have, in some instances, offered up personnel at the Defendant companies to answer questions in real time. The process has yielded important responses on inquiries concerning such important matters as the data files containing the transaction-level data, the meaning of various alternative address and location fields, how to interpret customer codes to reveal the identity and location of purchasers, means for identifying sales of the Capacitor products at issue in the case, and the reason for gaps or unfilled fields in the datasets.

Unfortunately, Defendant Nippon Chemi-Con ("NCC") and its U.S. subsidiary Defendant United Chemi-Con ("UCC") stand alone in providing completely inadequate and deficient responses to DPP experts' questions. DPPs submitted these questions via email on August 18, 2015. On the day before this filing, Tuesday, September 22—also the date on which the five-week response period stated in the Joint Statement elapsed—counsel for NCC and UCC submitted their responses via email to DPPs. In those responses, NCC and UCC flatly refused to provide any information about how to link up fields in their transactional datasets with their customer and product information. NCC and UCC responded to requests for confirmation of preliminary translations with the observation that "NCC is not a certified translation service and will not serve that function for the Plaintiffs. NCC provided materials as they existed in the ordinary course of business." The other responses are no better. Question 23 to NCC may offer the most telling example of NCC and UCC's overall disregard for their obligation to provide data in usable form:

> "23. How are the values in the UnitPrice field calculated? What units is it expressed in? Is it per individual capacitor?
>
> "Response: 建値単価 (tatene-tanka), translated by Plaintiffs as "Unit Price," refers to the sales price per one unit."

Defendant Nippon Chem-Con Corporation's Responses to Plaintiffs' Transactional Data Questions, 13. The complete refusal on the part of the Nippon Chemi-Con Defendants to provide any meaningful response to DPPs' data questions, and their apparent unwillingness to provide basic factual information about the structure and content of its datasets, has deprived Plaintiffs of the ability to determine even the most basic details about the NCC/UCC commerce at issue in this case, including the identity and locations of customers and the products involved. Such intransigence presents a significant impediment to the prosecution of Plaintiffs' claims. Plaintiffs will meet and confer with NCC and UCC concerning these deficiencies, which are significant given that NCC and UCC comprise a significant amount of the data Plaintiffs need to compile.

Other Defendants have provided much more satisfactory responses. Nevertheless there is much work still to be done. The following table summarizes the progress made on analyzing Defendants' transactional data to date:

| Defendant | Data Questions | Product Data | Customer Data | Missing Data |
|---|---|---|---|---|
| AVX | Partial responses 9/8 to 8/13 set. | Incomplete. | Incomplete. | Some product & customer info. |
| ELNA | Answered. | PDF only. | Insufficient. | Address info. |
| Fujitsu | *No transactional data produced to date.*[4] | | | |
| Hitachi | Answered; new set sent on 9/18. | Await responses | Await responses | Some product & customer info. |
| Holy Stone | Await answers to 8/10 questions. | PDF only; linking file unidentified. | Pending translations. | Some years missing sales. |
| KEMET | Await answers to 8/10 questions. | Await responses. | Await responses. | No issues at this time. |
| Matsuo | Data call follow-up sent 9/18. | Await responses. | Await responses. | No issues at this time. |
| NEC TOKIN | Answered; more questions coming. | PDF only. | More questions coming. | No issues at this time. |
| Nichicon | Answered; more questions coming. | Mostly PDF; need ranges ID'd. | More questions coming. | No issues at this time. |
| Nippon Chemi-Con | Answered; Plaintiffs believe answer inadequate | Deficient. | Deficient. | Product & customer info. |
| Nissei | *No transactional data produced to date; served with SAC on Sept. 21, 2015.* | | | |

[4] In or around April 2009, Fujitsu sold its division responsible for manufacturing the types of Capacitors at issue in this case, FMD Suzhou, which had been a division of Fujitsu's former subsidiary Fujitsu Media Devices, to Defendant Nichicon.

| Nitsuko | Await answers to 7/31 questions. | Await responses; numbers only. | Await responses. | No issues at this time. |
|---|---|---|---|---|
| Okaya | Partial responses to 8/18 questions. | PDF only; pending translations. | Pending translations. | No issues at this time. |
| Panasonic | Await answers to questions re 8/4 data call. | Mostly PDF. | Pending translations. | Supplemented recently; analysis underway. |
| ROHM | Answered; more questions coming. | Mostly PDF. | Incomplete location info. | Some customer info. |
| Rubycon | Inadequate responses; call requested 9/18. | PDF only. | Mismatch between data & lookup table. | Unclear; await call. |
| Shinyei | Answered 7/31 questions 9/14. | Mostly PDF. | No issues at this time. | No issues at this time. |
| Shizuki | *No transactional data produced to date; appeared July 27, 2015.* | | | |
| Soshin | Call requested 9/18. | PDF only. | Mismatch between data & lookup table. | No issues at this time. |
| Taitsu | Answered; more questions coming. | PDF only; pending translations. | Pending translations. | No issues at this time. |
| TOSHIN KOGYO | *No transactional data produced to date; served but has not appeared.* | | | |

At this point much work remains to be done to get Defendants' voluminous transactional data into a useable format in preparation for filing their class certification motions on February 12, 2016. It is a very labor-intensive process that has thus far required hundreds of thousand dollars' worth of time and expense. DPPs' experts, along with many of the DPPs' attorneys, have been working without interruption or delay to process and prepare the data.

It is apparent that the task of the compilation of a reliable robust sales database and analysis of it will take more time than originally planned and makes it highly unlikely that the February 12, 2016 deadline can be met. Based on their substantial experience in cases similar to this one, DPPs' experts have indicated that an additional six months is needed for the work on the database to be completed, and an additional 4 months is required to analyze the data and prepare class certification reports. Accordingly, DPPs expect class certification briefs can be filed by August 1, 2016. Significantly, Plaintiffs do not request adjustment to any other aspect of the court's schedule, including briefing on FTAIA issues, the completion of document discovery or depositions.

1    Should the Court grant this request, DPPs will keep the Court informed in the interim period

2    as to their experts' progress.

3    **IPPs:**  IPPs have likewise been engaged in the laborious process of analyzing Defendants'

4    voluminous transactional data, as well as crafting detailed questions aimed at gaining a greater

5    understanding of that data.  IPPs will not repeat the observations made by DPPs regarding this

6    process, but largely agree with their statement.

7    Over the summer, IPPs' team of econometric experts translated and attempted to analyze

8    Defendants' transactional data.  Beginning in August, pursuant to the parties' agreement, IPPs sent

9    out detailed correspondence containing questions about the Defendants' data.  In many cases, these

10   letters are over twenty-pages in length and include dozens of questions about the specifics of the

11   data—information that is critical for their econometric models.  This is a difficult and time-

12   consuming process for both Plaintiffs *and* Defendants.

13   IPPs concur with DPPs' statement that the parties will need at least an additional six months

14   in order to prepare for class certification briefing.  Added to the complexity of untangling

15   Defendants' data is the fact that IPPs have to undergo (and are undergoing, *see infra* at II C) a similar

16   process with respect to third-party transactional data from distributors.  In that regard, IPPs'

17   econometricians have to analyze and understand the third-parties' purchase and sales data.  IPPs are

18   vigorously pursuing both the data and answers to questions from Defendants and third-parties and

19   will continue to do so.   As this Court knows, standards for certification of antitrust cases require an

20   intense analysis of defendants' and, in this case, third party distributors' transactional data.   As can

21   be seen in recent class certification decisions in the Northern District, the centerpiece of antitrust

22   class certification motions is most often the methodology used by plaintiffs' experts in analyzing the

23   transactional data.  *See e.g., In re High-Tech Employee Antitrust Litig*, 985 F.Supp.2d 1167 (N.D.

24   Cal. 2013) (discussing the employment compensation data at issue in case); *In re Cathode Ray Tubes*

25   *Antitrust Litig*, 2013 U.S. Dist. LEXIS 137946, Case No. C-07-5944-SC (N.D. Cal., Sept 24, 2013)

26   (certifying the indirect purchaser class); *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311

27   (N.D. Cal. 2014) (discussing the parties' approach to the data).   Although Plaintiffs have worked

28   diligently to move forward on this task in this case, the reality has been that the nature and

1    complexity of the data produced—in foreign languages and covering a period of more than a

2    decade—has resulted in a slower process than had been anticipated.

3          One very practical manner in which the process can become slightly more efficient is to

4    require Defendants to send their answers to transactional data questions to both IPPs and DPPs.  This

5    will ensure that neither IPPs nor DPPs repeat questions and will assist both in framing additional

6    questions.  Another practical solution to reduce inefficiencies in the process is to require

7    Defendants—in any follow-up meet and confer teleconference calls regarding their answers to data

8    questions—to have a client representative that is knowledgeable about the data attend so that they can

9    answer real time questions from Plaintiffs' experts.

10         **2.      Defendants' Statement**

11         Defendants strongly object to Plaintiffs' request to delay class certification briefing an

12   additional six months.  Additional delay is unnecessary and unwarranted.  Defendants produced their

13   transactional data to Plaintiffs months ago and Plaintiffs have had ample time to identify deficiencies

14   and/or request additional information from Defendants.  As Plaintiffs admit, the majority of

15   Defendants have responded to Plaintiffs' questions about transactional data – some of which came as

16   questionnaires of 20 or more pages – and continue to work in good faith to address additional

17   questions Plaintiffs may have.

18         Plaintiffs' description of the status and format of each Defendant's transactional data

19   production is in many cases incorrect.  Plaintiffs claim that many Defendants have produced product

20   data in "only" or "mostly" PDF format while, in fact, many Defendants have produced PDF data in

21   addition to numerous Excel spreadsheets.  For example, ELNA and ROHM have produced Excel

22   files as well as the PDF files identified above.  Plaintiffs' characterization of Nichicon's production of

23   Product Data as "Mostly PDF; need ranges ID'd" is similarly inaccurate. The great majority of

24   Nichicon's production of product data was in data (standardized text or tab-delineated) format.

25   Finally, Plaintiffs' representations that Panasonic and Sanyo have provided their product data in

26   "[m]ostly PDF" format is incorrect.  In fact, Panasonic and Sanyo have produced the majority of their

27   detailed product information and customer information in electronic Excel spreadsheets, along with a

28   few additional documents produced in PDF format that contain supplemental information. At no

point have Plaintiffs asked Defendants who provided PDF files to supplement with documents in an alternative format. As many Defendants are seeing Plaintiffs' characterization of their productions as "incomplete," "insufficient," or "deficient" for the first time, Defendants are unclear about what Plaintiffs mean. Plaintiffs have never identified these deficiencies to Defendants during the meet-and-confer process, much less given Defendants the opportunity to remedy these alleged deficiencies.

Additionally, the time-consuming process of assembling and analyzing transactional data is no surprise to Plaintiffs. Plaintiffs' counsel are experienced antitrust lawyers who are well aware of the complexities of the type of economic analysis that accompanies class certification briefing. Plaintiffs also know that each Defendant makes many different types of capacitors and that the majority of Defendants' business records would be maintained in a foreign language. Plaintiffs are not just discovering these issues now, and are not entitled to additional time just because the analysis proves to be difficult.

An additional six months to complete "work on the database" followed by four months for additional analysis seems excessive by any measure. The Court has already extended the class certification schedule once, and Plaintiffs have not shown good cause for extending the time for class certification again. Defendants remain committed to working through any outstanding issues regarding transactional data through the meet-and-confer process and remain on track to produce additional documents and data according to the existing schedule imposed by the Court. As a result, Defendants respectfully request that the Court deny Plaintiffs' demand for additional extensions.

### 3. NCC/UCC's Statement

In violation of the Court's Standing Order for Discovery in Civil Cases, ¶¶ 18-21, which require the parties to meet and confer before bringing a discovery dispute before the Court, Plaintiffs raise for the first time concerns with NCC's and UCC's responses to DPPs' delayed set of transactional data questions. If Plaintiffs have an issue with NCC's or UCC's responses, they should discuss those issues with NCC and UCC before bothering the Court with these concerns.

To the extent Plaintiffs complain about a delay, it is a delay they themselves created. This Court ordered a stay on discovery with respect to NCC on January 14, 2015, (Dkt. 514) until the resolution of NCC's motion to dismiss for lack of personal jurisdiction. The Court lifted that stay

with its decision on the motion and order on June 11, 2015 (Dkt. 738).  Following the removal of the stay, the parties met and conferred on June 16th, with NCC and UCC immediately proposing a schedule based off the Amended Scheduling Order this Court entered on June 8, 2015 (Dkt. 735). NCC and UCC memorialized this schedule in a letter to Plaintiffs on June 26th and Plaintiffs agreed to the schedule in a meet and confer on June 29th.  NCC and UCC subsequently produced transactional data on July 31st.  Although under the agreed-upon schedule Plaintiffs were supposed to submit their initial written questions concerning this transactional data on August 7th, DPPs did not send transactional data questions to NCC or UCC until August 18th and August 20th respectively. The IPPs sent duplicative transactional data questions just this past Friday, September 18th.  In compliance with the schedule and adjusting for Plaintiffs' 11-day delay, NCC and UCC provided responses to DPPs' questions on September 22nd.  As these facts indicate, any delay is the result of Plaintiffs' failure to follow the agreed-upon schedule, and it is unconvincing for Plaintiffs to complain their own delay is negatively impacting their case.

**B.   Report on the Parties' Document Productions to Date**

**1.   Defendants' Document Productions**

**a.   Plaintiffs' Statement**

As of September 22, 2015, Defendants have produced documents as follows:

| Defendant Family | Pages |
|------------------|-------|
| AVX | 122,077 |
| ELNA | 354,390 |
| EPCOS | 4,662 |
| Fujitsu | 0 |
| Hitachi | 54,794 |
| Holy Stone | 5,284 |
| KEMET | 31,830 |
| Matsuo | 42,928 |
| NEC TOKIN | 190,432 |
| Nichicon | 79,937 |
| Nippon Chemi-Con | 459,143 |
| Nissei | -- |
| Nitsuko | 22 |
| Okaya | 30,302 |
| Panasonic | 349,432 |
| ROHM | 73,335 |
| Rubycon | 622,610 |
| Shinyei | 49,365 |

| Shizuki | -- |
|---|---|
| Soshin | 273,062 |
| Taitsu | 50,748 |
| TOSHIN KOGYO | -- |
| **TOTAL** | **2,424,256** |

At this time, only three issues related to Defendants' document productions warrant the Court's attention. *See infra* Section III.

### b.  Defendants' Statement

Other than those identified in Section III, Defendants do not believe there are any disputes regarding document discovery that are ripe for resolution at this time.  Defendants continue to work diligently to produce documents on a rolling basis and are in full compliance with the agreed-upon schedule.

Defendants will note that page counts can be a misleading indicator of the volume actually produced.  Many Defendants are producing natively, as demanded by Plaintiffs, so the document page counts shown in the chart above do not accurately reflect the actual pages produced, as each native image file will only show a single Bates-number even though the document is oftentimes longer than just one page.

### 2.  Plaintiffs' Document Productions to Date

### a.  Defendants' Statement

**DPPs:** Defendants remain concerned with the languid pace of DPPs' productions in response to Defendants' discovery requests. The four DPPs have produced a collective total of only 146 Bates-numbered pages to date, despite the fact that Defendants propounded their discovery requests on DPPs over six months ago.

Even accounting for natively-produced documents, these minimal production figures do not change substantially. In the Joint Status Conference Statement on July 1, 2015, DPPs advised the Court that its "production of ESI will begin in due course." Joint Status Conference Statement, dated July 1, 2015 [Dkt. 754], at 8. But notably, none of the four DPPs has produced any additional documents or data since the parties submitted their last Joint Status Conference Statement over two-and-a-half months ago.

1    Further, on September 1, 2015, DPP eIQ Energy, Inc. ("eIQ") advised Defendants—for the

2    first time—that due to a network server crash, it will not be able to produce certain responsive

3    documents by the October 15, 2015 deadline for substantial completion of DPPs' custodial and

4    centralized productions. On September 15, 2015, Defendants inquired, among other things: (i) when

5    eIQ expects to complete the restoration of the network server that crashed; and (ii) why eIQ did not

6    begin the restoration or recovery process for its network server earlier, particularly in light of the

7    need to collect and search for documents responsive to Defendants' discovery requests, which

8    Defendants served over six months ago. eIQ has not responded to Defendants' September 15th letter,

9    but DPPs unpersuasively attempt below to excuse eIQ's delay in starting the restoration process for

10   its crashed server by explaining that "eIQ is not a large company and has only a limited number of

11   employees."  But notably, DPPs do not explain why eIQ could not have started the restoration of its

12   server months ago, particularly because its server crashed in *2014*.  eIQ's failure to timely restore its

13   crashed server is particularly egregious in light of its need to extract and review documents

14   responsive to Defendants' discovery requests, which Defendants propounded *over six months ago*.

15   Further, DPPs do not dispute below that eIQ will not meet the October 15, 2015 substantial

16   completion deadline for ESI impacted by its server crash, and on September 1, 2015, counsel for eIQ

17   estimated that it will take approximately two-to-three months following the restoration to review and

18   produce documents responsive to Defendants' discovery requests.  Thus, by its own estimate, eIQ

19   likely will not be able to produce responsive documents impacted by its server crash until November

20   or even December 2015—a delay that could have been easily avoided if eIQ had timely restored its

21   crashed server.

22   Defendants have been discussing these discovery response deficiencies with DPPs in ongoing

23   meet-and-confer communications, and have memorialized these deficiencies in numerous detailed

24   correspondence. Nonetheless, Defendants do not believe that any dispute regarding Plaintiffs'

25   responses is ripe for Court resolution at this time, and are continuing to meet and confer with DPPs

26   regarding their responses to Defendants' discovery requests.

27   **IPPs:**  Defendants have grave concerns about the pace of IPPs' productions in response to

28   Defendants' discovery requests.  Four of the IPPs claim that their productions are complete, but two

1   of them (Michael Brooks and Toy-Knowlogy) have produced only two documents each.  Since the

2   last status conference, the IPPs combined have produced only four additional documents, all from

3   Alfred H. Siegel (Circuit City).  Since that time, Circuit City has repeatedly promised that it was

4   making progress with its custodial and targeted document searches.  But no additional documents

5   have been produced.  While Defendants do not believe that any dispute regarding IPPs' responses is

6   ripe at this time for Court resolution, Defendants hope that the pace of the IPPs' document

7   productions will improve and that Court intervention will not become necessary.

8                **b.  Plaintiffs' Statement**

9        **DPPs:** As Defendants acknowledge above, DPPs do not believe there is any discovery dispute

10  relating to their document productions to date that is ripe for Court resolution at this time. Defendants

11  first provided DPPs with their desired ESI search terms on July 31, 2015. Those search terms are

12  quite broad and have brought back several hundred thousand documents that are currently being

13  reviewed prior to production. Pursuant to the parties' agreed-upon schedule (Dkt. 730), both

14  Plaintiffs and Defendants have until October 15, 2015 to substantially complete production of

15  documents responsive to the other side's document requests. DPPs' efforts are well under way. DPPs

16  intend to make their first wave of rolling productions from representative plaintiffs Chip-Tech Co.,

17  Ltd., Dependable Component Supply, and eIQ Energy prior to the parties' forthcoming status

18  conference, with a production from Walker Components to follow. At this time, DPPs have every

19  reason to believe that the substantial production of the documents they have agreed to produce to

20  Defendants will occur on or before October 15, 2015.

21        Regarding the eIQ server crash the Defendants reference above, the situation is nowhere near

22  as egregious or dire as they suggest. The suggestion that eIQ was negligent in not beginning the

23  document restoration earlier is unfounded. eIQ is not a large company and has only a limited number

24  of employees. Further, it has a limited number of employees that are even involved with purchasing

25  capacitors. eIQ moved its entire corporate offices in May-June 2015, and has spent the past several

26  months packing and unpacking its corporate offices. The ESI in question is not necessary for eIQ's

27  daily operations (*e.g.*, much of it pertains to former employees or company operations not currently

28  relevant) and, accordingly, the logistics of the move took precedence. Regardless, DPPs have

1    contracted for the data recovery to be expedited at additional expense. We now expect that the data

2    will be restored prior to the status conference. Once the data is restored, DPPs will then run

3    Defendants' ESI search terms and begin reviewing documents. Until the search terms are run, DPPs

4    do not know the total volume of ESI that eIQ may potentially produce. That being said, DPPs have

5    collected over ten banker boxes worth of potentially responsive documents from eIQ, and the

6    responsive, non-privileged documents culled from those boxes will be produced to Defendants prior

7    to the parties' status conference. DPPs further intend to dedicate all available resources to working to

8    meet the parties' agreed-upon deadline for substantial document production.

9        **IPPs:**  Defendants expression of "grave" concern about IPPs' productions is strange given

10   that each and every named Indirect Purchaser Plaintiff, except for Alfred Siegel of the Circuit City

11   Liquidating Trust ("CCLT"), has completely produced all transactional data and other documents to

12   Defendants on June 1, 2015 – nearly four months ago.

13       Although Defendants express concern about IPPs' production*s*, it is clear from their statement

14   that they are singularly focused on CCLT.[5]  As Defendants themselves note, no issue is ripe for Court

15   intervention at this time with respect to CCLT.  In 2008, over six years before the commencement of

16   this litigation, Circuit City Stores went into bankruptcy and liquidation.  Many of its databases and

17   servers have subsequently been decommissioned.  No employees from the legacy Circuit City Stores'

18   service centers are now employed with CCLT and CCLT only employs an extremely limited number

19   of employees now at all.  Notwithstanding these difficulties, on June 1, 2015, CCLT produced the

20   capacitor transactional data that could be located after a reasonably diligent search.   This data

21   consisted of close to 5,000 capacitor transactions purchased from third-party distributors and over 60

22   pages of data.  Defendants have been in possession of this data since June.

23       It is possible that additional transaction data resides on legacy systems that have been

24   decommissioned, are inaccessible, or are not searchable.  CCLT, with the assistance of counsel,

25

26   _____

27   [5] Michael Brooks and Toy-Knowlogy have completed their productions and Defendants have been so
     advised on numerous occasions.  That those class representatives have only produced two documents
28   each merely reflects the fact that they do not possess any further responsive documents, which is
     hardly surprising given that the focus in this litigation is on Defendants' anticompetitive conduct.

1   continues to look into whether it is feasible to produce additional transactional data from these

2   systems, assuming it exists at all, and expects to have an answer for the Defendants in the coming

3   weeks.  In addition to these efforts, on July 16, 2015 and August 10, 2015, CCLT produced

4   additional documents and warranty data to Defendants.

5          Aside from transactional data, CCLT and Defendants have largely agreed on custodians and

6   search terms.  ESI has now been collected from those custodial files, resulting in a collection of 2,500

7   documents that are potentially responsive to Defendants' requests.  IPPs believe these documents will

8   be ready for production in the next two weeks.

9   **C.   Report on Third Party Discovery**

10         **1.   IPPs' Statement**

11         On June 30, 2015, Plaintiffs served 22 third-party distributors with Fed. R. Civ. Proc. 45

12  subpoenas seeking, among other items, the distributors' data regarding direct purchases of capacitors

13  and their sales to the IPP class. IPPs have been meeting and conferring with the third-parties for

14  several months in an attempt to reduce any purported burden on these third-parties. Given the large

15  amount of data required, the discussions and negotiations have understandably been slow. To date,

16  IPPs have only received purchase data from third-party Allied Electronic, Inc.

17         Beginning on August 21, 2015 and ending on September 22, 2015, Defendants served mostly

18  duplicative subpoenas on the same third-party distributors as Plaintiffs. IPPs believe that service of

19  these duplicative subpoenas has caused delay, as third-parties justifiably respond negatively to

20  receiving additional, duplicative discovery in the same case. Defendants have refused to jointly meet

21  and confer with IPPs and the third-parties to streamline the endeavor, which causes further delay and

22  interference with the process. The purchase and sales data requested in the subpoenas is important

23  for class certification, and the delays in securing this data is an additional reason, beyond the slow

24  pace of addressing Defendants' transactional data, why an adjustment to the class certification

25  schedule is appropriate.  On September 22, 2015, the parties agreed to a stipulation and proposed

26  order regarding providing each side with formal and informal information obtained from third-

27  parties (Dkt. 887).

28

### 2. Defendants' Statement

Defendants have recently served twenty-two subpoenas on various third parties seeking, among other things, those entities' respective capacitor: (i) transactional data; (ii) procurement and purchase price policies, procedures, and practices; (iii) purchase agreements; and (iv) distribution channels. As noted above, IPPs previously served third-party subpoenas on those same entities. Defendants disagree with IPPs' above assertion that Defendants' service of third-party subpoenas have somehow "caused delay," and IPPs provide no support whatsoever for their "belief" that Defendants' subpoenas have delayed any responses to IPPs' subpoenas.  Rather, Defendants are just as entitled to pursue third-party discovery under Rule 45 as IPPs, and none of the subpoenaed third parties that Defendants have meet and conferred with to date have advised that Defendants' subpoenas will delay any of their respective responses to IPPs' subpoenas.

IPPs' above assertion that Defendants have supposedly "refused" to coordinate with IPPs regarding third-party discovery is also inaccurate.  Rather, Defendants advised IPPs that it is not workable or efficient to conduct joint meet and confers with the subpoenaed third parties because Defendants' subpoenas differ from IPPs' subpoenas, including containing five additional requests and expanded transactional data fields, and the inevitable disputes between Defendants and IPPs regarding those differences would only frustrate and delay the meet-and-confer process.  And on September 18, 2015, Defendants advised IPPs that Defendants would coordinate with IPPs to ensure that the subpoenaed third parties only need to make a single transactional data production in response to the subpoenas served by both Defendants and IPPs.

Defendants are currently meeting and conferring with the various subpoenaed entities regarding their respective responses to the subpoenas, and Defendants do not have any issue to raise at this time regarding any of the third-parties' responses.

## III.   DISPUTED DISCOVERY ISSUES

### A. Plaintiffs' Search Term Dispute with the Shinyei Defendants

#### 1. Plaintiffs' Statement

The Shinyei Defendants refuse to provide Plaintiffs with hit counts for agreed-upon search terms. Plaintiffs and the Shinyei Defendants have met and conferred repeatedly on this issue through

telephonic conversations and written correspondence and the parties are at an impasse. Plaintiffs advised the Shinyei Defendants that they would bring this issue to the Court's attention at the forthcoming status conference.

The parties have reached agreement on Global Search Terms and Shinyei-specific search terms, including following Court intervention.[6] As Plaintiffs advised the Court previously, Plaintiffs had asked the Shinyei Defendants "to engage in a process undertaken by other Defendants in which the parties run search terms and, depending on hit counts, either produce documents, remove search terms, or negotiate limiters." *See* Dkt. 849.

The Shinyei Defendants have now run the parties' agreed-upon search terms across their ESI but refuse to share the resulting hit counts with Plaintiffs. The Shinyei Defendants fail to provide a single explanation for their refusal except that they believe they are not obligated to disclose them. Instead, the Shinyei Defendants contend that they have sole authority to determine whether and when modifications to the terms are necessary and will notify Plaintiffs accordingly.[7] The Shinyei Defendants' position is contrary to the Court's stipulated ESI Order, this Court's guidelines on electronic-discovery, and prevailing case law, all of which emphasize the importance of collaboration and transparency in discovery, particularly where search terms are involved.

Importantly, the Court's ESI Order requires the parties to mutually discuss and agree upon modifications or variants to the search terms.[8] Consistent with that, nothing in the Court's ESI Order

---

[6] On August 7, 2015 Plaintiffs sought an Order from the Court requiring the Shinyei Defendants to run search terms against its ESI that reflect the names of conspiratorial meeting locations which Plaintiffs discovered upon review of the Shinyei Defendants' productions to the DOJ. Dkt. 849. On August 20, 2015 the Court ordered that the Shinyei Defendants' "objections to the ESI search terms are overruled. Plaintiffs may use the challenged terms." Dkt. 857.

[7] The Shinyei Defendants have thus far unilaterally decided that the hit count for one type of search term is too high. The Shinyei Defendants represent that it sees no other terms that require modification "at this time."

[8] The Court's ESI Order states: "Should any parties' search results for any agreed-upon search term or phrase from the general list or Defendant-specific lists result in an excessively high hit rate or raise any other party-specific or custodian-specific issues, the parties agree to meet and confer about these issues in an effort to seek a mutually agreeable limitation or variant of the search term or phrase at issue." *See* Dkt. 782.

leaves the determination of search term results to one party's sole discretion. Indeed, by taking its current position, the Shinyei Defendants have largely departed from the collaborative practice of sharing hit counts and negotiating limited search terms modifications that their fellow Defendants have followed to date in this case. The Shinyei Defendants' refusal to share the search term hit counts deliberately obstructs Plaintiffs' ability to seek modifications to the terms. *See Burd v. Ford Motor Co.*, No.3:13-CV-20976, 2015 WL 4137915, at *3 (S.D.W. Va. July 8, 2015) (concluding that "[defendant] Ford was not forthcoming in sharing specifics about the results of the searches with Plaintiffs; thereby, hindering modifications to the search terms and phrases.")

The Shinyei Defendants' position also contravenes the Northern District of California's Guidelines for the Discovery of Electronically Stored Information which makes clear that, "[t]he Court expects cooperation on issues relating to the preservation, collection, search, review, and production of ESI." *Id.* (Guideline 1.02). Likewise, courts recognize the importance of cooperation and transparency in the discovery of ESI. *See Apple, Inc. v. Samsung Electronics Co. Ltd., No. 12–CV–0630, 2013 WL 1942163,* at *3 (N.D. Cal. May 9, 2013) (discussing the principles of cooperative, collaborative, and transparent discovery whereby the parties work collaboratively to ensure meaningful discovery*); William A. Gross Const. Associates, Inc. v. Am. Mfrs. Mut. Ins. Co*., 256 F.R.D. 134, 136 (S.D.N.Y. 2009)(concluding that, with respect to retrieval of ESI and key word searching, "the best solution in the entire area of electronic discovery is cooperation among counsel.").

Transparency is imperative in this context as search terms require informed exchanges between the parties to ensure the quality of the results. *See In re Seroquel Products Liability Litig.*, 244 F.R.D. 650, 662 (M.D.Fla.2007) ("[W]hile key word searching is a recognized method to winnow relevant documents from large repositories, use of this technique must be a cooperative and informed process.... Common sense dictates that sampling and other quality assurance techniques must be employed to meet requirements of completeness."). By way of example, connectors, limiters, inadvertent misspellings of search terms or other causes may produce excessive hits, few or no hits, or other issues requiring the parties' attention as contemplated by the Court's ESI Order. For instance, in this litigation, Defendant Taitsu appropriately disclosed its comprehensive hit report to

Plaintiffs and Plaintiffs were able to identify key terms that were resulting in zero hits when there should have been more. The issue was raised with Taitsu and Taitsu is now addressing the issue with its vendor. Plaintiffs and the Shinyei Defendants should *both* have the opportunity to identify and address such issues.

The parties have expended considerable time and effort to reach agreement on the parties' global search terms in both English and Japanese. Plaintiffs should not be foreclosed from viewing the hit counts resulting from that effort or from addressing areas that Plaintiffs perceive as requiring modification. Accordingly, Plaintiffs respectfully request the Court to order the Shinyei Defendants to provide Plaintiffs with the hit counts for the parties' agreed-upon search terms and to work collaboratively with Plaintiffs to modify the search terms if necessary.

### 2.  Shinyei Defendants' Statement

Across the numerous meet and confers in which Plaintiffs and Shinyei have engaged over at least the last three months, Shinyei has repeatedly made clear and confirmed to Plaintiffs upon inquiry that—consistent with the standard practice in this litigation—Shinyei would provide hit information if it sought modification of any agreed-upon search terms.  Contrary to Plaintiffs' assertions, nothing about Shinyei's position contradicts the standard practice of Defendants in this litigation or the ESI Order governing electronic discovery in this case.  In arguing otherwise, Plaintiffs' Statement blatantly mischaracterizes Shinyei's position and the parties' conduct in this litigation.  Moreover, Plaintiffs' claim that it is "imperative" that they receive hit counts for ***all*** search terms, ***regardless*** of whether modification is sought—a sweeping request made to Shinyei for the first time only recently—is directly belied by the facts that Plaintiffs never raised such a request during the negotiations of the ESI Agreement or search terms, or in the process that Plaintiffs themselves previously identified for the modification of search terms.  Indeed, Plaintiffs cannot dispute that despite months of communications on the topic, they never raised their request until very recently.

By Plaintiffs' own terms, Shinyei's position is entirely in keeping with the "collaborative practice of sharing hit counts and negotiating limited search terms modifications that their fellow Defendants have followed to date in this case."  Plaintiffs' assertion to the contrary is without basis and misleading.  As Plaintiffs are well aware, Shinyei's "fellow Defendants" have shared hit

1   information only to the extent they seek modifications to search terms.[9]  Plaintiffs do not dispute—

2   nor can they—that Shinyei has repeatedly agreed to follow the same approach.[10]  Shinyei's position

3   is therefore *no different* than that of other Defendants, and Plaintiffs know full well that they have no

4   basis to claim otherwise.

5          Moreover, at no time prior to a recent meet and confer did Plaintiffs take issue with Shinyei's

6   position, nor could they, as providing hit information to the extent that modification is sought is

7   entirely in keeping with the ESI Order.  As Plaintiffs acknowledge, the ESI Order provides that

8   "[s]hould any parties' search results for any agreed-upon search term or phrase from the general list

9   or Defendant-specific lists result in an excessively high hit rate or raise any other party-specific or

10  custodian-specific issues, the parties agree to meet and confer about these issues . . . ." (Dkt. 782 at

11  3.)  Nothing in the ESI Order requires that hit counts be provided regardless of whether modification

12  is sought, nor was such a request discussed or contemplated during any of the negotiations regarding

13  the ESI Agreement.  Nor did Plaintiffs ever raise a request for such information during the *over four*

14  *months* of negotiations concerning global search terms, or during the course of negotiations

15  concerning Shinyei-specific terms.

16         Nor did Plaintiffs make any such request in their July 31, 2015 joint letter to all Defendants

17  that directly addressed the modification of search terms.  In that letter, Plaintiffs only requested hit

18  information "[i]f *you [i.e., Defendants]* seek exceptions or modifications to either the English or

19  Japanese section of the Global Search Term List."  (Pls.' Letter to Defs. dated July 31, 2015

20  (emphasis added).)  Nowhere did Plaintiffs request or even contemplate the sweeping demand they

21  _____

22
23  [9] Plaintiffs assertions that Taitsu "disclosed its comprehensive hit report to Plaintiffs" and that the parties then addressed an "issue" with "zero hits" similarly mischaracterize the record.  According to Taitsu's counsel, and as Plaintiffs are well aware, Taitsu provided Plaintiffs with a partial,
24  preliminary report of search term hits for the sole purpose of negotiating modifications to certain terms.  Taitsu specifically told Plaintiffs that they should not rely on the numbers in the report other than as the parties discussed because the results were preliminary, and further advised Plaintiffs that
25  the "zero hit" results were due to searches that had not been run.  Thus, contrary to Plaintiffs' claims, there is no "issue" with "zero hits" that Plaintiffs identified or that the parties are addressing.
26  Moreover, just last week Plaintiffs requested from Taitsu the "comprehensive hit report" that they now claim Taitsu previously provided, a request that Taitsu reasonably declined.
27
28  [10] In fact, as Plaintiffs reference, Shinyei has discussed a potential modification with Plaintiffs due to high hit counts and will be providing hit information to Plaintiffs related thereto.

1   now make that they be provided with hit counts for all search terms, regardless of whether

2   modification is sought.

3       Plaintiffs do not dispute that they never raised their current request in negotiations concerning

4   the ESI Agreement or search terms, or in their July 31 letter.  Accordingly, any claim by Plaintiffs

5   that the information they now request is "imperative" for "cooperation" or "transparency," or that

6   Shinyei's "refusal to share hit counts deliberately obstructs" the process, is completely disingenuous,

7   unfounded, and directly undermined by the facts and standard practice in this litigation to date.

8       Plaintiffs further ignores the practical realities of their request.  As Plaintiffs themselves

9   acknowledge, "[t]he parties have expended considerable time and effort to reach agreement on the

10  parties' global search terms."  Plaintiffs' request, however, will surely result in an endless back and

11  forth as Plaintiffs cherry-pick the search terms they now want to change and issue any number of

12  follow-up "modification requests" depending on whether they get the results they unilaterally decide

13  are acceptable, all in the name of purported "cooperation." In essence, Plaintiffs' request will result in

14  discovery that never closes and poses an undue burden on Shinyei.

15      Plaintiffs' reliance on the cited case law is misplaced and fails to support their request, as none

16  of those cases holds or even suggests that sharing hit counts of all search terms, regardless of whether

17  modification is sought, is required as part of cooperative, collaborative discovery.  For example,

18  while Plaintiffs quote the *Burd* case for the proposition that "[the defendant] was not forthcoming in

19  sharing specifics about the results of the searches with Plaintiffs; thereby, hindering modifications to

20  the search terms and phrases," Plaintiffs ignore that the case represents a more extreme discovery

21  scenario that is readily distinguishable on the facts.  The *Burd* case involved a protracted dispute

22  regarding the sufficiency of the defendant's production, where the parties' later-negotiated search

23  terms resulted in fewer than 150 additional documents total.  2015 WL 4137915, at *1-3.  The

24  plaintiffs asserted that "the purported lack of documents . . . demonstrated a problem with the search

25  terms," while the defendant asserted that the search terms at issue "were too imprecise" and that the

26  plaintiffs "were intransigent about changing the search terms, even though they yielded a vast number

27  of unresponsive documents."  2015 WL 4137915, at *3.  No such circumstances exist here, however,

28  where the agreed-upon search terms yield a significant number of documents and Shinyei has agreed

1  to provide hit information to Plaintiffs in the event modifications are needed.  Moreover, nowhere did

2  the *Burd* court state or suggest that the defendant was obligated to share "specifics about the results"

3  with the plaintiffs as a matter of course, or that such information was warranted absent the numerous

4  factual issues specific to that case.[11]

5          Finally, Plaintiffs' assertion that Plaintiffs and Shinyei "have met and conferred repeatedly on

6  this issue" mischaracterizes the record.  Despite numerous prior meet and confers over the last three

7  months, not until August 28, 2015 did Plaintiffs suggest *for the first time* that Shinyei provide hit

8  counts for all search terms, regardless of whether modification was sought.  Shinyei advised that it

9  would provide hit information if it sought any modifications, consistent with the practice in this

10  litigation, and Plaintiffs appeared to agree.  To Shinyei's surprise, on September 3, 2015 it received a

11  letter that again suggested that Shinyei provide all hit counts as a matter of course.  During a

12  subsequent meet and confer on September 16, 2015, Shinyei sought to clarify Plaintiffs' position, at

13  which time Plaintiffs confirmed their current request.  Shinyei noted that Plaintiffs' request was not

14  contemplated in the negotiations concerning the ESI Order or search terms, or in Plaintiffs' own July

15  31 letter—points that Plaintiffs did not dispute.  Nevertheless, on September 22, 2015, Plaintiffs sent

16  another letter in which they reiterated their demand, and Plaintiffs' above statement followed.

17          For the reasons stated above, Shinyei respectfully requests that Plaintiffs' request be denied.

18  **B.   Clarification of the Court's August 20, 2015 Order**

19      **1.  Plaintiffs' Statement**

20          As referenced in footnote 2 above, the Court's August 20, 2015 Order resolved a dispute

21  between Plaintiffs and the Shinyei Defendants regarding their obligations to run against their ESI

---

[11] Similarly, the other cases cited by Plaintiffs merely discuss the general proposition that parties should cooperate in discovery, or situations where the parties failed to cooperate at all.  *See, e.g.*, *Apple, Inc. v. Samsung Elec. Co. Ltd.*, No. 12–CV–0630, 2013 WL 1942163, at *3 (N.D. Cal. May 9, 2013) (addressing circumstance where third party inappropriately believed that discovery obligations did not apply to it and refused to provide search terms and custodians); *William A. Gross Const. Asso.c, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 256 F.R.D. 134, 136 (S.D.N.Y. 2009) (addressing circumstance where third party made assertions regarding the scope of the parties' proposed search terms but failed to provide any input regarding the terms); *In re Seroquel Products Liability Litig.*, 244 F.R.D. 650, 662 (M.D. Fla. 2007) (noting that the defendant, *inter alia*, failed to cooperate with the plaintiffs and instead chose search terms on its own).  Here, Shinyei has already repeatedly agreed to cooperate with Plaintiffs and provide hit information to the extent it seeks to modify search terms.

1   specific search terms pertaining to cartel meetings and meeting locations. The Court's Order

2   instructed that Shinyei Defendants' "objections to the ESI search terms are overruled. Plaintiffs may

3   use the challenged terms." Dkt. 857.

4          Though this dispute arose in the context of search terms discovered from review of the

5   Shinyei Defendants' document productions and were initially proposed by Plaintiffs as additional

6   Shinyei-specific search terms, Plaintiffs believe that these search terms could and should have a

7   broader reach in this case. Indeed, the search terms at issue pertain to cartel meetings and meeting

8   locations. The Shinyei Defendants objected to running these search terms against their own ESI

9   because they believed that specific search terms pertaining to cartel meetings and meeting locations

10  should have been contemplated and incorporated in the parties' global search terms. This argument

11  certainly falls flat because Plaintiffs had limited visibility into the details regarding the Defendants'

12  cartel meetings at the time the parties began negotiating the global search term list. As Plaintiffs learn

13  more about the specifics about how Defendants' years-long capacitors price-fixing conspiracy was

14  organized and how the cartel operated, it is only reasonable that Plaintiffs be permitted the

15  opportunity to pursue targeted searches against Defendants' collected ESI to obtain documents

16  responsive to their document requests that, for some reason, were not produced as responsive to

17  another search term.

18         Plaintiffs recently asked the Nichicon Defendants whether they will run these meeting

19  locations against their collected ESI. Nichicon indicated that it did not intend to do so. Plaintiffs

20  intend to ask the same question of the other Defendants, but believe that any protracted and

21  inefficient negotiations on this issue among the parties could be easily avoided by the Court

22  addressing at the status conference whether its August 20, 2015 Order was intended to apply to all

23  Defendants.

24       **2.  Defendants' Statement**

25         Plaintiffs' request that the Court require ***all Defendants*** to run search terms that were

26  purportedly created using Shinyei-specific documents produced in this case, and which Plaintiffs told

27  the Court were tailored to meet Shinyei-specific issues (Dkt 849-5), is impractical, unwarranted, and

28  contrary to the "targeted" discovery Plaintiffs claim this will elicit.  Plaintiffs are fully aware of this

issue.  When Plaintiffs and Shinyei were attempting to negotiate this dispute (immediately prior to Plaintiffs' letter brief to the Court, Dkt 849-5), Plaintiffs used as a negotiating tactic in those discussions a demand that all Defendants run the Shinyei-specific terms, which Defendants rejected and Plaintiffs never raised again.  Indeed, Plaintiffs conceded in a telephone conversation with Defendants on that very issue that many of the other Defendants are not even alleged to have participated in the same purported cartel as Shinyei.

Only just recently, after two months of extensive negotiations with the Nichicon Defendants regarding the English-language search terms, which initially resulted in hits encompassing the great majority of all of Nichicon America's electronic custodial documents, did Plaintiffs ask Nichicon if it would run the Shinyei-specific search terms.  Nichicon objected to the introduction of these additional 85+ search terms at the end of the parties' negotiations and the lack of any rationale from Plaintiffs as to why these specific terms supposedly culled from Shinyei's specific documents, should be applied to Nichicon.  Plaintiffs have never responded or otherwise provided any rationale.  Plaintiffs have also not otherwise provided any such rationale or engaged in any discussions with any other Defendants regarding the Shinyei-specific search terms.

Defendants have already agreed to a voluminous set of more than 400 English and Japanese search terms and phrases, which has resulted in many Defendants seeing excessive hit rates.  Defendants and Plaintiffs have worked hard to identify and modify those previously agreed to search terms so as to advance a productive process moving forward.  Plaintiffs have been in full agreement with this approach. (*see* Plaintiffs' footnote 7 above; Dkt 782).  Adding search terms that were the result of a defendant-specific negotiation to the entire defense group, particularly at this late stage, is inefficient and should be rejected.

Moreover, Plaintiffs' assertions that search terms are to be run against "ESI" is inaccurate.  As negotiated by the parties, search terms are to be run against agreed-upon custodial sources (Dkt. 782), not more broadly against "ESI."  Defendants previously advised Plaintiffs of this point, and Plaintiffs never sought to discuss the issue.  Nor did the Court's order regarding the Shinyei-specific search terms address the issue, contrary to Plaintiffs' suggestion.

### C.   UCC/NCC's Custodian Negotiations

#### 1.   Plaintiffs' Statement

The parties initially agreed to a total of 15 custodians from NCC and UCC on July 17, 2015. On August 21, 2015—nearly a month after agreement on custodians and years after UCC/NCC collected and produced documents to government regulators—UCC/NCC notified Plaintiffs for the first time that they did not have custodial email records for five of the agreed upon NCC custodians (Hiraoka, Isawa, Ohno, Shimazaki, and Ohta), and one of the UCC custodians (Kudo), because those individuals are former employees. On August 24, 2015, Plaintiffs responded that in light of these facts, the parties should reopen the custodian discussion. NCC initially declined to do so, and has not proposed any replacement custodians. Plaintiffs proposed additional NCC custodians to replace those for whom NCC has no email. At present NCC is evaluating whether it has email for those individuals and whether to add those individuals as custodians. As an alternative and in light of the missing ESI, Plaintiffs requested that UCC/NCC run the former employees' (and agreed upon custodians) names as search terms against its other collected ESI in an attempt to capture emails that may reside in other custodians' ESI. At present UCC/NCC is also evaluating this request. The parties are continuing to meet and confer on these issues. While these issues may not be ripe for Court intervention at this time given UCC/NCC's continued evaluations of the requests, Plaintiffs provide this statement as a status update to potential contemplated discovery motions.

#### 2.   NCC/UCC's Statement

NCC and UCC agree with the Plaintiffs that their custodian negotiations are not ripe for Court intervention at this time because the parties are continuing to meet and confer.  However, NCC and UCC disagree that Plaintiffs did not have notice that many former custodians' emails might not exist, a fact that was raised with Plaintiffs in meet and confers on June 29th as well as July 10th.  Both of these meet and confers preceded the letter memorializing the specific agreed upon custodians in this case that was sent to Plaintiffs on July 17th.  NCC and UCC also reject any implication that they are avoiding their discovery burden.  By Plaintiffs' own count, NCC and UCC have collectively produced <u>more documents than all other defendants, save one</u>, despite the existence of the stay as to NCC.

IV.   **UPDATE ON CASE MANAGEMENT ISSUES**

A.   **Plaintiffs' Motions for Default Judgment Against Defendant TOSHIN KOGYO**

Plaintiffs have served and reserved Defendant TOSHIN KOGYO Co., Ltd. ("TOSHIN KOGYO") numerous times in this litigation, but the company has failed to make an appearance. Instead, TOSHIN KOGYO has improperly filed two "motions to dismiss" DPPs' complaints with the Court (Dkts. 430, 600), and one motion to dismiss IPPs' complaint (Dkt. 816). The Court has stricken the two purported motions against DPPs' complaints as being improperly filed by a corporate officer (Dkts. 457, 682), and IPPs' motion to strike is pending before the Court (Dkt. 852). Plaintiffs intend to file for a default judgment against Toshin Kogyo in the near term.

B.   **Depositions**

Plaintiffs have started the process of scheduling and noticing depositions. Plaintiffs have scheduled the deposition of Jack Nakatani of Panasonic for November 5, 2015 and will be noticing this deposition accordingly. DPPs have sent Kemet a Rule 30(b)(6) deposition notice on certain topics, and are meeting and conferring with Kemet concerning scheduling a deposition. Plaintiffs anticipate contacting other Defendants within the next two weeks to schedule 30(b)(6) depositions and depositions of certain fact witnesses.

Date: September 23, 2015          JOSEPH SAVERI LAW FIRM, INC.

*/s/ Joseph R. Saveri*
Joseph R. Saveri (State Bar No. 130064)
Andrew M. Purdy (State Bar No. 261912)
Matthew S. Weiler (State Bar No. 236052)
James G. Dallal (State Bar No. 277826)
Ryan J. McEwan (State Bar No. 285595)
555 Montgomery Street, Suite 1210
San Francisco, California 94111
Telephone:     (415) 500-6800
Facsimile:     (415) 395-9940
E-mails:       jsaveri@saverilawfirm.com
               apurdy@saverilawfirm.com
               mweiler@saverilawfirm.com
               jdallal@saverilawfirm.com
               rmcewan@saverilawfirm.com

*Interim Lead Counsel for Direct Purchaser Plaintiffs*

Date: September 23, 2015          COTCHETT, PITRE & McCARTHY, LLP

*/s/ Steven N. Williams*

1   Joseph W. Cotchett (State Bar No. 36324)
Steven N. Williams (State Bar No. 175489)
2   Adam J. Zapala (State Bar No. 245748)
Elizabeth Tran (State Bar No. 280502)
3   840 Malcolm Road, Suite 200
Burlingame, CA 94010
4   Telephone:   (650) 697-6000
Facsimile:   (650) 697-0577
5   E-mails:      jcotchett@cpmlegal.com
swilliams@cpmlegal.com
6               azapala@cpmlegal.com
etran@cpmlegal.com
7
*Interim Lead Counsel for Indirect Purchaser Plaintiffs*
8

9
10  Date: September 23, 2015          MINTZ LEVIN COHN FERRIS GLOVSKY  AND
POPEO PC

11  */s/ Bruce D. Sokler*
Bruce D. Sokler (*admitted pro hac vice*)
12  701 Pennsylvania Avenue NW
Suite 900
13  Washington, DC 20004
202-434-7303
14  Fax: 202-434-7400
Email: bdsokler@mintz.com
15
*Attorneys for Defendant AVX Corporation*
16
17  Date: September 23, 2015          WILMER CUTLER PICKERING HALE AND DORR
LLP

18  */s/ Heather S. Tewksbury*
Heather S. Tewksbury
19  950 Page Mill Road
Palo Alto, CA 94304
20  (650) 858-6134
Fax: (650) 858-6100
21  Email: heather.tewksbury@wilmerhale.com

22  *Attorney for Defendants Elna Co. Ltd. and Elna America Inc.*
23

24  Date: September 23, 2015          WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
25
*/s/ Jonathan M. Jacobson*
26  Jonathan M. Jacobson
Chul Pak (*admitted pro hac vice*)
27  Jeffrey C. Bank (*admitted pro hac vice*)
Justin Cohen (*admitted pro hac vice*)
28  1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone:  (212) 497-7758

1    Facsimile:  (212) 999-5899
     jjacobson@wsgr.com
2    cpak@wsgr.com
     jbank@wsgr.com
3    jcohen@wsgr.com

4
     Jeff VanHooreweghe (*admitted pro hac vice*)
5    1700 K Street, N.W., Fifth Floor
     Washington, DC 20006
6    Telephone:  (202) 973-8825
     Facsimile:  (202) 973-8899
7    jvanhooreweghe@wsgr.com

8    *Attorneys for Defendants Hitachi Chemical Co., Ltd.,*
     *Hitachi Chemical Company America, Ltd., and*
9    *Hitachi AIC Incorporated*

10   Date: September 23, 2015          PILLSBURY WINTHROP SHAW PITTMAN LLP

11                                     */s/ Roxane A. Polidora*
                                       Roxane A. Polidora
12                                     Roxane A. Polidora (CA Bar No. 135972)
                                       Jacob R. Sorensen (CA Bar No. 209134)
13                                     Four Embarcadero Center, 22nd Floor
                                       San Francisco, CA 94111
14                                     Telephone: (415) 983-1000
                                       Email: roxane.polidora@pillsburylaw.com
15                                     jake.sorensen@pillsburylaw.com

16                                     *Attorneys for Defendants KEMET Corporation and*
                                       *KEMET Electronics Corporation*
17

18   Date: September 23, 2015          DENTONS US LLP

19                                     */s/ Bonnie Lau*
                                       Bonnie Lau
20                                     525 Market Street, 26th Floor
                                       San Francisco, CA 94105
21                                     415-882-5000
                                       Fax: 415- 882-0300
22                                     Email: bonnie.lau@dentons.com

23                                     *Attorneys for Defendant Matsuo Electric Co., Ltd.*

24   Date: September 23, 2015          GIBSON, DUNN & CRUTCHER LLP

25                                     */s/ George A. Nicoud III*

26                                     GEORGE A. NICOUD III, SBN 106111
                                       AUSTIN V. SCHWING, SBN 211696
27                                     ELI M. LAZARUS, SBN 284082
                                       aschwing@gibsondunn.com
28                                     tnicoud@gibsondunn.com
                                       elazarus@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:      415.393.8200
Facsimile:      415.393.8306

MATTHEW PARROTT, SBN 302731
mparrott@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA  92612-4412
Telephone:      949.451.3800
Facsimile:      949.451.4220

*Attorneys for Defendants NEC TOKIN Corporation and
NEC TOKIN America, Inc.*

Date: September 23, 2015            K&L GATES LLP

                                   */s/ Michael E. Martinez*

                                   Scott M. Mendel (*pro hac vice*)
                                   Steven M. Kowal (*pro hac vice*)
                                   Michael E. Martinez (*pro hac vice*)
                                   Lauren N. Norris (*pro hac vice*)
                                   Lauren B. Salins (*pro hac vice*)
                                   K&L GATES LLP
                                   70 West Madison Street, Suite 3100
                                   Chicago, IL  60602
                                   Telephone: (312) 372-1121
                                   Facsimile: (312) 827-8000

                                   *Counsel for Defendants
                                   Nichicon Corporation
                                   Nichicon (America) Corporation
                                   FPCAP Electronics (Suzhou) Co., Ltd.*

Date: September 23, 2015            WINSTON & STRAWN LLP

                                   */s/ Jeffrey L. Kessler*
                                   Jeffrey L. Kessler
                                   Jeffrey L. Kessler (*pro hac vice*)
                                   A. Paul Victor (*pro hac vice*)
                                   Molly M. Donovan (*pro hac vice*)
                                   Mollie C. Richardson (*pro hac vice*)
                                   200 Park Avenue
                                   New York, New York 10166
                                   Telephone: (212) 294-4698
                                   Facsimile: (212) 294-4700

jkessler@winston.com
pvictor@winston.com
mmdonovan@winston.com
mrichardson@winston.com

Ian L. Papendick (State Bar No. 275648)
101 California Street
San Francisco, CA 94111
Tel: (415) 591-6905
Fax: (415) 591-1400
ipapendick@winston.com

*Counsel for Defendants Panasonic Corporation,*
*Panasonic Corporation of North America, SANYO*
*Electric Co., Ltd., and SANYO North America*
*Corporation*

Date: September 23, 2015                 O'MELVENY & MYERS LLP

                                         */s/ Michael F. Tubach*

                                         Michael F. Tubach (SBN 145955)
                                         Christina J. Brown (SBN 242130)
                                         Two Embarcadero Center, 28th Floor
                                         San Francisco, CA 94111-3305
                                         Telephone:  (415) 984-8700
                                         Facsimile:  (415) 984-8701
                                         Email: mtubach@omm.com
                                         Email: cjbrown@omm.com

                                         Kenneth R. O'Rourke (SBN 120144 )
                                         400 South Hope Street, 18th Floor
                                         Los Angeles, CA 90071
                                         Telephone: (213) 430-6000
                                         Facsimile: (213) 430-6407
                                         Email:  korourke@omm.com

                                         *Attorneys for Defendants ROHM Co., Ltd. and ROHM*
                                         *Semiconductor U.S.A., LLC*

Date: September 23, 2015                 HUNTON AND WILLIAMS LLP

                                         */s/ Djordje Petkoski*
                                         Djordje Petkoski

                                         2200 Pennsylvania Avenue, NW
                                         Washington, DC 20037
                                         202-955-1500
                                         Email: dpetkoski@hunton.com

                                         *Attorneys for Defendants Rubycon Corporation  and*
                                         *Rubycon America Inc.*

| | | |
|---|---|---|
| 1 | Date: September 23, 2015 | CADWALADER, WICKERSHAM & TAFT LLP |
| 2 | | */s/ Charles F. Rule* |
| 3 | | Charles F. Rule (admitted *pro hac vice*) |
| | | Joseph J. Bial (admitted *pro hac vice*) |
| 4 | | Daniel J. Howley (admitted *pro hac vice*) |
| | | 700 6th St, NW |
| 5 | | Washington, DC 20001 |
| | | Telephone:  (202) 862-2200 |
| 6 | | Facsimile:  (202) 862-2400 |
| | | rick.rule@cwt.com |
| 7 | | joseph.bial@cwt.com |
| | | daniel.howley@cwt.com |
| 8 | | |
| | | *Attorneys for Defendants United Chemi-Con, Inc. and* |
| 9 | | *Nippon Chemi-Con Corporation* |
| 10 | Date: September 23, 2015 | ROPES & GRAY LLP |
| 11 | | */s/ Mark S. Popofsky* |
| 12 | | Mark S. Popofsky |
| | | One Metro Center |
| 13 | | 700 12th Street NW, Suite 900 |
| | | Washington, DC 20005-3948 |
| 14 | | Telephone: (202) 508-4624 |
| | | Facsimile: (202) 508-4650 |
| 15 | | mark.popofsky@ropesgray.com |
| 16 | | Jane E. Willis (*admission pro hac vice pending*) |
| | | 800 Boylston Street |
| 17 | | Boston, MA 02199-3600 |
| | | Telephone: (617) 951-7603 |
| 18 | | Facsimile: (617) 235-0435 |
| | | jane.willis@ropesgray.com |
| 19 | | |
| | | *Attorneys for Taitsu Corporation and Taitsu America,* |
| 20 | | *Inc.* |
| 21 | Date: September 23, 2015 | MORRISON & FOERSTER LLP |
| 22 | | */s/ Paul T. Friedman* |
| 23 | | Paul T. Friedman |
| | | Michael P. Kniffen |
| 24 | | 425 Market Street |
| | | San Francisco, California 94105-2482 |
| 25 | | Telephone: 415.268.7000 |
| | | Facsimile: 415.268.7522 |
| 26 | | Email: PFriedman@mofo.com |
| | | Email: MKniffen@mofo.com |
| 27 | | |
| | | Jeffrey A. Jaeckel |
| 28 | | 2000 Pennsylvania Avenue, NW Suite 6000 |
| | | Washington, District of Columbia 20006-1888 |
| | | Telephone: 202.887.1500 |

Facsimile: 202.887.0763
Email: JJaeckel@mofo.com

*Attorneys for Defendant Fujitsu Limited*

Date: September 23, 2015                    JONES DAY

*/s/ Eric P. Enson*

Jeffrey A. LeVee (State Bar No. 125863)
jlevee@JonesDay.com
Eric P. Enson (State Bar No. 204447)
epenson@JonesDay.com
Rachel H. Zernik (State Bar No. 281222)
rzernik@jonesday.com
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071.2300
Telephone:   +1.213.489.3939
Facsimile:   +1.213.243.2539

*Counsel for Defendants*
*Holy Stone Enterprise Co., Ltd.*
*Holystone International, and Vishay Polytech Co., Ltd.*

Date: September 23, 2015                    BAKER & MCKENZIE LLP
*/s/ Darrell Prescott*

Douglas Tween (admitted *pro hac vice*)
Darrell Prescott (admitted *pro hac vice*)
Catherine Koh Stillman (SBN 252440)
452 Fifth Avenue
New York, NY 10018
(212) 626-4355
Fax: (212) 310-1655
Email: Douglas.Tween@bakermckenzie.com
Email: Darrell.Prescott@bakermckenzie.com
Email:  Catherine.Stillman@bakermckenzie.com

Meghan E. Hausler (*admitted pro hac vice*)
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, TX 75206
Telephone: (214) 965-7219
Facsimile: (214) 965-5937
Email:  Meghan.Hausler@bakermckenzie.com

Colin H. Murray (SBN 159142)
Two Embarcadero Center, 11th Floor
San Francisco, CA 94111
(415) 591-3244
Fax: (415) 576-3099
Email: Colin.Murray@bakermckenzie.com

*Attorneys for Defendants Okaya Electric Industries Co.,*
*Ltd. and Okaya Electric America, Inc.*

Date: September 23, 2015

HUGHES HUBBARD & REED LLP

*/s/ Ethan E. Litwin_____*

Ethan E. Litwin (*admitted pro hac vice*)
Sigrid Jernudd (*admitted pro hac vice*)
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004-1482
Tel: (212) 837-6000
Fax: (212) 422-4726
Email: Ethan.Litwin@hugheshubbard.com
Email: Sigrid.Jernudd@hugheshubbard.com
David H. Stern (CA Bar No. 196408)
Carolin Sahimi (CA Bar No. 260312)
Hughes Hubbard & Reed LLP
350 South Grand Avenue
Los Angeles, CA 90071-3442
Tel: (213) 613-2800
Fax: (213) 613-2950
Email: David.Stern@hugheshubbard.com
Email: Carolin.Sahimi@hugheshubbard.com

*Attorneys for Defendants Soshin Electric Co., Ltd. and Soshin Electronics of America, Inc.*

Date: September 23, 2015

LATHAM & WATKINS LLP

*/s/ Belinda S Lee_____*

Belinda S Lee
Ashley M. Bauer
505 Montgomery Street, 20th Floor
San Francisco, CA  94111
Telephone:  415-391-0600
Facsimile:  415-395-8095
belinda.lee@lw.com
ashley.bauer@lw.com

*Attorneys for Defendant Nitsuko Electronics Corporation*

Date: September 23, 2015

MCKENNA LONG & ALDRIDGE LLP

*/s/ Gaspare J. Bono_____*

Gaspare J. Bono (*admitted pro hac vice*)
Stephen M. Chippendale (*admitted pro hac vice*)
Claire M. Maddox (*admitted pro hac vice*)
McKenna Long & Aldridge LLP
1900 K St., NW
Washington, DC 20006
Tele.: (202) 496-7500
Fax:  (202) 496-7756
gbono@mckennalong.com
schippendale@mckennalong.com

cmaddox@mckennalong.com

Andrew S. Azarmi (SBN 241407)
McKenna Long & Aldridge LLP
Spear Tower, One Market Plaza, 24th Fl.
San Francisco, CA 94105
Tele.: (415) 267-4000
Fax:  (415) 356-3873
aazarmi@mckennalong.com

*Attorneys for Defendants*
*Shinyei Kaisha,*
*Shinyei Technology Co., Ltd.,*
*Shinyei Capacitor Co., Ltd., and*
*Shinyei Corporation of America, Inc.*

Pursuant to Civil Local Rule 5.1(i)(3), I attest that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

Dated: September 23, 2015    */s/ Adam J. Zapala*
             Adam J. Zapala