Joseph W. Cotchett (36324)
Steven N. Williams (175489)
Adam J. Zapala (245748)
Elizabeth Tran (280502)
Joyce Change (300780)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
jcotchett@cpmlegal.com
swilliams@cpmlegal.com
azapala@cpmlegal.com
etran@cpmlegal.com
jchang@cpmlegal.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE CAPACITORS ANTITRUST LITIGATION** ) ) ) ) ) ) This Document Relates To: ) ALL INDIRECT PURCHASER ACTIONS ) ) ) ) ) ) ) ) ) ) ) ) ) | **Case No. 3:14-cv-03264-JD** <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT DISMISSING PLAINTIFFS' INDIRECT PURCHASER CLAIMS BASED ON FOREIGN SALES OR, IN THE ALTERNATIVE, TO SIMPLIFY THE ISSUES UNDER FED. R. CIV. P. 16** <br><br> **Date:** January 13, 2015 <br> **Time:** 10:00 am <br> **Judge:** Hon. James Donato <br> Courtroom 11, 19th Floor |

---

PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT DISMISING PLAINTIFFS' INDIRECT PURCHASER CLAIMS BASED ON FOREIGN SALES OR, IN THE ALTERNATIVE, TO SIMPLIFY THE ISSUES UNDER FED. R. CIV. P. 16; Case No. 3:14-cv-03264-JD

# TABLE OF CONTENTS

**Page**

I.    STATEMENT OF THE ISSUE ..................................................................................1

II.   INTRODUCTION .....................................................................................................1

III.  STATEMENT OF UNDISPUTED FACTS .............................................................2

IV.   STANDARD OF REVIEW ......................................................................................3

    A.    Summary Judgement Standard ....................................................................3

    B.    The Foreign Trade Antitrust Improvements Act ........................................3

V.    ARGUMENT ............................................................................................................4

    A.    The FTAIA Does Apply to State Antitrust Claims......................................4

        1.    The Supremacy Clause Does Not Preclude State Antitrust Laws From Regulating Foreign Commerce ....................................................5

        2.    The Commerce Clause Does Not Preclude State Antitrust Laws From Regulating Foreign Commerce ....................................................7

        3.    Applying State Law Claims to Foreign Commerce Will Not Offend Principles of International Comity..................................................8

        4.    IPPs' State Law Claims Reach Overseas Capacitor Sales to Third-Party Distributors Because Such Claims Can Only Be Harmonized To The Extent That They Are Consistent With Federal Law...................................9

    B.    Even if the FTAIA Applies to State Law Claims, It Does Not Bar the Indirect Purchaser Claims at Issue in this Case Because They Meet the "Domestic Effects" Exception ...............................................................................10

        1.    The Ninth Circuit's Decision in *Hsiung II* Emphatically Rejects Defendants' Arguments and Requires Denial of Their Motion.................11

        2.    The Ninth Circuit Correctly Held that the Seventh Circuit's Decision in *Motorola* is Limited to the Specific Facts of that Case .............................13

        3.    The Domestic Effects of Defendants' Conspiracy Gives Rise to IPPs' Claims..................................................................................16

        4.    IPPs' Claims are Sufficiently "Direct" to Fall Within the FTAIA's Domestic Effects Exception............................................................19

    C.    IPPs' Claims for Purchases from Foreign Distributors Qualify as "Import" Trade Not Subject to the FTAIA.................................................................22

VI.   CONCLUSION........................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguayo v. U.S. Bank,*
  653 F.3d 912 (9th Cir. 2011) ................................................................. 6

*Amarel v. Connell,*
  202 Cal. App. 3d 137 (1988) ................................................................ 6

*Astoria Federal Savings & Loan Ass'n v. Solimino,*
  501 U.S. 104 (1991) ............................................................................ 20

*Barclays Bank Plc v. Franchise Tax Bd.,*
  512 U.S. 298 (1994) .............................................................................. 8

*Boyd v. AWB Ltd.,*
  544 F. Supp. 2d 236 (S.D.N.Y. 2008) ................................................... 4

*California v. ARC Am. Corp.,*
  490 U.S. 93 (1989) ..................................................................... 5, 9, 21

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) .............................................................................. 3

*F. Hoffmann-LaRoche Ltd, v. Empagran,*
  542 U.S. 155 (2004) ...................................................................... passim

*Fed. Treas. Enter. Sojuzplodoimport v. SPI Spirits Ltd.,*
  726 F.3d 62 (2d Cir. 2013) ................................................................... 9

*GDG Acquisitions, LLC v. Gov't of Belize,*
  749 F.3d 1024 (11th Cir. 2014) ........................................................... 9

*Gregory v. Ashcroft,*
  501 U.S. 452 (1991) .............................................................................. 7

*Hartford Fire Ins. Co. v. California,*
  509 U.S. 764 (1993) .............................................................................. 9

*High Tech Gays v. Defense Indus. Sec. Clearance Office,*
  895 F.2d 563 (9th Cir. 1990) ............................................................... 3

*Illinois Brick Co., v. Illinois,*
  431 U.S. 720 (1977) ...................................................................... 13, 14

*In re Air Cargo Shipping Servs. Antitrust Litigation,*
  2008 U.S. Dist. LEXIS 107882 (E.D.N.Y. Sept. 26, 2008) ................. 23

*In re Aurora Dairy Corp. Organic Milk Mktg. & Sales Practices Litig.,*
  621 F.3d 781 (8th Cir. 2010) ............................................................... 6

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
   546 F.3d 981 (9th Cir. 2008) ................................................................................ 18

*In re Farm Raised Salmon Cases*,
   42 Cal.4th 1077 (2008) ........................................................................................ 5

*In re Intel Corp. Microprocessor Antitrust Litig.*,
   476 F. Supp. 2d 452 (D. Del. 2007) ...................................................................... 4

*In re Monosodium Glutamate Antitrust Litigation*,
   477 F.3d 535 (8th Cir. 2007) ................................................................................ 18

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
   2010 WL 5477313 (N.D. Cal. Dec. 31, 2010) ...................................................... 4

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   822 F.Supp.2d 953 (N.D. Cal. 2011) ............................................................ passim

*Japan Line, Ltd. v. Cnty. Of L.A.*,
   441 U.S. 434 (1979) ................................................................................... 5, 7, 8

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
   232 F.3d 979 (9th Cir. 2000) ................................................................................ 7

*Linde v. Arab Bank, PLC*,
   706 F.3d 92 (2d Cir. 2013) .................................................................................. 9

*Lotes Co., Ltd. v. Hon Hai Precision Industry Co.*,
   753 F.3d 395 (2nd Cir. 2014) ................................................................... 17, 18, 20

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996) ............................................................................................ 5

*Minn-Chem, Inc. v. Agrium Inc.*,
   683 F.3d 845 (7th Cir. 2012) ..................................................................... 18, 19, 21

*Motorola Mobility LLC v. AU Optronics Corp.*,
   775 F.3d 816 (7th Cir. 2014) ................................................................. 13, 14, 15, 16

*Nissan Fire & Marine Ins. Cos. v. Fritz Companies, Inc.*,
   210 F.3d 1099 (9th Cir. 2000) ............................................................................. 3

*Oneok, Inc. v. Learjet, Inc.*,
   575 U.S. ___ (2015) ............................................................................................ 6

*Pinney Dock and Transport Co. v. Penn Cent. Corp.*,
   838 F.2d 1445 (6th Cir. 1988) ............................................................................. 6

*Proview Technology Inc., et al. v. AU Optronics Corp., et al.*,
   2014 WL 2916933 (N.D. Cal., Sept. 19, 2014) ............................................. 22, 23

*Rambus Inc. v. Micron Tech.*,
   2009 Cal. Super. LEXIS 362 (Cal. Super. Ct. May 29, 2009) .............................. 10

*United States v. Hui Hsiung,*
   758 F.3d 1074 (9th Cir. 2014) ............................................................... 13

*United States v. Hui Hsiung,*
   778 F.3d 738 (9th Cir. 2015) ........................................................... passim

*United States v. LSL Biotechnologies,*
   379 F.3d 672 (9th Cir. 2004) ........................................................... 12, 21

*Wyeth v. Levine,*
   555 U.S. 555 (2009) ............................................................................... 5

**Statutes**

15 U.S.C. § 6a ............................................................................... 1, 2, 4

**Other Authorities**

Export Trading Company Act of 1982
   Pub. L. No. 97-290, § 103(a)(7) ............................................................. 6
   Pub. L. No. 97-290, §§ 402-403 ............................................................. 6

Jack L. Goldsmith, *Federal Courts, Foreign Affairs, and Federalism,*
   83 VA. L. REV. 1617 (1997) ..................................................................... 7

Leanne M. Wilson, Note, *the Fate of the Dormant Foreign Commerce Clause After Garamendi and Crosby,*
   107 COLUM. L. REV. 746 (2007) ............................................................... 7

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
   132 S. Ct. 2566 (2012) ............................................................................ 7

Sarah H. Cleveland, Crosby and the "One-Voice" Myth in U.S. Foreign Relations,
   46 VILL. L. REV. 975 (2001) ..................................................................... 7

U.S. CONST., Amdt. 10 ............................................................................ 7

**Rules**

Fed. R. Civ. Proc. 56(d) ........................................................................ 24

1

**I.      STATEMENT OF THE ISSUE**

2

Whether indirect purchaser claims based on price-fixing conduct are barred as a matter of

3

law by the Foreign Trade Antitrust Improvement Act, 15 U.S.C. § 6a ("FTAIA"), whenever there

4

is an initial "foreign-to-foreign" sale, despite the fact that the Indirect Purchaser Plaintiffs ("IPP"

5

or "IPPs") in this case purchased capacitors in the United States at supracompetitive prices, the

6

domestic effects of the conspiracy—the imposition of supracompetitive prices in domestic

7

commerce—gave rise to IPPs' claims, and Defendants admit that they otherwise imported

8

hundreds of millions of dollars of capacitors into the United States market.

9

**II.     INTRODUCTION**

10

Defendants' Motion concerns only one category of commerce: Defendants' sales of

11

capacitors to foreign distributors, who resell those capacitors to purchasers in the United States.

12

Defendants concede, as they must, that claims relating to the capacitors they import to the United

13

States—either for direct sale to customers or to their United States subsidiaries or affiliates for

14

sale—are not barred by the FTAIA because they constitute "import" commerce or trade.

15

Defendants' Motion asks this Court to accept the radical argument that indirect purchaser claims

16

based on price-fixing are barred as a matter of law whenever there is an initial foreign-to-foreign

17

sale.[1]  No court—either in the Ninth Circuit or in any other circuit—has ever accepted

18

Defendants' tortured reading of the FTAIA and its case law; and there is good reason.

19

Defendants' erroneous construction of the FTAIA would create a gaping hole in enforcement of

20

the antitrust laws, would leave indirect purchasers—a class of purchasers that most courts

21

_____

22

[1] As Defendants stated in multiple correspondence, Defendants' Motion raises pure issues of law regarding whether particular theories of harm are legally cognizable in light of the FTAIA.  *See* Email from Scott Mendel (counsel for Nichicon and liaison for Defendants on this issue) to IPPs'

23

Counsel, 10/7/15 (The summary judgment motion "raises strictly an issue of law."); *see also* Email from Scott Mendel to IPP's Counsel, 10/19/2015 ("the FTAIA motion . . . raises no factual

24

issues. IPPs claim that foreign distributors purchase capacitors directly from Defendants and resell them to purchasers located in the United States . . . . Defendants do not dispute that such

25

transactions exist. We argue that as a matter of law the FTAIA excludes such transactions from the coverage of state antitrust and unfair competition laws.").  Because Defendants' motion

26

raises purely legal issues, IPPs satisfy their burden by demonstrating that the legal authorities reject their position.

27

28

recognize suffer the real harm in a price-fixing conspiracy—without a remedy in many cases, and would provide would-be foreign price-fixers with a roadmap for how to avoid U.S. liability despite engaging in a conspiracy that has a "direct, substantial and reasonably foreseeable" effect on the United States.  15 U.S.C. § 6a.  This was not Congress's intent in drafting the FTAIA. *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*, 822 F.Supp.2d 953, 964 (N.D. Cal. 2011) (*"TFT-LCD"*) (Defendants' position would exclude from the antitrust laws' "reach a significant amount of anticompetitive conduct that has real consequences for American consumers.").

Defendants can only reach their misguided conclusion by ignoring controlling Ninth Circuit precedent that expressly rejects their construction of the domestic effects exception, *see United States v. Hui Hsiung*, 778 F.3d 738, 750-751 (9th Cir. 2015) (*"Hsiung II"*), and through reliance on out of circuit precedent construing foreign purchasers' "convoluted attempts to convert their foreign injuries into some nebulous effect on American commerce."  *TFT-LCD*, 822 F.Supp.2d at 964.  But unlike so many of the cases cited by Defendants, this IPP Class is not comprised of foreign purchasers asserting "tortured theories of causation . . . ."  *Id.* at 966. Instead, it is comprised of U.S. entities that purchased capacitors at supracompetitive prices in domestic commerce.  Such claims assert a "domestic injury that is concrete and quantifiable. More importantly, the domestic injury is directly traceable back to the defendants' anticompetitive conduct."  *Id.*

## III.   STATEMENT OF UNDISPUTED FACTS

IPPs purchased standalone electrolytic and film capacitors in the United States from distributors at supracompetitive prices.  IPP Second Consolidated Complaint ("Compl.") ¶¶ 1-3, 312, 335.  The distributors purchased their capacitors directly from Defendants and passed along the supracompetitive prices to the IPP Class.  *Id.* ¶¶ 12, 312.  Collectively, Defendants directly imported into the United States hundreds of millions of dollars of capacitors for direct sale to U.S. customers or to supply their U.S. subsidiaries.  *See* Declarations of Defendants, ECF Nos. 915-1 through 29; 916-1 through 11.  Additionally, Defendants sell standalone capacitors to foreign distributors, who in turn pass along the supracompetitive prices paid to purchasers in the

United States.  Compl. ¶¶ 2-3, 273-274; *see also* Donovan Decl., Ex. 1, IPPs' Resps. & Objs. To Defs.' Second Set of Interrogatories, ECF No. 911-2 ("IPPs' Rog Responses").  The United States market purchases approximately $2.3 billion worth of capacitors per year—roughly accounting for 12% of the total market.  *Id.* ¶ 279.  As alleged in the Second Consolidated Complaint, given the size and importance of the market, the United States was a focus of Defendants' price-fixing conspiracy.  *Id.* ¶¶ 342-365.

## IV.  STANDARD OF REVIEW

### A.  Summary Judgement Standard

A moving party without the ultimate burden of persuasion at trial—here, Defendants— has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. *See Nissan Fire & Marine Ins. Cos. v. Fritz Companies, Inc.*, 210 F.3d 1099 (9th Cir. 2000) ("*Nissan Fire*").  In order to carry its burden of production, the moving party must produce either evidence negating an essential element of the nonmoving party's claim or show that the nonmoving party does not have enough evidence to carry its ultimate burden of persuasion at trial. *See High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990).  A moving party may not require the nonmoving party to produce evidence supporting its claim or defense simply by saying that the nonmoving party has no such evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ("*Celotex*").  Because Defendants have moved on purely legal grounds—and not on the sufficiency of the evidence, which could only be assessed at the end of the discovery process, *see Nissan Fire*, 210 F.3d at 1105-06—IPPs meet their burden by rebutting the legal arguments advanced by Defendants.

### B.  The Foreign Trade Antitrust Improvements Act

The FTAIA[2]   excludes from the Sherman Act's reach "**only foreign injury**."   *F. Hoffmann-LaRoche Ltd, v. Empagran*, 542 U.S. 155, 158 (2004) ("*Empagran*") (emphasis

---

[2] The FTAIA states that "Section 1 to 7 of this title [the Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless (1) such conduct has a direct, substantial, and reasonably foreseeable effect . . . [and] (2)

added).  It lays down a general rule placing all (nonimport) activity involving foreign commerce outside the Sherman Act's reach.  It then brings such conduct within the Sherman Act's reach provided that the conduct" meets the domestic effects exception.  *Id.* at 162. "Although the statute is a web of words, it boils down to two principles.  First, the Sherman Act applies to import trade or import commerce with foreign nations . . . . Second . . . the Sherman Act does not apply to nonimport trade or commerce with foreign nations, unless the domestic effects exception is met." *Hsiung II*, 778 F.3d at 751 (internal citations omitted).

## V.   ARGUMENT

### A.   The FTAIA Does Apply to State Antitrust Claims

Nothing in the express language of the FTAIA or its legislative history reveals a Congressional intent to limit state law or immunize companies from state antitrust liability for foreign conduct that injured residents of a state. Indeed, the FTAIA specifically refers to the amendment of the Sherman Act and says nothing about its applicability to state law. *Boyd v. AWB Ltd.*, 544 F. Supp. 2d 236, 247 (S.D.N.Y. 2008) ("FTAIA by its express terms applies only to Sherman Act claims. . . ."); Pub. L. No. 97-920, §§ 401-03, 96 Stat. at 1246-47; S. Rep. No. 97-644, at 29 (1982).   Defendants primarily rely on two cases to support the purported limitations imposed by the FTAIA, but those cases are readily distinguishable.  Since *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-md-01819 CW, 2010 WL 5477313, at *4 (N.D. Cal. Dec. 31, 2010) ("*SRAM*")*,* the law regarding the FTAIA has changed dramatically. Judge Wilkin's decision in *SRAM* began with the premise that the FTAIA was jurisdictional, but the Ninth Circuit has since rejected that and ruled that the FTAIA is part of the substantive elements of a Sherman Act claim. *See Hsiung II,* 778 F.3d at 751.  Further, in *In re Intel Corp. Microprocessor Antitrust Litig.,* 476 F. Supp. 2d 452, 457 (D. Del. 2007), the district court relied on the FTC Act to support its conclusion that the FTAIA applies to state law, but as noted in this brief (*see* Section A(1), *supra*), Congress explicitly chose to preempt state laws in the FTC Act,

such effective gives rise to a claim under the provisions of section 1 to 7 of this title . . . ." 15 U.S.C. § 6a.

but did not make this decision as to the FTAIA.  Further, the *Intel* court noted that the plaintiffs there did not support the arguments about why the FTAIA did not apply to state law claims, and relied almost entirely in *Japan Line, Ltd. v. Cnty. Of L.A.,* 441 U.S. 434 (1979) ("Japan Line") for its conclusion.  Below Plaintiffs show why that case does not support Defendants' arguments. The *Intel* court limited its decision to the particular circumstances of that case, which was not a cartel price-fixing case involving one intermediary step between the defendants and purchasers.

### 1.   The Supremacy Clause Does Not Preclude State Antitrust Laws From Regulating Foreign Commerce

The FTAIA does not preempt state law claims in any way. Nothing in the FTAIA's 33-year history indicates that Congress regarded state antitrust litigation against foreign companies as an obstacle to achieving its objectives under the FTAIA—otherwise, it surely would have enacted an express preemption provision.  *See Wyeth v. Levine*, 555 U.S. 555, 574-75 (2009) ("Wyeth") ("Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them").

There are two cornerstones of preemption jurisprudence. *Wyeth,* 555 U.S. 555 (2009). "First, 'the purpose of Congress is the ultimate touchstone in every pre-emption case.'" *Id. quoting Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996) ("Lohr"). Second, "[i]n all preemption cases, and particularly in those in which Congress has 'legislated… in a field which the States have traditionally occupied,' … we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Id.* at 1194-95; *see also In re Farm Raised Salmon Cases,* 42 Cal.4th 1077, 1088 (2008) (in the area of antitrust law, an especially "strong presumption against preemption" applies); *California v. ARC Am. Corp.,* 490 U.S. 93, 101 (1989) ("Arc America") (applying the "clear and manifest purpose" standard, given the "long history of state common-law and statutory remedies against monopolies and unfair business practices"). This is in line with the Supreme Court's most recent holding on federal preemption in *Oneok, Inc. v. Learjet,*

1    *Inc.,* 575 U.S. ___ (2015), where the Court ruled that state antitrust claims could proceed even

2    when overcharges arose out of practices occurring in a federally regulated wholesale market.

3    "Absent a clear expression to the contrary, it must be presumed Congress did not intend to

4    displace state law." *Amarel v. Connell,* 202 Cal. App. 3d 137, 149 (1988).

5          Since the dispositive issue in any federal preemption question remains congressional

6    intent, the analysis must begin there—and there is no clear congressional intent for the FTAIA to

7    limit state antitrust law. Indeed, the legislative history of the FTAIA supports IPPs' position. The

8    FTAIA is part of a set of laws passed by Congress that contained three new statutory schemes

9    addressing antitrust laws. Two of the three laws—the Export Trading Company Act of 1982 and

10   a title concerning "Export Trade Certificates of Review"—were passed **on the same day that**

11   **Congress passed the FTAIA**. Both addressed "antitrust laws," explicitly defining the term to

12   mean both federal and state antitrust or unfair competition law, and limiting both federal and

13   state antitrust law in the foreign commerce context. Export Trading Company Act of 1982, Pub.

14   L. No. 97-290, § 103(a)(7). By stark contrast, the FTAIA does not: the FTAIA only explicitly

15   identifies the Sherman Act and the federal FTC Act as its subjects. Pub. L. No. 97-290, §§ 402-

16   403. **This reflects a conscious intent by Congress to not preempt state laws.**

17         Furthermore, the Supreme Court has already held that "Congress has not pre-empted the

18   field of antitrust law, finding that **the federal antitrust regime is "to supplement, not displace,**

19   **state antitrust remedies.**" *ARC America,* 490 U.S. at 102 (emphasis added); *see also Pinney*

20   *Dock and Transport Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1481 (6th Cir. 1988) (finding "no

21   suggestion that Congress has preempted the entire field of antitrust regulation"). Moreover,

22   courts have repeatedly rejected preemption arguments pertaining to state consumer protection

23   law because this field has been historically occupied by the state, not Congress. *Aguayo v. U.S.*

24   *Bank*, 653 F.3d 912, 917 (9th Cir. 2011); *In re Aurora Dairy Corp. Organic Milk Mktg. & Sales*

25   *Practices Litig.*, 621 F.3d 781, 794 (8th Cir. 2010).

26         Defendants' preemption arguments are further contradicted by the states' right to

27   establish more extensive antitrust remedies for indirect purchasers than federal law provides.

28

1   *ARC America.*, 490 U.S. at 105. Furthermore, within the limits of the U.S. Constitution, there is a

2   significant state interest in regulating foreign anticompetitive conduct that inflicts injury upon

3   residents of the states.   Ultimately, the United States federal government is one of "limited

4   powers", which are "few and defined." *Gregory v. Ashcroft,* 501 U.S. 452, 457-58 (1991).   In

5   contrast, the states retain substantial sovereign authority and "the powers not delegated to the

6   United States . . . are reserved to the States respectively, or to the people." U.S. CONST., Amdt.

7   10. The states therefore have the "general power of governing"—a power "possessed by the

8   States but not by the Federal Government." *Nat'l Fed'n of Indep. Bus. v. Sebelius,* 132 S. Ct.

9   2566, 2578 (2012) ("*Sebelius*"). Pursuant to these "numerous and indefinite" powers, a state does

10   not need federal permission to act so long as its actions remain within the bounds set forth by the

11   U.S. Constitution. *See Sebelius,* 132 S. Ct. at 2578.

12           **2.**      **The Commerce Clause Does Not Preclude State Antitrust Laws From**
13                     **Regulating Foreign Commerce**

14         Applying state antitrust law to conduct occurring abroad does not interfere with

15   Congress's power to regulate foreign commerce. In fact, some commentators have viewed the

16   Foreign Commerce Clause doctrine to be essentially defunct and have criticized it as "yield[ing]

17   few criteria for meaningfully distinguishing conduct by states that can, or cannot, be tolerated."[3]

18   Irrespective of whether the doctrine persists, however, ***the Supreme Court has made clear that***

19   ***the Commerce Clause does not preempt state antitrust laws.*** *See Knevelbaard Dairies v. Kraft*

20   *Foods, Inc.,* 232 F.3d 979, 993 (9th Cir. 2000).

21         Defendants cite to *Japan Line,* but that is the only case in which the Supreme Court has

22   actually held that a state law hinders the United States' need for uniformity with respect to a

23   particular area of foreign commerce. 441 U.S. 434, 448 (1979); *see also Barclays Bank Plc v.*

24

25   [3] Leanne M. Wilson, Note, *the Fate of the Dormant Foreign Commerce Clause After Garamendi and Crosby,* 107 COLUM. L. REV. 746, 789 (2007) "The dormant Foreign Commerce Clause has

26   outlived its usefulness."); Jack L. Goldsmith, *Federal Courts, Foreign Affairs, and Federalism,* 83 VA. L. REV. 1617, 1700 (1997); Sarah H. Cleveland, Crosby and the "One-Voice" Myth in

27   U.S. Foreign Relations, 46 VILL. L. REV. 975, 984 (2001).

28

*Franchise Tax Bd.,* 512 U.S. 298, 327 (1994) ("*Barclays*").  In *Japan Line,* the Court invalidated a state law that levied a tax on foreign containers while they passed through California because the state's taxation could have led affected foreign nations to "retaliate against American-owned instrumentalities," caused "the Nation as a whole to suffer," and thereby caused a dormant Foreign Commerce Clause violation. *Japan Line,* 441 U.S. at 450.

In the two decades following *Japan Line*, however, the Supreme Court refined and limited its dormant Foreign Commerce Clause doctrine. For example, in *Barclays*, the Court rejected defendants' challenge that California's tax system offended the Commerce Clause. 512 U.S. at 301-03. In reaching its decision, the Court recognized that "Congress may more passively indicate that certain practices do *not* 'impair federal uniformity in an area where federal uniformity is essential.'" *Id.* at 323.  The Supreme Court has explained that, where Congress has acquiesced to state regulation in foreign commerce, the dormant Foreign Commerce power is, by definition, not violated.  *Id.* Therefore, to allow states to independently regulate and determine the application of their antitrust laws to foreign commerce is not inconsistent with the federal government's power to regulate foreign commerce.

### 3.      Applying State Law Claims to Foreign Commerce Will Not Offend Principles of International Comity

Defendants overstate the holdings and analysis in the *Empagran* cases.  *See Empagran*, 542 U.S. at 165 (2004). *Empagran* simply acknowledged that "America's antitrust laws, when applied to foreign conduct, can interfere with a foreign nation's ability independently to regulate its own commercial affairs." However, "***our courts have long held such application nonetheless reasonable, and hence consistent with prescriptive comity principles***, insofar as the laws reflect a legislative effort to redress domestic antitrust injury caused by foreign anticompetitive conduct." *Id.*  Since many other nations condemn anticompetitive conduct and now cooperate to eradicate price-fixing cartels, applying state antitrust statutes to conduct overseas is unlikely to raise the comity concerns that Defendants suggest. The doctrine of international comity is a "consideration guiding courts, where possible, towards interpretations of domestic law that avoid

conflict with foreign law." *Linde v. Arab Bank, PLC,* 706 F.3d 92, 111 (2d Cir. 2013). The Supreme Court has held that "[n]o conflict of law exists… where a person subject to regulation by two states can comply with the laws of both." *Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 799 (1993).

To that end, comity arguments require a "weighing of all of the relevant interests of all the nations affected by the court's decision." *Linde,* 706 F.3d at 111.  Arguments over comity will not shield a foreign sovereign that has availed itself of the protection of a jurisdiction's laws from the United States' interests in enforcing its laws, particularly on commercial matters. *Fed. Treas. Enter. Sojuzplodoimport v. SPI Spirits Ltd.,* 726 F.3d 62, 82 (2d Cir. 2013). Furthermore, courts have held that ***dismissal on international comity grounds is reserved "for rare (indeed often calamitous) cases*** in which powerful diplomatic interests of the United States and foreign sovereigns aligned in supporting dismissal." *GDG Acquisitions, LLC v. Gov't of Belize,* 749 F.3d 1024, 1034 (11th Cir. 2014) (emphasis added).

### 4. IPPs' State Law Claims Reach Overseas Capacitor Sales to Third-Party Distributors Because Such Claims Can Only Be Harmonized To The Extent That They Are Consistent With Federal Law

Defendants grossly overstate the meaning behind so-called harmonization provisions. ***State antitrust laws can only be harmonized to the extent that they are consistent with federal law; harmonization can only apply where provisions of two laws are the same or substantially the same.*** The FTAIA does not exist in state laws, and therefore cannot be harmonized with something that does not exist.  The desire for some uniformity between federal and state antitrust laws was never intended to eliminate the choices that state legislators may make, particularly when those state legislators' choices are not consistent with federal law. Otherwise, every state law permitting indirect purchaser claims and the Supreme Court's holding in *ARC America* would be meaningless. It is not enough to simply argue that state law harmonization statutes exist, and thereby undercut the freedom of state legislators to permit even more vigorous enforcement of state antitrust law than federal law.

1    Furthermore, Defendants are misleading the Court by summarily concluding that "in the

2    thirty-three years the FTAIA has existed, it appears that every court to decide the issue—both at

3    the federal and state level—has held that the FTAIA applies to state law claims." Def. Mot. at

4    10. That is wrong. For example, in the *Rambus v. Micron* case, Judge Kramer **denied** the

5    defendants' motion for summary adjudication of plaintiffs' "foreign commerce" claims.

6        Where, as here, the claims at issue involve statutory or common law rights
         established pursuant to the State of California's general police power to regulate
7        competition, preemption applies only if it is the clear and manifest intent of
         Congress to displace state law. *California v. ARC Corp.,* 490 U.S. 92, 101 (1989).
8        ***Here, there is no basis for concluding that Congress intended to deprive the
         California state courts of jurisdiction to resolve [plaintiff]'s claims.***
9

10   *Rambus Inc. v. Micron Tech.,* 2009 Cal. Super. LEXIS 362, *1 (Cal. Super. Ct. May 29, 2009)

11   (emphasis added); *see also* Declaration of Steven N. Williams, Ex. A.

12       **B.      Even if the FTAIA Applies to State Law Claims, It Does Not Bar the Indirect
                 Purchaser Claims at Issue in this Case Because They Meet the "Domestic
13               Effects" Exception**

14   Assuming *arguendo* that the FTAIA may be applied to state law claims at all, it does not

15   bar these IPP claims because they meet the domestic effects exception.  Defendants make two

16   erroneous contentions: (1) that IPPs cannot meet the domestic effects exception as a matter of

17   law because their claims purportedly do not arise from the domestic effects of Defendants' price-

18   fixing conduct; and (2) IPPs' claims are not sufficiently "direct."  Def. Mot. at 11-17.  The

19   upshot of Defendants' argument is the radical proposition that the FTAIA bars all price-fixing

20   claims as a matter of law where the initial sale of the price-fixed product is foreign-to-foreign,

21   regardless of any subsequent sales or effects on domestic commerce.

22   Defendants' legal arguments fail as a matter of law because this price-fixing conspiracy

23   caused a domestic effect—that is, the payment of supracompetitive prices for standalone

24   capacitors that were passed through the distribution chain by foreign distributors to United

25   States' purchasers.  IPPs' Rog Responses, ECF No. 911-2.  The Ninth Circuit and other courts

26   have expressly held that such claims are not barred by the FTAIA and are fully cognizable under

27   the antitrust laws.

28

1    **1.    The Ninth Circuit's Decision in *Hsiung II* Emphatically Rejects**
2         **Defendants' Arguments and Requires Denial of Their Motion**

3         This Court need look no further than the Ninth Circuit's recent holding in *Hsiung II* to
4    determine that Defendants' arguments lack merit.   778 F.3d 738.   That Defendants have
5    assiduously avoided discussing *Hsiung II* and instead focused on out-of-circuit precedent that is
6    inapplicable to the facts of this case is hardly surprising.   That is because the same arguments
7    that Defendants raise here were considered and rejected by the Ninth Circuit.   In *Hsiung II*, the
8    Ninth Circuit made clear that the antitrust laws apply even where the initial sale of the price-
9    fixed product was "foreign-to-foreign."

10        *Hsiung II* involved the criminal convictions of the Taiwanese company AU Optronics
11   and two of its executives for their participation in a price-fixing conspiracy involving liquid
12   crystal display panels known as "TFT-LCDs."   778 F.3d at 742.   As Defendants do here, the
13   defendants argued that the FTAIA barred application of the antitrust laws because the price-
14   fixing conduct occurred overseas and the bulk of the panels were sold to third-parties overseas,
15   who incorporated the panels into finished products, such as televisions and mobile phones, that
16   were ultimately imported to the United States by non-defendants and resold.   Defendants argued
17   that such commerce "is too attenuated from the United States and that the intervening
18   development, manufacture [of finished products by overseas third-parties incorporating the
19   price-fixed component] and sale of the products worldwide resulted in a defuse effect."   *Id.* at
20   758.   Despite adopting a more narrow "directness" test than other circuit courts, the Ninth Circuit
21   nevertheless found that an initial foreign-to-foreign sale of the price-fixed LCDs did not bar
22   application of the antitrust laws.   It further held that "the impact on the United States market
23   [from such sales] was direct and followed 'as an immediate consequence' of the price fixing."
24   *Id.* at 759.   In doing so, the court noted that LCDs were a "substantial cost component" of the
25   finished products and that some panels were directly imported by Defendants into the United
26   States or sold to U.S. companies' subsidiaries overseas.

27
28

Here, the directness of the harm is even more apparent.  The capacitors purchased by the IPP Class in this case are almost **_the only_** cost component of the purchases because they purchase standalone capacitors.  Indeed, distributors merely act as middlemen, marking the capacitors up to compensate for any small marginal costs and to obtain a profit.  The harm is, therefore, even more direct than it was in *Hsiung II*.  Moreover, as in that case, each of Defendants' declarations in this case establish that in addition to selling to foreign distributors, Defendants also import capacitors into the United States—either as direct sales to customers or as "sales" to their wholly-owned U.S. distributors.  *See* Declarations of Defendants, ECF Nos. 915-1 through 29; 916-1 through 11.  Defendants' declarations admit to engaging in hundreds of millions of dollars of direct importation of capacitors in U.S. commerce. *Id*.

Moreover, the Ninth Circuit contrasted the situation in *Hsiung II*—where a price-fixed product is first sold overseas and the supracompetitive overcharge is passed along through the distribution chain to purchasers in the United States—with the factual situation in *United States v. LSL Biotechnologies*, 379 F.3d 672 (9th Cir. 2004) (*"LSL Biotechnologies"*), where the effect on domestic commerce was speculative and based on future innovation or involved an action in a foreign country that filters through many layers and finally has a "few ripples" in the United States.  778 F.3d at 759.

The distribution chain in the *Hsiung II* case and the LCDs conspiracy generally was much more convoluted and multi-layered than the distribution chain at issue in this Motion.  In *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 822 F.Supp.2d 953 (N.D. Cal. 2011), uncited by Defendants, Judge Illston considered and rejected the same arguments that Defendants make. In finding that such indirect purchaser claims were subject to the domestic effects exception, Judge Illston described the LCD distribution chain as having, in some cases, **seven layers**.  *Id.* at 961. Here, by contrast, there are only two layers: a sale from Defendants to a foreign distributor that resells the standalone, price-fixed capacitor, to purchasers in the United States.

It is also worth noting that the Ninth Circuit in *Hsiung II* went out of its way to clarify that the claims Defendants seek to dismiss through this Motion are not barred by the FTAIA by

amending its initial opinion to address this very point—another fact that Defendants failed to highlight for this Court.  *See, e.g., Hui Hsiung II*, 778 F.3d 738; *compare United States v. Hui Hsiung*, 758 F.3d 1074 (9th Cir. 2014) (*Hui Hsiung I*").  In the Ninth Circuit's initial decision in *Hsiung I*, rendered prior to the Seventh Circuit's decision in *Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816 (7th Cir. 2014) ("*Motorola*"), the court upheld the convictions based only on the import exception and did "not reach the alternate theory under the FTAIA relating to the domestic effects of the transactions."  *Id.* at 1078.  The Ninth Circuit's abrupt change in course by also affirming the convictions under the domestic effects exception in *Hsiung II* can only be read as representing its strong belief that claims based on initial foreign-to-foreign sales, like the indirect ones at issue in this case, are not barred by the FTAIA.  The Ninth Circuit's holding affirmatively settles the purely legal issues raised by Defendants' Motion and establishes that IPPs' claims are cognizable under the FTAIA.

### 2. The Ninth Circuit Correctly Held that the Seventh Circuit's Decision in *Motorola* is Limited to the Specific Facts of that Case

Defendants rely heavily on the Seventh Circuit's *Motorola* decision as somehow supporting their position that IPPs' claims should be barred by the FTAIA.  Yet, the Ninth Circuit correctly held in *Hsiung II* that *Motorola* merely involved the straightforward application of the Supreme Court's *Illinois Brick* doctrine that indirect purchasers may not sue for damages under the federal antitrust laws.  *See Illinois Brick Co., v. Illinois*, 431 U.S. 720 (1977); *see also Hsiung II*, 778 F.3d at 760.  That issue is not present in this case.

As an initial matter, it should be noted that the holding and facts in *Motorola* are *sui generis*.  Judge Richard Posner discussed "the oddity of this case" in describing the fact that Motorola sought recovery under the Sherman Act for the price-fixed purchases of LCDs by its separate corporate foreign-subsidiaries, which then resold the products to Motorola itself.  775 F.3d at 818.  Motorola attempted to argue that it and its foreign subsidiaries operated as a "single-enterprise" such that the foreign-subsidiaries' purchases should be considered Motorola's purchases.  In rejecting this argument, Judge Posner found that "a corporation is not entitled to

establish and use its affiliates' separate legal existence for some purposes, yet have their separate corporate existence disregarded for its own benefit against third parties." *Id.* at 819. Having taken the benefit of the position that Motorola's foreign subsidiaries were exempt from U.S. labor laws and taxes, it could not claim, when convenient, that the entities were in fact merely a "single-enterprise." *Id.* The court further reasoned that the "antitrust laws were not to be used for injury to foreign customers" and "[t]he parent [i.e., Motorola] has no right to seek relief on their behalf in the United States." *Id.* Relatedly, the court reasoned that the antitrust laws do not give owners, employees or investors in a particular company the right to sue for the antitrust violation committed against the company itself, as Motorola had effectively argued. *Id.* at 820. Finally, the Seventh Circuit was concerned with Motorola's apparent attempt to forum shop. *Id.* The court reasoned that Motorola made a decision to incorporate subsidiaries overseas, that those overseas subsidiaries should pursue remedies in those foreign jurisdictions and that "if the remedies [in those foreign jurisdictions] are inadequate . . . . these are the consequences that Motorola committed to accept by deciding to create subsidiaries that would be governed by the laws of those countries." *Id.* at 821.

Here, in stark contrast to *Motorola*, the IPP Class is not pursuing claims under the Sherman Act that are barred by the *Illinois Brick* doctrine. The IPPs are pursuing indirect purchaser claims that have been made viable by various state laws. The IPP Class, moreover, is not pursuing damages that were suffered by its foreign-subsidiaries that purchased capacitors in foreign commerce. IPPs' Rog Responses, ECF No. 911-2. The IPP Class is not seeking to benefit by divergent representations that its foreign subsidiaries are at once separate corporate entities for some purposes while at the same time a "single-enterprise" for purposes of recovering antitrust damages. The IPP Class is not made up of foreign purchasers nor are its members seeking recovery for foreign harm. The IPP Class is not made up of parent companies seeking to recover for the purchases of separate entities. The IPP Class does not consist of the investors or the shareholders of the companies themselves that were harmed by Defendants' price-fixing conduct. And, contrary to *Motorola*, the IPP Class is not forum shopping. As

individuals and companies residing in the United States, the IPP Class does not have a remedy in foreign jurisdictions and cannot sue there.  Accepting Defendants' theory would result in the IPP Class lacking a remedy to recover for Defendants' supracompetitive pricing that passed through the distribution chain to create a domestic effect in the United States.

*Motorola* is also distinguishable on the ground that the damage theory that is most applicable to this case was waived by Motorola in the district court.  Judge Posner found that

> Motorola waived in the district court any argument that it could base damages on the effect of the cartel's pricing of components on the cost to Motorola of cellphones incorporating those components.  It argued *only* that its foreign subsidiaries overpaid for the LCD panels.  How the overcharge may have affected Motorola's cellphone business because of the component price fixing was a path that Motorola stepped off of after the pleadings . . . .  Motorola's damages expert . . . discussed *only* the damages that Motorola's foreign subsidiaries incurred from having to overpay for LCD panels.

*Id.* at 823-24 (emphasis added).  As a result, Motorola could not demonstrate that *its* injury arose out of the domestic effects of the conspiracy (*i.e.*, supracompetitive prices in the United States) rather than the foreign harm suffered by its subsidiaries.

Here, as articulated in IPPs' complaint and responses to interrogatories, the damages theory pursued in this case is to show that the supracompetitive price paid for by foreign distributors was passed along to IPPs in the United States.  In contrast to *Motorola*, IPPs will not be quantifying the harm to foreign distributors as if it were their own.  This is a fundamentally different theory than the one pursued in *Motorola* and differentiates it from the facts of this case.

Finally, at its core, the *Motorola* case was merely a "wrong plaintiff" case, rather than a case where the alleged conduct and distribution chain were fundamentally at odds with finding the claims cognizable vis-à-vis the FTAIA.[4]  Indeed, as Judge Posner makes clear, the domestic effects test is a low threshold.  He stated that if the prices of the components were indeed fixed, the domestic effects exception was easily satisfied.  He held that the distribution chain did not

---

[4] In *Empagran*, the Supreme Court noted that there may be cases where the conduct is cognizable under the FTAIA, but the claim nevertheless fails because it was brought, for example, by foreign purchasers whose claims do not arise from the domestic effects of the conspiracy. *Empagran*, 542 U.S. at 168-173.

present "many layers" resulting in a "few ripples" in the United States, assuming that the domestic effects exception had been satisfied. *Motorola*, 775 F.3d at 819. Indeed, Judge Posner found that "a cartel almost always *knowingly* causes injury to indirect purchasers . . . ." *Id.* at 823. Thus, the issue requiring dismissal was that Motorola could not demonstrate that its harm arose from the domestic effects of the cartel since its damages theory was based solely on the harm suffered by its foreign subsidiaries. This holding provides Defendants with no support.

Whatever additional gloss Defendants attempt to apply to the Seventh Circuit's holding in *Motorola*, they cannot escape from the fact the Ninth Circuit has already provided its interpretation of *Motorola* in *Hsiung II*. That binding interpretation is that the case involved the straightforward application of the *Illinois Brick* doctrine and that, contrary to Defendants' central legal theory, an initial foreign-to-foreign sale does not bar an antitrust claim under the FTAIA as a matter of law.

### 3.    The Domestic Effects of Defendants' Conspiracy Gives Rise to IPPs' Claims

Defendants incorrectly argue that IPPs' claims for purchases do not arise from the domestic effects of the conspiracy and are therefore barred by the FTAIA. In doing so, Defendants misleadingly cite to out-of-circuit precedent involving claims made by *foreign purchasers* at a very different point in the distribution chain. IPPs in this case are **not** foreign purchasers; they are U.S. companies and residents that purchased capacitors at supracompetitive prices in domestic commerce. The cases cited by Defendants stand for the simple and unremarkable proposition that a foreign purchaser cannot invoke the U.S. antitrust laws merely because there was some domestic effect to another entity occurring later in the distribution chain that does not give rise to the harm suffered by that foreign purchaser.

In other words, in this particular case, the foreign distributors that purchased capacitors at supracompetitive prices could not bring their own antitrust action claiming that the domestic effects occurring later in the distribution chain to IPPs in domestic commerce gives rise to their

1    claim.  This is because, in this example, the foreign distributor's harm was suffered in foreign,

2    not domestic, commerce.

3          For example, Defendants cite *Lotes Co., Ltd. v. Hon Hai Precision Industry Co.*, 753 F.3d

4    395 (2nd Cir. 2014) ("*Lotes*") for the proposition that IPPs' claims in this case do not arise from

5    the domestic effects of the conspiracy.  Because IPPs' claims are based on supracompetitive

6    prices passed on by foreign distributors, Defendants argue, "the direction of causation runs the

7    wrong way." Def. Mot. at 13, *citing Lotes*, 753 F.3d at 414.  Defendants also cite *Lotes* with a

8    parenthetical standing for the proposition that "where foreign antitrust injury later results in

9    domestic effects, such effects do not give rise to the claim." Def. Mot. at 13.  Defendants'

10   citations to this Court are highly misleading.

11         *Lotes* involved a Taiwanese company suing several competitors—also manufacturers and

12   sellers of USB connectors—for monopolization of the Chinese market.  Lotes alleged that

13   participants in the USB standard setting forum refused to grant it RAND-Zero licenses in

14   violation of the antitrust laws.   It further alleged that "[g]iven the central role Chinese

15   manufacturing plays in the global electronics supply chain . . . curbing competition in China will

16   have downstream effects worldwide, including in the United States." *Id.* at 402.  The Second

17   Circuit correctly found that the alleged domestic effects (*i.e.,* higher prices in the downstream

18   U.S. market) did not cause Lotes's upstream injury, "that injury flowed directly from the

19   defendants' [initial] exclusionary foreign conduct." *Id.* at 414.  It is in this sense, contrary to

20   Defendants' citation and the facts of this case, that the "direction of causation runs the wrong

21   way." *Id.* at 414.  Lotes's injury "*precedes* any domestic effect in the causal chain." *Id.*  Lotes's

22   construction of the domestic effects exception meant that it need not actually be harmed in

23   domestic commerce, so long *as some other* entity is harmed further down the distribution chain.

24         IPPs' claims in this case bear no resemblance to the claims asserted in *Lotes*.  First, IPPs

25   are not foreign companies asserting monopolization claims in foreign markets and relying on the

26   downstream effects to another entity in U.S. commerce to preclude application of the FTAIA.

27   More importantly, IPPs' injuries do not precede the domestic effects in the causal chain.

28

Defendants' price-fixing conduct caused supracompetitive prices to be passed along to U.S. commerce, the effect of which is the payment of supracompetitive prices by the IPP Class in domestic commerce. The harm to the IPP Class occurred when purchases of supracompetitive capacitors were made in domestic commerce, not further up the distribution chain as in *Lotes*.

Defendants' reliance on the Supreme Court's decision in *Empagran* fares no better. 542 U.S. 155. That case again involved the claims of *foreign, not domestic, purchasers*. *Id.* at 159-60. As in *Lotes*, plaintiffs attempted to argue that domestic effects in U.S. commerce felt *by other purchases further down the distribution chain*, meant that they satisfied the domestic effects exception. The Supreme Court easily rejected the theory because the domestic effect did not give rise to the foreign purchasers' claim, and thus it could not satisfy the FTAIA's domestic effects exception.

Defendants' other cited cases are similarly inapposite. *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981 (9th Cir. 2008) ("*DRAM*"), like *Empagran* and *Lotes*, involved the claims of a foreign purchaser—a British manufacturing company—making purchases of DRAM in foreign commerce. Because the plaintiff had alleged a global conspiracy, it could not demonstrate that the domestic effects of the conspiracy *gave rise to its own harm*. *In re Monosodium Glutamate Antitrust Litigation*, 477 F.3d 535 (8th Cir. 2007) also involved the claims of foreign purchasers where the domestic effect of the conspiracy did not give rise to their claims. These cases have no bearing on the claims asserted by IPPs in this case, other than to highlight that IPPs' claims in this case do in fact arise from the domestic effects of the conspiracy.

Finally, *Minn-Chem, Inc. v. Agrium Inc.*, 683 F.3d 845 (7th Cir. 2012) ("*Minn-Chem*"), also cited by Defendants, shows precisely why IPPs' claims in this case arise from the domestic effects of the conspiracy. *Minn-Chem* involved an alleged conspiracy to limit the output, and thus raise the prices, of a naturally occurring mineral— potash—used in fertilizer. The appeal in *Minn-Chem* included classes of both direct and indirect purchasers that purchased potash *in domestic commerce*. The plaintiffs alleged that the Chinese market in particular was the focus of

the cartel's efforts and that once the cartel succeeded in raising the price of potash abroad, it could raise prices in U.S. domestic commerce. The Seventh Circuit correctly distinguished the case from *Empagran*, stating that "the plaintiffs there were foreign purchasers of allegedly price-fixed products that were sold in foreign markets . . . . In our case, by contrast, the plaintiffs are all U.S. purchasers, and so the particular problem addressed in *Empagran* does not arise here." *Id.* at 855. Despite the existence of a much more convoluted theory of injury in *Minn-Chem* (i.e., the setting of foreign benchmark prices affecting the U.S. market) than those asserted here, the Seventh Circuit found that plaintiffs had satisfied the direct effects test.

### 4. IPPs' Claims are Sufficiently "Direct" to Fall Within the FTAIA's Domestic Effects Exception

Defendants contend that IPPs' theory of harm as applied to purchases from foreign distributors cannot meet the FTAIA's "directness" requirement as a matter of law because the capacitors were purchased through an intermediary—here, a foreign distributor. Defendants are incorrect. Defendants' construction of "direct" is unduly narrow and has been rejected by the Ninth Circuit in *Hsiung II* and other courts within the Northern District of California. *See Hsiung II*, 778 F.3d at 758-60; *see also TFT-LCD*, 822 F.Supp.2d at 961-965. Defendants have failed to cite a single case—either in this Circuit or in any other circuit for that matter— standing for the proposition that indirect purchaser claims based on price-fixing involving purchases made in U.S. commerce fail as a matter of law for a lack of directness. And, as discussed, there is directly contrary authority.

In *Hsiung II*, the Ninth Circuit affirmed convictions and a $500 million criminal fine for price-fixing LCD panels based, in part, on what were indirect sales. The commerce that formed the basis of the domestic effects exception involved an initial foreign-to-foreign sale. *Hsiung II*, 778 F.3d at 758-60. If Defendants' theory in this case were correct, the Ninth Circuit would not have affirmed the verdicts under the domestic effects exception. *Hsiung II* demonstrates the fallacy of Defendants' position.

In *TFT-LCD*, Judge Illston also rejected the same argument that Defendants make. 822 F.Supp.3d at 961-67. There defendants also argued that an initial foreign-to-foreign sale automatically cuts-off the indirect purchasers' right to recovery under the FTAIA. The district court found defendants' proposed definition of "direct effect" as "too narrow." *Id.* at 964. Judge Illston ruled that defendants' construction "would all but eviscerate the distinction between the 'domestic injury' exception and 'import commerce' . . . ." *Id.* at 963. The district court further reasoned that an effect does not become "indirect" merely because of

> a complex manufacturing process . . . . [B]ecause the effect of defendants' anticompetitive conduct did not change significantly between the beginning of the process (overcharges for LCD panels) and the end (overcharges for monitors, and notebook computers), the effect 'proceeded without deviation or interruption' from the LCD manufacturer to the American retail store.

*Id.* at 964. The holding in the Ninth Circuit's *Hsiung II* and the district court's holding in *TFT-LCD* powerfully reject Defendants' construction of the directness required for the domestic effects test.

At its core, Defendants' argument is that only import commerce avoids the strictures of the FTAIA. Yet such a reading of the FTAIA renders the domestic effects exception entirely superfluous. Defendants' interpretation, therefore, violates a basic canon of statutory interpretation—that a statutory scheme should be interpreted so as to avoid rendering any of its parts superfluous. *See Astoria Federal Savings & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991) ("The court construes statutes… so as to avoid rendering superfluous any parts thereof.") *Lotes*, cited with approval by Defendants, makes the same observation about the infirmity of Defendants' construction of the "direct" requirement. 753 F.3d at 411. The Second Circuit stated that the Defendants' construction "would all but collapse the FTAIA's domestic effects exception into its separate import exclusion." *Id.* The issue in *Lotes* was not whether indirect purchaser claims such as IPPs' in this case could satisfy the direct effects test. Indeed, the Second Circuit found that they would. *See id.* at 412-13. The *Lotes* court stated that

> [t]his kind of complex manufacturing process is increasingly common in our modern globalized economy, and antitrust law has long recognized that anticompetitive injuries can be transmitted through multi-layered supply chains. Indeed, the Supreme Court has held that claims by indirect purchaser are "consistent with the broad purposes of the federal antitrust laws: deterring anticompetitive conduct and ensuring compensation."

*Id.*, *quoting ARC America*, 490 U.S. at 102. Instead, the determinative issue for the Second Circuit in *Lotes* was that a foreign purchaser sued, relying on a domestic effect that did not give rise to its antitrust claim. It was thus a "wrong plaintiff" case, not a wrong conduct case. *Accord*, *Minn-Chem*, 683 F.3d at 845 (permitting a theory of harm under the FTAIA—the setting of benchmark prices in China and other foreign markets having a trickle-down effect on the U.S. market—that is much less direct than the theory pursued in this case).

Finally, Defendants' reliance on the Ninth Circuit's decision in *LSL Biotechnologies* is similarly misplaced. 379 F.3d 672. Whatever the holding regarding directness and the factual situation at issue in that case, the Ninth Circuit subsequently clarified in *Hsiung II* that the definition of "direct" in this Circuit is broad enough to encompasses IPPs' claims in this case. *LSL Biotechnologies* involved the completely inapposite factual scenario of a U.S. company prohibiting a foreign company, Hazera, from producing and marketing long shelf-life tomato seeds. In finding the effect too indirect, the Ninth Circuit stated that

> [t]he delay of *possible* 'innovations' does not have a direct effect on American commerce. Even if Hazera were free to distribute new types of long shelf-life seeds in North America, there is no indication that Hazera has yet figured out a different way to produce such a seeds without violating LSL's intellectual property rights . . . . Moreover, there is no indication that Hazera is in a stronger (or as strong a) position to develop such a new seed as Monsanto and Novartis . . . . Thus, any innovation that Hazera would bring to American consumers is speculative at best and doubtful at worst.

*Id.* at 681. Despite these facts and the tortured theory of harm, the Ninth Circuit was nonetheless careful to note that it could "imagine a situation where the exclusion of a potential foreign competitor would satisfy the 'direct' requirement." *Id.* at 681. As is obvious, *LSL*

1   *Biotechnologies* has no application to the facts of this case and has in any event been clarified

2   by a subsequent Ninth Circuit decision in *Hsiung II* as permitting IPPs' claims.

3   **C.     IPPs' Claims for Purchases from Foreign Distributors Qualify as "Import"**
        **Trade Not Subject to the FTAIA**

4

5          It is undisputed that the foreign Defendants imported capacitors into the United States—

6   either by direct sales of the capacitors to customers in the United States or by importing such

7   capacitors to their respective U.S. subsidiaries for sale in the United States.   *See, e.g.,*

8   Declarations of Defendants, ECF Nos. 915-1 through 29; 916-1 through 11.   But as made clear

9   in the Ninth Circuit's holding in *Hsiung II* and its progeny, any civil claims regarding a

10  conspiracy that took place in part in import commerce—as this conspiracy did—qualifies all of

11  the commerce at issue in the case as import commerce.   In other words, because Defendants

12  indisputably engaged in some import commerce, even Defendants' sales to foreign distributors

13  qualifies as import commerce.

14         Two Northern District of California decisions demonstrate *Hsiung II*'s application.   *See,*

15  *e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*, Case No. 10-cv-3205 SI, 2014 U.S. Dist.

16  LEXIS 13228 (N.D. Cal., Sept. 18, 2014) ("*TracFone*"); *Proview Technology Inc., et al. v. AU*

17  *Optronics Corp., et al.*, Case No. 12-cv-3802-SI, 2014 WL 2916933 (N.D. Cal., Sept. 19, 2014)

18  ("*Proview*"), ECF No. 76.   In *TracFone*, defendants moved to dismiss plaintiff's Florida

19  Deceptive and Unfair Trade Practices claim based on price-fixing LCDs to the extent that the

20  indirect purchaser claim was based on an initial foreign-to-foreign sale.   *Id.*, *59-60.   Under the

21  Defendants' formulation in this case, such commerce could never properly be considered

22  "import commerce" because it was not the defendants themselves that imported the price-fixed

23  product.   Judge Illston, relying on *Hsiung II*, nevertheless found that such claims qualify as

24  import commerce, reasoning that the *Hsiung II* court "stated that . . . where 'at least a portion of

25  the transactions . . . involved[d] the heartland situation of the direct importation of foreign

26  goods into the United States' the defendants' conduct was properly considered import trade,

27  outside the scope of the FTAIA."   *Id.*, *62.

28

1    The district court reached the same conclusion in *Proview* with respect to plaintiff's

2    indirect purchaser claims under California law.   *Proview*, Case No. 12-cv-3802-SI, 2014 WL

3    2916933, ECF No. 76.   The court, therefore, concluded that the FTAIA did not apply to

4    California indirect purchaser claims based on the import exception, despite the initial sale

5    occurring solely in foreign commerce.   Other courts around the country have similarly held.   *In*

6    *re Air Cargo Shipping Servs. Antitrust Litigation*, MD 06-1775 (JG) (VVP), 2008 U.S. Dist.

7    LEXIS 107882, at *103 (E.D.N.Y. Sept. 26, 2008); *In re Vitamin C Antitrust Litig.*, 904

8    F.Supp.2d 310, 317 (E.D.N.Y. 2012).

9    Even where there is no importation of price-fixed products by defendants at all—in

10    contrast to this case and the situation in *TracFone and Proview*—the Ninth Circuit in *Hsiung II*

11    left open the question of whether sales to a foreign intermediary that in turn imports the product

12    into the United States nonetheless qualifies as import commerce excluded altogether from the

13    FTAIA.   *Hsiung II*, 778 F.3d at n. 8 (not deciding the "outer bounds of import trade" and

14    whether wholly foreign commerce can nevertheless constitute import trade based on an

15    intermediary's importation).   The convictions were affirmed on narrower grounds.   Thus, even

16    in a situation where there is no direct importation by the Defendants themselves at all, the Ninth

17    Circuit has left open whether the foreign distributors' importation of price-fixed capacitors

18    nonetheless qualifies the commerce as import trade.   Here too this Court need not to reach this

19    question because the commerce at issue in this Motion clearly qualifies under the domestic

20    effects exception and is excluded from the FTAIA's reach based on Defendants' admitted

21    importation of capacitors in domestic commerce.[5]

22

23

24

25    [5] Defendants have offered no separate rationale for granting their requested relief under Fed. R.
Civ. P. 16.   *See* Def. Mot. at 16-17.   As the foregoing authorities make clear, dismissal of the

26    indirect purchaser claims based on purchases from foreign distributors is not appropriate under
Rule 56 and is, therefore, certainly not appropriate on Rule 16.   Defendants' request should be

27    denied.

28

1

## VI.   CONCLUSION

2  For the foregoing reasons, Defendants' Joint Motion for Partial Summary Judgment

3  Dismissing Plaintiffs' Indirect Purchaser Claims Based on Foreign Sales must be denied.

4  Controlling Ninth Circuit precedent demonstrates that IPPs' legal and damages theories meet

5  the domestic effects exception.  Moreover, because IPPs' purchases occurred in domestic

6  commerce, the domestic effects of the conspiracy—supracompetitive prices charged in the

7  United States—give rise to the Class's claims.  Finally, even Defendants' foreign-to-foreign

8  sales that are ultimately resold in the United States qualify as import commerce under *Hsiung II*

9  and its progeny.[6]

10  Dated:  November 23, 2015

11  Respectfully submitted,

12  */s/ Steven N. Williams*
Joseph W. Cotchett (36324)

13  Steven N. Williams (175489)
Adam J. Zapala (245748)

14  Elizabeth Tran (280502)
Joyce Chang (300780)

15  **COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road, Suite 200

16  Burlingame, CA 94010
Telephone: (650) 697-6000

17  Facsimile: (650) 697-0577
jcotchett@cpmlegal.com

18  swilliams@cpmlegal.com
azapala@cpmlegal.com

19  etran@cpmlegal.com
jchang@cpmlegal.com

20

21  *Interim Lead Counsel for the Putative Indirect Purchaser Class*

22

23

---

24  [6] While IPPs agree with the Direct Purchaser Plaintiffs' ("DPPs") about the discovery record, the deposition testimony of Defendants' declarants, and the evidence in the case thus far—because

25  Defendants' Motion directed at the IPPs' case raises pure questions of law—IPPs' are not required to set forth the type of evidence appearing in DPPs' Opposition.  Should this Court

26  desire a fully developed factual record, it should delay resolution of this issue under Fed. R. Civ. P. 56(d) until the end of discovery, when IPPs may make a full factual and econometric showing

27  of the "effect" of the price fixing conspiracy on the U.S. purchasers and domestic market.

28