UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE CAPACITORS ANTITRUST LITIGATION. | Master File No. 14-cv-03264-JD<br><br>**ORDER ON MOTIONS TO DISMISS AMENDED COMPLAINTS**<br><br>Re: Dkt. Nos. 787, 788, 791, 792, 793, 927 |

In these consolidated antitrust class actions, plaintiffs are direct and indirect purchasers of capacitors, a ubiquitous component in electronic devices of all types. The gist of the complaints is that the defendant manufacturers have conspired to fix capacitor prices in the global market.

The Court granted in part and denied in part defendants' initial motions to dismiss the direct purchaser plaintiffs' ("DPPs") and indirect purchaser plaintiffs' ("IPPs") consolidated complaints. Dkt. No. 710. The DPPs and IPPs subsequently amended their complaints in response to the Court's order, and now before the Court are defendants' second sets of motions to dismiss the amended complaints. The Court grants the motion to dismiss the IPPs' non-California state law claims on Article III standing grounds, grants the separate individual motion to dismiss the direct purchaser plaintiffs' complaint by American Shizuki Corporation, and denies the motions in all other respects.

## BACKGROUND

This order addresses what is new and different in the complaints since the prior motion to dismiss order. Dkt. No. 710. On the DPP side, the case now involves a new direct purchaser plaintiff who is proceeding on an individual basis rather than as a part of the putative class. On June 22, 2015, the Court related to this action *Flextronics International USA, Inc. v. NEC Tokin Corporation et al*, Case No. 15-cv-02517. Dkt. No. 751. Flextronics's case has been consolidated into this one and counsel were directed to work together to file a joint complaint. Dkt. No. 774.

On July 22, 2015, the DPPs and Flextronics filed their "consolidated second amended class action complaint and complaint of Flextronics International USA, Inc."[1] Dkt. Nos. 799-4, 826. That complaint is the operative complaint for all parties in the direct purchaser action. For the allegations that continue to be made on a class basis, the overall substance is basically the same as the initial complaint, Dkt. No. 401, which the Court largely sustained over defendants' challenges to it. The four named plaintiffs who wish to act as class representatives remain the same, and they again press one claim for relief on behalf of the putative class, under Section 1 of the Sherman Act, 15 U.S.C. § 1. Dkt. No. 799-4. Flextronics, which sues a subset of the defendants named by the original DPPs, joins in the Sherman Act Section 1 claim "for damages only," and additionally asserts against the defendants it has named a claim for the violation of California's Cartwright Act, Cal. Bus. & Prof. Code § 16720, and Unfair Competition Law, Cal. Bus. & Prof. Code § 17200. *Id*.

In the amended complaint, the DPPs refined their allegations against the fourteen individual defendants who were dismissed by the Court with leave to amend, and most of the defendants have now answered the amended complaint. *See* Dkt. Nos. 829-838, 840-848. A few others were voluntarily dismissed or are in settlement talks. Dkt. Nos. 746, 858, 879. The pending motions that are ripe for the Court's resolution in this order are four separate challenges to the DPPs' and Flextronics' allegations. Those motions were brought by AVX Corporation (Dkt. Nos. 787), Holy Stone Enterprise Co., Ltd. and Milestone Global Technology, Inc. (Dkt. Nos. 788, 818), Hitachi Chemical Co. America, Ltd. (Dkt. Nos. 792, 817), and Shizuki Electric Co., Inc. and American Shizuki Corporation (Dkt. No. 927). The Court resolves the motions in the second half of this order.

On the IPP side, the most important development is that the second consolidated complaint, Dkt. No. 741, reprises claims under a slew of state antitrust and consumer protection statutes that the Court had believed were voluntarily dismissed along with the "consumer indirect

---

[1] Unless otherwise noted, the Court refers to the original direct purchaser plaintiffs (*i.e.*, those who wish to proceed as a class) as the "DPPs," and to the DPPs and Flextronics together as "the direct purchaser plaintiffs."

purchaser plaintiffs" who were voluntarily dismissed from the case. Dkt. No. 594. Otherwise, the named plaintiffs and key factual and legal allegations remain the same. In addition to a joint motion to dismiss filed by a large group of defendants, there is one pending individual challenge to the IPPs' complaint filed by Hitachi Chemical Co. America, Ltd. Dkt. Nos. 791, 793.

**DISCUSSION**

## I. INDIRECT PURCHASER PLAINTIFFS' COMPLAINT

### A. The Non-California State Law Claims (Dkt. No. 793)

The Court begins with the IPPs' amended complaint, and defendants' joint motion to dismiss it.[2] The operative IPP complaint is brought by the five named "first-level" indirect purchaser plaintiffs who are the same as before: two individual "California residents" (Michael Brooks and Steve Wong), two "California companies" (CAE Sound and Toy-Knowlgy Inc., both with their principal places of business in California), and Alfred H. Siegel, the "Liquidating Trustee of the Circuit City Stores, Inc. Liquidating Trust." Dkt. No. 741 ¶¶ 29-33. Mr. Siegel's citizenship is not separately alleged, but the Circuit City Stores, Inc. Liquidating Trust was established in connection with the bankruptcy proceedings of Circuit City Stores, Inc., which "was incorporated in Virginia and had its principal place of business in Richmond, Virginia" during the relevant time period. *Id*. ¶ 34. Both the prior version of the complaint and the current complaint allege claims under California law, but not Virginia law.

The version of the IPP complaint that the Court dismissed had antitrust and consumer protection claims under the laws of twenty-one states in addition to California. But that version of the complaint had also included thirty-one "consumer indirect purchaser plaintiffs" who were alleged to be residents of twenty-one states in addition to California. Dkt. No. 400. The consumer indirect purchaser plaintiffs were parties who had purchased products containing capacitors that

---

[2] The joint motion is brought by ELNA Co., Ltd., ELNA America, Inc., Hitachi Chemical Co., Ltd., Hitachi Chemical Company America, Ltd., Hitachi AIC Incorporated, Matsuo Electric Co., Ltd., NEC TOKIN Corporation, NEC TOKIN America, Inc., Nichicon Corporation, Nichicon (America) Corporation, Nitsuko Electronics Corp., Okaya Electric Industries Co., Ltd., Panasonic Corporation, Panasonic Corporation of North America, SANYO Electric Co., Ltd., SANYO North America Corp., Rubycon Corporation, Rubycon America Inc., Shinyei Technology Co., Ltd., Shinyei Capacitor Co., Ltd., Soshin Electric Co., Ltd., Taitsu Corporation, United Chemi-Con, Inc., and Nippon Chemi-Con Corporation. *See* Dkt. No. 793 at vii n.1.

3

were manufactured by one or more defendants. At the prior motion to dismiss hearing, the Court raised a question about proceeding with claims by downstream buyers who looked to be a long distance away from the alleged conspiracy. The IPPs, on their own motion, voluntarily dismissed all of the consumer plaintiffs without prejudice. Dkt. No. 594. The subsequent motion to dismiss order consequently "deem[ed] all state claims other than those under California law to have been voluntarily dismissed by the indirect purchaser plaintiffs." Dkt. No. 710 at 4 n.2.

That conclusion was the product of the voluntary dismissal rather than a formal finding by the Court, and the IPPs have now repackaged their state law claims in a different format. The IPPs still consist of only the five named first-level indirect purchaser plaintiffs from California and Virginia, but the operative complaint alleges claims under the antitrust and consumer protection laws of thirty-one states in addition to California. Dkt. No. 741 ¶¶ 387-445.

The main argument defendants jointly make against the IPPs' complaint is that the state claims outside California must be dismissed because the named plaintiffs lack Article III standing to bring them. Dkt. No. 793 at 1-5. The IPPs respond that (i) the named plaintiffs have sufficiently alleged Article III standing to proceed with their case as a whole, and that Article III standing is not to be "conflated . . . with 'statutory standing'"; (ii) Article III standing for their state antitrust and consumer protection claims "are not circumscribed merely to residency or the place-of-purchase," and standing can and does arise more broadly from the allegations IPPs say they have here, mainly delivery of allegedly price-fixed products to one of the named plaintiffs (Circuit City) in certain states; and (iii) resolution of the standing question should be deferred until class certification in any event. Dkt. No. 854 at 1-8.

Taking up the last argument first, the Court declines to defer resolution of this threshold issue until a later time. The Ninth Circuit has made clear that the district courts can -- and usually should -- resolve the issue of Article III standing at the outset of a case. *See Easter v. Am. W. Fin.*, 381 F.3d 948, 962 (9th Cir. 2004) ("The district court correctly addressed the issue of standing before it addressed the issue of class certification") (quoting statement in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), that a "court must be sure of its own jurisdiction before getting to the

merits"). This is a sound sequence because the query under Article III of the United States Constitution is a jurisdictional one.

Article III provides that federal courts may only hear "cases" and "controversies," and this limitation is a key part of the separation of powers principles that are fundamental to our republic. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992) (discussing Article III's conferral of "[t]he judicial Power" and the undefined "Cases" and "Controversies" limitation to federal courts' jurisdiction, and explaining that "the Constitution's central mechanism of separation of powers depends largely upon common understanding of what activities are appropriate to legislatures, to executives, and to courts."). *Lujan* is a keystone in the federal jurisdiction edifice. In it, the United States Supreme Court held that the "core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III," and identified the three elements that make up the "irreducible constitutional minimum of standing." *Id*. at 560-61. The plaintiff must have suffered an "injury in fact"; the injury must be "'fairly . . . trace[able]' to the challenged action of the defendant"; and it must be "'likely' . . . that the injury will be 'redressed by a favorable decision.'" *Id*. (internal citations omitted). *See also TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 824 (9th Cir. 2011) ("Constitutional standing calls for the familiar trio of injury in fact, causation and redressability.")

The Supreme Court has been very clear that Article III standing is a threshold inquiry that must be undertaken at the outset of a case, before the Court proceeds any further. For example, in *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998), the Court declined to endorse the "hypothetical jurisdiction" approach "because it carries the courts beyond the bounds of authorized judicial action and thus offends fundamental principles of separation of powers." The Court explained that, "[w]ithout jurisdiction the court cannot proceed at all in any cause," and "[t]he requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" *Id*. (internal citations omitted).

Although some district courts have on occasion deferred this inquiry until class certification, that approach stands out as the exception to the rule, and the IPPs offer no good

reason to put off the issue here. In the employment class action case that IPPs rely on most heavily, Judge Spero expressly noted that there was at least one named plaintiff who could assert a claim under each of the state laws invoked by plaintiffs. *See Senne v. Kansas City Royals Baseball Corp.*, Case No. 14-cv-00608-JCS, 2015 WL 4240716, at *14 (N.D. Cal. July 13, 2015) ("plaintiffs do not seek to assert any claims under laws of states where no named plaintiff resides. Rather, there is a named plaintiff with standing to assert a claim under the laws of every state whose laws are invoked in this action"). Judge Spero also expressly found that "there is at least one named plaintiff who is alleged to have been employed in every state whose laws are invoked" and plaintiffs had therefore "made this threshold showing of standing." *Id*. That case does not support any argument that this "threshold" jurisdictional inquiry can or should be deferred here, and the Court declines to do so.

As a first step in answering the jurisdictional inquiry, IPPs urge the Court to evaluate the named plaintiffs' Article III standing on a highly general, rather than specific claim by claim, basis. *See*, *e.g.*, Dkt. No. 854 at 2 ("Here, IPPs have sufficiently alleged Article III, injury-in-fact, standing. The SCC alleges that each named plaintiff paid artificially inflated prices for capacitors as a result of defendants' price-fixing conspiracy. Plaintiffs have, therefore, suffered monetary harm, which is the classic form of injury for purposes of the constitutional requirement."). To do otherwise, IPPs say, is to impermissibly "conflate[] Article III standing with 'statutory standing.'" *See id*. at 1.

But the Court finds that it is IPPs who get the law wrong. The Supreme Court has expressly directed that Article III standing must be measured claim by claim. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("What we have never done is apply the rationale of *Gibbs* to permit a federal court to exercise supplemental jurisdiction over a claim that does not itself satisfy those elements of the Article III inquiry, such as constitutional standing . . . . [O]ur standing cases confirm that a plaintiff must demonstrate standing *for each claim he seeks to press*"; and "standing is not dispensed in gross") (emphases added; internal quotation marks and citations omitted). And when measuring standing claim by claim, it is a named plaintiff who must possess the requisite standing; it is not sufficient that a putative class member

may have standing to press one of the claims. *See Lewis v. Casey*, 518 U.S. 343, 357-58 (1996) ("That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'") (citations omitted). Consequently, at least one of the five named plaintiffs must have Article III standing for each of the state law antitrust and consumer protection claims alleged in the IPP complaint. Otherwise, the Court lacks jurisdiction over the claim and must dismiss it.

The remaining question is what is needed to establish Article III standing for each state antitrust or consumer protection law claim asserted in this case. So-called "statutory standing" is not enough by itself. *See*, *e.g.*, *Steel Co.*, 523 U.S. at 96-97 ("The latter question [whether a plaintiff 'came within the "zone of interests" for which the cause of action was available'] is an issue of *statutory* standing. It has nothing to do with whether there is [a] case or controversy under Article III.") (emphasis in original).[3] To be clear, the holding that statutory standing "has nothing to do with" Article III standing under the current state of the law lends no support to IPPs' argument that Article III standing should not be examined state law claim by state law claim. The Supreme Court clearly said in *DaimlerChrysler* (which post-dated *Steel Co.* by eight years) that Article III standing must be examined claim by claim, and that directive is not in conflict with the instruction that Article III standing is separate from, and not to be measured by, statutory standing.

Although they criticize defendants for it, IPPs themselves commit the error of focusing on statutory rather than Article III standing. At the hearing, for example, IPPs' counsel argued that nothing amounting to injury needed to have happened in the states whose laws are being invoked because "[t]he statutes don't call for it." Dkt. No. 922 at 11:10-11; *see also id*. at 15:22-23 ("the statutes don't require the purchase in those states."). This position has two significant flaws. As

---

[3] The Supreme Court is expected to address the issue of whether Congress may confer Article III standing upon a plaintiff who suffers no concrete harm, and who therefore could not otherwise invoke the jurisdiction of a federal court, by authorizing a private right of action based on a bare violation of a federal statute. *Robins v. Spokeo, Inc.*, 742 F.3d 409 (9th Cir. 2014), *cert. granted*, 135 S.Ct. 1892 (Apr. 27, 2015). That is a different question than the state law issues raised here.

7

an initial matter, IPPs have never actually identified any specific state statute that does not require an in-state purchase or other injury. But even assuming such statutes exist, pointing to them undermines IPPs' argument. As IPPs concede, Article III standing is different from, and not to be measured by, statutory standing. *Steel Co.*, 523 U.S. 83; *see also TrafficSchool.com*, 653 F.3d at 825 ("the district court should have undertaken an independent analysis of Article III standing before determining standing under the Lanham Act.").

This is a key point because the Article III standing requirement is a constitutional limitation that applies to all claims litigated in a federal court whether based on federal or state law. So even when a plaintiff asserts a state claim (under the federal court's diversity jurisdiction, supplemental jurisdiction, or some other proper basis of exercising federal subject matter jurisdiction over the state claim), the plaintiff has no ability to pursue that claim in federal court until and unless the plaintiff is found to possess Article III standing for the state claim. It is of no moment that a state statute might purport to expressly give the plaintiff a right to sue; a plaintiff who clearly has standing under a state statute but not under the requirements of Article III cannot proceed with that claim in federal court. *See Lee v. Am. Nat'l Ins. Co.*, 260 F.3d 997, 1001-02 (9th Cir. 2001) ("a plaintiff whose cause of action is perfectly viable in state court under state law may nonetheless be foreclosed from litigating the same cause of action in federal court, if he cannot demonstrate the requisite injury"); *Fiedler v. Clark*, 714 F.2d 77, 80 (9th Cir. 1983) ("The legislative history of article XI, section 9 of the Hawaii Constitution suggests the legislature was attempting to remove barriers to standing to sue, not to enlarge the subject matter jurisdiction of the federal courts. In any event, '[in] determining jurisdiction, district courts of the United States must look to the sources of their power, article III of the United States Constitution and Congressional statutory grants of jurisdiction, not to the acts of state legislatures. However extensive their power to create and define substantive rights, the states have no power directly to enlarge or contract federal jurisdiction.'").

Consequently, to say that a state statute does not require actual injury undermines the possibility of Article III standing. The absence of an injury requirement under state law does not, as IPPs suggest, trump the constitutional standing requirements. And whether or not the state

statutes at issue "call for" an in-state injury or purchase says nothing about whether or not such an injury is required under Article III.

As these considerations make clear, the determinant of the IPPs' Article III standing for the state law claims here is the injury-in-fact requirement. IPPs acknowledge that the strong trend in this district and in other courts is to require an in-state purchase to establish Article III standing for state antitrust and related consumer protection claims like the ones alleged in this case. *See*, *e.g.*, *In re Ditropan XL Antitrust Litigation*, 529 F. Supp. 2d 1098, 1107 (N.D. Cal. 2007) (dismissing for failure to demonstrate Article III standing antitrust claims under laws of twenty-four states in which "none of the named plaintiffs reside [] or are alleged to have personally purchased Ditropan XL"); *In re Graphics Processing Units Antitrust Litigation*, 527 F. Supp. 2d 1011, 1026-27 (N.D. Cal. 2007) (dismissing for lack of standing antitrust and consumer claims under laws of states where "there is no named plaintiff from those states who has suffered injury as a result of defendants' conduct"); *Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours and Co.*, Case No. 13-cv-01180-BLF, at *3 (N.D. Cal. Sep, 22, 2014) ("The trend in the Northern District of California is to consider Article III issues at the pleading stage in antitrust cases and to dismiss claims asserted under the laws of states in which no plaintiff resides or has purchased products."); *see also United Food and Commercial Workers Local 1776 & Participating Employers Health and Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052 (N.D. Cal. 2014) ("*Lidoderm*") ("The question is whether the EPP was *harmed* in a particular state by either its own purchase of a Lidoderm or generic patch or by its reimbursement of a purchase of a Lidoderm or generic patch in that state.") (emphasis in original); *In re Flonase Antitrust Litigation*, 692 F. Supp. 2d 524, 532-33 (E.D. Penn. 2010) ("each named plaintiff has standing to bring a claim under the laws of the states where they are located, and where they purchased Flonase or reimbursed their members for Flonase purchases.").

The Court joins these decisions to find that in-state injury in the form of an in-state purchase of a capacitor at a supra-competitive price is required here to satisfy Article III standing

for each of the state law claims asserted.[4] As IPPs acknowledge, suffering monetary harm "is the classic form of injury for purposes of the constitutional requirement," and in the context of this case, it makes sense that this monetary harm would take the form of, in the IPPs' own words, "each named plaintiff pa[ying] artificially inflated prices for capacitors as a result of defendants' price-fixing conspiracy." Dkt. No. 854 at 2. For each of IPPs' state law claims, they need a plaintiff who has been injured in-state in that way.

Whether other forms of injury or conduct might satisfy Article III is not before the Court. For the sake of completeness in the event IPPs choose to amend one last time, as the Court will permit, residence in a state alone -- without a purchase or any other conduct amounting to "injury" -- cannot be sufficient, or even relevant, for Article III purposes. The constitutional requirement is for an injury in fact to a named plaintiff personally, and it is hard to see how mere residence in a state without any purchase can satisfy that, even if some bad act under the state's antitrust laws happened there. Merely living in a state, even one where price-fixing conduct occurred, is not a basis for standing if the plaintiff did not actually pay a supra-competitive price there for the accused product. Standing does not arise simply because illegality is in the air. *See Lexmark Int'l Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1387 n.3 (2014) (generalized grievances "do not present constitutional 'cases' or 'controversies.'").

On a final point, the IPPs say they have some states where defendants shipped allegedly price-fixed capacitors to Circuit City, one of the named plaintiffs. Although they did not specify which states in their complaint, counsel stated at the hearing that he can amend IPPs' complaint to allege that "Circuit City plaintiff receives deliveries of products in various states in the country. At a minimum, in California, Florida, Hawaii, and Illinois." Dkt. No. 922 at 11:24-12:3. And IPPs argue that Circuit City should at least be seen as having Article III standing to pursue claims

---

[4] Because the antitrust claims and consumer protection claims here are based on the same factual allegation of a price-fixing conspiracy, the Court finds that the Article III injury-in-fact needed is the same for both types of claims. *See*, *e.g.*, Dkt. No. 741 ¶ 390 (alleging, for state antitrust claims, that "defendants have combined and conspired to raise, fix, maintain or stabilize the prices of electrolytic and film capacitors sold in the United States."); ¶ 422 (alleging, for state consumer protection and unfair competition law claims, that defendants engaged in conduct "in violation of these states' consumer protection and unfair competition laws by engaging in a conspiracy to fix and stabilize the price of electrolytic and film capacitors as described above.").

under the laws of those states in which deliveries were received, while at the same time admitting that the purchases themselves were made in Virginia. But this does not comport with the Court's application of Article III. Just receiving deliveries of price-fixed goods that were purchased elsewhere does not constitute an Article III injury-in-fact under the antitrust or consumer protection laws. The IPPs' complaint itself alleges the injury in this case as the purchase, not the received shipment of purchased goods. *See*, *e.g.*, Dkt. No. 741 ¶ 370 ("Plaintiffs and all members of the Classes are similarly affected by defendants' wrongful conduct in that they paid artificially inflated prices for electrolytic and film capacitors purchased indirectly from defendants."). That is what comports with this Court's understanding of what Article III requires for an injury in fact in this case, and the Court denies IPPs' request to broaden the requirement to encompass those states in which Circuit City only received deliveries.[5]

In sum, to have standing under Article III to bring a state-law antitrust or related consumer protection claim in a price-fixing class action, a named plaintiff must have purchased the price-fixed product in the state under whose law he or she seeks to bring a claim. The IPPs admit that they do not have such plaintiffs for any of the thirty-one states whose laws are asserted other than California. Consequently, the Court dismisses the non-California state law claims for lack of Article III standing. IPPs will have one last opportunity to renew claims under those laws if they are able to locate a named plaintiff who can assert an Article III injury-in-fact consistent with this order. If IPPs want to pursue that option, they need to amend by **January 27, 2016**.

**B. Hitachi Chemical Co. America, Ltd. (Dkt. No. 791)**

In its prior dismissal order, the Court dismissed the IPPs' complaint with leave to amend for five U.S. subsidiaries, because the complaint failed to sufficiently allege that those subsidiaries had "joined the conspiracy and played some role in it." Dkt. No. 710 at 26. Hitachi

---

[5] The IPPs' main case, *In re Cathode Ray Tube (CRT) Antitrust Litigation*, Case No. C-07-5944-SC, 2013 WL 4505701 (N.D. Cal. Aug. 21, 2013), is inapposite. It is mainly a discussion of due process (and to a lesser extent, prudential standing), which is a question the Court has no occasion to reach in this case because of the lack of Article III standing, and the *CRT* court also did not elaborate at all on the actual factual allegations in the underlying complaints that drove its ultimate conclusion. Though IPPs make arguments from the underlying complaints themselves from those cases' dockets, those complaints are not before the Court.

11

1    Chemical Co. America, Ltd. ("HCA") was one of those five, and it is now the only defendant

2    (U.S. subsidiary or not) that has filed an individual motion to dismiss the IPPs' complaint. Dkt.

3    No. 791.

4        HCA argues that "[d]espite receiving a second chance to amend their allegations, IPPs still

5    fail to allege that HCA consciously participated in the alleged conspiracies." Dkt. No. 791 at 2.

6    But a central premise of this argument is that the IPPs have "added only one allegation that

7    specifically relates to HCA." *Id*. (citing Dkt. No. 741 ¶ 157). In making this argument, however,

8    HCA ignores numerous other allegations IPPs have added to their complaint (such as those

9    detailed in the IPPs' opposition brief, Dkt. No. 853-3 at 1-3), which now bring this case into the

10   realm of cases where courts have found the pleaded allegations to be sufficient.

11       For example, the IPPs' complaint now alleges that HCA was established by its Japanese

12   parent company (which is also a defendant in this case and which has not moved to dismiss IPPs'

13   complaint) "to effectuate and achieve the cartel's aims and purposes," that HCA "perform[ed]

14   functions at the direction of and [was] controlled by" the Japan-based defendant parent's "officers

15   and managers in Japan," and that each corporate parent alleged in the complaint "dominate[d] and

16   control[led] the finances, policies, and business practices of their various subsidiaries, including

17   the U.S. subsidiaries." Dkt. No. 741 ¶¶ 165, 170. The complaint also alleges that "the individual

18   participants in the conspiratorial meetings and discussions did not distinguish between entities

19   within a particular corporate family," and "[i]ndeed, the employees from defendants appear to

20   have attended the conspiratorial meetings on behalf of their entire corporate families, including

21   their respective U.S. subsidiaries." *Id*. ¶ 177. IPPs further allege that "because of their generic

22   uses of defendants' names, individual participants in the conspiratorial meetings and discussions

23   did not always know the specific corporate affiliation of their counterparts, nor did they

24   distinguish between entities within the respective corporate families. Participants in the

25   conspiratorial meetings entered into agreements on behalf of, and reported these meetings and

26   discussions to their respective corporate families and U.S. affiliates. As a result, the entire

27   corporate family was represented in meetings and discussions by their agents and were parties to

28   the agreements reached in those meetings." *Id*. The complaint goes on to provide specific factual

examples of these allegations from e-mails and other documents IPPs have been able to gather thus far. *Id.* ¶¶ 179-84.

HCA's present motion is a Rule 12 motion to dismiss, not a Rule 56 motion for summary judgment. Keeping in mind the standard that applies at this earlier stage of the case, the Court finds that the IPPs' complaint now contains the types of allegations that "judges in this district have repeatedly found sufficient" to go forward. *In re Lithium Ion Batteries Antitrust Litigation*, Case No. 13-MD-2420-YGR, 2014 WL 4955377, at *33 (N.D. Cal. Oct. 2, 2014); *see also In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1019-20 (N.D. Cal. 2010) (finding complaints sufficiently stated a claim as to "each of the . . . Hitachi . . . entities," where, among other things, the complaints alleged that "Hitachi, Ltd., a Japanese company, dominated and controlled the finances, policies, and affairs of Hitachi America, Ltd. . . . relating to the antitrust violations alleged."). HCA's motion is denied.

## II. DIRECT PURCHASER PLAINTIFFS' COMPLAINT

On the DPP side, there is no joint motion to dismiss brought by any group of defendants, and instead just four separate motions brought on an individual (or corporate entity) basis.[6]

### A. AVX Corporation (Dkt. No. 787)

Defendant AVX Corporation seeks dismissal on the basis that the DPPs' complaint fails to state a claim against it that meets the pleading standards of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Dkt. No. 787. AVX notes that it was not named as a defendant in the IPPs' complaint, and argues that DPPs have not sufficiently alleged that AVX "joined a price-fixing conspiracy." *Id.* at 2 and n.2.

The Court previously dismissed the complaint against AVX Corporation with leave to amend because the only substantive allegation against AVX in the prior complaint was "that it 'worked to coordinate pricing strategy' with other defendants." Dkt. No. 710 at 13. While AVX still takes umbrage at the fact that the DPPs have refused to use "the necessary formulation" and

---

[6] There is an additional pending motion brought by Fujitsu (Dkt. No. 789), but the case has been stayed as to that defendant on the basis of a pending settlement so the Court does not take up that motion at this time. Dkt. Nos. 879, 980.

13

allege that AVX "joined the conspiracy," Dkt. No. 787 at 2, the Court declines to find that there is any such "necessary formulation." Pleading an antitrust complaint is not like performing a religious rite -- there are no particular words that must be uttered in a particular sequence.

As AVX argues and DPPs do not dispute, it is true that DPPs still have not alleged that AVX appears on any "formal written attendance rosters at cartel meetings." Dkt. No. 855-4 at 7. But that, too, is not strictly required. The DPPs' complaint now asserts that "[i]n December 2009, an AVX representative stated that the company once raised the prices of in-vehicle tantalum capacitors products by 50 percent in conjunction with KEMET," another defendant. Dkt. No. 799-4 ¶ 220(f). The complaint also alleges that an AVX representative participated in a meeting with a SANYO representative in which they "discussed plans to raise capacitors prices 'in order to pursue profits' and limit production." *Id*. ¶ 217(b). This is significantly more than what was previously alleged, and at this stage of the proceedings, the Court finds DPPs have alleged enough to let the complaint go forward as to AVX. DPPs' theory for their Sherman Act § 1 claim is that defendants have "combined and conspired to raise, fix, maintain or stabilize the prices of aluminum, tantalum and film capacitors," and that they have "combined and conspired to set artificial and unjustified production lead times to limit available supply" of those capacitors. *Id*. ¶¶ 436-37. DPPs have now made direct factual allegations against AVX to support those legal claims, and it is irrelevant that DPPs have not also made other allegations using the words of AVX's choice. AVX's motion is denied.

### B. Holy Stone Enterprise Co., Ltd. & Milestone Global Technology, Inc. (Dkt. No. 788)

The Court previously denied the motion to dismiss that was brought by Holy Stone Enterprise Co., Ltd. and HolyStone International together. The two defendants had "refer[red] to themselves collectively as 'Holy Stone'" and sought dismissal "for failure to offer facts plausibly suggesting that Holy Stone joined and participated in the alleged 'global' conspiracy." Dkt. No. 710 at 15 (quoting from Holy Stone's motion to dismiss brief, Dkt. No. 480 at 19). The Court found that "the allegations against Holy Stone are sufficient under *Twombly*," and denied the motion to dismiss. *Id*. at 16.

14

Having lost once, the same defendants now try a different tack against the amended complaint. Moving as "Holy Stone Enterprise Co., Ltd. . . . a Taiwanese corporation" ("Holy Stone Taiwan") and "Milestone Global Technology, Inc., doing business as HolyStone International . . . a California corporation" ("Holy Stone US"), the Holy Stone defendants now argue that DPPs "[i]mportantly and without any justification, . . . collectively refer to Holy Stone Taiwan and HolyStone US as 'Holy Stone' in the FACC." Dkt. No. 788 at 2. The Holy Stone defendants also argue that "DPPs do not make any substantive allegations regarding the participation of Holy Stone Taiwan or Holy Stone US in the alleged competitor meetings or the alleged cartel." *Id*.

As an initial matter, DPPs and Flextronics argue that this belated attempt by the Holy Stone defendants to differentiate themselves from one another is procedurally improper and the motion should be denied under Federal Rule of Civil Procedure 12(g). Dkt. No. 855-4 at 22. That rule bars a party that has made a motion under Rule 12 from making "another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." But an argument that a complaint fails to state a claim upon which relief can be granted is not waived, and instead, the remedy under the rule is that the Holy Stone defendants would have to wait to make the argument in a Rule 12(c) motion (after the pleadings are closed) or at trial. *See* Fed. R. Civ. P. 12(h)(2). On the substance, the direct purchaser plaintiffs argue that the Holy Stone defendants' motion should be denied in any event because the existing allegations "are sufficient for dismissal of the Holy Stone Defendants' current motion to dismiss." Dkt. No. 855-4 at 23.

The Court is sympathetic to the direct purchaser plaintiffs' first argument and does find the Holy Stone defendants' second motion to dismiss to be improper to the extent it contains arguments that should have been raised in their prior motion. While the direct purchaser plaintiffs ask that the Court deny Holy Stone defendants' motion in its entirety and order them to answer for the sake of efficiency, the Court finds that it would be equally inefficient to take that course when it simply defers a substantive ruling that would inevitably have to be made on a 12(c) motion the Holy Stone defendants would undoubtedly file after filing their answer. Because the Court

ultimately agrees with the direct purchaser plaintiffs that the motion can be resolved and denied on the existing allegations in the complaint, the Court finds that making that ruling now is the most efficient way forward.

The Court begins with its prior ruling that "the allegations against Holy Stone are sufficient under *Twombly*." Dkt. No. 710 at 16. The allegations the Court relied on to reach that conclusion are again contained in the amended complaint. *See* Dkt. No. 799-4 ¶¶ 196, 206, 212(bb). In addition to those allegations that the Court has already upheld, the direct purchaser plaintiffs have added to the mix these new allegations: Paragraph 198 alleges that all participants at the cartel meetings alleged in the complaint "understood that other participants in cartel activities entered into agreements and understandings with each other on behalf of all entities within their respective corporate enterprises on whose behalf they attended and participated, such as . . . Holy Stone . . . ." Paragraph 238 alleges that the "Japan-based defendants having U.S. subsidiaries," such as Holy Stone, "established those subsidiaries not only to market, sell and distribute their capacitors in the United States, but also to effectuate and achieve the cartel's aims and purposes." That paragraph further alleges that these corporate entities chose not to perform these functions themselves and "instead established corporate subsidiaries and affiliates that perform functions at the direction of and are controlled by their officers and managers in Japan."

Taken together, at this stage and in this procedural posture, these allegations are sufficient under *Twombly* against both Holy Stone defendants, however they wish to be labelled. The Holy Stone defendants' motion is denied.

**C. Hitachi Chemical Co. America, Ltd. (Dkt. No. 792)**

HCA, which moved separately for dismissal of IPPs' complaint as discussed above, moves separately for the dismissal of DPPs' and Flextronics' allegations against it as well. Dkt. Nos. 792, 817. HCA argues that both sets of direct purchaser plaintiffs have failed to allege that "HCA joined the alleged conspiracy or played any role in it." *See* Dkt. No. 792 at 2; 817 at 2.

Because HCA, too, failed to make the arguments it now raises in the first round of briefing for the initial complaint, the direct purchaser plaintiffs argue that HCA's motion, too, should be barred as procedurally improper under FRCP 12(g), like the Holy Stone defendants'. But the

16

Court finds that the same analysis that drove the denial of the Holy Stone defendants' motion above supports the denial of HCA's motion as well.

One difference is that unlike the Holy Stone defendants, there is no prior ruling upholding the direct purchaser plaintiffs' allegations against the Hitachi corporate family generally or against HCA's parent corporation, Hitachi Chemical Co., Ltd. That is because Hitachi Chemical has never separately argued that the allegations against it were not enough. Indeed, Hitachi Chemical has now answered the operative direct purchaser plaintiffs' complaint. Dkt. No. 829.

This is not surprising. The direct purchaser plaintiffs' complaint alleges, among other things, that "[m]eeting rosters and records dating from 2002 to 2012 indicate that officers, managers and/or employees of the following defendant companies participated in or were informed of the cartel's regular meetings: . . . Hitachi . . . ." Dkt. No. 799-4 ¶ 196. "Hitachi" is further alleged to have "played a key role in organizing the cartel's regular meetings and coordinating the operation of the cartel during the class period," because it manufactured both electrolytic and film capacitors and was a "globally dominant manufacturer" of these capacitors. *Id*. ¶ 200. "Hitachi" is also alleged to have "regularly attended cartel meetings where attendees fixed prices for both electrolytic and film capacitors." *Id*. This is merely a small sampling of the allegations against "Hitachi" generally.

Added to that are allegations similar to the ones discussed for Holy Stone. The direct purchaser plaintiffs' complaint states that the participants at the alleged cartel meetings "represented their respective corporate families and did not make known to the other participants any distinctions between the corporate entities within their corporate families whose interest they were representing" and that "records of meetings throughout the class period do not make or recognize corporate formalities or distinctions between entities or officers within a single corporate enterprise or corporate family." Dkt. No. 799-4 ¶ 197. As was the case with the Holy Stone defendants, DPPs also again allege that "[a]ll participants understood that other participants in cartel activities entered into agreements and understandings with each other on behalf of all entities within their respective corporate enterprises on whose behalf they attended and participated, such as . . . Hitachi . . . ." *Id*. ¶ 198.

17

United States District Court
Northern District of California

Taken together, the Court finds that the DPPs' and Flextronics' allegations against HCA are sufficient under *Twombly*. HCA's motion is denied.

**D. Shizuki Electric Co., Inc. & American Shizuki Corporation (Dkt. No. 927)**

The final pending motion the Court addresses in this order is the motion to dismiss of defendants Shizuki Electric Co., Inc. ("Shizuki Electric") and its subsidiary, American Shizuki Corporation ("ASC"), who were newly named in the amended complaint. Dkt. No. 927. Because of the timing of these defendants becoming a part of this case, their motion was filed after the hearing on the other motions discussed in this order. The Court finds it appropriate to resolve this motion (which the Court took under submission on the papers) here with the other motions to dismiss.

Shizuki Electric acknowledges that the complaint contains similar allegations of participation in cartel meetings that the Court previously sustained as against other defendants. *See* Dkt. No. 947-3 at 3 (acknowledging "the allegations are similar" to the allegations that were made against "several defendants whose *Twombly* arguments were rejected"). Shizuki Electric tries to distinguish those allegations by saying "[t]he allegations against those defendants are more specific and focus on discussions that suggest they furthered the goals of the cartel," and "[a]dditionally, these defendants' participation in the meetings occurred in the heart of the conspiracy period; not in its early days when it allegedly was transitioning from a legitimate trade association to an unlawful cartel." *Id.* at 3-4. But this is too fine a distinction, especially at the motion to dismiss stage. Shizuki Electric's motion is denied.

The Court does, however, find the allegations against ASC to be "too paltry." Dkt. No. 927 at 6. As ASC points out, it is "not even named in the list of subsidiaries alleged to have acted 'to effectuate and achieve the cartel's aims and purposes.'" *Id.* at 7 (citing Dkt. No. 799-4 ¶¶ 238-39). Tellingly, the DPPs have no substantive response other than to request amendment on the basis of "additional facts derived from the discovery recently produced by defendants." Dkt. No. 943-4 at 5. ASC's motion to dismiss is consequently granted. ASC asks that the Court deny DPPs the chance to amend, but leave to amend is to be granted liberally when justice requires, *see* FRCP 15; this is only DPPs' first strike as against ASC; and DPPs have already put forward

specific examples of additional factual allegations they would add against ASC if given the chance. *See* Dkt. No. 943-4 at 6-7. DPPs may amend their complaint, but only for the purpose of adding fact allegations against ASC.

**CONCLUSION**

The joint motion to dismiss the non-California state law claims alleged in the IPPs' complaint is granted. Dkt. No. 793. The state antitrust and consumer protection claims alleged under the laws of any state other than California are dismissed without prejudice to amendment by IPPs no later than **January 27, 2016** in a manner consistent with this order.

Hitachi Chemical Co. America, Ltd.'s motion to dismiss the IPPs' complaint is denied. Dkt. No. 791.

AVX Corporation's motion to dismiss the DPPs' complaint is denied. Dkt. No. 787.

Holy Stone Enterprise Co., Ltd. and Milestone Global Technology, Inc.'s motion to dismiss the direct purchaser plaintiffs' complaint is denied. Dkt. Nos. 788, 818.

Hitachi Chemical Co. America, Ltd.'s motion to dismiss the direct purchaser plaintiffs' complaint is denied. Dkt. Nos. 792, 817.

Shizuki Electric Co., Inc.'s motion to dismiss the direct purchaser plaintiffs' complaint is denied. Dkt. No. 927. American Shizuki Corporation's motion to dismiss is granted, but with leave to amend. DPPs and Flextronics are directed to file any amended complaint by **January 27, 2016**.

**IT IS SO ORDERED.**

Dated: December 30, 2015

_____
JAMES DONATO
United States District Judge