UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE CAPACITORS ANTITRUST LITIGATION. | Master File No. 14-cv-03264-JD<br><br>**ORDER RE PHASE I OF SUMMARY JUDGMENT ON FOREIGN TRANSACTIONS** |

This order resolves legal disputes between the parties about the application of Section 6a of the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a ("FTAIA"), in this case. Dkt. Nos. 911, 915. After additional briefing and submission of evidence by the parties, the Court will issue a Phase II order that will constitute the final decision on defendants' motions for summary judgment.

## BACKGROUND

In these consolidated antitrust class actions, plaintiffs are direct and indirect purchasers of capacitors, a small component used to store and even out the flow of energy in electronic devices. *See* Dkt. Nos. 710, 1003. Capacitors are a basic building block of electrical devices and it is no exaggeration to say that they are present in virtually every electronic device in the world. The gist of the complaints is that the defendants, who "dominate" the highly concentrated markets for electrolytic and film capacitors, conspired to fix prices and suppress competition in those markets. *See* Dkt. Nos. 799-4, 1112. Defendants are mainly overseas manufacturers operating in Japan and other parts of East Asia.

Given the international bent of the allegations, the parties and the Court recognized from the start that the FTAIA would play a pivotal role in this case. As is often noted, the FTAIA is an "inelegantly phrased" statute. *Animal Science Products, Inc. v. China Minmetals Corp.*, 654 F.3d

462, 465 (3d Cir. 2011); *see also United States v. Hsiung*, 778 F.3d 738, 751 (9th Cir. 2015) ("a web of words"). The intent behind the statute is not the complicating factor. Congress's goal was to assure American companies that they would not be liable under the Sherman Act for conduct that typically would be considered anticompetitive so long as that conduct adversely affected foreign markets only. *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 161 (2004) ("*Empagran I*") (citing H.R. Rep. No. 97-686 at 1-3, 9-10 (1982)). As the Supreme Court has held, the FTAIA removes overseas transactions and business arrangements from the purview of the Sherman Act "*unless* those activities adversely affect domestic commerce, imports to the United States, or exporting activities of one engaged in such activities within the United States." *Id.* (emphasis in original).

The challenge of the FTAIA is applying Congress's intent to the myriad of complex business practices found in the global economy. This task has bedeviled the courts. The Supreme Court has not addressed the FTAIA since *Empagran I* in 2004, and circuit and district court decisions often differ, sometimes sharply, over basic provisions of the FTAIA. *See*, *e.g.*, *Hsiung*, 778 F.3d at 758 n.9 (noting disagreement between Ninth Circuit, and Second and Seventh Circuits, over definition of "direct" in Section 6a(1)). The extraterritorial reach of the Sherman Act remains far from obvious in the case law.

The facts pertinent to the FTAIA add to the complexity of applying it. They typically consist of gigabytes of transactional data, emails, contracts and other business documents for each individual defendant, along with scores of witness depositions, all subject to language translation challenges. Economists and other consultants are often retained to help manage and understand these vast data sets, and inevitably add their own voluminous expert reports and deposition testimony.

All of this can make cases with a serious FTAIA component a time and money sinkhole for the litigants. The typical case management schedule exacerbates the problem by tending to defer FTAIA determinations until late in the case and after years of staggeringly costly multinational discovery.

After discussions with the parties, the Court decided to address the FTAIA issues sooner rather than later in the case. The goal was to resolve the parties' FTAIA disagreements early enough to realize downstream efficiencies and economies in discovery and class certification and other motions. Early resolution might also help to spur settlement talks. To these ends, the Court set a separate and early briefing track for FTAIA issues. After an initial round of briefs on this track, it became clear that a phased approach would simplify and clarify resolution of the FTAIA questions.

This order decides the first phase, which focuses on the parties' disagreements about the scope of the import exclusion and proximate cause for the domestic effects exception to the FTAIA. *See* Fed. R. Civ. P. 56 Advisory Committee Notes to the 1946 Amendment (partial summary judgment under the rule may be "a pretrial adjudication that certain issues shall be deemed established for the trial of the case. This adjudication is more nearly akin to the preliminary order under Rule 16, and likewise serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact"); *Allen v. C & H Distributors, LLC*, No. 10-1604, 2013 WL 4506233, at *2 (W.D. La. Aug. 22, 2013) (Rule 56 proper vehicle for determining applicable law). The second phase will apply these legal determinations to the record and end in a final order on defendants' requests for summary judgment under the FTAIA. The parties' next steps are detailed in the Conclusion.

**DISCUSSION**

This consolidated case involves multiple groups of plaintiffs, close to two dozen defendants, and more than a decade of alleged conspiratorial conduct. There are two operative complaints. One presents the claims of the direct purchaser plaintiffs, which consists of (1) entities who seek to proceed as a class, *i.e.*, the Direct Purchaser Plaintiffs ("DPPs"), and (2) Flextronics International USA, Inc. ("Flextronics"), which has opted to proceed on an individual, non-class basis. Dkt. No. 799-4. The other operative complaint is the fourth consolidated complaint filed by the indirect purchaser plaintiffs ("IPPs"). Dkt. No. 1112. The IPPs are individuals and companies who purchased stand-alone capacitors from distributors, who in turn purchased those capacitors from defendants. *Id*. ¶¶ 29-39. The IPPs do not include any

3

1 consumers who purchased finished goods incorporating capacitors. Plaintiffs in that category
2 were voluntarily dismissed without prejudice earlier in the case. Dkt. No. 710 at 3-4. Defendants
3 for both complaints are mostly foreign corporations that manufacture capacitors and are alleged to
4 have participated in a global price-fixing conspiracy spanning over a decade.

The FTAIA is pivotal here because it limits the extraterritorial reach of Section 1 of the Sherman Act, 15 U.S.C. § 1, which prohibits conspiracies "in restraint of trade or commerce among the several States, or with foreign nations." A claim under Section 1 of the Sherman Act is the only claim DPPs have alleged against defendants. Dkt. No. 799-4 ¶¶ 433-443. Flextronics joins in alleging the same claim and adds claims under California's Cartwright Act (Cal. Bus. & Prof. Code § 16720) and Unfair Competition Law (Cal. Bus. & Prof. Code § 17200). *Id*. ¶¶ 433-469. The IPPs allege claims under (1) Section 1 of the Sherman Act (for injunctive relief only), (2) state antitrust and restraint of trade claims under the laws of California, Iowa, Michigan, Minnesota, Nebraska and New York, and (3) state consumer protection and unfair competition claims under the laws of California, Florida, Nebraska and New York. Dkt. No. 1112 ¶¶ 381-419.

In our circuit, it is now settled that the limitations imposed by the FTAIA are not jurisdictional but go to the merits of a Sherman Act claim. *Hsiung*, 778 F.3d at 751. The FTAIA "boils down to two principles." *Id*. "Import trade or import commerce" with foreign nations falls squarely within the scope of the Sherman Act and is excluded from the FTAIA altogether. *Id*. "Nonimport trade or commerce with foreign nations," on the other hand, is subject to the FTAIA and is not governed by the Sherman Act unless it meets the "domestic effects exception." *Id*. at 756. To meet the exception, (1) the conduct must have had a "direct, substantial and reasonably foreseeable effect" on U.S. domestic commerce, and (2) such U.S. domestic effect must "give[] rise to" a Sherman Act claim. 15 U.S.C. § 6a; *see also In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, 546 F.3d 981, 985-86 (9th Cir. 2008).

**I.   DPPS' AND FLEXTRONICS' ALLEGATIONS**

The parties' main dispute under the FTAIA for the direct purchasers' allegations are the scope of commerce that constitutes "import trade or import commerce," and the scope of

4

nonimport trade or commerce that satisfies the domestic effects exception (and the second prong of that exception in particular). The Court resolves these disputes by category of transaction.

### A. Capacitors Billed To Entities In The U.S.

The parties agree that capacitor sales billed to entities in the United States are not excluded by the FTAIA regardless of where the products were ultimately delivered. *See*, *e.g.*, Dkt. No. 915 at 4 (defendants' request for an order "limiting the sales at issue in the instant action to sales invoiced directly to U.S.-located customers as reflected in Defendants' transaction data"). These transactions are within this case.

### B. Capacitors Billed To Foreign Entities But Shipped To The U.S. -- Scope Of "Import Trade Or Commerce"

The parties disagree about capacitors billed to foreign entities but which defendants shipped to the United States. Dkt. No. 967-5 at 5-13; Dkt. No. 983-5. This category of transactions presents the question of what constitutes import trade or commerce. Plaintiffs take the position that "[t]he capacitors that defendants shipped to U.S. entities are import commerce," Dkt. No. 967-5 at 5, and fall "within the Sherman Act without further clarification or pleading." *Hsiung*, 778 F.3d at 754.

While "our circuit has not defined 'import trade' for purposes of the FTAIA," it has held that "not much imagination is required to say that this phrase means precisely what it says." *Hsiung*, 778 F.3d at 754-55. The Ninth Circuit readily found in *Hsiung* that "transactions between the foreign defendant producers of TFT-LCDs and purchasers located in the United States" were import trade because the defendants had "sold" TFT-LCD panels to customers in the United States. *Id*. at 756 ("Trial testimony established that AUO imported over one million price-fixed panels per month into the United States. . . . The panels were sold into the United States, falling squarely within the scope of the Sherman Act."). But *Hsiung* does not tackle the issue presented here, where a product was billed to an entity abroad but delivered to the United States.

Other courts have expressly addressed this situation. In *Animal Science*, for example, the Third Circuit held that functioning as a physical importer was not a mandatory condition for satisfying the import trade or commerce exception. "Rather, the relevant inquiry is whether the

defendants' alleged anticompetitive behavior 'was directed at an import market.'" *Animal Science,* 654 F.3d at 470 (internal citation omitted).  The court also found "the delivery location of goods sold by a foreign seller to be relevant to whether that seller's actions were directed at a United States import market," and directed the district court on remand to give weight to well-pled allegations that the defendants in the case had "made direct sales of magnesite for delivery in the United States during the time period of the alleged conspiracy." *Id*. at 471 n.11; *see also Fond du Lac Bumper Exchange, Inc. v. Jui Li Enterprise Co., Ltd.*, 795 F. Supp. 2d 847, 850-51 (E.D. Wis. 2011) (even if defendants "transferred title to the [aftermarket auto] parts to plaintiffs in Taiwan and did not themselves ship the parts into the United States, by allegedly agreeing to fix the prices of parts to be sold in the United States and taking the additional steps" such as delivering "the parts to their ships for transport to the United States" and bringing parts into the United States, "defendants' conduct involved import commerce.").[1]

    Here, the undisputed facts for the transactions in this category are that defendants invoiced capacitor sales to a foreign purchaser but directly shipped the capacitors to a location in the United States.  *See* Dkt. No. 983-5 at 2; Dkt. No. 967-5 at 5-8.  Defendants not only knew and intended that the goods would be delivered to the United States, they themselves shipped them here.  The complaint alleges import trade directed toward the United States, Dkt. No. 799-4 ¶¶ 8, 9, 13, 212, and plaintiffs have submitted evidence indicating that defendants' alleged conspiracy focused on the U.S. market, evidence defendants do not contest for purposes of this motion.  Dkt. No. 1076 at 10.  Consequently, the transactions in this category qualify as import trade or commerce.

    This holding is consonant with *Hsiung*.  Our circuit declined to "determine the outer bounds of import trade," but it did expressly take note of the Third Circuit's test that "the import

---

[1] Plaintiffs rely heavily on *In re Vitamin C Antitrust Litigation*, 904 F. Supp. 2d 310 (E.D.N.Y. 2012), for similar reasoning.  In that case, "[b]oth parties agree[d] that the vitamin C at issue was bought overseas by foreign purchasers and shipped into the United States." *Id*. at 316-17.  The trial court held that the "relevant inquiry is whether the defendants' alleged anticompetitive behavior 'was directed at an import market,'" and concluded that it was because the complaint alleged conspiracy meetings and conversations "in which the price, volume of sales and exports to the United States, and markets for vitamins were discussed and agreed upon." *Id*.  But the Second Circuit recently vacated the judgment in the case and remanded it for dismissal after concluding that the trial court should have declined jurisdiction under principles of international comity. *In re Vitamin C Antitrust Litig.,* No. 13-4791-cv, 2016 WL 5017312 (2d Cir. Sept. 20, 2016).

trade exclusion . . . applies to importers and to defendants whose 'conduct is directed at a U.S. import market,' even if the defendants did not engage in importation of products into the United States." 778 F.3d at 755 n.8. While *Hsiung* also held that "[t]argeting is not a legal element for import trade under the Sherman Act," there is no question that the court considered those kinds of allegations to be relevant to the import trade analysis, as it went on to note that "[i]n any event, the negotiations in the United States and the significant direct sales to the United States certainly qualify as targeting." *Id*. at 756; *see also id*. at 755-56 ("These allegations directly describe that the defendants and their coconspirators engaged in import commerce with the United States -- indeed, the conspiracy's intent, as alleged, was to 'suppress and eliminate competition' by fixing the prices for panels that AUO and AUOA sold to manufacturers 'in the United States and elsewhere' for incorporation into retail technology sold to consumers in the United States and elsewhere.").[2]

And harkening back to *Hsiung*'s observation that import trade is not always that hard to fathom, the Court notes plaintiffs' proffer of a dictionary definition of "import," which they say means "to bring (as merchandise) into a place or country from another country." Dkt. No. 967-5 at 5 (citing the Merriam-Webster Dictionary at http://www.merriam-webster.com/dictionary/import). This is a straightforward and commonsense definition of "import," and it is difficult to see how directly shipping a product to the United States would not fit within it.

Defendants do not offer a meaningful rebuttal to any of these points. Consequently, the Court finds that sales of capacitors by defendants that were invoiced to a foreign purchaser but shipped by a defendant to a location in the United States counts as "import trade or import commerce," is subject to the Sherman Act and is a part of this case.

The Court declines at this time to consider whether the domestic effects exception also applies to this category of trade. Plaintiffs say the exception fits here, Dkt. No. 967-5 at 8-13, and some courts have considered that question even after applying the import exclusion. *See*, *e.g.*,

---

[2] Interestingly, the circuit also approved a jury instruction in *Hsiung* which included the element that "the members of the conspiracy engaged in one or both of the following activities: (A) fixing the price of TFT-LCD panels *targeted* by the participants to be sold in the United States or for delivery to the United States . . . ." 778 F.3d at 748 (emphasis added).

*Fond du Lac*, 795 F. Supp. 2d at 851. But the Court's finding on the import trade question makes this additional step unnecessary.

### C. Capacitors Billed And Shipped To A Foreign Entity -- Proximate Cause Under The Domestic Effects Exception

The category of capacitors that were billed and shipped to a foreign entity raises the question of FTAIA's domestic effects exception and its causation requirement. To meet the domestic effects exception and come within the scope of the Sherman Act, the nonimport trade or commerce conduct must have had a "direct, substantial and reasonably foreseeable" effect on U.S. domestic commerce, and this domestic effect must have "given rise to" the Sherman Act claim. 15 U.S.C. § 6a; *see also DRAM*, 546 F.3d at 985-86. Defendants focus mainly on the causation element. Dkt. No. 915 at 17-23.

Defendants acknowledge that proximate cause is the applicable test in our circuit, s*ee DRAM*, 546 F.3d at 987, but go on to strangle it with unreasonable geographic strictures. They say that "[t]here is simply no basis for the DPPs and Flextronics USA to argue that where foreign purchasers pay supra-competitive prices overseas as a result of the alleged conspiracy, those foreign effects are proximately caused by U.S. anticompetitive effects that 'give rise to' the foreign purchaser impact." Dkt. No. 983-5 at 9; *see also id*. at 3 ("such transactions cannot, as a matter of law, satisfy the 'gives rise to' requirement of the FTAIA").

Defendants go too far. The locus of a transaction is not dispositive under the FTAIA. As the District of Columbia Circuit held in rejecting a similar argument:

> The appellees suggest that the exception applies only to injuries that arise in U.S. commerce, thus describing its reach by the situs of the transaction and resulting injuries rather than by the situs of the effects of the allegedly anti-competitive conduct giving rise to the appellants' claims. This interpretation has no support from the text of the statute, which expressly covers conduct involving "trade or commerce with foreign nations." 15 U.S.C. § 6a(1)(A). In addition, the legislative history makes clear that ***the FTAIA's "domestic effects" requirement "does not exclude all persons injured abroad from recovering under the antitrust laws of the United States***." H.R.Rep. No. 97-686, at 17a. The appellants need only demonstrate therefore that the U.S. effects of the appellees' allegedly anti-competitive conduct "g[a]ve rise to" their claims.

8

*Empagran S.A. v. F. Hoffmann-Laroche, Ltd.*, 417 F.3d 1267, 1269 (D.C. Cir. 2005) ("*Empagran II*") (emphasis added). The FTAIA does not state or support a per se rule excluding foreign purchasers just because they did their buying abroad.

The cases defendants rely on do not support a different conclusion. Defendants say that *Empagran I* and *DRAM* "express unambiguously that in price-fixing class actions where foreign purchasers seek damages arising from direct purchases of a product sold outside the United States by foreign defendants, those purchasers' alleged injuries were caused ***independently*** from any effect on U.S. commerce and thus such claims are barred by the FTAIA." Dkt. No. 915 at 18. But these cases do not stand for the proposition defendants urge. In *Empagran I*, it was "assumed that the foreign effect, *i.e.*, higher prices in Ukraine, Panama, Australia, and Ecuador, was independent of the domestic effect, *i.e.*, higher domestic prices." 542 U.S. at 160; *see also id.* at 164 ("we reemphasize that we base our decision upon the following: The price-fixing conduct significantly and adversely affects both customers outside the United States and customers within the United States, but the adverse foreign effect is independent of any adverse domestic effect."). The Supreme Court declined to address in the first instance the alternative argument "that the foreign injury was not independent," stating that respondents "remain[ed] free to ask the Court of Appeals to consider the claim" on remand. *Id*. at 175. On remand, the Court of Appeals for the District of Columbia Circuit did conclude that there was a lack of proximate cause (such that the second prong of the FTAIA's domestic effects exception was not met after all), but not simply because appellants were foreign corporations that had purchased vitamin products outside of the United States. *Empagran II*, 417 F.3d at 1268-70.

So, too, in *DRAM*. The plaintiff-appellant was a British corporation that had "purchased DRAM outside of the United States from the defendants, various [computer] memory companies." 546 F.3d at 984. The court held that plaintiff "Centerprise has not shown that the higher U.S. prices proximately caused its foreign injury of having to pay higher prices abroad. Other actors or forces may have affected the foreign prices." *Id*. at 988. Significantly, the court found it merely "notabl[e]" that Centerprise was "a foreign consumer that made its purchases entirely outside of the United States." *Id*. at 989. This observation did not drive the court's decision. Instead, what

9

the court found was that even "a direct correlation between prices [in the U.S. and prices abroad] does not establish a sufficient causal relationship." *Id*. More specifically, the court held that, for the allegation "that the defendants' activities resulted in the U.S. prices setting the worldwide price," plaintiff had "not set forth a theory with any specificity of how this price-setting occurred or how it shows a direct causal relationship." *Id*. at 990.

As all of this shows, these cases turned on failures of pleading and proof specific to them. They do not stand for a bright line rule, as defendants contend, that no foreign plaintiff alleging a global conspiracy can ever satisfy the "gives rise to" prong of the FTAIA domestic effects exception.

But this is not to say that plaintiffs' interpretation of proximate cause is significantly better. Plaintiffs argue for a "global pricing" theory of proximate cause based on the idea that "the domestic effects of defendants' conduct gave rise to plaintiffs' claims where defendants made sales to a U.S. corporate family member and to a foreign corporate family member as part of a global pricing system." Dkt. No. 967-5 at 14-17. The problem with this theory is that it is analytically indistinguishable from similar theories that have already failed in court, most critically in the Ninth Circuit. *See DRAM*, 546 F.3d at 989-90 ("Centerprise's complaint suggests that super-competitive DRAM prices in the United States may have facilitated the defendants' scheme to charge super-competitive prices abroad, but it does not sufficiently allege a theory that the higher U.S. prices proximately caused Centerprise's foreign injury of having to pay higher prices outside the United States," and "[s]imilar arguments were made and rejected in *Empagran II* and *In re Monosodium Glutamate* -- that there was a single global price kept in equipoise by the maintenance of super-competitive prices in the U.S. market.").

And as *Empagran II* found, "[w]hile maintaining super-competitive prices in the United States may have facilitated the appellees' scheme to charge comparable prices abroad, this fact demonstrates at most but-for causation. It does not establish . . . that the U.S. effects of the appellees' conduct -- i.e., increased prices in the United States -- proximately caused the foreign appellants' injuries." 417 F.3d at 1271. That holding applies with equal force here. Plaintiffs' global pricing theory is rejected as a matter of law.

Going forward in this case, the Sherman Act claims of foreign purchasers who were invoiced and received their capacitors abroad are not barred as a matter of law, but they may not allege a claim on the basis of a global pricing theory. While *DRAM* likely leaves only a small opening for plaintiffs to establish proximate cause in this category, they are certainly free to proffer facts in Phase II showing that they can get through the eye of that needle.

### D. Capacitors Incorporated Into Products Destined For Sale In The United States

Flextronics' allegations raise another category of trade: capacitors that were manufactured abroad and incorporated abroad into finished products destined for sale in the United States. *Hsiung* suggests, without definitively stating, that transactions like this may come within the Sherman Act either as import trade or under the domestic effects exception. For the "[f]oreign sales of panels that were incorporated into finished consumer products ultimately sold in the United States," the court noted that the parties acknowledged the conduct was both substantial and had a reasonably foreseeable impact on the United States, and the court went on to find that the impact was also sufficiently "direct," thereby satisfying the first prong of the domestic effects exception. 778 F.3d at 758-59. An important part of the court's holding was that TFT-LCDs were a "substantial cost component of the finished products," and it was "well understood that substantial numbers of finished products were destined for the United States and that the practical upshot of the conspiracy would be and was increased prices to customers in the United States." *Id*. at 759. None of that fits well here, where the parties agree that capacitors are tiny parts that cost pennies or less to buy, and are unlikely to be a substantial cost component of finished products even when used in volume.

Another wrinkle for this category is that *Hsiung* was a criminal case brought by the United States government. Because the government was not seeking civil monetary damages, *Hsiung* had no need to address the second prong of the domestic effects exception. That is quite different from this civil damages case, which makes it difficult to apply the broader statements in *Hsiung*. The challenge is compounded by the fact *Hsiung* did not turn on the domestic effects exception. After finding that the first prong of the exception had been satisfied, the court stated that "even disregarding the domestic effects exception, the evidence that the defendants engaged in import

11

trade was overwhelming . . . [and the] evidence offered in support of the import trade theory alone was sufficient to convict the defendants of price-fixing in violation of the Sherman Act." *Id*. at 760.

In any event, the ultimate legal disposition of this category will depend on the facts, which are far from undisputed here. The Court leaves this category for further development and resolution in Phase II or later stages of the case. The parties are advised to consider the discussion of *Hsiung* when returning to this category in future motions.

This concludes the Court's treatment of the transaction categories raised by the direct purchaser plaintiffs' allegations as briefed by the parties. Defendants made a passing gesture at arguing that the direct purchaser plaintiffs cannot recover under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), for "purchases of capacitors or finished goods containing capacitors from their foreign affiliates who purchased the capacitors directly from defendants." Dkt. No. 915 at 24-26. The intersection of *Illinois Brick* and the FTAIA is a complex topic and the Court declines to address it at this stage in light of the cursory briefing and underdeveloped factual record presently before it.

## II. IPPS' ALLEGATIONS

The fundamental dispute on the IPP side of the case is whether the FTAIA applies to the state antitrust and consumer protection claims alleged by the IPPs. Defendants say that the "state law claims are governed by the extraterritorial limitations imposed by the FTAIA," which bar "claims that involve standalone capacitors first sold outside the United States to a third-party distributor that is not an alleged conspirator." Dkt. No. 911 at 1, 5.

Both sides frame the discussion in terms of the application of the federal FTAIA statute to state law claims, and they invoke arguments drawing on the Supremacy Clause, the Commerce Clause, principles of international comity, and the harmonization provisions contained in some of the state statutes. Dkt. Nos. 911, 965. This issue is, rather strikingly, not settled in our circuit. *See In re TFT-LCD (Flat Panel) Antitrust Litigation*, 637 Fed. Appx. 981, 984 n.2 (9th Cir. 2016) (finding it "not necessary to reach Best Buy's arguments . . . that the FTAIA does not apply to claims under Minnesota law."). District court opinions have in general declined to find that state

competition laws cast a wider net than the FTAIA.  *See*, *e.g.*, *In re Static Random Access Memory (SRAM) Antitrust Litigation*, No. 07-md-01819 CW, 2010 WL 5477313, at *4 (N.D. Cal. Dec. 31, 2010) ("the United States Constitution vests Congress with the express power to 'regulate Commerce with foreign Nations,' U.S. Const. Art. I, § 8, cl. 3, and courts have accordingly recognized that foreign commerce is 'pre-eminently a matter of national concern' on which the federal government has historically spoke[n] with 'one voice.'") (quoting *Japan Line, Ltd. v. County of L.A.*, 441 U.S. 434, 448, 453-54 (1979)); *The 'In' Porters, S.A. v. Hanes Printables, Inc.*, 663 F. Supp. 494, 502 n.8 (M.D.N.C. 1987).  Some state courts have reached the same conclusion.  *See*, *e.g.*, *Amarel v. Connell*, 202 Cal. App. 3d 137, 149 (1988) (assuming FTAIA applies to limit reach of state law); *Global Reinsurance Corp. U.S. Branch v. Equitas Ltd.*, 18 N.Y.3d 722, 735 (N.Y. 2012) ("The federal limitation upon the reach of the Sherman Act, predicated upon and an expression of the essentially federal power to regulate foreign commerce, would be undone if states remained free to authorize 'little Sherman Act' claims that went beyond it.").

Plaintiffs have not cited any federal or state decisions that extend the reach of a state law beyond the FTAIA, and the Court declines to do so here.  But that answers only half of the state-law territoriality question.  To say that state law does not exceed the scope of the FTAIA is not to say that the reach of a given state's law is the same as the FTAIA.  It is possible that a state has limited the scope of its competition laws to conduct occurring wholly or mainly within its borders, or by some other boundary that is less than coterminous with federal law.  For example, in *Global Reinsurance*, the New York Court of Appeals addressed the "extraterritorial reach of our state antitrust law," the Donnelly Act, to an alleged antitrust conspiracy.  *Id*. at 735.  While the Donnelly Act is based on Section 1 of the Sherman Act, the court made clear that simply assuming that its extraterritorial reach was the same as federal law was "an assumption that we do not ultimately embrace."  *Id*.  "Even if the Sherman Act could reach the purported conspiracy, it would not follow that the Donnelly Act should be viewed as coextensive.  For a Donnelly Act claim to reach a purely extraterritorial conspiracy, there would, we think, have to be a very close nexus between the conspiracy and injury to competition in this state."  *Id*.

13

Although *Global Reinsurance* involves different facts than the ones IPPs allege, it asks a pertinent question -- to what extent, if any, does the challenged conduct come within the territorial scope of the state laws IPPs sue under? The current round of briefs does not address this issue, possibly in part because the state laws cited by the IPPs changed when they filed a fourth amended complaint after the papers were filed.

Consequently, the Court defers resolution of this issue until the parties file supplemental briefs addressing it on a state-by-state basis. IPPs and defendants are directed to meet and confer on a proposed schedule for this briefing and to include the proposal in the global stipulation for a revised case management schedule that the parties will be submitting to the Court per its prior order. Dkt. No. 1253.

## CONCLUSION

This order ends Phase I of the FTAIA proceedings. For next steps, the parties will jointly propose a schedule that includes: (1) defendants' Phase II summary judgment motions consistent with the legal holdings in this order; and (2) the supplemental state law briefs called for in the IPP section. The parties should be prepared to discuss scheduling at least at a high level at the status conference on **October 6, 2016.**

**IT IS SO ORDERED.**

Dated: September 30, 2016

JAMES DONATO
United States District Judge