UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re: CAPACITORS ANTITRUST LITIGATION | Master File No. 3:14-cv-03264-JD |
| | **[PROPOSED] ORDER GRANTING DIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF PROPOSED SETTLEMENTS WITH DEFENDANTS FUJITSU LIMITED, NEC TOKIN, NITSUKO, THE OKAYA DEFENDANTS, AND ROHM** |
| THIS DOCUMENT RELATES TO: ALL DIRECT PURCHASER ACTIONS | |

This matter is before the Court on Direct Purchaser Plaintiffs' Motion for Final Approval of Settlements ("Motion") with Fujitsu Limited, NEC TOKIN Corporation, NEC TOKIN America, Inc., Nitsuko Electronics Corporation, Okaya Electric Industries Co., Ltd. and Okaya Electric America, Inc., ROHM Co., Ltd., and ROHM Semiconductor U.S.A., LLC (the "Settling Defendants") (Dkt. 1461).

The Settlements total $32,600,000 in cash and secure agreements by each of the five Settling Defendants to cooperate in the DPPs' continued prosecution of their claims against the non-settling Defendants—are the first in this litigation since its inception over two and a half years ago. The Court has already preliminarily approved the Settlements. *See* Dkt. 1455.

Upon consideration of Direct Purchaser Plaintiff Counsel's Motion, Lead Class Counsel's supporting declaration concurrently filed therewith, the declaration of Kendall S. Zylstra of claims administrator Rust Consulting ("Rust") concurrently filed therewith, all other papers in the Court's files, and the argument at the March 2, 2017 hearing, the Court finds the following and (1) grants final approval to the Settlements; (2) finds DPPs' dissemination of notice to be in accordance with the Court-approved notice program and with Rule 23 and due process requirements; (3) finally certifies the Settlement Class; and (4) grants final approval of DPPs' *pro rata* allocation plan.

## I.    TERMS OF THE SETTLEMENTS

Taken together, the Settlements each resolve all of the Direct Purchaser Class' claims in the Action against the respective Settling Defendants. Details of the Settlements are contained in the agreements themselves, which are attached as Exhibits A, B, C, D, and E to Lead Class Counsel's Declaration (Dkt. 1461-1). The terms of the Settlements most pertinent to the Court's final approval consideration are set forth below. The settlements constitute an outstanding result for the benefit of the Class. *See id*. at ¶¶ 6-8.

As set forth below, the settlement payments for each of the Settling Defendants represent between approximately 27% to over 1,100% of their respective net U.S. sales during the relevant time period. *See id*. at ¶¶ 9-24 .Together, the total payments under the Settlements represent a repayment to Class members of approximately 48% of the total net U.S. sales of the Settling Defendants during the relevant time period. *See id*.

**A.** **Settlement Amounts and Additional Consideration Unique to Each Settling Defendants**

**1.** **Fujitsu Settlement**

Fujitsu has agreed to pay $2,000,000 to resolve the claims of the Direct Purchaser Plaintiff class into the Settlement Fund within twenty business days after the Court's order granting the Preliminary Approval Motion. *See* Dkt. 1461-1, Ex. A at ¶ 12.

As additional consideration, Fujitsu has agreed to cooperate with Plaintiffs in the further prosecution of their claims against the Non-Settling Defendants. Fujitsu has agreed, if required, to make available employees and/or representatives to establish, if possible, the foundational requirements for admitting relevant business records at trial, and to provide up to a total of two current employees as witnesses to provide information regarding sales, pricing, production, capacity and cost of its capacitor products, to the extent any current Fujitsu employee has direct personal knowledge regarding such topics. *See id.*, at ¶ 13. Based on Fujitsu's document production and representations to DPPs' counsel, the total volume of direct capacitors sales by Fujitsu Limited's subsidiaries (through which Fujitsu Limited sold capacitors) did not exceed $200,000 during the relevant time period. *See id*. Fujitsu Limited's settlement payment represents 1,000% (10 times) its sales during the relevant time period. *See id*.

**2.** **NEC TOKIN Settlement**

NEC TOKIN has agreed to pay a total settlement amount of $24,000,000. NEC TOKIN agreed that it would pay $4,000,000 into the Settlement Fund on or before July 29, 2016, $200,000 of which shall be available immediately thereafter for reimbursement of such costs, fees, and expenses related to the provision of notice to the Settlement Class Members. *See* Dkt. 1461-1, Ex. B at ¶¶ 19-20. NEC TOKIN has already made both of these payments. *See id.*, at ¶ 11. NEC TOKIN has agreed to make additional payments into the Settlement Fund as follows: (a) $5 million on or before May 15, 2017; (b) $5 million on or before May 15, 2018; (c) $5 million on or before May 15, 2019; (d) $5 million on or before December 31, 2019. *See id.*, Ex. B at ¶ 19.

As further consideration, NEC TOKIN has agreed to cooperate with Plaintiffs in the continuing prosecution of their claims against the Non-Settling Defendants. NEC TOKIN will make up to six

current employees available for interview by Plaintiffs for deposition and for testimony at hearings or trials. *See id.*, at ¶ 22. NEC TOKIN will also encourage up to six former employees to make themselves available for interview by Plaintiffs for deposition and for testimony at hearings or trials. *See id.* Finally, NEC TOKIN will provide declarations consistent with the declarants' belief as to the relevant facts as requested by DPPs regarding additional topics (*e.g.*, liability, impact, damages, class certification, admissibility/foundation). *See id.*

In connection with its criminal guilty plea, NEC TOKIN has represented that its sales of tantalum electrolytic capacitors in the United States from April 2002 to December 2013 were $51.1 million. *See* Dkt. 1298-6 at 4. NEC TOKIN's settlement payment represents approximately 47% of its sales during the relevant time period. See Dkt. 1461-1 at ¶ 15.

### 3. Nitsuko Settlement

Nitsuko has agreed to pay a total amount of $1,100,000. Nitsuko agreed to pay $100,000 into the Settlement Fund within thirty calendar days after the Court's order granting the Preliminary Approval Motion, which amount shall be available immediately thereafter for reimbursement of such costs, fees, and expenses related to the provision of notice to the Settlement Class Members. *See* Dkt. 1461-1, Ex. C at ¶ 19. Nitsuko has agreed to additional payments into the Settlement Fund as follows: within 30 calendar days after the settlement's Effective Date, Nitsuko shall pay $450,000; within three hundred 365 calendar days after the Effective Date, Nitsuko shall pay $350,000; within 427 calendar days after the Effective Date, Nitsuko shall pay $200,000. *See id.*, at ¶¶ 19-20. Nitsuko has not yet made any of these payments. *See id.*, at ¶ 18.

Nitsuko also has agreed to cooperate with Plaintiffs in the further prosecution of their claims against the Non-Settling Defendants. Nitsuko has agreed to produce to Plaintiffs documents concerning (a) JFC meetings attended by Nitsuko, including meeting minutes and notes from attendees, and emails concerning JFC meetings; (b) documents that it has provided to U.S. and foreign law enforcement authorities; and (c) English language translations of foreign language documents that it provided to the U.S. Department of Justice within fifteen business days after the Preliminary Approval by the Court of this Agreement. *See id.*, Ex. C at ¶ 21. Additionally, Nitsuko agreed to make available two certain agreed-upon Nitsuko employees for depositions, and to provide assistance reasonably necessary to

establish the foundation for and admissibility of documents Nitsuko has produced in this Action or pursuant to this Settlement Agreement. *See id.*

Nitsuko sold less than $100,000 of capacitors to U.S. purchasers during the relevant time period. Dkt. 1461-1 at ¶ 18. Nitsuko's settlement payment represents approximately 1,100% of its sales during the relevant time period. *See id.*

### 4.    The Okaya Defendants' Settlement

The Okaya Defendants have agreed to pay a total of $3,650,000. The Okaya Defendants have agreed to pay $100,000 into the Settlement Fund within thirty calendar days after the Court's order granting the Preliminary Approval Motion, which amount shall be available immediately thereafter for reimbursement of such costs, fees, and expenses related to the provision of notice to the Settlement Class Members. *See* Dkt. 1461-1, Ex. D at ¶ 19. The Okaya Defendants have agreed to pay $3,550,000 into the Settlement Fund in one lump sum payment within thirty calendar days after the Effective Date as defined in the Settlement Agreement. *See id.* The Okaya Defendants have made this lump sum payment. *See id.*, at ¶ 19.

As additional consideration, the Okaya Defendants have agreed to cooperate with DPPs in the further prosecution of their claims against the Non-Settling Defendants. The Okaya Defendants have provided DPPs (a) certain documents concerning various cartel meetings, including, without limitation, "JFC" and "JEITA" meetings; (b) documents that it has provided to U.S. and foreign law enforcement authorities; and (c) English language translations of foreign language documents that it provided to the U.S. Department of Justice. *See id.*, Ex. D at ¶¶ 23-24. In addition, the Okaya Defendants have agreed to provide an oral proffer of testimony, and have agreed to provide a declaration or affidavit in lieu of testifying at a Rule 30(b)(6) deposition for purposes of DPPs' motion for class certification. *See id.*, at ¶ 25. The Okaya Defendants have also agreed to make two employees available for deposition, and to produce to testify at trial one witness in their employ regarding the Okaya Defendants' participation in JFC and JEITA meetings, and to provide authentication and foundation for documents to be used in connection with the prosecution of the case against the Non-Settling Defendants. *See id.*, at ¶¶ 26-27.

The total amount of capacitors that Okaya sold to U.S. purchasers from 2002 to 2014 totaled close to $11,000,000. Dkt. 1461-1 at ¶ 21. Okaya's settlement payment represents approximately 33% of its U.S. sales during the relevant time period. *See id.*

### 5. ROHM Settlement

ROHM agreed to pay $1,850,000 within thirty days following the execution of its settlement agreement. *See* Dkt. 1461-1, Ex. E at ¶ 12. ROHM has already made this payment. *See id.,* at ¶ 22.

1. ROHM also agreed to cooperate with Plaintiffs in the further prosecution of their claims against the non-settling Defendants. ROHM has agreed to provide an initial attorney proffer lasting two business days, during which counsel will describe the facts developed through its worldwide investigation of its conduct. *See id.,* Ex. E at ¶ 22. ROHM agreed to make up to two current employees available for interview, deposition, and testimony at hearings or trials. ROHM agreed to make available employees and/or representatives to establish the foundational requirements for admitting relevant ROHM business records at trial, and to provide up to two current employees as witnesses at trial. *See id.* ROHM has also agreed to provide declarations, if requested, consistent with the declarants' belief concerning additional topics such as liability, impact, damages, class certification, and the admissibility of evidence. *See id.*

2. DPPs estimate the total amount of capacitors that ROHM sold to U.S. customers during the relevant time period was approximately $7 million. Dkt. 1461-1 at ¶ 24. ROHM's settlement payment represents approximately 26.4% of its sales during the relevant time period. *See id.*

### B. Terms Common to All Five Settlements

#### 1. Release of All Claims

In exchange for the Settling Defendants' monetary and cooperation consideration, upon entry of a final judgment approving the proposed Settlements, DPPs will release the Settling Defendants of all claims related to any of the alleged conduct giving rise to this litigation. *See* Dkt. 1461-1 Exs. A at ¶¶ 9-10; B at ¶ 12; C at ¶ 12; D at ¶ 12; E at ¶ 12.

The Settlements, however, do not resolve or compromise any claims against the Non-Settling Defendants. *See* Dkt. 1461-1 at ¶ 25. Further, the Settling Defendants sales are not removed for purposes of asserting joint and several or derivative liability against any Non-Settling Defendant. *See id.*

### 2. Option to Rescind Settlement Agreements

The Settling Defendants each have the option to rescind their settlement agreements for certain specified reasons, *e.g.*, if the level of opt-outs exceeds certain dollar amounts of direct purchases set forth in the confidential supplemental agreements, which can be made available to the Court for *in camera* inspection. *See* Dkt. 1461-1 Exs. A at ¶ 26; B at ¶¶ 38-40; C at ¶ 36; D at ¶¶ 42-43; E at ¶¶ 39-40. The dollar amount triggering rescission rights is different for each Settling Defendant. *See* Dkt. 1461-1 at ¶ 26.

### 3. Attorneys' Fees and Expenses

The Settlement Agreements provide that Interim Class Counsel may seek attorneys' fees and reimbursement of costs and expenses incurred in the prosecution of this litigation. *See* Dkt. 1461-1 Exs. A at ¶¶ 20-22; B at ¶¶ 31-35; C at ¶¶ 29-33; D at ¶¶ 35-39; E at ¶ 31.

## II. THE COURT FINALLY APPROVES DPPS' SETTLEMENTS, FINDING EACH TO BE FAIR, REASONABLE, AND ADEQUATE

A class action may be dismissed, compromised, or settled only with the approval of the Court. The Rule 23(e) settlement approval procedure includes: (1) certification of a settlement class and preliminary approval of the proposed settlement; (2) dissemination of notice of the settlement to all affected class members; and (3) a fairness hearing at which class members may be heard regarding the settlement, and at which counsel may introduce evidence and present argument concerning the fairness, adequacy, and reasonableness of the settlement. *See* 4 William B. Rubenstein, Albert Conte & Herbert Newberg, *Newberg on Class Actions* §§ 13:39 *et seq.* (5th ed. 2014). This procedure safeguards class members' due process rights and enables the Court to fulfill its role as the guardian of class interests. *Id.*

The law favors the compromise and settlement of class action suits. *See*, *e.g.*, *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 635 (9th Cir. 1982); *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 576 (9th Cir. 2004) ("*Churchill*"); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). "[T]he decision to approve or reject a settlement is committed to the sound discretion of the trial judge because he is 'exposed to the litigants and their strategies, positions and proof.'" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1988) (quoting *Officers for Justice*, 688 F.2d at 626). In exercising such discretion, courts should give

> proper deference to the private consensual decision of the parties. . . .
> [T]he court's intrusion upon what is otherwise a private consensual
> agreement negotiated between the parties to a lawsuit must be limited to
> the extent necessary to reach a reasoned judgment that the agreement is
> not the product of fraud or overreaching by, or collusion between, the
> negotiating parties, and that the settlement, taken as a whole, is fair,
> reasonable and adequate to all concerned.

*Id.* at 1027 (citation and quotations omitted).

When parties reach settlement before a class is certified, courts "must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). Pre-class certification settlements "must with-stand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (citing *Hanlon*, 150 F.3d at 1026). In evaluating a proposed class action settlement, the Ninth Circuit requires the Court to balance the following factors:

> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity,
> and likely duration of further litigation; (3) the risk of maintaining class
> action status throughout the trial; (4) the amount offered in settlement;
> (5) the extent of discovery completed and the stage of the proceedings;
> (6) the experience and views of counsel; (7) the presence of a
> governmental participant; and (8) the reaction of the class members to
> the proposed settlement.

*Churchill*, 361 F.3d at 575 (citing *Hanlon*, 150 F.3d at 1026); *accord Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993); *Officers for Justice*, 688 F.2d at 625.

The Court finds that the balance of these factors weighs in favor of final approval.

### A.   The Significant Monetary and Other Benefits to the Settlement Class Favor Approval

The Settlements provide important relief for Settlement Class members. The relief afforded is fair, adequate and reasonable, particularly given the potential risks of litigation.

Damages in a price-fixing antitrust conspiracy case generally are based on the amount of the overcharge resulting from anticompetitive activity, usually measured as a percentage of total sales. The $32.6 million in total settlement in this case represents approximately 48% of the total net U.S. sales of all Settling Defendants during the relevant time period. *See* Dkt. 1461-1 ¶¶ 9-24. None of the Settling Defendants is paying less than 26% of its aggregate net U.S. sales during the relevant time period. NEC

8

TOKIN is paying approximately 47% of its net U.S. sales during the relevant time period. *See* Dkt. 1461-1 ¶ 15.  Two of the Settling Defendants are paying between 10 to 11 times their respective aggregate net U.S. sales during the relevant time period. *See* Dkt. 1461-1 at ¶¶ 10-24.

The percentage recovered from Settling Defendants far exceeds the percentage recovered in many other antitrust class action settlements. *See, e.g.*, *In Re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M-02-1486 PJH, slip. op. (N.D. Cal. Nov. 1, 2006) (approving settlements of 10.53% to 13.96% of sales); *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 U.S. Dist. LEXIS 29163, at *5 (E.D. Pa. May 10, 2004) (recovery represented approximately 2% of sales); *In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619, 627 (E.D. Pa. 2004) (recovery represented 1.62% of sales); *In re Plastic Tableware Antitrust Litig.*, No. Civ. A. 94-3564, 1995 U.S. Dist. LEXIS 17014, at *4 (E.D. Pa. Nov. 13, 1995) (recovery represented 3.5% of sales).

The amount of the total settlement payments is particularly large considering the relatively minor commerce of the Settling Defendants compared with the non-settling Defendants. The Settling Defendants' net sales to U.S. purchasers constitute approximately 1% of the total commerce at issue in this litigation—even though the Settling Defendants' corporate families represent approximately 25% of the corporate Defendant families sued by DPPs in the Complaint. *See* Dkt. 1461-1 ¶¶ 9-24. The Settlements do not reduce the damages the Class can recover as each of the Non-Settling Defendants remains jointly and severally liable for all the damages caused by the cartel. *See* Dkt. 1461-1 at Exs. A at ¶ 25; B at ¶ 18; C at ¶ 18; D at ¶ 18; E at ¶ 18. The Settlements do not limit  DPPs' continued prosecution of their claims against the non-settling Defendants. Indeed, the Settlements materially advance it. *See* Dkt. 1461-1 at ¶ 8.

Finally, each of the Settling Defendants has agreed to provide valuable assistance to DPPs in their continuing case against the remaining non-settling Defendants. *See* Dkt. 1461-1 at ¶¶ 10-24.

### B.   Although DPPs' Claims are Strong, The Court Should Approve the Settlements Because They Eliminate Certain Litigation Risks to the Settlement Class

The "strength of the plaintiffs' case," the "risk, expense, complexity, and likely duration of further litigation," and "the risk of maintaining class action status throughout the trial" favor approval of the Settlements. *See Churchill*, 361 F.3d at 575.

An antitrust class action is "arguably the most complex action to prosecute. . . . The legal and factual issues involved are always numerous and uncertain in outcome.'" *In re Optical Disk Drive Prods. Antitrust Litig.*, No. 3:10-md-2143 RS, 2016 U.S. Dist. LEXIS 175515, at *45 (N.D. Cal. Dec. 19, 2016) (citation and internal quotations omitted). Indeed, the "history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal." *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 476 (S.D.N.Y. 1998).

These are important considerations because Defendants continue to stand on their defenses despite three rounds of motions to dismiss and two rounds of summary judgment motions. Defendants are represented in this action by some of the most experienced antitrust attorneys in the United States and they have vigorously defended their clients at every stage of this litigation. The Settlements are in the best interests of the Settlement Class because they eliminate the risks of continued litigation while at the same time providing substantial cash recovery and other benefits to the Class. The Settlements also provide the Class substantial strategic advantages. The Settling Defendants have agreed to cooperate with DPPs in the continuing suit against the non-Settling Defendants for a much larger potential recovery. *See* Dkt. 1461-1 at ¶¶ 10-24. Moreover, the greater the number of Defendants, the more complicated the case becomes, presenting challenges at trial. Partial settlements such as this one streamline the case and allow plaintiffs to focus their efforts on the remaining culpable defendants.

### C. The Settlements Resulted from Informed, Arm's-Length Negotiations Between the Parties and DPPs' Experienced Counsel

In determining whether to approve a class action settlement, "'the district court must reach a reasoned judgment that the proposed agreement is not the product of fraud or overreaching by, or collusion among, the negotiating parties'. . . ." *City of Seattle*, 955 F.2d at 1290 (*quoting Ficalora v. Lockheed Cal. Co.*, 751 F.2d 995, 997 (9th Cir. 1985)). Where a proposed class settlement "has been reached after meaningful discovery, after arm's length negotiation, conducted by capable counsel, it is presumptively fair." *M. Berenson Co., Inc. v. Faneuil Hall Marketplace, Inc.*, 671 F. Supp. 819, 822 (D. Mass. 1987).

The judgment of experienced counsel regarding a settlement reached by arm's-length negotiations should be given significant weight and a presumption of reasonableness. *See Linney v. Cellular Alaska P'ship*, Nos. 96-3008-DLJ, 97-0203-DLJ, 97-0425-DLJ, & 97-0457-DLJ, 1997 U.S. Dist. LEXIS 24300, at *16 (N.D. Cal. July 18, 1997), *aff'd* 151 F.3d 1234 (9th Cir. 1998); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2007). Here, to the extent the Settlements might be viewed as "early" because the class certification issues have not yet been litigated, these are "early resolution[s] [that] demonstrate that the parties and their counsel are well prepared and well aware of the strength and weaknesses of their positions and of the interests to be served by an amicable end to the case." *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 967 (N.D. Ill. 2011) (citations omitted).

Lead Class Counsel have extensive experience handling antitrust class actions and other complex litigation from inception through trials and appeals. *See* Dkt. 1461-1 at ¶ 2. Lead Class Counsel have represented DPPs since the commencement of this litigation, conducted an in-depth investigation into the factual and legal issues raised in this action both before and after filing the case, and litigated the case assiduously for over two and a half years. *See id.* at ¶ 3. Counsel for the Settlement Class have also conducted arm's-length negotiations on a well-informed basis against experienced defense counsel. *See id.* at ¶¶ 4-5.

Counsel for the Settlement Class and for the Settling Defendants endorse the Settlements as fair, adequate and reasonable. *See* Dkt. 1461-1 ¶ 6. The "experience and views of counsel" thus favors approval of the Settlements. *Churchill*, 361 F.3d at 575. This buttresses the presumptive fairness of the Settlements. *See, e.g., Hashw v. Dep't Stores Nat'l Bank,* 182 F. Supp. 3d 935, 943 (D. Minn. 2016) (presumption of fairness was "especially true because the settlement was reached through mediation with a third-party neutral"); *Schiller v. David's Bridal, Inc.*, No. 1:10-cv-00616-AWI-SKO, 2012 U.S. Dist. LEXIS 2117001, at *28 (E.D. Cal. June 11, 2012) (same).

### D.     The Case's Procedural Posture, Along With the Significant Discovery Conducted to Date, Has Informed Settlement Negotiations and Supports Final Approval

The "extent of discovery completed and the stage of the proceedings" in this case favors final approval. *Churchill*, 361 F.3d at 575.

The extent of the discovery conducted to date and the procedural posture of the case demonstrate the factual basis for the Settlements and the knowledge of counsel for the Settlement Class with respect to the facts and legal issues in the case. *See* Dkt. 1458-1 at ¶¶ 18-55. The settlement negotiations and the ultimate decision to settle was informed by a detailed and sufficient analysis. *See, e.g., In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000). "A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair." *Knight v. Red Door Salons, Inc.*, No. 08-01520 SC, 2009 U.S. Dist. LEXIS 11149, at *10 (N.D. Cal. Feb. 2, 2009) (citation omitted). This case was commenced by the Lead Class Counsel on July 18, 2014. Since then, counsel for the Settlement Class have received from Defendants approximately 7 terabytes of ESI and more than 500 gigabytes of transactional data during discovery, the great majority of which are in Japanese. *See* Dkt. 1458-1 at ¶¶ 45-46, 51. The docket contains over 1,450 filed documents. Counsel have protected DPPs' claims against two rounds of motions to dismiss and two rounds of summary judgment motions filed by dozens of experienced and well-respected attorneys on behalf of the corporate Defendant families. *See id.* at ¶¶ 21-37. Based on this work, Counsel have developed substantial information and conducted substantial analysis regarding the strengths and weaknesses of the case. *See id.* at ¶ 50. Counsel therefore possess the expertise and information to make an informed judgment as to the fairness and appropriateness of the Settlements for the Settlement Class.

**E.**     **Class Members' Positive Reaction to the Settlements Favors Final Approval**

A court may appropriately infer that a class settlement is fair, adequate, and reasonable when few Class members object to it. *See Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir. 1977); *Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004). Indeed, a court can approve a class action settlement over the objections of a significant percentage of Class members. *See City of Seattle*, 955 F.2d at 1291-96.

Starting December 14, 2016, DPPs' Court-approved notice program reached out directly to 2,279 prospective Class members. *See* Dkt. 1461-1 at ¶ 29; Dkt. 1462 at ¶ 4. DPPs have received no objections and no opt-out notices. *See* Dkt. 1461-1 at ¶ 34.

### III. THE COURT-APPROVED NOTICE PROGRAM SATISFIES RULE 23 AND DUE PROCESS AND HAS BEEN FULLY IMPLEMENTED

Federal Rule of Civil Procedure 23(e)(1) provides that a court must direct notice in a "reasonable manner" to all class members to be bound by a proposed settlement. When a proposed Rule 23(b)(3) class settlement is presented for court approval, the Federal Rules require class members to receive:

> the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B); *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) (same) (citing *Mullane v. Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950)). "[T]he class must be notified of a proposed settlement in a manner that does not systematically leave any group without notice." *Officers for Justice*, 688 F.2d at 624 (citations omitted). These requirements ensure that class notice procedures comply with the demands of due process. *Rannis v. Recchia*, 380 F. App'x 646, 650 (9th Cir. 2010) (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974)). The notice provided to Class members in this case comports with due process and satisfies all applicable requirements.

### IV. THE COURT FINALLY CERTIFIES THE SETTLEMENT CLASS

It is well-established that a class may be certified for purposes of settlement. *See, e.g., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). This is necessary to effectuate the Settlements. A class action is maintainable only if it meets the four Rule 23(a) prerequisites:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

13

Fed. R. Civ. P. 23(a). In a settlement-only certification context, the "specifications of the Rule . . . designed to protect absentees by blocking unwarranted or overbroad class definitions . . . demand undiluted, even heightened, attention[.]" *Amchem*, 521 U.S. at 620.

In addition to the Rule 23(a) prerequisites, "parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Id.* at 614. Rule 23(b)(3), relevant here, requires that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

All requirements under Fed. R. Civ. P. 23 have been satisfied.

First, the Settlement Class should be finally certified. The definition of the Settlement Class that DPPs proposed in their preliminary approval motion was provisionally certified by the Court in its Preliminary Approval Order. *See* Dkts. 1298 at 8; 1455 at ¶¶ 3. No potential Class member has objected to the Settlement Class Definition. *See* Dkt. 1461-1 at ¶ 34.

Second, the proposed Settlement Class satisfies each of Rule 23(a)'s four prerequisites. DPPs' motion for preliminary approval set forth in detail how Rule 23(a)'s numerosity, commonality, typicality and adequacy prerequisites are met here. *See* Dkt. 1298 at 19-20. The Court's Preliminary Approval Order provisionally found that the Settlement Class fulfills each of these requirements. *See* Dkt. 1455 at 4. No potential Settlement Class member has objected to the Court's provisional findings, and there have been no intervening events that would affect those findings. *See* Dkt. 1461-1 at ¶ 34.

Third, DPPs' claims satisfy Rule 23(b)(3)'s predominance and superiority requirements . DPPs' motion for preliminary approval set forth in detail how common issues predominate over individualized issues in the Settlement Class' prosecution of claims alleging a years-long capacitors price-fixing conspiracy among the Defendants. *See* Dkt. 1298 at 20-21. DPPs also explained why prosecuting DPPs' claims as a class action is superior to any individualized adjudication of these claims. *See id.* The Court's Preliminary Approval Order provisionally found that DPPs satisfied Rules 23(b)'s predominance and superiority requirements. *See* Dkt. 1455 at 4. As with Rule 23(a)'s prerequisites, no potential Settlement Class member has objected to the Court's provisional findings, and there have been no material intervening events. The Court therefore finally certifies the Settlement Class.

## V.   THE COURT FINALLY APPROVES DPPS' ALLOCATION PLAN

A plan of allocation of class settlement funds is subject to the fair, reasonable and adequate standard that applies to approval of class settlements. *In re Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 1152, 1154 (N.D. Cal. 2001). A plan of allocation that compensates class members based on the type and extent of their injuries is generally considered reasonable. *Id; see also In re Computron Software, Inc. Sec. Litig.*, 6 F. Supp. 2d 313, 321 (D.N.J. 1998).

DPPs' preliminary approval motion sets forth a plan for pro rata distribution of the Settlement Fund to the Settlement Class, after payment of the attorney's fees and expenses. The plan is impartial; no Class member is favored over others.  *See* Dkt. 1298 at 22-23. Pro rata distribution has frequently been determined by Courts to be fair, adequate, and reasonable. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2015 U.S. Dist. LEXIS 170525, at *198-200 (N.D. Cal. Dec. 17, 2015) (approving pro rata plan of allocation based upon proportional value of price-fixed component in finished product); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M-02-1486 PJH, Dkt. No. 2093, at *2 (Oct. 27, 2010) (Order Approving Pro Rata Distribution); *In re Vitamins Antitrust Litig.*, No. 99-197 TFH, 2000 U.S. Dist. LEXIS 8931, at *32 (D.D.C. Mar. 31, 2000) ("Settlement distributions, such as this one, that apportions funds according to the relative amount of damages suffered by class members have repeatedly been deemed fair and reasonable.") (citations omitted); *In re Lloyds' Am. Trust Fund Litig.*, No. 96 Civ.1262 RWS, 2002 U.S. Dist. LEXIS 22663, at *54 (S.D.N.Y. Nov. 26, 2002) ("Pro rata allocations provided in the Stipulation are not only reasonable and rational, but appear to be the fairest method of allocating the settlement benefits."); *In re PaineWebber Ltd. P'ships Litig.,* 171 F.R.D. 104, 135 (S.D.N.Y. 1997), aff'd 117 F.3d 721 (2d Cir. 1997) ("[A] pro rata distribution of the Settlement on the basis of Recognized Loss will provide a straightforward and equitable nexus for allocation and will avoid a costly, speculative and bootless comparison of the merits of the Class Members' claims.").

The Court's Preliminary Approval Order provisionally found DPPs' pro rata allocation plan to be "sufficiently fair, reasonable, and adequate" and approved it. *See* Dkt. 1455 at ¶ 6. No Class member has objected to DPPs' proposed allocation plan. *See* Dkt. 1461-1 at ¶ 34. Accordingly, the Court finally approves the allocation plan.

IT IS SO ORDERED.

Dated:

_____
HON. JAMES DONATO
United States District Judge