Pages 1 - 31

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE:  CAPACITORS ANTITRUST    )
LITIGATION,                     )
                                )   No. CV 14-03264-JD
_____ )


                           San Francisco, California
                           Thursday, March 2, 2017

                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Direct Purchaser Plaintiffs:
                         JOSEPH SAVERI LAW FIRM
                         505 Montgomery Street - Suite 625
                         San Francisco, CA  94111
                  **BY:  JOSEPH R. SAVERI, ESQUIRE**

For the Rohm Defendants:
                         O'MELVENY & MYERS LLP
                         Two Embarcadero Center - 28th Floor
                         San Francisco, CA  94111
                  **BY:  MICHAEL F. TUBACH, ESQUIRE**


            (Appearances continued on the next page)



Reported By:        Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                    Official Reporter

APPEARANCES CONTINUED:


For the NEC Tokin Defendants:
                        GIBSON, DUNN & CRUTCHER LLP
                        555 Mission Street - Suite 3000
                        San Francisco, CA  94105
                   BY:  **GEORGE A. NICOUD, III, ESQUIRE**


For the Okaya Defendants:
                        BAKER & MCKENZIE LLP
                        452 Fifth Avenue
                        New York, NY  10018
                   BY:  **DARRELL PRESCOTT, ESQUIRE**


For Defendant Fujitsu Limited:
                        MORRISON & FOERSTER LLP
                        2000 Pennsylvania Avenue, NW
                        Suite 600
                        Washington, DC  20006
                   BY:  **JEFFREY A. JAECKEL, ESQUIRE**


For Defendant Nitsuko Electronics Corporation:
                        LATHAM & WATKINS LLP
                        505 Montgomery Street - Suite 2000
                        San Francisco, CA  94111
                   BY:  **BELINDA S. LEE, ESQUIRE**

<u>**Thursday - March 2, 2017**</u>                                    <u>**10:11 a.m.**</u>

**P R O C E E D I N G S**

**---oOo---**

**THE CLERK:**  Calling CV 14-3264, In Re Capacitors

Antitrust Litigation.

Counsel.

**MR. SAVERI:**  Good morning, Your Honor.  Joseph Saveri

on behalf of the Direct Purchaser Plaintiffs.

**MR. TUBACH:**  Good morning, Your Honor.  Michael Tubach

on behalf of the Rohm defendants.

**MR. NICOUD:**  Good morning, Your Honor.  Trey Nicoud on

behalf of the NEC Tokin defendants.

**MR. PRESCOTT:**  Good morning.  Darrell Prescott for the

Okaya defendants.

**MR. JAECKEL:**  Good morning.  Jeff Jaeckel on behalf of

Fujitsu Limited.

**THE COURT:**  For who?

**MR. JAECKEL:**  Fujitsu.

**MS. LEE:**  Good morning, Your Honor.  Belinda Lee on

behalf of Nitsuko Electronics.

**THE COURT:**  Okay.  Anybody else?  Good?  Okay.  All

right.

Let's do the fee motion -- I mean, the final approval and

the fee motion.

Mr. Saveri, we have gone from 94 undeliverables to 316.

```
 1    What happened?

 2              MR. SAVERI:  I'm sorry?

 3              THE COURT:  We've gone from 94 undeliverables to 316.

 4    What happened?

 5              MR. SAVERI:  The -- we received more -- we received

 6    more undeliverables back than we did -- than we were aware of

 7    when we filed our original papers.  And that --

 8              THE COURT:  That's a lot more.  I mean, that's

 9    hundreds more.  What happened -- what's going on with the

10    deliverables?

11              MR. SAVERI:  Well, so I -- our address list comes from

12    the transactional data that the defendants provided to us.  The

13    names and the addresses that are in those -- in that -- in

14    those databases go back into the early 2000s.  A lot of that

15    information, it turns out -- and that's the best we have.  We

16    used those addresses and we used the U.S. Postal Service to

17    send those out.

18        Sometimes it takes a long time for that -- for the

19    undeliverable mail to come back to us.

20        When we got the undeliverables, we did the things we

21    ordinarily do in these cases, which is to do skip tracing.  We

22    did internet searches.  We did the best we could --

23              THE COURT:  These are all companies.  These aren't

24    people.  These are companies; right?

25              MR. SAVERI:  They are.  And that's why, if we get an
```

1    undeliverable back, we do things like we look on the internet,

2    we try to take reasonable steps to identify who the companies

3    are, and --

4            THE COURT:  Don't they all have registered agents for

5    acceptance of service?

6            MR. SAVERI:  No.  And some of them, because of the age

7    that we're talking about, are -- they don't exist anymore.

8    They are defunct.  The names have changed.  They've been

9    purchased.

10           THE COURT:  Well, that's fine, but what about -- did

11   you check with Secretaries of State?

12           MR. SAVERI:  That's ordinarily -- those are the things

13   we do, including doing just straight internet research to see

14   if we can find people on the internet, and when we do, we send

15   them -- we mail them notices.

16       So the -- frankly, given the -- I don't have -- I can't

17   tell you right now exactly what the -- how the undeliverables

18   correspond to the age of the record, but my belief is that most

19   of the undeliverables are accounted for by old records that are

20   in the defendants' databases.

21           THE COURT:  Well --

22           MR. SAVERI:  And then, Your Honor --

23           THE COURT:  I mean, only about 600 people filed claim

24   forms.  I mean, that's just not very good.

25           MR. SAVERI:  Well --

1      **THE COURT:**  In fact, it's kind of sad.  That's like --

2   so you had 2,600 or so -- 2,670 potential members.  Only 600

3   people submitted a claim.  I mean --

4      **MR. SAVERI:**  So --

5      **THE COURT:**  I know you say they're the bigger buyers,

6   but still, that's less than half of the total amount of

7   commerce at issue.  I mean, it's just not a very good --

8      **MR. SAVERI:**  That's not quite right, Your Honor.

9      So we think that there are, based on the information --

10  based on the information we have, we think that there are

11  approximately 1800 -- well, almost 1900 class members.

12     **THE COURT:**  You told me there were 2,668 potential

13  class members.

14     **MR. SAVERI:**  Yes.  And when we say that, what we mean

15  is we mailed notices to everybody or all addresses we had.  We

16  sent more notices than there are class members.  We sent

17  notices to the entities that were listed in the defendants'

18  databases, in the sales database.  We also send subsequent

19  mailings to additional defendants --

20     **THE COURT:**  You're making me nervous because you told

21  me -- you said somewhere -- one of you said somewhere there are

22  2,668 potential class members.  Period.  You didn't say, "We're

23  sending out 2,668 notices, but we think there are only 1800

24  class members."  You said, "There are 2,668 class members."

25  Okay.  So now it turns out that's wrong.  There may be 1900.

1          **MR. SAVERI:**  Well --

2          **THE COURT:**  You told me there were 94 missing claims.

3     Now it turns out there are 316.  I mean, this is getting --

4     this is making me uncomfortable.  There is just too much moving

5     around here, and I need to bank on what you tell me because I

6     have -- I have a duty to the class to make sure this is fair,

7     adequate, and reasonable, and I can't discharge that duty when

8     I get facts that are unreliable.

9          **MR. SAVERI:**  So, Your Honor, let me try to clarify a

10    couple of the things that have come up.

11         The number of mailed notices, which was approximately

12    2200, included all the addresses and all the class -- potential

13    class members that we are aware of.  That was compiled from

14    two -- well, three sources.  One was the -- were the entities

15    that were identified specifically from the defendants' sales

16    databases.

17         Two, we received subsequently later in the process

18    additional lists of potential class members from some of the

19    defendants.

20         In addition, three, we have --

21         **THE COURT:**  Let me just jump in.  This isn't in your

22    papers.  Okay.  I can't do this on the fly, Mr. Saveri.  You

23    know, this is not just *the judge is going to rubber stamp it*

24    *because it's a big antitrust case and that's what happens*.  I'm

25    not going to do that.

1        Now, I've got numbers here that don't add up.  I've got

2    conflicts between the numbers.  I have facts that are

3    represented to me that turned out not to be true or wildly off,

4    and I can't walk out of here and say consequently I'm approving

5    it.  That just doesn't add up to me.

6        So I'm going to give you a chance to fix this.  All right?

7    It needs to be rock solid.  We're burning too much of your time

8    and too much of my time on this.  So just go back, make sure

9    every fact is tied up, 100 percent accurate, every sentence --

10   when a sentence says "2,668 potential class members exist,"

11   that's what that means.  Not "well, we sent out -- we think

12   there are only 1800, but we sent out 800 more letters just to

13   be sure."

14       Okay?  Let's do that.  You file that whenever you want,

15   but I can't -- I'm uncomfortable in the face of this much

16   uncertainty for approving this.

17           **MR. SAVERI:**  And, Your Honor, if we haven't been as

18   clear as we should have been --

19           **THE COURT:**  It's not *if*.  I'm telling you this is

20   about as clear as mud, and what makes me nervous here is that I

21   feel like I'm walking on sand.  It's not a firm foundation.

22   Okay?  There are just too many "this and that," and "but let me

23   explain" and "well, here's what happened since.  I know it's

24   not in our papers, but" -- I can't do that.  I need a clear

25   record, and potential class members who might come back and

1    revisit this and say "Why in the world did the judge do this,"

2    they need to understand.  They need to know, well, this is the

3    fact.

4        I don't want to hear from a class member who might poke up

5    in two months and say, "Well, I don't get it. These papers are

6    all wrong, these numbers are all wrong, and the judge just said

7    'Great, here's your money'." I can't do that.  You have got to

8    rework that for me.  All right?

9        So I'm going to deny it without prejudice to being

10   renewed.

11       Now, while you're all here, I want to clean up a number of

12   loose ends.  First is the --

13       **MR. SAVERI:**  Your Honor, we have an interest in

14   obviously addressing this as quickly as possible, so we would

15   like to get that submitted and we would like to be back out

16   here as soon as --

17       **THE COURT:**  That's fine.  Any time you want to do it

18   is fine.  I'm more concerned it's just right.

19       **MR. SAVERI:**  I understand.

20       **THE COURT:**  There is not going to be any hangup on

21   time.  I just want it to be accurate.  Okay?

22       **MR. SAVERI:**  Got it.

23       **THE COURT:**  So whenever you want to do it, that's

24   fine.  You don't have to notice it for 30 days or anything like

25   that.  Just submit it, redo it, and I'll have you in promptly.

1        **MR. SAVERI:**  Okay.

2        **THE COURT:**  Okay?

3        **MR. SAVERI:**  Yes.

4        **THE COURT:**  How much time do you think you're going to

5    need?  A week?

6        **MR. SAVERI:**  Let's -- yeah.  We'll do it in a week.

7        **THE COURT:**  Yes?

8        **MR. TUBACH:**  Your Honor, we would -- we just -- there

9    is one other issue we want to raise when the Court is done

10   setting the schedule.

11       **THE COURT:**  Is this going to affect the schedule?

12       **MR. TUBACH:**  It might.

13       **THE COURT:**  Let's --

14       **MR. TUBACH:**  We're going to ask that the Court hold

15   off entering either final approval orders or final judgments

16   until three weeks from today.  And --

17       **THE COURT:**  Three weeks?

18       **MR. TUBACH:**  Yes.  So that may not affect how this

19   ends up working out.

20       The reason for that is there are basically 12 corporate

21   families that have opted out so far, and one of them has

22   already expressed an interest in rescinding its opt-out and

23   rejoining --

24       **THE COURT:**  Now, two of those are the ones in the

25   Florida case; right?

1          **MR. TUBACH:**  Yes.  Two of those are in the Florida

2     case.

3          **THE COURT:**  And then ten more opted out?

4          **MR. TUBACH:**  And Flextronics is another one.

5          **THE COURT:**  Flextronics.  So three opted out?

6          **MR. TUBACH:**  So there are nine --

7          **THE COURT:**  Are these ten going to file cases?

8     Nine --

9          **MR. TUBACH:**  That's always a possibility when you opt

10    out.  It's not necessarily the case, but having learned more

11    about their potential recovery, at least one class member or

12    one potential class member that indicated it wanted to opt out

13    of the litigation has indicated it wants to opt back in and

14    participate in the settlement.

15         **THE COURT:**  Is that right?

16         **MR. SAVERI:**  Yes.  One of the things that -- and, you

17    know, Your Honor, we have made substantial efforts to

18    communicate with firms that have submitted opt-outs so that

19    they understand exactly what's at stake, and based on some of

20    those communications, we have at least one opt-out who believes

21    that they want to change their mind, that they want to

22    participate in the --

23         **THE COURT:**  Haven't they missed the claim deadline?

24         **MR. SAVERI:**  They missed the opt-out deadline.

25         **THE COURT:**  Are you going to waive that for them?

1          **MR. SAVERI:**  I would recommend we do it.

2          **THE COURT:**  It's up to you.  I mean, if you want to do

3     it --

4          **MR. SAVERI:**  I recommend we do it.  My interest is in

5     having the final judgment have its -- having its broadest

6     possible effect, and if people want to participate in the

7     settlement, which I think is a terrific deal, I have an

8     interest in that.

9          **THE COURT:**  I mean, the class members don't have --

10    I'm just thinking out loud here.  I've never looked at this

11    issue.

12         But the class members who met the deadline would not have

13    an objection that that would dilute their recovery, would they?

14         **MR. TUBACH:**  No, Your Honor.  And Judge Wilken had an

15    opinion on exactly this where she said they're in no worse

16    position than if the company hadn't opted out in the first

17    place.  So when they're deciding -- all the class members are

18    deciding whether or not to opt out, they don't know what

19    anybody is going to do --

20         **THE COURT:**  That makes sense, yes, although I can see

21    someone arguing "Well, wait a minute; now you're cutting my

22    check back," but I get it.

23         **MR. TUBACH:**  Courts routinely do this, Your Honor, in

24    large antitrust class actions like this.

25         **MR. SAVERI:**  And, again, I think Mr. Tubach can speak

1    for himself, but I think we're aligned on this and would like

2    to permit that process to continue, and hopefully the people

3    who would like to rescind their opt-out and do it quickly can

4    exercise that discretion and participate in the settlement.

5         THE COURT:  Well, there is a point where they can't

6    rescind their opt-out.

7         MR. SAVERI:  And that's why we thought the three weeks

8    seemed like a reasonable interval between --

9         THE COURT:  So you want to file after the close of

10   that three weeks so I can get a full sense of who's in, who's

11   out?  How about that?

12        MR. SAVERI:  Yes.  Fine.  That's fine, Your Honor.

13        THE COURT:  Why don't you wait, give yourself a week

14   after that, let the dust settle.  All right?  Let this

15   three-week period pass.  And then just give me a full, complete

16   report on where everything is.  I don't need the whole

17   attorneys' fees -- don't worry about that.  I just want the

18   data related to the approval of the final settlement.  Okay?

19        MR. SAVERI:  Yes.

20        THE COURT:  That would be good.

21        MR. SAVERI:  Yes.

22        THE COURT:  All right?

23        MR. SAVERI:  Yes.

24        THE COURT:  I will have you back in like five weeks.

25        MR. SAVERI:  That's fine.

1        **THE COURT:**  I don't need too much time.  Okay?

2        **MR. TUBACH:**  Thank you.

3        **THE COURT:**  Also can you do me a favor, Mr. Saveri?

4    Don't staple things.  The court copies, don't staple them.

5    You're supposed to clip them, and there's such a huge volume,

6    although it seems like a trivial issue, it's actually burdening

7    the clerk who's involved in this.  Don't staple and use side

8    tabs.  Okay?

9        **MR. SAVERI:**  If we're going to go this granular --

10        **THE COURT:**  It's not granular.  It's in my order.

11   It's not granular.  This is in my order and you're not

12   following it.  So just do it for me.  All right?  It's hurting

13   people's hands physically.  I just need you to do it.

14   Everybody else is doing it.  The Saveri firm can catch up and

15   take the staples out, use clips and side tabs.  All right?

16        **MR. SAVERI:**  Yes.  We will do it.

17        **THE COURT:**  Okay.  Now, let's talk about the depos.

18   I've had enough with the location of the depos.

19        Who wants to handle that on the defense side?  This is

20   under submission.  I'm just going to tell you what my ruling

21   is, but somebody should stand up on the defense side.

22        **MR. TUBACH:**  Your Honor, Michael Tubach again.  I

23   don't think any of the other defendants are here.  This is only

24   for purposes of the settlement, and of course all the settling

25   defendants have an interest in --

1        **THE COURT:**  Well, I'm just announcing my ruling.  I

2   had it under submission.

3        **MR. TUBACH:**  That's fine.

4        **THE CLERK:**  Actually, Your Honor, it looks like

5   somebody wants to come forward.

6        **THE COURT:**  Come on up.

7        **MS. VU:**  Good morning, Your Honor.  Quynh Vu for NCC.

8        **THE COURT:**  I can't hear you.  Come on up.  Wait until

9   you get to the podium.

10        **MS. VU:**  Quynh Vu for NCC.

11        **THE COURT:**  NCC.  All right.

12        **THE CLERK:**  You're going to need to spell your name.

13        **MS. VU:**  Q-U-Y-N-H.  Last name V-U.

14        **THE COURT:**  For NCC?

15        **MS. VU:**  Yes.

16        **THE COURT:**  All right.

17        **MR. PURDY:**  Good morning, Your Honor.  Andrew Purdy on

18   behalf of the Direct Purchaser Plaintiffs.  I have actually

19   been involved in the negotiations with those who have not shown

20   up for depos, so we actually do have an update, but --

21        **THE COURT:**  What's the update?

22        **MR. PURDY:**  Sure.  So we have agreement as to a number

23   of the individuals who were named -- or actually all the

24   individuals who were named in the sanctions motion have agreed

25   to sit for deposition in Hong Kong by May 5th, so we have some

```
 1   wiggle room about dates.  Probably we're going to do the depos
 2   the last two weeks of April.  There are --
 3            THE COURT:  It's all done then?  You've worked
 4   everything out?
 5            MR. PURDY:  Well, there are several individuals that
 6   we mentioned in our renewal of the sanctions motion, folks that
 7   we found out about after we filed the sanctions motion who will
 8   not -- would not come to the United States for depositions.
 9   There's two individuals and so we're still negotiating --
10            THE COURT:  These are people I haven't seen yet?
11            MR. PURDY:  Yes.
12            MR. SAVERI:  And then there are --
13            MR. PURDY:  Then there's Matsuo.
14            THE COURT:  Let me just jump in.  So the letter I have
15   is now resolved.  You've worked all that out; is that right?
16            MR. PURDY:  Save two individuals.  Mr. Shiozaki from
17   Nichicon, who said that he will only appear for deposition in
18   Japan.  And then for NCC I believe there was one individual,
19   Mr. Kakizaki, who we are still trying to get a date for, but it
20   appears that he will sit for a deposition in Hong Kong.  We are
21   just trying to make sure that the dates are all around the same
22   period in late April.
23            THE COURT:  Is that right, Ms. Vu?
24            MS. VU:  I am actually here as local counsel.  I was
25   not intimately involved in these discussions.
```

1    I got word this morning that they -- the parties are very
2  close to getting a stipulation on file.  They wanted to do it
3  yesterday.  There were some talks about plaintiffs going in
4  unilaterally and representing certain things to the Court.
5    So I just want to make sure that -- to represent the NCC.
6  Didn't think this matter would be brought up collaterally, and
7  they're just here to object on the unilateral representation.
8  I have --
9          **THE COURT:**  On the what?  More loudly.
10         **MS. VU:**  Yes.
11         **THE COURT:**  Slow down a little bit.
12         **MS. VU:**  We just wanted to object at plaintiffs who
13 represented they wanted to bring this matter up unilaterally
14 without filing any stipulation or a joint letter to the Court
15 yesterday.  NCC --
16         **THE COURT:**  I got a letter yesterday?
17         **MR. PURDY:**  No, Your Honor.
18         **MS. VU:**  We submitted a draft stipulation for you all
19 to review, and we hadn't gotten word on it yesterday night or
20 this morning.
21         **THE COURT:**  What did they bring up unilaterally?
22         **MS. VU:**  I'm sorry?
23         **THE COURT:**  What did they bring up unilaterally?
24         **MS. VU:**  We wanted to have this matter addressed --
25         **THE COURT:**  No, no.  I brought it up.  They didn't

1   bring it up.  Everyone is surprised.  Okay.  Not just you.

2           **MR. PURDY:**  Your Honor, I should mention one thing.  I

3   do think with NCC -- and if we have at least one more day to

4   follow up --

5           **THE COURT:**  That's fine.  You are working out NCC.

6       And, Ms. Vu, I understand you're not the point person, but

7   you understand that's under way; right?

8           **MS. VU:**  Correct.

9           **MR. PURDY:**  And with Nichicon, we're nearly there,

10  save Mr. Shiosaki, who will not agree at this point to appear

11  in Hong Kong like everyone else.

12      The one defendant that was subject to the sanctions

13  motion, Matsuo, their individual, Mr. Miyanishi, has refused to

14  come to Hong Kong for deposition.  He said he would only appear

15  in Japan.

16      And so we submitted a letter, I believe a week ago, where

17  we asked for the Court to rule on the sanctions motion as to

18  Matsuo.

19          **THE COURT:**  All right.  Here is what I would like to

20  do.

21          **MR. PURDY:**  Sure.

22          **THE COURT:**  It's getting too piecemeal for me to be

23  effective.

24          **MR. PURDY:**  Sure.

25          **THE COURT:**  So we're going to term all those pending

1  letters.  You send me a letter when you're ready in the next

2  couple of days.

3      **MR. PURDY:**  Sure.

4      **THE COURT:**  Maybe you want to finish the NCC thing

5  first.

6      Is it NEC or NCC?

7      **MS. VU:**  NCC.

8      **THE COURT:**  Why don't you finish that and see if there

9  is any lingering issue.  And then send me a letter next week of

10  anything that is outstanding.  All right?  Just whoever is

11  left.  Okay?

12      **MR. PURDY:**  Sure.

13      **THE COURT:**  Now, I am going to give you a preview of

14  how this is going to be handled.

15      The defendants are going to have two choices.  They either

16  show up in the United States, and if they fail to show up, they

17  will face contempt proceedings in front of the Court, or they

18  pay for reasonable travel costs for one DPP lawyer and one IPP

19  lawyer to fly to an agreeable location somewhere in East Asia.

20  Okay?  All expenses paid, so that the plaintiffs bear no

21  out-of-pocket loss.

22      This is compensatory, not coercive.  It's just to even the

23  playing field.  I will accommodate everybody's perspective, but

24  not at the cost of imposing what would effectively be reverse

25  sanctions on the plaintiffs for having to pay to go out there.

1    Okay.

2        So that's the guideline.  With that in mind, you all talk

3    about what's left to do.  There shouldn't be anything, but if

4    for some reason somebody cannot -- a defendant cannot find its

5    way to fit within those two options, you let me know.  Okay?

6            **MR. PURDY:**  Okay.

7            **THE COURT:**  And if it turns out everybody is fine,

8    just send me a one-liner saying, "We worked it all out."

9            **MR. PURDY:**  Okay.

10           **THE COURT:**  In the meantime, I'm going to term all

11   these things and just wait to hear from you.  A week from now?

12   Is that --

13           **MR. PURDY:**  That's fine, Your Honor.

14           **THE COURT:**  It's not a hard-and-fast deadline.

15           **MR. PURDY:**  Sure.  One question, though.  With Matsuo,

16   though, I do believe that the parties are at an impasse on that

17   because --

18           **THE COURT:**  I've now given you how I'm going to

19   resolve it, so why don't you revisit it with them.  That's the

20   menu.  If they don't want to order off the menu, then the next

21   thing to do is for them to give something that I will look at.

22   It's got to be a clear record saying, "We refuse to do either."

23   And then you can file a contempt motion.  Okay?

24           **MR. PURDY:**  Okay.  Thank you, Your Honor.

25           **MR. LIFVENDAHL:**  Your Honor, if I may, Eric Lifvendahl

1   on behalf of Flextronics.

2       We are a party to the same motion that Your Honor is

3   talking about now.  We feel we should be included in -- if the

4   parties decide to go to Hong Kong rather than the witness come

5   here, that our travel expenses also be covered because we have

6   been prejudiced just like the other plaintiffs and IPPs and

7   DPPs in this case.

8           THE COURT:  That seems reasonable.  Any reason not to,

9   Ms. Vu?

10          MS. VU:  Your Honor, I'm not involved intimately in

11  this issue.  I don't know --

12          THE COURT:  Just think out loud.  Is there any reason

13  why Flextronics should be treated differently?  What do you

14  think?

15          MS. VU:  I know that --

16          THE COURT:  You're not going to walk out of here with

17  anything bad.  Just tell me what you think.  Can you think of

18  any reason why Flextronics should be treated differently?  I

19  can't.

20          MS. VU:  Your Honor, not at this moment, but we can

21  certainly have a talk with them.

22          THE COURT:  All right.  Okay.

23          MR. LIFVENDAHL:  Thank you, Your Honor.

24          THE COURT:  Anything else on that?

25          MR. SAVERI:  No.

1      **THE COURT:**  All right.  Thank you.

2         Now, stipulation -- who filed that scheduling stipulation?

3      **MR. SAVERI:**  I'm sorry.  Which stipulation,

4   Your Honor?

5      **THE COURT:**  I think -- oh, it was for the FTAIA for

6   the IPPs.

7      **MR. SAVERI:**  That was not us.

8      **MR. PAPENDICK:**  Good morning, Your Honor.  Ian

9   Papendick for the Panasonic defendants.

10      **MR. RAM:**  And Mark Ram for the Indirect Purchasers.

11      **THE COURT:**  Okay.  Here it is.  Well, I tell you what.

12   If you want to get that interrogatory work done by March 6th,

13   that's fine.  Okay?  I'm kind of inclined to just hold off on

14   the rest of the scheduling until I get the Phase 1 order out,

15   so --

16      **MR. PAPENDICK:**  Sorry, Your Honor.  I didn't hear.

17      **THE COURT:**  Hold off on the rest of the scheduling

18   until I get the Phase 1 order out.  I appreciate the date

19   proposals, but let me finish that order and then I'll send you

20   a schedule.  Okay?

21      **MR. PAPENDICK:**  That makes sense.

22      **THE COURT:**  Just get the discovery done, the

23   supplemental discovery done by March 6th and don't worry about

24   the rest of it.  I'll let you know once I get that order out.

25   Okay?

1          **MR. RAM:**  All right.

2          **THE COURT:**  Is that good?

3          **MR. PAPENDICK:**  Very good.

4          **THE COURT:**  All right.  Okay.  And I have the Nissei

5    jurisdictional motion under submission.  I'm just going to tell

6    you it's denied.  I will issue a very short written order in

7    the next couple of days.

8          **MR. SAVERI:**  Which motion?  I was getting --

9          **THE COURT:**  Nissei's motion to dismiss for lack of

10   personal jurisdiction.  That's going to be denied.  That is

11   denied, and I will have a very, very short order coming out

12   soon.

13         **MR. SAVERI:**  Okay.

14         **THE COURT:**  Yes?

15         **MR. SAVERI:**  There's one other issue.

16         **THE COURT:**  Yes?

17         **MR. SAVERI:**  We filed a letter brief this morning on

18   it.  The defendants have not had an opportunity to respond.  It

19   has to do with the scheduling of the expert depositions with

20   respect to class certification.

21         **THE COURT:**  Oh, okay.

22         **MR. SAVERI:**  You set forward a scheduling order to

23   take us to -- from now until the end -- to trial.  Under that

24   order, we are doing our expert reports followed, as we

25   understood the stipulation, by depositions of the experts.

1    **THE COURT:**  This is for class certification?

2    **MR. SAVERI:**  Correct.

3    **THE COURT:**  Can I just jump in for a moment?  What are

4  the expert issues for class cert?  We've cleared out the FTAIA

5  ground rules.  I mean, what are the experts opining on that

6  requires expert testimony?

7    **MR. SAVERI:**  We have -- we, the Direct Purchaser

8  Plaintiffs, have expert testimony on the issue of class-wide

9  impact and damages.  It goes to the predominance.  I realize

10  this is a direct-purchaser case, but we've --

11    **THE COURT:**  It's a price-fixing case, more

12  importantly.

13    **MR. SAVERI:**  Yes, but --

14    **THE COURT:**  You really think there is a need for

15  expert testimony in a price-fixing case?

16    **MR. SAVERI:**  Your Honor, I think we, the class, can be

17  certified without it.  I think that the evidence -- the expert

18  testimony that we've submitted further supports our proof of

19  predominance.  I certainly wouldn't want to go bare without --

20    **THE COURT:**  I understand.

21    **MR. SAVERI:**  So, Your Honor, under the schedule the

22  Court set, we negotiated a procedure where the expert reports

23  are done and then there are depositions of the experts, and

24  then once that's completed, the expert discovery is done, we go

25  into the briefing, so that the expert work is -- and the

1    *Daubert* motions follow after that expert discovery.  We

2    understood that to be the schedule and the sequence.

3        The defendants have now taken the position that they want

4    depositions of the experts at this point so that it would be, I

5    presume, after each report, we have a series of expert

6    depositions.  That's inconsistent --

7              THE COURT:  After each report?

8              MR. SAVERI:  Yes.  And, Your Honor, that, I believe --

9              THE COURT:  I'm looking at the amended scheduling

10   order --

11             MR. SAVERI:  And that's Docket 1405.

12             THE COURT:  Yes.

13             MR. SAVERI:  And under that schedule, it's pretty

14   clear that the expert discovery --

15             THE COURT:  Yes.  That's why -- I set it up that way

16   intentionally.

17             MR. SAVERI:  And that's what we understood, but we

18   have a dispute apparently about that.  What -- and --

19             THE COURT:  You served your opening reports already?

20             MR. SAVERI:  We did, consistent with the schedule.

21             THE COURT:  Who are your experts or expert?

22             MR. SAVERI:  We have James McClave, who is an

23   econometrician from Florida, a Ph.D., economist and

24   econometrician.  We also have Douglas Zona, who is an

25   economist.

1       **THE COURT:**  All right.

2       **MR. SAVERI:**  And those, consistent -- we've complied

3  with the schedule, but now we're in a position where the

4  defendants have said --

5       **THE COURT:**  They don't need to say anything.  This is

6  a Rule 16 schedule.  It cannot be amended.  So you can bring a

7  motion to --

8       **MR. PAPENDICK:**  Your Honor, if I may?

9       **THE COURT:**  You can bring a motion to amend, but I'm

10  probably not -- it's not worth it because I'm not going to

11  modify the schedule.  You can't just say -- this is a case

12  scheduling order.  You don't get to just wing it.

13       **MR. PAPENDICK:**  We think that what we are asking is

14  entirely consistent with the schedule.  Our understanding,

15  since we were negotiating the original schedule that we

16  submitted and that Your Honor then modified, was that

17  defendants would have the opportunity to depose the plaintiffs'

18  experts in advance of submitting our own opposition report so

19  that we would be able to question the experts on the bases of

20  their analyses.

21       We think that's appropriate and consistent with the way

22  that we've done it in many other component cases.  And we don't

23  think there is anything in the schedule that limits us to

24  taking the depositions after the reports have been -- after --

25       **THE COURT:**  The schedule says that expert depositions

1    have to be done by May 19th.  So I don't understand what the

2    issue is.  I gathered from Mr. Saveri you wanted to push that

3    deadline out.

4              **MR. PAPENDICK:**  No, we do not.  We asked -- day before

5    yesterday, we asked for depositions of the plaintiffs' experts

6    for the week of March 13th, and we certainly did not -- we do

7    not want to modify the schedule.  We informed them that if they

8    are unwilling to produce their experts in sufficient time for

9    us to be able to use the deposition testimony to prepare our

10   expert reports --

11             **THE COURT:**  Let me jump in.  This is easy.

12        They can take the depos whenever they notice them,

13   Mr. Saveri.  They just have to be done by May 19th.  There is

14   no priority or anything else in these, so --

15             **MR. SAVERI:**  Your Honor, what we want to avoid,

16   then -- we think it makes sense to have the expert -- one, we

17   want to have the experts deposed once.

18             **THE COURT:**  They will be deposed once.

19             **MR. SAVERI:**  And so --

20             **THE COURT:**  Federal rules provide a witness sits once

21   for deposition unless there is a court order, and I have not

22   ordered multiple sittings.

23             **MR. SAVERI:**  So that means, for example, that there

24   will not be a deposition after we do -- after -- if we submit a

25   reply --

1       **THE COURT:**  I can't be more basic.  It means there

2   will be one deposition per witness, period.  They can take it

3   whenever they want.  If they want to do it tomorrow and forego

4   seeing some other stuff, they can do that.  It has to be done

5   by May 19th.  That's my only order.

6       So you all work out the dates.  But I'm hard-pressed to

7   see anybody saying you can't do this expert on X date unless

8   that expert is, you know, out of town or tied up or the usual

9   scheduling issues.

10      **MR. SAVERI:**  And that's fine.  Each expert is going to

11  get deposed once, and we can work out a mutually-agreeable

12  schedule.  That's fine with us.

13      **THE COURT:**  If they want to do it sooner, that's up to

14  them.  If you want to do it later, that's up to you.  Just as

15  long as it's done by May 19th.

16      **MR. PAPENDICK:**  Your Honor, if I may, there is

17  authority in the district to allow a second day of expert

18  deposition testimony in circumstances where --

19      **THE COURT:**  That's a different issue.  That's a

20  different issue.  If you want to extend the normal deposition

21  day, then you can ask or you can work it out with Mr. Saveri.

22  But someone is not going to be deposed on March 10th and then

23  send a notice out for a deposition again on May 5th.  That's

24  just not going to happen unless you all have agreed to a second

25  day and that's the second day.

1   **MR. SAVERI:**  And we're amenable.  If the issues are so

2   complicated that we need to spill over into a second day, that

3   makes sense.  We do it all the time.

4   **THE COURT:**  I can't imagine, having gone through many

5   expert depositions in class cert and antitrust cases

6   personally, it's going to take more than seven hours.  I have

7   done expert depositions in 90 minutes in cases that were as

8   sizeable as this.  It was a mystery to me how this could

9   possibly stretch into seven hours, let alone ten.

10  **MR. SAVERI:**  I'm just expressing my amenability --

11  **THE COURT:**  I know that.  I'm expressing my view to

12  the defendants.  I just cannot see that.  It's an expert.

13  And, by the way, in antitrust cases, as I'm sure you know,

14  the econometricians and the economists are generally pretty

15  sound.  This is not a case where someone is going to have a

16  wing and a prayer on a liability theory.  This is just

17  populating the class in a case where the FTAIA issues have been

18  resolved, for the most part.

19  You do whatever you want.  I'm just telling you I don't

20  see this as a big hangup and I don't see this as a

21  time-consuming exercise.

22  **MR. PAPENDICK:**  To respond to Your Honor's comment

23  about hours, we generally are able and we certainly expect to

24  be able to finish the expert's depositions within seven hours.

25  What we commonly do is reserve some hours to use for a second

1   day in the event that the experts present new analyses in their

2   rebuttal reports.  And that's what we had proposed doing in

3   this instance as well.

4        **THE COURT:**  Well, it's inappropriate to raise new

5   analyses in a rebuttal report.  If they are responsive to an

6   opposition, well, that's fine.  But you can't just wheel out --

7   if you say A and B in your opening report -- you all know this;

8   I'm just going to be clear here to hopefully short circuit any

9   misunderstandings.

10       If you all say "A and B are our theories" in your opening

11   report, you cannot say, "Well, let's try on C in the rebuttal."

12   You can't do that.

13       We're not getting into any of this.  You've got one

14   seven-our day under the rules.  If you all agree to the

15   modification, that's fine.  You can privately order anything

16   you want.

17       The two ground rules are May 19th is your cutoff.  And

18   unless somebody brings a motion to me that I approve, that has

19   not changed.  And you get one day per witness, period, unless

20   you all agree to change it or you send me a motion and I agree

21   to change it for you.  Those are the rules.  Okay?  Spare

22   yourself the trouble of having a long back and forth on these

23   things.  Clients don't need those bills.  You don't need to be

24   burning time on it.  You've got bigger stuff to do.  This is

25   not hard.  This is actually the easier part of the case, the

1   experts.  Okay?

2          **MR. SAVERI:**  We just anticipate it makes sense for us

3   to do the depositions at the end, but if they want to do them

4   in the beginning, that's their choice.

5          **THE COURT:**  Listen, everybody has their own strategy.

6   They're all good lawyers.

7          **MR. SAVERI:**  I'm not going to prejudge it.

8          **THE COURT:**  Maybe they're setting you up in a way

9   that's fiendish and you can't figure it out until it's too

10  late.  Who knows?  But it's up to them.  You may be doing the

11  same to them.  You all get to work that out.  That's where the

12  lawyerly art comes in.  It's going to be done by May 19th.

13  That's where the judge's art comes in.  May 19th.

14      Anything else I can help you with today?

15         **MR. SAVERI:**  I don't think so.

16         **MR. PAPENDICK:**  I don't think so, Your Honor.

17         **THE COURT:**  All right.  Thank you.

18              (Proceedings adjourned at 10:46 a.m.)

19

20

21

22

23

24

25

1

2

3                    <u>CERTIFICATE OF REPORTER</u>

4          I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7   DATE:   Friday, March 3, 2017

8

9   *Pamela A. Batalo*

10  _____
    Pamela A. Batalo, CSR No. 3593, RMR, FCRR
11  U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25