Joseph R. Saveri (State Bar No. 130064)
Joshua Paul Davis (State Bar No. 193254)
Andrew M. Purdy (State Bar No. 261912)
James G. Dallal (State Bar No. 277826)
Nicomedes Sy Herrera (State Bar No. 275332)
JOSEPH SAVERI LAW FIRM, INC.
555 Montgomery Street, Suite 1210
San Francisco, California 94111
Telephone: (415) 500-6800
Facsimile:  (415) 395-9940
Email:   jsaveri@saverilawfirm.com
         jdavis@saverilawfirm.com
         apurdy@saverilawfirm.com
         jdallal@saverilawfirm.com
         nherrera@saverilawfirm.com

*Interim Lead Class Counsel for Direct Purchaser Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| IN RE CAPACITORS ANTITRUST LITIGATION | Master File No. 3:14-cv-03264-JD |
|---|---|
| | **DIRECT PURCHASER PLAINTIFFS' SUPPLEMENTAL REPORT RENEWING THEIR MOTONS FOR:** |
| THIS DOCUMENT RELATES TO: ALL DIRECT PURCHASER ACTIONS | (1) FINAL APPROVAL OF PROPOSED SETTLEMENTS WITH DEFENDANTS FUJITSU LIMITED, NEC TOKIN, NITSUKO, THE OKAYA DEFENDANTS, AND ROHM (DOCKET NO. 1453); AND |
| | (2) AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES (DOCKET NO. 1458) |
| | Date: April 6, 2017<br>Time: 10:00 am<br>Courtroom: 11, 19th Floor |

# INTRODUCTION

At the March 2 hearing on final approval of proposed Settlements with Defendants Fujitsu, NEC TOKIN, Nitsuko, the Okaya Defendants, and ROHM,[1] and in the Civil Minutes entry for that hearing (Dkt. 1534), the Court directed Lead Class Counsel to submit a report providing complete and accurate information concerning the number of returned mailings and the number of claims filed, to enable the Court to "confidently and meaningfully exercise its judgment" before ruling on the motion for final approval and the fee request. Lead Class Counsel have reviewed the results of the notice program and the claims filed to date with the claims administrator and submit this supplemental report in response to the Court's orders.

The bottom line: the claims administrator mailed 2,756 Notice and Claim Form packages to potential class members. Excluding duplicates, notice was mailed to 2,331 class members. Of these, 1,921 were identified based on transactional records as having made a qualifying purchase of Capacitors. After processing returns, researching alternative addresses for returned packages, and conducting a second mailing, notice was successfully delivered to 1,949 out of these 2,331 class members. For the 1,921 class members for whom the administrator had transactional data, 1,588, or 82.67%, received direct mailed notice.

The claims administrator sent claim forms pre-populated with purchase data to the 1,921 class members identified in transactional records. In response, class members submitted 282[2] non-duplicative claims supported by transaction data, a 14.68% claim rate. The class members who submitted claims represent 66.1% of the total commerce at issue during the settlement class period. They are expected to recover an average of over $23,000 per claimant.[3] The claims administrator has received an additional 434 claims, which may bump the claims rate higher. Many of these claims appear to be duplicates or are unsupported by records, however, and the claims administrator will audit all claims before payment.

---

[1] Terms not otherwise defined herein are attributed the same meanings as in DPPs' Final Approval Motion and Motion for Fees.

[2] The claims administrator received 285 claim form submissions from the 1,921 class members identified from Defendants' transation records, but three were duplicates.

[3] Assuming a 100% participation rate, but exclusive of fees or awards that the Court awards.

Courts have repeatedly found that notice programs comparable to the one used here satisfy due process. The level of participation in the settlement also weighs in favor of approval. Class members representing two-thirds of the commerce at issue will share in the settlement. Lead Class Counsel have made extraordinary efforts to provide notice to the Class and to encourage class member participation. Lead Class Counsel directed the claims administrator to individually research addresses of potential class members; used discovery to identify transaction records; retained expert consultants to analyze and compile a list of class members from multiple databases containing over seven million direct purchase records; worked with the claims administrator to generate and deliver pre-populated claim forms to all class members identified from Defendants' transaction data; called the largest direct purchasers to inform them of the Settlements; and—with the claims administrator—responded directly to hundreds of inquiries from class members.

The record before the Court, as supplemented, demonstrates that the proposed Settlements are fair, reasonable, and adequate, and deserving of the Court's final approval.

## PROCEDURAL HISTORY

On September 27, 2016, DPPs filed their Motion for Preliminary Approval, Dkt. 1298. On October 14, 2016, the Court held a hearing on this motion and on October 17, 2016, entered a Minute Order requiring the parties to submit supplemental papers setting forth a procedure for final approval, Dkt. 1348. On November 4, 2016, DPPs filed their Supplemental Submission in Further Support of Motion for Preliminary Approval, Dkt. 1378.

In their Supplemental Submission, DPPs proposed a comprehensive notice program that included first-class mailed notice to the class members that Lead Class Counsel and their experts identified from the direct purchase transaction records they obtained from Defendants during discovery. *Id.* at 2, 4. Defendants' testimony at depositions, and their counsels' representations made in production letters and in response to DPP's inquiries, confirm that relevant direct purchase transactions are recorded in the transaction data Defendants produced to DPPs.[4] The notice program also provided

---

[4] *See* Declaration of Joseph R. Saveri dated November 4, 2016 (Dkt. 1378-1), at ¶ 2.

for notice by publication via the Internet (online advertisements and notices), on social media, and through through a settlement website.

On November 10, 2016, the Court held a second hearing on DPPs' motion for preliminary approval and on November 14, 2016, entered Civil Minutes stating that the Court would issue preliminary approval orders. Dkt. 1391. On December 4, 2016, the Settling Defendants filed their Memorandum in Support of Preliminary Approval of Settlements. Dkt. 1377.

On January 27, 2017, the Court issued its Preliminary Approval Order directing the implementation of the notice program. Dkt. 1455 ¶¶ 12, 15. Among other things, the Preliminary Approval Order provided that "[w]ithin fourteen (14) days of the Preliminary Approval Order, the Settling Defendants are to provide an electronic list of potential Settlement Class Members . . . ." *Id.* ¶ 13. The Court also set the Opt-Out Deadline for February 13, 2017. *Id.* ¶ 17.

On January 30, 2017, DPPs filed their Motion for Fees, Dkt. 1458. On January 31, DPPs filed their Final Approval Motion, Dkt. 1461. On February 21, 2017, DPPs filed their Supplemental Brief in further support of DPPs' Final Approval Motion, Dkt. 1497, and Motion for Fees, Dkt. 1499.

On March 2, 2017, the Court held a hearing on DPPs' motions for Final Approval and Fees, and on March 3, 2017, entered a Minute Order directing Lead Class Counsel "to file a full and complete report renewing their motions by March 30, 2017." Dkt. 1534. The Court also directed DPPs to focus on "presenting complete and accurate data" in support of DPPs' motions. *Id.*

I.   **COMPLIANCE WITH THE COURT'S ORDER REGARDING CLASS NOTICE**

The parties have complied in all respects with the Court's Preliminary Approval Order.

A.   **Notice by First Class Mail**

1.   **Compilation and Initial Mailing of the DPP Class Member List from Defendants' Transaction Data**

The claims administrator, together with other consultants retained by Lead Class Counsel, aggregated and synthesized over seven million direct purchase transactions of Capacitors contained in Defendants' databases during the relevant time period (*i.e.,* January 1, 2002 through July 22, 2015).[5]

---

[5] The compilation included transaction-level data produced by each Defendant. The data are business

The compilation included 1,834 contact records for class members linked to at least one direct purchase of a qualifying Capacitor, from any Defendant, that was shipped or invoiced to an address within the United States.[6] The claims administrator mailed notice to these 1,834 entities by December 14, 2016. The claims administrator updated the DPP Class Member List with contact information obtained from the National Change of Address (NCOA) system maintained by the U.S. Postal Service. Using Defendants' transaction data, the claims administrator also pre-populated the claim forms with information detailing class members' respective purchases of Capacitors billed to or shipped to the United States during the class period.

Of the initial 1,834 notice and claim form packages, 501 were returned as undeliverable. As the returned packages were received, the claims administrator took additional steps to identify additional or alternative addresses. These efforts yielded alternative addresses for 299 of them.

### 2. Follow-Up Mailings

From January 25, 2017 through February 3, 2017, the claims administrator mailed a second round of notices and claim forms to the 299 class members whose packages had been returned as undeliverable, but for whom the claims administrator had successfully identified alternative addresses. Of these, 74 were returned a second time. The claims administrator recommended that no further effort be made to locate class members, reasoning that such efforts were unlikely to be cost-effective. Declaration of Jason Stinehart ("Stinehart Decl.") ¶ 16.

Following the December 14, 2016 initial mailing, the claims administrator continued to analyze Defendants' transaction data and identified 87 additional entities for which Defendants had provided

---

records of Defendants. The data have been subject to extensive review, including a lengthy series of questions and answers between DPPs and the producing Defendants, and depositions taken in connection with the briefing of FTAIA issues. Saveri Decl. (Nov. 11, 2016), Dkt. 1378-1 ¶ 2. Based on this, DPPs believe the data are reliable records of class members who purchased Capacitors directly from Defendants during the class period.

[6] The Court provisionally certified the Settlement Class as including "[a]ll persons in the United States that purchased Capacitors (including through controlled subsidiaries, agents, affiliates or joint-ventures) directly from any of the Defendants, their subsidiaries, agents, affiliates or joint ventures from January, 1, 2002 through July 22, 2015. …" The Court defined Capacitors as "aluminum, tantalum and film capacitors." Preliminary Approval Order, Dkt. 1455, at first unnumbered paragraph and ¶ 3.

fragmented or incomplete names and addresses. At the direction of Lead Class Counsel, the claims administrator attempted to locate valid mailing addresses for these potential class members. The claims administrator discovered contact information for each of the 87 entities by January 21, 2017. *Id.* ¶ 19.

The claims administrator added these 87 entities to the DPP Class Member List and mailed notices and claim forms to each of them. For this group, 57 packages were returned as undeliverable. *Id.* Therefore out of the 1,921 total notices and claim forms sent by the claims administrator to the DPP Class Member List (as updated by the NCOA database and the claims administrator's targeted research), a total of 333 remain undeliverable, including after re-mailings. *Id.* ¶ 20.

### 3. Supplemental Direct Mailings to Additional Entities

After the initial mailing on December 14, 2016 and through February 3, 2017, the claims adminstrator acquired identifying information—but no data—for entities that were not linked to any qualifying direct purchase within any transactional data in any relevant database. Based on the lack of transactional data, and after consulting with defense counsel, Lead Class Counsel lacked any basis to conclude that these entities qualified as class members. Nevertheless, out of an abundance of caution, Lead Class Counsel instructed the claims administrator to mail notice and claim form packages to these additional entities. Stinehart Decl. ¶ 22. The claims admnistrator did so, ultimately mailing notice and claim form packages to a total of 835 entities for which the parties lacked any transactional data. Of these additional entities, the claims administrator determined that 425 were duplicates of records already included in the initial DPP mailings, leaving 410 new entities. *Id.* ¶ 23. The Postal Service returned 49 of these mailings as undeliverable. *Id.* ¶ 25. The claims administrator recommended that no further attempt be made to re-mail to these entities. *Id.*

### 4. Summary and Discussion

Notice and claim form packages were mailed to 1,921 direct purchasers for whom the parties had transaction data. A total of 333 remained undeliverable after a second mailing. A total of 1,588 were successfully mailed, resulting in an 82.67% delivery rate. Stinehart Decl. ¶ 26. The 82.67% actual direct mail delivery rate for DPPs' direct mailing campaign is well within the range of acceptable delivery rates for the *total* expected reach of a notice program (including the combined expected reaches of *both* a direct mail campaign and supplemental efforts like publication, Internet and social media). *See Judges'*

*Class Action Notice and Claims Process Checklist and Plain Language Guide* (Federal Judicial Center 2010), at p. 3 ("It is reasonable to reach between 70-95%. A study of recent published decisions showed that the median reach calculation on approved notice plans was 87%.").

Taking the supplemental direct mailings to additional entities into account does not significantly alter the result. Even if the mailings to the entities for which the parties lacked transaction data are included, the mailings will have nevertheless reached 1,949 out of a combined total of 2,331 non-duplicative addressees, or 83.61%. Stinehart Decl. ¶ 27.

In sum, Lead Class Counsel and the claims administrator took numerous affirmative steps to provide actual notice to every known and even possible Class Member. These efforts exceed what is required by Fed. R. Civ. P. 23 and due process. Indeed, Jason Stinehart, a Program Manager at Rust Consulting, Inc., the claims administrator, affirms that DPPs' efforts to provide adequate notice to the class members exceeds what is customary in the industry, and that the delivery rate of the direct mail campaign lies within the top range of similar class actions (involving class members that are corporations instead of individuals). *Id.* ¶ 28.

Lead Class Counsel have consulted with the claims administrator about the feasibility of contacting the registered agent for service of process of those entities for which no valid address could be located. The claims administrator advised that professionals in the notice industry believe commercial batch skip-tracing and targeted Internet research provide the most effective means of identifying valid addresses for class members. *Id.* ¶ 18. While mailing to a service agent might provide effective legal notice, the claims administrator believes it would not generate meaningful claim activity and would substantially increase administrative costs. *Id.*

Due process does not require achieving actual notice to every individual class member; rather, due process requires reasonable efforts to inform class members. *See Silber v. Mabon*, 18 F.3d 1449, 1453-54 (9th Cir. 1994) ("We do not believe that [*Phillips Petroleum v. Shutts*, 472 U.S. 797 (1985)] changes the traditional standard for class notice from 'best practicable' to 'actually received' notice."); *see also Briseno v. ConAgra Foods, Inc.*, 2017 U.S. App. LEXIS 20, at *13 (9th Cir. Jan. 3, 2017) (holding that "neither Rule 23 nor the Due Process Clause requires actual notice to each individual class member"); *Rannis v. Recchia*, 380 F. App'x 646, 650 (9th Cir. 2010) ("[D]ue process requires

reasonable effort to inform affected class members through individual notice, not receipt of individual notice."); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 3:07-cv-5944 JST, 2016 U.S. Dist. LEXIS 24951, at *262 (N.D. Cal. Dec. 17, 2015); *see generally* Final Approval Motion, Dkt. 1461, at 20, n. 5; Memorandum of Settling Defendants in Support of Motions for Preliminary Approval of Settlements, Dkt. 1377 at 3-9.

In upholding the adequacy of a notice program even where the plaintiffs had mailed notice to some class member shareholders five days *after* the deadline for filing objections or opting out, the Ninth Circuit explained:

> [the relevant inquiry] "is not whether some individual shareholders got adequate notice, but whether the class as a whole had notice adequate to flush out whatever objections might reasonably be raised to the settlement. If an individual shareholder later claims he did not receive adequate notice and therefore should not be bound by the settlement, he can litigate that issue on an individual basis when the settlement is raised as a bar to a lawsuit he has brought."

*Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993). Here, as discussed below, there are no objections to the Settlements or the application for an award of attorneys' fees and reimbursement of expenses.

**B.    Publication Notice**

The Court ruled that, together with the mailing of the notices and claim forms to class members identified in Defendants' transaction data, "publication of the Summary Notice, and internet posting of the Long Form Notice" represent the best notice practicable under the circumstances. Preliminary Approval Order, Dkt. 1455 at ¶ 12; *see also* Fed. R. Civ. P. 23(b)(3). Such actions therefore constitute "due, adequate and sufficient notice" sufficient to satisfy due process requirements. *Id.*

In addition to providing direct notice by U.S. mail, the claims administrator (with the assistance of Lead Class Counsel as necessary) provided notice by publication (including an advertisement published in the national edition of *The Wall Street Journal*), by Internet postings capturing 5,779 unique visitors, and through a social media campaign that generated 283,880 gross impressions. Stinehart Decl., ¶¶ 29-30. The claims administrator ran banner advertisements on thirteen different electronics-industry-focused websites for a three-week period (December 19, 2016 to January 8, 2017),

during which the websites on which the banner ads ran generated a total of 4,262,977 gross impressions. *Id.* ¶ 31.

In addition, Lead Class Counsel and the claims administrator initiated or responded to hundreds of telephone calls and e-mails. *Id.* ¶ 33; Saveri Decl. ¶ 14. Moreover, the claims administrator advertised on websites that were specifically directed to a niche target audience of companies that purchase Capacitors. Stinehart Decl. ¶ 31.

Finally, Lead Class Counsel called, left messages, or attempted to contact over 188 of the largest class members to confirm their receipt of the claim form and notice packets, and to answer any questions they might have about the Settlements. Saveri Decl. ¶ 14. Lead Class Counsel initiated or answered hundreds of telephone calls and email inquiries from potential class members concerning the Settlements. Saveri Decl. ¶ 14.

## II. THE CLASS MEMBERS' RESPONSE

As of March 30, 2017, Rust received 282 non-duplicative claim forms (and three duplicates) from class members who returned pre-populated claim forms supported by transactional data, a 14.68% claim rate. Overall, Rust has received 719 claim forms. Of the 835 additional entity contacts provided by Defendants for which the parties lacked transactional data, two filed claims. Rust has also received from entities not included in the direct mail campaign an additional 432 claims, most of which are duplicative or unsupported. Rust will audit all claim forms to ensure validity.

For the 282 non-duplicative claims supported by Defendants' transactional data, total purchases are $5,059,132,669.54. The claims submitted therefore account for 66.15% of the $7,653,644,063.66 in total commerce from all Defendants (based on Defendants' transactional data) from January 1, 2002 through July 22, 2015. This participation rate compares favorably with other settlements approved by this District and other federal courts. *See, e.g., Moore v. Verizon Commc'n Inc.*, No. C 09-1823, 2013 U.S. Dist. LEXIS 122901, 2013 WL 4610764, at *8 (N.D. Cal. Aug. 28, 2013) (approving settlement with only a 3% claims rate); *see also In re Packaged Ice Antitrust Litig.*, 2011 WL 6209188, *14 (E.D. Mich. Dec. 13, 2011) (granting final approval where there was a claims response rate representing 46% of Defendants' sales during the class period, which "suggest[ed] good participation and [was] a positive indication as to the favorable reaction of absent class members" (even though the number of responses

filed was less than 1% of the total notices mailed)); *Meijer, Inc. v. 3M*, 2006 WL 2382718, *14 (E.D. Pa. Aug. 14, 2006) (granting final approval in antitrust action where "over 60%" of the purchases by Settlement class members were claimed by claimants); *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 WL 6248154, *5 (E.D.Pa. Sept. 27, 2004) (granting final approval where claims covered more than two thirds of the relevant sales volume, and stating: "The fact that there have been no objectors to the Settlement, that the claims filed represent a significant majority of the sales at issue, and that claims have been filed by major companies with significant resources . . . supports approval of the settlement.").

Twelve corporate groups comprising 44 affiliated entities that received notices and claim forms (*i.e.,* parents and subsidiaries) have requested exclusion from the Settlements. These opt-outs represent approximately 19.1% of the total commerce.

The fact that many of the largest class members have chosen to remain in the Class and benefit from the Settlements supports approval of the Final Approval Motion and the Motion for Fees. These businesses, some of which are among the largest business concerns in the country, are sophisticated consumers of legal services. They should be considered to know well the value of the benefit achieved and the work needed to obtain it against a complex worldwide cartel such as the one at issue in this case.

There is no opposition to DPPs' Final Approval Motion or Motion for Fees. Indeed, one of the top five largest direct purchasers initially considered opting out of the Settlements, but after reconsidering the favorable terms of the Settlements, decided to submit a claim form instead.

### III. CONCLUSION

For the foregoing reasons, and for the reasons set forth in the Final Approval Motion and the Motion for Fees, DPPs respectfully request that the Court grant final approval of the proposed Settlements with the Settling Defendants, certify the Settlement Class, approve DPPs' proposed allocation plan, and award DPPs' attorneys their requested fees and reimbursable expenses.

Dated: March 30, 2017

JOSEPH SAVERI LAW FIRM, INC.

By: /s/ *Joseph R. Saveri*
Joseph R. Saveri

Joseph R. Saveri (State Bar No. 130064)
Joshua Paul Davis (State Bar No. 193254)
Andrew M. Purdy (State Bar No. 261912)
James G. Dallal (State Bar No. 277826)
Nicomedes Sy Herrera (State Bar No. 275332)
JOSEPH SAVERI LAW FIRM, INC.
555 Montgomery Street, Suite 1210
San Francisco, California 94111
Telephone: (415) 500-6800
Facsimile:  (415) 395-9940

*Interim Lead Class Counsel for
Direct Purchaser Plaintiffs*