1   **[Counsel for Moving Defendants Listed on Signature Pages]**

2

3

4

5

6

7

8

9   **UNITED STATES DISTRICT COURT**
    **NORTHERN DISTRICT OF CALIFORNIA**
10  **SAN FRANCISCO DIVISION**

11

12                                                  Case No.  3:14-cv-03264-JD

13  IN RE CAPACITORS ANTITRUST               **DEFENDANTS' OPPOSITION**
    LITIGATION,                              **TO INDIRECT PURCHASER**
14                                           **PLAINTIFFS' MOTION FOR**
    This Document Relates To:                **CLASS CERTIFICATION**
15
    ALL INDIRECT PURCHASER ACTIONS           Date of Hearing:  September 7, 2017
16                                           Time of Hearing:  10:00 AM
                                             Location:  Courtroom 11, 19th Floor
17                                           Judge: Hon. James Donato

18                                           **REDACTED VERSION OF**
                                             **DOCUMENT SOUGHT TO BE**
19                                           **SEALED**

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................1

LEGAL STANDARD..........................................................................................................3

ARGUMENT .......................................................................................................................6

I.    CALIFORNIA LAW CANNOT BE APPLIED TO REVIVE THE IPPS' LONG DISMISSED CLAIMS OF A SINGLE MULTI-STATE CLASS ..........................6

    A.    This Court Has Already Ruled that Out-of-State Purchasers Cannot Bring Claims Under California Law ................................................................7

    B.    IPPs' Proposed Thirty-One State Class Under California Law Contradicts the Allegations in the Fifth Amended Complaint – Making it Too Late to Seek to Raise This Issue Again Now and Greatly Expand the Proposed Class ..........................................................................................................8

    C.    Both Due Process and Choice of Law Principles Bar the Application of California Law to the Proposed Multi-State Class .....................................10

II.    THE IPP CLASSES DO NOT SATISFY RULE 23(B)(3) BECAUSE PLAINTIFFS' PROFFERED EXPERT METHODOLOGIES ARE INCAPABLE OF PROVING CLASS-WIDE IMPACT WITH COMMON EVIDENCE .........17

    A.    Dr. Lamb Offers No Reliable Common Method For Proving That Overcharges Impacted All Direct Purchaser Sales And Were Then Uniformly Passed Through to All or Almost All Putative Class Members ....................................................................................................18

        1.    Dr. Lamb's Uniform "Average" Overcharge and Pass-Through Models Improperly Aggregate Non-Cohesive Data, Obscuring Real-World Pricing Differences That Preclude Class Certification, and Improperly Include Irrelevant Sales to Non-Distributors That Render the Entire Analysis Unreliable ............................................19

        2.    Dr. Lamb's Uniform Overcharges Over the Entire Class Period Obscure Significant Variations in Capacitor Pricing That Bear Directly on Whether a Putative Class Member Was Injured .........24

        3.    Dr. Lamb's Models Fail to Account for Divergent Price Effects in Response to Significant Market Events Over the Twelve-Year Period ...............................................................................................26

        4.    Dr. Lamb's "Market Characteristics" and "Pricing Structure" Opinions Are Also Incapable of Proving Class-wide Impact With Common Evidence .............................................................................28

    B.    Dr. Lamb Fails to Offer a Common Methodology Using Common Evidence Capable of Estimating the Amount of Overcharge Passed On to IPPs' Customers .......................................................................................32

C.    Dr. Leonard's Critiques of The Defects in Dr. Lamb's Methods Provide Strong and Persuasive Support for Concluding that the IPPs Have Not Met Their Burden on Class Certification ......................................................33

D.    Dr. Moore Established That Dr. Lamb's Model Was Not Correctly Specified and Therefore Not Suitable to Show Common Impact With Respect To The Alleged Film Conspiracy ................................................35

III.    PLAINTIFFS ALSO FAIL TO PRESENT COMMON EVIDENCE OF ANTITRUST IMPACT AND DAMAGES ON A CLASS-WIDE BASIS USING DOCUMENTS PRODUCED BY DEFENDANTS ................................................36

IV.    THE NAMED IPPS ARE INADEQUATE TO REPRESENT THE PUTATIVE CLASS BECAUSE THEY ARE "STRIKINGLY UNFAMILIAR" WITH THIS LITIGATION ................................................................................................38

V.    IPPS HAVE FAILED TO ESTABLISH THAT RULE 23(a) REQUIREMENTS ARE MET FOR THEIR SEPARATE STATE DAMAGES CLASSES ...............40

CONCLUSION ..............................................................................................................40

# TABLE OF AUTHORITIES

**Cases**

*A&M Supply Company v. Microsoft Corporation,*
    654 N.W.2d 572 (Mich. Ct. App. 2002) .................................................................17

*Anziulewicz v. Bluefield Community Hospital, Inc.,*
    531 F.Supp. 49 (S.D. W. Va. 1981) .......................................................................17

*Associated General Contractors of California v. California State Council of*
    *Carpenters,* 459 U.S. 519 (1983) ...........................................................................15

*AT&T Mobility LLC v. AU Optronics Corporation,*
    707 F.3d 1106 (9th Cir. 2013) .........................................................................12, 14

*Barry B. Roseman v. Sports and Recreation,*
    165 F.R.D. 108 (M.D. Fla. 1996) ...........................................................................39

*Berlowitz v. Nob Hill Masonic Management,*
    No. C-96-01241 MHP, 1996 WL 724776 (N.D. Cal. Dec. 6, 1996) .........................9

*BNSF Railway Co. v. Tyrrell et al.,*
    No. 16-405 (May 30, 2017 ) ...................................................................................11

*Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County,*
    *et al.,* No. 16-466 (June 19, 2017) (slip op.) ...........................................................11

*California v. Infineon Technologies AG, No. C 06-4333 PJH,*
    *2008 WL 4155665 (N.D. Cal. Sept. 5, 2008)* ......................................................4, 19

*Comcast Corporation v. Behrend,*
    133 S.Ct. 1426 (2013) ...................................................................................1, 4, 6

*Comes v. Microsoft Corporation,*
    646 N.W. 2d 440 (Iowa 2002) ................................................................................32

*Costelo v. Chertoff,*
    258 F.R.D. 600 (C.D. Cal. 2009) .............................................................................9

*Darvin v. International Harvester Company,*
    610 F. Supp. 255 (S.D.N.Y. 1985)....................................................................38, 39

*Ellis v. Costco Wholesale Corporation,*
    657 F.3d 970 (9th Cir. 2011) ...................................................................................4

*Frenzel v. AliphCom,*
    76 F. Supp. 3d 999, 1006-10 (N.D. Cal. 2014).......................................................12

*General Electric Company v. Joiner*,
    522 U.S. 136 (1997).................................................................................31

*Granfield v. NVIDIA Corp.*,
    No. C 11–05403 JW, 2012 WL 2847575 (N.D. Cal. July 11, 2012).......................................12

*Griffiths v. Blue Cross and Blue Shield of Alabama*,
    147 F.Supp.2d 1203 (N.D. Ala. 2001)...................................................17

*In re Air Cargo Shipping Servs. Antitrust Litigation*,
    No. 06-MD-1175 JG VVP, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) ..........................29

*In re Cathode Ray Tube (CRT) Antitrust Litigation*,
    No. C-07-5944-SC, 2013 WL 5428139 (N.D. Cal. June 20, 2013)........................................4

*In re Facebook, Inc., PPC Advertising Litigation*,
    282 F.R.D. 446 (N.D. Cal. 2012), *aff'd* 588 F. App'x 733 (9th Cir. 2014)...........................38

*In re Flash Memory Antitrust Litigation*,
    No. C 07-0086...........................................................................5, 19, 24

*In re Graphics Processing Units Antitrust Litigation*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ...............................................10, 13

*In re Graphics Processing Units Antitrust Litigation*,
    253 F.R.D. 478 (N.D. Cal. 2008) ............................................... *passim*

*In re High-Tech Employee Antitrust Litigation*,
    289 F.R.D. 555 (N.D. Cal. 2013).............................................................5

*In re Korean Ramen Antitrust Litigation*,
    No. 3:13-cv-04115-WHO, 2017 WL 235052 (N.D. Cal. Jan. 19, 2017)...............................15

*In re Lithium Ion Batteries Antitrust Litigation*,
    No. 13-MD-2420 YGR, 2017 WL 1391491 (N.D. Cal. Apr. 12, 2017)........................5, 6, 11

*In re Live Concert Antitrust Litigation*,
    863 F. Supp. 2d 966 (C.D. Cal. 2012) ..................................................28

*In re Optical Disk Drive Antitrust Litigation*,
    303 F.R.D. 311 (N.D. Cal. 2014)............................................... *passim*

*In re Optical Disk Drive Antitrust Litigation*,
    No. 3:10-MD-2143 RS, 2016 WL 467444 (N.D. Cal. Feb. 8, 2016). ..............................11, 16

*In re Pharmacy Benefit Managers Antitrust Litigation*,
    Nos. 03-4730, 06-1782, 06-4114, 06-4115, 06-4305, 2017 WL 275398
     (E.D. Pa. Jan. 18, 2017) ...........................................................................20

*In re: TFT-LCD (Flat Panel) Antitrust Litigation*,
   267 F.R.D. 583 (N.D. Cal. 2010)......................................................................9

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
   No. 07-1827, 2012 WL 6709621 (N.D. Cal. 2012) .........................................17, 32

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
   No. 07-1827 SI, 2013 WL 1164897 (N.D. Cal. Mar. 20, 2013)...............................14

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
   No. 07-1827 SI, 2013 WL 1891367 (N.D. Cal. May 6, 2013) ...............................15

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
   No. 07-md-01827-SI, 2014 WL 4652145 (N.D. Cal. Sept. 18, 2014)....................32

*In re Zyprexa Products Liabiality Litigation*,
   489 F. Supp. 2d 230 (E.D.N.Y. 2007) ............................................................34

*K-S Pharmacies, Inc. v. Abbott Laboratories*,
   No. 94CV002384, 1996 WL 33323859 (Wis. Cir. Ct. May 17, 1996)....................17

*Kanne v. Visa U.S.A. Inc.*,
   272 Neb. 489 (Neb. 2006)...........................................................................16

*Kearney v. Salomon Smith Barney, Inc.*,
   39 Cal. 4th 95 (2006) ................................................................................10

*Lava Trading, Inc. v. Hartford Fire Insurance Company*,
   No. 03 Civ. 7037 (PKC), 2005 WL 4684238 (S.D.N.Y. Apr. 11, 2005) ................26

*Lee v. Pep Boys-Manny Moe & Jack of California*,
   No. 12-CV-05064-JSC, 2015 WL 9480475 (N.D. Cal. Dec. 23, 2015)..................38

*Marsh v. First Bank of Deleware*,
   No. 11-CV-05226-WHO, 2014 WL 554553 (N.D. Cal. Feb. 7, 2014) ...............13, 14

*Mazza v. American Honda Motor Company*,
   666 F.3d 581 (9th Cir. 2012) ................................................................. *passim*

*Moore v. Apple Inc.*,
   309 F.R.D. 532 (N.D. Cal. 2015).....................................................................5

*Nass-Romero v. Visa U.S.A., Inc.*,
   279 P.3d 772 (N.M. Ct. App. 2012)................................................................16

*Ohio Six Limited v. Motel 6 Operating L.P.*,
   No. CV 11-08102 MMM (Ex), 2013 WL 12125747 (C.D. Cal. Aug. 7, 2013) ........34

*Panavision International, L.P. v. Toeppen*,
   141 F.3d 1316 (9th Cir. 1998) .......................................................................13

*Perez v. State Farm Mut. Auto. Ins. Co.*,
  No. C 06-01962 JW, 2012 WL 3116355 (N.D. Cal. July 31, 2012) .......................................31

*Peterson v. Visa U.S.A., Inc.*,
  No. Civ.A. 03-8080, 2005 WL 1403761 (D.C. Super. Ct. Apr. 22, 2005)............................16

*Phillips Petroleum Company v. Shutts*,
  472 U.S. 797 (1985)...........................................................................................................7, 12

*Roberts v. Marshalls of CA, LLC*,
  2017 WL 1152967 (N.D. Cal. Mar. 28, 2017).........................................................................5

*Sandoval v. County of Sonoma*,
  No. 11-cv-05817-THE, 2015 WL 1926269 (N.D. Cal. Apr. 27, 2015)....................................9

*Sher v. Raytheon Company*,
  49 Fed. Appx. 887 (11th Cir. 2011).........................................................................................5

*Sickles v. Cabot Corporation*,
  379 N.J. Super. 100, 877 A.2d 267 (A.D. 2005) ...................................................................15

*Teague v. Bayer AG*,
  671 S.E.2d 550 (N.C. Ct. App. 2009)....................................................................................17

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016)..............................................................................................................5

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)..................................................................................................................4

*Washington Mutual Bank, FA v. Superior Court of Orange County*,
  24 Cal. 4th 906 (2001) ...........................................................................................................10

*West v. Prudential Securities, Inc.*,
  282 F.3d 935 (7th Cir. 2002) ...................................................................................................5

**Other Authorities**

Thomas Fuller, *Floodwaters are Gone, but Supply Chain Issues Linger*,
  NY TIMES, Jan. 20, 2012.........................................................................................................27

Thomas Fuller, *In the Flooded Thai Capital, Residents Are Now Refugees*,
  NY TIMES, Nov. 8, 2011 ..........................................................................................................27

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether, after numerous years of litigation, Indirect Purchaser Plaintiffs ("IPPs") can upend the entire scope of these cases through their last-minute attempt to expand the class they seek to certify to include purchasers from 31 states under the laws of California in contravention of the allegations in their Fifth Amended Complaint and this Court's prior rulings, as well as due process and choice of law principles which preclude such a multi-state California law class.

2. Whether IPPs have met their burden of establishing that class-wide impact and damages can be proven with common evidence, to demonstrate that common issues predominate, where the IPPs' expert opinions are based on unreliable methodologies, improperly assume a uniform impact and do not even try to analyze the substantial differences in capacitor pricing among different types of capacitors and different class members.

3. Whether IPPs can show common evidence of conspiracy or impact though documents relating to competitor meetings when such documents do not refer to prices to U.S. distributors, which are the relevant sales to the IPP class.

4. Whether IPPs can satisfy the "rigorous analysis" required to determine whether they have met each of the Rule 23(a) requirements where IPPs have failed to provide any evidence that the named plaintiffs are adequate class representatives, and where those named plaintiffs are, in fact, "strikingly unfamiliar" with the litigation and their duties as class representatives.

# INTRODUCTION

In its class certification submission, IPPs seek to certify no fewer than eighteen separate classes, including separate film and electrolytic monetary damages classes for 31 different states under Rule 23(b)(3) and California law; and, if the court declines to certify the classes under California law, separate film and electrolytic damages classes under the laws of California, Florida, Iowa, Michigan, Minnesota, Nebraska, and New York.  IPPs purport to represent all persons or entities in the United States who indirectly purchased one or more electrolytic or film capacitors from a capacitor distributor from April 1, 2002 through February 28, 2014.

In order to obtain class certification of such a broad group of purchasers, IPPs bear the heavy burden of proving that they satisfy every prerequisite for class certification under Rule 23.  But, IPPs cannot meet that burden with respect to any of the asserted damages classes, since IPPs cannot show that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).  To show this, IPPs must establish through common proof not only the existence of a conspiracy, but also that the alleged conspiracy impacted all or almost all putative class members, and a common methodology for determining the amount of damages for each putative class member.  IPPs cannot meet this standard, as IPPs' proposed economic methodologies are incapable of reliably proving class-wide impact and damages.  This is a critical hurdle for any damages class to be certified, and IPPs fail to meet it.

IPPs similarly fail to carry their burden under Rule 23(a), a "rigorous analysis" designed to ensure plaintiffs meet the basic prerequisites for certification of either a damages or injunctive relief class, including adequacy of representation.  *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1432 (2013).  IPPs' named plaintiffs are wholly inadequate because they: 1) have not read the pleadings in this matter beyond the complaint; 2) cannot identify the defendants in this lawsuit; and 3) are completely unaware of how the litigation is proceeding.  These named plaintiffs have shown that they are not qualified to protect the interests of the class under Rule 23(a).

Class Certification should be denied to the IPPs for each of the following reasons:

1    ***First***, ***IPPs cannot certify a single, multi-state class under California law in***
2    ***contravention of this Court's prior rulings and IPPs' complaints, as well as due process and***
3    ***choice of law principles which preclude multi-state class certification under California law***.
4    This Court already ruled on the first motion to dismiss that California law could not be applied to
5    IPPs' claims on behalf of a multi-state class because IPPs "hardly [alleged] any contacts" with
6    California, and because California law significantly conflicted with other states' laws.  *See* May
7    26, 2015 Order on Motions to Dismiss (Dkt. No. 710) (the "May 2015 Order").   After IPPs
8    amended their complaint, the Court again dismissed all of IPPs' claims asserted on behalf of non-
9    California residents, finding that those residents lacked Article III standing.   December 30, 2015
10   Order on Motions to Dismiss Amended Complaints (Dkt. No. 1003) (the "Dec. 2015 Order").
11   Despite this Court's clear rulings, and ignoring the operative class allegations in their own
12   complaint, IPPs now attempt to greatly expand their proposed class and completely upend the
13   scope of this litigation.  This is not allowed as a matter of law and should be rejected.

14        ***Second***, ***IPPs have failed to offer a reliable common method to prove that overcharges***
15   ***impacted all direct purchaser sales and were passed through to all or almost all putative class***
16   ***members, and that any overcharges were not passed on to IPPs' customers***.  In an effort to meet
17   their burden under Rule 23(b)(3), IPPs offer the deeply flawed expert testimony and models of Dr.
18   Russell Lamb.[1]  Dr. Lamb's models improperly aggregate and average data, ignoring critical
19   differences which impacted price among capacitor types, time periods, and end uses.  Moreover,
20   when he purported to study alleged overcharge at the direct purchaser level, Dr. Lamb inexplicably
21   mixed in data from non-distributor entities not involved in sales to IPPs.  Dr. Lamb's models also
22   fail to account for major market-changing events, which drastically impacted capacitors prices.  In
23   short: they are incapable of supporting class certification because they *assume* uniform class-wide
24   impact and damages, when that is what they are required to prove and test.  Indeed, when
25   Defendants' expert accounts for product differences, or allows for Dr. Lamb's regressions to vary
26   by customer or time period, the results show no statistically significant impact or injury to vast

27
28   ---
     [1] *See* Certain Defs.' Joint Mot. to Exclude Test. of Dr. Russell L. Lamb, Dkt. No. 1677 ("Lamb *Daubert*").

portions of the class.  Dr. Lamb cannot make up for these critical deficiencies in his regressions with qualitative analyses of "market characteristics" and "pricing structure," which are based on nothing more than speculation and anecdotal evidence.  Furthermore, Dr. Lamb does nothing to account for the amount of overcharge passed on by IPPs to their various customers operating in different markets thereby reducing, if not eliminating, their alleged injury.  This is fatal in and of itself, but compounded further by Dr. Lamb's opinions that pass-through rates would be expected to vary if the purchaser operates in a different market facing a different "competitive landscape" as IPPs' customers do by IPPs' own admission.  Accordingly, Dr. Lamb's testimony fails to assist IPPs in meeting their burden to advance a reliable common methodology for proving class-wide impact and damages.

*Third*, *IPPs failed to identify any documents that support their claim that common evidence supports class certification with respect to the distributor sales that make up the proposed IPP class.*  IPPs' evidence of industry meetings and alleged conspiratorial discussions refer to sales to *non-distributors* (such as Original Equipment Manufacturers ("OEMs")).  Simply put, this evidence has nothing to do with distributors who actually sold capacitors to IPPs in the U.S., and thus does not provide any common evidence to support IPPs claims.

*Fourth, the named IPPs have not demonstrated that they are adequate or typical class representatives under Rule 23(a), since they have shown "striking[] unfamiliar[ity]" with this litigation and have done nothing to show that they can be adequate representatives*.  The named IPPs have failed to show that they have taken even the most basic steps to familiarize themselves with the record in this case, were unable to identify the defendants in this lawsuit, and have relied entirely on counsel for all decision-making in the litigation without even the pretense of class representative supervision.  The named IPPs have also done nothing to show that their claims are typical of those asserted by absent class members in the states that they seek to represent.

## LEGAL STANDARD

The IPPs claim that the standard for class certification is "readily met" in any "prototypical" case alleging an antitrust violation.  Motion at 9-10 (citing various pre-*Comcast* and

1   pre-*Dukes* decisions).    But the Supreme Court has made it clear that there is no such relaxed

2   standard for class certification, and a district court must conduct a "rigorous analysis" to determine

3   whether plaintiffs have satisfied their burden of proving each of Rule 23(a)'s prerequisites, and the

4   "even more demanding" requirements of Rule 23(b)(3).  *Comcast*, 133 S. Ct. at 1432-33; *Ellis v.*

5   *Costco Wholesale*, 657 F.3d 970, 980 (9th Cir. 2011).  This rigorous and demanding analysis "will

6   entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores, Inc. v.*

7   *Dukes*, 564 U.S. 338, 350 (2011).  And, the Court must resolve "any factual disputes necessary to

8   determine whether there was a common pattern and practice that could affect the class as a whole."

9   *Ellis*, 657 F.3d at 983.

10        Rule 23(b)(3) requires IPPs to establish through common proof the (i) existence of a

11   conspiracy to fix prices in violation of antitrust laws; (ii) impact to all or almost all putative class

12   members resulting from the alleged conspiracy; and (iii) a methodology for determining the

13   amount of damages, if any, to each putative class member.  Plaintiffs must raise more than common

14   questions; those common questions must prove capable of "generat[ing] common *answers*" that

15   apply across the class and predominate over individualized liability and damages questions.  *Ellis*,

16   657 F.3d at 981 (quoting *Dukes*, 564 U.S. at 350); *see also Cal. v. Infineon Techs. AG*, No. C 06-

17   4333 PJH, 2008 WL 4155665, at *56 (N.D. Cal. Sept. 5, 2008) ("*Infineon*").

18        To meet this test, it is also IPPs' burden to provide a reliable expert methodology to

19   establish "that the pass-through of increased prices impacted consumers commonly, and that

20   impact, damages and the quantification of damages can all be proved with common, classwide

21   evidence." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-SC, 2013 WL 5428139,

22   at *1 (N.D. Cal. June 20, 2013), R&R adopted, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013); *see*

23   *also In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 321-22, 324 (N.D. Cal. 2014)

24   ("*ODD I*") (denying class certification because IPPs had "not met their burden to show they have

25   a methodology capable of establishing impact and damages on a class-wide basis").  Courts are

26   required to "give careful scrutiny" to plaintiffs' proffered method, and deny certification where

27   the proposed class is not "sufficiently cohesive to warrant adjudication by representation." *Tyson*

28

1   *Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016); *Roberts v. Marshalls of CA, LLC*, 2017

2   WL 1152967, at *10 (N.D. Cal. Mar. 28, 2017) (denying certification because "proposed classes

3   are not sufficiently cohesive to warrant adjudication by representation").  Because of this, IPPs are

4   wrong to claim that the fatal errors in their proffered expert's methods are merely "scientific

5   disputes" to be resolved by the trier of fact.  *See In re High-Tech Employee Antitrust Litig.*, 289

6   F.R.D. 555, 567 (N.D. Cal. 2013) (In a "battle of the experts," the Court must "not merely

7   determine whether such evidence is admissible, but also 'judg[e] the persuasiveness of the

8   evidence presented.'") (alteration in original) (quoting *Ellis*, 657 F.3d at 982); *Sher v. Raytheon

9   Co.*, 49 Fed. Appx. 887, 890 (11th Cir. 2011) (the "district court erred by not weighing conflicting

10  expert testimony presented by both parties at the class certification stage"); *West v. Prudential

11  Sec., Inc.*, 282 F.3d 935, 938 (7th Cir. 2002) (reversing grant of class certification because "a

12  district judge may not duck hard questions by observing that each side has some support" from a

13  "clash" of "economist[s]," nor by observing "that considerations relevant to class certification also

14  may affect the decision on the merits").

15      IPPs must not only present a reliable common methodology to show that overcharges were

16  paid on a class-wide basis, but also that such overcharges were passed through to all or almost all

17  class members.  *See ODD I*, 303 F.R.D. at 319; *In re Lithium Ion Batteries Antitrust Litig.*, No.

18  13-MD-2420 YGR, 2017 WL 1391491, at *12 (N.D. Cal. Apr. 12, 2017) ("*Batteries*"); *In re Flash

19  Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL 2332081, at *10-13 (N.D. Cal. June 9,

20  2010) ("*Flash*").  The class should not be certified if IPPs' class definition is "so broad that it

21  sweeps within it persons who could not have been injured by the defendant's conduct." *Moore v.

22  Apple Inc.*, 309 F.R.D. 532, 542 (N.D. Cal. 2015) (citation omitted); *Tyson*, 136 S. Ct. at 1053

23  (Roberts, J., concurring) ("Article III does not give federal courts the power to order relief to any

24  uninjured plaintiff, class action or not.").

25      As shown below, IPPs have failed to establish through reliable expert testimony that

26  individual injury resulting from the alleged conspiracies—antitrust impact—is "capable of proof

27  at trial through evidence that [is] common to the class rather than individual to its members," and

28

that "the damages resulting from that injury [a]re measurable 'on a class-wide basis' through use of a 'common methodology.'"  *Comcast*, 133 S. Ct. at 1430; *Batteries*, 2017 WL 1391491, at *12 (denying certification of IPP class based on plaintiffs' failure to "show that pass-through and damages can be established by expert analysis on a class-wide basis").

<u>ARGUMENT</u>

**I.    CALIFORNIA LAW CANNOT BE APPLIED TO REVIVE THE IPPS' LONG DISMISSED CLAIMS OF A SINGLE MULTI-STATE CLASS**

IPPs ask the Court to certify under California law a single, multi-state class comprised of the residents of 31 states who indirectly purchased capacitors from distributors located in those states.  In doing so, IPPs attempt to circumvent this Court's previous rulings that California law could not be applied to a multi-state class and an in-state purchase was required to invoke the antitrust laws of a specific state.  This Court specifically decided to determine these issues at the pleading stage rather than at class certification.  *See e.g.*, May 2015 Order at 24; Dec. 2015 Order at 4-5.  This made sense in order to provide the parties with guidance on the scope of discovery. IPPs surprise attempt at this late stage to expand their class under California law to include customers from 30 additional states that have their own relevant antitrust and consumer protection statutes ignores the Court's previous rulings and the class allegations in their own Complaint and should be rejected out of hand.  Indeed, this last-second effort to apply California law to a multi-state class is intended to circumvent this Court's ruling that IPPs were required to find individual plaintiffs from each relevant repealer state if they desired to represent indirect purchasers in those states.[2]  Nor have IPPs ever sought to amend their complaint – despite having several opportunities to do so – to add such a multi-state California class claim to this action (thereby depriving Defendants of any notice to even seek additional discovery to refute such a

---

[2] As "authority" for their attempt to bring claims under California law on behalf of class members in 31 states, IPPs attach to their Motion a confusing list of the antitrust and unfair competition statutes of those states.  However, this list does not provide a fulsome or accurate picture of the standing requirements of each of those states and appears to concede that IPPs do not have standing under certain states' antitrust laws.  It further ignores both due process principles and the myriad of conflicts that this Court should take into consideration when determining whether a class is appropriate for certification, as discussed in further detail below.

1   claim).  It is far too late to do so now.

2       Further, even if the Court were inclined to revisit the issue at this late date, IPPs' effort to

3   certify a multi-state class under California law should be rejected, once again, because it is

4   inconsistent with due process and choice of law principles.  Specifically, there are not sufficient

5   contacts between the alleged conspiratorial acts and California to justify applying California law

6   on a multi-state basis under the due process principles of *Phillips Petroleum Co. v. Shutts*, 472

7   U.S. 797, 821-22 (1985) – a proposition underscored by analogous recent Supreme Court

8   authority in the jurisdictional contexts emphasizing the due process limitation on states

9   attempting to apply their laws to companies that have little connection to their jurisdictions.  Nor,

10  if due process were not a bar, would there be any basis to apply California law under choice of

11  law principles, as each of the other thirty states have their own true conflicts and interests in

12  seeing that their specific laws are applied to indirect purchasers in their states.

13      The only IPP class motion appropriately before the Court is thus their alternative motion

14  to certify separate state classes for: California, Florida, Iowa, Michigan, Minnesota, Nebraska

15  and New York—the only states from which there are named plaintiffs willing to pursue indirect

16  purchaser claims.  Mot. at 2.

17      **A.    This Court Has Already Ruled that Out-of-State Purchasers Cannot Bring
          Claims Under California Law**

18
19      This Court previously determined that California law could not be applied to IPPs' claims

20  on behalf of a nationwide class.  In the May 2015 Order striking "all references to a nationwide

21  class in indirect purchasers' claims under California's Cartwright Act and Unfair Competition

22  Law," this Court determined that IPPs could not bring their claims under California law because

23  IPPs had alleged "hardly any contacts" with California and the "potential conflict with the laws

24  of other states . . . 'looms large.'"  May 2015 Order at 23-24.  IPPs then filed a new complaint,

25  alleging claims under the antitrust and consumer protection laws of thirty-one states but with

26  only five named plaintiffs: four California-based individuals or corporations who allegedly

27  purchased capacitors in California, and a Virginia corporation which allegedly purchased

28  capacitors in Virginia but distributed them throughout the other states, including California.

-7-

1   IPPs' Second Amended Complaint (Dkt. No. 741) at ¶¶ 387-445.  Finding a lack of Article III

2   standing for all claims except those asserted by the California plaintiffs, the Court dismissed all

3   of IPPs' claims asserted on behalf of the residents of the other thirty states.  The Court held that

4   an "in-state injury in the form of an in-state purchase of a capacitor at a supra-competitive price

5   is required to satisfy Article III standing" to bring an antitrust or related consumer protection

6   claim under state law.  Dec. 2015 Order at 9-11.

7          These findings – that the application of California law to IPPs' proposed multi-state class

8   violated principles of due process and that an injury under a state antitrust law required an in-

9   state purchase by a resident—are dispositive of the IPPs' renewed attempt to apply California

10  law to a multi-state class.  IPPs should not be allowed to attempt to re-litigate issues already

11  decided by this Court, especially at this late date, when the time for Defendants to conduct

12  discovery in opposition to such a multi-state case has already passed.

13      **B.     IPPs' Proposed Thirty-One State Class Under California Law Contradicts
                 the Allegations in the Fifth Amended Complaint – Making it Too Late to
14               Seek to Raise This Issue Again Now and Greatly Expand the Proposed Class**

15         Since the Court rejected IPPs' efforts to allege a nationwide class under California law and

16  ruled that IPPs could only pursue claims on behalf of purchasers in non-California states if they

17  had a named class representative who purchased capacitors in those states, IPPs have amended

18  their complaint several more times.  In each such instance, IPPs have only alleged they are seeking

19  to certify separate damage classes under separate state laws, each limited to indirect purchasers of

20  capacitors from distributors in the seven states who "as residents of" those states indirectly

21  purchased one or more electrolytic or film capacitors during the respective class periods.  Fifth

22  Amended Compl. at ¶ 393-94a-g (listing distinct classes for each state and limiting each class to

23  persons who were residents in the state at the time of purchase); IPPs' Fourth Consolidated Compl.

24  (Dkt. No. 1112) at ¶ 370-71a-g (same); IPPs' Third Consolidated Compl. (Dkt. No. 1057) at ¶ 369-

25  70a-g (same).  Moreover, in other relevant court filings, IPPs have repeatedly reaffirmed that it

26  was their intent to only seek to certify separate damage classes in the seven states in which they

27

28

had named class representatives who made purchases in those states.[3]  Accordingly, these are the only alleged classes as to which Defendants have focused their discovery, including the depositions of named plaintiffs.  These are also the only state classes for which the parties have briefed and argued application of the FTAIA.

It is simply not permissible for IPPs to now attempt, at the very last minute, to expand their proposed California class to include purchasers of capacitors from thirty-one different states all under California law – in direct contravention of not only the prior rulings of this court, but also the allegations of their three most recent complaints, filed in a time period spanning more than eighteen months. Mot. at 1 & n.1; *see Berlowitz v. Nob Hill Masonic Mgmt.*, No. C-96-01241 MHP, 1996 WL 724776, at *2 (N.D. Cal. Dec. 6, 1996) (declining to alter plaintiff's proposed class on a motion to certify because "[t]he court is bound by the class definition provided in the complaint"); *Costelo v. Chertoff*, 258 F.R.D. 600, 604-05 (C.D. Cal. 2009) (same).  Indeed, even those courts which have occasionally permitted modification of the class proposed in the complaint have only done so where "the proposed modifications [to the class definition] are minor, require no additional discovery, and cause no prejudice to defendants," *In re: TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 590-91 (N.D. Cal. 2010), or doing so results in a narrower class. *Sandoval v. Cty. of Sonoma*, No. 11-cv-05817-THE, 2015 WL 1926269, at *2 (N.D. Cal. Apr. 27, 2015) ("[w]hile a party moving for class certification cannot *expand* the class definition, the party can *narrow* the definition used in the complaint") (emphasis in original).  No case has ever permitted what the IPPs seek to do here – suddenly present the parties and the Court with a vastly expanded class that has both been previously rejected by the Court and not included in any of the three most recent IPP amended complaints.  Had Defendants known that they faced such a 31-state class, they would have conducted discovery focused on refuting that class based on factual differences affecting the price of capacitors sold in those states.

---

[3] *See, e.g.*, IPPs' Suppl. Br. Regarding Application of State Competition Law in Resp. to Order re Phase I of Summ. J. on Foreign Transactions (Dkt. No. 1407) at 1 ("IPPs sue under the antitrust and restraint of trade laws of California, Iowa, Michigan, Minnesota, Nebraska, and New York . . . as well as the consumer protection and unfair competition laws of California, Florida, Nebraska, and New York" (internal citations omitted)).

1

2

**C.     Both Due Process and Choice of Law Principles Bar the Application of California Law to the Proposed Multi-State Class**

3

4

5

6

7

8

9

10

11

12

13

14

15

Even if this Court were to permit IPPs to raise this multi-state class issue again at this late date, it should still reach the same conclusion as it did previously:  that no such multi-state application of California law is permitted for the IPP claims in this action.  May 2015 Order at 24; Dec. 2015 Order at 10.  As this District has previously acknowledged, "[f]or a nationwide class to invoke the law of a particular state, the chosen state's law must both (1) not conflict with the law of another jurisdiction that has an interest in the case,[4] and (2) have a significant contact or significant aggregation of contacts to claims asserted by each member of the plaintiff class to ensure that the choice of the forum state's law is not arbitrary or unfair."  *In re Graphics Processing Units Antitrust Litig.,* 527 F. Supp. 2d 1011, 1027 (N.D. Cal. 2007) *("GPU I")* (citing *Shutts*, 472 U.S. at 821-22); *see also* May 2015 Order at 23 (citing *Shutts* and *GPU I*).  If either of these two conditions is not met, the application of that particular state's law to claims asserted by a multistate class violates the Due Process Clause of the Fourteenth Amendment.  *GPU I*, 527 F. Supp. 2d at 1027 *(citing Shutts*, 472 U.S. at 821-22).  As this Court previously held, these conditions are not met here.  May 2015 Order at 24.

16

17

18

19

20

21

Completely ignoring this Court's previous rulings and the allegations in their own complaint, IPPs weakly assert that the "[t]rend" is to permit purchasers from other states to sue under California law.  Mot. at 30.  However, each of the cases cited by IPPs (*id.*) to support this purported "trend" is distinguishable because the plaintiffs in those cases, unlike the IPPs here, demonstrated that defendants had significant contacts with the State of California.  *See id.* (citing

22

23

24

25

26

27

28

---

[4] California choice of law rules employ a three-step governmental interest test: (1) determine whether the relevant law of the affected jurisdictions is different; (2) if different, examine each jurisdiction's interest in applying its own law to the particular circumstances to determine whether a true conflict exists; (3) if a true conflict exists, evaluate the interests of the affected jurisdictions to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state.  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 590 (9th Cir. 2012).  IPPs cite *Wash Mut.Bank, FA v. Superior Court*, 24 Cal. 4th 906, 921 (2001) and *Kearney v. Salomon Smith Barney*, 39 Cal. 4th 95, 107-08 (2006) to argue that Defendants bear a "substantial burden" to show that the law of California should not apply to out of state indirect purchasers.  Neither case references such a "substantial burden" standard.  *See Wash Mut. Bank, FA*, 24 Cal. 4th at 921; *Kearney*, 39 Cal. 4th at 107-08.

-10-

1  *In re Korean Ramen Antitrust Litig.*, No. 3:13-cv-04115-WHO, 2017 WL 235052, at *21-23 (N.D.

2  Cal. Jan. 19, 2017) (certification appropriate for 24 *Illinois Brick* repealer jurisdictions where

3  sufficient contacts to California existed); *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-MD-

4  2143 RS, 2016 WL 467444, at *14 (N.D. Cal. Feb. 8, 2016) ("*ODD II*"), *leave to appeal denied*

5  *sub nom. Wagner et al. v. Hitachi Ltd., et al.* (same); *In re Lithium Ion Batteries Antitrust Litig.*,

6  No. 13-MD-2420 YGR, 2017 U.S. Dist. LEXIS 57340, at *98-99 (N.D. Cal. Apr. 12, 2017)

7  (same).[5]

8         This Court's prior ruling that application of California law to a multi-state class would not

9  be appropriate on the facts presented here is even more strongly supported today, in light of new

10  Supreme Court authority, addressing the analogous issue of personal jurisdiction, which has

11  emphasized the limitations on states applying their laws, or extending their reach, to out of state

12  defendants when due process indicates that the states' asserted connections to the allegedly

13  unlawful conduct are insufficient.  *Bristol-Myers Squibb Co. v. Superior Court of Cal., S.F. Cnty.,*

14  *et al.*, No. 16-466 (June 19, 2017) (slip op.) (California courts lacked jurisdiction to entertain

15  claims brought by plaintiffs who were not California residents due to lack of sufficient contacts

16  between the forum and the specific claims at issue); *BNSF Railway Co. v. Tyrrell et al.*, No. 16-

17  405 (May 30, 2017 ) (slip op.) (exercise of personal jurisdiction under Montana law did not

18  comport with the Due Process Clause because neither plaintiff alleged injury from work in or

19  related to Montana).

20         Moreover, in its previous rulings, this Court appropriately focused both on the location of

21  the purchase and that there were "hardly any contacts at all in California" in determining what law

22  may apply to indirect purchaser claims.  May 2015 Order at 24; Dec. 2015 Order at 9-10; *Mazza*,

23  666 F.3d at 590 (district court abused its discretion in certifying a class under California UCL that

24  contained class members who purchased or leased their car in different jurisdictions).  Here, the

25  last events necessary for liability were the purchases that occurred in individual putative class

26

27  _____

[5] Crucially, each of these cases are further distinguishable in that the indirect purchasers sought
28  in the operative complaints to apply California law to all of the class members in numerous
states.  *See* the operative complaints in each of these cases, Ex. 1 at ¶¶ 36, 190; Ex. 2 at ¶¶ 380-
81; Ex. 3 at ¶¶ 463-64.

1    members' home states.  *See also Frenzel v. AliphCom*, 76 F. Supp. 3d 999, 1006-10 (N.D. Cal.

2    2014) (dismissing nationwide class claims under UCL where nonresident class members

3    "purchased their [product] in other states"); *Granfield v. NVIDIA Corp.*, No. C 11–05403 JW,

4    2012 WL 2847575, *3 (N.D. Cal. July 11, 2012) (dismissing California claims asserted by an out-

5    of-state resident who purchased her computer in home state).

6         Indeed, even when one broadens the analysis to consider contacts with California, it is

7    clear, as this Court previously found, that Defendants' contacts with California are insufficient to

8    support applying the California Cartwright Act and UCL to out-of-state transactions under due

9    process principles.  *Mazza*, 666 F.3d at 589-90; *see also AT&T Mobility LLC v. AU Optronics

10   Corp*, 707 F.3d 1106, 1113-14 (9th Cir. 2013) (plaintiff must show that "*each defendant . . .

11   [engaged in] sufficient conspiratorial conduct within California*, that is not 'slight and casual'")

12   (emphasis added).

13        Notwithstanding IPPs' conclusory assertions to the contrary, evidence adduced during

14   discovery leads to the exact same conclusion the Court reached previously: there are "hardly any

15   contacts at all with California."  May 2015 Order at 24.  Specifically, the evidence demonstrates

16   that: (1) the great majority of the putative class members in the proposed 31-state class reside in

17   jurisdictions other than California (Mot. at 33); (2) the great majority of the putative class members

18   in the 31-state class purchased their capacitors from distributors outside of California (*id.*); (3) the

19   great majority of the capacitors at issue in the 31-state class never entered California (*id.*); (4) none

20   of the capacitors products at issue were manufactured in California; and (5) virtually all of the

21   alleged conspiratorial meeting and agreements are claimed to have taken place and were

22   formulated overseas (and outside of California).[6]  *See Shutts*, 472 U.S. at 821 (holding that Kansas

23   law could not apply to a nationwide class where vast majority of class members had no apparent

24   connection to Kansas because the state "may not take a transaction with little or no relationship to

25   the forum and apply the law of the forum in order to satisfy the procedural requirement that there

26   be a 'common question of law'").  Indeed, there is no evidence that Defendants targeted the alleged

27

28   ─────────────────────
     [6] The vast majority of the capacitors alleged to be at issue were manufactured overseas, and none
     were manufactured in California.

conspiracy at California purchasers of capacitors; and, as demonstrated below, there are no documents or testimony evidencing any competitor discussion about sales to distributors in California or their customers at all. *See Marsh v. First Bank of Del.*, No. 11-CV-05226-WHO, 2014 WL 554553, at *13 (N.D. Cal. Feb. 7, 2014) ("[i]f the defendants' actions are as widespread as the TAC alleges . . . then the proportional harm [plaintiff] felt is insufficient to impose California's laws on up to 49 other states' citizens").

The decision in *GPU I* is instructive on this point. There, the plaintiffs argued that because certain defendants conducted business in California and because some conspiratorial activity allegedly occurred in California, the Cartwright Act and UCL should apply to a nationwide class of indirect purchasers. *GPU I*, 527 F. Supp. 2d at 1028. The Court rejected that argument, finding it "hard to see why the laws of other states should be tossed overboard and their residents remitted to California law for transactions that, for individual consumers, are local in nature." *Id.*; *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998) (the brunt of the harm suffered by a corporate plaintiff is in the state where it maintains its principal place of business); May 2015 Order at 23. Even where substantial contacts to the forum state have been pled, the court noted, courts have declined to apply a single state's laws to a broad multi-state antitrust class. *GPU I*, 527 F. Supp. 2d at 1028.

IPPs point to twelve pages of the parties' production (which totaled many millions of pages) and cite a list of inapposite evidence as somehow warranting the application of California law to out of state purchasers. Mot. at 32-33. These pages evidence ███████████ ████████████████████████████████████████████████████████████████ ████████████████████████████. Mot. Ex. 53.[7] In fact, even the majority of these carefully selected documents purporting to show "acts in furtherance of the conspiracy were carried out in California" show only that the locations of meetings where purportedly conspiratorial conduct took place were overseas. *See Mot. Exs. 56-59* (███████████████

_____

[7] "Mot. Ex.__" refers to Exhibits filed in support of IPPs' Motion for Class Certification, Dkt. No. 1680, 1682.

1  ████████████ ); Mot. Ex. 59 (████████████████

2  ████████████████████ ).  Others in this batch of 12 documents ████████████

3  ████████████ .  *See* Mot. Ex. 55.  This lack of evidence of any conspiratorial connection

4  to California further demonstrates why this Court was correct in holding that there is no basis in

5  this case to apply California law to indirect purchasers in other states, who have no connection to

6  California.  *See also* Fifth Amended Compl. at ¶¶ 141-54, 167-72 (majority of the alleged

7  conspiratorial "group meetings and discussions" are alleged to have occurred in Asia and none in

8  California); *see also Marsh,* 2014 WL 554553, at *12 (holding that "[a] mere branch office with

9  no connection to the challenged conduct is insufficient to bind non-Californians to California

10  law").

11        IPPs further point to *non-defendant* subsidiaries' offices in California, but identify no

12  conspiratorial conduct taken on the part of those subsidiaries.  *Comp.* Mot. at 34-35 *with* Fifth

13  Amended Compl. at ¶¶ 61-62, 83-90 (entities referenced for Matsuo, Shinyei, Soshin and Taitsu

14  are not defendants in this action); *see also* May 2015 Order at 25-26 (dismissing from this action

15  certain U.S. subsidiaries where the complaint contained no allegation that the "subsidiaries joined

16  the conspiracy and played some role in it").

17        This falls far short of IPPs' obligation to identify sufficient contacts between California

18  and each defendant to justify the application of California law. [8]  *Comp. with AT&T Mobility LLC*,

19  707 F.3d at 1113-14; *see In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-1827 SI, 2013 WL

20  1164897, at *4 (N.D. Cal. Mar. 20, 2013) (dismissing Cartwright Act claims on due process

21  grounds because plaintiffs failed to "adequately allege conspiratorial conduct of each Defendant

22  in California"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-1827 SI, 2013 WL 1891367,

---

[8] In the absence of evidence showing that each Defendant engaged in conspiratorial conduct in California, IPPs point to plea deals entered into by certain Defendants and suggest that a guilty plea in a criminal investigation not related to this action "establish the appropriateness of applying California law to the classes."  Mot. at 31.  But the pro forma pleas add nothing to the discussion -- the details relating to conduct in California are even more sparse than those provided by IPPs in the complaint, which this Court previously determined "allege[d] hardly any contacts at all with the state of California."  May 2015 Order at 24.

1   at *4 (N.D. Cal. May 6, 2013).[9]

2          Beyond the due process issues, as this Court previously noted, the choice of law analysis

3   shows the potential for conflicts between California law and the laws of other states "looms large."

4   May 2015 Order at 23-24 (citation omitted).  In their Motion, IPPs make no attempt to allay the

5   concerns expressed by this Court, which found "merit in disposing of this issue at an early stage

6   of the litigation, particularly where the issue of whether the different state's laws conflict will not

7   change significantly as this action progresses."  *Id.* at 24 (citation omitted).

8          To begin with, IPPs' proposed class includes multiple *Illinois Brick* non-repealer states.[10]

9   Motion at 1.  Courts within the Ninth Circuit, including decisions cited by IPPs, recognize that

10  indirect purchaser claims under the Cartwright Act cannot be applied to residents of non-repealer

11  states.  *See, e.g.*, *Korean Ramen*, 2017 WL 235052, at *22.  This is a "true conflict."  *Mazza*, 666

12  F.3d at 590.

13         Further, even among the *Illinois Brick* repealer states, a number of meaningful differences

14  relating to the limits of indirect purchaser standing exist, creating another true conflict that

15  prohibits the application of California law to other states.  Specifically, this Court has determined

16  that Cartwright Act claims are not subject to the antitrust standing factors enunciated in *Associated*

17  *General Contractors of California v. California State Council of Carpenters*, 459 U.S. 519 (1983)

18  ("*AGC*").  *See* May 2015 Order at 21-23 (citing, among others, *Samsung Elecs. Co., Ltd. v.*

19  *Panasonic Corp.*, 747 F.3d 1199, 1205 n.4 (9th Cir. 2014) ("it is no longer the law in California"

20  that the Cartwright Act is "coextensive with the Sherman Act")).  However, at least Nebraska,

21  New Mexico and Washington D.C. do apply the *AGC* antitrust standing requirements.  *Kanne v.*

22

23  _____
    [9] IPPs further ignore the locations of the four other U.S.-based defendants, New Jersey and
    Illinois - unsurprising, as in neither state can a private individual bring claims on behalf of a class
24  of indirect purchasers for violations of state antitrust laws.  Fifth Amended Compl. at ¶¶ 46, 49,
    52, 67; 740 Ill. Comp. Stat. 10/7 (2010); *Sickles v. Cabot Corp.,* 379 N.J. Super. 100, 877 A.2d
25  267 (A.D. 2005).

26  [10] These states are Arkansas, Florida, Massachusetts, Missouri, and Montana.  6 Von
    Kalinowski, Julian O. et al., Antitrust Laws and Trade Regulation §§ 104.09[1][a]-[b],
27  109.09[1][c] & n.19, 121.08[1][c] & n.31 (Matthew Bender 2d ed. 2017); 7 Von Kalinowski,
    Julian O. et al., Antitrust Laws and Trade Regulation §§125.08[7] & n.36, 126.08[1][c] & n.17.1
28  (Matthew Bender 2d ed. 2017). *Comp*. Mot. at 1 with ABA SECTION OF ANTITRUST LAW,
    STATE ANTITRUST PRACTICE & STATUTES (FIFTH) (2014).

-15-

1   *Visa U.S.A. Inc.*, 272 Neb. 489, 494-95 (Neb. 2006); *Nass-Romero v. Visa U.S.A., Inc.*, 279 P.3d

2   772, 778-80 (N.M. Ct. App. 2012); *Peterson v. Visa U.S.A., Inc.*, No. Civ.A. 03-8080, 2005 WL

3   1403761, at *2-5 (D.C. Super. Ct. Apr. 22, 2005).  This difference alone presents another "true

4   conflict." *See ODD II*, 2016 WL 467444, at *14 n.14 ("[*AGC*] might be applied under local law to

5   preclude IPP recovery.  If so, that would present a conflict similar to that existing in non-*Illinois*

6   *Brick* repealer jurisdictions.")

7          The parties have also previously briefed whether the Foreign Trade Antitrust

8   Improvements Act (the "FTAIA") bars claims asserted by IPPs under New York and Florida law.

9   Specifically, New York's Donnelly Act and consumer protection statute and Florida's Deceptive

10  and Unfair Trade Practices Act do not permit claims based on indirect purchases of capacitors first

11  sold overseas by a Defendant to a third-party distributor because Defendants' conduct with respect

12  to those sales did not occur in New York or Florida (as required for IPPs' claims under the

13  consumer protection statutes) and did not have a "particular New York orientation" sufficient to

14  give rise to a "very close nexus" to competition in New York (as required for IPPs' Donnelly Act

15  claim).[11]  Significantly, for purposes of the true conflict issue, these states also prohibit claims

16  based on capacitors first sold out-of-state, not just overseas.  Defendants' Supplemental Brief in

17  Support of Phase I Briefing of Defendants' Motion for Partial Summary Judgment Dismissing

18  Plaintiffs' Indirect Purchaser Claims Based on Foreign Sales (Dkt. No. 1372) (collecting

19  authority).  For this reason, the laws of New York and Florida present yet another "true conflict"

20  with the laws of California.  Other states in the thirty now sought to be included by IPPs also have

21  similar in state limitations that present a true conflict with California law, including Alabama and

22  West Virgina.  *See Griffiths v. Blue Cross & Blue Shield*, 147 F.Supp.2d 1203, 1220 (N.D. Ala.

23

24  _____

[11] *See* Defs.' Supp. Br. in Supp. of Phase I Briefing of Defs.' Mot. for Partial Summ. J.
25  Dismissing Pls.' Indirect Purchaser Claims Based on Foreign Sales (Dkt. No. 1372); IPPs' Supp.
    Br. Regarding Appl. of State Competition Law in Resp. to Order Re Phase I of Summ. J. on
26  Foreign Transactions (Dkt. No. 1407); and Reply in Support of Defendants' Supplemental Brief
    in Support of Phase I Briefing of Defs.' Mot. for Partial Summ. J. Dismissing Pls.' Indirect
27  Purchaser Claims Based on Foreign Sales (Dkt. No. 1411).  Defendants did not brief this issue as
    it relates to the states without named plaintiff residents at the time of the this briefing because, at
28  that time, those states were not at issue.

1    2001); *Anziulewicz v. Bluefield Cmty. Hosp., Inc*., 531 F.Supp. 49, 53 (S.D. W. Va. 1981).

2    Moreover, there is a four-year statute of limitations for Cartwright and UCL claims, as

3    opposed to states with shorter limitation periods for similar claims (*e.g.*, Tennessee, three years

4    (*see* Tenn. Code § 28-3-105)).   In addition, Michigan and North Carolina, require indirect

5    purchasers to prove as part of their case that a portion of the alleged overcharge was "passed on"

6    to them. *A&M Supply Co. v. Microsoft Corp.*, 654 N.W.2d 572, 574-75 (Mich. Ct. App. 2002);

7    *Teague v. Bayer AG*, 671 S.E.2d 550, 558 (N.C. Ct. App. 2009).   Other states allow no "pass on"

8    defense at all. *K-S Pharmacies Inc. v. Abbott Labs.*, No. 94CV002384, 1996 WL 33323859, at

9    *12 (Wis. Cir. Ct. May 17, 1996).   All of these differences provide further true conflicts with

10   California law. *Comp. with In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-1827, 2012 WL

11   6709621, at *2 (N.D. Cal. 2012) (defendants permitted to present a pass-on defense to California

12   claims).   This is a mere sampling of the numerous true conflicts between California and other

13   states' laws at issue in the IPPs' proposed 31 state class applying California law that led to this

14   Court's previous ruling denying such a class because the potential conflicts "loom[ed] large."[12]

15   In sum, each state has a valid interest in "calibrat[ing] liability to foster commerce" in a

16   different manner than that chosen by California. *See Mazza*, 666 F.3d at 593-94 (finding that

17   "California's interest in applying its law to residents of foreign states is attenuated" and district

18   court "ignor[ed] or [gave] too little attention to each state's interest in promoting business").   These

19   true conflicts thus provide a further ground for why this Court should conclude that it decided this

20   issue correctly back in 2015 and that there is no basis for applying California law to the IPPS'

21   proposed 31-state class.

22   **II.     THE IPP CLASSES DO NOT SATISFY RULE 23(B)(3) BECAUSE PLAINTIFFS'**
     **PROFFERED EXPERT METHODOLOGIES ARE INCAPABLE OF PROVING**
23   **CLASS-WIDE IMPACT WITH COMMON EVIDENCE**

24   IPPs rely on Dr. Lamb's overcharge and pass-through models to satisfy their burden of

25   demonstrating that a common methodology exists that is capable of measuring impact and

26   damages for each member of the class. But, Dr. Lamb's methods are inherently incapable of doing

27

28   [12] *See* Appendix A and the Joint Mot. to Dismiss the Indirect Purchaser Pls.' Second Consol.
     Compl. (Dkt. No. 793) at 7-15, identifying other true conflicts with California law.

so, and are also unreliable, and thus cannot survive the rigorous analysis required before a damages class can be certified.

>    **A.**   **Dr. Lamb Offers No Reliable Common Method For Proving That Overcharges Impacted All Direct Purchaser Sales And Were Then Uniformly Passed Through to All or Almost All Putative Class Members**

IPPs contend that Dr. Lamb's "models … confirm that the direct purchasers suffered overcharges" and furthermore "show substantial pass through of the overcharges." Mot. at 15, 20. To support the reliability of these models in demonstrating class-wide impact, IPPs point to the models' statistical properties, including R-Squareds exceeding 90% and overall statistical significance at the one percent level for each of the three dielectrics in the overcharge model. *Id.* at 17-18. There are numerous flaws in IPPs' conclusions.

*First*, Dr. Lamb's overcharge and pass-through models lump together, aggregate, and average data for different capacitors that were manufactured by different suppliers and sold to different direct purchasers (and ultimately to different indirect purchasers) under different competitive circumstances. Dr. Lamb even lumps in capacitor purchases by *non-distributers* such as OEMs, which did not even sell capacitors to IPPs and so are not at all relevant to the IPP class consisting solely of U.S. purchasers from *distributors*. These uniform average overcharge and pass-through rates obscure differences that impact large segments of the putative class differently, as shown through testing by Defendants' expert Dr. Gregory K. Leonard, PhD. The result is a methodology that improperly assumes the answer – uniform impact to all class members – of the very question it is supposed to be studying.

*Second*, Dr. Lamb assumes a single, identical overcharge at all points throughout a twelve-year period. He repeats this error by making the same assumption with pass-through rates. This is yet another form of improperly aggregating and averaging data: in this case, data from disparate time periods affected by different events and supply and demand conditions. It results in the very same problem of an "average," or uniform, overcharge, which obscures differences in impact that were revealed when Defendants' expert allowed overcharge rates to vary over time in Dr. Lamb's regressions.

*Third*, Dr. Lamb fails to control for the price effects of at least three significant events during that twelve-year period—the Tohoku earthquake and tsunami in 2011, the 2011 floods in Taiwan, and the Great Recession in 2008—yet again concealing important differences among the proposed class in the wake of those events, in addition to rendering his regressions unreliable.

*Fourth*, Dr. Lamb's speculative "market characteristics" and "pricing structure" opinions are unable to demonstrate overcharge and pass-through to all or nearly all of the proposed class, and are in any case unreliable and contradicted by the record facts.

In each case, standard testing reveals that Dr. Lamb's methods are deeply flawed and conceal significant differences among the members of the proposed class, including the critical fact that many class members cannot be shown to have suffered any impact at all.  While each of these deficiencies is by itself reason not to certify a class, the aggregate effect and interplay of them renders Dr. Lamb's opinions unsalvageable and incapable of supporting class certification.

> **1.      Dr. Lamb's Uniform "Average" Overcharge and Pass-Through Models Improperly Aggregate Non-Cohesive Data, Obscuring Real-World Pricing Differences That Preclude Class Certification, and Improperly Include Irrelevant Sales to Non-Distributors That Render the Entire Analysis Unreliable**

Courts in this district have rejected expert analyses at the class certification stage that mask important differences through improper aggregations and averaging, which conceal, rather than study, important differences among putative class members.  *See ODD I*, 303 F.R.D. at 321 (rejecting a "model in which the alleged conspiratorial overcharge is assumed to be the same for all purchasers across all models," since that "cannot serve to establish that all (or nearly all) members of the class suffered damage"); *Flash*, 2010 WL 2332081, at *10 (denying class certification where expert's model failed to account for "the wide range of different types of products with equally varied attributes"); *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 494, 497 (N.D. Cal. 2008) ("*GPU II*") ("Averaging masks the differences and by definition glides over what may be important differences."); *Infineon*, 2008 WL 4155665, at *11 ("[E]ach divergent factor—customer size, type, procurement channel, product, distribution step" that an expert failed to account for "is a factor that increases the likelihood that proof of pass-

through can only be shown with resort to individualized proof."); *see also In re Pharmacy Benefit Managers Antitrust Litig.*, Nos. 03-4730, 06-1782, 06-4114, 06-4115, 06-4305, 2017 WL 275398, at *20-21 (E.D. Pa. Jan. 18, 2017) ("[A]verages cannot demonstrate antitrust impact for individual class members. . . . [T]here is no valid scientific connection between the averages evidence and the pertinent inquiry of whether the differential was the result of anticompetitive behavior.") (citations omitted); ABA SECTION OF ANTITRUST LAW, ECONOMETRICS: LEGAL, PRACTICAL, AND TECHNICAL ISSUES 220 (1st ed. 2005) (cited in Mot. Ex. 46 ("Lamb Decl.")[13] ¶¶ 189 n.399, 195 n. 419, 272 n. 528, 334 n. 599) (averages "hide substantial variation across individual cases, which may be key to determining whether there is common impact").

Here, at both the direct and indirect purchaser levels, Dr. Lamb's models suffer from this critical defect of aggregating and averaging data in a manner that masks important differences that require individualized inquiries on injury and damages. The models ignore significant pricing differences among manufacturers, direct purchasers, indirect purchasers, and even the capacitors themselves, ███████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████. Mot. Ex. 49 [Leonard Rep.][14] ¶¶ 41-44, 60-63, 105, 109; *see also* Ex. 22 [Lamb Tr.] 120:1-22, ██████████████████████████████████████████████████████████████████. The many flaws with a single, average overcharge are pervasive.

Indeed, when Defendants' expert Dr. Leonard controlled for product variation using individual capacitor part numbers (which were readily available in Dr. Lamb's own data), ████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████ Leonard Rep. ¶¶ 113-14 & n.281.[15] This fact alone demonstrates why a class

---

[13] "Lamb Decl." refers to Ex. 46 to IPP Mot. for Class Certification, Dkt. 1680-40, 1682-46.
[14] "Leonard Rep." refers to Ex. 49 to IPP Mot. for Class Certification, Dkt. 1680-43, 1682-49.
[15] Dr. Lamb's ████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ Leonard Rep. ¶¶ 105, 113 n.281. Given these lowered "averages," it is all the more likely that a substantial portion of the class experienced no pass-through of any overcharge.

-20-

cannot be certified on the basis of Dr. Lamb's single overcharge and pass-through assumptions.

Moreover, Dr. Lamb's overcharge model disregards significant differences across capacitor products that impact price. For example:

- Dr. Lamb's analyses ignore the vast majority of product characteristics which affect prices differently, including the specific configuration, electrolyte, endurance, equivalent series inductance ("ESI"), equivalent series resistance ("ESR"), operating temperature, polarity, ripple current rating, size, and tolerance. *See* Leonard Rep. ¶ 19; Ex. 4[16] [Watlock Tr.] 216:12-219:7 ( ). Dr. Lamb accounts . *See* Leonard Rep. ¶ 44 n.119; Lamb Tr. 108:5-8. Indeed, Dr. Lamb acknowledged that his mode Lamb Tr. 112:13-114:12.

- Dr. Lamb does not test or even consider that the composition of capacitors varies greatly in terms of component parts (such as foil, can and top), even where those differences cause manufacturing costs and sales prices to diverge widely between capacitors of the same dielectric. *See* Lamb Tr. 136:6-138:5, 140:5-142:8 ; Leonard Rep. ¶ 71 ( ).

- Lamb Tr. 126:7-12. ).

- Dr. Lamb's or cost upwards of . *See* Ex. 5 [Lubman Tr. Tr.] 276:13-277:25, 584:17-585:5 . There is no credible basis for his assumption that such dramatically different capacitor products would be impacted by the alleged conspiracy in identical ways.

- Ex. 6 [KEM0011705-922] at 736-39. In fact, even if two capacitors are completely identical across all features, different end uses can result in different prices because of the different supply and demand factors that are involved. For example,

---

[16] "Ex. ___" refers to the concurrently filed Fortier Declaration to this Opposition.

[17] Dr. Lamb testified that he did not even know that large can capacitor sales were included in the IPP class, and had virtually no knowledge about their properties, manufacture, or end uses which could impact price aside from the fact that "capacitors come in the sort of, to put it in layman's terms lots of different sizes." Lamb Tr. 17:2-19:1, 69:14-70:2, 79:9-80:24.

████████████████████████████████████████████.  *See* Ex. 4 [Watlock Tr.] 153:13-154:6; 211:2-14.

The differences among capacitor products and the corresponding lack of price commonality cannot be disputed.  Yet Dr. Lamb simply ignored these product differences by assuming, without factual or empirical support, that they have no effect on the existence or magnitude of the alleged antitrust injury to each class member.  *See ODD I*, 303 F.R.D. at 324 (where overcharges calculated by IPP expert "reflect aggregate estimates for all purchasers purchasing ODDs of particular types in given years . . . class-wide impact is still being *assumed* by the models, rather than demonstrated by the results"); *GPU II*, 253 F.R.D. at 494, 497 (finding expert's models "grossly lacking" where "the products at issue [we]re highly diverse," but the expert used averages "[d]espite having all of the necessary data set to correlate individual products and particular purchasers").  This is exactly the type of situation in which aggregating and averaging to conceal product differences impacting price has been rejected as a basis for class certification.

Further, to generate the purported overcharges at the direct purchaser level for aluminum, tantalum, and film capacitors, Dr. Lamb lumped together extensive amounts of sales pricing data from entities not involved in the IPP case, ████████████████████████████ ████████████████████████████████████████████████████████████ ████████.  Leonard Rep. ¶¶ 57-58; *see also* Lamb Tr. Tr. 150:2-14.  These non-distributor entities paid different prices than the distributors that resold capacitors to members of IPPs' purported class, and Dr. Lamb had no basis for simply lumping together the non-distributor sales pricing data with the sales pricing data for distributors who did sell to putative IPP class members.  The prices charged to these different types of direct purchasers by Defendants were simply not the same.  For instance, ████████████████████████████████████████████████ ████████████████████████████████████████.  Ex. 4 [Watlock Tr.] 15:7-11, 50:2-11, 163:19-164:2, 182:20-183:8.  ████████████████████████████████████████ ██████████████████████████████████  Ex. 7 [Magoncia Tr.] 86:12-87:10; *see also* Lamb Tr. 163:6-25.  This is just one example, for one defendant, of the myriad pricing variations

-22-

1   that were obscured by Dr. Lamb's unsupported assumption that he could simply pool together the

2   pricing data for sales to distributors with the pricing data for sales to non-distributors.

3         Significantly, *as discussed infra* Section III, the alleged conspiratorial documents cited by

4   IPPs do not concern prices or sales to the distributors that sold capacitors to IPPs in the U.S.  This

5   raises a distinct possibility that if just relevant sales to distributors were examined, the overcharge

6   results in Dr. Lamb's analysis might not show any impact at all.

7         In short, Dr. Lamb's pricing analyses did not focus on the relevant inquiry:  whether the

8   distributors that actually sold capacitors to the IPPs in the U.S. all sustained an overcharge.  When

9   Dr. Leonard

10

11                                              .  Leonard Rep. ¶ 58 & n.149.

12         Similarly, Dr. Lamb's single overcharge model disregards important cost and pricing

13   differences among the defendant manufacturers.   For example,

14                                        .  Ex. 4 [Watlock Tr.] 16:2-6, 55:7-

15   56:2.[18]  But rather than trying to account for the cost differences of manufacturing capacitors in

16   the United States—by including geographical indicator variables in the regression analysis —Dr.

17   Lamb instead wrongly assumes (through his one-size-fits-all overcharge assumption)

18                                 .  *See* Leonard Rep. ¶¶ 62-63, 96; Lamb Tr.

19   19:13-20:21, 22:2-22.   He also ignored all other differences in procurement costs among the

20   Defendants, which would have impacted their pricing.

21

22                              .  Leonard Rep. ¶ 71& n.180.  By ignoring these differences

23   in manufacturing costs among different Defendants, Dr. Lamb's averaging and aggregating of data

24   preclude him from offering reliable class-wide results.  *Id.* ¶¶ 63-67 & n.153.

25         These aggregation errors are then compounded by Dr. Lamb in his pass-through models,

26

---

27   [18] Notably, Dr. Lamb was unaware of this fact prior to his deposition.  (dep 16:3-17:1, 18:17-
     19:12 (testifying, "I don't know what manufacturing facilities [UCC] has in the United States or
28   elsewhere" and "I don't know that I ever knew that it had a plant in Lansing, North Carolina").)

1   in which he lumped together all putative class members regardless of whether they purchased high

2   volumes of capacitors pursuant to long-term, negotiated contracts, or made only isolated purchases

3   at list prices without any contract at all.  *Compare* Ex. 8 [Schwamb Tr.] 61:2-61:15 (IPP describing

4   "one-off" purchases); *with* Ex. 5 [Lubman Tr.] 387:11-388:14 (█████████████████████████

5   ██████████████████████████████); *see also* Leonard Rep. ¶ 109.  Standard statistical tests

6   show that the data utilized in Dr. Lamb's pass-through models should not be pooled, ████████

7   ██████████████████████████████████████████████████████████████████████.

8   Leonard Rep. ¶ 110 & n.275.  When Dr. Leonard allowed Dr. Lamb's pass-through rates to vary

9   by customer, the differences were revealing: ███████████████████████████████████████

10  ████████████████████████████████████████████████████████████████████████

11  ██████████████████████████████████████████.  *Id.* ¶ 111.

12      Dr. Lamb's own pass-through model, together with the evidence of substantial pricing and

13  cost variations in the capacitors industry, which his analyses just assumed away, illustrates the

14  unreliability of his "one-size-fits-all" approach.  *See Flash,* 2010 WL 2332081, at *11.  On this

15  record, Dr. Lamb's methods cannot provide a reliable basis for certifying the proposed class.

16      **2.    Dr. Lamb's Uniform Overcharges Over the Entire Class Period**
            **Obscure Significant Variations in Capacitor Pricing That Bear**

17          **Directly on Whether a Putative Class Member Was Injured**

18      Courts deny class certification where an expert's model "obscures individual variations

19  over time among the prices that different customers pay for the same or different products . . . ."

20  *Flash*, 2010 WL 2332081, at *10.

21      Dr. Lamb opines that, ██████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████████████

23  ████████████████████████       Mot. Ex. 47 [Lamb Reply][19] ¶ 28.  But Dr. Lamb provides

24  no economic basis for his assumption that a single uniform overcharge rate can be reliably applied

25  to *each* purchase of *every* aluminum, tantalum, and film capacitor over a *twelve-year period* (2002-

26

27  _____

28  [19] "Lamb Reply" refers to Ex. 47 to IPP Mot. for Class Certification, Dkt. 1680-41, 1682-47.

1   2014) during which supply, demand, costs, and pricing varied significantly.[20]  When Dr. Lamb's

2   own model does not apply this single overcharge for the entire proposed class period, ***the model***

3   ***shows*** ████████████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████████████

5   ████   Leonard Rep. ¶¶ 48-50, Leonard Rep. Exs. 2-4.  In an attempt to defend his uniform

6   overcharge assumption, Dr. Lamb introduces a new analysis in his reply that runs separate

7   regressions breaking out one individual year at a time, but arbitrarily keeping all other eleven years

8   combined.  Even under this unconventional method,[21] ***Dr. Lamb finds substantial differences***

9   ***across his estimated single-year overcharges.***

10   • ████████████████████████████████████████████████████

11   ████████████████████████████████████████

12   • ████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████

14   • ████████████████████████████████████

15   ████████████████████████████████.

16   Lamb Reply ¶ 27 & Table 2.

17   Incredibly, Dr. Lamb's testimony is that, ████████████████████████████

18   ████████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████ *Id.* ¶ 28; *see*

20   *also* Lamb Tr. 239:10-241:13 (explaining he used a single overcharge because ████████

21   ████████████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████████

23   ████████████████").  But that explanation makes no sense.  Even if one were to assume a

24

25   [20] Numerous documents cited by IPPs illustrate that during the alleged conspiracy period, there
    were market-driven price declines the meeting participants had no ability to affect. *See, e.g.,*

26   Mot. Ex. 16 ████████████████████████████████████); Mot. Ex. 22

27   (████████████████████████████████); Mot. Ex. 19 (████████████████████); Mot.
    Ex. 25 (PAN-CU004116310_EN) ████████████████████████████████████████████.

28   [21] Unlike Dr. Leonard, Dr. Lamb is not relaxing the time restriction to allow *variation* over time.

single agreement for each type of capacitor lasting for twelve years, that does not mean that it can be assumed that the price impact of such an agreement would be the same for each of these twelve years.  To the contrary, this was precisely the question that Dr. Lamb's analysis was supposed to study: what was the impact of the alleged conspiracy on different purchasers during the proposed class period?  By assuming the answer to this question with a single aggregated overcharge, Dr. Lamb fails to provide any reliable basis for measuring or assessing class-wide impact to individual class members.  An expert may not simply "take[] assumptions given to him by [the plaintiff] and embrace[] and bolster[] them with his own opinion without an adequate basis to support that opinion."  *See Lava Trading, Inc. v. Hartford Fire Ins. Co.*, No. 03 Civ. 7037 (PKC), 2005 WL 4684238, at *2 (S.D.N.Y. Apr. 11, 2005).

Indeed, ███████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████. Leonard Rep. ¶ 48 & n.123; *see also id.* at ¶¶ 48-51 & Leonard Rep. Exs. 2-4 (████████████████████████ ████████████████████████████████████████████████████████ ████████████████).  There is thus no reliable basis for Dr. Lamb to have made such an assumption here.  *See ODD I*, 303 F.R.D. at 321 (rejecting "model in which the alleged conspiratorial overcharge is assumed to be the same . . . *throughout the entire class period*" since that "assumes the very proposition that the DPPs are now offering it, in part, to show") (emphasis added); *c.f. GPU II*, 253 F.R.D. at 494-95 (finding the plaintiffs' expert's conclusions "evaporate[]" when the court considered the defense expert's analysis, since many of the disaggregated results "were negative or statistically not different from zero").

### 3.    Dr. Lamb's Models Fail to Account for Divergent Price Effects in Response to Significant Market Events Over the Twelve-Year Period

Over the twelve-year period of IPPs' alleged conspiracy, there were several events that roiled capacitor markets worldwide, including in Asia specifically.  These include the devastating Tohoku earthquake and tsunami in March 2011, the Thailand flood that shut down hundreds of

factories, affected close to 3 million people, and killed over 500 people in 2011, and the Great

Recession in 2008 and 2009.  *See* Leonard Rep. ¶¶ 52-53 (███████████████████████████

███████████████████████████████); Thomas Fuller, *Floodwaters are Gone, but*

*Supply Chain Issues Linger*, NY TIMES, Jan. 20, 2012, https://nyti.ms/2kCcZHu; Thomas Fuller,

*In the Flooded Thai Capital, Residents Are Now Refugees*, NY TIMES, Nov. 8, 2011,

https://nyti.ms/2suRQSY.  Dr. Lamb ███████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████.

Lamb Reply ¶¶ 34, 36.  This approach fails to rule out other non-conspiratorial causes for price

effects and is not a proper basis for class certification.  *See GPU II*, 253 F.R.D. at 496 ("Notably

absent from [DPPs' expert's] analysis are other factors that would likely have an impact on prices,

including . . . supply and demand factors . . . .  Without incorporating such variables, it is impossible

to account for the diversity in products and purchasers here.")

Indeed, Dr. Leonard's empirical testing ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████.  Leonard Rep. ¶¶ 80-81, 83-86 & Leonard

Rep. Exs. 7-9.  This variation in price impact is not surprising given that some manufacturers were

hit harder than others by the earthquake based on the location of their plants, disrupting supply

chains in different ways.  ███████████████████████████████████████████████████

████████████████████████████ Ex. 21 [UCC-CAP-00023057].  ████████████████

████████████████████████████████████████ Leonard  Rep. ¶ 53. ████

████████████████████████████████████████████████████████████████████████████

Other defendants whose factories were in different locations did not experience the same impact

from the earthquake.  It is precisely these types of divergent impacts which Dr. Lamb was required

(but failed) to study, and not simply assume away.[22]

**4.    Dr. Lamb's "Market Characteristics" and "Pricing Structure" Opinions Are Also Incapable of Proving Class-wide Impact With Common Evidence**

Apparently recognizing the deficiencies in the regression analyses of Dr. Lamb, IPPs propose that the Court look to two other, largely qualitative analyses offered by Dr. Lamb:  namely, that certain "market characteristics" and a "pricing structure" would make it more likely that the alleged conspiracy would have widespread effects.[23]  But these "opinions" by Dr. Lamb are nothing more than speculation based on a (misleading) presentation of anecdotal evidence.

Dr. Lamb's opinion that the mere presence of certain "market characteristics" or a "pricing structure" demonstrates that all or nearly all class members would have experienced a common impact from the alleged conspiracy is pure conjecture devoid of any reliable expert analysis.  In proving predominance under Rule 23, "Plaintiffs must show not that 'market conditions are favorable for impact' . . . but that there is a common, formulaic method of proving that if defendants conspired to raise prices, the direct purchasers plaintiffs bought from paid an overcharge."   *GPU II*, 253 F.R.D. at 502; *see also ODD I*, 303 F.R.D at 320 ("[W]hile such industry characteristics may be preconditions for any colorable case of class-wide impact, they do not establish such impact."); *c.f. In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 996 (C.D. Cal. 2012)) (excluding expert that opined, in effect: "I am an economist, I reviewed a large amount of 'industry information' . . . and this industry information supports my conclusion.").

Dr. Lamb's analysis suffers from this same defect.  As Dr. Leonard explains:

███████████████████████████████████████████

---

[22] IPPs attempt to justify Dr. Lamb's regressions by stating the "Japanese earthquake or flood in Thailand were too transitory in nature to have any real effect."  Mot. at 23. ███████████ ████████████████████████████████████████████████████████ *See* Leonard Rep. ¶¶ 52-56.

[23] While IPPs imply that each of these three methods could be independently sufficient in determining common impact, their own expert disagrees.  He instead states that he bases his opinion on a combination of all of his methods, taken together.  *Compare* Mot. at 8 *with* Lamb Decl. ¶¶ 259, 304, 323.

Leonard Rep. ¶ 87.  Dr. Lamb himself admits ███████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████   Lamb Reply ¶ 49; *see also* Lamb Tr. 65:19-66:18 █████████

████████████████████████████████████████████████████████████████

███████████████████).   Having made this concession, he cannot fill this gap by merely

discussing industry characteristics or a purported pricing structure.

None of the cases cited by IPPs relied solely on a market characteristics or price structure

analysis to determine class-wide impact, and at least two expressly stated that to do so would be

inappropriate.  *See, e.g.*, *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 JG

VVP, 2014 WL 7882100, at *49 (E.D.N.Y. Oct. 15, 2014), R. & R. adopted, No. 06-MD-1775 JG

VVP, 2015 WL 5093503 (E.D.N.Y. July 10, 2015) ("[M]arket analysis does not establish the fact

of each plaintiff's impact 'on its own.'"); *Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*,

No. 09-CV-0852, 2016 WL 3579953, at *7 (E.D. Wis. June 24, 2016) ("[A]ntitrust impact based

on a simple description of general market characteristics cannot be presumed.").

Moreover, the first three market characteristics cited by IPPs – barriers to entry, availability

of substitutes, and market share (Mot. at 8) – actually undermine, rather than support, Dr. Lamb's

opinions.  Dr. Lamb finds ███████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

Lamb Decl. ¶¶ 99, 216 & Tables 4, 9.  For Film, even Dr. Lamb conceded ████████████

███████████████████████████████████ *id.* ¶ 297, and Dr. Leonard confirmed ████

████████████████████████████████████████, Leonard Rep. ¶ 88

& App'x D, Fig. 5.  There is also extensive record evidence indicating the existence of substantial

competition from outside capacitor suppliers, ████████████████████████████

████████████████████████████████████

[24] Other sources identified by Dr. Leonard put the numbers even higher: ██████████████

████████████████████.  Leonard Rep. ¶ 88 & App'x D, Fig. 4.

-29-

1 [REDACTED]

2 [REDACTED] *Id.* ¶¶ 26-28, 88 & App'x D,

3 Figs. 4-5.[25]  Under these circumstances where [REDACTED]

4 [REDACTED], Dr. Lamb cannot credibly opine that

5 Defendants [REDACTED]

6 [REDACTED] Lamb Tr. 127:8-128:11.

7 The record evidence likewise does not support Dr. Lamb's broad assumption that [REDACTED]

8 [REDACTED]

9 Mot. at 8-9 (citing Lamb Decl. ¶¶ 107-113, 219-222, 299-302).  In reality, [REDACTED]

10 [REDACTED]

11 *See* Leonard Rep. ¶¶ 94-95; Ex. 9 [Fujisaku 2016 Tr.] 156:23-158:1 ([REDACTED]

12 [REDACTED]); Ex. 10 [Danno Tr.] 110:1-7

13 ([REDACTED] Dr. Lamb also admitted [REDACTED]

14 [REDACTED]

15 [REDACTED], *see* Lamb Decl, ¶¶ 102-05, 326, further contradicting his assumption that [REDACTED]

16 [REDACTED], *id.* ¶¶ 107, 239,

17 310.[26]

18 Dr. Lamb's "pricing structure" analysis is equally flawed.  Dr. Lamb attempts (but fails) to

19 [REDACTED]

20 [REDACTED] Lamb Decl. ¶¶ 143, 244, 315.  The fatal problem with this analysis is that Dr.

21 Lamb's regressions incorrectly test only whether prices respond to differences in voltage,

22 _____

23 [25] [REDACTED] Ex. 17

24 [REDACTED]

25 [REDACTED]

26 [REDACTED]

27 [26] In reply, Dr. Lamb assumes that [REDACTED]

28 [REDACTED]. Lamb Reply ¶ 80.  He provides no evidence or analyses, however, to support this assumption, which therefore is unreliable and must be rejected.

-30-

capacitance, and product series. *Id.* ¶¶ 149-53, 252-56, 318-21. These are traits that *do not change over time* for a given capacitors product, and hence have no bearing on the relevant question: do individual capacitors' prices move together over time. A court can and should reject expert testimony at the class certification stage where, as here, "the expert's purported methodology fails to explain his final conclusion." *Perez v. State Farm Mut. Auto. Ins. Co.*, No. C 06-01962 JW, 2012 WL 3116355, at *2 (N.D. Cal. July 31, 2012); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing . . . requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). By ignoring factors affecting capacitors that would change over time, Dr. Lamb never does a regression to answer the relevant question. *See* Leonard Rep. ¶¶ 75-79.

Having failed to show the existence of a pricing structure with his quantitative test, Dr. Lamb falls back on ███████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ Lamb Decl. ¶¶ 144, 147-48, 248-51, 316-17. But as discussed above, *supra* pp. 29-30, his approach lacks the necessary scientific rigor to support class certification. Further, it is not supported by the record evidence. For instance, Dr. Lamb assumes that ████████████████ ████████████████████████████ but as previously discussed, *see supra* p. 24, this ignores numerous important differences in Defendants' cost structures. Lamb Decl. ¶¶ 147, 249; Leonard Rep. ¶ 71. He also admitted he ███████████████████████████████████████ ██████████████████ *See* Lamb Tr. 136:6-17. Dr. Lamb likewise conclusorily assumes, without any record support, that ███████████████████████████████████████████ ██████████████ Lamb Rep. ¶¶ 148, 251, 317, even though IPPs' own complaint acknowledges a wide range of radically different end uses within a dielectric. Dkt. No. 1589 ¶¶ 119-23 (end uses for aluminum capacitors include computer and television screens, home appliances, industrial lighting, and renewable energy systems); *id.* ¶ 126 (tantalum capacitors are used in small consumer electronics such as smartphones and tablets, as well as industrial, medical, and military applications); *id.* ¶ 134 (film capacitors are "useful for many industrial applications

and general-purpose applications in electronics"); *see also* Leonard Rep. ¶ 72. Finally, Dr. Leonard conducted an analysis that ███████████████████████████████████████ ████████████████████████████████████████████████████████████████████████. *See* Leonard Rep. ¶¶ 82-86, 95 & Leonard Rep. Exs. 7-9.

In sum, Dr. Lamb's "market characteristics" and "pricing structure" opinions fare no better than his overcharge or pass-through regressions. None of these analyses, taken separately or together, provide a reliable common basis for proving class-wide impact or damages.

### B. Dr. Lamb Fails to Offer a Common Methodology Using Common Evidence Capable of Estimating the Amount of Overcharge Passed On to IPPs' Customers

Even if the Court finds that Dr. Lamb's methodology can establish injury to all class members and the amount of damages passed on to them, which it cannot, IPPs and Dr. Lamb have failed to proffer any methodology addressing the amount of overcharge passed on by IPPs to their customers thereby reducing, if not eliminating, their alleged injury.[27] Incredibly, Dr. Lamb has not only failed to establish that pass-on of any overcharge to IPPs' customers could be addressed using a common methodology and evidence, but he has actually suggested that a common methodology and evidence cannot be used. Specifically, Dr. Lamb claims that ██████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████

---

[27] *See, e.g.*, Neb. Rev. St. § 59-821.01, 59-1609.01 (recognizing pass-through defense under Nebraska's antitrust and consumer protection statutes); N.Y. Gen. Bus. Law § 340(6) (recognizing pass-through defense under New York Donnelly Act); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-md-01827-SI, 2014 WL 4652145, at *2 (N.D. Cal. Sept. 18, 2014) (permitting defendants to present pass-through defense under Florida Deceptive and Unfair Trade Practices Act); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 6709621, at *1-7 (N.D. Cal. Dec. 26, 2012), *aff'd*, 637 F. App'x 981 (9th Cir. 2016) (finding that defendants may assert pass-through defense against New York, Michigan, and Minnesota claims and that under California law the defense is available where multiple levels of "injured purchasers" have sued *or* "a risk remains they may sue" and where cost-plus defense may be viable) (citation omitted); *see also Comes v. Microsoft Corp.*, 646 N.W.2d 440, 449-50 (Iowa 2002) (noting that Iowa "courts are fully capable of ensuring antitrust defendants are not forced to pay more in damages than amounts to which the injured parties are entitled"). As discussed in Defendants' February 23, 2017 letter brief (Dkt. No. 1504), there is authority supporting the pass-through defense for each state for which there is a named plaintiff.

Lamb Rep. ¶ 169.  But by this same logic, separate methodologies and evidence would be required for each market in which IPPs' customers operate since each has its own "market characteristics" and faces its own "competitive landscape."  *See* Lamb at ¶ 170

Dr. Lamb admits that

*See, e.g.*, Lamb ¶¶ 21, 26, and 41 and Tables 7, 12, and 15 (Dr. Lamb concludes that

)

As IPPs themselves have admitted in their complaint, capacitors have radically different end uses and are incorporated into various products that are sold in numerous and highly differentiated markets with varying competitive conditions.  Dkt. No. 1589 ¶¶ 119-23, 126, 134. IPPs have the burden of establishing that a common methodology exists to establish injury and to estimate damages, including the amount of overcharge that was passed on to their customers.  Their ability to satisfy this burden is not only not addressed by their expert, Dr. Lamb, but Dr. Lamb's opinions demonstrate why it cannot be satisfied given the myriad markets IPPs' customers operate in and the various competitive conditions they each individually face.

**C.    Dr. Leonard's Critiques of The Defects in Dr. Lamb's Methods Provide Strong and Persuasive Support for Concluding that the IPPs Have Not Met Their Burden on Class Certification**

As discussed above, *supra* Section II.A., Dr. Leonard conducted a series of standard economic tests of Dr. Lamb's regressions to demonstrate that they cover up and fail to account for critical differences in pricing and circumstances of sales across the putative class so as to render them an unreliable basis for offering an opinion on class-wide impact and damages.  Among other things, these analyses demonstrated that Dr. Lamb improperly aggregated data regarding manufacturers, direct purchasers, capacitor products, and time periods in ways that obscured important differences in impact to the proposed class.  IPPs have not filed any *Daubert* motion to

exclude Dr. Leonard's rebuttal tests.  Plaintiffs' criticisms of Dr. Leonard's report are a straw man, designed to try to draw the Court's attention away from the controlling inquiry at class certification: are ***Dr. Lamb's*** models and methodologies reliable and capable of satisfying IPPs' burden to demonstrate a common methodology for proving class-wide impact and damages?  They are not.

IPPs fundamentally mischaracterize the role of a rebuttal expert when they criticize Dr. Leonard for not "proffer[ing] his own model or methodology."  Mot. at 20.  Dr. Leonard, as a rebuttal expert, is properly testing the reliability of Dr. Lamb's models and methodologies—there was no need for Dr. Leonard to offer a model of his own.  *See Ohio Six Ltd. v. Motel 6 Operating L.P.*, No. CV 11-08102 MMM (Ex), 2013 WL 12125747, at *16 (C.D. Cal. Aug. 7, 2013) ("Contrary to plaintiffs' suggestion, a rebuttal expert who critiques another expert's theories or conclusions need not offer his own independent theories or conclusions . . .") (quoting *In re Cessna 208 Series Aircraft Prod. Liab. Litig.*, No. 05–md–1721–KHV, 2009 WL 1649773, at *1 (D. Kan. June 9, 2009)); *see also ODD I*, 303 F.R.D. at 324 ("Whether or not defendants' analysis proves many class-members were not injured, the . . . point is that the IPPs have not met their burden . . ."); *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007) (rebuttal experts "have no burden to produce models or methods of their own; they need only attack those of plaintiffs' experts.").

IPPs' "multicollinearity" critique of one of Dr. Leonard's tests[28] is misplaced for the same reason.  His analysis was designed to test the reliability of Dr. Lamb's regressions to show class-wide impact and damages – not to offer a separate methodology for assessing those claimed effects.  Accordingly, multicollinearity, even if it exists, is not a valid critique of Dr. Leonard's F-tests, which make absolutely clear that Dr. Lamb has a misspecified model.[29]

In sum, Dr. Leonard's testing of Dr. Lamb's methodology was powerful and entirely valid

---

[28] It is somewhat astonishing that IPPs now hinge much of their criticism of Dr. Leonard on multicollinearity, given that IPPs' counsel refused to permit Dr. Leonard to testify on that subject at his deposition.  *See* Ex. 23 [Leonard Tr.] 212:13-214:24.

[29] More specifically, Dr. Leonard is not offering a method for calculating alleged overcharges – let alone with precision.  Dr. Lamb's, and therefore IPPs', critique of Dr. Leonard is simply not relevant.

1  for the purpose for which it was offered – to show that IPPs did not meet their burden to present a

2  reliable common methodology for proving class-wide impact and damages from the alleged

3  conspiracy for all or almost all putative class members.

4      **D.    Dr. Moore Established That Dr. Lamb's Model Was Not Correctly Specified
            and Therefore Not Suitable to Show Common Impact With Respect To The
5          Alleged Film Conspiracy**

6          Just as with Dr. Leonard, IPPs' criticism of Dr. Moore is misplaced.  While Dr. Lamb's

7  assignment was to ***develop*** a model to assess the extent of the alleged impact on the proposed class,

8  Dr. Moore's assignment was to ***test*** that model, especially with respect to the alleged Film

9  Conspiracy.  His analysis provides persuasive support for the conclusion that Dr. Lamb, and the

10  IPPs, fail to meet their burden on class certification.

11          Specifically, Dr. Moore's analysis revealed another critical flaw in Dr. Lamb's model:

12  While Dr. Lamb's opinion in support of common class-wide impact with respect to film capacitors

13  derives ██████████████████████████████████ (Lamb Rep. ¶¶ 142-156,

14  314-323), Dr. Moore tested that assumption and found that is not the case.  In fact, Dr. Moore's

15  testing shows the opposite—████████████████████████████████

16  ████████████████████████████████████████

17  ██  Mot. Ex. 48 [Moore Rep.][30] ¶¶ 127, 132-137.

18          Tellingly, Dr. Lamb does not even try to rebut Dr. Moore's analysis on this point.  And

19  while the IPPs argue that "the fact that [Dr. Moore's] regression produces some negative

20  coefficients [for individual customers] is meaningless" (Mot. at 25), these negative coefficients

21  strongly refute Dr. Lamb's assumption that "prices move together."  Indeed, these results show

22  that, once other factors chosen by Dr. Lamb are controlled for with his own regression model,

23  prices rise or fall for film capacitors differentially across proposed class members.  While the IPPs

24  accuse Dr. Moore of "slicing and dicing the transactional data" with respect to individual

25  overcharges, they ignore that testing on an individual purchaser level is ***necessary*** to form a reliable

26  opinion on the primary class certification inquiry of whether "all or almost all" of the proposed

27

28  _____

[30] "Moore Rep." refers to Ex. 48 to IPP Mot. for Class Certification, Dkt. 1680-42, 1682-48.

1    class members experienced antitrust impact from the alleged conspiracy.

2        Also without merit is the IPPs' challenge to Dr. Moore's "but-for" quantity regression,

3    which compares actual sales quantities to the but-for sales quantities that Dr. Lamb's model would

4    predict.  Indeed, the usefulness of such an analysis has even been ███████████████████████

5    ████████.  *See* Mot. Ex. 50 [Moore Tr.] 369:25-370:11.[31]

6    **III.    PLAINTIFFS ALSO FAIL TO PRESENT COMMON EVIDENCE OF
              ANTITRUST IMPACT AND DAMAGES ON A CLASS-WIDE BASIS USING**
7    **        DOCUMENTS PRODUCED BY DEFENDANTS**

8        In addition to the expert testimony discussed above, the IPPs also claim that they have

9    presented common evidence of class-wide impact and damages under Rule 23(b)(3) using

10   "Defendants' own documents" about industry meetings.  Mot. at 14.  IPPs argue that those

11   documents support certification of classes of over 400,000 purchasers who bought different types

12   of capacitors over a twelve-year period in certain *U.S.* states from ***distributors***.  But the

13   documents cited by IPPs have little, if anything to do with sales of capacitors to their putative

14   classes, and have virtually nothing to do with their specific burden to come forward with a

15   common method of proving class-wide impact and damages to all or almost all class members.

16       None of the meeting documents IPPs cite concern U.S. distributors or U.S. purchasers

17   who bought capacitors from those distributors.  For example, ███████████████████████████

18   ████████████████████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████  Mot. Ex. 28 [July 15, 2008 Meeting].

20   None are U.S. companies and none are distributors.[32]  They therefore provide zero evidence

21   relating to impact or damages to any members of the putative IPP class, all of whom only

22   purchased capacitors in the U.S. from distributors.  Similarly, ███████████████████████████

23

24   ───────────────────────────────
     [31] Moreover, although the IPPs and Dr. Lamb have criticized Dr. Moore for performing this

25   quantity regression analysis on a transactional level rather than on a market-wide level, Dr. Lamb
     never actually tested the analysis on a market-wide level, and therefore the IPPs have no basis

26   for suggesting that those results would have been materially different from the transactional-level
     results that Dr. Moore obtained.

27   [32] The IPPs describe the U.S. as "one of the largest consumers of electrolytic and film capacitors."
     But as illustrated by the documents IPPs cite, the U.S. is at mostly an afterthought and a minor

28   market for these products, which are sold largely in Asian markets like Japan, Taiwan, China, and
     Southeast Asia where purchasers of capacitors operate manufacturing and assembly plants.

. *See, e.g.*, Mot. Ex. 24 (

); Mot. Ex. 25 (

); Mot. Ex. 26 (

).  And, the SM

meetings, cited extensively by IPPs, took place in South East Asia and focused on local

customers in that region.  There is not a single discussion of distributors who were reselling

capacitors to customers in the United States.  *See, e.g.*, Mot. Ex. 29 (

); Mot. Ex. 30 (                                                    ); Mot. Ex. 31

(

).

In sum, the electrolytic documents have no relevance to showing any impact on

distributors who were reselling capacitors to members of the putative class in the United States –

the only relevant purchases for purposes of this motion.  They also are completely inapposite

with respect to the IPPs' specific burden to present a common methodology to prove class-wide

impact and damages with respect to the alleged electrolytic conspiracy.

Similarly, the documents purporting to show common impact and damages for purchasers

of film capacitors have nothing to do with distributors making sales to U.S. customers.  For

example, the IPPs claim that Okaya raised prices "after a series of JFC meetings wherein the

competitors discussed the need to raise prices," but these documents say nothing regarding U.S.

companies or distributors who sold to putative class members, and do not even evidence any

agreement to raise prices for film capacitors.[33]  *See* Mot. at 6-7 & Mot. Exs. 35-36, 38-39.

Simply put, there is not a single competitor meeting document cited by IPPs that provides

any evidence of common impact or damages to distributors who resold capacitors to putative

members of the class in the United States, whether of film or electrolytic capacitors.  The cited

---

[33] And, the cited documents and deposition testimony show Okaya's move to raise prices was
due to a rise in materials costs, was "something that Okaya decided to do on its own," and "ha[d]
nothing to do with the competitors." (*See* Ex. 11 [A. Ikazaki (Okaya) Dep.] 106:11 – 112:03
(discussing OKA-000158180 and OKA-000158181, respectively Mot. Exs. 38 and Ex. 39).)

documents do not involve relevant class members, and do not even come close to providing the

required evidence of injury and damages to all or almost all class members.

## IV.   THE NAMED IPPS ARE INADEQUATE TO REPRESENT THE PUTATIVE CLASS BECAUSE THEY ARE "STRIKINGLY UNFAMILIAR" WITH THIS LITIGATION

The deposition testimony of the named IPPs demonstrate that they are "strikingly

unfamiliar" with this litigation, thereby rendering them wholly inadequate to protect the interests

of absent class members under Rule 23(a)(4).  *Lee v. Pep Boys-Manny Moe & Jack of*

*California*, No. 12-CV-05064-JSC, 2015 WL 9480475, at *11 (N.D. Cal. Dec. 23, 2015) (finding

representative plaintiff inadequate because he "never read any of the pleadings or the discovery,

[wa]s ignorant of the procedural aspects of class action litigation . . . [and] appear[ed] strikingly

unfamiliar with . . . how his case is proceeding"); *see also In re Facebook, Inc., PPC Advert.*

*Litig.*, 282 F.R.D. 446, 454 (N.D. Cal. 2012), *aff'd* 588 F. App'x 733 (9th Cir. 2014)

(representative plaintiff inadequate because "he testified . . . that he knows essentially nothing

about the case, and indicated that he would defer to counsel in prosecuting this action"); *Darvin*

*v. Int'l Harvester Co.*, 610 F. Supp. 255, 256 (S.D.N.Y. 1985) (same, in part because of serious

lack of familiarity with lawsuit).

The deposition testimony is replete with evidence of the named IPPs' complete

disengagement from this litigation.  For example, the numerous named IPPs testified that they:

- reviewed no documents or filings other than the complaints and did not review the complaints prior to filing;[34]

- could not even identify which entities are Defendants in this lawsuit;[35]

- were completely unaware of how the litigation is proceeding or what is transpiring on the case,[36] and

---

[34] *See, e.g.*, Ex. 15 [AGS Tr.] 33:7-34:4, 39:20-23; Ex. 16 [CAE Sound Tr.] 69:23-70:3; Ex. 13 [J&O Tr.] 61:25-62:2; Ex. 17 [Toy-Knowlogy Tr.] 172:11-173:13.

[35] *See, e.g.*, Ex. 15 [AGS Tr.] 39:2-10; Ex. 12 [Angstrom Tr.] 45:20-47:4 (mistaking distributors as defendants); Ex. 13 [J&O Tr.] 47:10-22, 60:14-61:17; Ex. 18 [MakersLED Tr.] 67:9-22, 72:21-73:6; Ex. 20 [Brooks Tr.] 49:21-50:8; Ex. 14 [Nebraska Dynamics Tr.] 40:22-41:10.

[36] *See, e.g.*, Ex. 15 [AGS Tr.] 41:4-12; Ex. 12 [Angstrom Tr.] 47:22-49:19; Ex. 16 [CAE Sound Tr.] 65:1-19, 69:20-70:3; Ex. 13 [J&O Tr.] 59:1362:2.

-38-

- completely rely on counsel for all decision-making for the litigation.[37]

Indeed, named IPP Angstrom, Inc. ("Angstrom") admitted ███████████████████

████████████████████████████████████.  *See* Ex. 12

[Angstrom Tr.] 42:20-43:5.  Two other named IPPs—J&O Electronics and Nebraska

Dynamics—specifically admitted that ***they do not track the litigation at all***.  Ex. 13 [J&O Tr.]

260:1-8 ("*I don't track[] that.  They just contact me.  That's all.*") (emphasis added); Ex. 14

[Nebraska Dynamics Tr.] 158:10-159:2 (receives periodic litigation updates from counsel, but

"*do[es]n't follow it otherwise*") (emphasis added).  Federal courts have repeatedly found that

such complete disengagement from the class action and cavalier disregard for their fiduciary

responsibilities renders class representatives inadequate under Rule 23(a)(4).  This Court should

do the same.

Further, named IPP Michael Brooks and Nebraska Dynamics are inadequate for the

separate reason that they are classic "serial plaintiffs" subject to unique defenses inapplicable to

absent putative class members.  Specifically, Mr. Brooks testified that he has sought to be a

representative plaintiff ***in four other price-fixing class actions***.  *See* Ex. 20 [Brooks Tr.] 22:21-

30:14, 32:8-33:9.  And named IPP Nebraska Dynamics testified that it is currently a

representative plaintiff in a separate electronic components price-fixing class action ***with the***

***same attorneys involved in this litigation***.  *See* Ex. 14 [Nebraska Dynamics Tr.] 17:6-18:24.

Both Mr. Brooks' and Nebraska Dynamics' extensive involvement in similar lawsuits makes

them vulnerable to unique defenses, thereby rendering them inadequate to represent the putative

IPP class under Rule 23(a)(4).  *See Barry B. Roseman v. Sports and Recreation*, 165 F.R.D. 108,

111 (M.D. Fla. 1996) (finding that plaintiff's "extensive experience and involvement in similar

lawsuits may result in unique defenses rendering the plaintiff unable to adequately represent the

class"); *Darvin,* 610 F. Supp. at 256 (finding plaintiff inadequate in part because of unique

defenses not applicable to other class members).

---

[37] *See, e.g.*, Ex. 12 [Angstrom Tr.] 47:22-49:7; Ex. 16 [CAE Sound Tr.] 60:17-64:22; Ex. 13 [J&O Tr.] 41:13-46:1, 53:2-56:7, 260:1-8; Ex. 18 [MakersLED Tr.] 67:9-22; Ex. 20 [Brooks Tr.] 42:20-45:1, 49:6-10; Ex. 14 [Nebraska Dynamics Tr.] 40:10-16, 158:10-159:2; Ex. 19 [Wong Tr.] 32:9-35:4, 38:5-39:6.

DEFENDANTS' OPPOSITION TO IPP MOTION FOR CLASS CERTIFICATION
No. 3:14-cv-03264-JD

**V.    IPPS HAVE FAILED TO ESTABLISH THAT RULE 23(A) REQUIREMENTS ARE MET FOR THEIR SEPARATE STATE DAMAGES CLASSES**

In addition to all of the other defects set forth above, IPPs have made no showing and advanced no argument whatsoever to demonstrate that they can satisfy the requirements of Rule 23(a) with respect to each of the seven separate state classes that IPPs have asserted in their amended complaints.  For example, IPPs have made no factual showing that there were enough purchasers of capacitors in Nebraska (or any of the other individual seven states) to satisfy Rule 23(a)'s numerosity requirement for the proposed Nebraska sub-class.  Similarly, they have not even attempted to demonstrate that the claims of their named plaintiffs in these seven individual states are typical of other purchasers in those specific states.  There has simply been no showing with respect to those specific states at all.  Accordingly, IPPs' request to certify classes in these individual states must be denied.

## CONCLUSION

For all foregoing reasons, the Court should reject IPPs motion to certify a class in its entirety.  Alternatively, and in any event, this Court should not even entertain IPPs' motion to certify a class outside of the seven states in which they have named class representatives who have made indirect purchases of the relevant products in those states.


DATED:  July 13, 2017                          Respectfully submitted,


                                               WILMER CUTLER PICKERING HALE AND
                                               DORR LLP

                                               */s/ Heather S. Tewksbury*
                                               Heather S. Tewksbury (CA SBN 222202)
                                               heather.tewksbury@wilmerhale.com
                                               Erik Shallman (CA SBN 301854)
                                               erik.shallman@wilmerhale.com
                                               WILMER CUTLER PICKERING
                                               HALE AND DORR LLP
                                               950 Page Mill Road
                                               Palo Alto, California  94304
                                               Telephone:  (650) 858-6000
                                               Facsimile:  (650) 858-6100

                                               Thomas Mueller (admitted *pro hac vice*)
                                               thomas.mueller@wilmerhale.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Chris Megaw (admitted *pro hac vice*)
chris.megaw@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

Allyson Fortier (CA SBN 287291)
Allyson.Fortier@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
350 S. Grand Ave. Suite 2100
Los Angeles, CA 90071
Telephone:  (213) 443-5307
Facsimile:  (213) 443-5400

*Counsel for Defendants*
*ELNA Co., Ltd. and ELNA America, Inc*.


WINSTON & STRAWN LLP

By:    */s/ Jeffrey L. Kessler*
Jeffrey L. Kessler (*pro hac vice*)
A. Paul Victor (*pro hac vice*)
Molly M. Donovan (*pro hac vice*)
Mollie C. Richardson (*pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 294-4698
Facsimile: (212) 294-4700
jkessler@winston.com
pvictor@winston.com
mmdonovan@winston.com
mrichardson@winston.com

Ian L. Papendick (SBN 275648)
101 California Street
San Francisco, CA 94111
Tel: (415) 591-6905
Fax: (415) 591-1400
ipapendick@winston.com

*Counsel for Defendants*
*Panasonic Corporation*
*Panasonic Corporation of North America*
*SANYO Electric Co., Ltd.*
*SANYO North America Corporation*


K&L GATES LLP

*/s/ Michael E. Martinez*

-41-

Scott M. Mendel (*pro hac vice*)
Steven M. Kowal (*pro hac vice*)
Michael E. Martinez *(pro hac vice)*
Lauren N. Donahue *(pro hac vice)*
Brian J. Smith (*pro hac vice*)
K&L GATES LLP
70 West Madison Street, Suite 2800
Chicago, IL 60602

Telephone: (312) 372-1121
Facsimile: (312) 827-8000

*Counsel for Defendants*
*Nichicon Corporation*
*Nichicon (America) Corporation*

SHEARMAN AND STERLING LLP

*/s/ Djordje Petkoski*
Djordje Petkoski (admitted pro hac vice)
David A. Higbee (*pro hac vice*)
Ryan Shores (*pro hac vice*)
401 9th St., NW
Washington, D.C.  20004
Telephone: (202) 508-8000
Facsimile: (202) 508-8100
djordje.petkoski@shearman.com
david.higbee@shearman.com
ryan.shores@shearman.com

John Cove (SBN 212213)
535 Mission Street, 25th Floor
San Francisco, California 94105
Telephone: (415) 616-1139
Facsimile: (415) 616-1199
john.cove@shearman.com

*Attorneys for Defendants Rubycon Corporation and*
*Rubycon America Inc.*

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP

*/s/ Joseph J. Bial*
Joseph J. Bial (admitted *pro hac vice*)
Eric R. Sega (admitted *pro hac vice*)
2001 K Street, NW
Washington, DC 20001
Telephone:  (202) 223-7300
Facsimile:  (202) 223-7402

jbial@paulweiss.com
esega@paulweiss.com

-42-

1

2

*Attorneys for Defendants United Chemi-Con, Inc.
and Nippon Chemi-Con Corporation*

3

JONES DAY

4

_____*/s/ Eric P. Enson*_____
Jeffrey A. LeVee

5

Eric P. Enson
Rachel H. Zernik

6

JONES DAY
555 South Flower Street, Fiftieth Floor

7

Los Angeles, CA 90071.2300
T: 213-489-3939

8

F: 213-243-2539
jlevee@JonesDay.com

9

epenson@JonesDay.com
rzernik@JonesDay.com

10

11

*Counsel for Defendants Holy Stone Enterprise Co.,
Ltd., Holy Stone Holdings Co., Ltd., Holy Stone
Polytech Co., Ltd., Milestone Global Technology,*

12

*Inc. and Vishay Polytech Co., Ltd.*

13

DENTONS US LLP

14

_____*/s/ Bonnie Lau*_____
Bonnie Lau

15

DENTONS US LLP
One Market Plaza, Spear Tower, 24th Floor

16

San Francisco, CA 94105
T: 415-882-5000

17

F: 415- 882-0300
bonnie.lau@dentons.com

18

Felix T. Woo

19

DENTONS US LLP
601 S. Figueroa Street, Suite 2500

20

Los Angeles, California  90017
T: (213) 623-9300

21

F: (213) 623-9924
felix.woo@dentons.com

22

*Counsel for Defendant Matsuo Electric Co., Ltd.*

23

DENTONS US LLP

24

25

_____*/s/ Gaspare J. Bono*_____
Gaspare J. Bono (admitted *pro hac vice*)

26

Stephen M. Chippendale (admitted *pro hac vice*)
Claire M. Maddox (admitted *pro hac vice*)

27

Eric Y. Wu (admitted *pro hac vice*)
DENTONS US LLP

28

1900 K St., NW

-43-

Washington, DC 20006
Tele.: (202) 496-7500
Fax: (202) 496-7756
gap.bono@dentons.com
steve.chippendale@dentons.com
claire.maddox@dentons.com
eric.wu@dentons.com

Andrew S. Azarmi (SBN 241407)
DENTONS US LLP
Spear Tower, One Market Plaza, 24th Fl.
San Francisco, CA 94105
Tele.: (415) 267-4000
Fax: (415) 356-3873
andrew.azarmi@dentons.com

*Attorneys for Defendants*
*Shinyei Kaisha, Shinyei Technology Co., Ltd.,*
*Shinyei Capacitor Co., Ltd., and*
*Shinyei Corporation of America*

*/s/ Mark D. Flanagan*
Mark D. Flanagan (Bar No. 130303)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA  94304
Telephone:  (650) 858-6047
Facsimile:  (650) 858-6100
Mark.Flanagan@wilmerhale.com

Allyson T. Fortier (Bar No. 287291)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
350 S. Grand Ave., Suite 2100
Los Angeles, CA  90071
Telephone:  (213) 443-5300
Facsimile:  (213) 443-5400
Allyson.Fortier@wilmerhale.com

*Counsel for Defendant Nissei*
*Electric Co., Ltd.*

BONA LAW PC

*/s/ Aaron Gott*
AARON GOTT
Jarod Bona
Aaron Gott
4275 Executive Square, Suite 200
La Jolla, CA 920370

-44-

(858) 964-4589
(858) 964-2301 (fax)
jarod.bona@bonalawpc.com
aaron.gott@bonalawpc.com

*Attorneys for Defendants*
*Taitsu Corporation and Taitsu America, Inc.*

Pursuant to Local Rule 5-1(i)(3), the filer attests that concurrence in the filing of this document has been obtained from each of the above signatories.

DEFENDANTS' OPPOSITION TO IPP MOTION FOR CLASS CERTIFICATION
No. 3:14-cv-03264-JD