1  Steven N. Williams (State Bar No. 175489)
   Adam Zapala (State Bar No. 245748)
2  Elizabeth Tran (State Bar No. 280502)
   Mark F. Ram (State Bar No. 294050)
3  **COTCHETT PITRE & McCARTHY LLP**
   840 Malcolm Road, Suite 200
4  Burlingame, CA 94010
   Telephone: (650) 697-6000
5  Facsimile: (650) 697-0577
   swilliams@cpmlegal.com
6  azapala@cpmlegal.com
   etran@cpmlegal.com
7  mram@cpmlegal.com

8  *Interim Lead Counsel for the Indirect Purchaser Plaintiffs*

9

10                **UNITED STATES DISTRICT COURT**

11          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

12                   **SAN FRANCISCO DIVISION**

13  **IN RE CAPACITORS ANTITRUST**        **Case No. 3:14-cv-03264-JD**
    **LITIGATION**
14
                                          **REPLY BRIEF IN SUPPORT OF**
15  **THIS DOCUMENT RELATES TO:**         **INDIRECT PURCHASER PLAINTIFFS'**
                                          **MOTION FOR CLASS CERTIFICATION**
16  **ALL INDIRECT PURCHASER ACTIONS**
                                          Date:  September 7, 2017
17                                        Time: 10:00 a.m.
                                          Place: Courtroom 11, 19th Floor
18                                        Judge: Honorable James Donato

19

20

21

22

23

24                **\*REDACTED – PUBLIC VERSION \***

25

26

27

28

Law Offices
COTCHETT, PITRE &
McCARTHY, LLP

**Reply Brief ISO Indirect Purchaser Plaintiffs' Motion for Class Certification;**
**Case No. 3-14-cv-03264-JD**

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ........................................................................................................1

II.   ARGUMENT ..............................................................................................................1

      A.    California Law Should be Applied .....................................................................1

            1.    Defendants Fail to Address the Recent Trend in Ninth Circuit
                  Courts .......................................................................................................2

            2.    Applying California Law to Purchasers in the Indirect Purchaser States
                  Does Not "Circumvent" this Court's Prior Rulings...................................3

            3.    Defendants Do Not Rebut their Significant Contacts with California........4

            4.    Defendants Have Not Identified Any Burdens or Conflicts to
                  Permitting Invocation of California Law ...................................................5

      B.    IPPs' Expert Has Set Forth Reliable and Commonly Accepted Methodologies
            for Establishing Predominance and Class-Wide Impact.........................................8

            1.    IPPs Did Not Inappropriately "Pool" Data that Obscured Important
                  Product or Customer Variation ................................................................8

            2.    Dr. Lamb's Methodology for Establishing a Single Overcharge for
                  Each Capacitor Dielectric is Econometrically Sound and is Based on the
                  Documentary Evidence and Guilty Pleas in this Action.........................12

            3.    Dr. Lamb's Models Appropriately Account for Major Market Events .....14

            4.    Along with his Overcharge Regressions, Dr. Lamb's Market and
                  Price Structure Analyses Provide Reliable Methods of Demonstrating
                  Common Impact.......................................................................................15

      C.    Defendants' Arguments Regarding a Pass-On Defense Go to Merits and Not
            Class Certification Issues ................................................................................18

      D.    Dr. Leonard's Models are Misspecified and Fundamentally Unreliable ...............21

      E.    Dr. Moore's Models are Misspecified and Fundamentally Unreliable..................21

      F.    Plaintiffs Have Submitted Substantial Common Documentary Evidence
            Showing Defendants' Price-Fixing Conspiracy.....................................................22

            1.    The Documents Defendants Cite Discuss General Price Increase
                  Efforts ....................................................................................................23

            2.    Defendants Do Not Even Address a Number of Documents that Were
                  Submitted Evidencing Pricing Agreements on Capacitors Destined for
                  Overseas Locations, Including the U.S....................................................23

3.     Documents Relied on by IPPs' Expert Demonstrate Price-Fixing
       for U.S. Customers and Distributors.............................................24

4.     The Film-Only Defendants' Arguments Are Irrelevant............................25

       a.     It is Black-Letter Law that DOJ's Decision Not to Criminally
              Prosecute Has No Bearing on Subsequent Civil Litigation...........25

       b.     The Film-Only Defendants Ignore Evidence that is Common
              to the Class of the Price-Fixing Conspiracy ...............................27

G.   The Named Plaintiffs Are Adequate to Represent the Putative Classes...............27

H.   IPPs' Easily Meet the Permissive Rule 23(a) Requirements ...............................30

III.   CONCLUSION.............................................................................................30

1

**TABLE OF AUTHORITIES**

2

3

**Page(s)**

**Cases**

4

*In re Air Cargo Shipping Servs. Antitrust Litig.,*
   2014 U.S. Dist. LEXIS 180914 (E.D.N.Y. 2014)...............................................8, 9

5

*Allstate Ins. Co. v. Hague,*
   449 U.S. 302 (1981).....................................................................................2, 3

6

7

*AT&T Mobility LLC v. AU Optronics Corp.,*
   707 F.3d 1106 (9th Cir. 2013) .....................................................................2, 3

8

*In re Auto. Parts Antitrust Litig.,*
   2013 U.S. Dist. LEXIS 80338 ( E.D. Mich. 2013).............................................8

9

10

*B.W.I. Custom Kitchen v. Owens-Illinois,*
   191 Cal.App.3d 1341 (1987) ...........................................................................19

11

*Barry B. Roseman v. Sports and Rec.,*
   165 F.R.D. 108 (M.D. Fla. 1996).....................................................................29

12

13

*Bazemore v. Friday,*
   478 U.S. 385 (1986)...................................................................................9, 14

14

*Biancur v. Hickey,*
   1997 WL 9857 (N.D. Cal. Jan. 7, 1997) .........................................................28

15

16

*In re Capacitors Antitrust Litig.,*
   106 F.Supp.3d 1051 (N.D. Cal. 2015) .........................................................3, 4

17

18

*In re Capacitors Antitrust Litig.,*
   154 F.Supp.3d 918 (N.D. Cal. 2015) ................................................................4

19

*In re Cathode Ray Tube Antitrust Litig.,*
   2014 U.S. Dist. LEXIS 35391 .....................................................................7, 8

20

21

*In re Chocolate Confectionary Antitrust Litig.,*
   289 F.R.D. 200, 2012 U.S. Dist. LEXIS 174681 (M.D. Pa. 2012)....................8, 14

22

23

*Clayworth v. Pfizer, Inc.,*
   49 Cal. 4th 758, 787 (2010) ...........................................................................19

24

*Comes v. Microsoft,*
   646 N.W.2d 440, 444-50 (Iowa 2002).............................................................20

25

26

*Darvin v. Int'l Harvester Co.,*
   610 F. Supp. 255 (S.D.N.Y. 1985) ..................................................................29

27

28

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

*In re Domestic Air Transportation Antitrust Litig.*,
    137 F.R.D. 677 (N.D. Ga. 1991) ...........................................................................19

*In re Flat Glass Antitrust Litig.*,
    2009 U.S. Dist. LEXIS 10329 (N.D. Cal. 2009) ............................................26, 27

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ...............................................................................28

*Hemmings v. Tidyman's Inc.*,
    285 F.3d 1174 (9th Cir. 2002) ...............................................................................14

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002), *cert. denied,* 537 U.S. 1188 (2005)........................26

*In re High-Tech Emple. Antitrust Litig.*,
    985 F. Supp. 2d. at 1206, 1224 ...............................................................................9

*Kearney v. Salomon Smith Barney*,
    39 Cal. 4th 95 (2006) ..............................................................................................7

*In re Korean Ramen Antitrust Litig.*,
    No. 3:13-cv-04115-WHO, U.S. Dist. LEXIS 7765 (N.D. Cal. Jan. 19, 2017).................2, 5, 8

*Lee v. Pep Boys-Manny Moe & Jack of Cal.*,
    2015 WL 9480475 (N.D. Cal. Dec. 23, 2015) .....................................................28

*In re Lithium Ion Batteries Antitrust Litig.*,
    No. 13-MD-2420 YGR, 2017 U.S. Dist. LEXIS 57340 (N.D. Cal. Apr. 12,
    2017) ...........................................................................................................2, 5, 6, 8

*In re Northrop Grumman Corp. ERISA Litig.*,
    2011 U.S. Dist. LEXIS 94451 (C.D. Cal. 2011).................................................30

*In re Optical Disk Drives Antitrust Litig.*,
    No. 3:10-md-2143 RS, 2016 U.S. Dist. LEXIS 15899 (N.D. Cal. Feb. 8, 2016)........1, 2, 5, 26

*In re Polypropylene Carpet Antitrust Litig.*,
    178 F.R.D. 603 (N.D. Ga. 1997).........................................................................26

*Sebo v. Rubenstein*,
    188 F.R.D. 310 (N.D. Ill. 1999) ..........................................................................28

*In re Static Random Access Memory Antitrust Litig.*,
    264 F.R.D. 603 (N.D. Cal. 2009)...............................................................1, 8, 26

*In re Tableware Antitrust Litig.*,
    241 F.R.D. 644 (N.D. Cal. 2007) (Walker, C.J.) ................................................28

*In re TCT-LCD (Flat Panel) Antitrust Litigation*,
   267 F.R.D. 583 (N.D. Cal. 2010)...................................................................... *passim*

*In re Vitamins Antitrust Litig.*,
   2000 U.S. Dist. LEXIS 7397 (D. D.C. May 9, 2000)............................................26

*Woods v. Vector Marketing Corp.*,
   2015 U.S. Dist. LEXIS 118678 (N.D. Cal. 2015) ................................................30

*In re Worlds of Wonder Sec. Litig.*,
   1990 WL 61951 (N.D. Cal. Mar. 23, 1990)..........................................................28

**Statutes**

N.Y. Gen. Bus. Law § 340(6) ..............................................................................20

Neb. Rev. Stat. Ann. § 59-821.01 .......................................................................20

**Rules**

Federal Rules of Civil Procedure

   Rule 23(a)............................................................................................................30

   Rule 23(a)(4) ..............................................................................................27, 28, 30

   Rule 23(g) ...........................................................................................................29

**Other Authorities**

Damodar N. Gujarati, *Basic Econometrics*,
   Fourth Edition, Boston, MA: McGraw-Hill, 2004 .................................................14

Dimitrios Asteriou and Stephen G. Hall, *Applied Econometrics a Modern
   Approach,* Revised Edition, New York, NY: Palgrave MacMillan, 2007...............14

**Reply Brief ISO Indirect Purchaser Plaintiffs' Motion for Class Certification;
Case No. 3-14-cv-03264-JD**                                                                                          v

I.      **INTRODUCTION**

Defendants' arguments against certifying the proposed Indirect Purchaser Plaintiffs' ("IPPs") classes plough no new ground.  Their arguments come from a standard playbook: that the markets at issue are too complex; the products too varied; the pricing processes too intricate; intervening catastrophes were too great; or the experts failed to use that one additional variable that would have made all the difference; or some combination of all of the foregoing. What Defendants ignore is the fact that courts within this Circuit reject these arguments in price-fixing cases such as this one—even where the markets at issue are far more complex, the products far more varied, with pricing processes that are far more convoluted.  *See In re TCT-LCD (Flat Panel) Antitrust Litigation*, 267 F.R.D. 583, 603-604 (N.D. Cal. 2010) ("*LCD*"); *In re Static Random Access Memory Antitrust Litig.*, 264 F.R.D. 603 (N.D. Cal. 2009) ("*SRAM*"); *In re Optical Disk Drives Antitrust Litig.*, No. 3:10-md-2143 RS, 2016 U.S. Dist. LEXIS 15899 (N.D. Cal. Feb. 8, 2016) ("*ODD*").  If there is any complexity introduced to this case, it is a result of Defendants' conspiracies that precluded the normal operation of market forces, requiring IPPs to construct a world that never in fact existed: the "but-for" competitive marketplace. As demonstrated in IPPs' Motion for Class Certification ("Motion"), ECF No. 1681, and in the Opposition to Defendants' Motion to Exclude Testimony of Dr. Russell L. Lamb ("*Daubert* Opposition"), ECF No. 1740, IPPs utilized widely accepted and scientifically rigorous and reliable methodologies for establishing class-wide impact.  This Court should certify the classes and permit IPPs to present their case to a jury, as the Framers of the Constitution envisioned.

II.     **ARGUMENT**

A.      **California Law Should be Applied**

In arguing that California law should not be applied to purchasers in other states permitting indirect purchaser lawsuits, Defendants fail to engage with the substantial case law from Ninth Circuit courts permitting litigants to do exactly that.  Moreover, in making their argument, Defendants conflate standing concepts, erroneously contend that IPPs are attempting to "circumvent" this Court's prior rulings, and ignore the substantial contacts that Defendants either had, or continue to have, with California.  Because Defendants have failed to meet their

1 "substantial burden" of showing that a foreign law should apply, this Court should apply

2 California law to purchasers in the 31 states.

3       **1.    Defendants Fail to Address the Recent Trend in Ninth Circuit Courts**

4       Defendants do not substantively address the most recent indirect purchaser class action

5 decisions from Ninth Circuit courts that directly support application of California law to

6 purchasers in those states that permit indirect purchaser lawsuits.  *In re Korean Ramen Antitrust*

7 *Litig.*, No. 3:13-cv-04115-WHO, U.S. Dist. LEXIS 7765 at *65 (N.D. Cal. Jan. 19, 2017)

8 ("*Ramen*") (application of California law appropriate); *ODD*, 2016 U.S. Dist. LEXIS 15899 at

9 *76-77 (same); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2017 U.S.

10 Dist. LEXIS 57340, at *98-99 (N.D. Cal. Apr. 12, 2017) (same) ("*Batteries*").  Defendants only

11 address these decisions in passing, mainly because they stand for the very proposition they hope

12 this Court rejects.  Yet, there is no reasoned basis (and Defendants provide none) to distinguish

13 this case from any of the aforementioned cases permitting this approach.  Defendants repeatedly

14 state that this case involves allegations where the cartel primarily achieved its unlawful price-

15 fixing conduct through meetings in foreign countries.  Yet that is no different than most any

16 price-fixing cases brought in the United States.  Indeed, each of the foregoing cases involved

17 allegations of a foreign price-fixing cartel.

18       Not only do Defendants' arguments ignore the clear trend among district courts within

19 the Ninth Circuit, but Defendants' position runs counter to the Ninth Circuit's direction in *AT&T*

20 *Mobility LLC v. AU Optronics Corp.*, 707 F.3d 1106 (9th Cir. 2013) ("*AT&T*") that the due

21 process clause imposes only "modest restrictions" on the invocation of a state's law and sets "a

22 highly permissive standard." *Id.* at 1111.  The Ninth Circuit based its decision on the Supreme

23 Court's analysis in *Allstate Ins. Co. v. Hague*, 449 U.S. 302 (1981) ("*Allstate*").[1]  In *AT&T*,

24 plaintiffs purchased price-fixed LCDs—price-fixing that, as in this case, primarily occurred in

---

25 [1] *Allstate* involved very tenuous contacts with the forum state.  There, the Supreme Court upheld

26 application of Minnesota law to an insurance contract delivered in Wisconsin, to a Wisconsin
resident, who died in an auto accident occurring in Wisconsin.  449 U.S. at 320.  The only

27 contacts with Minnesota appeared to be the fact that the decedent's wife moved there after his
death, the decedent's daily commute there and his membership in their workforce, and

28 Defendant's general business presence in the state. *Id.*

---

foreign countries.  The Ninth Circuit reversed the district court's dismissal of the California

Cartwright cause of action, despite the fact that none of the plaintiffs purchased in California.

Defendants argued, as Defendants do here, that invocation of a state's law should be based on the

"place of purchase" rule alone.  The Ninth Circuit rejected that approach as "a return to the

'wooden' and 'now largely abandoned'" doctrinal framework that unnecessarily limits

invocation of a particular state's law.  *AT&T*, 707 F.3d at 1111-1112.  So too here, where IPPs

have demonstrated a sufficient aggregation of contacts with California to meet the "highly

permissive standard" established by the Supreme Court in *Allstate* and reaffirmed in the context

of price-fixing lawsuits by the Ninth Circuit.[2]  The Ninth Circuit in *AT&T* also identified an

important textual basis to apply California law to a wide variety of cartels.  The Cartwright Act

does not limit its reach to "residents" of California, or even only to those entities or persons that

purchased products within its borders.  *See AT&T*, 707 F.3d at 1110-1111.

### 2.     Applying California Law to Purchasers in the Indirect Purchaser States Does Not "Circumvent" this Court's Prior Rulings

In attempting to get this Court to reject IPPs' streamlined approach, Defendants

misrepresent this Court's previous rulings and conflate standing concepts from the Court's prior

orders.   First, Defendants argue that this Court has already rejected IPPs' approach in the initial

motion to dismiss.  *See* Dfs.' Opp. at 7-8.  Not so.  The Court's decision was based on the

premise that California law could be applied *nationwide*, which meant even to purchasers in

states that do not permit indirect purchaser lawsuits.  *See In re Capacitors Antitrust Litig.*, 106

F.Supp.3d 1051, 1073-1075 (N.D. Cal. 2015) ("MTD Order 1").  It was precisely this dynamic—

the fact that application of the Cartwright Act nationwide would apply to purchasers even in

states that chose not to permit such lawsuits—that led this Court to conclude that the potential for

conflicts "looms large."  *Id.* at 1073.  But that issue has been addressed by limiting IPPs' Motion

to only those purchasers from states that permit indirect purchaser lawsuits.  Indeed, Defendants

fail to address that IPPs' Motion follows the precise roadmap that this Court set out in its MTD

---

[2]  It would be one thing for IPPs to include purchasers from states that do not permit indirect purchaser lawsuits.  Instead, IPPs' approach avoids any true conflicts.

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

Order 1.  *Id.* at 1074.  There, this Court expressly held that "any Cartwright Act class that may ultimately be certified would, at most, have to be limited to states with laws like California's." *Id.*  That is precisely what IPPs did.

Second, in opposing application of California law to purchasers from indirect purchaser states, Defendants conflate a number of issues.  Defendants argue that the Court previously ruled that "an in-state purchase was required to invoke the antitrust laws of a specific state", Dfs.' Opp. at 7, and that an in-state purchase is required to satisfy Article III standing.  *Id.* at 8.  That may well be, but it misses the point with respect to this particular issue.  As an initial matter, IPPs' approach clearly satisfies this requirement.  Defendants do not dispute that IPPs are invoking California law or that there are Class Representatives with qualifying purchases of capacitors in California.  IPPs have therefore satisfied the requirement that in order to invoke a particular state's law—here, California—that class representatives purchased capacitors at supracompetitive levels in the state.  Thus, there is no issue with respect to Article III standing.  Moreover, the issue addressed in this Court's Second Motion to Dismiss Order ("MTD Order 2") was not whether a particular state's law could be invoked to cover purchasers from other states, but was whether a California purchaser, for example, *could invoke another state's law* such that subclasses could be certified in those states without class representatives.  *See In re Capacitors Antitrust Litig.*, 154 F.Supp.3d 918, 922-928 (N.D. Cal. 2015).  Although many courts have accepted this approach, this Court found that class certification is not "logically-antecedent" to the issue of standing under state law.   But that is a far cry from the issue addressed in IPPs' Motion.  Thus, Defendants' discussion of, and citation to, this Court's MTD Order 2 simply misses the point. IPPs' proposal for certifying a class of purchasers from indirect purchaser states under California law is entirely consistent with the roadmap that this Court itself provided.

### 3.    Defendants Do Not Rebut their Significant Contacts with California

Because they cannot, Defendants do not address their significant contacts with the forum state, with are summarized in IPPs' Motion at 29-35.   Instead, they state that the majority of the conspiratorial meetings and manufacturing occurred overseas.  Dfs.' Opp. at 12.  Putting aside that IPPs did identify conspiratorial meetings in California, Motion at 32-33, Defendants'

argument fails to address the relevant inquiry. Merely identifying the fact that conspiratorial meetings occurred overseas does not address which state law *should* be applied. Defendants have not identified any state that has a *greater* interest than California in having its law applied to these conspiracies. Indeed, as discussed above, it is undoubtedly the case that a significant majority of the collusive communications in *Ramen*, *ODD*, and *Batteries* occurred overseas. And yet this was no roadblock. As outlined in IPPs' motion, moreover, 21% of sales to indirect purchasers overall went to purchasers in California. The next highest state was Texas, with only 12.9% of overall purchases. Motion at 33. And while Defendants' assert that "there is no evidence that Defendants targeted the alleged conspiracy at California purchasers of capacitors," their conclusory assertions are at odds with documentary evidence. There is documentary evidence, some of which is before the Court on this Motion, showing Defendants effort to fix the prices of capacitors sold to entities in California. Motion at 32-33. ███████████████
████████████████████████████████████████████████████. *Id.*

      Finally, in a stunning rhetorical flourish, Defendants assert that their express admissions in guilty pleas submitted to this Court should not be credited.[3] They provide no basis to ignore these admissions, beyond their bald assertion that the criminal case is purportedly "not related to this action" and the admissions took place within the confines of a "pro forma" guilty plea. *See* Dfs.' Opp. at 14. On the first score, Defendants are simply wrong as a matter of fact – this Court has related all of the criminal guilty pleas to this civil action. On the second score, Defendants cannot now run away from express admissions made in their guilty pleas. Surely, Defendants are not telling this Court that their executives perjured themselves when they entered guilty pleas and admitted to the factual bases alleged in the pleas. They are now bound by those admissions. The guilty pleas demonstrate clear additional grounds upon which to apply California law.

### 4. Defendants Have Not Identified Any Burdens or Conflicts to Permitting Invocation of California Law

      Although Defendants attempt to manufacture a parade of horribles should this Court certify a class of purchasers from indirect purchaser states under California law, each "burden"

---

[3] In the guilty pleas, Defendants admitted that "acts in furtherance of this conspiracy were carried out within the Northern District of California."

they identify does not stand up to scrutiny.  Defendants argue that they were "surprised" by this development and that had they known they would have conducted more discovery to address it. *See* Dfs.' Opp. at 9.  But Defendants fail to address how they would have approached discovery in any different manner.  The vast amount of discovery in this case is focused on Defendants' conduct, not Plaintiffs'.  Moreover, Defendants had an opportunity to depose *all* of the Class Representatives, including Class Representatives hailing from states outside of California, and to obtain documents and interrogatories from those Class Representatives.  Indeed, had IPPs merely proceeded with the California Class Representatives from the beginning, the scope of Defendants' permitted discovery would have *even narrower* than it actually was.  Counsel for IPPs are lead counsel in the *Batteries* litigation, where Judge Gonzalez-Rogers found that California law could be invoked for purchasers from the indirect purchaser states.  Defendants in that case—which include many Defendants[4] and counsel[5] from this case—did nothing different in discovery than what they typically do and what they did in this case.

Nor can Defendants satisfy their "substantial burden" to show that the law of another state should apply because of "true conflicts" with California law.  *See* Dfs.' Opp. at 15. Defendants state, without any citation or support, that IPPs included "multiple *Illinois-Brick* non-repealer" states in their motion.  Again, not so.  Each of the 31 states identified in IPPs' Motion permit indirect purchaser lawsuits, either through the state's antitrust statute, its unfair competition law statute *or* through another consumer protection statute.  The chart IPPs provided with their Motion (Appendix A) shows the authority from each of the 31 states permitting indirect purchaser lawsuits.  Indeed, it is precisely the same chart submitted to Judge Gonzalez Rogers in *Batteries*, where she found that California law could be applied to each of those states. *See Batteries*, No. 4:13-md-02420-YGR, ECF No. 1036, Appendix C.[6]

---

[4] The following Defendants were originally named as defendants in *Batteries*: Panasonic Corporation; Panasonic Corporation of America; Sanyo Electric Co., Ltd; Sanyo North America Corporation; NEC Tokin Corporation.  The Gibson, Dunn & Crutcher LLP. represent NEC Tokin, as they do in this case.
[5] The Winston & Strawn attorneys, including Mr. Kessler, represent Panasonic and Sanyo in *Batteries*, just as they do in this case.
[6] Defendants mistakenly assert that Arkansas, Florida, Massachusetts, Missouri and Montana are non-repealer states.  *See* Defs. Opp. fn. 10.  Yet each of those states permit indirect purchaser lawsuits.  *See* Appendix A, ECF No. 1681-1.

Next, Defendants speculate that the *AGC* prudential standing test could create a true conflict because this Court already found that the test does not apply to California state law claims. Dfs.' Opp. at 15. But *a prudential standing test* cannot create the "true conflict" that courts consider when engaged in the choice of law analysis. *See Kearney v. Salomon Smith Barney*, 39 Cal. 4th 95, 107-08 (2006). In any event, Defendants had an opportunity to address these issues on the Second Motion to Dismiss when IPPs brought their Second Consolidated Complaint and included claims from each of the states permitting indirect purchaser lawsuits. *See* Defendants' Motion to Dismiss, ECF No. 793. At that time, though moving to dismiss many of the state law claims on various grounds, Defendants did not even raise *AGC* as a potential impediment to those state law claims, which shows how persuasive their manufactured conflict argument now is. There is simply no authority for the proposition that the prudential *AGC* standing test would bar any of the indirect purchaser claims here, given that IPPs are proceeding based on purchases of standalone capacitors made from distributors. Such claims are precisely the kind of indirect purchaser claims that were intended to move forward for purposes of seeking redress under the various state laws.

Defendants again speculate that the FTAIA may create conflicts where none exist. As IPPs' Supplemental Brief made clear, both New York and Florida law are at least coextensive with the FTAIA. *See* IPPs' FTAIA Supplemental Brief at 1-15, ECF No. 1407. Moreover, contradicting their previous briefing,[7] Defendants now take the radical (and completely unsupported) position that New York and Florida law *does bar* indirect purchaser claims when the first sale occurred outside of either state. *See* Dfs.' Opp. at 16. This simply highlights how radical and untethered their position is on this issue. Countless cases have permitted indirect purchasers in New York to sue for conduct *and* initial sales that occurred outside the state, where the price-fixed product was resold to indirect purchasers within the state. *See, e.g., LCD*, 822 F.Supp.2d at 968; *In re Cathode Ray Tube Antitrust Litig.*, 2014 U.S. Dist. LEXIS 35391 at

---

[7] When IPPs previously argued that Defendants' position would mean that a conspiracy hatched in Connecticut, where the initial sale occurred in Connecticut with the product subsequently resold in New York would be barred under Defendants' construction of New York law, they argued that such a claim could never be made *See* Dfs.' Supp. Reply Brief at 9, ECF No. 1411.

1   **63, 66, 101, 106; *Batteries*, 2014 U.S. Dist. Lexis 141358 at **49, 60-61, nn. 6-7, 74, n.11,

2   83-102, 194-195; *In re Auto. Parts Antitrust Litig.*, 2013 U.S. Dist. LEXIS 80338 ( E.D. Mich.

3   2013) at **75-81.  Defendants cannot meet their substantial burden of demonstrating a true

4   conflict.

5         **B.**    **IPPs' Expert Has Set Forth Reliable and Commonly Accepted Methodologies for Establishing Predominance and Class-Wide Impact**

6   

7                 **1.**    **IPPs Did Not Inappropriately "Pool" Data that Obscured Important Product or Customer Variation**

8           Defendants make arguments and attacks on Dr. Lamb's work that are commonly made by

9   defendants in price-fixing cases and that are commonly rejected out of hand by district courts at

10  the class certification stage.  *See, e.g., CRT*, Case No. MDL NO. 1917, 2013 U.S. Dist. LEXIS

11  137944, *89-90 (N.D. Cal. June 30, 2013); *LCD*, No. M 07-1827 SI, 2012 U.S. Dist. LEXIS

12  21696 at *46-*48 (N.D. Cal., February 21, 2012); *In re Aftermarket Automotive Lighting*

13  *Products Antitrust Litigation*, 276 F.R.D. 364, 372-374 (CD. Cal. 2011) ("*Aftermarket Auto.*");

14  *Ramen*, 2017 U.S. Dist. LEXIS 7756, at *37-40 (N.D. Cal. Jan. 19, 2017); *In re Air Cargo*

15  *Shipping Servs. Antitrust Litig.*, 2014 U.S. Dist. LEXIS 180914 (E.D.N.Y. 2014) at *278 ("*Air*

16  *Cargo*"); *CRT*, 2013 U.S. Dist. LEXIS 137944, at *89-93 (N.D. Cal. June 20, 2013); *In re*

17  *Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200, 212-213, 2012 U.S. Dist. LEXIS

18  174681 (M.D. Pa. 2012); *LCD*, 2012 U.S. Dist. LEXIS 21696, at *37-46; *LCD*, 267 F.R.D. at

19  605-06; *SRAM*, 264 F.R.D. at 614.

20          First, Defendants argue that Dr. Lamb's analysis is flawed because he purportedly did not

21  properly account for product variation.  Dfs.' Opp. at 20-22.  In doing so, Defendants contend

22  that the appropriate approach would have been to control for individual capacitor part numbers.

23  Yet, as explained in IPPs' Motion and again in the *Daubert* Opposition, it was not necessary for

24  Dr. Lamb to use additional product characteristics, since his regression demonstrates that the

25  product characteristics he *did* use explain 95% to 99% of variation in pricing. Lamb Report ¶¶

26  152, 255, 320. Thus, the effects of any additional product characteristics on price variation would

27  have been negligible at best.  Additionally, utilizing individual capacitor part numbers—literally

28  hundreds of thousands—results in severe overfitting of the model because product series

accounts for most of these other product characteristics.  Finally, the analysis that Dr. Leonard's

performs is not relevant to the question of whether common factors can explain price

movements. Dr. Lamb's analysis of average residuals, which control for changes in product

composition over time, shows that the majority of price variation is explained by common

factors. Lamb Rebuttal Report ¶ 87.

        Defendants cannot escape the conclusion that upwards of 95% to 99% of the price

variation between capacitors are explained by the factors selected by Dr. Lamb.  They also

cannot escape the fact that countless courts have rejected these kind of attacks.  As the Supreme

Court itself has held, regression analyses are admissible and probative even if they contain "less

than all measurable variables . . ." *See Bazemore v. Friday*, 478 U.S. 385 (1986); *see also Air

Cargo*, 2014 U.S. Dist. LEXIS 180914 at 165-173; *Pressure Sensitive Labelstock*, 2007 U.S.

Dist. LEXIS 85466, at *61–62; *In re High-Tech Emple. Antitrust Litig.,* 985 F. Supp. 2d. 1167,

1224 (N.D.Cal. 2013); *Natchitoches Parish Hosp. Serv. Dist.v. Tyco Int'l, Ltd.,* 247 F.R.D. 253,

270 (D. Mass. 2008).

        With respect to Dr. Lamb's pass-through regression, Defendants make similar

complaints. But, as Dr. Lamb established, using product number "fixed effects," ███████

███████, significantly increases the number of fixed effects, thereby reducing the variation

available to establish the relationship between price and cost because much of the variation in

price across two similar products will be attributed to the differences in the part number instead

of the differences in cost. Lamb Rebuttal Report ¶ 109. Thus, Dr. Leonard's purported

"sensitivity test" in this regard is fundamentally flawed. In any event, as noted, Dr. Lamb's

regression demonstrates that the chosen characteristics explain the vast majority of variations in

price. *Id.* ¶ 110.

        Second, Defendants argue that Dr. Lamb's pricing analysis did not appropriately account

for variation in input costs.  Dfs.' Opp. at 21-22.  Yet, as Dr. Lamb discussed, while not every

capacitor of a particular dielectric has the same cost, the same types of materials are generally

included in all capacitors of a given dielectric. For example, with respect to aluminum

capacitors, Dr. Lamb explained why it is appropriate to use a cost variable based on aluminum

foil and electricity costs as an explanatory variable controlling for costs in the regression. *See* Lamb Report at ¶ 192; *see also* Declaration of Steven N. Williams in Support of IPPs' Reply ("Williams Decl."), Ex. 1; "Lamb Depo" at 136:6-137:22.  Defendants' renewed arguments in their Opposition fare no differently than their failed arguments in the *Daubert* motion.

Third, Defendants again criticize Dr. Lamb for using all of the available, reliable data and instead argue that he should have limited his direct purchaser overcharge regression to the data pertaining only to purchases made by Distributors.  Dfs.' Opp. at 22.  But Dr. Lamb did not choose to use all of the data in a vacuum.  He engaged in that analysis for several sound econometric reasons.  *See* Lamb Rebuttal Report ¶¶ 46-47. First, using all of the reliable, available data increases the precision and robustness of Dr. Lamb's findings. Lamb Depo. at 62:2-63:5; 119:5-25; 164:1-21.  As noted in IPPs' *Daubert* Opposition, the variation introduced by including all of the available data improves the accuracy of Dr. Lamb's estimates. Lamb Rebuttal at ¶ 46.  Second, the documentary evidence in the case does not indicate that Defendants' admitted price-fixing conspiracy was targeted at one segment of the industry or to one type of purchasers to the exclusion of others.  *See* Lamb Rebuttal Report ¶¶ 46-47; Lamb Report ¶¶ 154-156.  In addition to these documents, many of the documents summarized in and submitted with IPPs' Motion indicate collusion generally on price increase efforts that are not specific to customers.  *See, e.g.,* IPPs Motion at 3-6; *see also* Declaration of Steven N. Williams in Support of IPPs' Motion for Class Certification, ECF No. 1682, Exs. 12-43; 53-69; Lamb Report ¶¶ 124-135; 229-236; 305-307 (discussing general price increase that would have been widespread across all types of customers).  Thus, the documentary evidence (and the guilty pleas) do not provide a basis to conclude that only certain market segments were targeted by the price-fixing conspiracy to the exclusion of others.  There are also sound economic and logical reasons to reject such a hypotheses.  As Dr. Lamb testified to during his deposition, a cartel does not seek to differentiate its overcharge across customers because they are all competing in the downstream market, and that would merely drive out of business the customers that were receiving the supracompetitive price increase and benefit those customers that were not, which is obviously counterproductive and illogical. Lamb Depo at 150:2 – 152:4 ("In other words, it

Law Offices
Cотcheтт, Pıtre &
McCarthy, LLP

doesn't make any sense to think that you overcharge one group of purchasers and not another when they're all competing in the downstream market against each other.  You'd be driving out of business the group that you're overcharging and then all you have left is the group that you're not overcharging and that would be counterproductive."); Lamb Depo at 158:10 – 159:15 ("It's just a hypothetical that doesn't register as – as meaningful or sensible, in my view.").

Defendants' citation to evidence purportedly showing that different, direct purchaser customers may have paid different prices depending on whether they were a distributor compared to an EMS is meaningless. Dfs.' Opp. at 22.  As Dr. Lamb explained:

> I would expect that there may – that there are different prices across different purchasers even for the same series, voltage, and capacitance. That's partly why I control for customer in my aluminum overcharge regression, but those differences in prices don't mean that there are different overcharges or different degrees of artificial price inflation.  The difference in the level of prices is a common feature in many markets in which the effect of the cartel is measured to be the same.

Lamb Depo at 152:15-25. Any systematic difference in pricing between customers is accounted for by the customer fixed effects variable included in Dr. Lamb's overcharge regression. Lamb Depo at 153:11-18; 155:8 – 156:8.  Finally, as shown in the Lamb Rebuttal, when his overcharge regression is limited to data pertaining to distributors only, they still result in positive and statistically significant overcharges for all three regressions. Lamb Rebuttal ¶ 47.

Fourth, Defendants criticize Dr. Lamb's approach because he purportedly did not consider the different end uses for which the customers used the price-fixed components.  Dfs. Opp. at 21.  But as he explained, common demand factors are supported by the strong correlation between demand for semiconductors and demand for capacitors and the fact that there are "broad categories of end-uses that make up the bulk of capacitor demand within each dielectric" Id. at ¶ 84.

Finally, Dr. Lamb fully justified his approach in terms of estimating pass through rates. In a distribution chain such as the one here pass-through is a feature of the market. This is neither "abstract" nor "implausible". Nevertheless, Dr. Lamb tests his hypothesis and finds that cost increases on distributors were indeed passed on to the IPP class.

1  ████████████████████ Lamb Rebuttal ¶ 111-114. ████

2  ██████████████████████████████████████████████████

3  ██████████████████████████████████████████████

4  This is contrary to standard econometric literature, which clearly states that one cannot accept

5  the null hypothesis of no pass-through simply because pass-through was not proven with at least

6  95 percent likelihood. ██████████████████████████████████████

7  ███████████████████████████████████████

8  ████ – instead, it merely demonstrates that there is insufficient data to measure customer-

9  specific pass-through.  Not surprisingly, ███████████████████████████

10  ███████████████████████████████████████

11  ████████████████████████████████ Lamb Rebuttal Report ¶¶ 112-114.

        **2.**       **Dr. Lamb's Methodology for Establishing a Single Overcharge for Each Capacitor Dielectric is Econometrically Sound and is Based on the Documentary Evidence and Guilty Pleas in this Action**

14         Defendants next appear to claim that the single overcharge percentages derived from the

15  data for aluminum, tantalum and film are implausible given the alleged length of the conspiracy.

16  *See, e.g.,* Dfs.' Opp. at 24-26.  They claim that the better approach is to fundamentally alter Dr.

17  Lamb's model in favor of attempting to estimate yearly coefficients.  There are several problems

18  with this approach.  As an initial matter, there is no basis in the documentary evidence

19  suggesting that Defendants decided to collude on a calendar-year basis, disbanded their

20  conspiracies in December of a particular year, and then reconstituted them again early in the

21  following year. Lamb Rebuttal Report ¶¶ 20-22. Such an assumption simply makes no logical

22  sense, especially given Dr. Leonard's results of almost yearly negative coefficients. Moreover,

23  there is no structural break in the data suggesting that testing on a calendar year basis is

24  appropriate. Defendants have no real answers to these questions.

25         But more importantly, Dr. Leonard's analysis, as noted, is fundamentally flawed because

26  Dr. Lamb's model already incorporated linear *and* quadratic time trend variables that account for

27  changes over time. █████████████████████████████ created a

28  multicollinearity problem ██████████████████████████████ Lamb Rebuttal

Law Offices
COTCHETT, PITRE &
McCARTHY, LLP

Report ¶¶ 23; Moore Report ¶¶ 86-89. And Dr. Lamb tested the degree of multicollinearity in
Dr. Leonard's model and found high degrees of the Variance Inflation Factor ("VIF"). Lamb
Rebuttal Report ¶¶ 23-26. Although Defendants and ███████████████████████████
█████████████████████████████████████████████, that contention is belied by the
model's results. Even if one could accurately describe what Dr. Lamb did as an average, █
███████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████
█████████████████████████████████████████████ *See* Lamb Rebuttal Report ¶
22. ██████████████████████████████████████████
██████████████████ *See* Lamb Depo at 189:20–195:4.

Finally, while it is inappropriate to estimate annual overcharges, an alternative method—
shown by Dr. Lamb in his Rebuttal Report—reduces the problem of multicollinearity and still
results in positive and statistically significant overcharges for each year of the proposed
Electrolytic and Film Class Periods and for all but one year for Tantalum Capacitors. Lamb
Rebuttal Report ¶¶ 27-28, Table 2. Contrary to Defendants' contention, there is nothing
nonsensical or arbitrary about breaking out one individual year at a time. *See* Dfs.' Opp. at 25.
As discussed in the Lamb Rebuttal Report, he attempted to avoid the problem of
multicollinearity █████████████████, because instead of including twelve additional time-
related indicator variables, he included one. Lamb Rebuttal Report ¶ 27. The fact that Dr.
Leonard's "sensitivity test" is contradicted in such a dramatic fashion demonstrates its flaws.

As explained in Dr. Lamb's Rebuttal Report, ████████████████████████████
████████████ reliably reject the concept that the data can be pooled. ███████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████ Moreover, the

construction of these tests fail to consider well-known problems associated with simplistically

applying such sensitivity tests in the context of many thousands of observations. It is well

understood that any statistical test, such as the F-Test, has a high degree of "power" with the

presence of a large number of observations.  In light of this, even trivial differences between the

estimated coefficients will be "statistically significant," leading to the misleading conclusion

that, for example, the overcharge was different for different Distributors.[8]

### 3.    Dr. Lamb's Models Appropriately Account for Major Market Events

Next, Defendants argue that Dr. Lamb's model fails to account for events that severely

"roiled" the capacitors industry.  Dfs.' Opp. at 26-28.  Defendants argue that the model did not

account for the Japanese earthquake and tsunami, the Thai floor or the severe recession in 2008

and 2009.  Defendants are mistaken. First, Defendants are simply wrong on the law.  Courts

routinely reject the positon that an expert's model must include every possible variable,

including market events like the ones identified by Defendants.  *Bazemore*, 978 U.S. 385 (1986)

(regression analysis probative even if it contains "less than all measurable variables . . . ");

*Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002); *High-Tech*, 289 F.R.D. at

581. Second, the argument ignores the fact that in his Rebuttal Report, Dr. Lamb tested

Defendants' hypothesis that these events would have impacted pricing for customers in

disproportionate ways that would not have existed in the "but for" world, and firmly rejected it.

Dr. Lamb's regression in his Rebuttal Report included event indicators (*i.e.*, dummy variables),

---

[8] *See, e.g.,* Peter Kennedy, "Sinning in the Basement: What Are the Rules? The Ten Commandments of Applied Econometrics," *Journal of Economic Surveys*, Vol. 16, No. 4, 2002, p. 580: "Very large sample sizes, such as those that have become common in cross-sectional data, thanks to the computer revolution, can give rise to estimated coefficients with very small standard errors. A consequence of this is that coefficients of trivial magnitude may test significantly different from zero"; *see also* Dimitrios Asteriou and Stephen G. Hall, *Applied Econometrics a Modern Approach,* Revised Edition, New York, NY: Palgrave MacMillan, 2007, pp. 201-202. "Note that while the Chow test might suggest that there is parameter instability, it does not give us any information regarding which parameters are affected. For this reason, dummy variables provide a better and more direct way of examining structural stability;"; Damodar N. Gujarati, *Basic Econometrics*, Fourth Edition, Boston, MA: McGraw-Hill, 2004, pp. 277 – 278. "If it is not possible to determine when the structural change actually took place, we may have to use other methods."

1  which showed that the overcharges could not be attributed to those extraneous events. Lamb

2  Rebuttal Report ¶¶ 35 (recession) 40 (variables of events like earthquake).  In any event, with

3  respect to the great recession, Dr. Lamb's analysis included an explanatory variable for World

4  GDP, which incorporates or accounts for weakened demand and the economic downturn in 2009.

5  Lamb Rebuttal Report ¶¶ 34-35.

6         Third, Defendants fail to explain why those events would not have had a common market

7  impact, rather than varying impacts across Defendants' U.S. customers.  *See* Lamb Depo at 259:

8  11 – 262:25.  Fourth, events like the Japanese earthquake or the flood in Thailand were too

9  transitory in nature to have any real effect on the overcharge coefficients generated by Dr.

10 Lamb's model, as has been recognized in several industry journals on the subject. Lamb Rebuttal

11 Report ¶¶ 36-40. Moreover, it is not necessary to account for every discrete event that occurred

12 during the proposed Class Periods because while the earthquake (or flood) may have temporarily

13 affected production, and may have caused a temporary change in capacitor prices, Dr. Lamb's

14 regressions estimate the overcharges paid over the duration of the proposed Class Periods. *Id.* at

15 ¶ 36.

16        Finally, Defendants' purported sensitivity testing of Dr. Lamb's conclusions are

17 nonsensical. ██████████████████████████████████████████████████

18 ██████████████████████████████████████████████████

19 ██████████████████████████████████████████████████

20 ██████████████████████████████████████████████████

21 ██████████████          Dfs'. Mot. at 8, since Dr. Lamb's model includes time trend variables.

22 Doing so, would have resulted in multicollinearity problems.  Lamb Rebuttal Report ¶ 23. n. 48;

23 Moore Report at ¶¶ 86-89; *see also* Lamb Depo. at 259:17- 262:25.

24        **4.    Along with his Overcharge Regressions, Dr. Lamb's Market and**
              **Price Structure Analyses Provide Reliable Methods of Demonstrating**
25            **Common Impact**

26        As stated in IPPs' Motion, the Lamb Report outlines three general methodologies for

27 arriving at his expert opinion that all, or nearly all, IPP class members suffered injury. First, Dr.

28 Lamb employs a multiple regression analysis to demonstrate that prices were inflated above

levels that would be expected in a competitive market and that they were passed on. Lamb Report ¶¶ 22(c), 27(c), 32(c), 141, 179-197, 228, 242, 268-282, 313, 330-342; ¶¶ 198-209, 283-290, 343-350. Next, based on his extensive background and training in economics, Dr. Lamb conducts an analysis of the structural characteristics of the capacitors' markets and concludes they had attributes that facilitated the conspiracy.  Finally, Dr. Lamb determines that there is a "pricing structure" that is common to the IPP classes. The existence of this "pricing structure" shows that the artificially inflated prices during the period were paid by all, or nearly all, direct purchasers. Lamb Report ¶¶ 142-156, 243-259, 314-323.

It is these three methodologies working together that enable Dr. Lamb to conclude that class certification is appropriate in this case.  Defendants' arguments in this regard miss the mark because IPPs never asserted that any one methodology standing on its own are enough to certify an indirect purchaser class.  That does not mean, in any way, that IPPs have somehow conceded that Dr. Lamb's regression analyses are deficient.  *See* Dfs.' Opp. at 28.  It is common in antitrust litigation for economists to utilize a variety of techniques to reach their conclusion that all, or nearly all, class members were affected.  As a result, Defendants' statement that "[n]one of the cases cited by IPPs relied solely on market characteristics or price structure analysis to determine class-wide impact", Dfs. Opp. at 29, is meaningless.

Regarding market characteristics, Defendants' attack on Dr. Lamb's analysis appears to be more situated for vigorous cross examination at trial or a closing argument to a jury. Dfs. Opp. at 29-30.  Defendants merely point to what are purported factual disputes concerning barriers to entry, or other aspects of Dr. Lamb's structural market analysis.  In any event, neither of Defendants' experts challenged Dr. Lamb's well-supported conclusion that significant barriers to entry existed in all of the capacitors markets.  Lamb Rebuttal Report ¶¶ 15-16. And Dr. Lamb cites several pieces of literature that state that the mere existence of suppliers outside of the cartel does not mean that the cartel cannot be effective in raising prices.  *Id.* ¶¶ 72-75.

With respect to customization and the commodity-like nature of capacitors, there is simply nothing in the Defendants' expert reports that cause any type of concern.  The Film-Only

1   Defendants[9] greatly exaggerate this claim.  First, as is true of all Defendants, the Film-Only

2   Defendants had "product crosswalks" for their film capacitors, showing how they were

3   interchangeable with products produced by other Defendants participating in that conspiracy.

4   Lamb Report ¶¶ 299-302; *see also* Lamb Depo at 280:11-281:10.  Crosswalks could not exist

5   unless products are interchangeable.  Second, perfect interchangeability is not required for

6   purposes of class certification, but more importantly, for purposes of an effective cartel.  As Dr.

7   Lamb cogently explained in his deposition testimony, it is not necessary to have perfect

8   interchangeability in a particular marketplace so long as firms have the *capacity* to make the

9   market "contestable."  Lamb Depo at 277:15 – 278:25.  Moreover, the kind of market

10  segmentation by specialty is actually what economists call "endogenous to the existence of a

11  cartel. Whether the product is one that becomes produced by multiple Defendants and offered

12  more frequently in the marketplace by multiple suppliers is a function of whether the industry

13  has been cartelized in a way that splits up the market that way." Lamb Depo at 283:3-9; 283:21 –

14  284:9.

15          Third, the Film-Defendants' own expert ███████████████████████████████

16  ████████████████████████████████████████       Williams Decl., Ex. 2,

17  "Moore Depo." at 344:22–348:10 (███████████████████████████████████████

18  ███████████████████████████████████████████████████████████████

19  ██████████████████████████████████████████

20  ████████       Moore Depo. at 351:10-352: 9-25.  Fourth, the behavior of Defendants in attending

21  the JFC cartel meetings since 1985 impeaches their exaggerated contention of a lack of

22  interchangeability.  If it were the case that Defendants were not operating in the same markets

23  because of a significant lack of interchangeability, the JFC meetings would have been

24  completely useless to the participants.  There would have been no value to the information

25  learned at such meetings, including even the non-illicit information the parties exchanged.

26

27  ---

   [9] The "Film-Only Defendants" filed their own 10-page brief and are Shizuki, Shinyei, Nissei

28  and Taitsu.

1  Defendants' arguments simply fail to make sense given the extensive communications they had

2  with their competitors.

3  Moreover, the mere fact that there was some purchasers that viewed the capacitors

4  produced by Defendants as higher quality than those produced by alternative suppliers has no

5  bearing on Dr. Lamb's conclusion that a capacitor of a given dielectric with a given level of

6  capacitance, voltage, or product series produced by one of the Defendants is interchangeable

7  with that produced by another Defendant.  As Dr. Lamb argues, markets may be segmented on

8  the basis of quality, but within a particular quality band they are interchangeable.  Lamb Rebuttal

9  Report ¶¶ 80.

10  Defendants' critique of Dr. Lamb's pricing structure analysis appears to misunderstand

11  his analysis.  Defendants claim that his analysis could not show whether prices move together

12  over time because he analyzed voltage, capacitance, and product series – all variables that do not

13  change over time.  Dfs. Opp. at 30-31.  But this is again a straw man argument.  Dr. Lamb's

14  product characteristics regression was meant to show that common factors—*e.g.*, voltage,

15  capacitance and product series—explain the vast majority of price variation.  In other words,

16  while a superficial review of prices may appear to be varied, those variations are actually

17  explained by factors common to the class, not by different prices being charged to different

18  members of the class on an unexplainable basis.  But, Defendants' critique also omits important

19  information in the Rebuttal Report: that is, the average residuals are explained by a time series

20  regression.  Lamb Rebuttal Report ¶¶ 85-87.  This demonstrates that "over time", Dr. Lamb's

21  analysis does show that the prices are explained by factors common to the classes.  *Id.*  And

22  while Defendants appear to criticize Dr. Lamb's cost variables (variables that Defendants'

23  experts did not contest in their own reports), the extremely high R-squareds associated with Dr.

24  Lamb's regressions show that his selection of variables and results are reliable.  Lamb Depo. at

25  134:19–137:22; 142:9–143:16; 145:6–18.

26  **C.    Defendants' Arguments Regarding a Pass-On Defense Go to Merits and Not Class Certification Issues**

27  Defendants also erroneously argue that class certification should be denied because Dr.

28  Lamb did not address issues of pass-on.  As an initial matter, as several courts have held, pass-on

1    is an issue of damages that go to the merits of the action, not to whether a class should be

2    certified in the first instance.  *See, e.g., In re Domestic Air Transportation Antitrust Litig.*, 137

3    F.R.D. 677, 696 (N.D. Ga. 1991) (finding that a pass-on defense went to the merits of the

4    action); *B.W.I. Custom Kitchen v. Owens-Illinois*, 191 Cal.App.3d 1341, 1353 (1987) (refusing to

5    address defensive pass on at the class certification stage). Accordingly, Defendants' arguments

6    are premature.

7         In any event, as previously stated, a pass-on defense is not legally available where there

8    is no downstream class, as here.  That is because there is no need to allocate damages between

9    the non-existent multiple level IPP class.  For example, in in *Clayworth v. Pfizer*, *Inc*., the

10   California Supreme Court concluded, "under the Cartwright Act as under federal law [] a pass-on

11   defense generally may **not** be asserted." 49 Cal. 4th 758, 787 (2010) (emphasis added).

12   *Clayworth* thus announced the general rule that under California law there is **no** pass-on defense.

13   *Clayworth* went on to discuss a potential exception to that general rule, which is not present here,

14   stating that in "instances where multiple levels of purchasers have sued . . . trial courts and

15   parties have at their disposal and may employ joinder, interpleader, consolidation, and like

16   procedural devices to bring all claimants before the court . . ." *Id*. at 787.  Because *Clayworth*

17   was an indirect purchaser case, its reference to multiple levels of purchasers refers to multiple

18   levels of indirect purchasers. Here, there is only one IPP class and no chance of duplicative

19   recovery as between this IPP class and any downstream purchasers—both because no other

20   downstream IPP party has sued and because of Defendants' successful argument that such a

21   party could not sue under the antitrust laws.  Because IPPs are not presenting claims for any

22   purchases downstream of the present plaintiffs, there is no risk of duplicative damages, nor any

23   need, as discussed in *Clayworth* and *LCDs infra*, to allocate damages between the indirect

24   classes.

25        With respect to Florida, Michigan, Minnesota and Iowa, contrary to Defendants'

26   arguments, their antitrust or consumer protection laws are ***silent*** as to whether a defendant may

27   assert a pass-on defense. Judge Illston's decision in *LCD*—which involved multiple levels of

28   indirect purchasers—elucidates the point the California Supreme Court made in *Clayworth* and

1   demonstrates why Defendants are incorrect as a matter of law.  *See* No. 3:10-cv-03205-SI, 2014

2   WL 4652145, at *2 (N.D. Cal. Sept. 18, 2014).  There, Judge Illston permitted a potential pass-

3   on defense because there were multiple levels of indirect purchasers suing. *Id.* at *2 (N.D. Cal.

4   Sept. 18, 2014) (noting "the risk of duplicative recovery if the defense is precluded . . . ."); *see*

5   *also*, *LCD*, No. C 09-4997 SI, 2012 WL 6709621, at *4 (N.D. Cal. Dec. 26, 2012).  Here, unlike

6   *LCD*, there is no chance of duplicative recovery among indirect purchasers because there is only

7   one IPP class.  Similarly, contrary to Defendants' suggestion, in *Comes v. Microsoft*, the court

8   stated that "[e]ven assuming such danger of multiple liability exists, there is no federal policy

9   against states imposing liability in addition to that imposed under federal law." 646 N.W.2d 440,

10  444-50 (Iowa 2002). The decision in *Comes*, therefore, recognizes that in enacting an *Illinois*

11  *Brick* repealer statute, the legislature understood the risk of duplicative damages.  Neither the

12  *Comes* case, nor Iowa law generally, justifies Defendants' arguments.

13         The statutory language in New York and Nebraska embraces the same reasoning of the

14  California Supreme Court in *Clayworth*.  These states' indirect purchaser statues permit a pass-

15  on defense *but only if* those to whom the overcharge was passed on to are *entitled to recover*

16  *themselves*.  *See* Neb. Rev. Stat. Ann. § 59-821.01; N.Y. Gen. Bus. Law § 340(6) (permitting the

17  defense if the downstream plaintiffs "are themselves entitled to recover so as to avoid duplication

18  of recovery of damages."). The statutory language thus incorporates the *Clayworth* Court's

19  reasoning – a pass-through defense should only be available when necessary to avoid the risk of

20  duplicative damages, which doesn't exist in this case.  Here, Defendants argued that such any

21  such downstream plaintiffs could not actually have claims under the antitrust laws because they

22  were too remote. *See* Dfs. Mtd., ECF No. 474 at 13-16; Dfs. Reply, ECF No. 551 at 14-15.  This

23  Court agreed with that reasoning.  Defendants' position lacks merit and, in any event, comes at

24  the wrong stage of this litigation.

25         Finally, Defendants themselves are judicially-estopped from arguing that such damages

26  need to be apportioned amongst the non-existent various levels of the IPP chain.  Indeed, at the

27  outset of this litigation, IPPs' First Consolidated Complaint included the claims of not only first-

28  level indirect purchasers who purchased standalone capacitors from distributors, but *also*

1  downstream indirect purchasers who purchased products incorporating price-fixed capacitors.

2  *See* IPPs' First Consolidated Complaint, ECF No. 400.  In moving to dismiss the downstream

3  IPPs from that complaint, Defendants argued that it would be *impossible* to trace the overcharge

4  through the distribution chain and that such an analysis was simply too speculative, remote and

5  burdensome.  *See* Defendants' Joint Motion to Dismiss, ECF No. 474 at 13-14; ECF No. 551 at

6  14-15.  Defendants cannot have it both ways.

7         **D.**    **Dr. Leonard's Models are Misspecified and Fundamentally Unreliable**

8         As set forth in IPPs' Motion, Dr. Leonard's models and critiques are fundamentally

9  misspecified, poorly constructed and ultimately unreliable—even as purported "sensitivity tests"

10  of Dr. Lamb's work .  *See* Motion at 26-28.  With respect to his yearly overchange analysis,

11  

12  *See* Lamb

13  Rebuttal Report ¶ 23. n. 48; Moore Report at ¶¶ 86-89; *see also* Motion at 26-27.  Defendants

14  have no response to this misspecification other than to complain about a strategic choice

15  Defendants made not to have their own expert testify about the multicollinearity problems in his

16  model.  *See* Dfs.' Opp. at 34, n. 28; *see also* Williams Decl.., Ex. 3, "Leonard Depo" at 212:3–

17  214:24 (Plaintiffs' counsel asserts objection and Defendants apparently agree with it, ending that

18  line of questioning).   Defendants' Opposition essentially concedes the misspecification in Dr.

19  Leonard's model, and the best they can say is that notwithstanding those problems, his separate

20  F-Tests show that Dr. Lamb's work is unreliable.  But Dr. Lamb addressed the problems inherent

21  in Dr. Leonard's F-Tests and purported Chow Tests.  *See, e.g.,* Lamb Rebuttal Report ¶¶ 61-67.

22         **E.**    **Dr. Moore's Models are Misspecified and Fundamentally Unreliable**

23         As set forth in IPPs' Motion for Class Certification—aside from the misspecification of

24  Dr. Moore's models—his work was riddled with errors and was misleading in several ways,

25  Moore Depo. 245:14-249:2; 290:5-291:7;

26  301:5-308:12; 309:8-310:21; 322:18-323:25; 332:8-344:5; 375:6-376:13; 380:12-381:12; 382:4–

27  13; 383:12–384:10; *see also* Motion at 24-26.  Dr. Moore was forced to correct errors in his

28  analysis on three separate occasions, requiring the exchange of three errata by Defendants,

1 [REDACTED]

2 [REDACTED] *Id.*

3 Defendants do not address Dr. Moore's incredible concession during his deposition testimony at

4 all.  Instead, they forge ahead as if it was not an issue.  *See* Dfs.' Opp. at 35-36.  With respect to

5 his other "testing," IPPs' addressed the flaws in Dr. Moore's analysis in the Motion.  *See* Motion

6 at 24-26.  Most prominently, [REDACTED]

7 [REDACTED]

8 [REDACTED] Moore Depo. at 280:23–290:3; 300:23–308:12; 322:18–323:25; 322-

9 323:25. [REDACTED]

10 [REDACTED]

11 [REDACTED] *See* Lamb Rebuttal Report ¶ 59; *see also* Moore Depo. at 281:7-282:1.  This means

12 they are not, in fact, estimates of customer specific overcharges.

### F.   Plaintiffs Have Submitted Substantial Common Documentary Evidence Showing Defendants' Price-Fixing Conspiracy

In an almost baffling claim, Defendants next argue that IPPs have failed to provide

evidence showing a price-fixing conspiracy affecting U.S. purchasers or distributors.  In order to

make such an astounding claim, Defendants must (1) ignore a substantial number of documents

that were submitted showing discussion of price increases across the aboard, including in

[REDACTED] markets, (2) ignore the express admissions of their co-conspirators in the guilty pleas

that their illegal conduct had a direct, substantial and reasonably foreseeable impact on United

States' customers, (3) misrepresent the documents that were submitted, and (4) ignore other

documents relied on by IPPs' expert to establish common impact.  In any event, though it is

voluminous and well-documented in this case, it is not a prerequisite that plaintiffs submit

liability evidence in support of class certification in antitrust actions.  The question presented is

whether there is a common method for showing antitrust impact.  This is not a summary

judgment motion on liability.  Moreover, even if Defendants are correct (and they are not), this is

an issue that is common to the classes and will rise and fall as to the classes as whole: *i.e.,*

whether Defendants fixed prices on U.S. purchasers and distributors.

1          **1.     The Documents Defendants Cite Discuss General Price Increase
2                 Efforts**

3          Defendants baldly assert that "none" of the documents IPPs cite concern U.S. customers or

4    distributors. *See* Dfs.' Opp. at 36. They then specifically take issue with Exs. 28, 24, 25, 26, 29,

5    30, and 31. Defendants' assertions are contradicted by the documents themselves:

6    • Regarding Exhibit 28, ███████████████████████████████████████████

7    ████████████████████████████████████████████████████████████████████

8    █████████████████████████████████████████████████

9    • Regarding Exhibit 24, Defendants can only reach their reading of the document by
     excluding certain portions that pertain to █████████████████████

10   ████████████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████

13

14   • ████████████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████████████

16   ███████████████████████████████████████████

17   • Exhibit 26 ████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████████████

20   ██████████████████████████████████ *Id.*

21   • Defendants' contentions regarding the geographic scope of the so-called "SM Meetings" is
     curious, considering that several members of this group have been indicted here in the U.S.,
22   including NCC's Kaname Takahashi and Yasutoshi Ohno. ███████████████████

23   ████████████████████████████████████████████████████████████████████

24   ████████████████████████████████ *See* Ex. 30.

25          **2.     Defendants Do Not Even Address a Number of Documents that Were
26                 Submitted Evidencing Pricing Agreements on Capacitors Destined for
                  Overseas Locations, Including the U.S.**

27          Similar to Defendants' misrepresentations concerning the aforementioned documents,

28   they do not even address a number of documents submitted with IPPs' Motion:



- Exhibit 12 are

- Exhibit 15 shows

- Exhibit 16

    Similarly, Exhibit 17

- In Exhibit 19

- One could hardly expect a *better* cartel document than Exhibit 27

- Exhibit 66

Similarly, the DPPs submitted extensive documentation of Defendants' pricing fixing with their Motion. *See* Declaration of Joseph Saveri, Exs. 7-141, ECF Nos. 1693-1.

       **3.**      **Documents Relied on by IPPs' Expert Demonstrate Price-Fixing for U.S. Customers and Distributors**

IPPs' expert also relied on a copious number of documents that demonstrated price coordination of prices "across the board," and specifically regarding distributors. *See, e.g.,* Lamb Report. For example:

-



Defendants' argument can be easily rejected.[14]

### 4.    The Film-Only Defendants' Arguments Are Irrelevant

The Film-Only Defendants submit a separate brief, making arguments mainly directed at DPPs' allegations concerning a single, overarching conspiracy involving both electrolytic and film capacitors.  Those arguments are irrelevant to IPPs' Motion.  The other arguments are easily rejected because they have no bearing on the question before this Court at class certification.

### a.    It is Black-Letter Law that DOJ's Decision Not to Criminally Prosecute Has No Bearing on Subsequent Civil Litigation

The entire point of the Film-Only Defendants' separate brief appears to be to repeatedly point out that DOJ dropped its criminal investigation without formal charges.  Yet, as several courts have held, DOJ's determination not to prosecute the film Defendants is a non-event in terms of this civil litigation.  Their repeated arguments ignore both the fact that it is legally

---

[10] RUB_000616687_EN - 695_EN at 691_EN.
[11] NICHICON-AM00184938.
[12] NICHICON-AM00184938.
[13] HIT00031394.
[14] Defendants do not even attempt to make this argument in their Opposition to DPPs' Motion for Class Certification.

1   irrelevant *and* irrelevant to the question of class certification before this Court.

2          For example, in *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 664-65

3   (7th Cir. 2002), *cert. denied,* 537 U.S. 1188 (2005) ("*High Fructose*"), Judge Richard Posner

4   rejected precisely the same argument that the Film-Only Defendants make here, though in *High*

5   *Fructose* the argument was at least made at the procedurally correct stage – summary judgment.

6   There, Judge Posner stated that DOJ's decision not to prosecute the alleged cartel was irrelevant

7   at summary judgment: "[b]ut neither can it be used, as the defendants wish to use it in this case,

8   to show that because the Justice Department has not moved against the alleged HFCS price-

9   fixing conspiracy, there must not have been one.  The Justice Department has limited resources .

10  . . . [it] may also have felt that the antitrust class action bar had both the desire and the resources

11  to prosecute such a suit vigorously, as indeed it has done." *Id.* at 664-65.  Judge Posner also

12  discussed the differences in standards of proof in a criminal case versus a civil case as one reason

13  why the Justice Department may choose not to criminally prosecute.  *Id.* at 664.

14         Other courts are in accord.  *In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603,

15  619-20 (N.D. Ga. 1997) ("*Polypropylene Carpet*"); *In re Vitamins Antitrust Litig.*, 2000 U.S.

16  Dist. LEXIS 7397, *53-54 (D. D.C. May 9, 2000) ("*Vitamins*"); *In re Flat Glass Antitrust Litig.*,

17  2009 U.S. Dist. LEXIS 10329 at 14-17 (N.D. Cal. 2009) ("*Flat Glass*"). *See also* <u>Principles of</u>

18  <u>Federal Prosecution</u>, United States Department of Justice, § 9-27.400 ("readily provable

19  charges" may be dropped or bargained away "because the United States' Attorney's Office is

20  particularly overburdened, the case would be time-consuming to try, and proceeding to trial

21  would significantly reduce the number of cases disposed of by the office.").

22         Not only is the fact that DOJ dropped its pursuit if criminal charges legally insignificant

23  (even on a motion for summary judgment), it is irrelevant to the class certification analysis.  *See*

24  *Polypropylene Carpet,* 178 F.R.D. at 619-20.  History is replete with successful civil antitrust

25  cases without there ever being a criminal investigation at all, including classes that have been

26  certified.  *See, e.g.*, *SRAM*, 264 F.R.D. 603 (N.D. Cal. 2009) (class certified and no criminal

27  investigation); *Flat Glass*, 2009 U.S. Dist. LEXIS 10329 (N.D. Cal. 2009); *ODD*, 2016 U.S.

28  Dist. LEXIS 15899 (N.D. Cal. 2016) (indirect purchaser class certified involving many

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

**Reply Brief ISO Indirect Purchaser Plaintiffs' Motion for Class Certification;**
**Case No. 3-14-cv-03264-JD**                                                                      26

defendant families and yet only one guilty plea); *Flat Glass*, 191 F.R.D. 472 (W.D. Penn. 1999) (certifying class with no guilty pleas)

### b.    The Film-Only Defendants Ignore Evidence that is Common to the Class of the Price-Fixing Conspiracy

The Film-Only Defendants engage in a document counting game that is supposed to somehow demonstrate their lack of participation in a conspiracy to fix prices. They argue that of the 69 exhibits submitted with IPPs' Motion, only 13 relate to the film conspiracy. Film Dfs.' Opp. at 3-4. Putting aside the fact that IPPs were not required to submit *any* documents regarding the purported conspiracy—let alone *all* such documents showing a conspiracy—the contention makes no sense. It is immaterial to the class certification analysis whether IPPs submitted *more* documentary evidence regarding the electrolytic conspiracy, not to mention irrelevant to whether the Film-Only Defendants themselves engaged in a conspiracy. Similarly, these Defendants go on to state that IPPs dedicate only 1 page to summarizing some of the liability evidence related to film, as if this is somehow probative of their lack of participation in the conspiracy. In reality, the only thing it is probative of is the fact that at class certification, the focus is on IPPs' expert's methodologies, not factual disputes about the liability evidence that only a jury can resolve.

Regardless, the Film-Only Defendants appear to ignore the pervasive pricing discussions and coordination that did occur at the JFC meetings, as well as numerous bilateral meetings occurring in or around JFC meetings. IPPs' Motion at 6-7; Lamb's Report ¶¶ 294, 305-307; 322-323. The Film-Only Defendants' invitation for this Court to reach decisions that are not appropriate at class certification or, worse, to invade the province of the jury should be rejected.

### G.    The Named Plaintiffs Are Adequate to Represent the Putative Classes

Each named Plaintiff satisfies Rule 23(a)(4)'s adequacy requirements. Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of

1   the class?" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). In connection with

2   *Hanlon*'s second question, courts in this circuit require only that class representatives have

3   "minimal familiarity with the litigation." *In re Tableware Antitrust Litig.*, 241 F.R.D. 644, 649

4   (N.D. Cal. 2007) (Walker, C.J.). Their "detailed understanding of the theories and facts of the

5   case is not required." *Id.* Class representatives need not "be intimately familiar with every factual

6   and legal issue in the case"; rather, they need only "understand the gravamen of the claim." *In re

7   Worlds of Wonder Sec. Litig.*, 1990 WL 61951, at *3 (N.D. Cal. Mar. 23, 1990). Indeed, even in

8   Defendants' leading case, Judge Samuel Conti recognized that "[g]iven this standard, class

9   representatives are given some leeway when it comes to knowledge of and participation in their

10  case." *Lee v. Pep Boys-Manny Moe & Jack of Cal.*, 2015 WL 9480475, at *10 (N.D. Cal. Dec.

11  23, 2015).

12          Despite these standards, Defendants would have this Court require class representatives

13  to hold bar licenses and actively participate in day-to-day decision-making of this case to satisfy

14  Rule 23(a)(4).  This is contrary to the standards articulated by courts. *See, e.g.*, *Sebo v.

15  Rubenstein*, 188 F.R.D. 310, 316 (N.D. Ill. 1999) (reading pleadings and briefs "is not required

16  before the court can find that [the representative] will provide adequate representation for the

17  class"). In *TFT-LCD*, Judge Susan Illston rejected defendants' adequacy argument based on

18  "plaintiffs' level of participation and knowledge about th[e] litigation" where the proposed class

19  representatives "could not recall whether they had read the initial complaints before they were

20  filed." *LCD*, 267 F.R.D. at 595.  Judge Illston determined the class representatives were

21  adequate because they had "provided answers to written discovery, given deposition testimony,

22  and followed the progress of this litigation through communication with counsel[.]" *Id.* Nor does

23  the law require class representatives to able to identify all entities named as defendants. *See

24  Biancur v. Hickey*, 1997 WL 9857, at *10 (N.D. Cal. Jan. 7, 1997) ("Counsel is responsible for

25  guiding the intricacies of litigation, such as joinder of defendants."). Requiring class

26  representatives, who are not lawyers, to make overall and day-to-day strategic decisions about

27  this complex action would go against not only common sense and various statutes, but the

28  Federal Rules of Civil Procedure. *See Hanlon*, 150 F.3d at 1020 (Rule 23(a)(4)'s adequacy

inquiry asks whether named plaintiffs ***and their counsel*** will vigorously prosecute the action on behalf of the class); *see also* Fed. R. Civ. P. 23(g).

Defendants' assertion that the proposed class representatives are "completely unaware of how the litigation is proceeding" ignores their deposition testimony. They testified that they: (1) read the complaint and other documents provided by counsel; (2) understand what the case is about, what claims they are making and why, and what recovery they are seeking on behalf of themselves and the class; (3) understood their responsibilities as class representatives; and (4) even demonstrated an acute knowledge of capacitors and the capacitors market. [15]

The proposed class representatives have fully discharged their duties to date. *See LCD*, 267 F.R.D. at 595. They have spent many hours searching for and collecting documents responsive to defendants' requests; responded to interrogatories (nineteen for some plaintiffs, nine for others); prepared for, traveled to, and testified at depositions that covered up to 24 separate 30(b)(6) topics.[16] Given the named Plaintiffs' testimony and discovery efforts, Defendants' assertion that they are "completely unaware of how the litigation is proceeding" is disingenuous and offensive.

Defendants also speculate that certain class representatives are subject to "unique defenses," yet they fail to identify any such defense. The fact that a plaintiff acted as a proposed or actual class representative in other class actions is not inherently detrimental to their ability to vigorously advocate on behalf of the class' interests in this litigation. To the extent that defendants found case law in support of this argument, the "unique defenses" identified in those cases do not apply here. *See Barry B. Roseman v. Sports and Rec.*, 165 F.R.D. 108, 111 (M.D. Fla. 1996) (securities fraud case where defendant could rebut presumption of reliance by showing 14-time securities-fraud plaintiff purchased stock anticipating price to fall); *Darvin v. Int'l Harvester Co.*, 610 F. Supp. 255, 257 (S.D.N.Y. 1985) (inconsistent deposition testimony and lack of credibility could subject proposed class representative to unique defenses). In the

---

[15] Appendix A (citations to excerpts from deposition transcripts showing involvement in case); *see also* Williams Decl., Exs. 4-13 (excerpts of class representative deposition transcripts).
[16] Appendix B (summarizing class representative discovery)

Law Offices
COTCHETT, PITRE &
MCCARTHY, LLP

1   absence of unique defenses that could apply in this case, the Court should disregard defendants'

2   unique defenses claim.

3          In short, the adequacy standard is a relatively permissive one, which does not "pose a

4   particularly high bar to class certification." *Woods v. Vector Marketing Corp.*, 2015 U.S. Dist.

5   LEXIS 118678 at 39 (N.D. Cal. 2015) (collecting cases). Courts are generally reluctant to deny

6   class certification on adequacy grounds. *In re Northrop Grumman Corp. ERISA Litig.*, 2011 U.S.

7   Dist. LEXIS 94451 at 62-64 (C.D. Cal. 2011). As shown above, this Court should determine that

8   each of the proposed class representatives are adequate under Rule 23(a)(4).

9          **H.      IPPs' Easily Meet the Permissive Rule 23(a) Requirements**

10         As demonstrated in IPPs' Motion, the classes easily meet the standards under Rule 23(a).

11  *See* Motion at 9-12.  Despite demonstrating a numerous class, Defendants now claim that IPPs

12  did not show whether the state subclasses are numerous enough.  Yet, as they know because they

13  have the same distributor sales data, over the class periods, a conservative calculation shows that

14  there are over (1) 58,000 purchasers in California; (2) 24,000 purchasers in Florida; (3) 3,000

15  purchasers in Iowa; (4) 12,500 purchasers in Michigan; (5) 1,500 purchasers in Nebraska; (6)

16  19,500 purchasers in New York; and (7) 10,000 purchasers in Minnesota. These numbers satisfy

17  numerosity.  And, as stated in the Motion, the Class Representatives are typical because the

18  typicality inquiry focuses on the conduct of the Defendants, not on their individual dealings.

19  *LCD,* 267 F.R.D. 291, 300 (N.D. Cal. 2010) ("*LCDs I*") (class representatives are typical even

20  with different purchasing procedures).

21  **III.    CONCLUSION**

22         For the foregoing reasons, this Court should certify the IPP classes.

23  Dated: August 3, 2017                    Respectfully submitted,

24                                           By:    */s/ Steven N. Williams*
                                             Steven N. Williams
25                                           Adam J. Zapala
                                             Elizabeth Tran
26                                           Mark F. Ram
                                             **COTCHETT, PITRE & McCARTHY, LLP**
27                                           San Francisco Airport Office Center
                                             840 Malcolm Road, Suite 200
28                                           Burlingame, CA 94010

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Telephone: (650) 697-6000
Facsimile: (650) 697-0577
swilliams@cpmlegal.com
azapala@cpmlegal.com
etran@cpmlegal.com
mram@cpmlegal.com

*Interim Lead Class Counsel for Indirect Purchaser
Plaintiffs*

**Reply Brief ISO Indirect Purchaser Plaintiffs' Motion for Class Certification;
Case No. 3-14-cv-03264-JD**