**Joseph Saveri Law Firm, Inc.**
601 California, Ste. 1000
San Francisco, CA 94108

January 10, 2018

Hon. Judge James Donato
United States District Court
450 Golden Gate Avenue
Courtroom 11, 19th Floor
San Francisco, California 94102

Re:   *In re Capacitors Antitrust Litigation*, No. 14-cv-03264-JD

Dear Judge Donato:

KEMET Corporation and KEMET Electronics Corporation (together, "KEMET") have moved for a protective order barring the deposition of KEMET CEO Per Olof Loof. ECF No 1993. Mr. Loof has unique personal knowledge of KEMET's participation in anticompetitive cartel activity. DPPs respectfully ask that the Court deny the motion and allow the deposition.

## I.   Background

DPPs allege that KEMET participated in the capacitors cartel via direct meetings and communications that included anticompetitive agreements and exchanges of sensitive, non-public pricing and capacity information with other cartel members. ECF No. 1831 (DPPs' Third Amended Complaint) at ¶¶ 219-31. KEMET also acquired a controlling voting interest in Defendant TOKIN Corporation—formerly NEC TOKIN Corporation—a major cartel member that pleaded guilty to criminal price fixing. *Id.* ¶¶ 231-33. KEMET refused to produce Mr. Loof's custodial files until the Court ordered their production in July 2015. (Dkt. No. 758.)

## II.   A Deposition of a Top-Level Corporate Officer May Proceed if the Witness Has Personal Knowledge of Relevant Facts

KEMET primarily relies on inapposite caselaw about so-called "apex" depositions—i.e., depositions conducted to elicit testimony from a top-level official not directly involved in the conduct at issue. A party invoking the apex doctrine to prevent a deposition must first demonstrate good cause for the protection. *In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2014 WL 939287, at *2–3 (N.D. Cal. Mar. 6, 2014). KEMET's letter brief does not mention its burden, the good-cause requirement of Rule 26, or this Court's prior reference to the need for KEMET to establish "good grounds" before a protective order may issue. *See* ECF No 758.

And KEMET admits that a central factor in resolving a motion to preclude an apex deposition is "whether the deponent has unique first-hand, non-repetitive knowledge of the facts at issue in the case." *Hunt v. Continental Cas. Co.*, 2015 WL 1518067, at *2 (N.D. Cal. Apr. 3, 2015) (citing *Apple Inc.*, 282 F.R.D at 263). The threshold is low, and satisfied "where a corporate officer may have *any* first-hand knowledge of relevant facts[.]" *Id.* (emphasis in original) (citations omitted).

## III.   Mr. Loof's Unique Knowledge Warrants a Deposition

During negotiations with KEMET, Plaintiffs provided sample documents showing Mr. Loof's supervision of—and attendance at—meetings where KEMET exchanged sensitive business information with its competitors, as well as his role in negotiating and setting capacitor prices. KEMET attempts to explain them away. ECF No. 1993 at 2. Nonetheless, the weight of the evi-

Hon. James Donato
January 10, 2018
Page 2

dence makes clear that Mr. Loof has first-hand knowledge directly relevant to DPPs' claims. *Compare In re Google Litig.*, 2011 WL 4985279, at *2 (N.D. Cal. Oct. 19, 2011) (where witness has personal knowledge of relevant facts, "even a corporate president or CEO is subject to deposition") (cite omitted). Mr. Loof's relevant personal knowledge concerns the following matters:

**Direct Communications with Cartel Members.** As CEO, Mr. Loof discussed pricing and other sensitive topics with competitors. *See, e.g.* KEM1100504 (Mr. Loof spoke with other component manufacturer CEOs about pricing in Asia, noted that prices were holding, and agreed that price erosion had slowed, developments creating a need to prepare); KEM1099330 (Mr. Loof met with the CEOs of NEC TOKIN and Taiyo Yuden in Japan); NICHICON-AM00293129 (Ex. 2816); Persico Tr. at 195:8-15 (Mr. Loof met with Nichicon's President Takeda in 2009); and KEM1437972 (Ex. 2802) (Mr. Loof met with NEC TOKIN and Hitachi executives in 2007 and exchanged sensitive information, including prices).

**Reports from Subordinates about Communications with Cartel Members.** At least two KEMET employees who exchanged competitive information with Japan-based competitors—Daniel Persico, Vice President of Strategic Marketing and Business Development; and Philip Lessner, Senior Vice President and Chief Technology Officer—reported to Mr. Loof and briefed him on meetings where they learned competitor pricing and other confidential facts. Mr. Lessner informed Mr. Loof that KEMET had agreed to continue exchanges between TOKIN and KEMET every six months, alternating between Japan and the United States, with the cross-competitor discussions to include production rates, product plans, and capacity and production estimates. KEM1420479; *see also* KEM1091420, KEM1175918 (Mr. Persico to share his notes from his May 2011 Japan trip, during which he obtained production capacity details from Japanese competitors, with Mr. Loof); *and* KEM1418703 (Mr. Loof agreed it would be desirable for KEMET and TOKIN to continue exchanging marketing and other information even after their technical licensing agreement expired). James McClintock, another KEMET employee, forwarded Mr. Lessner's report on a 2005 meeting with Sanyo to Mr. Loof, highlighting that SANYO and TOKIN were in regular communication and indicating awareness that the Japan-based firms were coordinating closely). KEM1099127 (Ex. 416), KEM1099128 (Ex. 417).

**Involvement in the Pricing and Sale of Capacitors.** Mr. Loof was personally involved in KEMET's pricing and sales decisions for capacitors. That involvement is directly relevant to the price-fixing claims in this case, particularly given Mr. Loof's undisputed knowledge of non-public information that KEMET exchanged with its competitors. *See Apple, Inc.*, 282 F.R.D. at 265 (deponent engaged in "the type of hands-on action which demonstrates the unique personal knowledge required to compel a deposition of a CEO"). Fernando Spada, KEMET's former Vice President of Product Marketing—the unit responsible for pricing—testified about numerous instances in which Mr. Loof participated in senior-level discussions with customers about price increases. *See* Spada Dep. Tr. 331:22-334:10, 334:24-335:19, 337:20-338:23 (Mr. Loof met with senior management at four major U.S. and European companies). Documentary evidence, moreover, shows that Mr. Loof was directly and personally involved in pricing capacitors and in negotiating pricing with customers. *E.g.*, KEM1107048 (Mr. Loof gave input on pricing strategy); KEM1120492 (Mr. Loof told of pricing movements to prepare for upcoming meetings and advised Panasonic was being more disciplined while TOKIN was dropping prices).

Hon. James Donato
January 10, 2018
Page 3

***Knowledge of and Control over TOKIN.*** Mr. Loof also has unique knowledge about KEMET and TOKIN's close "strategic relationship," which began with information exchanges as early as 2002. *E.g.*, KEM1396069 (email from December 2002 stating that TOKIN sought to share market information with KEMET on a regular basis); KEM1143469 & KEM1143470 (Ex. 1455) (September 2009 presentation states KEMET and TOKIN maintain a regular dialogue about marketing). From 2009 to April 2017, Mr. Loof personally negotiated and supervised the TOKIN acquisition. *E.g.*, KEM1114899 (Mr. Loof involved in direct negotiation of the purchase price for TOKIN). Since 2013, Mr. Loof has served both as CEO and Director of KEMET and as Representative Director and Chairman of TOKIN with control over TOKIN's pricing and sales decisions. In performing these dual roles, Mr. Loof received and exchanged information and communications relevant to DPPs' claims. *E.g.*, KEM0787343 (email from customer asking that Mr. Loof intervene in pricing negotiations with TOKIN); *cf. Apple Inc.*, 282 F.R.D. at 269 (compelling deposition of an executive with "unique role as the financial interface" between two defendants).

## IV.    KEMET Has Not Established Good Cause to Bar Mr. Loof's Deposition

The party seeking to avoid discovery has a "heavy burden" to show "harm or prejudice that will result from the discovery." *Apple Inc. v. Samsung Elecs. Co.*, 282 F.R.D. 259, 263 (N.D. Cal. 2012) (citing *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1063 (9th Cir. 2004)); *see also Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975) (party seeking to preclude deposition bears "heavy burden"). Moreover, "[a]bsent extraordinary circumstances, it is very unusual for a court to prohibit the taking of a deposition." *Medimmune, LLC v. PDL Biopharma, Inc.*, 2010 WL 2640473, at *1 (N.D. Cal. June 30, 2010). KEMET provides no specific facts demonstrating a risk of harm or prejudice and cites no "extraordinary circumstances." *See id. and Kennedy v. Jackson Nat'l Life Ins. Co.*, 2010 WL 1644944, at *1 (N.D. Cal. Apr. 22, 2010) (broad allegations of harm unsubstantiated by "specific examples or articulated reasoning" do not suffice) (citing *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992)); *see also Grateful Dead Prods. v. Sagan*, 2007 WL 2155693, at *1 (N.D. Cal. July 26, 2007) (denying protective order where "no specific facts" supported "actual showing of undue burden").

KEMET relies on *Celerity, Inc. v. Ultra Cleaning Holding, Inc.*, 2007 WL 205067 (N.D. Cal. Jan. 25, 2007), a case where the witnesses were not shown to possess any first-hand knowledge of relevant facts. The evidence here shows that, rather than being "removed from the daily subjects of the litigation" as KEMET suggests (ECF No. 1993 at 2-3), Mr. Loof possesses unique, personal knowledge of critical facts relating to KEMET's pricing decisions and competitor contacts. *Compare WebSideStory, Inc. v. NetRatings, Inc.*, 2007 WL 1120567, at *4 (S.D. Cal. Apr. 6, 2007) (evidence that a former CEO had "personal knowledge of facts relevant to the lawsuit" rendered him "subject to deposition regardless of his position in the corporate hierarchy.").

Furthermore, apex depositions may proceed even where "other witnesses may be able to testify as to what occurred" given that "it is not uncommon for different witnesses to an event to have differing recollections of what occurred." *First Nat'l Mortg. Co. v. Fed. Realty Inv. Trust*, 2007 WL 4170548, at *2 (N.D. Cal. Nov. 19, 2007). Here, other key KEMET witnesses DPPs requested are unavailable. Mr. Williams cited illness and has produced a doctor's note. Mr. Kotelon, Mr. Lohwasser, and Mr. Chen live abroad and have refused to appear voluntarily. Given Mr. Loof's oversight of all of them, DPPs require his testimony to bridge the gaps in the discovery record.

Hon. James Donato
January 10, 2018
Page 4

***

Based on the foregoing, KEMET has not shown good cause for a protective order, and DPPs request an order compelling Mr. Loof's deposition.

Respectfully,

**Joseph Saveri Law Firm, Inc.**

_____ */s/Joseph R. Saveri* _____

*Interim Lead Class Counsel for*
*Direct Purchaser Plaintiffs*

cc: All Counsel (via email)