Pages 1 – 87

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JAMES DONATO, JUDGE

| | | |
|---|---|---|
| IN RE CAPACITORS ANTITRUST LITIGATION. | ) ) | NO. C 14-3264 JD |

| | | |
|---|---|---|
| AASI BENEFICIARIES' TRUST, BY AND THROUGH KENNETH A. WELT, LIQUIDATING TRUSTEE, | ) ) ) ) | |
| Plaintiff, VS. | ) ) ) | NO. C 17-03472 |
| AVX CORPORATION, et al., | ) ) | |
| Defendants. | ) ) | |

| | | |
|---|---|---|
| IN RE CAPACITORS ANTITRUST LITIGATION (No. III). | ) ) | NO. MD-17-02801-JD |

| | | |
|---|---|---|
| AVNET INCORPORATED, | ) ) | |
| Plaintiff, VS. | ) ) ) | NO. C 17-07046-JD |
| HITACHI CHEMICAL COMPANY, LTD., et al., | ) ) ) | |
| Defendants. | ) ) | |

Wednesday, May 9, 2018
San Francisco, California

### **TRANSCRIPT OF PROCEEDINGS**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
             Official Reporter, U.S. District Court

(Cases and Appearances continued, next page)

```
BENCHMARK ELECTRONICS, INC.,      )
et al.,                           )
                                  )
            Plaintiffs,           )
                                  )
  VS.                             )   NO. C-17-07047-JD
                                  )
AVX CORPORATION, et al.,          )
                                  )
            Defendants.           )
_____  )


DIGI-KEY CORPORATION,             )
                                  )
            Plaintiff,            )
                                  )
  VS.                             )   NO. C 18-00184-JD
                                  )
AVX CORPORATION, et al.,          )
                                  )   San Francisco, California
            Defendants.           )
_____  )
```

**APPEARANCES**:

For Indirect Purchaser Plaintiffs:
                        COTCHETT, PITRE & MCCARTHY LLP
                        San Francisco Airport Office Center
                        840 Malcolm Road
                        Suite 200
                        Burlingame, California  94010
             **BY:  ADAM J. ZAPALA, ESQ.**

For Direct Purchaser Plaintiffs:
                        JOSEPH SAVERI LAW FIRM
                        601 California Street
                        Suite 1000
                        San Francisco, California  94108
             **BY:  STEVEN N. WILLIAMS, ESQ.**
                 **DEMETRIUS X. LAMBRINOS, ESQ.**
                 **JAMES DALLAL, ESQ.**
                 **NICOMEDES SY HERRERA, ESQ.**


(Appearances continued, next page)

For Plaintiffs AASI, Avnet and Benchmark:

                  BILZIN SUMBERG BAENA
                    PRICE & AXELROD LLP
                  1450 Brickell Avenuet23rd Floor
                  Miami, Florida  33131-3456
            BY:  **SCOTT N. WAGNER, ESQ.**


For Arrow Electronics:

                  BOIES SCHILLER FLEXNER LLP
                  401 East Las Olas Boulevard
                  Suite 1200
                  Fort Lauderdale, Florida  33301
            BY:  **STUART H. SINGER, ESQ.**


For Defendant Flextronics:

                  WILLIAMS MONTGOMERY & JOHN
                  1607 22nd Street N.W.
                  Suite 300
                  Washington, D.C.  20008
            BY:  **CHARLES E. TOMPKINS, ESQ.**


For Defendant Matsuo Electric Company, Ltd.:

                  DENTONS US LLP
                  525 Market Street
                  26th Floor
                  San Francisco, California  94105-2708
            BY:  **BONNIE LAU, ESQ.**


For Shinyei Defendants:

                  DENTONS US LLP
                  525 Market Street
                  26th Floor
                  San Francisco, California  94105-2708
            BY:  **CLAIRE M. MADDOX, ESQ.**


For Defendants Panasonic and Sanyo:

                  WINSTON & STRAWN LLP
                  101 California Street
                  San Francisco, California  94111
            BY:  **IAN L. PAPENDICK, ESQ.**

(Appearances continued, next page)

```
For Nichicon Defendants:
                         K&L GATES
                         70 West Madison Street
                         Suite 3100
                         Chicago, Illinois  60602-4207
               BY:  MICHAEL E. MARTINEZ, ESQ.

For Defendant Hitachi:
                         WILSON SONSINI GOODRICH & ROSATI
                         1301 Avenue of the Amiercias
                         40th Floor
                         New York, New York  10019-6022
               BY:  JEFFREY BANK, ESQ.

For Defendant AVX Corporation:
                         MINTZ LEVIN COHN FERRIS
                          GLOVSKY AND POPEO, PC
                         701 Pennsylvania Avenue, N.W.
                         Washington, D.C.  20004
               BY:  ROBERT G. KIDWELL, ESQ.

For Defendant Nissei Electric:
                         WILMER CUTLER PICKERING
                          HALE AND DORR, LLP
                         950 Page Mill Road
                         Palo Alto, California  94304
               BY:  MARK FLANAGAN, ESQ.


For Defendant Shizuki Electric Company, Inc.:
                         DAVIS WRIGHT TREMAINE LLP
                         505 Montgomery Street
                         Suite 800
                         San Francisco, California  94111
               BY:  ALLISON A. DAVIS, ESQ.



For Defendants Nippon Chemi-Con and United Chemi-Con:
                         PAUL WEISS RIFKIND
                          WHARTON & GARRISON, LLP
                         2001 K Street, N.W.
                         Washington, D.C.  20006-1047
               BY:  ERIC SEGA, ESQ.

(Appearances continued, next page)
```

For Defendants ROHM Company and ROHM Semiconductor USA, LLP:
                     O'MELVENY & MYERS LLP
                     Two Embarcadero Center
                     28th Floor
                     San Francisco, California   94111
          BY:   **ASHISH SUDHAKARAN, ESQ.**

For Defendant Nitsuko:
                     LATHAM & WATKINS
                     505 Montgomery Street
                     Suite 1900
                     San Francisco, California   94111
          BY:   **KATHERINE M. LARKIN-WONG, ESQ.**

For Defendant ELNA:
                     WILMER CUTLER PICKERING
                       HALE AND DORR, LLP
                     950 Page Mill Road
                     Palo Alto, California   94304
          BY:   **HEATHER S. TEWKSBURY, ESQ.**

Other counsel present:
                     BAKER & MCKENZIE, LLP
                     452 Fifth Avenue
                     New York, New York   10018
          BY:   **DARRELL PRESCOTT, ESQ.**

                     SHEARMAN & STERLING, LLP
                     535 Mission Street
                     25th Floor
                     San Francisco, California   94105-2997
          BY:   **JOHN COVE, ESQ.**

                     BONA LAW, P.C.
                     4275 Executive Square
                     Suite 200
                     La Jolla, California   92037
          BY:   **AARON R. GOTT, ESQ.**

                     PILLSBURY, WINTHROP, SHAW, PITTMAN LLP
                     Four Embarcadero Center
                     22nd Floor
                     San Francisco, California   94111
          BY:   **ROXANE A. POLIDORA, ESQ.**

(Appearances continued, next page)

```
            JONES DAY
            555 South Flower Street
            50th Floor
            Los Angeles, California  90071-2452
       BY:  KELLY OZUROVICH, ESQ.
```

1  <u>**Wednesday - May 9, 2018**</u>                              <u>**2:09 p.m.**</u>

2                        <u>**P R O C E E D I N G S**</u>

3       **THE CLERK:**  All rise.

4    Please be seated.

5       **THE COURT:**  Good afternoon.

6       **THE CLERK:**  Calling Civil 14-3264, In Re Capacitors

7  Antitrust Litigation; Civil 17-3472, the AASI Beficiaries

8  Trust, by and through Kenneth Welt, Liquidating Trustee, versus

9  AVX Corporation; Multi-District Litigation 17-2801, In Re

10  Capacitors Antitrust Litigation, No. III; Civil 17-7046, Avent

11  Incorporated versus Hitachi Chemical Company, Limited; Civil

12  17-7047, Benchmark Electronics, Incorporated versus AVX

13  Corporation; and Civil 18-184, Digi-Key Corporation versus AVX

14  Corporation.

15    Counsel?

16       **MR. ZAPALA:**  Good afternoon, Your Honor.  Adam Zapala,

17  Cotchett, Pitre & McCarthy, for the indirect purchaser

18  plaintiffs.

19       **MR. WILLIAMS:**  Good afternoon, Your Honor.  Steve

20  Williams, Joseph Saveri Law Firm, for the direct purchasers.

21       **THE COURT:**  You're back.  You switched teams.

22       **MR. WILLIAMS:**  (Nods head)

23       **MR. ZAPALA:**  Well, not teams.  He's on the same team,

24  it's just a different group.

25       **THE COURT:**  While we're on the record, would you like

1    to tell us why?

2        No, no, no, I'm just --

3        (Laughter)

4            **MR. WILLIAMS:**  No, thank you.

5            **UNIDENTIFIED MAN:**  We'd like to hear that.

6            **MR. LAMBRINOS:**  Demetrius Lambrinos, also of Joseph

7    Saveri Law Firm, direct purchaser plaintiffs.

8            **MR. DALLAL:**  James Lallal, also of Joseph Saveri Law

9    Firm, direct purchaser plaintiffs.

10           **MR. TOMPKINS:**  Charles Tompkins for Flextronics.

11           **MR. WAGNER:**  Scott Wagner behalf of AASI, Avnet and

12   Benchmark.

13           **MR. SINGER:**  Good afternoon, Your Honor.  Stuart

14   Singer, Boies, Schiller & Flexner, on behalf of Arrow

15   Electronics, Inc.

16           **THE COURT:**  Oh, is that the one that just arrived?

17           **MR. SINGER:**  Yes, we just joined as --

18           **THE COURT:**  Okay.  All right.

19           **MS. LAU:**  Good afternoon, Your Honor.  Bonnie Lau for

20   defendant Matsuo Electric Company, Limited.

21           **MR. PAPENDICK:**  Good afternoon, Your Honor.  Ian

22   Papendick for Panasonic and the Sanyo defendants.

23           **MR. MARTINEZ:**  Hello, Your Honor.  Michael Martinez

24   for Nichicon defendants.

25           **MR. BANK:**  Good afternoon, Your Honor.  Jeff Bank from

 1    Wilson Sonsini for Hitachi.

 2              **MR. KIDWELL:**   Good afternoon, Your Honor.   Robert

 3    Kidwell for defendant AVX Corporation.

 4              **THE COURT:**   AVX.   Is that right?

 5              **MR. KIDWELL:**   AVX.

 6              **THE COURT:**   AVX.   All right.

 7         We're going to get a number of things done today.   Let's

 8    start with the non-ordinary-course documents.

 9              **MR. LAMBRINOS:**   Your Honor --

10              **THE COURT:**   All right.   So, it looks like you agree

11    that we're going to drop the EC.

12              **MR. LAMBRINOS:**   Yes, sir.

13              **THE COURT:**   And you're going to exclude any leniency

14    program materials.

15         So my first question is:   What would be left?

16              **MR. LAMBRINOS:**   We believe that there's two items --

17    relevant items left, Your Honor.   Item No. 1 are witness

18    statements.   And Item No. 2, evidence of document alteration.

19              **THE COURT:**   All right.   Now, why would -- the EC

20    persuaded you for dropping everything.   I understand that, you

21    know, the other countries didn't write the same type of letter,

22    but aren't the EC's reasons applicable to everybody?

23              **MR. LAMBRINOS:**   Your Honor, the letters that were

24    written by the EC and the other regulators were written to

25    individual defendants, and only apply in individual instances.

1   And they're tailored in that sense.

2       We targeted the regulators we thought had the most

3   relevant information.  For example, the Taiwan FTC, there's no

4   letter.  Japan FTC and Korean FTC, there are letters, but they

5   are written only to individual defendants.  The JFTC letter's

6   only written to Vishay, the Korean FTC letter's only written to

7   Sanyo.  So they have a comity interest, they have a stated

8   comity interest, but so do we, in enforcing our antitrust laws.

9   And they do not have an ongoing antitrust investigation right

10  now.

11      And we believe that we need the witness statements to fill

12  in gaps in the discovery record from the dozens of unavailable

13  witnesses, former or supposedly former witnesses, at these

14  companies.

15      **THE COURT:**  Well, I mean, the EC says that these

16  disclosures would just threaten their competition

17  investigation, strategy, and their own prosecutorial

18  discretion.  I mean, that's not unique to the defendant.

19  That's -- that's for everything they do.

20      So why wouldn't that be the same for all the competition

21  agencies?

22      **MR. LAMBRINOS:**  The ET materials (verbatim) and the

23  way that the language is presented in the letter is slanted

24  towards the protection of the leniency materials.  And they do

25  talk about witness statements, generally.  But the focus here

```
1    is on leniency, which is why we dropped that request, which is
2    why we're not focusing on the EC.
3         So, you know, there's -- I would just be repeating myself,
4    but they didn't -- they can't assert a comity interest on
5    behalf of a different government that didn't state one.  And so
6    Taiwan, China --
7              THE COURT:  I'm not saying that.  I'm just saying that
8    the reasons that motivated the EC to say what it said apply to
9    all of the commissions.  It affects and interferes with their
10   national investigatory strategies; tips their hands in
11   potentially unfair ways.
12        The DOJ in our country certainly wouldn't give you that
13   material.  So why should the DOJ equivalent in the foreign
14   countries do it?
15             MR. LAMBRINOS:  I would start off by saying that the
16   EC letter, first, is only written to one defendant, NEC Tokin.
17   This is the EC letter that was attached as Exhibit B to
18   defendant's letter.  It is only written to NEC Tokin.
19        And then the second EC letter -- excuse me -- is only
20   written to Holy Stone.
21             THE COURT:  Ms. Lau?
22             MR. LAMBRINOS:  This is the second EC letter that was
23   attached as Exhibit C.
24             THE COURT:  All right.  Ms. Lau?  Let's hear from the
25   defendant.
```

1      **MS. LAU:**  Your Honor, I think you have already

2  answered that question.  The concerns that are articulated by

3  each of the regulators in this case are equally applicable to

4  all defendants.

5      It's irrelevant that only a single defendant's counsel

6  approached that particular regulator.  We did that simply,

7  Your Honor, in the interests of efficiency.

8      But what they have expressed, their concerns, the

9  disclosure would harm or impede ongoing cartel investigations,

10 and competition enforcement, more generally.  And then, their

11 other concern.

12     I don't think that there's really a distinction here

13 between leniency materials (Indicating quotation marks), if you

14 will, and any other company being subject to a competition

15 investigation because, of course, all of these regulators, they

16 depend on the voluntary cooperation and disclosure of all of

17 the parties in front of them, not just the initial leniency

18 applicant.

19     So I think that there's really no reason that any of these

20 letters should be specific to the individual defendant that

21 petitioned.  The rationale here is applicable to everyone.

22     And I think Your Honor also pointed out, in the KFTC's

23 letter, you know, they really highlight the global cooperation

24 that goes on now between these competition authorities.  And

25 KFTC specifically expresses that harm to one agency would be

 1    harm to all.

 2         And the bottom line is Your Honor's right.  We've already

 3    come to an explicit agreement with the Department of Justice

 4    here -- it's memorialized in 630 and 632 -- which states that

 5    no non-ordinary-course documents or communications should be

 6    divulged to the plaintiffs here.  And you're exactly right.

 7    These foreign regulators are asking for no more than to be

 8    treated just the same as the DOJ.

 9         **THE COURT:**  All right.

10         Mr. Lambrinos, last word?

11         **MR. LAMBRINOS:**  The last word from us, Your Honor, is

12    that we have a list of former employees from the defendants

13    (Indicating) who are unavailable for deposition.  And all we're

14    asking for is a discrete set of documents which are these

15    witness statements.  And we don't even know the list of witness

16    statements; we don't even know who the witnesses are that

17    provided the statements.

18         We can certainly match that up against the list of former

19    employees we have (Indicating), to narrow down the number of

20    witness statements we're seeking so it could be narrowly

21    tailored.  But that's how we envision the statements being

22    useful.

23         **THE COURT:**  Well, you can ask --

24         **MR. LAMBRINOS:**  They have not --

25         **THE COURT:**  You can ask:  Identify the witnesses who

 1   gave statements to the EC.

 2          **MR. LAMBRINOS:**  They will not -- they're not -- they

 3   will provide that information, Your Honor.  That's part of the

 4   reason we're here.

 5          **THE COURT:**  Why not?

 6          **MS. LAU:**  Your Honor, that's one of the categories of

 7   communication that these foreign regulators have expressed

 8   opposition to disclosure of.

 9      I can represent, with respect to Matsuo, at least -- I

10   haven't polled all of the other defendants -- but I'm not aware

11   of a single former employee that has been made available to

12   other regulators that hasn't similarly been made available in

13   the civil litigation.

14      So I think this concern is pure supposition, and it's not

15   supported by anything in the record.

16          **THE COURT:**  Well, I don't think the identities of the

17   witnesses are subject to suppression.  So you can certainly ask

18   that.  That's it, just the identity of the witnesses who gave

19   statements to the regulators.

20      But I'm going deny the rest of the request.

21          **MR. LAMBRINOS:**  Can we get a date by which they have

22   to produce the names of the witnesses?  Because we asked for

23   that as part of this motion, so it's part of the relief

24   requested.

25      Can the defendant provide that for all regulators, all

1  interviews that were conducted, and all names, to us in 15

2  days?

3       MS. LAU:  Respectfully, Your Honor, I do think that

4  the foreign regulators have expressed opposition to this.  So

5  we would actually request time to go back to each of these

6  regulators, and get their positions on the disclosure of the

7  witness names.

8       THE COURT:  I'm not interested in their positions.

9  The identities of the witnesses will be produced.

10      Two weeks, is that sufficient?  Three weeks?  How long do

11  you need?  How long does it take?  It doesn't take that long.

12  We are coming to the end here, so let's -- we've got to be a

13  little bit brisk.

14      MS. LAU:  I think two weeks is fine, Your Honor.

15      THE COURT:  All right.  So 14 days from today.  It's

16  just the names, that's it.

17      MR. LAMBRINOS:  Thank you.

18      THE COURT:  Nothing else.  No dates, no length of

19  interview, nothing.  Just who said something to somebody.

20      Okay?  All right.

21      MR. LAMBRINOS:  Thank you.

22      THE COURT:  In all other respects -- so looking at

23  that list, this is No. 1.

24      MR. LAMBRINOS:  Yes.

25      THE COURT:  Motion to Compel, and No. 2, which

1    apparently is the --

2              **MS. LAU:**  It's the same, Your Honor.

3              **THE COURT:**  -- the oral information equivalent.  Both

4    are denied, with the exception of the identity of the

5    witnesses.

6              **MR. LAMBRINOS:**  Thank you, Your Honor.

7              **THE COURT:**  All right.  No. 3.

8              **MS. LAU:**  I'm sorry, Your Honor.  One further

9    clarification.

10             **THE COURT:**  Yes.

11             **MS. LAU:**  I just want to -- with respect to the names

12   of the witnesses, you are asking the defendants to identify the

13   names of any former employees that were made available to

14   communicate with a foreign regulator.

15        Is that correct?

16             **THE COURT:**  Yes.

17             **UNIDENTIFIED MAN:**  No.

18             **MR. LAMBRINOS:**  Everyone.

19             **THE COURT:**  One said yes, and one said no.

20             **MR. LAMBRINOS:**  Everyone who was interviewed.

21             **MR. ZAPALA:**  From the IPP's perspective, we want

22   identification of anyone -- any employee, former or not, who

23   was interviewed by the regulator.

24             **MR. LAMBRINOS:**  Correct.

25             **MR. MARTINEZ:**  Frankly, Your Honor, that's just a

1  back-door attempt, just here at the end, when the original

2  request is based just on former employees.

3      The sole rationale is based just on former employees that

4  they don't have access to, because supposedly they could not be

5  deposed in the United States.

6      We've already identified --

7          THE COURT:  The original request was former employees?

8          MR. LAMBRINOS:  No, that's not right.  It's for all

9  non-ordinary-course documents.  And we are asking now for all

10 of the names of the people that were interviewed.

11         THE COURT:  Where is -- do I have the request?

12         MR. LAMBRINOS:  Yes.  If we need to go back to the

13 request, in the original --

14         MR. MARTINEZ:  If I may, Your Honor?

15         THE COURT:  What's the ECF number?

16         MR. LAMBRINOS:  I'll pull it up right now, Your Honor.

17 We attached it so that the -- the motion is ECF 1943.

18         THE COURT:  Yes.

19         MR. LAMBRINOS:  And Exhibit 1 to that is our second

20 set of RFPs.

21         THE COURT:  And which RFP is it?

22         MR. LAMBRINOS:  And it's RFP No. 33.

23     I'll read it?

24         THE COURT:  No, no.  I have it.

25         MR. MARTINEZ:  Just to clarify, my comments were made

1   to what Mr. Lambrinos said at the beginning of his motion right

2   here.  So it will be in the transcript.

3            THE COURT:  Let's see.  This doesn't ask for the

4   names; it just asks for the documents.  You can do an

5   interrogatory saying:  Identify --

6            MR. LAMBRINOS:  Interrogatory No. 35, Your Honor.

7   That's the second item that's at issue today, since the

8   corollary --

9            THE COURT:  Wait.  You said Exhibit 1.  That's the

10  request for production.

11           MR. LAMBRINOS:  Right.  So let me back this up a

12  little bit.  So, RFP 33 asks for all non-ordinary-course

13  documents produced to foreign regulators.  They have already

14  produced the ordinary-course documents.  The non-ordinary

15  course documents is everything that's left.

16     We are narrowing that to just the witness statements and

17  the evidence of document alteration by Taitsu.  Those are the

18  only two items we want.

19           THE COURT:  That is all denied.  So, I asked you a

20  question.

21           MR. LAMBRINOS:  Yes.

22           THE COURT:  The objection was made that you previously

23  asked only for the names of former employees who had possibly

24  been witnesses.

25     And you said:  No, that's not right.  We asked for former

1    and present.

2         And I said:  Show me, and you guided me to RFP 33 which

3    was not responsive.

4         So what request or interrogatory says identify the names

5    of the witnesses?

6              **MR. LAMBRINOS:**  Interrogatory No. 35, which is also at

7    issue today.

8              **THE COURT:**  Where is it?  What tab is it?

9              **MR. LAMBRINOS:**  That is ECF No. 1954, and it is

10   Exhibit A.

11             **THE COURT:**  Wait, that's not attached to 1943?

12             **MR. LAMBRINOS:**  Sorry, no.  So there's two separate

13   motions.  There was -- 1943 is just RFP 33.

14             **THE COURT:**  Oh, is that No. 2?

15             **MR. LAMBRINOS:**  Yes, exactly.

16             **THE COURT:**  Okay, which one for 1954?

17             **MR. LAMBRINOS:**  Exhibit A.

18             **THE COURT:**  Okay.

19             **MR. LAMBRINOS:**  35 is the interrogatory at issue.

20             **THE COURT:**  35?

21             **MR. LAMBRINOS:**  35, Interrogatory 35.

22             **THE COURT:**  All right.

23             **MR. LAMBRINOS:**  State all facts.

24             **MS. LAU:**  And Your Honor, what you'll see is that --

25             **THE COURT:**  Hold on, everybody.  Just let the old

 1   judge have a second here.

 2          **MS. LAU:**  Sure.

 3      (The Court examines document)

 4          **THE COURT:**  This says "State all facts."  It doesn't

 5   say "Identify the people."

 6          **MS. LAU:**  Exactly, Your Honor.

 7      (Multiple simultaneous speakers)

 8          **MR. LAMBRINOS:**  "...interview or discussion with a

 9   current or former employee," which is the last line of the

10   first paragraph.

11          **THE COURT:**  Well, just ask in an interrogatory, and

12   get the names.

13          **MR. LAMBRINOS:**  So we'll serve an interrogatory asking

14   for all of the names of everybody --

15          **THE COURT:**  Just do another one.  Just do another

16   names interrogatory.

17          **MR. LAMBRINOS:**  We will do that.  Thanks, Your Honor.

18          **THE COURT:**  All right.  Yes.

19          **MR. LAMBRINOS:**  Thank you.

20          **THE COURT:**  Okay.  All right.  No. 3.

21          **MS. LAU:**  Your Honor?

22          **THE COURT:**  Yes.

23          **MS. LAU:**  So they have already vastly exceeded their

24   35 interrogatories.  And I do want to highlight for the Court

25   that Interrogatory 35 does not ask for what they are asking

```
 1   for.
 2               THE COURT:  I understand that.  But we're --
 3               MS. LAU:  And that's one of the factors of the --
 4               THE COURT:  Hold on.  When I start, you stop.  Okay?
 5       All right?  When I start, you stop.
 6       We're resolving a motion to compel.  So that is -- they're
 7   going to get the interrogatory.  I don't care how many they
 8   have had already.
 9       All right?
10               MR. LAMBRINOS:  Thank you.
11               THE COURT:  Get that done in two weeks.  So serve it
12   today; get it done in two weeks.
13       All right.
14               MR. LAMBRINOS:  Yes, sir.
15               THE COURT:  All right.  Item No. 3.
16               MR. PAPENDICK:  May I ask for a clarification?  Ian
17   Papendick for Panasonic (Inaudible).
18               THE COURT:  Yes, Mr. Papendick.
19               MR. PAPENDICK:  Plaintiffs said that they're not
20   looking for information submitted as part of a leniency
21   application.  And can I understand that this order does not
22   apply --
23               THE COURT:  Yes.
24               MR. PAPENDICK:  Thank Your Honor.
25               THE COURT:  This is the non- -- non-leniency,
```

 1   non-ordinary-course-of-business witnesses.  Just the names.

 2         **MR. PAPENDICK:**  So the names -- the names do -- even

 3   for the leniency.

 4         **THE COURT:**  No, not the leniency.  They're out.  So

 5   anybody who is not leniency-related.  It seems to me there's

 6   probably nobody left.  But, they can ask.

 7      Okay?  All right.

 8         **MR. PAPENDICK:**  Understood.  Thank you, Your Honor.

 9         **THE COURT:**  Okay.  No. 3.  Internal investigation

10   documents.

11         **MR. LAMBRINOS:**  Yes, Your Honor.

12      Well, so, to just recall where the stage was set on this,

13   internal investigation documents got boiled down to apology

14   documents, and that they were ordered to -- defendants were

15   ordered to produce those documents.

16      And there was a question to the Court of whether or not we

17   would get the apologies, going all the way through the present,

18   meaning --

19         **THE COURT:**  Let me -- how many of these apology

20   documents are there?

21         **MR. LAMBRINOS:**  We had attached a couple to our joint

22   letter on the time period.

23         **THE COURT:**  I saw that.  But how many more do you

24   think there are?

25         **MR. LAMBRINOS:**  I've seen in other cases, there was --

1    I'm reluctant -- there was a filing in another case in the

2    Northern District in *Batteries*, where one of the defendants in

3    this case, the plaintiffs were basically saying that that

4    defendant was producing apology letters after depositions had

5    taken place.  Or contemporaneous with depositions, or just

6    before.

7        So people were being deposed, and then apologizing for

8    their conduct to their employers.

9            **THE COURT:**  Oh, okay.

10           **MR. LAMBRINOS:**  So we would like all of the apology

11   documents through to the present.

12       And our point on the temporal scope was we would -- 2014,

13   okay, August, 2014, fine.  But we have these five carve-outs.

14   Carve-out number one is the apology documents.  So that's where

15   we are with disciplinary records.

16       And I can go through the other four carve-outs, but I do

17   think they're reasonable.

18           **THE COURT:**  Well, let's start with the defendant.

19   Mr. Martinez.

20           **MR. MARTINEZ:**  Yes.

21           **THE COURT:**  So I had expected -- somebody told me, my

22   recollection is -- and I think it's in the transcript --

23   somebody told me there was a deal in place that 2014 was a hard

24   stop.  And I didn't see any evidence of that.

25       I saw some circumstantial evidence but, you know, a deal

1    is you call Mr. Lambrinos and say:  Okay, so the deal is

2    nothing after August, 2014.  And he says:  Right.

3        That's not there.

4            **MR. MARTINEZ:**  No, that's right.

5            **THE COURT:**  And then you all produced hundreds of

6    thousands of documents after 2014.

7            **MR. MARTINEZ:**  Let me address a couple of those

8    points, Your Honor.  First, there's no court order that says

9    that there's a document request.

10           **THE COURT:**  I know that.

11           **MR. MARTINEZ:**  To 2014.

12           **THE COURT:**  But somebody told me you all had an

13   agreement.

14           **MR. MARTINEZ:**  Well, we did, because we told them

15   repeatedly, in all responses to all discovery requests starting

16   from the beginning of 2015, that we were only producing

17   documents through 2014.

18       There were dozens -- in fact, I'm sure more than a hundred

19   meet-and-confers on these document requests.  At which time,

20   the plaintiffs never raised the issue or an objection to that

21   cutoff of 2014.

22       And of course, it makes sense in a case like this, as

23   Your Honor knows from private practice.  The complaints are

24   filed in 2014.  A grand jury investigation is begun.  We have a

25   preservation cutoff in 2014.

1        Of course, defendants are not going to be -- continually

2   to produce documents, for example, regarding pricing for the

3   next five years, until the end of the case.  There has to be a

4   cutoff date.  And that was the cutoff.

5              **THE COURT:**  Let me jump in.

6              **MR. MARTINEZ:**  Sure.

7              **THE COURT:**  I think -- I understand you think there

8   are, you know, a number of smoky fires.  But somebody told

9   me -- I don't remember who it was -- there was a deal.  And

10  that wasn't true.  You all don't have a deal.

11       And just saying in your responses:  But we're not going to

12  do X, not a deal.  It's just you saying:  We're not going to do

13  X.  Doesn't mean you agreed.  And then you all produced

14  hundreds of thousands of documents after that date.

15       So I'm feeling that I was slightly misled, and I don't

16  like it.  And now I asked you all to show me -- it's the reason

17  you're here now.  I said:  You show me the deal.

18       And you didn't.  You said:  Well, we said X.  But "we" is

19  unilateral.  It's not a deal.  It's the definition of not a

20  deal.

21             **MR. MARTINEZ:**  Couple of things, Your Honor.  One --

22             **THE COURT:**  What's the deal?

23             **MR. MARTINEZ:**  At the January 11th hearing, I

24  clarified the position of the defendants on this.  We also did

25  point out that in one of our very first meet-and-confers, that

```
 1   DPPs' counsel did agree that 2014 would be the cutoff.  Of

 2   course, that's not in a court order, but it was, from the

 3   defendants' standpoint -- everyone was on this call -- that

 4   that was the basis for what led to our consistent agreement for

 5   the next three years.

 6        And I think it's also, to be --

 7        THE COURT:  I'm sorry to jump in again.  You say

 8   "consistent agreement," but you all produced things in volume,

 9   following 2014.

10        MR. MARTINEZ:  If I can address that, Your Honor.

11        THE COURT:  Yes, please.

12        MR. MARTINEZ:  I would like to.  I think it's a really

13   particularly disingenuous chart, for two basic reasons.

14        First of all, it contains -- on that chart of those 300

15   and some thousand documents, about half of them are in 2014.

16   And what the plaintiffs don't point out in there is that a

17   number of defendants explicitly agreed with the plaintiffs, and

18   stated in their responses to their discovery requests that they

19   were produced through December 31, 2014.

20        So that explains --

21        THE COURT:  The chart actually does say that.  It says

22   documents -- this is, by the way, 2041-1 on the docket.

23        Chart says:  Documents produced between September 1 and

24   December 31st, 2014.

25        MR. MARTINEZ:  That's correct, Your Honor.  Right.
```

1             **THE COURT:**  And you all said the cutoff was August.

2    So that chart seems just fine to me.

3        What's wrong with that?

4        **MR. MARTINEZ:**  Well, no.  Because some defendants'

5    cutoff was December 31, 2014; some was August 31st, 2014.

6    Depending on when they were first filed in their lawsuit.

7        The first lawsuit named --

8        **THE COURT:**  I don't find that to be misleading.

9    Now, 2015 --

10       **MR. MARTINEZ:**  Sure.

11       **THE COURT:**  -- was the high point.  And what's the

12   explanation for that?

13       **MR. MARTINEZ:**  Sure.  So the NEC Tokin defendant, who

14   is not a part of this motion and settled out with the

15   plaintiffs a couple years ago, they constitute the biggest

16   other chunk of that.

17       The rest of them would be examples of PDF documents that

18   are, of course, going to take some -- you know, the metadata

19   from when they're actually copied and then produced by the

20   parties.

21       There are also going to be some examples of defendants

22   who, just by use of their vendor, just accidentally didn't have

23   the date cutoff right, and produce additional documents beyond

24   that date.  So that's --

25            **THE COURT:**  That would be a terrible vendor that

1    cannot -- that misinterprets 2014 for 2015.

2          **MR. MARTINEZ:**  It does happen.  A number --

3          **THE COURT:**  Then they should be fired.  You should get

4    your money back.

5          **MR. MARTINEZ:**  Those defendants probably should.

6          **THE COURT:**  What do you do when the vendor doesn't

7    recognize your name as a lawyer, and produces all your memos?

8          **MR. MARTINEZ:**  Well, that would not be good,

9    Your Honor, for sure.

10         **THE COURT:**  That wouldn't be good.

11         **MR. MARTINEZ:**  But that did happen in this case of one

12   of the defendants, and that constitutes the bulk of their

13   productions.

14        And then, the defendants did, on a special unique

15   scenario, agree to produce transaction data to the plaintiffs

16   beyond 2014, for an additional year of 2015.

17        And so that's -- a number of those documents are comprised

18   of the transaction data that was produced by the defendants in

19   response to that special request beyond the previous 2014 time

20   frame.

21        And then, there are going to be one-offs where particular

22   defendants agreed in a certain scenario to produce a certain

23   document.

24        So that explains why there's 325,000 listed on here

25   (Indicating).  But of course, there have been tens of millions

1  of documents produced.  It's a very tiny subset.

2      And as I just explained, very few of them are actually

3  intended to be an electronic-produced intentional document

4  outside of the transactional data, outside of PDFs that are

5  tagged with the date at which they are copied and then

6  produced, and outside of the small scenario of discrepancies

7  where the vendor messed up on the date range.

8          **THE COURT:**  Mr. Lambrinos?

9          **MR. LAMBRINOS:**  Your Honor, one thing I'll say is if

10  you look -- there's a couple of things.

11      When -- our joint submission on temporal scope, if you

12  look at Tab 6, is a lengthy email exchange between me and the

13  K&L Gates attorneys.

14      And on Page 11, I make all of the same arguments you made

15  a few minutes ago to Mr. Martinez.

16          **THE COURT:**  I'm not making arguments.

17          **MR. LAMBRINOS:**  Well, the position --

18          **THE COURT:**  You understand that.  Mr. Lambrinos, I'm

19  -- the Court is not making arguments.

20          **MR. LAMBRINOS:**  Sorry.  I mischar- -- misunderstood.

21      But we told them there was no agreement.  And they kept

22  saying there was an agreement.  And we said:  Your assertion in

23  this letter that you object is not an agreement.  The citation

24  to the preservation order is not an agreement.

25      They cited a meet-and-confer in May, May 1 of 2015.  I

 1   have cc'ed the people that were supposedly on that meet and

 2   confer.  I said:  There was no evidence of an agreement.  And

 3   if you have one, please respond to this email --

 4           THE COURT:  Let me, let me just jump in.  What do you

 5   want the end date to be, if we go past 2014?

 6           MR. LAMBRINOS:  Today.

 7           THE COURT:  When?

 8           MR. LAMBRINOS:  Today.

 9           THE COURT:  Oh, today.

10           MR. LAMBRINOS:  The present for the apology -- excuse

11   me -- we're talking about the discrete categories of documents,

12   Your Honor.

13           THE COURT:  What do you want the end date to be if

14   we're going past 2014?

15           MR. ZAPALA:  I was going to say -- Adam Zapala for the

16   indirect purchaser plaintiffs.

17       Here, we're talking about a very narrowly-tailored

18   document.  So we're just talking about apology letters; we want

19   them up to the present.  It's not burdensome for them to go get

20   them.  They have them.  They have them in a central location.

21   They don't have to do word searches; they don't have to search

22   through billions of electronic documents --

23           THE COURT:  What's the central location?

24           MR. ZAPALA:  We presume they keep them in their

25   personnel files.  I mean, these things aren't just floating out

```
 1    in the email ether.

 2        They have -- they made their employees do apology letters

 3    for a reason, because they wanted to retain them and hold them.

 4    So, so our view is --

 5            THE COURT:  I thought the apologies were spontaneous.

 6    Is that not right?

 7            MR. LAMBRINOS:  Excuse me?

 8            THE COURT:  I thought the apologies were spontaneous.

 9    They were ordered to, by the company?

10            MR. ZAPALA:  Correct.

11            MR. LAMBRINOS:  Yes, Your Honor.  I don't want to

12    testify --

13            THE COURT:  What's the point of that?  Why would the

14    company do that?

15            MR. LAMBRINOS:  What we see, Your Honor, is people,

16    they are ordered to make apologies, and they will write them

17    out.  And sometimes it is in their own words, and sometimes

18    they hand-write them.

19        I don't want to say what the motivation of the defendant

20    is.

21            THE COURT:  Mr. Papendick?

22            MR. PAPENDICK:  Certainly, Your Honor.  I could shed a

23    little light on it.

24            THE COURT:  Yes.

25            MR. PAPENDICK:  Ian Papendick.
```

1    These apology letters, we responded that none of them

2  exist in this case for my clients, for Panasonic and Sanyo.

3    But these things -- from what I understand, they're the

4  type of subsequent remedial measures to discipline employees

5  who have violated company policy in the past.  That's what they

6  are.  They're HR disciplinary measures.

7        THE COURT:  Okay.  All right.  Well, let's produce the

8  apology letters through May 1st, 2018.

9    Okay?

10        MR. LAMBRINOS:  Thank Your Honor.

11        THE COURT:  And No. 2, the second set goes to RFP 33.

12  That will be subject to the prior ruling.

13        MR. LAMBRINOS:  Yes.

14        THE COURT:  What are the personnel records in No. 79?

15        MR. LAMBRINOS:  No. 79, we're asking for personnel

16  records as part of that carve-out because there's a number of

17  former employees that we want to determine whether they have

18  ongoing benefits with the company, or an ongoing consulting

19  relationship.  And the only way to know that is through a

20  real-time personnel record.  And -- because there's a lot of

21  former employees that we think maybe they're working for an

22  affiliate, or maybe they have a consulting relationship or

23  ongoing benefit.  And we saw a lot of that in *Batteries* case,

24  for example.  And we are looking for the personnel records, for

25  that reason, through the present.

1            **THE COURT:**  What is that relevant to?

2            **MR. LAMBRINOS:**  That's relevant to determining the

3    corporate control over these individuals.  Because if they

4    still have control but they're claiming someone as a former,

5    but they're actually a consultant and receive ongoing benefits,

6    then they could have produced them for deposition and didn't.

7            **THE COURT:**  Okay.

8        Mr. Martinez?

9            **MR. MARTINEZ:**  Yes.  If I may, Your Honor, I want to

10   just add that this request is before you today solely as an

11   eleventh-hour addition by the plaintiffs.

12       Before we made our joint submission, it was never

13   discussed; we have never had a meet-and-confer on this request,

14   even though it is extraordinarily overbroad.  It asks on its

15   face -- and that's what they are going to ask you for here

16   today, unless they narrow it -- it asks for every document in

17   any employee's personnel file.

18       We have made objections to those, substantive, including

19   that production of many of those materials would violate

20   Japanese privacy law.

21       The plaintiffs have never requested a meet-and-confer.  We

22   have never discussed this --

23            **THE COURT:**  Docket No. 2041 says:  The parties have

24   met and conferred.

25            **MR. MARTINEZ:**  We have not, Your Honor.

1          **THE COURT:**  Is that right, Mr. Lambrinos?

2          **MR. LAMBRINOS:**  No, we have met and conferred on

3    personnel records.  That's -- we have met and conferred.  And

4    we met and conferred on this letter (Indicating).  We exchanged

5    drafts of this letter, back and forth.

6          The point of the -- additional point of the personnel

7    records is reprimands.  Not just apologies, but reprimands of

8    employees, which we've repeatedly asked for.  And we've asked

9    specific questions about specific employees, and whether they

10   were actually former.

11         **THE COURT:**  All right, just a moment.

12         So, Mr. Martinez, the letter says you met and conferred.

13   And Mr. Lambrinos said you met and conferred.

14         **MR. MARTINEZ:**  We did not, Your Honor.  They submitted

15   this list to us -- and actually, it was a different list -- two

16   days before we made this submission, different than what they

17   actually ended up putting in their submission that we got the

18   day before it was filed.  We then --

19         **THE COURT:**  Well, Document 2041 does refer to RFP 79,

20   personnel records, and RFP 80.

21         **MR. MARTINEZ:**  Correct.  We never met and conferred on

22   those requests before.

23         They make a proposal right before we put our joint

24   submission, saying that:  Yes, we concede on the 2014 date.

25   The only categories that we would say should be an exception to

1    those are the following.  All right?

2        We rejected that proposal.  So if they're calling that a

3    meet-and-confer, I guess they are.  But we never had a

4    substantive discussion about what documents they're actually

5    seeking in that request.

6        And the reason we rejected it, Your Honor, is because

7    Your Honor was very clear at that January 11th hearing on the

8    -- that all the other requests, except for the apology letters,

9    have been denied.  So that's why we didn't feel like we needed

10   to engage in a subsequent conversation about it.

11       **MR. LAMBRINOS:**  After this letter (Indicating) was

12   filed, I went to Mr. Martinez and asked if he wanted to discuss

13   the carve-out categories.  And he said no.

14       **THE COURT:**  All right.

15       **MR. MARTINEZ:**  He didn't actually have that

16   conversation with me.

17       **THE COURT:**  Okay, let's just move past that.  Here's

18   what we're going to do.  So you can -- not all personnel

19   records; that's too much.  All right?

20       But you can propound an interrogatory to the defendants,

21   saying:  Identify any former employee with whom you have a --

22   with whom you had or currently have -- had as of August, 2014,

23   or currently have today, consulting agreement, retainer

24   agreement, or any other financial tie.

25       I mean, I -- you haven't asked that before?  If you

```
1    haven't asked that, you can ask again.

2             MR. LAMBRINOS:  We have asked similar things.

3             MR. MARTINEZ:  They have not.

4             MR. LAMBRINOS:  Similar things, yes.

5             THE COURT:  That's what you can ask.  So that takes

6    care of No. 2.

7         No. 3 --

8             MR. MARTINEZ:  If I could clarify just one piece,

9    Your Honor?

10            THE COURT:  Yes.

11            MR. MARTINEZ:  This was only supposed to be about

12   former employees that they supposedly requested for deposition

13   before.

14        And is that the extent of your order, to just -- to match

15   up with what they requested?

16            THE COURT:  Yes.

17            MR. MARTINEZ:  Thank you.

18            MR. LAMBRINOS:  I'm sorry.  The RFP, as written, is

19   the personnel records of everyone.  But we will agree to the

20   narrowing to the formers.

21            THE COURT:  No, no.  Your rationale was you think

22   there are people you asked for deposition that weren't

23   produced.  So it's going to be limited to that.

24            MR. LAMBRINOS:  Right.  I'm agreeing.

25            THE COURT:  So, if you want to make things easy, you
```

```
1   can just give them the list of people you asked for, and then
2   they can respond.
3         MR. LAMBRINOS:  I think it would be good if we worked
4   together on that.  We'll provide as many names as we can, but
5   they --
6         THE COURT:  It would be good to work together,
7   although you all don't seem to be doing that.  If you can do
8   that, that's fine.
9         All right, No. 80.  Audio and video recordings of
10  competitor -- what is that about?
11        MR. LAMBRINOS:  There was a -- so we propounded
12  this -- 79 and 80 were part of the same RFP.
13        So there is a document that says -- it says:  Why did you
14  communicate with such-and-such competitor?  Now I'm worried
15  that competitor has recordings of our conversations.
16        So we're just saying:  If you have recordings of
17  competitor conversations amongst the cartel members, they
18  should produce them through the present.  That's all we're
19  saying there.
20        THE COURT:  But audio -- recordings of what?
21        MR. LAMBRINOS:  The meetings.  Cartel meetings.
22        THE COURT:  Post-filing of the complaint.
23        MR. LAMBRINOS:  From the relevant time period which
24  starts in 2000 to the present, correct, is what we're looking
25  for.
```

1          **THE COURT:**  Mr. Martinez?

2          **MR. MARTINEZ:**  Your Honor, we've already informed them

3     that the defendants are not aware of the existence of any such

4     recordings.  Just like we're not aware of the existence of any

5     such apology letters, either.

6          I'm not sure what else we can say on that, other than

7     there's no need -- and I think Your Honor can imagine this --

8     when -- given that the complaints are filed in 2014, the DOJ

9     investigation was begun in that same time period, as to why

10    there would be audio-video tapings of any type of meetings is

11    beyond us.

12         But they have a supposition that something may somewhere

13    exist.  And that's what we're arguing about.  We don't think we

14    should --

15         **MR. LAMBRINOS:**  (Inaudible)

16    (Multiple speakers)

17         **THE COURT:**  The defendants have represented they do

18    not have any responsive documents.

19         **MR. LAMBRINOS:**  They've done a diligent search?

20         **THE COURT:**  Well, they're going to be held to that.

21    So if you disprove it, somebody will be called to account.

22    Okay?

23         **MR. LAMBRINOS:**  Thank you.

24         **THE COURT:**  All right.  No. 3, ability to pay.  Yes,

25    that's perfectly fine.  That goes to your status as victims, as

1    well.  So that information is ordered.

2         Now, let's not get out of the control with that.  All

3    right?  This is not an opportunity to produce each and every

4    financial document.  You need to be very focused in what it is

5    that you want.  Okay?  It's late in the day, so you have got to

6    keep that in mind.

7         Now, you two can come back to me if you have disputes

8    about it, but it should be relatively straightforward.  All

9    right?

10              MR. LAMBRINOS:  Okay.

11              THE COURT:  Okay.  Keep that narrow.

12        All right.  No. 4, evidence relating to -- what is the

13   motivation for this request about alteration of documents?

14              MR. LAMBRINOS:  There is this testimony from a

15   representative -- an employee of Taitsu, who states that he

16   altered documents that were provided to the Chinese regulatory

17   authority.  So there would have been altered versions and

18   regular versions, and some kind of explanation.

19        And if that was the case, then we would like that evidence

20   of the alteration, and the attempts to correct it.

21              THE COURT:  But you only have one person who did that,

22   right?

23              MR. LAMBRINOS:  Yes.  We know that there was at least

24   the one defendant.  And if there were others, then we think

25   that it should also be produced.  We imagine that is a

```
 1   discrete, limited, small universe of documents.

 2          THE COURT:  Mr. Martinez?

 3          MR. MARTINEZ:  I can't speak for the one defendant

 4   that he's referring to.  I don't think there's any other

 5   defendant this applies to, whatsoever.

 6       I also think, though, Your Honor denied this request just

 7   in the previous argument on Item No. 1.  So as far as the --

 8   providing some clarity on that, I --

 9          THE COURT:  This has nothing to do with Item No. 1.

10   This is No. 4.  Evidence relating to employee alteration of

11   documents provided to foreign regulators.  There's no prior

12   ruling on that.

13       So what is --

14          MR. MARTINEZ:  I thought Mr. Lambrino (sic) brought

15   that up in the first --

16          THE COURT:  He may have mentioned it, but that's not

17   what we're doing.

18          MR. MARTINEZ:  In any event --

19          THE COURT:  Okay.  That will be ordered.  So you can

20   produce that, too, if there's anything out there.

21       And then finally -- oh, No. 5.  Non-privileged internal

22   investigation and disciplinary reports.

23       What does "disciplinary reports" mean?

24          MR. LAMBRINOS:  These are the notice of reprimand,

25   when individuals are reprimanded for their cartel behavior and
```

 1    their competitor contacts.  And then there's an incident

 2    report.  These are all HR documents, typically.

 3        This is -- they're just being reprimanded for having

 4    broken company policy by behaving in cartel behavior, at

 5    sometimes the orders of others.  And reprimanded.

 6              **THE COURT:**  Non-privileged.

 7              **MR. LAMBRINOS:**  Non-privileged, yes, sir.

 8              **THE COURT:**  Okay.

 9        Mr. Martinez?

10              **MR. MARTINEZ:**  We've already, at least for my client,

11    explained to plaintiffs that there are no such documents that

12    exist.  I think other defendants have made similar

13    representations.

14        So I'm not sure exactly what they're looking for that

15    would be different from the reprimands that they talked about

16    in Category 1 that you just addressed.

17              **THE COURT:**  Well, that's different.  Those are actual

18    documents that somebody has written.  This is somebody at the

19    company preparing a report about an employee, saying:  I think

20    employee X did this.  I'm writing him up or writing her up.

21        All right, that's fine if you don't have them.  But --

22    now, when I say "that's fine," that means I need an affirmative

23    representation from each defendant that:  We do not have this

24    document.  Okay?

25        So if you don't have it, you need to say that.  If you

don't say that, then I'm going to assume that you have it.   And

if you don't produce it, there will be consequences.   So that's

what we're going to do.

     **MR. MARTINEZ:**   Sure.   And just to clarify, Your Honor,

that's also true on the apologies issues.   We didn't get to it,

but all of the defendants that I have talked to in preparation

for today have told me that they have no such documents.

    So there shouldn't be any expectation that there's going

to be production soon.

     **THE COURT:**   That is fine.   But it's going to be in the

record, in a document that I will look at, and use to hold

people to account if it turns out not to be right.

    And we're not going to be squirrelly or slippery about

this.   We're going to have it on a clear paper trail:   On this

date, I told the plaintiffs we absolutely do not have this.

    And that's going to be the form of the answer.   And if it

turns out that that's wrong, then we will have a different

conversation.

    But it is going to be, first, literally set in stone.   And

you're going to live to that.   So make sure everybody does

that.   That will be the order that I will issue later today.

But there will be no:   Well, I told somebody who told me, the

judge, that we don't have it.   It's going to be each individual

defendant making that express representation under Rule 11 and

the other rules of conduct.

1       All right.  Let's move to No. 4.  30(b)(6) witness from

2  Panasonic.

3           MR. LAMBRINOS:  Okay.  That's a different attorney,

4  Your Honor.  Mr. Dallal from my office.

5           THE COURT:  Yes.  All right.  I don't need argument on

6  this.  I read the deposition.  It's within acceptable

7  parameters.  I wouldn't say it was the worst thing I've ever

8  seen.  I wouldn't say the witness was singing like a canary,

9  either, but it was certainly within the boundaries.  So I'm not

10  going to order that.

11       I'm going to note two things, though.  First, I was

12  surprised by the number of objections during the course of the

13  questioning.  That concerned me.

14       And I believe it was you, Mr. Papendick.

15           MR. PAPENDICK:  It was, Your Honor.

16           THE COURT:  That was too many.  Every page -- every

17  question, it seemed you had objection to.  Now, that is just

18  getting to the point where it's going to become too much.  So

19  just take that as a cautionary note, all right?

20           MR. PAPENDICK:  Absolutely, Your Honor.

21           THE COURT:  Nobody complained, but I was struck by

22  that.

23       The second thing is to the extent that developments in the

24  case provide evidence that contradicts what 30(b)(6) witnesses

25  are saying, you will have the opportunity to come to me; seek

1   appropriate evidentiary or other sanctions.

2       So for example, if a witness says:  We never had any

3   agreements with competitors, and then they enter into a guilty

4   plea which admits that they did, you can come visit with me,

5   and I will make sure that justice is done.  Okay?

6       Other than that, that will be -- no further deposition

7   will be ordered for No. 4.

8       No. 5, Sanyo -- I don't quite understand why Sanyo said:

9   We're not going to produce anybody.

10          MR. PAPENDICK:  We -- we never said that, Your Honor.

11  And -- and --

12          THE COURT:  Oh, you didn't.

13          MR. PAPENDICK:  No.  And plaintiffs put in there --

14          THE COURT:  Somebody told me you did.  Plaintiffs did.

15  Plaintiffs said that you canceled the Sanyo depositions.

16          MR. PAPENDICK:  Yes.  The plaintiffs filed their

17  motion to compel the Panasonic 30(b)(6).  And we told

18  plaintiffs that we were intending to educate the Sanyo 30(b)(6)

19  deponent in the same manner that we educated the Panasonic

20  30(b)(6) deponent.  Which we thought was appropriate under the

21  rules.

22      And we asked them to postpone the deposition until the

23  dispute that Your Honor just resolved was complete.

24          THE COURT:  Hm.

25          MR. PAPENDICK:  They refused, so we filed a motion for

1   a protective order.

2            **THE COURT:**  Oh, okay.

3            **MR. PAPENDICK:**  And to be clear, we had a date.  We

4   have been -- for the entire process, we have been working with

5   them through the end of 2017, to schedule a date for the

6   witness.

7        And we are absolutely willing to proceed now with the

8   30(b)(6), now that --

9            **THE COURT:**  All right, that's resolved.  You can go

10  forward on Sanyo.

11       Let's see.  No. 6.  Clawback documents.

12           **MR. WILLIAMS:**  Good afternoon, Your Honor.  Again,

13  Your Honor, Steve Williams for the direct purchasers.

14           **THE COURT:**  Hm.  Okay.  I have some concerns.

15       First, I don't think -- despite my initial thinking, I

16  don't think this is going to be possible on an exemplar basis.

17  I think all the documents are going to have to be reviewed.

18       And here is how we're going to do that.  So I'm going to

19  combine this No. 6 with No. 7.  And that involves the

20  additional 485 documents that apparently were clawed back by

21  Panasonic and Sanyo.

22       I read the three exemplars that I asked for and got.  And

23  I just -- I have doubts that are they are privileged, but I

24  can't really tell, because I don't know who these people are,

25  and I don't know the context of these documents.  I can see

 1    arguments on both sides.

 2        So you two are going to sit down with the 485 documents

 3    and the 99 previous ones -- right?  Was it 99 and 485?

 4            **MR. PAPENDICK:**  That's correct, Your Honor.

 5            **MR. WILLIAMS:**  Yeah.

 6            **THE COURT:**  When I say "you two," I do mean

 7    Mr. Williams and Mr. Papendick, in person.  And you're going to

 8    go through each and every one of them, and see what you can

 9    work out.

10        For what you cannot work out, I will review them in

11    camera.  Now, that is an extraordinary consumption of federal

12    judicial resources.  I will do it.

13        But if I review these documents, and it takes up that time

14    that I take away from my other cases, and it's going to be

15    hours and hours and hours of work, and if I find that they are

16    consistently not privileged, there will be substantial

17    sanctions.  I want to be very clear about that.  There will be

18    substantial sanctions.  That will be an abuse of process, in my

19    view.

20        So you two go through this.

21        And the flip side of that is true.  If the documents are

22    patently privileged and I'm being asked to go through them, and

23    see one patently privileged document after another, there will

24    be sanctions on the plaintiffs' side.  All right?

25        So you have a great degree of motivation, on top of your

1    already high level of professionalism, to make sure this gets

2    postured to me in the right way.  But there are going to be

3    consequences.  Financial, possibly attorney sanctions.

4         So keep that in mind.  All right?  Because you are asking

5    me to do an enormous amount of work, which I will do, but only

6    when you represent to me in good faith that you have an

7    argument saying this is or is not privileged.  Okay?

8         Now, you can get those to me in two weeks, maybe?  How

9    long -- how long do you need?  Three weeks?

10        MR. PAPENDICK:  Your Honor, these documents, they're

11   predominantly in Japanese.  And we don't have Japanese-speaking

12   attorneys available.

13        THE COURT:  Well, who made the decision they were

14   privileged?

15        MR. PAPENDICK:  We used a review team that does have

16   Japanese-language attorneys.

17        THE COURT:  So you were not on the team?  You were not

18   making the decision.

19        MR. PAPENDICK:  We have a review team of

20   Japanese-language attorneys that -- that ask us for -- to guide

21   them on the decisions.  And they inform us of the content and

22   substance of the documents, the people who are on them, what

23   the documents say.  It is a team of Japanese attorneys who work

24   with our case team to make these determinations.

25        May I ask --

1          **THE COURT:**  No.  You need to answer my questions

2    first.

3       Who are these lawyers?

4          **MR. PAPENDICK:**  Yes.  So, for the original 99 that are

5    being challenged, from our initial productions back in 2015, we

6    used a vendor in Japan to -- who had Japanese attorneys -- to

7    do the privilege review, due to the time limitations that were

8    present at that time.  We had to produce -- we produced over --

9    almost -- over 3 million documents in the span of just four to

10   five months.

11      For the clawback review, it was conducted in-house by

12   Japanese attorneys at our firm.

13         **THE COURT:**  All right.  So the initial team left them

14   out.  Now you want them back.

15      And who's the team that made the decision that these were

16   inadvertently produced?  The second group of people?

17         **MR. PAPENDICK:**  Yes, Your Honor.

18         **THE COURT:**  What was your role in that?  Did you have

19   any role in that?

20         **MR. PAPENDICK:**  I supervised the review, with my

21   colleagues.

22         **THE COURT:**  Did you look at each and every document?

23         **MR. PAPENDICK:**  We looked at the summaries that the

24   review team provided of each and every document.  We did not

25   have the resources or the time to have them all translated, so

1    we had to trust what our Japanese review team was telling us

2    about the documents.

3         **THE COURT:**  How do you want to handle this?

4    Mr. Williams?

5         **MR. WILLIAMS:**  Well, I think we'd certainly need a

6    little more time, but I have a suggestion, if I may, that I

7    think could eliminate the need for the parties and the Court to

8    do that work.

9         **THE COURT:**  Oh.  All right.  What is that?

10        **MR. WILLIAMS:**  I think that the facts show that there

11   has been a waiver.  And this is, in particular, as to the

12   second motion.  And for this reason.

13        We wrote Panasonic on December 12th to tell them:  These

14   are the documents we want you to use to prepare this witness.

15        And from that time, from December 12th until when the

16   deposition was going to be in February, we were going through

17   these documents, using them for our preparation.  They don't

18   tell us until February 1st that they're clawing them back.

19        And at that point, that's too late.  We can't undo what we

20   learned.  We've been using them.  They know on December 13th,

21   at the latest, that some of these things are privileged.

22        And their argument in response is --

23        **THE COURT:**  Now, how many -- is this the first 99?  Or

24   is this --

25        **MR. WILLIAMS:**  No.  This is not the first 99, sir.  So

 1   this is the -- it's ECF 102 in the MDL docket.  It's the second

 2   of the motions that we have on.

 3           THE COURT:  All right.  The 485.

 4           MR. WILLIAMS:  Yeah.  Your Honor's correct.

 5           THE COURT:  So how many of those were you using for

 6   this deposition, roughly?  Just roughly.

 7           MR. WILLIAMS:  I apologize, I did not hear the

 8   beginning of that.

 9           THE COURT:  How many were you using for the

10   deposition?

11           MR. WILLIAMS:  I think we had not sent them 485,

12   obviously, but the documents tend to be very similar.  They are

13   of a type of, if I understand it, in very broad terms, and not

14   to impinge on anything that's privileged, but this was talked

15   about at a hearing before.  These are essentially spreadsheets

16   where people who were involved in the cartel activity set forth

17   the facts:  Who did I meet with, when did I meet with them,

18   what did we talk about.

19           THE COURT:  I think I have those, or a sample of one.

20   Okay.

21           MR. WILLIAMS:  So as to the 99, Your Honor's correct.

22   It doesn't cure that issue as to those.  But certainly as to

23   the second set -- and I note that the argument Panasonic makes

24   in response is:  We didn't want to piecemeal tell you.

25       I don't think you can do that when you think privilege is

1    at issue.  I don't think you can think your adversary has your

2    privileged documents, and sit on them for six weeks, and then

3    tell them.

4         And I know Judge Ryu, in a decision not long ago,

5    commented that a party who's aware that the other side has

6    something that is privileged and got it by accident has to act

7    with virtual immediacy.  That's always been the standard I have

8    understood.  You can't wait to then send a comprehensive list

9    of 500 documents.  If you know I have one privileged document,

10   and I'm using it to prepare for the deposition, you can't take

11   it back later.

12        And these 485 are of the very same nature, and likely have

13   a lot of the same content as the 99.  If that's, in fact, true,

14   then there might not be a reason to go back and do the 99 if,

15   in fact, the Court were to agree that there's been a waiver as

16   to the 485.

17              **THE COURT:**  Hm.

18        Yes.

19         **MR. PAPENDICK:**  First, I would ask -- if the Court is

20   inclined to consider this argument right now, I would ask to

21   have the opportunity to brief the waiver issue as the motion

22   that counsel's referring to was only filed on Monday.  But to

23   correct some of the factual pieces of what he said, first,

24   Your Honor's correct, there were not 485 documents provided to

25   a list of us.  There was only a handful of documents.  Less

 1    than 40 exemplar documents.

 2          And in our preparation, we separated the ones that were

 3    relevant to the Panasonic deposition that went ahead, and we

 4    clawed back immediately the ones for the Panasonic deposition

 5    -- that related to Panasonic information.

 6          The ones for the Sanyo deposition, we clawed those back

 7    after.  That Sanyo deposition has not occurred yet.  There

 8    were --  they sent two separate lists but the list were

 9    commingled.  As for the 485, some of them are similar to some

10    extent but in no way are they -- is there identical information

11    on all of them, and in no way do all 485, are they all related

12    to the same investigation and the same time period.

13          For example, Your Honor, the -- I believe, if I'm

14    remembering correctly, some of the documents that you reviewed

15    in camera, from the 2011 time period.  The 485, the bulk of

16    them is from the 2014 time period, which is not -- which is not

17    part of the exemplar documents.

18                THE COURT:  Mr. Williams, let me ask you --

19                MR. PAPENDICK:  And I would have another --

20                THE COURT:  -- how would the waiver, would that have

21    applied to all 485 documents?  I mean, this waiver idea.  What

22    are you claiming would be waived?

23                MR. WILLIAMS:  I guess a couple of points I'd like to

24    make, and I'll answer your question very soon.  But I just want

25    to say first, to the extent there's an argument about let's

1  brief this, this was briefed.  This is in their Document 163.

2  They briefed this exact argument.  This is not the new motion.

3  This is the argument we're briefing now.

4      So I think that the answer to the question is:  My

5  understanding is that the waiver that comes with inadvertent

6  production of a privileged document extends to that document

7  and other documents of the same type with the same information.

8  It's not a subject-matter waiver, meaning we couldn't say

9  they've waived all privilege as to anything related to the

10  topics (Indicating).

11          THE COURT:  Well, but that's what I would like to hear

12  about, is what --

13          MR. WILLIAMS:  And that's my thought, is that the

14  reason --

15          THE COURT:  You need to follow train of --

16          MR. WILLIAMS:  Yeah.

17          THE COURT:  Who would be -- how long -- how long does

18  the shadow fall for a --

19          MR. WILLIAMS:  So here's what I think.  I think that

20  the reason that they found the 485 was because they were all of

21  a similar nature to the ones we did identify.

22          THE COURT:  Hm.

23          MR. WILLIAMS:  So I think that it would be incumbent

24  on Panasonic to go through, and if, in fact, there's waiver

25  because they waited six weeks to tell us that the documents we

1   identified for them were privileged, then it should be their

2   obligation as the party asserting the privilege to only then

3   assert privilege as to documents that do not have the same

4   information in them as the ones that we either identified in

5   our letter to them which began this process, or used at the

6   deposition, because those documents were again of the very same

7   nature, and it wasn't until we used them at the deposition that

8   they then said:  Wait, you can't use these, and by the way,

9   four days later, here's another one.  But they're all the same

10  types of documents.

11       So we've seen them, we've studied them, we've prepared to

12  examine witnesses on them for six weeks.  At that point, it's

13  too late to bring them all back.

14       So the answer again to the question would be:  Any

15  documents that have the same type of information, those should

16  be waived, and they should only be assertions of privilege --

17       **THE COURT:**  You can tell me that, right?  You can say:

18  Here are the 200 documents that look like this one.

19       **MR. WILLIAMS:**  I think we can.  I think, to me, the

20  issue is delicate in that we've sequestered them due to the

21  clawback request.

22       So if we're to work with Panasonic, we can certainly work

23  on that.  But it would seem to me, as an initial matter, they

24  ought to be reviewing them.  They ought to winnow it down to

25  the ones that don't have this same type of information.  And

1   it's only those documents for which they should be asserting

2   privilege.

3           **THE COURT:**  All right.

4           **MR. PAPENDICK:**  May I respond, Your Honor?

5           **THE COURT:**  Yes.

6           **MR. PAPENDICK:**  I think that under the law, if the

7   Court were to be inclined to find a waiver, it would be

8   document-specific, and not as expansive as Mr. Williams is

9   requesting.

10      When he says documents that have similar information --

11  sorry -- similar documents, there could be documents on a form,

12  a blank form, where people were filling out the form -- the

13  form looks the same, but completely different people,

14  completely different information.

15      I don't think that there should be a waiver for that type

16  of document.  Even if they look similar, it -- there were

17  investigation documents, there were forms filled out.  Yes.

18  But different information, different people.  I don't think

19  that the relief -- relief as expansive as he's requesting is

20  warranted.

21      And I would have another suggestion --

22          **THE COURT:**  So somebody on the reviewing team -- I

23  know this is an imperfect art and I know mistakes get made.

24  That's why I think you all have a clawback agreement.  I mean,

25  people understand that.  And that benefits everybody, and

1   there's no reason to get too worked up about it.   But

2   typically, that's five documents or, you know, two documents,

3   or maybe a half dozen documents, or maybe in a big case 24

4   documents.

5          But, you know, you are asking to get back now hundreds of

6   documents.   Over -- almost 600 documents.   And that -- you

7   know, that's -- that doesn't sound right to me.

8                  **MR. PAPENDICK:**   May --

9                  **THE COURT:**   Yes.

10                 **MR. PAPENDICK:**   May I, Your Honor?

11                 **THE COURT:**   Yes.

12                 **MR. PAPENDICK:**   First, the 99 documents, that first

13   set, those were withheld.   We logged those, 2015.   There are --

14   have been just over 500 clawed-back documents.   And when you

15   look at it in the context of the total production and the time

16   constraints that we were operating under back in 2015, you're

17   correct, it's less than ideal.   We certainly wish we hadn't

18   produced them.

19          But I think that it's an understandable and reasonable

20   error to have made, when we did have to review over 10 million

21   pages of documents for production in a four-and-a-half month

22   period.

23          And if I may, Your Honor, one other solution that I would

24   offer would be if we can get an agreement from the plaintiffs

25   that there would be no broader waiver for -- if we were to

1    agree to produce some of the documents, you know, even if we do

2    think we have legitimate claim of privilege but it might be

3    more on the fence, if we could have an agreement that that

4    wouldn't waive privilege to a broader set of documents, you

5    know, I think that we might be able to resolve this, or at

6    least narrow the dispute substantially.

7                **THE COURT:**  All right.

8                **MR. PAPENDICK:**  Going forward.

9                **THE COURT:**  I appreciate that.  And we will do that.

10          But -- and Mr. Williams, I hear what you're saying, but,

11   you know, waiver's a complicated thicket, and I would rather

12   have you two just work it out.  Okay?  So you take whatever

13   time you need, I won't put a time limit on it, and you do that

14   process.  And then you tender to me anything that you cannot

15   agree on.  And I don't need any briefing; just hand it to me.

16          And I will say, though, that if -- for any documents you

17   give me, I do want why -- I don't want any briefing, but why is

18   this privileged?  Okay.  Dr. X is an attorney.  And this was

19   his -- requesting somebody in the course of the lawsuit to

20   provide the following information.  Okay?

21          And if plaintiff is doubtful about that, you can tell me,

22   you know:  Dr. X is not actually an attorney, he's an engineer.

23   Or whatever the response is.  But, you all do that.

24          And anything that the defendant decides to produce will be

25   for that document, only.  They will not be at risk of opening

```
1    the door, because I want you two to solve this.  Okay?

2        Now, I am concerned, this is far too many documents.  And

3    to me, it look to me like somebody's just having dyspeptic

4    second thoughts.  Not that they were actually mistakes.  And

5    that is not going to fly.

6        Yes, Mr. Williams?

7            MR. PAPENDICK:  And we're -- you ordered the two of us

8    to do this, personally.

9            THE COURT:  In person.  At the location of your

10   choice.

11           MR. PAPENDICK:  Thank you.  And one thing I would ask

12   is --

13           THE COURT:  Typically I would require it in my jury

14   room, so you're getting a very significant indulgence.

15           MR. WILLIAMS:  Thank you.  What I would ask is to the

16   extent there's translations of these -- I don't know if

17   Mr. Papendick is fluent in Japanese.  I know I'm not.

18           MR. PAPENDICK:  I'm not.

19           THE COURT:  You both need to do it in a language you

20   can work in.  And I don't want to hear:  I'm just doing it

21   because Attorney X told me to.  You are both taking personal

22   responsibility for it.  All right?

23       So if it's in Japanese and you need an English

24   translation, you make sure you have it.  Because that's what

25   I'm going to make my decision on.  I'm not reading Japanese,
```

1    either.  I'm going to read the English translation.  All right?

2         So there won't be any buck passing in terms of:  Well, the

3    Japanese guy said this.  You two are responsible.  Okay?  All

4    right.

5         So, just whatever time frame you want for that.  Okay?

6              **MR. WILLIAMS:**  Thank Your Honor.

7              **THE COURT:**  All right, that resolves 7.  6 and 7.

8         Now -- oh.  Flextronics.  8.  I'm sorry, 9.  AVX' motion

9    to compel Flextronics document.

10             **MR. KIDWELL:**  Yes, Your Honor, Robert Kidwell for AVX.

11             **THE COURT:**  Yes.

12             **MR. TOMPKINS:**  Charles Tompkins for Flextronics.

13             **MR. KIDWELL:**  So starting off with 2089 and 2104,

14   Your Honor.

15             **THE COURT:**  Yes.

16             **MR. KIDWELL:**  So we issued a set of requests for

17   admissions to both Flextronics and DPPs, saying, you know:

18   Admit that you have no evidence that we did a number of things.

19   And I believe there are 20 of those.  And with it, we submitted

20   a request for production of documents that said:  For any

21   requests that you've denied or conditionally omitted, please

22   identify any evidence that you believe supports that claim.

23        In response to that, the DPPs called and asked for an

24   extra 30 days, and we gave it to them.  And they gave us a

25   fulsome response.

```
1        Flex gave us their response within 30 days, which is the
2   response you've had before you.  Since this motion was filed
3   and since Flextronics filed its response, they have given us a
4   supplemental production.
5              THE COURT:  Oh.  All right.
6              MR. KIDWELL:  And I believe Mr. Tompkins filed a
7   letter about that.   (Inaudible)
8              THE COURT:  Does that take care of everything?
9              MR. KIDWELL:  Well, that's the question I would like
10  to ask Your Honor.
11       So the information that was provided by Flextronics is
12  primarily a cut-and-paste of the DPPs' submission.  And if what
13  they are telling me is, substantively:  These are the documents
14  that we believe support our case and we're prepared to be bound
15  by them, then yes, it's great.
16       But if it's more along the lines of a:  Well, here's lists
17  of a bunch of documents so that we can say we gave you a
18  response, we'll fight later about whether we actually think
19  these are the documents or not, then I think they need to
20  supplement.
21             THE COURT:  Well, I have to say, I thought the
22  responses were a little bit thin.  So I was going to order you
23  to redo them.  But if you effectively have redone them, and
24  you're going to hang your hat on those responses, then that's
25  fine with me.  And that will be the response.
```

1          **MR. KIDWELL:**  And Your Honor --

2          **THE COURT:**  There will be no alteration,

3     supplementations, or quibbling.  That will be the response.

4          **MR. KIDWELL:**  I think it's -- it's important to

5     separate the request for production of documents which is one

6     item from the requests for admission which were the first

7     item -- the request for production were keyed off the requests

8     for admission.

9          **THE COURT:**  Let's just do the RFPs first.

10          **MR. KIDWELL:**  Sure.  There are five RFPs that, even

11     through supplementation, remain unanswered, other than with the

12     blanket objections.

13          **THE COURT:**  Oh.  Which ones are those?

14          **MR. KIDWELL:**  That's RFPs No. 5, 6, 7, 21 and 22.  And

15     some  of those are near and dear to my heart, because No. 21

16     is:  Admit you have no evidence that AVX entered into a

17     specific agreement to raise price or restrict output for

18     capacitors.

19          **THE COURT:**  Let me just -- now, where are?  That is

20     Tab number what?

21          **MR. KIDWELL:**  That would be 2089, tab -- first one.

22          **THE COURT:**  2089-dash -- look.  Let's just be clear

23     here.  I'm doing Item No. 10 --

24          **MR. KIDWELL:**  Uh-huh.

25          **THE COURT:**  -- which is the -- whether the requests

1    for the production responses were satisfactory.

2         MR. KIDWELL:  Correct.  And it's -- the responses to

3    requests for production, and also responses to request for

4    admission.

5         THE COURT:  We're just doing request for production

6    right now.  And where are those?  Just remind me where those

7    are.  I can't find them.

8         MR. KIDWELL:  So it should be 2089, Tab B.

9         THE COURT:  Tab B.  Okay.  Ah, yes.  Okay.  All right.

10        MR. KIDWELL:  Yes.  Exhibit A is the request for

11   admission, and then Tab B is request for production.

12        THE COURT:  Tab B has only three requests for

13   production.  So which one are we talking about?

14        MR. KIDWELL:  So the five RFPDs -- Tab B -- that are

15   unanswered are 5, 6, 7, 21 and 22.

16        THE COURT:  Right, but my Tab B has only three

17   requests for production.  Says "Relevant excerpts," and there

18   are only three there.  The ones you are talking about are not

19   in this tab.

20        MR. KIDWELL:  Hm.  There is a tabbing issue, then.

21        THE COURT:  So where are they?  I don't remember

22   seeing them.

23        MR. KIDWELL:  I can hand you my copy, if you like.

24        THE COURT:  I need the docket number.  Do you have the

25   docket-filed copy?

1          **MR. KIDWELL:**  I have my list.  I didn't bring the

2     tabbed file.

3          **MR. TOMPKINS:**  Your Honor, before we spend, I think

4     AVX is referring -- these requests for production that were not

5     supplemented are requests that --

6          **THE COURT:**  All right, we're moving beyond where I

7     want to be.  I need to see the requests.  I have your motion

8     here, and your letter, and I don't see the requests that you're

9     talking about.  So --

10          **MR. KIDWELL:**  Can I hand you them, right now,

11     Your Honor?

12          **THE COURT:**  Well, I need to see them in the docket.

13     Do you have a docket copy that says -- it will say -- blue on

14     the top.

15          **MR. KIDWELL:**  They were filed under seal, Your Honor.

16          **THE COURT:**  Oh, they were filed under seal.  Why were

17     they filed under seal?

18          **MR. KIDWELL:**  Because I believe they had his responses

19     on them.

20          **THE COURT:**  The responses are non-substantive.  Right?

21     Okay.  Everything I have from you is just for Request for

22     Production 1, 2 and 3, including the sealed copies.  So --

23          **MR. KIDWELL:**  We have a photocopying and tabbing

24     issue, it sounds like.

25          **THE COURT:**  That's all you gave me.  That's all I

1    have.  I work off of the official court copy.

2          MR. KIDWELL:  For purposes of our discussion here, may

3    I hand you a copy to look at while we talk about it?

4          THE COURT:  Well, that -- this -- I don't -- just one

5    second.

6       Okay.  I think the problem is we didn't get chambers

7    copies.  I think I've found it.  All right.

8       Now, let's start from the beginning.  So this is actually

9    No. 10.  And this (Indicating) is with respect to Docket

10   No. 122, and that is AVX's Motion to Compel Additional

11   Responses to Requests for Production and Requests for

12   Admission.  We are just doing the request for production right

13   now.  And I've found it.

14      So, now, which ones were they?  10?  Which numbers were

15   they?

16         MR. KIDWELL:  So Request for Production numbered 5, 6,

17   7, 21 and 22.

18         THE COURT:  Okay.

19         MR. TOMPKINS:  Your Honor, as to 5, 6 and 7, the

20   request is phrased "If you have denied..."  But we admitted.

21   So --

22         MR. KIDWELL:  With heavy qualification.

23         MR. TOMPKINS:  Well --

24         MR. KIDWELL:  And the requests for production asks for

25   evidence to support the qualification.

1          **THE COURT:**  All right, something has gone wrong with

2     the documents, because I have only the requests for admission.

3     Not the requests for production.

4          (The Court examines document)

5          **THE COURT:**  Oh, wait, all right.  So you're saying,

6     you admitted Request No. 5, and that is why you don't have any

7     documents?

8          **MR. TOMPKINS:**  Yeah, that's why we didn't supplement,

9     exactly.

10         **THE COURT:**  All right.  Okay.  So -- response to RFA

11    -- response to RFA No. 5.  Admit --

12         **MR. KIDWELL:**  And you'll want to look at RFA No. 2.

13         **THE COURT:**  Well, we're going to No. 5:  Admit that

14    you are aware of no evidence showing -- and so on.

15         Flex objects to the undefined term.  Okay.

16         Says "Denied."  No. 5 says "Denied."

17         **MR. KIDWELL:**  Request for Production of Documents

18    No. 5 refers to Request for Admission No. 2.  So if you just

19    look up to No. 2 on the prior page.

20         **THE COURT:**  What, what -- admit that you -- no

21    evidence.  Things happened.  Okay, where does it say "admit"?

22         **MR. TOMPKINS:**  Between -- Line 14 -- so right between

23    Line 13 and 14, far left side.  Says:  Flex responds as

24    follows, admitted.

25         **THE COURT:**  Okay.  So it was admitted.  What's the

```
1   problem?

2           MR. KIDWELL:  So with that one, it's a -- Admission

3   No. 3 and 4 continues to have a heavy qualification.

4           THE COURT:  Let's just take one at a time.  You all

5   are playing pinball here, and I can't follow a word you're

6   saying.

7        So we are on RFA No. 2.

8           MR. KIDWELL:  Yes.  The next word after "admitted" is

9   "however."

10          THE COURT:  RFA No. 2 says "Flex responds as follows:

11  Admitted."  Period.  Done.  Okay?

12          MR. KIDWELL:  "However," comma and then --

13          THE COURT:  "However" does not count.  They admit it.

14  All right?  So that takes care of that.

15          MR. KIDWELL:  I'll take it.

16          THE COURT:  If the rest of them are like that --

17          MR. KIDWELL:  They're not all like that.

18          THE COURT:  They don't need to do anything else.

19          MR. KIDWELL:  We can skip the next two, then.

20          THE COURT:  All right, show me one that isn't like

21  that.

22          MR. KIDWELL:  Let's go to No. 18, Request for

23  Admission 18.

24          THE COURT:  All right.  18.  Okay.  All right.  Says

25  it was denied.  So.
```

1        **MR. KIDWELL:**  So --

2        **THE COURT:**  What RFP does that correspond to?

3        **MR. KIDWELL:**  That corresponds to RFP 21.

4        **THE COURT:**  21.  All right.  If you denied the RFA 21

5    -- 18 -- let's see.  Okay.  Mister -- counsel for Flex?  What's

6    the -- says you produced everything already.

7        **MR. TOMPKINS:**  Your Honor, I think that the prior

8    production references and supplementation refer to many, many

9    documents responsive to this request for production.  We never

10   had an opportunity to confer at this level of detail about

11   Request for Production 21.

12       **THE COURT:**  We're doing it now.  Your response to

13   Request 21 says:  Flex responds that this evidence has already

14   been produced.  So what is the problem?

15       Listen.  They're going to live by their representation --

16       **MR. KIDWELL:**  Your Honor, the problem is he needs to

17   tell me what it is.

18       **THE COURT:**  Hold on.  They're going to live by their

19   representations.  All right?  He says you already have it.

20       If you want to write back and say -- an interrogatory that

21   says please identify it, that's fine, you can do that.  But

22   they're going to live by what they did or did not say.

23       If it turns out that they didn't proffer anything that you

24   think shows you conspired or participated in the conspiracy,

25   then that's fine.

1          **MR. KIDWELL:**  Well, Your Honor, the very purpose for

2     the request is for them to say:  After four years of discovery,

3     this is what we believe shows that you did something bad.

4          And it's important to AVX, Your Honor, because, you know,

5     we're not -- nobody's even claiming we're in the core

6     conspiracy.  We weren't in any meetings.  We're not being

7     investigated by the DOJ or any other competition agency.  You

8     know, we're -- we are -- guilt by association, because we are

9     in the industry.

10          **THE COURT:**  Listen --

11          **MR. KIDWELL:**  So I want to know what documents --

12          **THE COURT:**  Stop, stop, stop.  Stop.  We're just here

13     to solve the discovery issues.

14          **MR. KIDWELL:**  I hear you.

15          **THE COURT:**  Okay?  Your request for production said:

16     If you deny RFA 18, produce all evidence.

17          The Flextronics people say:  We have already produced this

18     evidence.

19          Okay?  They didn't do anything inappropriate.  You didn't

20     say:  Identify all the evidence.  You didn't say:  Provide the

21     Bates range for the evidence.  You said:  Produce all evidence.

22     They had given it to you.

23          How much have you gotten in terms of documents?  What's

24     the size of the document production?

25          **MR. KIDWELL:**  From Flex, in total?

1          THE COURT:  From Flex.

2          MR. KIDWELL:  Over a million pages.

3          THE COURT:  All right.  If you want to fine-tune that,

4    you can do that.  You can say:  All right, what are the

5    documents that you believe are the evidence that you've

6    identified in Request for Production No. 21?

7          MR. KIDWELL:  So Your Honor, in anticipation of that

8    precise suggestion, --

9          THE COURT:  Yes.

10         MR. KIDWELL:  -- I issued an interrogatory to

11   Flextronics last week that said:  If you don't think the

12   document requests are specific enough, here's an interrogatory.

13         THE COURT:  All right.

14         MR. KIDWELL:  List the Bates numbers for all the

15   documents that correspond with what I asked you for.

16         THE COURT:  All right, that sounds fine.  It was a

17   week ago.  He hasn't responded yet.

18         MR. TOMPKINS:  And Your Honor, it was that

19   interrogatory that actually led us to supplement the document

20   production.  The interrogatory's untimely, but we were,

21   nevertheless, supplementing in response to it.

22      We just didn't think a document production request is the

23   right vehicle for what's being sought.  But we'll respond to

24   the interrogatory in course.

25         THE COURT:  Okay.

 1             **MR. KIDWELL:**  Here's an easy --

 2             **THE DEFENDANT:**  Doesn't that solve everything?

 3             **MR. KIDWELL:**  Well, here's a request that's easy for

 4    you to do, and easy for me to ask, which is:  He can give me

 5    whatever he wants, as long as Your Honor orders that he's bound

 6    by it.

 7             **THE COURT:**  I don't have to.  He is bound by it.

 8    Well, Flex is bound by it.  That's the Federal Rules of Civil

 9    Procedure.

10             **MR. KIDWELL:**  A few months from now, when we're at

11    summary judgment --

12             **THE COURT:**  You can beat him like a piñata if you want

13    to.  All right?

14             **MR. KIDWELL:**  If he puts a document on that Rule 56

15    statement that wasn't on this response --

16             **THE COURT:**  Yes.

17             **MR. KIDWELL:**  -- strike it.

18             **THE COURT:**  You're not going to do anything.  You're

19    going to ask me to do something.  But you're certainly free to

20    do that.

21        Yes.

22             **MR. TOMPKINS:**  Your Honor, I do want to note that

23    discovery is ongoing.  With what's happened so far --

24             **THE COURT:**  Isn't discovery closing in a few months?

25             **MR. KIDWELL:**  Closed today.

1        **THE COURT:**  Closes today.  Discovery is not ongoing

2   much longer.  You've got four more hours.

3        **MR. TOMPKINS:**  There are several depositions that have

4   been rescheduled or put off because --

5        **THE COURT:**  That's fine.  But, look.  It's too late in

6   the day for you -- this thing has been churning and burning

7   since 2014.

8        **MR. TOMPKINS:**  Your Honor, we're happy to respond.

9        **THE COURT:**  I'm not going to accept the discovery is

10  still ongoing.  This is -- the sun is about 5:30 p.m. in the

11  sky.  Okay?

12       **MR. TOMPKINS:**  Absolutely, Your Honor.

13       **THE COURT:**  You may be technically right that there

14  are a handful of people left, but 98 percent, plus, of the

15  discovery is locked and loaded.  So I'm not going accept:

16  We're still kicking the tires here and trying to figure out

17  what things look like.  That is way too late in the day for

18  that.

19       **MR. TOMPKINS:**  Yeah.  And I'm not asking that,

20  Your Honor.  We're just saying that we would like to supplement

21  with material that is not actually -- you know, deposition

22  transcripts that haven't been taken, and things like that.  But

23  otherwise, we'll be bound by the answers.

24       **THE COURT:**  I find that -- well, you all, I think,

25  understand where you are.  Now, you're going to answer the

```
 1   interrogatory, and then AVX, you can do whatever you think is
 2   appropriate when the time comes.  All right?  But, of course,
 3   everybody is bound by what they say and don't say.  That goes
 4   without saying.
 5        Okay?
 6            MR. KIDWELL:  I appreciate it.
 7            THE COURT:  All right.  That takes care of that.
 8        No, No. 11.  Why don't you two stay up here -- I'm sorry,
 9   No. 10.
10            MR. KIDWELL:  This one's quick, Your Honor.
11            THE COURT:  Well, I have to say, I -- let me ask this.
12        I mean, Mr. Tompkins, your witness, you have an email
13   where somebody's talking about a document.  And goes on for a
14   couple of paragraphs.  And I guess their response is:  We don't
15   know what he's talking about?
16            MR. TOMPKINS:  Your Honor, let me go back and do some
17   backdrop on this.
18            THE COURT:  Yes.
19            MR. TOMPKINS:  The email that is the subject that led
20   to all of this is an email that, actually, the primary topic of
21   the email is different than the sentence that AVX is focused
22   on.
23        The sentence AVX is focused on is one sentence in the
24   second paragraph that talks about the disclosure of pricing
25   information from one supplier to another supplier.
```

1          Now, one thing that should be understood is the backdrop

2     of the document production in this case.  You know, at the very

3     beginning of the case, we produced documents using search terms

4     and agreed-upon custodians that were designed to catch anything

5     that had to do with capacitors.  For instance, if it had the

6     word "capacitors" in it, or if it was in the possession of

7     custodians that dealt with capacitors and the like.  And that's

8     why they were well over -- I think close to two million

9     documents produced.  So there is already a heavy presumption

10    that this particular reference to the disclosure of a pricing

11    issue has nothing at all to do with capacitors.

12         However, in an effort to respond to this and avoid this

13    argument here, we actually invested lots and lots of time

14    trying to figure out what was the reference in Mr. Linton's

15    email, because Mr. Linton at his deposition could not recall

16    it.

17         And to put this in context, he is the director of

18    procurement at Flex.  So he is in charge of procuring

19    everything that Flex procures, which is much more than

20    capacitors.  So the odds that this would be about capacitors or

21    even passive components is low to start out with.  And it would

22    be even lower if we had caught it -- we would have caught it in

23    our documents production the first time.

24         Nevertheless, we spent, you know, well over -- well,

25    "scores" is what I wrote -- well over 50 or 60 hours of

attorney time, as well as a lot of Flex's time, itself, going through a page-turning review of all of the investigation files, trying to find what the reference was.

And we did find, following the review, that there was an investigation where the results of the investigation were forwarded to Mr. Linton in November, and then again, there was a followup that went to him two weeks before this email on February 13th.

And that investigation involved a person who was in charge of obtaining trucking services in Mexico, and apparently had told one trucking supplier the other trucking supplier's price, because she was in close relationship with the other supplier and was trying to give them an advantage. And she was disciplined -- actually, eventually she was terminated, and the junior person was disciplined. And we have every reason to believe, based on the interviews that we conducted and the review that we have conducted, that this is the instance being referenced.

I certainly have no information to believe that it has anything at all to do with capacitors, passive components, AVX, anything -- or any other defendant. If it did, we would have found it in our first search.

So at this point, our position is that we have invested more than enough time in this issue, trying to figure out what this is about. And, I'm not sure what else I would do at this

1  point.  I mean, I have talked to every single person who's on

2  these emails.  And these are very high-level people.  A

3  director of procurement, VP of finance, chief compliance

4  counsel, you know, chief procurement counsel.  And nobody has

5  any specific recollection of what this was about.

6          THE COURT:  All right.  Well, let me just jump in.

7      So they don't have anything.

8          MR. KIDWELL:  So I have asked for the details of who

9  was asked, and whose files were searched, and what files were

10  searched, and how.  And you know as much as I do about that

11  right now, Your Honor.

12          THE COURT:  Did you get the whole story about the

13  trucking thing?

14          MR. KIDWELL:  I did hear the thing about the trucking

15  thing, although a trucking contract in Guadalajara doesn't

16  usually result in a corporate-wide complaint --

17          THE COURT:  Well, that's the position they are taking.

18  What else would you like to know?

19          MR. KIDWELL:  I'd like to know what they actually did.

20  I'd like to know if they went and talked to the AVX -- the

21  people who were in charge of procuring from AVX.

22      And here's why I'm pressing this issue, Your Honor.

23  Thirteen AVX employees have been deposed in this case.  And

24  from time to time, someone will find out that someone at AVX

25  knew what the bids were from somebody else in a particular bid.

1    And the question was:  How did you know that?

2         And they said:  Because the Flex procurement official told

3    me.

4              **THE COURT:**  Okay.

5              **MR. KIDWELL:**  Flex procurement officials are known to

6    hand out this information, for whatever reason that they

7    personally think it benefits them to do so.

8              **THE COURT:**  They're known for that?

9              **MR. KIDWELL:**  I'm sorry?

10             **THE COURT:**  They're known for that?

11             **MR. KIDWELL:**  They are known for that.

12             **THE COURT:**  All right.

13             **MR. KIDWELL:**  And so, to find that there's been an

14   internal investigation on this precise issue, I'm skeptical

15   that it's just about one trucking contract in Guadalajara,

16   Mexico.

17             **THE COURT:**  I don't know what else I can do.  I

18   understand you're skeptical, but that is not a basis for next

19   steps.  You have to show me something else.

20             **MR. KIDWELL:**  So a list of whose files were searched,

21   who was talked to, how they were searched would be a good

22   start.

23             **MR. TOMPKINS:**  Your Honor, we've provided lists of all

24   of the custodians whose files were searched.  And he has had --

25   AVX has had years to depose whoever they wanted to who had

```
 1   responsibility for purchasing capacitors from AVX, purchasing

 2   passive components for AVX.  They took a couple of depositions;

 3   they didn't take any more.  And discovery, as you just

 4   mentioned, is closed.

 5           THE COURT:  Did you depose Mr. Linton?

 6           MR. KIDWELL:  I'm sorry?

 7           THE COURT:  Did you depose Mr. Linton?

 8           MR. KIDWELL:  I did.  I issued a 30(b)(6) on this

 9   topic (Indicating).  With that, I issued a 30(b)(1).  We

10   discussed and agreed Mr. Linton would be perfect for the

11   30(b)(6) and the 30(b)(1).

12       Morning of the deposition, it's disclosed me Mr. Linton's

13   done no prep at all, isn't familiar with the topics that he's

14   is going to be discussing that day, and could only talk off the

15   very top of his head about:  I don't know; this was a long time

16   ago.

17           MR. TOMPKINS:  Your Honor, we did offer to provide a

18   30(b)(6) witness on this topic.  First, Mr. Linton testified to

19   the best of his knowledge.

20           THE COURT:  All right, just, you put what you told me

21   about the truck thing into an interrogatory response that

22   somebody executes, under penalty of perjury, at Flextronics.

23   That's what you're going to have.  If it turns out to be wrong,

24   there will be an accounting.  Okay?

25           MR. KIDWELL:  I can live with that.
```

```
 1            THE COURT:  All right, that takes care of that.

 2       All right, let's see, No. 11, Hitachi employees.  Have

 3  that done in one week, please, Mr. Tompkins.

 4            MR. TOMPKINS:  Yes, Your Honor.

 5            MR. BANK:  Jeff Bank for Hitachi.

 6            MR. WAGNER:  Scott Wagner for Avnet, ASI and

 7  Benchmark.

 8            THE COURT:  Yes.  Please.

 9            MR. WAGNER:  So, Your Honor, we're seeking to take the

10  deposition of two Hitachi witnesses, Takahide Osumi and Mitsugo

11  Yamamoto.  Mr. Osumi is a current employee; Mr. Yamamoto is a

12  former employee.  But we understand from Hitachi's counsel that

13  they still have control over him.

14       They have a novel theory for why these gentlemen should

15  not have to appear for deposition.  And that is that they get

16  to dictate to us how we are going to prosecute our case, and

17  who's depositions we can take.

18            THE COURT:  Let me just jump in.

19       Okay.  They'll take the Fifth.  That's fine.  But they --

20  you know, there's a whole format for taking the Fifth, and

21  there are consequences for taking the Fifth that they would

22  like to have a clear record for, so they're going to have to

23  go.  Right?  So.

24            MR. BANK:  Your Honor, Hitachi Chemicals only left in

25  certain opt-out cases.  And some opt-outs obviously entered
```

 1   this litigation at a late stage.  We worked with those opt-outs

 2   to come to an agreement that those opt-outs would review the

 3   discovery record taken in this case to date, and they would

 4   only propound unique non-duplicative discovery.

 5        In multiple meet-and-confers, we asked Avnet, ASI and

 6   Benchmark's counsel what exactly is it about these two

 7   witnesses that would be unique and non-duplicative.  We never

 8   got an answer to that.

 9        In addition, Hitachi Chemical is producing two percipient

10   witnesses in the United States to give substantive testimony,

11   and those two witnesses overlap with the witnesses sought by

12   the Avnet defendants.

13        On top of that, Hitachi Chemical is producing 30(b)(6)

14   witnesses in the United States to testify in response to the

15   Avnet defendants' and Flextronics defendants' requests.

16        The topics that the Avnet defendants and Flextronics

17   issued to Hitachi Chemical in their 30(b)(6) request cover

18   every topic under the sun that they could ask those two

19   witnesses in Hong Kong.  Therefore, we think the depositions

20   are unnecessary.

21        But at a minimum, we should go through these four

22   depositions that Hitachi Chemical has been willing to go

23   forward with in the United States, substantive depositions, and

24   then determine if there are any topics left, then force

25   everyone to go out to Hong Kong to take these Fifth-Amendment

1    depositions.

2         THE COURT:  I'm sorry; is it Mr. Wagner?

3         MR. WAGNER:  Yes.

4         THE COURT:  So was there a deal about fine-tuning the

5    discovery and --

6         MR. WAGNER:  There was a deal.  And what the deal was

7    and what Mr. Bank is referring to are written discovery

8    requests.  That we would not issue duplicative discovery

9    requests of what was prior -- was served by other plaintiffs in

10   the case.

11      With respect to depositions, what we said was (As read):

12           "We agree that we cannot issue a notice of deposition

13           pursuant to 30(b)(1) to any witness who has

14           previously sat for a deposition in the California

15           action..."

16      Which was this case.  We did this while we were still out

17   in Arizona.  These witnesses have not sat for a deposition.

18   We're well within -- we agreed to the 10-deposition limit per

19   family.

20         THE COURT:  They have not been deposed.

21         MR. WAGNER:  They have not been deposed.  We are

22   within the deposition limits.  Just because there might be

23   overlap of a 30(b)(6) deposition doesn't mean that we're not

24   entitled to the 30(b)(1) depositions.

25      And we believe these individuals actually do have

1   knowledge that is separate and apart from any witness that

2   Hitachi has produced to date, or will be producing.  I mean,

3   there's only been four Hitachi depositions to date in this

4   case.

5           THE COURT:  All right.

6           MR. BANK:  Your Honor, may I respond?

7           THE COURT:  Yes.

8           MR. BANK:  First of all, there have been more than

9   four Hitachi depositions to date.  There have been a number of

10  percipient witness depositions, as well as over 30 hours of

11  30(b)(6) testimony.

12      What Avnet agreed to was, quote (As read):

13              "Avnet further agrees that it will review all

14              discovery produced by defendants to date prior to

15              propounding its own discovery, to ensure that the

16              discovery sought from defendants is not duplicative."

17      With regards to the two individuals that they are seeking

18  now, one of them, Mr. Yamamoto, was CEO of the American

19  subsidiary for two years.

20          THE COURT:  Well, let me -- look.  It's two different

21  people.  If they haven't been deposed before, go ahead and do

22  it, do your thing.  Okay?

23          MR. WAGNER:  Thank Your Honor.

24          THE COURT:  So depositions are ordered.

25      Let's see, No. 12.  Oh, there is no No. 12.  Just a status

1   update.

2          **MR. ZAPALA:**  Just a status update.

3          **THE COURT:**  Yes.  Excellent.

4          **MR. ZAPALA:**  I don't know if Mr. Williams has anything

5   else to add, but we have been meeting and conferring with the

6   defendants.  We have not submitted an agreed-upon schedule to

7   Your Honor yet, but it is with the defendants.  We sent it this

8   week.  We expect to get comments back.  We're continuing the

9   process.

10         **THE COURT:**  Okay, you probably need time to think it

11  over.  So maybe next week?

12         **MS. LAU:**  Your Honor, the defendants actually request

13  the Court's guidance with respect to one issue.

14      So, we did receive a revised case schedule from the

15  plaintiffs on Monday night.  One of the important aspects of

16  this case schedule which we hadn't discussed, and appeared for

17  the first time in this proposal, is that the DPPs have split

18  off from the IPPs and the direct action plaintiffs, and in

19  fact, proposed two double-track schedules.  Including for all

20  expert submissions, summary-judgment motions, et cetera,

21  et cetera.

22      And the defendants have repeatedly understood the Court to

23  explain that there is just one train.  And in fact, at a

24  hearing in July 2014, the defendants, certain of them, had

25  raised early summary-judgment motions, if you will.  And the

1   Court was very explicit.  In fact, you said there is only going

2   to be one summary judgment deadline for global motions with a

3   unified brief, and that there would not be any space for any

4   other summary-judgment motions.

5        It's defendants' distinct preference to have a single

6   schedule for all plaintiffs --

7            THE COURT:  It was probably aspirational, rather than

8   a case management -- look.  I don't have -- you all work it

9   out.  If you can't work it out, I'll have you back in.  I can't

10  do this.  I don't even have the schedule, so I can't --

11       MR. WILLIAMS:  And one thing I should make clear,

12  though, is that the most important part of the train is the

13  Court, and there's no separate schedule.  This is only as to

14  the briefing between the parties.

15           THE COURT:  Yes.

16       MR. WILLIAMS:  But once the summary-judgment replies

17  come in, that's the same date, and everything from that date

18  forward is the same date.  And the Court doesn't have any

19  separate tracks.

20           MS. LAU:  Well --

21           THE COURT:  Let me just ask you this, though.

22       What I'm more concerned about -- first, I have a couple of

23  big things I have to get out which will be as soon as I can;

24  I'll be putting our very scarce resources to that next.  So I

25  can't promise you a date, but they are in the hopper.

1          But, now, Arrow has arrived.

2          **MR. SINGER:**  Yes, Your Honor.

3          **THE COURT:**  And how are we going to integrate Arrow in

4     an efficient fashion?

5          Tell me about Arrow.  So were you -- you're completely new

6     counsel, right?

7          **MR. SINGER:**  Yes.

8          **THE COURT:**  Okay.

9          **MR. SINGER:**  We are representing Arrow Electronics,

10    Inc.  It's a distributor.  It's filed suit April 16 --

11         **THE COURT:**  In Florida?  Where'd you file?

12         **MR. SINGER:**  In Denver.

13         **THE COURT:**  Denver, okay.

14         **MR. SINGER:**  Which is where Arrow is headquartered.

15         **THE COURT:**  Okay.

16         Well, Mr. Zapala and Mr. Williams, how do you plan to

17    accommodate Arrow?

18         Arrow's a DPP, I take it?

19         **MR. SINGER:**  We are a direct -- an opt-out who has a

20    direct purchase --

21         **THE COURT:**  All right.

22         **MR. SINGER:**  And we have been discussing with counsel

23    for the defendants, and we think we have an agreement which

24    will be reduced to a stipulation, that they will accept

25    service.  We agree to be bound by this discovery schedule.  We

1  understand we're a latecomer to that process.

2         **THE COURT:**  All right.

3         **MR. SINGER:**  And, you know, we recognize that.

4         **THE COURT:**  All right.  So there's nothing --

5  you're -- you're integrated.

6         **MS. LAU:**  Yes.  Your Honor --

7         **MR. ZAPALA:**  Sounds easy, Your Honor.

8         **THE COURT:**  Is that the practical punchline?  You're

9  integrated?  We don't have to do anything else?

10        **MR. ZAPALA:**  We didn't get notice of Arrow's

11 involvement until after we set the schedule.  So if

12 Mr. Singer's representing he has no problem being wrapped into

13 the schedule that we're currently negotiating with the

14 defendants, we have no problem.

15        **THE COURT:**  Is that right, Mr. Singer?

16        **MR. SINGER:**  That's correct.

17        **THE COURT:**  Okay.  Well, that was good.

18     Yes.

19        **MR. WAGNER:**  There was separate fact discovery

20 deadlines for certain of the opt-outs, which is not today, but

21 a month from today.

22        **THE COURT:**  No, I understand.

23        **MR. SINGER:**  Yeah, that's the part that --

24        **THE COURT:**  Okay.  So work it out.  And if you can't,

25 you know, you can come and see me.

1      Okay?

2              **MS. LAU:**  Your Honor --

3              **THE COURT:**  Yes.

4              **MS. LAU:**  -- there is one additional case, and I don't

5      see that counsel are present for TTI Mouser, but we are going

6      to work with that entity to make sure that they are similarly

7      roped into the existing schedule.

8              **THE COURT:**  Who is that?  Is that a new case?

9              **MR. ZAPALA:**  I know just from discovery in the case

10     that they're direct-purchaser distributors.  I don't know where

11     they filed their case.

12             **MS. LAU:**  And it doesn't appear that their counsel is

13     present to speak for them.

14             **THE COURT:**  I haven't got an MDL notice from the

15     court.

16             **MR. WAGNER:**  They filed here.

17             **THE COURT:**  They filed directly here?  Do you know

18     when?

19             **MR. WAGNER:**  Maybe about a month ago.

20             **MS. LAU:**  Yeah, in ND Cal.

21             **MR. PAPENDICK:**  It was two weeks ago.  And none of the

22     defendants have been served.  My colleague reached out to their

23     counsel to inform them.

24             **THE COURT:**  Do you know who the lawyer is?

25             **MR. PAPENDICK:**  I personally don't.

1          **THE COURT:**  But somebody at your firm does?

2          **MR. PAPENDICK:**  Someone in my firm, yes.

3          **THE COURT:**  Do you all know who the attorney is for

4    the plaintiff?

5          **MR. ZAPALA:**  I don't, offhand.  I'll take a look.

6    It's possible we've had negotiations with that attorney over

7    third-party discovery.

8          **THE COURT:**  Whoever it is, they need to file a notice

9    of related case, like -- they should have filed it already.

10   But they should file it right away.

11      Okay?

12         **MR. ZAPALA:**  Okay.

13         **THE COURT:**  All right.  Well, we've got a lot done

14   today.

15         **MR. WAGNER:**  Thank Your Honor.

16         **THE COURT:**  I'm not going to ask if there's anything

17   else.  All right, thank you.

18         **MS. LAU:**  Thank you, Your Honor.

19         **THE CLERK:**  All rise.  Court's in recess.

20      (Proceedings concluded)

21

22

23

24

25

1

2

3

4                    **CERTIFICATE OF REPORTER**

5          I, BELLE BALL, Official Reporter for the United States

6    Court, Northern District of California, hereby certify that the

7    foregoing is a correct transcript from the record of

8    proceedings in the above-entitled matter.

9

10                        *Belle Ball*

11    _____

                    /s/ Belle Ball

12          Belle Ball, CSR 8785, CRR, RDR

13            Thursday, May 10, 2018

14

15

16

17

18

19

20

21

22

23

24

25