UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE CAPACITORS ANTITRUST LITIGATION (NO. III) | Case No. 17-md-02801-JD<br><br>**SECOND ORDER RE FTAIA**<br><br>Re: Dkt. Nos. 1372, 1661<br>(Case No. 14-cv-03264-JD) |

This order supplements the Court's initial order on the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a ("FTAIA"). Dkt. No. 1302 in Case No. 14-cv-03264-JD; *see In re Capacitors Antitrust Litigation*, No. 14-cv-03264-JD, 2016 WL 5724960 (N.D. Cal. Sept. 30, 2016). It answers an additional question about the territorial reach of the state law claims alleged by the indirect purchaser plaintiffs, and applies the Court's FTAIA rulings to several categories of transactions involving Flextronics International USA, Inc. ("Flextronics"), and its overseas affiliates. The Flextronics' portion is a "Phase II" summary judgment motion under the framework set out in the initial order.

Since the filing of the initial order, the underlying individual actions have been collected into a multidistrict litigation ("MDL") case designated as Case No. 17-md-2801. This order has been filed in the MDL action and applies to all of the constituent cases. Unless otherwise noted, all docket number references in the order are to the consolidated civil action, Case No. 14-cv-3264, which is now a part of the MDL.

**BACKGROUND**

Familiarity with the basic facts summarized in the prior order is assumed. Plaintiffs are direct purchaser plaintiffs ("DPPs"), indirect purchaser plaintiffs ("IPPs"), and a number of

entities that opted out of the putative classes and are proceeding on an individual basis, most notably Flextronics for this order.

The relevant product is the capacitor, a tiny but ubiquitous component of electrical devices that stores and evens out the flow of electrical energy. The complaints allege that defendants engaged in a multi-year international conspiracy to fix prices and suppress competition in the markets for electrolytic and film capacitors. The defendants are for the most part overseas capacitors manufacturers operating in Japan and other parts of East Asia.

In light of the complexities that frequently arise when the FTAIA is in play, the Court implemented a two-phase motions track early in the litigation. Phase I, which culminated in the initial FTAIA order, resolved an initial round of disputes about the application of the FTAIA to the DPPs', IPPs' and Flextronics' allegations. 2016 WL 5724960. A Phase II was planned to apply these legal determinations to the actual transactions in the record on summary judgment. DPPs and defendants have jointly declined a Phase II on the DPP class action side. Dkt. No. 1421. The sole Phase II motion on deck is directed to Flextronics' transactions.

Independent of the Phase II proceedings, the Court concluded that additional briefing was needed on the application of the FTAIA to the IPPs' state law claims. The Court determined that no state law could reach farther abroad than the FTAIA, but the question of whether a state law was more circumscribed was not briefed or argued. At the Court's invitation, IPPs and defendants filed additional briefs, which are resolved here.

**DISCUSSION**

The FTAIA bars liability under the Sherman Act for export activity and commercial conduct abroad unless those activities "adversely affect domestic commerce, imports to the United States, or exporting activities of one engaged in such activities within the United States." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 161 (2004). As discussed in the initial order, the FTAIA "boils down to two principles." 2016 WL 5724960, at *3 (quoting *United States v. Hsiung*, 778 F.3d 738, 751 (9th Cir. 2015)). "Import trade or import commerce" with foreign nations falls squarely within the scope of the Sherman Act. *Id*. "Nonimport trade or commerce with foreign nations," on the other hand, is not governed by the Sherman Act unless it

2

meets the "domestic effects exception." *Id*. (quoting *Hsiung*, 778 F.3d at 756). To meet the exception, (1) the conduct must have had a "direct, substantial and reasonably foreseeable effect" on U.S. domestic commerce, and (2) such U.S. domestic effect must "give[] rise to" a Sherman Act claim. *Id*. (citing 15 U.S.C. § 6a and *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, 546 F.3d 981, 985-86 (9th Cir. 2008)).

## I. THE FTAIA ISSUES FOR IPPS

### A. REACH OF STATE LAWS VIS-À-VIS THE FTAIA

On the IPP side, the "fundamental dispute" in the initial motion was whether the FTAIA governed their state antitrust and consumer protection claims in the same way it applies to claims under the Sherman Act. 2016 WL 5724960, at *7. The Court answered in the affirmative, and declined to extend the reach of any state law beyond that of the FTAIA. *Id*., at *8. That conclusion did not address the possibility that a state law might apply less broadly than the FTAIA. The Court called for further briefing by the parties on a state-by-state basis, which has been filed. Dkt. Nos. 1372, 1407, 1411. Although the IPPs have asserted claims under the laws of a number of states, defendants have pursued the issue only under New York's Donnelly Act and consumer protection statute, and Florida's consumer protection statute.

#### 1. New York: The Donnelly Act and Consumer Protection Statute

Defendants rely heavily on *Global Reinsurance Corporation - U.S. Branch v. Equitas Ltd.*, 18 N.Y.3d 722 (N.Y. 2012), to argue that New York's antitrust statute, the Donnelly Act, has tighter coverage than the FTAIA. In defendants' view, the Donnelly Act applies only when there is a "very close nexus between the conspiracy and injury to competition in" the state of New York. Dkt. No. 1372 at 4 (quoting *Global Reinsurance*, 18 N.Y.S.3d at 736). They say that the required nexus has not been alleged here. The IPPs read the Donnelly Act to reach any foreign conduct that causes antitrust injury to New York purchasers and harm to competition in New York, which they say they have adequately alleged.

Defendants rightly identify *Global Reinsurance* as the most relevant case, so far as it goes. In the opinion, New York's highest state court declined to simply assume that "the extraterritorial reach of the Donnelly Act is as extensive as that of its federal counterpart, the Sherman Act." 18

3

N.Y.3d at 734; *see also* 2016 WL 5724960, at *8 (citing same). Instead, it held that "[f]or a Donnelly Act claim to reach a purely extraterritorial conspiracy, there would, we think, have to be a very close nexus between the conspiracy and injury to competition in this state." 18 N.Y.3d at 736. The court found that this "additional element" was not discernible in the plaintiff's claims. *Id*. It stopped short, however, of providing any guidance on what an actionable nexus might look like, or how a plaintiff could adequately allege it. As defendants acknowledge, no other case has developed the nexus point in any substance or detail. Dkt. No. 1372 at 4.

Even so, a comparison of the IPPs' complaint to the one found lacking in *Global Reinsurance* sheds considerable light on the sufficiency of the IPPs' allegations. The plaintiff in *Global Reinsurance* was the "New York branch of a German reinsurance corporation." 18 N.Y.3d at 726. The gravamen of the complaint was that the "German reinsurer through its New York branch purchased retrocessional [insurance] coverage *in a London marketplace* and consequently sustained economic injury when retrocessional claims management services were by agreement *within that London marketplace* consolidated so as to eliminate competition over their delivery." *Id*. at 734 (emphases added). The *Global Reinsurance* court characterized plaintiff's allegations as expressing "localized individual harm" in London, and noted that plaintiff pleaded at most that it may have been "injured by an anticompetitive restraint in the Lloyd's [of London] market." *Id*. at 733. By contrast, one of the named IPPs here is a New York company with its principal place of business in New York, which "purchased electrolytic and film capacitors as stand-alone products in New York from one or more distributors that purchased such capacitors as stand-alone products from one or more defendants during the respective Class Periods." Dkt. No. 1589 ¶ 34.

Whatever the final meaning of a close nexus might be under the Donnelly Act, it is clear that IPPs have alleged more ties to New York than did the plaintiffs in *Global Reinsurance*. That is enough to preserve the IPPs' New York claim at this stage of the case. Whether the evidence ultimately establishes a close nexus as a matter of fact is a debate reserved for summary judgment or trial.

For similar reasons, defendants' arguments under New York's consumer protection statute are also declined. Citing *Goshen v. Mutual Life Insurance Company of New York*, 98 N.Y.2d 314,

4

325 (N.Y. 2002), defendants argue in effect that the deceptive conduct must have occurred in New York, which in this case would mean that a price-fixing agreement was made within the state. Dkt. No. 1372 at 5-6. IPPs contend that they need allege only that purchasers were deceived within the state, meaning that a purchaser need only buy a price-fixed product there. Dkt. No. 1407 at 10. The IPPs have the better position. *See Goshen*, 98 N.Y.2d at 324-26 (concluding that "the transaction in which the consumer is deceived must occur in New York"; dismissing complaint of out-of-state plaintiffs but finding sufficient the allegations of the New York plaintiffs); *People ex rel. Spitzer v. Direct Revenue, LLC*, 19 Misc.3d 1124(A), at *6-7 (N.Y. Sup. Ct. 2008) ("the alleged statutory violations are barred for transactions occurring outside of New York," and "at least some part of the underlying unlawful transaction affecting [consumers] must be completed in this state"). IPPs have alleged that the relevant transaction of purchasing a price-fixed product occurred in New York, as the New York plaintiff purchased the capacitors at issue "in New York." Dkt. No. 1589 ¶ 34. This is sufficient for IPPs to move forward under the New York consumer protection statute.

### 2. Florida: Consumer Protection Statute

Defendants' contentions under Florida law sound similar themes. They say that Florida's consumer protection statute, the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 et seq. ("FDUTPA"), "applies only to actions that occurred within the state of Florida." Dkt. No. 1372 at 7 (quoting *Five for Entm't S.A. v. Rodriguez*, 877 F. Supp. 2d 1321, 1330-31 (S.D. Fla. 2012)). IPPs argue that the statute contains no geographical or residential restrictions, and all that is required is an effect on the Florida market. Dkt. No. 1407 at 12 (citing *Execu-Tech Bus. Sys. v. New Oji Paper Co.*, 752 So.2d 582, 584-85 (Fla. 2000)).

As both sides appear to recognize, Florida law on this issue is scant. Neither defendants nor IPPs have identified a case that answers the question, or even suggests an answer, or any other source such as legislative history that might provide some illumination. The plain language of the FDUTPA does not on its face rule out IPPs' allegations, and in the absence of any solid authority from defendants to the contrary, the Court declines to terminate the FDUTPA claims as a matter of

law. This claim, too, may be tested on the facts and record at the appropriate stage of the litigation.

### 3. Other State Law Claims

The Court notes that IPPs have also asserted claims under the competition laws of California, Iowa, Michigan, Minnesota and Nebraska, and the consumer protection laws of California and Nebraska. Defendants have not challenged these claims in these supplemental proceedings. For the sake of clarity, the Court concludes that the reach of all of the IPPs' state law claims is coterminous with the FTAIA. No more and no less.

## II. THE FTAIA ISSUES FOR FLEXTRONICS

The Phase II motion for Flextronics entails the application of the Court's initial FTAIA determinations to several categories of its transactions. Dkt. No. 1661. Flextronics' allegations are presented separately in Docket Number 1831, which is the consolidated third amended class action complaint of DPPs and complaint of Flextronics International USA, Inc.

Flextronics holds claims assigned to it by an extended family of nearly 100 overseas sister companies (the "Foreign Flex Entities"). Defendants' motion is directed solely to the assigned claims. Dkt. No. 1661 at 2-3 & 8 n.13.[1] They grumble a bit about how the assignments were effectuated, *see id.* at 6-7 & n.10, but do not raise a serious attack on them. In any event, the assignments do not affect the FTAIA analysis in any meaningful way because the nature of the transaction, as opposed to the ownership of the claim, drives the outcome.

The assigned claims are a mix of direct and indirect purchases by the Foreign Flex Entities. On the direct purchase side, the claims consist of: (1) capacitors sold and shipped by a foreign defendant to a Foreign Flex Entity, and incorporated abroad into finished goods that were sold <u>into</u> the U.S.; (2) capacitors sold and shipped by a foreign defendant to a Foreign Flex Entity, and incorporated abroad into finished goods that were sold <u>outside</u> the U.S.; and (3) capacitors sold and shipped by a defendant entity in the U.S. to a Foreign Flex Entity. On the indirect purchase

---

[1] The parties agreed to defer briefing on the indirect purchaser claims of Flextronics USA in its own capacity, pending the Court's resolution of IPPs' FTAIA issues. Dkt. No. 1661 at 3 n.3.

6

side, the claims consist of capacitors sold by defendants to foreign distributors and then re-sold by a distributor to a Foreign Flex Entity.

While the Phase II motion is formally one for summary judgment, it does not entail any factual disputes. For present purposes only, defendants have accepted all of Flextronics' factual representations about "how capacitor prices were negotiated," Dkt. No. 1807 at 1 n.2, and they focus on legal, not factual, arguments in support of their motion. Dkt. No. 1807.

### A. CAPACITORS SOLD AND SHIPPED BY A FOREIGN DEFENDANT TO A FOREIGN FLEX ENTITY, AND INCORPORATED ABROAD INTO FINISHED GOODS THAT WERE SOLD <u>INTO</u> THE UNITED STATES

For capacitors that were sold and shipped by a foreign defendant to a Foreign Flex Entity, and then incorporated abroad by the Foreign Flex Entity into finished goods that were sold into the United States, the main issue is whether these transactions count as "import commerce." The "Sherman Act applies to 'import trade or import commerce' with foreign nations. Put differently, the FTAIA does not alter the Sherman Act's coverage of import trade; import trade is excluded from the FTAIA altogether." *United States v. Hsiung*, 778 F.3d 738, 751 (9th Cir. 2015).

The dispute turns on one question: is it essential for defendants to do the importing themselves for a transaction to count as import? Defendants say yes, and that the proper focus is on the immediate conduct of defendants and not plaintiffs in how a product came to be in the United States. They point to *Hsiung*, 778 F.3d 738, and the *Motorola* line of cases (one of the civil counterparts to the criminal case of *Hsiung*), which includes the Seventh Circuit's opinion in *Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816 (7th Cir. 2015). That opinion held that it was "wrong" of Motorola to argue that certain transactions were import commerce where "[i]t was Motorola, rather than the defendants, that imported these panels into the United States, as components of the cellphones that its foreign subsidiaries manufactured abroad and sold and shipped to it." 775 F.3d at 818.

Flextronics rejects any notion that import commerce applies only when a defendant has shipped a product directly into the United States. It is enough, in Flextronics' view, that it "has presented evidence that defendants sold capacitors to Flex Affiliates knowing that the capacitors

would be incorporated into goods that were intended to be (and were) shipped to the U.S." Dkt. No. 1722-3 at 20 n.20.

No one-size-fits-all definition of import commerce is present in the case law, or ever likely to be so. *Hsiung* held that "import trade" "means precisely what it says," but left open the question of "whether commerce directed at, but not consummated within, an import market" falls under the FTAIA's import language. *Hsiung*, 778 F.3d at 754-55 & n.8. Even so, *Hsiung* provides good reasons to conclude that import trade should be not limited to situations where a defendant has directly brought a good into the United States. This is evidenced by *Hsiung's* favorable citation to the Third Circuit's determination that import trade "applies to importers and to defendants whose 'conduct is directed at a U.S. import market,' even if the defendants did not engage in importation of products into the United States." *Id*. at 755 n.8 (quoting *Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 471 & n.11 (3d Cir. 2011)). *Hsiung* also assumed that certain types of transactions amounted to import commerce, as when, for example, "AUO employees 'had one-on-one discussions in person or by phone with representatives of coconspirator TFT-LCD manufacturers during which they reached agreements on pricing of TFT-LCD sold to certain customers, including customers located in the United States.'" *Id*. at 755. The court additionally noted that trial testimony "establish[ing] that AUO imported over one million price-fixed panels per month into the United States" included evidence that "AUO and AUOA executives and employees negotiated with United States companies in the United States to sell TFT-LCD panels at the prices set at the Crystal Meetings." *Id*. at 756.

Flextronics follows that line of thought to contend that defendants' alleged conspiracy "was intended to and did inflate the price of capacitors sold in the U.S."; defendants engaged in acts in furtherance of the conspiracy in the United States, "including meeting in the U.S. with Flex management to negotiate capacitor prices"; and defendants "knew a substantial portion of the capacitors purchased by the Flex Affiliates were purchased in order to manufacture goods for Flex's U.S. customers or were intended to be and were incorporated into electronic goods shipped to the U.S. for sale in the U.S. market." Dkt. No. 1722-3 at 3, 8-11. Flextronics has also named its specific U.S. customers who were allegedly known to defendants, and states that defendants

had "specific conspiratorial discussions" and "reached agreements targeting the price of capacitors Flex purchased for incorporation into products manufactured for" those U.S. customers. *Id*. at 11. For purposes of this motion, defendants have not contested those factual representations. Dkt. No. 1807.

This state of the record leaves open the possibility that all transactions in this category may be subject to the Sherman Act as "import trade or commerce." The Court cannot definitively exclude them at this juncture, all the more so because they might also come within the FTAIA's domestic effects exception. These transactions remain in the case for disposition at trial.

So too for capacitors that were "purchased [by the Foreign Flex Entities] abroad and shipped to Mexico for manufacture into goods shipped to the United States pursuant to the IMMEX trade agreement." Dkt. No. 1722-3 at 20. Flextronics contends that these products are potentially within the scope of import commerce because they are "required under Mexican law to be subsequently transported out of Mexico," and so there is a triable question about whether these goods count as import commerce. *Id*.; *see also In re TFT-LCD (Flat Panel) Antitrust Litigation*, No. C 09-5609 SI, 2012 WL 3763616, at *2 (N.D. Cal. Aug. 29, 2012). Defendants essentially agree for now. *See* Dkt. No. 1807 at 15 n.11. The IMMEX transactions remain in the case for further proceedings.

### B. CAPACITORS SOLD AND SHIPPED BY A FOREIGN DEFENDANT TO A FOREIGN FLEX ENTITY, AND INCORPORATED ABROAD INTO FINISHED GOODS THAT WERE SOLD <u>OUTSIDE</u> THE UNITED STATES

The next category consists of capacitors sold and shipped by a foreign defendant to a Foreign Flex Entity, and then incorporated into a finished good that was ultimately sold outside of the United States. For this category, the issue is whether these transactions fall under the domestic effects exception in the FTAIA. Flextronics agrees that these transactions are not import commerce.[2]

---

[2] *See* Dkt. No. 1722-3 at 20 ("Flex agrees with defendants that foreign purchases of capacitors that are not shipped to the United States do not fall within the import commerce exclusion, with one exception."). The one exception is the last category discussed in Section II.A., *supra* -- *i.e.*, capacitors "purchased abroad and shipped to Mexico for manufacture into goods shipped to the United States pursuant to the IMMEX trade agreement." *Id*. at 20.

9

To refresh, the domestic effects exception states that conduct involving non-import trade or commerce with foreign nations is subject to the Sherman Act only if (1) the conduct had a "direct, substantial and reasonably foreseeable effect" on U.S. domestic commerce, and (2) such U.S. domestic effect "gives rise to" the plaintiff's Sherman Act claim. 15 U.S.C. § 6a. In effect, the inquiry is whether the alleged price-fixing conspiracy had an impact in the United States that would allow Flextronics (on behalf of the Foreign Flex Entities) to sue under the Sherman Act.

On the record before the Court, the answer is no. The capacitors in this category were sold abroad, incorporated into finished goods abroad, and the finished goods were sold abroad. There was no impact on a U.S. purchaser or consumer, and no allegation that anyone in the United States paid a supra-competitive price for these capacitors. To impose the Sherman Act on overseas transactions of this sort would undermine Congress's intent in the FTAIA and "create[] a serious risk of interference with a foreign nation's ability independently to regulate its own commercial affairs." *Empagran*, 542 U.S. at 165; *see also Motorola Mobility*, 775 F.3d at 820 ("U.S. antitrust laws are not to be used for injury to foreign customers.") (quotations omitted). If it turns out that the antitrust laws or enforcement policies of the host country are weak or non-existent, that risk was implicitly accepted in choosing to do business there. *Id.* The FTAIA expressly bars the application of U.S. federal antitrust laws as a substitute for overseas enforcement.

Other cases in our circuit have reached the same conclusion under similar circumstances. In *DRAM*, for example, our circuit determined that the FTAIA "clarifies that U.S. antitrust laws concern the protection of '*American* consumers and *American* exporters, not foreign consumers or producers.'" *DRAM*, 546 F.3d at 986 (emphasis in original; citation omitted). The relevant effect is that on American commerce. *Id.* The facts for this category of Flextronics' transactions show no such effect. The most Flextronics alleges is that its "U.S. management agreed on behalf of the Flex Affiliates to purchase capacitors following negotiations that took place in the U.S. and/or were directed and controlled by U.S. management." Dkt. No. 1722-3 at 6. This may be "domestic" in the geographic sense that something happened within the United States, but it is not a "direct, substantial, and reasonably foreseeable effect" on U.S. domestic commerce. *See also In re ODD*, Case No. 10-md-02143-RS (N.D. Cal.), Dkt. No. 2706, at 2-3 & 12 (concluding that

10

"foreign sales to foreign consumers," which include ODDs sold by defendants to plaintiffs and their subsidiaries "outside the United States for incorporation into computers that were subsequently sold to foreign consumers," are "too far removed and are not within the scope of either the federal or state antitrust laws," and that purchases in this category "concern precisely the foreign consumers and producers, and wholly foreign transactions, that the FTAIA shields"); *Motorola Mobility*, 775 F.3d at 818-19 ("The panels -- 57 percent of the total -- that never entered the United States neither affected domestic U.S. commerce nor gave rise to a cause of action under the Sherman Act.").

Flextronics' proximate causation position is equally infirm. It says that the conspiracy "inflated the price at which Flex's U.S. management agreed on behalf of the Flex Affiliates to purchase capacitors following negotiations that took place in the U.S. and/or were directed and controlled by U.S. management," and the "'practical upshot' of distorting the purchase terms agreed upon by Flex's U.S. management was that the Flex Affiliates purchased capacitors at the artificially inflated prices set or authorized by Flex U.S. management." Dkt. No. 1722-3 at 6. This in effect simply rewords the DPPs' global pricing theory, which the Court has already declined to adopt as a matter of law. 2016 WL 5724960, at *6.

### C. CAPACITORS SOLD AND SHIPPED BY A DEFENDANT ENTITY IN THE UNITED STATES TO A FOREIGN FLEX ENTITY

This category of transactions -- capacitors sold and shipped by a defendant entity in the United States to a Foreign Flex Entity -- concerns precisely the kind of conduct that the FTAIA sought to free from the constraints of the Sherman Act. *See Empagran*, 542 U.S. at 161 ("FTAIA seeks to make clear to American exporters . . . that the Sherman Act does not prevent them from entering into business arrangements (say, joint-selling arrangements), however anticompetitive, as long as those arrangements adversely affect only foreign markets."). Flextronics has not offered any new evidence or arguments for this category other than the ones discussed above, and so the Court concludes this category, too, must be ruled out as currently presented, except where the capacitors subsequently ended up back in the United States, either as stand-alone products or as components of finished goods.

### D. CAPACITORS SOLD BY A FOREIGN DEFENDANT TO A FOREIGN DISTRIBUTOR WHO THEN RESOLD TO A FOREIGN FLEX ENTITY

Defendants' motion challenges only this single category of indirect purchases -- capacitors sold by a foreign defendant to a foreign distributor, who then resold the capacitors to a Foreign Flex Entity -- arguing that under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), "only the first direct purchaser of an allegedly price-fixed product may bring suit for federal antitrust damages." Dkt. No. 1661 at 17. Flextronics cannot, and does not, disagree. *See* Dkt. No. 1722-3 at 5 n.4 & 16 (stating that it is "uncontroversial" that "neither Flex or the Flex Affiliates may pursue indirect purchaser claims under the Sherman Act," and that Flextronics "does not seek damages based on any injury derived from or passed on from the Flex Affiliates."). The parties did not directly address how the FTAIA might limit Flextronics' non-damages claims for the purchases in this category, but that analysis would likely proceed along the lines already laid out in the rest of this order.

### CONCLUSION

The Court denies defendants' requests to circumscribe the scope of IPPs' New York and Florida state law claims. The Court grants in part and denies in part defendants' Phase II requests to rule out certain categories of transactions that form the bases of Flextronics' claims in this case.

This completes the resolution of the pending legal FTAIA issues. The parties are in the best position to work out in the first instance how these rulings apply more broadly to the detailed transactional categories and data in all of the cases that are now a part of this MDL. To the extent the parties believe further proceedings on an FTAIA issue would be helpful, they may raise the matter with the Court.

**IT IS SO ORDERED.**

Dated: September 20, 2018

JAMES DONATO
United States District Judge