UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE CAPACITORS ANTITRUST LITIGATION (NO. III) | Case No. 17-md-02801-JD<br><br>**ORDER RE DIRECT PURCHASER PLAINTIFFS' CLASS CERTIFICATION MOTION AND DEFENDANTS'** *DAUBERT* **MOTIONS TO EXCLUDE EXPERT OPINIONS**<br><br>Re: Dkt. Nos. 1693, 1679, 1685<br>(Case No. 14-cv-03264-JD) |

The plaintiffs in this multi-district antitrust litigation are putative classes of direct and indirect purchasers, along with a few companies that opted out of the direct purchasers group to pursue claims on their own. The core allegation is that defendants profited from a long-running, global price-fixing conspiracy in the capacitor industry. This order resolves the direct purchaser plaintiffs' class certification motion and defendants' *Daubert* motions to exclude plaintiffs' expert opinions.

**BACKGROUND**

The relevant product is the capacitor, an electronic component used to temporarily store and even out the flow of electrical energy. Capacitors are essential for the functionality of virtually all electrical circuits. Everything that runs on electricity usually has at least one capacitor in it, and complex devices like cell phones typically have hundreds.

Capacitors come in different types and are categorized by the material used in the dielectric, which is the insulating layer between a capacitor's chargeable plates. Capacitor dielectrics are typically made out of aluminum, tantalum, plastic film or ceramic material. Aluminum and tantalum capacitors are further classified as electrolytic capacitors, which are polarized. Electrostatic capacitors are not polarized.

The direct purchaser plaintiffs (DPPs) seeking certification bought standalone capacitors directly from one or more of the defendants. The four named direct purchaser plaintiffs are Chip-Tech, Ltd., Dependable Component Supply Corporation, eIQ Energy, Inc., and Walker Component Group, Inc. All are United States companies. The defendants are for the most part overseas capacitors manufacturers in Japan and other parts of East Asia. The DPPs allege a single conspiracy among the defendant electrolytic capacitor manufacturers and film capacitor manufacturers to fix prices and suppress competition in the markets for aluminum and tantalum electrolytic capacitors, and film capacitors.

The DPPs contend that the defendants, which number in the dozens, effectuated the conspiracy through regular cartel meetings. These meetings ranged from informal group communications by email and telephone to formal gatherings of senior executives in Asia, all for the purpose of illegally colluding on capacitor pricing and production. To illustrate the level of collusion among the conspirators, the DPPs say that the presidents and other high-level executives at the electrolytic manufacturers convened "presidents' meetings" and "joint committee meetings" two or three times a year to coordinate on pricing practices. Dkt. No. 1766-1 ("Mot.") at 7. The DPPs also point to frequent meetings and interactions between less senior personnel. *Id*. at 7-8. Film capacitor meetings are alleged to have been held approximately six times a year. *Id*. The conspiracy meetings regularly included a social component of golf outings, dinner and drinks, which provided additional opportunities for collusion. *Id*. DPPs contend that the conspiratorial effort was successful, and that the defendants artificially raised the prices of capacitors that were billed or shipped to the United States.

As this domestic civil action has unfolded, several parallel government investigations have been underway in overseas jurisdictions. China's National Development and Reform Commission, the Fair Trade Commissions of Japan, South Korea, and Taiwan, the competition commission of Singapore, Brazil's Administrative Council for Economic Defense, and the European Commission's competition authority have all pursued inquiries into price fixing for

capacitors. Dkt. No. 1766-2 ("Saveri Decl."), Ex. 1 ¶ 18.[1] Several of the investigations have resulted in the imposition of fines on various defendants.

In the United States, the Department of Justice brought parallel criminal prosecutions for the price-fixing conspiracy against a number of the defendants in this action and their individual employees. This Court is presiding over the parallel criminal cases. To date, the Court has taken guilty pleas from defendants NEC Tokin Corporation (Case No. 15-cr-426), Hitachi Chemical Co., Ltd. (Case No. 16-cr-180), Elna Co., Ltd. (Case No. 16-cr-365), Holy Stone Holdings Co. Ltd. (Case No. 16-cr-366), Rubycon Corporation (Case No. 16-cr-367), Nichicon Corporation (Case No. 17-cr-368), Matsuo Electric Co. Ltd. (Case No. 17-cr-73), and Nippon Chemi-Con Corporation (Case No. 17-cr-540). The Court sentenced each of these corporations to fines ranging from $600,000 to $60 million, along with a condition to implement detailed compliance programs to prevent future price fixing and other anti-competitive conduct. Two individual employees of defendant companies, Satoshi Okubo (Case No. 17-cr-74) and Tokuo Tatai (Case No. 15-cr-163), also pled guilty and were each sentenced to a term of imprisonment of one year and a day.

## DISCUSSION

### I. LEGAL STANDARDS

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quotations omitted). To proceed under this special exception, the party seeking class certification must satisfy through evidentiary proof, and not just through pleading, that all of the requirements of Federal Rule of Civil Procedure 23 have been met. *Id*. That includes each of the four requirements of Rule 23(a) -- "sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation" -- and at least one of the provisions of Rule 23(b). *Id*. The DPPs seek certification under Rule 23(b)(3), which is

---

[1] The corrected version of the declaration can be found at Dkt. No. 1766-2, and unless otherwise noted, all "Ex." references in this order are to exhibits to that declaration. The exhibits themselves were filed as attachments to Dkt. No. 1693.

3

appropriate when "questions of law or fact common to class members predominate over any questions affecting only individual members," and a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

For both the Rule 23(a) and Rule 23(b) requirements, the Court's analysis must be "rigorous" and may "entail some overlap with the merits of the plaintiff's underlying claim." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 465-66 (2013); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011); *Comcast*, 569 U.S. at 33-34. This is because "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id*. (quotations omitted). But the rigorous analysis must not be confused with a "license to engage in free-ranging merits inquiries at the certification stage"; merits questions should "be considered to the extent -- but only to the extent -- that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 466.

The purpose of Rule 23 is "'to select the metho[d] best suited to adjudication of the controversy fairly and efficiently.'" *Alcantar v. Hobart Service*, 800 F.3d 1047, 1053 (9th Cir. 2015) (quoting *Amgen*, 568 U.S. at 460, alteration in original). Consequently, class certification is not summary judgment by another name. The plaintiffs' burden is to present enough evidence to warrant adjudication of their claims on a class basis, not to win their case.

For the commonality inquiry under Rule 23(a)(2), what matters "is not the raising of common 'questions' . . . but rather the capacity of a classwide proceeding to generate common *answers*." *Wal-Mart*, 564 U.S. at 350 (quotations omitted, emphasis in original). Plaintiffs must show that their claims "depend upon a common contention" that is "of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. For Rule 23(b)(3), plaintiffs must also show that the proposed class is "'sufficiently cohesive to warrant adjudication by representation'" in that common issues predominate over questions affecting only individual class members. *Amgen*, 568 U.S. at 469 (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). Plaintiffs need not prove that each element of their claim

4

is susceptible to classwide proof. *Id.* The "more important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016). Rule 23(b)(3) permits certification when "one or more of the central issues in the action are common to the class and can be said to predominate, . . . even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1045 (2016) (internal quotations omitted). It is well-established that "damage calculations alone cannot defeat certification," *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010), and "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013).

This Court has discussed in other orders the fuzzy line separating the Rule 23(a)(2) commonality inquiry and the Rule 23(b)(3) predominance determination. *See Ochoa v. McDonald's Corp.*, No. 3:14-cv-02098-JD, 2016 WL 3648550, at *5 (N.D. Cal. July 7, 2016). Our Circuit has recognized that the United States Supreme Court's decision in *Wal-Mart* established a "'rigorous' commonality standard" under Rule 23(a)(2). *Leyva*, 716 F.3d at 512. Courts have consequently found it appropriate to assess Rule 23(a)(2) commonality and Rule 23(b)(3) predominance together. *See*, *e.g.*, *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120-21 (9th Cir. 2017). That is the approach the Court takes here, while being mindful of the observation that "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast*, 569 U.S. at 34.

In addition to the DPPs' class certification motion, the Court has before it defendants' motions to exclude certain of DPPs' experts' testimony offered in support of class certification. The motions were made pursuant to Rules 104(a) and 702 of the Federal Rules of Evidence, as well as *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The analysis under *Daubert* is "flexible" and there is no "definitive checklist or test." 509 U.S. at 593-54. The two touchstones for admissibility are reliability and relevancy. *Id.* at 599.

The parties' *Daubert* and Rule 23 arguments often overlapped, and so the Court's *Daubert* analysis is woven into the class certification analysis, with any remaining *Daubert* issues taken up at the end of the order.

## II. DPPS' CLASS CERTIFICATION MOTION

The DPPs seek to certify this class:

> All persons that purchased capacitors directly from any of the Defendant Entities from January 1, 2002 to December 31, 2013 (the "Class Period"), where such persons are:
>
> (a) inside the United States and were billed or invoiced for capacitors by one or more Defendant Entities during the Class Period (*i.e.*, where capacitors were "billed to" persons within the United States); or
>
> (b) outside the United States and were billed or invoiced for capacitors by one or more Defendant Entities during the Class Period, where such capacitors were imported into the United States by one or more Defendant Entities (*i.e.*, where the capacitors were "billed to" persons outside the United States but "shipped to" persons within the United States).

Mot. at i.

DPPs clarify that "capacitors" as used in the proposed definition include aluminum, tantalum and film capacitors. *Id*. n.1. The defendant entities are AVX Corporation; ELNA Co., Ltd.; ELNA America Inc.; Holy Stone Enterprise Co., Ltd.; Milestone Global Technology, Inc. (d/b/a HolyStone International); Vishay Polytech Co., Ltd.; KEMET Corporation; KEMET Electronics Corporation; Matsuo Electric Co., Ltd.; Nichicon Corporation; Nichicon (America) Corporation; Nippon Chemi-Con Corporation; United Chemi-Con, Inc.; Nissei Electric Co., Ltd.; Panasonic Corporation; Panasonic Corporation of North America; SANYO Electric Co., Ltd.; SANYO North America Corporation; Rubycon Corporation; Rubycon America Inc.; Shinyei Kaisha; Shinyei Technology Co., Ltd.; Shinyei Capacitor Co., Ltd.; Shinyei Corporation of America, Inc.; Shizuki Electric Co., Ltd.; Taitsu Corporation; Taitsu America, Inc.; and TOSHIN KOGYO Co., Ltd. *Id*. n.2.[2] The "billed to" or "shipped to" the United States limitation in the class definition is undoubtedly related to the DPPs' stipulation to accept the Court's prior FTAIA

---

[2] The Court eliminated from DPPs' list those defendants that are marked as "settled/dismissed" in the most recent status update provided to the Court. Dkt. No. 2226.

6

ruling and to limit their case only to those categories of transactions the Court ruled were properly in the case. Dkt. Nos. 1302, 1421.

### A. Numerosity (23(a)(1))

Rule 23(a)(1) requires that the proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiffs state that the proposed class contains "almost two thousand members." Mot. at 18. That sizable number, and the facts and circumstances of this case, indicate that joinder of all members would be impracticable. The numerosity requirement is not contested by the defendants and the Court finds it satisfied.

### B. Commonality (23(a)(2)) and Predominance (23(b)(3))

Defendants do not contest commonality. *See* Dkt. No. 1745 ("Opp."). Their main challenge is to predominance, and for that inquiry, the Court is guided by the elements of the underlying cause of action. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). There is just one here, for fixing prices in violation of the Sherman Act, 15 U.S.C. § 1. Dkt. No. 1831 ¶¶ 433-43. To prevail on that claim, DPPs will have to establish an "antitrust violation" (here, the alleged conspiracy), "antitrust impact," and "the fact of damages." *Comcast*, 569 U.S. at 42 (Ginsburg, J., and Breyer, J., dissenting); *see also In re Cathode Ray Tube (CRT) Antitrust Litigation*, 308 F.R.D. 606, 620 (N.D. Cal. 2015) (elements of price-fixing claim are "(1) a conspiracy to fix prices in violation of the antitrust laws ('conspiracy'); (2) an antitrust injury -- *i.e.*, the impact of the defendants' unlawful activity ('impact'); and (3) damages caused by the antitrust violations ('damages').").

#### 1. Conspiracy

Whether defendants entered into a price-fixing conspiracy is of course a fundamental liability issue in this case. DPPs do not need to prove the fact of a conspiracy for certification, but only that the issue is common to the class and "is capable of classwide resolution . . . in one stroke." *Wal-Mart*, 564 U.S. at 350. This can be a relatively straightforward task because, as many courts have noted, the claim of a conspiracy to fix prices inherently lends itself to a finding of commonality and predominance, even when the market involves different products and prices. *In re Urethane Antitrust Litigation*, 768 F.3d 1245, 1254-56 (10th Cir. 2014).

There is no doubt that the question of a conspiracy is a common issue under Rule 23(a), which defendants do not deny. The dispute here is whether the DPPs have shown under Rule 23(b) that the existence of a conspiracy to fix prices is amendable to classwide proof. The record before the Court establishes that they have.

To a considerable degree, the fact of a conspiracy to fix prices has already been established by the criminal pleas. Eight corporations have pled guilty to conspiring, and accepted substantial criminal fines for their collusion. Two individuals have also pled guilty and been sentenced to time in a federal prison for their related conduct. In their plea agreements, defendants admitted they had "participated in a conspiracy . . . the primary purpose of which was to fix prices and rig bids of certain electrolytic capacitors sold in the United States and elsewhere." *See*, *e.g.*, Dkt. No. 9-2 at 3 (¶ 4(a)) in Case No. 16-cr-366 (Holy Stone); *see also* Mot. at 5 & n.8 (listing additional plea agreements). In addition, defendant Panasonic has applied for, and received on a conditional basis, leniency from the United States government under the Antitrust Criminal Penalty Enforcement and Reform Act ("ACPERA"). Plaintiffs state, without objection by defendants, that Panasonic must have admitted its "participation in a criminal antitrust violation." *Id*. at 4. It is worth noting that other jurisdictions outside the United States have also imposed fines for the conspiracy.

But the DPPs do not rely on the guilty pleas alone. They also present a substantial quantum of emails, reports, and other evidence harvested in discovery. For example, DPPs cite to a core set of 141 documents as "common documentary evidence and data confirming defendants' illegal conduct" that "reveals defendants' participation in hundreds of illegal cartel meetings and numerous illegal bilateral and multilateral meetings and communications." Mot. at 3-4. The documents show defendants discussing their goals of "restrain[ing] useless competition" and "striv[ing] to sustain prices by cooperating," Ex. 96, and exchanging information "in order to ensure all makers' profit generation and maintenance of [a] healthy market price." Ex. 85. They also show actual exchanges of competitively sensitive information such as pricing on capacitor sales. *See*, *e.g.*, Exs. 10, 12, 15, 30, 35. Many other documents evidence frequent, formal and informal meetings among defendants. *See*, *e.g.*, Exs. 9, 17, 20, 35, 36, 37, 38, 39, 59.

8

This record demonstrates that plaintiffs have enough common evidence to support classwide treatment of their conspiracy claim. Defendants have not identified any matters that would require a degree of individualized proof sufficient to defeat the DPPs' showing. Commonality and predominance are established for the element of a conspiracy.

### 2. Classwide Injury or Impact

The next question is whether plaintiffs can prove impact through classwide proof. Defendants treat this as a major battleground and focus their opposition on *Daubert* challenges to the plaintiffs' experts, Drs. James T. McClave and J. Douglas Zona.[3] Dr. McClave is an econometrician and statistician, and Dr. Zona an applied economist. Dr. McClave is plaintiffs' primary expert on the issue of impact, *see* Mot. at 14-15, and the majority of defendants' challenges are directed to his analysis. Defendants do not differentiate their challenges between classwide impact and damages. *See*, *e.g.*, Opp. at 8 ("DPPs cannot show predominance because their proposed econometric models are incapable of reliable proving class-wide impact or damages"). But the fact of injury is different from the amount of injury, and impact and damages should be analyzed separately, which the Court will do.

The appropriate concerns at this stage are not about the quality of the data Dr. McClave used or whether he included all the potential variables in his model. Challenges along those lines do not go to the admissibility of his opinions, but rather to matters of weight and probative value for a jury to evaluate. *Urethane*, 768 F.3d at 1261, 1263. Many of defendants' attacks miss this salient point by criticizing what Dr. McClave did or didn't take into account in running his analysis. Those observations may be grist for a good cross-examination at trial, but they do not play a material role in deciding whether Dr. McClave's work should be admitted under Rule 702. *See Obrey v. Johnson*, 400 F.3d 691, 695-96 (9th Cir. 2005) (a "regression analysis does not become inadmissible as evidence simply because it does not include every variable that is quantifiable and may be relevant to the question presented . . . [I]t is for the finder of fact to

---

[3] At the certification motion hearing, the Court mused out loud about the possibility of a further evidentiary proceeding. After spending a substantial amount of time reviewing the reports and *Daubert* arguments, the Court finds that the motions can all be resolved on the papers, and that the parties can be spared the time and expense of a further hearing.

9

consider the variables that have been left out of an analysis, and the reasons given for the omissions, and then to determine the weight to accord the study's results") (internal citation omitted).

The proper question is whether Dr. McClave practiced a generally accepted method for determining antitrust impact, or whether his work was "junk science" akin to predicting criminality by feeling the bumps on a person's head. *General Electric Co. v. Joiner*, 522 U.S. 136, 153 n.6 (1997). The materials presented to the Court show that his work is sound and reliable, and consistent with established econometric methods.

To start, Dr. McClave used a multiple regression approach that is a widely used econometric technique for determining whether prices were higher during a class period than they otherwise would have been without anti-competitive conduct. *See*, *e.g.*, *Urethane*, 768 F.3d at 1260-61; *Fond Du Lac Bumper Exchange, Inc. v. Jui Li Enterprise Co., Ltd.*, No. 09-cv-0852, 2016 WL 3579953, at *9 (E.D. Wis. 2016); *In re Graphics Processing Units Antitrust Litigation*, 253 F.R.D. 478, 495-96 (N.D. Cal. 2008) ("*GPU*"). Multiple regression analysis is a type of statistical tool that tests the relationship between dependent and independent variables to determine how the variables might impact each other or are causally related. *Urethane*, 768 F.3d at 1260-61; *GPU*, 253 F.R.D. at 493.

A fair reading of Dr. McClave's report leaves no doubt that he performed a multiple regression analysis in a reliable and professionally accepted manner. His analysis compared the prices charged during the period when the conspiracy allegedly operated (the "class period") with prices charged before or after the class period, when the market was unaffected by the alleged conspiracy ("benchmark" period). He called the difference between these prices the "overcharge." Saveri Decl., Ex. 2 ("McClave Opening") at 4. To perform this analysis, he constructed a transaction database, based on the transaction data produced by defendants and comprising over seven million individual transactions. *Id*. at 3. To test whether, "while accounting for factors that determine prices in a competitive market, prices [were] elevated above their competitive levels as a result of the alleged conspiratorial behavior," *id*. at 5, he included explanatory variables such as those based on the cost of the raw material used for the capacitor's dialectric, and demand. *Id*. at

10

6-7. He included a time variable, "to account for price-related factors not captured explicitly by the other supply and demand variables," as well as an "indicator or 'dummy' variable" for each type of capacitor at issue in DPPs' case. *Id*. at 5-7.

He concluded that his model accounted "for nearly all -- more than 98% -- of the variability in capacitor transaction prices," and found the "estimates of all three conspiracy period indicators" to be "positive and statistically significant," indicating that "aluminum product prices were elevated by 9.8%, tantalum product prices by 7.5%, and film product prices by 7.2%." *Id*. at 8. He takes these results as "empirical evidence" pointing to "an effective conspiracy that caused plaintiffs to pay supracompetitive prices." *Id*. He additionally opined that his model results lead to the "inference that all, or nearly all, class members are impacted." *Id*. He stated that the estimates provided by his multiple regression model could be used to calculate aggregate class overcharges during the class period as follows:

| Capacitor Type | Revenue | Overcharge Percent | Overcharges |
|---|---|---|---|
| Aluminum | $3,062,325,188 | 8.9% | $272,546,942 |
| Film | $382,759,263 | 6.7% | $25,644,871 |
| Tantalum | $3,107,828,081 | 7.0% | $217,547,966 |
| **TOTAL** | **$6,552,912,532** | | **$515,739,778** |

*Id*. at 9.

To be sure, defendants dispute Dr. McClave's conclusions, but they do not identify any methodological flaws sufficiently grave to bar admission of his work. They say, for example, that the data he used was "fatally deficient and unrepresentative," but it appears that Dr. McClave analyzed all reliable data that was produced by defendants and provided to him, *see* McClave Opening at 3 & n.5, including the non-trivial sum of over seven million individual transactions. And while defendants argue that Dr. McClave failed to account for rebates and discounts on a classwide basis, Dr. McClave's report itself states that "[p]rice adjustments were taken into account when sufficient information was provided to relate the adjustment to the original transactions." *Id*. at 3 n.6. In any event, these challenges again go to weight and not admissibility.

11

Defendants press the point that Dr. McClave's model is based on the "assumption that every purchaser of each of the three different types of capacitors at issue paid the same uniform overcharge (7.2% for film capacitors, 9.8% for aluminum capacitors, and 7.5% for tantalum capacitors) for all purchases during the twelve-year class period." Opp. at 4. Defendants say that while Dr. McClave claimed to have done a "customer-by-customer" analysis, this was nothing more than a comparison of each customer's actual prices with the "but-for" predicted prices for each customer, where the "but-for" price was based purely on the 8.9%, 6.7%, and 7.0% respective aggregate overcharge percentages he calculated for aluminum, film and tantalum capacitors over the entire 12-year alleged conspiracy period. They also contend that Dr. McClave's method "did not calculate separate overcharges for class members on an individual basis." Opp. at 4; *see also* Dkt. No. 1745-1 ("Papendick Decl."), Ex. 1 ("McClave depo excerpt") at 137:21-139:12 ("customer-specific" calculation uses uniform overcharge percentage for that product and compares that to actual prices paid; but-for overcharge percentage is never varied by customer).

Even if these criticisms were accepted for the sake of discussion, they do not warrant exclusion of Dr. McClave's work on *Daubert* grounds, or a denial of the DPPs' certification motion. That is because defendants demand too much. In effect, they argue that DPPs must prove that each and every putative class member was harmed before certification can be granted. But Rule 23 does not require proof of impact on each purchaser before a class can be certified. *Kleen Products LLC v. International Paper Co.*, 831 F.3d 919, 927 (7th Cir. 2016). Rule 702 and *Daubert* do not require what Rule 23 does not. In addition, the prevailing view, which the Court agrees with, is that "price-fixing affects all market participants, creating an inference of class-wide impact even when prices are individually negotiated." *Urethane*, 768 F.3d at 1254. Setting the certification bar at the extreme height defendants propose would almost certainly kill off most antitrust class actions well before an adjudication of the merits of the case.

What really matters "is whether the class can point to common proof that will establish antitrust injury (in the form of cartel pricing here) on a classwide basis." *Kleen*, 831 F.3d at 927. On this point, if DPPs had relied solely on Dr. McClave's analysis as common proof of classwide

impact, defendants' argument might pack some punch. But DPPs present much more than Dr. McClave's opinions. They offer Dr. Zona's analysis as well. Dr. Zona's report provided considerable material about how the structure of the market for capacitors was conducive to price fixing, including evidence about the concentration of manufacturers, the barriers to entry created by the manufacturing process, low elasticity of demand, and the commodity-like nature of capacitors. *See* Saveri Decl., Ex. 1 (Zona Opening). He also performed his own price dispersion analysis, which he says is consistent with the existence of the alleged conspiracy. *Id*. at 32-37. Dr. Zona opines that "one might expect a broader range of prices in collusive situations," *i.e.*, a bigger spread between the lowest and highest prices paid, and he goes on to show "an increase in price spread during the class period." *Id*. This price dispersion analysis supplements, but does not contradict, Dr. McClave's regression analysis, as defendants argue. Both experts' opinions go to DPPs' theory of liability, which is that defendants engaged in a price-fixing conspiracy that artificially raised the prices of the capacitors purchased by the putative class.

In addition, DPPs have a substantial body of factual evidence in the form of defendants' own documents and criminal guilty pleas. A good argument can be made that these sources are enough in themselves to establish common proof. The Court has already noted the panoply of emails, reports, meeting minutes and other documents produced by defendants showing that defendants themselves acknowledged that "their collusion had a wide impact on prices for capacitors." Mot. at 11-12; *see*, *e.g.*, Ex. 116 (meeting minutes reflecting successful "price restoration" and stating, "we have confirmed at today's meeting that all companies will proceed strongly."); Ex. 99 ("Price returns have started throughout the world. The entire world is also joining forces in correcting products that are not profitable."). And there are the guilty pleas in which defendants admitted their participation in a price-fixing conspiracy that had a substantial and intended effect in the United States. The criminal judgments that followed from these guilty pleas are admissible at trial as "prima facie evidence of the violation of antitrust laws." *City of Burbank v. General Electric Co.*, 329 F.2d 825, 834 (9th Cir. 1964); *see also* 15 U.S.C. § 16(a) ("A final judgment . . . rendered in any . . . criminal proceeding brought by . . . the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie

13

evidence against such defendant in any action or proceeding brought by any other party against such defendant under said laws as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto").

These multiple sources of evidence amply support class treatment of the antitrust injury element. They also distinguish this case from others where class certification was found to be problematic. For example, the plaintiffs in *GPU* and *In re Optical Disk Drive Antitrust Litigation*, 303 F.R.D. 311 (N.D. Cal. 2014) ("*ODD I*"), who failed to establish a way of showing classwide impact, did not have the substantial evidentiary sources present here. This case has "plus factors" beyond the expert reports that were glaringly absent in those cases. *Cf. GPU*, 253 F.R.D. at 482 (defendants received subpoenas from DOJ Antitrust Division but "[u]ltimately, the DOJ dropped its investigation without filing any indictments"); *ODD I*, 303 F.R.D. at 314-15 (even though plaintiffs alleged a price-fixing conspiracy, much of the evidence plaintiffs pointed to related only to instances of "bid rigging," and the court noted that "[a]t least at this juncture . . . , plaintiffs have not proffered evidence or allegations that there were one or more instances in which the defendants' executive decision-makers entered into express agreements to fix prices across the board on an ongoing basis.").[4]

### 3. Damages

Defendants raise a number of issues about proof of damages. These include issues of customization of capacitors and other variations, such as different raw materials or amount of raw materials, different end uses and demands, and differences among class members with regard to bargaining power and pricing.

---

[4] Although defendants focus almost entirely on attacking Dr. McClave's analysis on its own terms, they make passing mention of their expert, Dr. John H. Johnson, IV, for the proposition that "Dr. McClave's own model shows a lack of class-wide impact for numerous putative class members." Opp. at 19-20. As plaintiffs rightly point out, Dr. Johnson's analysis appears to suffer from data sets that are too small. *See* Dkt. No. 1781 ("Reply") at 1 ("Dr. Johnson chops the data into tiny datasets -- running more than one regression per class member -- thereby reaching no statistically significant results for most class members and unreliable results purportedly suggesting no injury to others."). In addition, Dr. Johnson's remarks do not account for the other sources of evidence that the Court has considered in assessing issues of classwide proof.

14

Without a doubt, these issues may require further attention should the case go to trial. Even so, they pose no barrier to certification because, as discussed, these kinds of individualized damage variations do not defeat predominance. Our Circuit recently re-affirmed this view in *Torres*, 835 F.3d at 1135, when it determined that the district court correctly found that predominance was not defeated where "nearly all" of the individualized questions raised by the defendant went to "the issue of damages rather than liability." And to the extent any class members may not have paid any overcharges at all (assuming DPPs prevail on conspiracy and impact), that will bring into play the *Torres* court's statement that "the district court is well situated to winnow out those non-injured members at the damages phase of the litigation, or to refine the class definition." *Id.* at 1137.

It is also worth noting that a variety of tools can be used to address damages. These range from the appointment of a magistrate judge or special master to preside over individual damages proceedings, to altering or amending the class definition in response to developments at trial. *See In re Air Cargo Shipping Servs. Antitrust Litigation*, No. 06-MD-1175 (JG)(VVP), 2014 WL 7882100, at \*63 (E.D.N.Y. Oct. 15, 2014). The Court may also call for a trial plan from DPPs that addresses how the aggregate damages estimated from their expert's report can then be apportioned among the class members. *See*, *e.g.*, *In re Lidoderm Antitrust Litigation*, No. 14-md-02521-WHO, 2017 WL 679367, at \*11 (N.D. Cal. Feb. 21, 2017). Much can be done with the collaboration of counsel and the Court to manage damages issues. It is enough to find here that these issues do not warrant a denial of class certification.

### 4. Inclusion of Film and Electrolytic Capacitors and Claims Against AVX and KEMET

Defendants challenge the "implausible multi-product conspiracy" (*i.e.*, one that includes both electrolytic and film capacitors) and essentially attack the sufficiency of the evidence against AVX and KEMET. Opp. at 29-33. The film-only defendants have also filed an opposition to the same effect. Dkt. No. 1750-3.

But among other things, defendants do not dispute that at a minimum, Hitachi, Nichicon, NCC, Panasonic and Rubycon attended both film and electrolytic capacitors meetings. Opp. at 29

n.30. And while defendants argue that "different personnel from the different divisions of these defendants" attended these respective meetings, *id*., DPPs have identified documents that suggest that for at least one of those companies, the same person attended both types of meetings. Exs. 39, 157, 158, 159.[5] DPPs have also submitted documentary evidence that shows both types of capacitors were sometimes discussed at the same meeting. *See*, *e.g.*, Exs. 126, 161, 162, 163. DPPs have further identified some common evidence they can offer to prove that AVX and KEMET joined the conspiracy through communications and meetings with Asian-based conspiracy members, even though they themselves were not based in Asia. Reply at 23-24 (citing, *e.g.*, Exs. 171, 172, 173).

These are sufficient for present purposes. Whether or not there was a single conspiracy and whether or not AVX and KEMET also joined it are common merits questions that are unsuitable for resolution at this stage. DPPs have sufficiently identified the common proof they can offer on both points. The class certification procedure is decidedly not an alternative form of summary judgment or an occasion to hold a mini-trial on the merits. *Alcantar*, 800 F.3d at 1053.

### C. Typicality and Adequacy (23(a)(3)-(4))

Typicality and adequacy are satisfied as well. Defendants have not challenged the adequacy of class counsel, and the Court independently finds, based on the submissions by plaintiffs' counsel and from observing their performance over several years in this litigation, that they are more than up to the task.

For the individual named plaintiffs, defendants have not identified any alleged misconduct by Chip-Tech that pertains directly to the claims at issue. Although defendants vaguely refer to some possible individual defenses, they do not say what they are. Opp. at 35.

Nor have defendants otherwise meaningfully challenged the typicality or adequacy of any of the four named plaintiffs. None of them is situated so differently from the class they seek to represent that they might be subject to a conflict. The fact that Chip-Tech has exited the capacitor business and Dependable is now a "dissolved entity" are not disqualifying factors. Typicality may

---

[5] Exhibits 151 to 190 were filed with DPPs' class certification reply at Dkt. No. 1781.

be a bar to certification if other members would suffer because the named plaintiffs would be "preoccupied with defenses unique to" them. *Just Film*, 847 F.3d at 1116 (quotation omitted). DPPs have adequately shown that would not be the case for any of the named plaintiffs.

While some of the corporate designees may have made deposition statements that reflected a rather general understanding of the litigation, none were so "startlingly unfamiliar with the case" that they vitiated the possibility of serving as a class representative. *In re Facebook Biometric Information Privacy Litigation*, 326 F.R.D. 535, 543 (N.D. Cal. 2018) (quotations omitted). Moreover, "objections to adequacy based on a named representative's alleged ignorance are disfavored," and "[e]ven if the named plaintiffs have relied heavily on the advice of attorneys and others, it is hardly a badge of inadequacy to seek help from those with relevant expertise, particularly in a complex case like this one." *Id*. (citations omitted).

### D. Superiority of Class Adjudication (23(b)(3))

The last remaining factor for class certification is superiority under Rule 23(b)(3). Defendants do not contest this factor. In analyzing it, the Court is to specifically consider "the likely difficulties in managing a class action." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1126-28 (9th Cir. 2017).

As the preceding discussion indicates, a class action is clearly superior to individual proceedings here, especially on the questions of conspiracy, impact and fact of damages. Any remaining individualized questions on the calculation and distribution of damages can be managed. Consequently, the Court finds this factor satisfied as well, which concludes the class certification analysis in DPPs' favor.

### III. DEFENDANTS' *DAUBERT* MOTIONS TO EXCLUDE PLAINTIFFS' EXPERTS MCCLAVE AND ZONA

The Court has already considered and rejected the main challenges to plaintiffs' experts. In the case of Dr. McClave, defendants' *Daubert* arguments are duplicative of their substantive arguments, and so the Court denies the motion to exclude his opinion for the same reasons. Dkt. No. 1679.

The Court also rejects the remaining *Daubert* arguments against Dr. Zona. Defendants seek to exclude Dr. Zona's opinion "that defendants engaged in the alleged conspiracy." Dkt. No. 1685. The Court acknowledges that that is a topic on which it is not likely to permit expert testimony at trial, but because Dr. Zona's opinion on that point was wholly immaterial to the Court's class certification analysis, defendants' motion to exclude that opinion is denied as moot. For Dr. Zona's price dispersion theory, again defendants' challenges go to weight, rather than admissibility. It is not junk science, and defendants' motion to exclude it is denied. Lastly, Dr. Zona's opinions about the reliability of Dr. McClave's work are also admissible as far as they go.

**CONCLUSION**

The direct purchaser plaintiffs' motion for class certification is granted, and defendants' *Daubert* motions to exclude the DPPs' expert opinions are denied.

The Court certifies a class consisting of all persons that purchased capacitors directly from any of the remaining defendants from January 1, 2002 to December 31, 2013 (the "Class Period"), where such persons are: (a) inside the United States and were billed or invoiced for capacitors by one or more Defendant Entities during the Class Period (*i.e.*, where capacitors were "billed to" persons within the United States); or (b) outside the United States and were billed or invoiced for capacitors by one or more Defendant Entities during the Class Period, where such capacitors were imported into the United States by one or more Defendant Entities (*i.e.*, where the capacitors were "billed to" persons outside the United States but "shipped to" persons within the United States). The Joseph Saveri Law Firm is appointed as counsel for the class.

DPPs are ordered to submit by **December 17, 2018**, a proposed plan for dissemination of notice to the class.

**IT IS SO ORDERED.**

Dated: November 14, 2018

JAMES DONATO
United States District Judge

18