Charles E. Tompkins (*pro hac vice*)
**WILLIAMS MONTGOMERY & JOHN LTD.**
1200 18th Street NW, Suite 325
Washington, D.C. 20036
Telephone: (202) 791-9951
Facsimile: (312) 630-8586
Email: cet@willmont.com

Paul J. Ripp (*pro hac vice*)
**WILLIAMS MONTGOMERY & JOHN LTD.**
233 S. Wacker Drive, Suite 6800
Chicago, IL  60606
Telephone: (312) 443-3200
Facsimile: (312) 630-8500
Email: pjr@willmont.com

Whitney E. Street (State Bar No. 223870)
**BLOCK & LEVITON LLP**
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 968-1852
Facsimile: (617) 507-6020
Email: wstreet@blockesq.com

*Counsel for Plaintiff Flextronics International USA, Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re Capacitors Antitrust Litigation* | **Case No. 17-md-02801-JD** |
| *This document relates to:* | **DIRECT ACTION PLAINTIFFS' OPPOSITION TO DEFENDANT AVX CORPORATION'S MOTION FOR SUMMARY JUDGMENT AGAINST ALL PLAINTIFFS** |
| *The AASI Beneficiaries' Trust, by and Through Kenneth A. Welt, Liquidating Trustee, v. AVX Corp. et al.*, Case No. 3:17-cv-03472-JD | |
| *Benchmark Electronics, Inc. et al. v. AVX Corp. et al.*, Case No. 3:17-cv-7047-JD | Date:  To be set by the Court |
| *Flextronics International USA, Inc.'s Individual Action*, Case No. 3:14-cv-03264-JD | Time:  To be set by the Court Place:  Courtroom 11, 19th Floor Judge:  Hon. James Donato |

**[REDACTED PUBLIC VERSION OF DOCUMENT SOUGHT TO BE SEALED]**

# **TABLE OF CONTENTS**

**PAGE**

I.    PRELIMINARY STATEMENT .............................................................. 1

II.   STATEMENT OF FACTS .................................................................... 3

    **A.**    AVX'S ORGANIZATIONAL STRUCTURE ....................................... 3

    **B.**    AVX PRICE COORDINATION WITH CONSPIRATORS ................................ 4

        **1.**    PRICE COORDINATION: 2003-2004 ..................................... 4

        **2.**    PRICE COORDINATION: 2005-2008 ..................................... 8

        **3.**    PRICE COORDINATION: 2009-2014 ................................... 10

        **4.**    AVX'S ███████████████ ..................................... 12

III.  ARGUMENT ................................................................................ 12

    **A.**    AVX MISAPPREHENDS THE STANDARD FOR SUMMARY
        JUDGMENT ...................................................................... 12

    **B.**    DISPUTES OF FACT PREVENT SUMMARY JUDGMENT ......................... 13

    **C.**    THE SUBSTANCE AND TIMING OF AVX'S COMPETITOR
        COMMUNICATIONS SUPPORT THE INFERENCE THAT AVX
        CONSPIRED TO INFLATE CAPACITOR PRICES ......................... 15

    **D.**    A JURY MAY REASONABLY INFER AVX CONSPIRED BECAUSE
        AVX SHARED ███████████████ WITH COMPETITORS ....... 17

    **E.**    A JURY MAY REASONABLY INFER AVX CONSPIRED BECAUSE
        AVX EXECUTIVES WITH PRICING AUTHORITY EXCHANGED
        CONFIDENTIAL INFORMATION WITH COMPETITORS ......................... 18

    **F.**    AVX'S EFFORTS TO CONCEAL COMMUNICATIONS WITH
        COMPETITORS SUPPORT THE INFERENCE OF CONSPIRACY ............... 18

    **G.**    AVX SALES DATA SUPPORTS AN INFERENCE OF CONSPIRACY ......... 19

    **H.**    AVX'S ARGUMENTS FOR SUMMARY JUDGMENT ARE
        UNPERSUASIVE .............................................................. 21

**1.** IT IS IMMATERIAL THAT AVX DID NOT ATTEND FORMAL CARTEL MEETINGS. ............................................. 21

**2.** DR. SNAIL'S PRICE ANALYSIS IS IRRELEVANT AND UNRELIABLE ............................................................... 22

**3.** THE CARTEL MEMBERS' DISCOVERY RESPONSES DO NOT SUPPORT SUMMARY JUDGMENT .......................... 23

CONCLUSION .......................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).................................................................................12, 13

*In re Baby Food Antitrust Litig*,
    166 F.3d 112 (3d Cir. 1999)......................................................................14, 18

*Barnes v. Arden Mayfair, Inc.*,
    759 F.2d 676 (9th Cir. 1985) ....................................................................13, 23

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*,
    620 F.2d 1360, 1364 (9th Cir. 1980) ........................................................13, 25

*In re Blood Reagents Antitrust Litig.*,
    266 F. Supp. 3d 750 (E.D. Penn. 2017) .........................................................18

*In re Cathode Ray Tube Antitrust Litig.*,
    No. 13-cv-00157, 2017 WL 11237000 (N.D. Cal. Mar. 9, 2017) ...........1, 2, 13, 21

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    No. 11-cv-05514-SC, 2017 WL 4863907 (N.D. Cal. Feb. 7, 2017) ("*CRT I*")..................1, 23

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    No. C-07-5944 JST, 2017 WL 5957654 (N.D. Cal. Feb. 27, 2017)....................14, 17

*In re Citric Acid Litig.*,
    191 F.3d 1090 (9th Cir. 1999)..............................................................14, 18, 23

*In re Citric Acid Litig.*,
    996 F. Supp. 951 (N.D. Cal. 1998) ...........................................................17, 18

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690, 698-99 (1962) ...................................................................13, 22

*In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.*,
    906 F.2d 432 (9th Cir. 1990) .........................................................................18

*In re Ethylene Propylene Diene Monomer Antitrust Litig.*,
    681 F. Supp. 2d 141 (D. Conn. 2009) ...........................................................19

*In re Flat Glass Antitrust Litig.*,
    385 F.3d 350 (3d Cir. 2004)..........................................................................18

*Higgins v. Farr Fin. Inc.*,
    No. C 07-02200 JSW, 2011 WL 13257721 (N.D. Cal. July 20, 2011) ..................................23

*In re Korean Ramen Antitrust Litig.*,
    281 F. Supp. 3d 892 (N.D. Cal. 2017) ..............................................................................17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ...........................................................................................................13

*Rossi v. Standard Roofing, Inc.*,
    156 F.3d 452 (3d Cir. 1998) ...............................................................................................13

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
    No. 07-MD-01819 CW, 2010 WL 5138859 (N.D. Cal. Dec. 10, 2010)
    (Wilkens, J.) ................................................................................................................. *passim*

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. 12-cv-4114 SI, 2013 WL 3387652 (N.D. Cal. July 8, 2013)...........................................21

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. C 09-5840 SI, 2012 WL 4808425 (N.D. Cal. Oct. 9, 2012) ........................................1, 18

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. C 10-0117 SI, 2012 WL 6521463 (N.D. Cal. Dec. 13, 2012) .........................................22

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. M 07-1827 SI, 2011 WL 7713911 (N.D. Cal. Nov. 7, 2011) ("*LCD I*")..........1, 14, 16, 21

*United States v. Container Corp. of Am.*,
    393 U.S. 333, 337 (1969) ....................................................................................................16

*In re Urethane Antitrust Litig.*,
    913 F. Supp. 2d 1145 (D. Kan. 2012) .................................................................................19

**Other Authorities**

Fed. R. Civ. P. 56 ...................................................................................................................12

## I.  **PRELIMINARY STATEMENT**

Defendant AVX Corporation's ("AVX's") Motion for Summary Judgment ("Motion") disputes the import of select portions of the record and asks the Court to decide that AVX's communications with its competitors evidence stupidity rather than conspiracy.  This approach wrongly supposes that the evidence could not support both.  Moreover, choosing between different witnesses' accounts of meetings with competitors, interpreting documents suggesting agreements with competitors, and evaluating the credibility of AVX witnesses' dubious explanations of their conduct is the jury's job, not the Court's.

AVX misreads the authority to argue that summary judgment is appropriate because AVX did not attend group cartel meetings.[1]  AVX's failure to attend group meetings does not afford a "free pass" on summary judgment.  *In re Cathode Ray Tube Antitrust Litig.*, No. 13-cv-00157, 2017 WL 11237000, at *7 (N.D. Cal. Mar. 9, 2017) ("*CRT II*").  The record demonstrates that



*See infra* Part II.B.1-4.  For example:



---

[1] *See* Motion at 17:19-18:12 (citing *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2011 WL 7713911 (N.D. Cal. Nov. 7, 2011) ("*LCD I*"), *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 09-5840 SI, 2012 WL 4808425 (N.D. Cal. Oct. 9, 2012) ("*LCD II*")); *id.* at 7 n. 25, 17:11-18, 20:4-7 (citing *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 11-cv-05514-SC, 2017 WL 4863907 (N.D. Cal. Feb. 7, 2017) ("*CRT I*")).

[2] Plaintiffs refer the Court to their Opposition to the Electrolytic Defendants' Motion for Summary Judgment for a discussion of the extensive evidence demonstrating KEMET's participation in the capacitors price-fixing conspiracy.

These are just three of dozens of examples of communications between

. *See infra id.*  These communications are more than sufficient for a reasonable jury to find that AVX knowingly participated in a cartel to inflate capacitor prices.

AVX suggests that the Court ignore the evidence AVX participated in the conspiracy and instead trust certain co-conspirators' discovery responses.  The jury should decide whether to credit documentary evidence of price-fixing or the lawyer-drafted discovery responses of admitted conspirators, particularly where, as here, the co-conspirators on which AVX relies have disavowed their own participation in the conspiracy despite pleading guilty.

Nor are the discovery responses persuasive.

And there is no way to assess the completeness or reliability of the information          did provide because

AVX also relies heavily on a "                              " conducted by its expert, Dr. Timothy S. Snail, which purports to show that          But Dr. Snail admitted that          Dr. Snail merely attempted to

That is irrelevant to whether a reasonable jury could find that AVX participated



1   in a conspiracy that inflated market prices.  Dr. Snail himself testified ███████████████

2   █████████████████████████████████████

3           Dr. Snail also opined that ████████████████████████████

4   ████████████████████ which is exactly what the data shows.  In her report,

5   DAPs' expert, Dr. Leslie M. Marx, ██████████████████████████

6   ██████████████████████████████████████

7   ████████████████████[3]  Both Dr. Marx and Dr. Snail also

8   ██████████████████████████████████████

9   Dr. Marx ███████████████████████████████

10  ██████████████████████ Dr. Snail then ████████

11  ██████████████████████████████████████

12  ██████████████████████████████████████

13  ████████████  These results strongly suggest that AVX participated in the conspiracy.

## II.  STATEMENT OF FACTS

### A.  AVX'S ORGANIZATIONAL STRUCTURE

AVX is a global passive and electrical mechanical components manufacturer headquartered in South Carolina.  Declaration of Charles Tompkins in Support of Direct Action Plaintiffs' Opposition to AVX's Motion for Summary Judgment ("Tompkins Decl."), Ex.[4] 1 (████ ████████.  The AVX employees relevant to this action were members of interwoven teams within AVX's global capacitor divisions. ████████████████████████ ██████████████████████. Ex. 2 ████████████████████████████████████████

---

[3] AVX suggests the Court should ignore Dr. Marx's analysis because average prices are irrelevant. *See* Motion at 2:26-27 ("Mother Theresa [sic] was a billionaire if you average her income with that of the world's billionaires.").  But the relevant issue is not *average* pricing but rather the similarity in *price movements* and estimated overcharges among AVX and other cartel members.

[4] "Ex. __" shall refer to the exhibits attached to the Tompkins Decl., dated July 24, 2019, unless otherwise defined.



Ex. 3

Ex. 4 ; Ex. 5 Ex. 6

; Ex. 7 .

Ex. 2

Ex. 1

Ex. 8 .

Ex. 1 ; Ex. 9 .

Ex. 1

*Id.* .

*Id.*

*Id.*;

Ex. 8 ; Ex. 10

Ex. 8 .

Ex. 9 ; Ex. 1 ; Ex. 8

. Ex. 1

.

**B. AVX PRICE COORDINATION WITH CONSPIRATORS**

**1. Price Coordination: 2003-2004**

In 2003, AVX sought to increase prices of its capacitors.  AVX could not increase prices

unilaterally.

1

2 ██████████ Ex. 1 █████████.

3

4 ████████████████ Ex. 11 ████

5 ██████████ *See* Ex. 3

6 ████.

7 ████████ *See* Ex. 12 █████████. ████

8

9 *Id.* (emphasis

10 added). ████████████████ *Id.*

11     AVX and KEMET also had a long history of price cooperation.  For example, ██

12 ████████████████████████ [5] *See*

13 Ex. 13 ████████████.

14

15

16 *See id.*; Ex. 14 ██████████.

17

18 which AVX discusses at length,

19 also reflects ████████ *See* Ex. 15 ██

20 ██; Motion at 13:7-14:16. ███████

21 ██████ Ex. 16 ██████. AVX suggests that

22 ████ Motion at 14:2-3; Ex. 16 ██████.

23

24 *See* Ex. 17

25

26 [5] ████████████████████

27 ██████████. *See infra* Part II.B.4.

28



1 ██████████ .  ████████████████████████

2 ██████ Ex. 2 ███████████ .

3 ████████████████████████████████

4 ████████████████████████████████

5 ████ See Ex. 18 ██████████████ ██

6 ████████████████ See id. ███████████ . ██

7 ████████████████████████████████

8 ████ See Ex. 19 ██████████████

9 ████████████████████████████

10 ████████ See id.; Ex. 3 ███████████ . F

11 ████████████████████████████████

12 See Ex. 19 ███████████ . █████████

13 ████████████ See id. ███████████████

14 ████████████████████ See Ex. 2 (

15 ████ ; Ex. 7 ███████ .

16 ████████████████████████████████

17 ████ See Ex. 20 ██████████████ ██

18 ██████████████████████████████ See

19 Ex. 21 ███████████ .

20 ████████████████████████████████

21 ████████████████████████████████

22 ████████████████████████████████

23 ████████ Ex. 18 ███████████ ; Ex. 11 ██

24 ██████ A grand jury indicted Date for price-fixing, and ████

25 ████████████████ See Ex. 23 (Dep. Ex. 1286, Date

26 ████████████████████████ See Ex. 16

27 ████ ; Ex. 22 ██████ .



Indictment); Ex. 24

*See*

Ex. 25 .

*See* Ex. 26

.

*See* Ex. 11

*See* Ex. 27 .

*See* Ex. 28 ; Ex. 29

.

Ex. 29

.

*Id.* .

*See* Ex. 30 .

*See id.* (emphasis in original).

*See* Ex. 31

.

*See id.* ███████████████████████ (all caps in original). ███████████

███████████████████████████████████████████████████████ *See* Ex.

3 ███████████████.

███████████████████████████████████████ *See* Ex. 32 ████████

███████████████████████; Ex. 33 █████████████████████ ███████

███████████████████████████████████████████████████████ *See*

Ex. 34 ████████████████████.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████ *See* Ex. 35 ██████████

███████████ ████████████████████████

██████████████████████████████████████████████████████

██████████████████████████

*See id.* (all caps in original). █████████████████████████████

████████████████████ *See* Ex. 36 ████████████████████; Ex. 3

█████████████████.

## 2.  Price Coordination: 2005-2008

██████████████████████████████████████████████████████████

███████████████████████████████████████ *See* Ex. 37 ████████

███████████████████████ ████████████████████████ *See id.*

████████████████████ *See* Ex. 38 ████████████████████████ █

██████████████████████████████████████████████████████████

███████████████████████████ *See id.* █████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████ *See* Ex. 11 █████████

███████████; *see also* Ex. 39 ██████████████ ████████████████████





1

2 *See* Ex. 40 ;

3 Ex. 11

4 .

5 *See* Ex. 41

6 .

7 *See* Ex. 11

8

9 Ex. 42

10 ; *see also* Ex. 43

11 .

12

13 *See* Ex. 44 .

14 *See* Ex. 45 (

15

16 *See id.* *See id.*

17 *See* Ex. 3 .

18 Perhaps, but a reasonable jury could infer that      was kidding on the square.

19

20 *See* Ex. 46 ( .

21

22 *See id.*; Ex. 3 .

23 *See* Ex. 47

24 . It is reasonable to infer the information came from

25

26

27

28



1    *See* Ex. 48 ███████████; Ex. 9 ██████████.

2 ████████████████ *See* Ex. 48

3 ████ Ex. 9 ██████████.

4 ████. *See* Ex. 48 █████████.

5

6 ████. *See* Ex. 49 ████████; Ex. 50

7 ████████████.

8

9 ████████████ Ex. 49

10 ████████.

11 **3.  Price Coordination: 2009-2014**

12      Following the market crash of 2008, AVX and its competitors redoubled efforts to maintain

13 or increase prices. ████████████████



14 ████████ *See* Ex. 3 █████.

15 ██████████████

16 ████████ *See id.*

17 For example, ████

18 ████████ *See* Ex. 51

19 ████.

20 ████████ *Id.*

21 ██████████████

22 ████████ *Id.*

23 ████ *Id.*

24 ████ *See* Ex. 52

25 ██████████████

26 ████ *See id.*

27

28



Case No. 17-md-02801-JD
DAPS' OPPOSITION TO AVX CORPORATION'S MOTION FOR SUMMARY JUDGMENT

**4.   AVX's** ███████████████████

███████████████████████████████████████

████████████████████████ Ex. 59 ████████████████████

███████. AVX asserts it first became aware of ████████████ during

discovery.  Motion at 11:14-18. ████████████████████████. *See*

Ex. 59 ████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████.

█████████████████████████████████████ *See*

Ex. 9 ████████████████████

██████████ *See id.* ████████████████.

AVX also claims ████████████████ Motion at 11:15-17.

█████████████████████████████████████████████

███ *See* Ex. 59 ████████████████████████████████

███████████████.

## III.   ARGUMENT

### A.  AVX MISAPPREHENDS THE STANDARD FOR SUMMARY JUDGMENT

The summary judgment standard is familiar: this Court should deny summary judgment

unless the evidence demonstrates "no genuine and disputed issues of material fact remain" and

AVX is "clearly entitled to prevail as a matter of law."  *In re Static Random Access Memory*

*(SRAM) Antitrust Litig.*, No. 07-MD-01819 CW, 2010 WL 5138859, at *5 (N.D. Cal. Dec. 10,

2010) (Wilkens, J.) ("*SRAM*") (citing Fed. R. Civ. P. 56).  The Court must view the evidence in

the light most favorable to the nonmoving party and draw all reasonable inferences in that party's

favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "[T]he weighing of the

evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a

judge [when] ruling on a motion for summary judgment." *Id.* Where substantial factual evidence supports a reasonable inference of conspiracy, summary judgment is inappropriate. *Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 681 (9th Cir. 1985).

"In antitrust cases, these general standards are applied even more stringently and summary judgments granted more sparingly." *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1364 (9th Cir. 1980). "'[P]laintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each…. The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'" *CRT II*, 2017 WL 11237000, at *2 (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962)). Summary judgment also is generally inappropriate where expert testimony supports the non-movant's case. *SRAM*, 2010 WL 5138859, at *6.

AVX overstates the requirement that antitrust plaintiffs present evidence "that tends to exclude the possibility that the alleged conspirators acted independently." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (quotations omitted). As the Court explained: "[r]espondents . . . must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents." *Id.* "Defendants are [not] entitled to summary judgment merely by showing that there is a plausible explanation for their conduct…[.]" *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 467 (3d Cir. 1998) (internal brackets, quotation marks, and citations omitted). "[W]here the nonmoving party has put forth evidence that provides an inference of concerted action, the moving party bears the burden of proving that drawing the inference of unlawful behavior is unreasonable." *Id.* (internal quotation marks and citations omitted).

## B. DISPUTES OF FACT PREVENT SUMMARY JUDGMENT

The Court should decline AVX's invitation to wade into conflicting interpretations of the evidence. For example, it is not for the Court to decide whether ████████████████

1    ████████████████████████████████████████████████████████████.[7]  *See* Motion

2    at 11:12-12:4.  "[S]uch disputes regarding the interpretation of evidence are not appropriate for

3    resolution on summary judgment."  *See LCD I*, 2011 WL 7713911, at *1.  Nor should the Court

4    evaluate the credibility of ████████████████████████████████████████████████████████

5    ██████████████  *See* Motion at 14:2-4.

6           Where "there is conflicting evidence about the purpose" of meetings between competitors,

7    "[a] jury, not the Court, should determine whose characterization of those meetings is most

8    credible."  *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944 JST, 2017 WL 5957654,

9    at *4 (N.D. Cal. Feb. 27, 2017) ("*CRT III*").[8]  Here, a reasonable jury could infer that AVX

10   participated in the conspiracy because: (1) the timing and topics of AVX's meetings with other

11   cartel members suggest price coordination; (2) AVX shared ██████████████ with other

12   conspirators which were discussed at formal group cartel meetings; (3) high-level executives with

13   pricing authority exchanged confidential market information which was discussed at formal group

14   cartel meetings; (4) AVX concealed its communications with competitors; and (5) the results of

15   both DAPs' and AVX's price analyses are consistent with collusion.

16

17

18

19   [7] ██████████████████ presents a classic jury question: do you believe that ████████████

20   ████████████████████████████████████████, or do you believe

     that ████████████████████████████████████████?  The answer will inform how

21   the jury views the credibility of other AVX claims.  *See supra* Part II.B.4.

22   [8] AVX cites *In re Baby Food Antitrust Litig*, 166 F.3d 112 (3d Cir. 1999) and *In re Citric Acid
     Litig.*, 191 F.3d 1090 (9th Cir. 1999) ("*Citric Acid II*"), for the proposition that the Court need not

23   determine the subject matter of the competitor meetings.  *See* Motion at 21:8-15.  Both cases are
     inapposite because the individuals who met with competitors in those cases did not have pricing

24   authority.  *See Baby Food*, 166 F.3d at 125; *Citric Acid II*, 191 F.3d at 1105; *see also SRAM,* 2010
     WL 5138859, at *7 (distinguishing *Baby Food*).  There was therefore no need for either court to

25   resolve competing accounts of discussions at the meetings.  *See Baby Food*, 166 F.3d at 125; *Citric
     Acid II*, 191 F.3d at 1105.  Here, the topics of discussion at the meetings are relevant because AVX

26   executives with pricing authority met other cartel member executives with pricing authority.  *See,*

27   *e.g., supra* Part II.B.2.

28

### C. THE SUBSTANCE AND TIMING OF AVX'S COMPETITOR COMMUNICATIONS SUPPORT THE INFERENCE THAT AVX CONSPIRED TO INFLATE CAPACITOR PRICES

A jury can infer that AVX participated in the conspiracy because AVX executives discussed the same topics in bilateral meetings as the other conspirators discussed at group meetings, and the circumstances of the bilateral meetings suggest coordination with other cartel members. *See SRAM*, 2010 WL 5138859, at *8 (a jury may infer conspiracy where bilateral communications address the same topics as larger cartel meetings). For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Ex. 11 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The formal cartel meetings addressed the same topics.[9]

AVX and its competitors also often discussed the same customers as other cartel members. For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 43 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Ex. 1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 43 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Ex. 3 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.



[9] *See, e.g.*, Composite Ex. 60 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

[10] Ex. 1 (▮▮▮▮▮▮▮▮▮▮.

1   ████████████████████████████████████████████████████████████████

2   ████████████████     *Id.*    ████████████████.

3       The timing of AVX's communications also suggest coordination with other cartel

4   members.  *See LCD I*, 2011 WL 7713911, at *1-2 (summary judgment inappropriate where

5   circumstantial evidence suggested Defendant Toshiba was in contact with the larger cartel).  For

6   example, ████████████████████████████████████████████████████████████

7   ███████████████████████████████████████████████████████████ Ex. 45

8   ██████████████████████████; Ex. 47 ██████████████████████████. ██

9   ████████████████████████████████████████████████████████████████

10  ██████████████████████████████████████████ Ex. 54 ██████████████

11  ██████████████████.

12      Similarly, ████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████████

15  ██████ Ex.  42 ████████████████████████████████; Ex.  43 ██████████

16  ████████████████.    Indeed,  the  record  suggests ██████████████████

17  ████████████████████████████████████████████████████████████████

18  Attached as Composite Exhibit 60 to the Tompkins Decl. are ██████████████████

19  ████████████████████████████████████████████████████████████████

20  ██████   *See* Composite Ex. 60.  A reasonable jury could conclude that AVX intentionally used

21  bilateral communications to coordinate pricing with the cartel as a whole.[11]

22

23  _____

    [11] AVX suggests that a jury could not infer AVX participated in the conspiracy because ██████████████

24  ████████████████████████████████████ *See* Motion at

    4:8-11.  The  single  document  AVX  identifies  is  far  from  clear,  and  a  reasonable  jury  could

25  conclude that ████████████████████████████████████████████████████████

26  ████████████████████████████ *See SRAM*, 2010 WL 5138859, at *9 (quoting *United*

    *States  v.  Container  Corp.  of  Am.*, 393 U.S. 333, 337 (1969) ("'the  continuation  of  some

27  competition is not fatal' to a Section 1 Sherman Act case.")).  The testimony AVX cites is

28

### D. A JURY MAY REASONABLY INFER AVX CONSPIRED BECAUSE AVX SHARED ███████████████████ WITH COMPETITORS

Conveying pricing intentions to competitors supports the inference of price fixing.  *In re Citric Acid Litig.*, 996 F. Supp. 951, 959-60 (N.D. Cal. 1998) ("*Citric Acid I*") ("such advance notice [of conspirators' price increases] would tend to support an inference of conspiracy"); *CRT III*, 2017 WL 5957654, at *3 (sharing future production information with cartel members is more consistent with anticompetitive conduct than legitimate business activity); *In re Korean Ramen Antitrust Litig.*, 281 F. Supp. 3d 892, 919 (N.D. Cal. 2017) (inference of conspiratorial behavior reasonably drawn from exchanges of advance notice of price increases).



AVX executives with pricing authority routinely conveyed ████████ to competitors. For example, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *See* Ex. 18 ████████████████████████; Ex. 26 ████████████████; Ex. 11 ████████████████████; Ex. 46 ████████████████; Ex. 47 ████████████████; Ex. 51 ████████; Ex. 52 ████████████████; Ex. 53 ████████ Ex. 54 ████████; Ex. 55 ████████; Ex. 56 ████████████. ████████████████████████████. *See, e.g.*, Ex. 27 ████████████████; Ex. 47 ████████████████. AVX also shared ████████ information.  *See supra* Parts II.B.3.[12]

_____

inadmissible because ████████████████████████████████ *See* Ex. 61 ████████████████.

[12] AVX suggests the ████████ is irrelevant because it happened in Europe.  *See* Motion at 11:12-14:16.  However, because ████████████, unlawful agreements in any region served to reinforce inflated pricing in other regions. Ex. 9 ████████, Ex. 1 ████████. The EU conduct is also relevant because ████████████████████████████████████████████████. *See* Ex. 19 ████████████; Ex. 62 ████████████████; Ex. 50 ████████████.

### E.  A JURY MAY REASONABLY INFER AVX CONSPIRED BECAUSE AVX EXECUTIVES WITH PRICING AUTHORITY EXCHANGED CONFIDENTIAL INFORMATION WITH COMPETITORS

The exchange of pricing and production information between high-level executives permits an inference of conspiracy.  *See In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 368-69 (3d Cir. 2004); *Baby Food*, 166 F.3d at 126 n.8; *SRAM*, 2010 WL 5138859, at *7; *see also In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.*, 906 F.2d 432, 450, 465 (9th Cir. 1990) (reversing summary judgment where testimony indicated that high-level officials engaged in secret conversations regarding product pricing).  Here, senior AVX executives with pricing authority exchanged confidential information with their competitors.  *See supra* Part II.B.

AVX suggests that its information exchanges merely involved "the exchange of market information, gathering competitive intelligence," or gossip, and that "the mere exchange of information between competitors does not create an inference of an agreement to fix prices." Motion at 12:18-19, 20:9-11.  AVX misses the point: a jury must decide whether the record as a whole reflects "the mere exchange of information" or participation in a cartel.  *Id.*; *LCD II*, 2012 WL 4808425, at *2.  And unlike in *Baby Food* or the *Citric Acid* cases, the information exchanges here involved high-level executives with pricing authority and individually indicted members of the conspiracy.  *See, e.g., supra* Part II.B.2 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  *Compare Baby Food*, 166 F.3d at 125; *Citric Acid II*, 191 F.3d at 1105 (summary judgment appropriate because the individuals involved in the meetings did not have pricing authority).[13]

### F.  AVX'S EFFORTS TO CONCEAL COMMUNICATIONS WITH COMPETITORS SUPPORT THE INFERENCE OF CONSPIRACY

Efforts to conceal communications with competitors support an inference of unlawful conduct.  *See, e.g.*, *In re Blood Reagents Antitrust Litig.*, 266 F. Supp. 3d 750, 777 (E.D. Penn.

---

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *See* Ex. 59 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ .

[13] AVX focuses on a single communication between ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ was merely engaged in normal-course intelligence gathering, and cites *Citric Acid I* for the proposition that such intelligence gathering is "proper competitive behavior."  Motion at 21:3-4, *citing Citric Acid I*, 996 F. Supp. at 960.  But *Citric Acid I* discusses the propriety of gathering competitive intelligence from *customers*, not competitors.  *See Citric Acid I*, 966 F. Supp at 960.

2017) (efforts to conceal a lunch meeting during which pricing information was shared "raise[] an inference of conspiracy"); *In re Urethane Antitrust Litig.*, 913 F. Supp. 2d 1145, 1155-56 (D. Kan. 2012) (evidence that alleged antitrust conspirators "undertook to maintain the secrecy of their communications" was circumstantial evidence that a conspiracy existed); *In re Ethylene Propylene Diene Monomer Antitrust Litig.*, 681 F. Supp. 2d 141, 176 (D. Conn. 2009) (evidence of attempts to conceal communications with competitors sufficient to support inference of conspiracy).

*See* Ex. 30

.[14]   AVX employees also used code words to obscure communications with competitors.  For example,

*See* Ex. 28 .

Ex. 9 .

*See* Ex. 11 ( .  A jury might chalk up using first letters to expediency—

*See* Ex. 63

*See* Ex. 52

.  These efforts at concealment strongly suggest unlawful activity.

### G.  AVX SALES DATA SUPPORTS AN INFERENCE OF CONSPIRACY

The similarity of AVX's and the other Defendants' price movements also suggest that AVX participated in the conspiracy.  Dr. Snail opined that

Ex. 64 DAPs'

---

[14] Ex. 31

1  expert Dr. Marx ███████████████████████████████

2  ████████████████████████████████████████ Ex. 63

3  ███████████ . To show this, Dr. Marx ████████████

4  ██████████████████████████████████████████

5  ████████████████████████████████ *Id.* ████████

6  ███████████████████████ *Id.*



16  Dr. Marx also ███████████████████████████

17  ████████████████ *Id.*  Dr. Marx calculated ██████

18  ████████████████████████████████████████ *Id.*

19  Dr. Snail did not ████████████████████████████

20  ████████████ Dr. Snail did attempt ████████████████

21  ████████████████████████████████████████

22  ████████ Ex. 64 █████████████████ . Dr. Snail's effort essentially

23  confirmed Dr. Marx's analysis.  Dr. Snail ████████████████

24  ██████████████████████ *See id.*

25  Dr. Marx's ███████████████ and Dr. Snail's ██████████ are

26  important because AVX claims that it did not participate in the capacitors price-fixing conspiracy,

and that AVX's unique products cannot be compared with capacitors sold by the other Defendants. *See* Motion at 6:4-7:13.  If so, why did ████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████ ████████          *See* Ex. 63 ████████████████.  At minimum, Dr. Marx's and Dr. Snail's price analyses raise issues that a jury should decide.

## H.   AVX'S ARGUMENTS FOR SUMMARY JUDGMENT ARE UNPERSUASIVE

AVX suggests that a jury could not reasonably infer conspiracy because AVX did not attend formal cartel meetings and certain admitted conspirators did not identify AVX as a co-conspirator.  Motion at 3:17-5:12.  AVX also contends that its expert's price analysis supports summary judgment.  *Id.* at 14:19-15:13.[15]  None of these arguments are persuasive.

### 1.   It is Immaterial that AVX did not Attend Formal Cartel Meetings.

The courts in *CRT II, LCD I,* and *SRAM* all held that a defendant's failure to attend formal cartel meetings does not mandate summary judgment.  In *CRT II,* Mitsubishi argued that it was entitled to summary judgment because it did attend cartel meetings.  Judge Tigar disagreed:

> Mitsubishi argues that Plaintiffs "advance no reason to believe that any of the bilateral meetings had any connection to the Glass Meetings." [Citation omitted].  That cannot be right.  The presence of various Glass Meetings attendees at the bilateral meetings and the exchange during those meetings of CRT pricing and production information sufficiently connects them to the group meetings at the summary judgment stage.

2017 WL 11237000, at *7.  Judge Illston reached the same conclusion in *LCD I.  LCD I,* 2011 WL 7713911, at *1 (there was "ample evidence for a jury to find that Toshiba participated in the overarching conspiracy to fix prices of TFT-LCD panels," even though there was "no 'smoking gun' [evidence] linking Toshiba to the crystal meetings….").  *Accord In re TFT-LCD (Flat Panel)*

---

[15] AVX also argues that summary judgment is appropriate because AVX manufactured specialty capacitors for space projects.  Motion at 2:5-10, 7:9-12.  Perhaps it did, but ██████████████████ █████████████████████████████████████████████████████████████.  *See* Ex. 1 ████████████████████████; Ex. 65 ████████████████████████.

*Antitrust Litig.*, No. 12-cv-4114 SI, 2013 WL 3387652, at *1-2 (N.D. Cal. July 8, 2013) ("*LCD III*"); *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 10-0117 SI, 2012 WL 6521463, at *1-2 (N.D. Cal. Dec. 13, 2012) ("*LCD IV*") (virtually identical order as to defendant Mitsui).

   *SRAM* also is instructive.  In *SRAM*, defendant Cypress, like AVX, moved for summary judgment because Cypress did not attend group cartel meetings.  2010 WL 5138859, at *1-2.  The court deemed evidence of confidential information exchanges between a Cypress employee and conspirator Samsung sufficient to raise a material dispute of fact as to whether Cypress agreed to join the conspiracy.  *Id.* at *9.  Similarly, here, the evidence demonstrates that AVX exchanged confidential information, including █████████████████████ and other conspirators that attended the larger cartel meetings.  *See supra* Part II.B.  This evidence is more than sufficient for a reasonable jury to infer that AVX participated in the conspiracy.

### 2. Dr. Snail's Price Analysis is Irrelevant and Unreliable

   AVX also attempts to support its contention that it did not participate in the capacitors cartel by pointing to its expert Dr. Snail's "████████████████████."  *See* Motion at 14:19-15:13.  According to AVX, Dr. Snail ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████  *See id*.  This argument is irrelevant even if accurate.

   First, DAPs need not prove that ████████████████████████.  The operative questions are whether AVX participated in the conspiracy and whether the conspiracy, as a whole, caused Plaintiffs to pay overcharges.  *See Cont'l Ore Co.*, 370 U.S. at 698-99 (conspiracy evidence should not be compartmentalized).  ████[16] only the trier of fact can interpret and weigh the documents and testimony and decide

---

[16] Ex. 65 ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████

1    whether that evidence proves AVX participated in the conspiracy.  *See, e.g.*, Ex. 65 ███

2    ████████████████████████████████████████████████████████████████

3    ███████.

4          Second, Dr. Snail did not in fact ██████████████████████████████

5    Dr. Snail admitted ████████████████████████████████████████████

6    ██████ Ex. 65 █████████████████.  Dr. Snail measured only whether

7    ██████████████████████████████████████  *See id.* ███

8    ███████.  AVX suggests that Dr. Snail's analysis somehow █████████

9    █████████████████████████  Motion at 14:19-15:13.

10   But Dr. Snail conceded that ████████████████████████████████████

11   █████ *See, e.g.*, Ex. 65 ████████████████.

          **3.   The Cartel Members' Discovery Responses Do Not Support Summary
                Judgment**

          AVX next cites *Citric Acid*, *CRT I*, and *Barnes* to argue that the Court should ignore the

     evidence that AVX conspired because certain cartel members did not identify AVX as a co-

     conspirator.   Motion at 16:18-17:18.   The discovery material AVX cites is unlikely to be

     admissible, and even if it were, a jury must decide whether the responses are probative.[17]  All three

     cases AVX cites are unpersuasive because none involved anything like the quantum of evidence

     against AVX.   For example, in *Citric Acid* the Ninth Circuit thoroughly reviewed all of the

     evidence and concluded that "'[a]ll in all, there is no more than a scintilla of evidence that Cargill

     was a participant in the citric acid conspiracy....'"  191 F.3d. at 1106.  The same is not true here.

          The co-conspirators' discovery responses that AVX references also are unreliable.  *See*

     Motion at 5 nn.13-17.   Even though each pleaded guilty to participating in a conspiracy that began

     _____

     [17] ███████████████████████████████████████████ *See, e.g.*, Ex. 66
     
     ██████████████████████████████████████  The admissions

     are hearsay and thus not admissible except against the admitting party.  *See Higgins v. Farr Fin.
     Inc.*, No. C 07-02200 JSW, 2011 WL 13257721, at *2 (N.D. Cal. July 20, 2011).

as early as September 1997 and continued until January 2014—or in Panasonic's and Sanyo's case, admitted to their participation as part of their amnesty application—the co-conspirators still minimize or deny their own liability.  Ex. 63 ████████████.  For example, ████████████ ████████████████████████████████████████████ ████████" but also argues at summary judgment that it conspired only as to tantalum capacitors.  *See* Ex. 67 ████████████████; Hitachi's Motion for Summary Judgment, ECF No. 676.  Similarly, Holy Stone, ████████████████████ ████████████████████████ *See* Holy Stone's Motion for Summary Judgment, ECF No. 680; Ex. 68 ████████ ████████████████████.

Nichicon, which the Court said "did more damage to American consumers than any other single defendant I've had so far,"[18] still claims that the "DAPs fail to raise a material issue of fact as to whether Nichicon Japan's participation in the conspiracy caused injury to their purchases in the United States."  Nichicon's Motion for Summary Judgment, ECF No. 627, at 12.  And Panasonic maintains that ████████████████████████ ████████████████████████████[19] despite express admissions to the Competition Commission of Singapore ("CCS") that Panasonic entered into a global "No Price Reduction Agreement" with its competitors.[20]  Even NCC, the ringleader and enforcer of the capacitors conspiracy,[21] maintains it is entitled to summary judgment.  *See* NCC's Motion for Summary Judgment, ECF No. 656.  The co-conspirators are well aware that ████████████

---

[18] Ex. 69 (*United States v. Nichicon Corp.*, No. 17-cr-368-JD, ECF No. 37, Transcript of Apr. 11, 2018 Nichicon Sentencing Hearing at 16:12-16, 36:15-16).

[19] *See* Ex. 70 ████████████████████████████████████.

[20] Ex. 71 (Notice of Infringement Decision of the CCS (Jan. 5, 2018), ¶ 170).

[21] Ex. 72 (*USA v. Nippon Chemi-Con Corporation*, No. 4:17-cr-00540-JD, ECF No. 83, Transcript of Oct. 3, 2018 NCC Sentencing Hearing at 29:12-18).

1    ██████████████████████████████.[22]   It is not surprising that they seek to avoid joint and

2    several liability for the damages caused by those purchases.

3            Nor are Tokin's discovery responses persuasive.  Tokin did not, as AVX claims, "identify

4    the participants in the conspiracy to which it pleads guilty."  Motion at 5 n.15.  Rather, Tokin

5    provided a ████████████████████████████████   *See* Skolke Decl., Ex. 8 at

6    ████████████████   attached to Motion.   Tokin also identified documents responsive to the

7    interrogatory, including ████████████████████████████.  *See* Ex. 73

8    ██████████████████████.[23]   Because ████████   was unavailable for deposition, DAPs had

9    no opportunity to ask him about the meaning of ████████   or AVX's involvement in the

10   conspiracy.[24]  As Judge Wilken observed in *SRAM*, "[I]n complex antitrust litigation where motive

11   and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and

12   hostile witnesses thicken the plot.  It is only when the witnesses are present and subject to cross

13   examination that their credibility and the weight to be given their testimony can be appraised."

14   *SRAM*, 2010 WL 5138859, at *5 (citing *Beltz*, 620 F.2d at 1365).  This case should proceed to trial

15   so that a jury can assess both the evidence against AVX and the credibility of the various

16   explanations of the evidence that AVX presents in its Motion.

17                                        **CONCLUSION**

18           For these reasons, AVX's Motion for Summary Judgment should be denied.

21   [22] *See, e.g.,* Ex. 63 ███████████████████.

22   [23] *See, e.g.,* Ex. 74 (███████████████████████████████████████████

23   ████████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████████

26   [24] Hitachi and NCC's discovery responses also are unreliable because ███████████████████  The

27   Court can infer that those employees conspired with AVX based on their ████████████████████

Dated: July 24, 2019

Respectfully submitted,

**WILLIAMS MONTGOMERY & JOHN LTD.**
By: */s/ Charles E. Tompkins*
    Charles E. Tompkins

Charles E. Tompkins (*pro hac vice*)
**WILLIAMS MONTGOMERY & JOHN LTD.**
1200 18th Street NW, Suite 325
Washington, D.C. 20036
Telephone: (202) 791-9951
Facsimile: (312) 630-8586
Email: cet@willmont.com

Paul J. Ripp (*pro hac vice*)
**WILLIAMS MONTGOMERY & JOHN LTD.**
233 S. Wacker Drive, Suite 6800
Chicago, IL  60606
Telephone: (312) 443-3200
Facsimile: (312) 630-8500
Email: pjr@willmont.com

*Counsel for Plaintiff Flextronics International USA, Inc.*

Robert W. Turken (*pro hac vice*)
Scott N. Wagner (*pro hac vice*)
**BILZIN SUMBERG BAENA PRICE
& AXELROD LLP**
1450 Brickell Avenue, Suite 2300
Miami, FL 33131-3456
Telephone: (305) 374-7580
Email: rturken@bilzin.com
Email: swagner@bilzin.com

*Counsel for Plaintiffs AASI and Benchmark Electronics*

Doc. 1289781