UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE CAPACITORS ANTITRUST LITIGATION | Master File No. 3:17-md-02801-JD |
| | Case No. 3:14-cv-03264-JD |
| THIS DOCUMENT RELATES TO:<br>THE DIRECT PURCHASER CLASS ACTION | JOINT SET OF UPDATED PROPOSED FINAL JURY INSTRUCTIONS AND OBJECTIONS |
| | Trial Date:   November 29, 2021<br>Time:          9:00 a.m.<br>Judge          Honorable James Donato<br>Courtroom:   11, 19th Floor |

# TABLE OF CONTENTS

Page(s)

STIPULATED INSTRUCTION NO. 1 RE DUTY OF JURY ....................................................1

STIPULATED INSTRUCTION NO. 2: BURDEN OF PROOF: PREPONDERANCE OF THE EVIDENCE ........................................................................................... 2

STIPULATED INSTRUCTION NO. 3 RE CLASS ACTION ................................................. 3

DISPUTED INSTRUCTION NO. 4: IDENTIFICATION OF THE PARTIES AND CLAIMS AND DEFENSES OFFERED BY DPPS.......................................................... 4

DISPUTED INSTRUCTION NO. 4 RE IDENTIFICATION OF THE PARTIES AND CLAIMS AND DEFENSES OFFERED BY DEFENDANTS....................................... 6

DPP'S ARGUMENT RE DISPUTED INSTRUCTION NO. 4: IDENTIFICATION OF THE PARTIES AND CLAIMS AND DEFENSES .................................................... 7

DEFENDANTS' ARGUMENT ON DISPUTED INSTRUCTION NO. 4: IDENTIFICATION OF THE PARTIES AND CLAIMS AND DEFENSES ............... 9

STIPULATED INSTRUCTION NO. 5 RE CORPORATIONS—FAIR TREATMENT........ 11

STIPULATED INSTRUCTION NO. 6 RE WHAT IS EVIDENCE ...................................... 12

STIPULATED INSTRUCTION NO. 7 RE DIRECT AND CIRCUMSTANTIAL EVIDENCE ...................................................................................................................13

STIPULATED INSTRUCTION NO. 8 RE WHAT IS NOT EVIDENCE.............................. 14

STIPULATED INSTRUCTION NO. 9 RE RULING ON OBJECTIONS.............................. 15

STIPULATED INSTRUCTION NO. 10 RE DEPOSITION TESTIMONY .......................... 16

STIPULATED INSTRUCTION NO. 11 RE USE OF INTERROGATORIES......................... 17

STIPULATED INSTRUCTION NO. 12 RE CREDIBILITY OF WITNESSES..................... 18

STIPULATED INSTRUCTION NO. 13 RE IMPEACHMENT EVIDENCE—WITNESS OFFERED ................................................................................................................... 19

STIPULATED INSTRUCTION NO. 14 RE FOREIGN LANGUAGE TESTIMONY .......... 20

STIPULATED INSTRUCTION NO. 15 RE TRANSLATED DOCUMENTS ....................... 21

STIPULATED INSTRUCTION NO. 16 RE EXPERT OPINION ......................................... 22

STIPULATED INSTRUCTION NO. 17 RE CHARTS AND SUMMARIES ........................ 23

STIPULATED INSTRUCTION NO. 18 RE STIPULATIONS OF FACT ............................. 24

STIPULATED INSTRUCTION NO. 19 RE JUDICIAL NOTICE...........................................25

DISPUTED INSTRUCTION NO. 20 RE FAILURE TO CALL AVAILABLE WITNESS
       OFFERED BY DPPS .............................................................................. 26

DISPUTED INSTRUCTION NO. 20: FAILURE TO CALL AVAILABLE WITNESS ......... 27

DPP'S ARGUMENT RE DISPUTED INSTRUCTION NO. 20 RE FAILURE TO CALL
       AVAILABLE WITNESS ......................................................................... 28

DEFENDANTS' BRIEF ON DISPUTED INSTRUCTION NO. 20: FAILURE TO CALL
       AVAILABLE WITNESS ......................................................................... 30

DISPUTED INSTRUCTION NO. 21 RE OVERVIEW OF ANTITRUST CLAIMS
       OFFERED BY DPPS .............................................................................. 32

DISPUTED INSTRUCTION NO. 21 RE OVERVIEW OF ANTITRUST CLAIMS
       OFFERED BY DEFENDANTS .................................................................33

DPP'S ARGUMENT RE DISPUTED INSTRUCTION NO. 21: OVERVIEW OF
       ANTITRUST CLAIMS ........................................................................... 34

DEFENDANTS' BRIEF ON DISPUTED INSTRUCTION NO. 21: OVERVIEW OF
       ANTITRUST CLAIMS ........................................................................... 36

STIPULATED INSTRUCTION NO. 22 RE CONSPIRACY, CONTRACT, OR
       COMBINATION ....................................................................................37

DISPUTED INSTRUCTION NO. 22A RE SINGLE V. MULTIPLE CONSPIRACIES
       OFFERED BY DEFENDANTS ................................................................ 39

DPP'S ARGUMENT RE DEFENDANTS' PROPOSED JURY INSTRUCTION NO. 22A:
       SINGLE V. MULTIPLE CONSPIRACIES ................................................. 40

DEFENDANTS' BRIEF ON DISPUTED INSTRUCTION NO. 22A RE SINGLE V.
       MULTIPLE CONSPIRACIES................................................................... 42

DISPUTED INSTRUCTION NO. 23 RE PARTICIPATION AND INTENT OFFERED BY
       DPPS ................................................................................................... 44

DISPUTED INSTRUCTION NO. 23 RE PARTICIPATION AND INTENT OFFERED BY
       DEFENDANTS....................................................................................... 46

DPP'S ARGUMENT RE DISPUTED INSTRUCTION NO. 23: PARTICIPATION AND
       INTENT ............................................................................................... 47

DEFENDANTS' BRIEF ON DISPUTED INSTRUCTION NO. 23: PARTICIPATION AND
       INTENT ............................................................................................... 49

DISPUTED INSTRUCTION NO. 24 RE GOOD INTENT NOT A DEFENSE OFFERED
       BY DPPS .............................................................................................. 50

DISPUTED INSTRUCTION NO. 24 RE GOOD INTENT NOT A DEFENSE ...................51

DPP'S ARGUMENT RE DISPUTED INSTRUCTION NO. 24: GOOD INTENT IS NOT A DEFENSE OFFERED BY DPPS............................................................................ 52

DEFENDANTS' BRIEF ON DISPUTED JURY INSTRUCTION NO. 24:  GOOD INTENT NOT A DEFENSE ........................................................................ 54

DISPUTED INSTRUCTION NO. 25 RE CORPORATIONS AND AGENCY OFFERED BY DPPS.................................................................................................55

DISPUTED INSTRUCTION NO. 25 RE CORPORATIONS OR AGENCY OFFERED BY DEFENDANTS.......................................................................................57

DPP'S ARGUMENT RE DISPUTED INSTRUCTION NO. 25: CORPORATIONS OR AGENCY ........................................................................................ 58

DEFENDANTS' BRIEF ON DISPUTED INSTRUCTION NO. 25:  CORPORATIONS OR AGENCY ........................................................................................ 60

DISPUTED INSTRUCTION NO. 26 RE SUBSIDIARY PURPOSE OFFERED BY DPPS... 62

DISPUTED INSTRUCTION NO. 26 RE AFFILIATED CORPORATE PARTIES OFFERED BY DEFENDANTS................................................................................ 63

DPP'S ARGUMENT RE DISPUTED INSTRUCTION NO. 26: SUBSIDIARY PURPOSE/AFFILIATED CORPORATE PARTIES........................................ 64

DEFENDANTS' BRIEF ON DISPUTED INSTRUCTION NO. 26: AFFILIATED CORPORATE PARTIES ........................................................................ 66

STIPULATED INSTRUCTION NO. 27 RE EVIDENCE OF INFORMATION EXCHANGE ........................................................................................... 68

STIPULATED INSTRUCTION NO. 28 RE EVIDENCE OF PRICES CHARGED ............. 69

STIPULATED INSTRUCTION NO. 29 RE EVIDENCE OF COMPETITION.................... 70

DISPUTED INSTRUCTION NO. 29A RE EVIDENCE OF SIMILARITY OFFERED BY DEFENDANTS................................................................................71

DPP'S ARGUMENT RE DISPUTED INSTRUCTION NO. 29A: EVIDENCE OF SIMILARITY OFFERED BY DEFENDANTS .............................................73

DEFENDANTS' BRIEF ON DISPUTED INSTRUCTION NO. 29A RE EVIDENCE OF SIMILARITY.....................................................................................75

DISPUTED INSTRUCTION NO. 29B RE IMPORT COMMERCE – INTENT; SUBSTANTIAL EFFECT OFFERED BY DEFENDANTS.......................................76

DPP'S ARGUMENT RE DISPUTED INSTRUCTION NO. 29B: IMPORT COMMERCE – INTENT; SUBSTANTIAL EFFECT OFFERED BY DEFENDANTS......................77

DEFENDANTS' BRIEF ON DISPUTED INSTRUCTION NO. 29B RE IMPORT COMMERCE – INTENT; SUBSTANTIAL EFFECT ............................................... 78

DISPUTED INSTRUCTION NO. 30 RE TESTIMONY OF WITNESSES INVOLVING SPECIAL CIRCUMSTANCE—LENIENCY OFFERED BY DPPS ............................ 80

DISPUTED INSTRUCTION NO. 30 RE TESTIMONY OF WITNESSES INVOLVING SPECIAL CIRCUMSTANCE—LENIENCY OFFERED BY DEFENDANTS ...........81

DPP'S ARGUMENT RE DISPUTED INSTRUCTION NO. 30 RE TESTIMONY OF WITNESSES INVOLVING SPECIAL CIRCUMSTANCE—LENIENCY ................ 82

DEFENDANTS' BRIEF ON DISPUTED INSTRUCTION NO. 30:  TESTIMONY OF WITNESSES INVOLVING SPECIAL CIRCUMSTANCE—LENIENCY ................ 83

DISPUTED INSTRUCTION NO. 31 RE GUILTY PLEAS AND CONVICTIONS OFFERED BY DPPS ................................................................................ 84

DISPUTED INSTRUCTION NO. 31: RE GUILTY PLEAS AND CONVICTIONS OFFERED BY DEFENDANTS ......................................................... 94

DPP'S ARGUMENT RE DISPUTED INSTRUCTION NO. 31: GUILTY PLEAS AND CONVICTIONS ................................................................................ 95

DEFENDANTS BRIEF RE DISPUTED INSTRUCTION NO. 31 RE GUILTY PLEAS AND CONVICTIONS ........................................................................ 96

DISPUTED INSTRUCTION NO. 31A RE LIMITED PURPOSE OF GUILTY PLEAS IN THIS CASE OFFERED BY DEFENDANTS .................................... 97

DPP'S ARGUMENT RE DISPUTED INSTRUCTION NO. 31A: LIMITED PURPOSE OF GUILTY PLEAS IN THIS CASE OFFERED BY DEFENDANTS............................. 99

DEFENDANTS' BRIEF ON DISPUTED INSTRUCTION NO. 31A RE LIMITED PURPOSE OF GUILTY PLEAS IN THIS CASE ........................................101

INSTRUCTION NO. 32 ........................................................................103

INSTRUCTION NO. 33........................................................................104

DISPUTED INSTRUCTION NO. 34 RE INVOCATION OF THE FIFTH AMENDMENT—BY A PARTY OR WITNESS IDENTIFIED WITH A PARTY OFFERED BY DPPS ........................................................................105

DISPUTED INSTRUCTION NO. 34 RE INVOCATION OF THE FIFTH AMENDMENT—BY A PARTY OR WITNESS IDENTIFIED WITH A PARTY OFFERED BY DEFENDANTS ................................................................106

DPP'S ARGUMENT RE DISPUTED INSTRUCTION NO. 34: INVOCATION OF THE FIFTH AMENDMENT—BY A PARTY OR WITNESS IDENTIFIED WITH A PARTY OFFERED BY DPPS ........................................................107

DEFENDANTS' BRIEF ON DISPUTED JURY INSTRUCTION NO. 34:  FIFTH AMENDMENT ADVERSE INFERENCE ....................................................109

DISPUTED INSTRUCTION NO. 34A RE INVOCATION OF THE FIFTH AMENDMENT—BY A NONPARTY WITNESS OFFERED BY DPPS.................. 111

DISPUTED INSTRUCTION NO. 34A RE INVOCATION OF THE FIFTH AMENDMENT—BY A NONPARTY WITNESS OFFERED BY DEFENDANTS . 112

DPP'S ARGUMENT RE DISPUTED INSTRUCTION NO. 34A: INVOCATION OF THE FIFTH AMENDMENT—BY A NONPARTY WITNESS OFFERED BY DPPS ...... 113

DEFENDANTS' BRIEF ON DISPUTED JURY INSTRUCTION NO. 34A:  INVOCATION OF THE FIFTH AMENDMENT—BY A NONPARTY WITNESS OFFERED BY DPPS ................................................................................................. 114

DISPUTED INSTRUCTION NO. 35 RE CAUSATION AND INJURY OFFERED BY DPPS ............................................................................................................ 116

DISPUTED INSTRUCTION NO. 35 RE CAUSATION AND INJURY OFFERED BY DEFENDANTS ................................................................................................. 118

DPP'S ARGUMENT RE DISPUTED INSTRUCTION NO. 35: CAUSATION AND INJURY ............................................................................................................ 120

DEFENDANTS' BRIEF ON DISPUTED INSTRUCTION NO. 35: CAUSATION AND INJURY ................................................................................................................ 122

STIPULATED INSTRUCTION NO. 36 RE TRADE ASSOCIATIONS ............................... 124

STIPULATED INSTRUCTION NO. 37 RE STATUTE OF LIMITATIONS ....................... 126

STIPULATED INSTRUCTION NO. 38 RE STATUTE OF LIMITATIONS— FRAUDULENT CONCEALMENT ................................................................ 127

STIPULATED INSTRUCTION NO. 39 RE DAMAGES—INTRODUCTION AND PURPOSE OFFERED BY DPPS ................................................................ 130

STIPULATED INSTRUCTION NO. 40 RE CALCULATION OF DAMAGES ................. 131

STIPULATED INSTRUCTION NO. 41 RE NOMINAL DAMAGES ................................. 132

DISPUTED INSTRUCTION NO. 42 RE CALCULATION OF DAMAGES OFFERED BY DPPS ................................................................................................................ 133

DISPUTED INSTRUCTION NO. 42 RE DAMAGES FOR PURCHASERS – CLASS OFFERED BY DEFENDANTS ................................................................ 134

DPP'S ARGUMENT RE DISPUTED INSTRUCTION NO. 42: CALCULATION OF DAMAGES ............................................................................................................ 135

DEFENDANTS' BRIEF ON DISPUTED INSTRUCTION NO. 42: CALCULATION OF DAMAGES ............................................................................................................ 136

DISPUTED INSTRUCTION NO. 43 RE NO PASS-ON CONSIDERATION OFFERED BY DPPS ................................................................................................................ 137

DISPUTED INSTRUCTION NO. 43 RE NO PASS-ON CONSIDERATION ..................... 138

DPP'S ARGUMENT RE DISPUTED INSTRUCTION NO. 43: NO PASS-ON
    CONSIDERATION OFFERED BY DPPS ................................................... 139

DEFENDANTS' BRIEF ON DISPUTED INSTRUCTION NO. 43: NO PASS-ON
    CONSIDERATION ........................................................................... 141

STIPULATED INSTRUCTION NO. 44 RE JOINT AND SEVERAL LIABILITY ............. 142

DISPUTED INSTRUCTION NO. 45 RE SETTLEMENT AGREEMENTS OF SETTLING
    DEFENDANTS OFFERED BY DPPS ..................................................... 143

DISPUTED INSTRUCTION NO. 45 RE SETTLEMENT AGREEMENTS OF SETTLING
    DEFENDANTS  OFFERED BY DEFENDANTS ......................................... 144

DPP'S ARGUMENT RE DISPUTED INSTRUCTION NO. 45 SETTLEMENT
    AGREEMENTS OF SETTLING DEFENDANTS ......................................... 145

DEFENDANTS' BRIEF ON DISPUTED INSTRUCTION NO. 45: SETTLEMENT
    AGREEMENTS OF SETTLING DEFENDANTS ......................................... 146

STIPULATED INSTRUCTION NO. 46 RE DUTY TO DELIBERATE ............................. 147

STIPULATED INSTRUCTION NO. 47 RE CONSIDERATION OF THE EVIDENCE—
    CONDUCT OF THE JURY ................................................................. 148

STIPULATED INSTRUCTION NO. 48 RE TAKING NOTES ..................................... 150

STIPULATED INSTRUCTION NO. 49 RE COMMUNICATION WITH COURT ........... 151

STIPULATED INSTRUCTION NO. 50 RE RETURN OF VERDICT ............................. 152

**Stipulated Instruction No. 1 Re Duty of Jury**

Members of the Jury: Now that you have heard all of the evidence [and the arguments of the attorneys], it is my duty to instruct you on the law that applies to this case.

A copy of these instructions will be sent to the jury room for you to consult during your deliberations.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath to do so.

Please do not read into these instructions or anything that I may say or do or have said or done that I have an opinion regarding the evidence or what your verdict should be.

*Authority*: Ninth Circuit Manual of Model Civil Jury Instructions, Instr. 1.4 (2017).

**Stipulated Instruction No. 2: Burden of Proof: Preponderance of the Evidence**

When a party has the burden of proving any claim by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim is more probably true than not true.

You should base your decision on all the evidence, regardless of which party presented it.

*Authority*: Adapted from Ninth Circuit Manual of Model Civil Jury Instructions, Instr. 1.6 (2017).

**Stipulated Instruction No. 3 Re Class Action**

This lawsuit has been brought as a class action. A class action is a lawsuit that has been brought by one or more persons or businesses called class representatives on behalf of a larger group of people or businesses whom the class representatives allege are similarly situated. All of these people or businesses together are called a class. The fact that this case is proceeding as a class action does not mean any decision has been made about the merits of the case, and you must not infer anything about the merits of this case based on the fact that it is a class action.

*Authority*: Adapted from *In re Korean Ramen Antitrust Litig.*, Jury Instructions, No. 3:13-cv-04115-WHO (N.D. Cal. Nov. 13, 2018) (Doc. 791).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Disputed Instruction No. 4: Identification of the Parties and Claims and Defenses Offered by DPPs**

To help you follow the evidence, I will give you a brief summary of the positions of the parties.

This trial involves a product called capacitors. Capacitors are electronic components used to temporarily store electrical energy. They are essential to ensure that electronic devices work. Everything that runs on electricity has at least one capacitor in it, and most devices have many more than one. Complex devices like cell phones typically have hundreds.

The Plaintiffs in the case are the Direct Purchaser Plaintiffs, who I will refer to as DPPs. DPPs are a certified class that purchased capacitors directly from one or more of the Defendants. The four named direct purchaser plaintiffs are Chip-Tech, Ltd., Dependable Component Supply Corp., eIQ Energy, Inc., and Walker Component Group, Inc. All are United States companies.

The class includes all persons (including individuals, companies, or other entities) that purchased capacitors (including through controlled subsidiaries, agents, affiliates, or joint ventures) directly from any of the Defendants, their subsidiaries, agents, affiliates, or joint ventures from January 1, 2002 to December 31, 2013 (the "Class Period") and such persons are: (a) inside the United States and were billed or invoiced for capacitors by one or more Defendants during the Class Period (*i.e.*, where capacitors were "billed to" persons within the United States); or (b) outside the United States and were billed or invoiced for capacitors by one or more Defendants during the Class Period, where such capacitors were imported into the United States by one or more Defendants (*i.e.*, where the capacitors were "billed to" persons outside the United States but "shipped to" persons within the United States).

The Defendants in this case are Nippon Chemi-Con Corporation and United Chemi-Con Inc., referred to as "NCC" and "UCC", and Matsuo Electric Co. Ltd., referred to as "Matsuo". Some Defendants manufactured and sold aluminum, film and tantalum capacitors, and some Defendants sold one type or another.

DPPs allege that the Defendants through words and conduct, reached an agreement, combination, or conspiracy to fix prices and suppress competition with respect to aluminum, film and tantalum capacitors. Many of these capacitors were billed to or shipped to the United States. A

Master File No. 3:17-md-02801-JD
Case No. 3:14-cv-03264-JD

4

conspiracy is an agreement, understanding or common course of conduct between two or more entities to restrain trade in some manner. Such conduct violates the Sherman Act, the United States' primary antitrust law. DPPs allege that they were injured by this agreement, combination, or conspiracy as it caused the DPPs to pay more for aluminum, film and tantalum capacitors than they otherwise would have in the absence of this contract, combination, or conspiracy. DPPs allege this conduct took place between January 1, 2002 and December 31, 2013. DPPs seek to recover overcharges they claim they paid as a result of the conduct during this time period.

DPPs allege this price fixing conspiracy occurred by the regular and systemized exchange of companies' confidential business information between each other, regularly scheduled meetings to discuss this confidential business information, raising, maintaining, and stabilizing prices for aluminum, film and tantalum capacitors at prices higher than those that would have been offered in the absence of the conspiracy, by limiting the production of capacitors, and by refusing to agree to requests from customers for price reductions.

DPPs have the burden of proving these claims.

Defendants deny those claims.


*Authority*: Ninth Circuit Manual of Model Civil Jury Instructions, Instr. 1.5 (2017); 3 Kevin O'Malley, et al., Fed. Jury Prac. & Instr. § 101:01 (6th ed. 2012).

**Disputed Instruction No. 4 Re Identification of the Parties and Claims and Defenses Offered by Defendants**

To help you consider the evidence, I will give you a brief summary of the positions of the parties:

The DPPs allege that Defendants "conspired by directly and indirectly communicating with each other to implement and effectuate an overarching scheme to control and set the prices of their aluminum, tantalum and film capacitors sold to United States purchasers and purchasers worldwide" from January 1, 2002 until December 31, 2013.  This is the conspiracy alleged by the DPPs in this case. The DPPs have the burden of proving this alleged conspiracy.

The Defendants deny the DPPs' claims.

*Authority*: Ninth Circuit Manual of Model Civil Jury Instructions, Instr. 1.5 (2017); Third Amended Class Action Complaint, at ¶ 13.

**DPP's Argument re Disputed Instruction No. 4: Identification of the Parties and Claims and Defenses**

DPPs' instruction adheres more closely to the purpose of jury instructions than Defendants' instruction, *see* 3 Fed. Jury Prac. & Instr. § 100:01 (6th ed. 2012) ("instructions help jurors focus on their duties and responsibilities, the parties' factual contentions, and the parties theories of the case."); *see also Spesco, Inc. v. Gen. Elec. Co.*, 719 F.2d 233, 239 (7th Cir. 1983) ("Jury instructions are designed to clarify issues for the jury and to educate the jury about what factors are probative on those issues."), and tracks the direction given by Ninth Circuit Model Civil Instruction 1.5 to track DPPs' claims.

Trial is scheduled for three-weeks. The jury will hear a substantial amount of testimony. The jurors should be reminded of the parties and claims, including the identity of the Defendants, as DPPs' instruction does.

This case involves the price fixing of a specific commodity, capacitors. The jury should be instructed about the product and its uses. Like the *TFT-LCD* instruction, DPPs' proposed instruction provides undisputed factual context to the jury. DPPs use plain English to describe capacitors, including what they are and how they are used.

DPPs' proposed instruction describes the parties in simple, plain English and in logical sequence, grouping members of the same corporate family together. UCC is a wholly-owned subsidiary of NCC, but this may not be obvious to a lay juror. The jury should be reminded of the identities of the subsidiary entities and their relationships.

*"This is the conspiracy alleged by the DPPs in this case."* DPPs object to the second-to-last sentence in the last paragraph of Defendants' proposed instruction as it is argumentative and misstates the law as to what DPPs must prove. DPPs get to choose the case they are trying, not Defendants, and DPPs are not limited to the allegations they made in their complaint. Defendants' proposed language would improperly mislead the jury into believing the Class must prove the specific conspiracy—as the Defendants would prefer to define it—rather than just *a* conspiracy—as the Sherman Act requires. 15 U.S.C. § 1; *see* ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 1, Instr. 2 ("To establish a violation of Section 1 of the Sherman Act, plaintiff must prove the following: [¶] (1) the existence of *a*

1   contract, combination, or conspiracy between or among at least two separate entities . . . ." (emphasis

2   added)); *see also Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 210 (1959) ("Section 1 of

3   the Sherman Act makes illegal *any* . . . conspiracy in restraint of trade" (emphasis added)). DPPs

4   should be free to present their case how they choose. It is the province of the jury to determine whether

5   DPPs have proved the conspiracy that they intend to prove during the trial of this action.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Defendants' Argument on Disputed Instruction No. 4: Identification of the Parties and Claims and Defenses**

The Court should adopt Defendants' proposed instruction and reject DPPs' version for several reasons.

First, DPPs' proposed instruction is too long and argumentative.  Plaintiffs cite no authority to support their use of such a long and argumentative instruction.  *See United States v. Assi*, 748 F.2d 62, 65 (2d Cir. 1984) (jury instructions should be "succinct" and "free of irrelevant and confusing digressions").  In contrast, Defendants' Proposed Jury Instruction succinctly tracks the Ninth Circuit Manual of Model Civil Jury Instruction and jury instructions from a recent analogous antitrust case in this district, and correctly describes the parties' claims and defenses by directly quoting the description of Plaintiffs' alleged conspiracy from the Third Amended Complaint.  And such a long instruction— even were it otherwise accurate, which it is not as further set forth below—is unnecessary following a trial of only about two weeks.

Second, DPPs' proposal improperly marshals the evidence and misstates the law.  The purpose of this instruction is simply to identify for the jury the claims and defenses at a general level, not to argue Plaintiffs' case or influence the jury's decision.  Plaintiffs nevertheless take two full paragraphs to state their "claims," while misstating key elements of antitrust law, describing their purported evidence, including immaterial details, and impermissibly suggesting that this evidence is sufficient to establish a conspiracy in violation of the Sherman Act.  Plaintiffs' proposed instruction is also argumentative and unduly prejudicial, and redundant of other instructions that correctly state the law.

Third, their proposed instruction applies generic references to certain groups of Defendants that are in fact distinct, apparently in the hope that the jury will impute the acts of one corporate actor to other corporate actors within the same group, regardless of the law and actual facts.  Because Defendants are separately incorporated, their independence must be presumed.  *See E. & J. Gallo Winery v. EnCana Energy Servs., Inc.*, Civ. No. 03-5412 AWI LJO, 2008 WL 2220396, at *5 (E.D. Cal. May 27, 2008).  As a result,  generic references disregard each Defendants' separate corporate existence

1    and improperly sidestep Plaintiffs' burden to prove liability as to each separate Defendant.  Plaintiffs'

2    proposed instruction is thus confusing to the jury and prejudicial to Defendants.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Stipulated Instruction No. 5 Re Corporations—Fair Treatment**

All parties are equal before the law and a corporation is entitled to the same fair and conscientious consideration by you as any party.

*Authority*: Ninth Circuit Manual of Model Civil Jury Instructions, Instr. 4.1 (2017).

**Stipulated Instruction No. 6 Re What is Evidence**

The evidence you are to consider in deciding what the facts are consists of:

(1)     the sworn testimony of any witness;

(2)     the exhibits that are admitted into evidence;

(3)     any facts to which the lawyers have agreed; and

(4)      any facts that I may instruct you to accept as proved.


*Authority*: Ninth Circuit Manual of Model Civil Jury Instructions, Instr. 1.9 (2017).

**Stipulated Instruction No. 7 Re Direct and Circumstantial Evidence**

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is proof of one or more facts from which you could find another fact. You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

*Authority*: Ninth Circuit Manual of Model Civil Jury Instructions, Instr. 1.12 (2017).

**Stipulated Instruction No. 8 Re What Is Not Evidence**

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

(1)  Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they said in their opening statements, closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

(2)  Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the Court's ruling on it.

(3)  Testimony that was excluded or stricken, or that you were instructed to disregard, is not evidence and must not be considered. In addition, some evidence was received only for a limited purpose; when I instructed you to consider certain evidence only for a limited purpose, you must do so and you may not consider that evidence for any other purpose.

(4)  Anything you may have seen or heard when court is not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

*Authority*: Ninth Circuit Manual of Model Civil Jury Instructions, Instr. 1.10 (2017).

**Stipulated Instruction No. 9 Re Ruling on Objections**

There are rules of evidence that control what was received into evidence. When a lawyer asked a question or offered an exhibit into evidence and a lawyer on the other side thought that it was not permitted by the rules of evidence, that lawyer objected. If I overruled the objection, the question was answered or the exhibit was received. If I sustained the objection, the question was not answered, or the exhibit was not received. Whenever I sustained an objection to a question, you must ignore the question and must not guess what the answer might have been.

Sometimes I ordered that evidence be stricken from the record and that you disregard or ignore that evidence. That means when you are deciding the case, you must not consider the stricken evidence for any purpose.

*Authority*: Ninth Circuit Manual of Model Civil Jury Instructions, Instr. 1.13 (2017).

1

**Stipulated Instruction No. 10 Re Deposition Testimony**

2

Depositions are part of the discovery process. Discovery is the period during a case when the

3

parties are permitted to learn information from each other. The questions and answers are recorded.

4

Insofar as possible, you should consider deposition testimony presented to you in court in lieu

5

of live testimony, in the same way as if the witness had been present to testify.

6

7

*Authority*: Ninth Circuit Manual of Model Civil Jury Instructions; Instr. 2.4 (2017).

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Stipulated Instruction No. 11 Re Use of Interrogatories**

2

Evidence was presented to you in the form of answers of one of the parties to written

3

interrogatories submitted by the other side. These answers were given in writing and under oath before

4

the trial in response to questions that were submitted under established court procedures.

5

You should consider the answers, insofar as possible, in the same way as if they were made

6

from the witness stand.

7

8

*Authority*: Ninth Circuit Manual of Model Civil Jury Instructions, Instr. 2.11 (2017).

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Stipulated Instruction No. 12 Re Credibility of Witnesses**

In deciding the facts in this case, you have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness said, or part of it, or none of it. In considering the testimony of any witness, you may take into account:

(1)  the opportunity and ability of the witness to see or hear or know the things testified to;

(2)  the witness's memory;

(3)  the witness's manner while testifying;

(4)  the witness's interest in the outcome of the case, if any;

(5)  the witness's bias or prejudice, if any;

(6)  whether other evidence contradicted the witness's testimony;

(7)  the reasonableness of the witness's testimony in light of all the evidence; and

(8)  any other factors that bear on believability.

Sometimes a witness may have said something that is not consistent with something else he or she said. Sometimes different witnesses gave different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

*Authority*: Ninth Circuit Manual of Model Civil Jury Instructions, Instr. 1.14 (2017).

**Stipulated Instruction No. 13 Re Impeachment Evidence—Witness Offered**

The evidence that a witness lied under oath or gave different testimony on a prior occasion may be considered, along with all other evidence, in deciding whether or not to believe the witness and how much weight to give to the testimony of the witness and for no other purpose.

*Authority*: March 3, 2020 Preliminary Jury Instructions (MDL ECF No. 1216); Ninth Circuit Manual of Model Civil Jury Instructions, Instr. 2.9 (2017).

**Stipulated Instruction No. 14 Re Foreign Language Testimony**

You have heard testimony of witnesses who testified in Japanese. Witnesses who do not speak English or are more proficient in another language testify through an official court interpreter. Although some of you may know Japanese, it is important that all jurors consider the same evidence. Therefore, you must accept the interpreter's translation of the witness's testimony. You must disregard any different meaning. You must not make any assumptions about a witness or a party based solely on the use of an interpreter to assist that witness or party.

*Authority*: Ninth Circuit Manual of Model Civil Jury Instructions, Instr. 2.8 (2017).

**Stipulated Instruction No. 15 Re Translated Documents**

You have seen English translations of documents that were written originally in Japanese, Chinese, or other foreign languages. Some documents were presented with a single translation into English. You must accept the translation of the document, and disregard any different meaning or interpretation from any other source, including your own understanding of the foreign language that you might have. The translation is the evidence, not the foreign language in the original document. This is important to ensure that all jurors consider only the same evidence.

Some documents may have been presented with two different translations into English because the parties could not agree on a single translation. In that case, you must decide whether a translation is accurate, in whole or in part. In considering whether a translation accurately states the words in a document, you should consider the testimony presented to you about how, and by whom, the translation was made. You may consider the knowledge, training, and experience of the translator, and the reasonableness of the translation in light of all the evidence in the case. You must not rely in any way on any knowledge you may have of the language in the original document.

*Authority*: March 3, 2020 Preliminary Jury Instructions (MDL ECF No. 1216) (as given); adapted from Ninth Circuit Manual of Model Civil Jury Instructions, Instr. 2.6 & 2.7 (2017).

**Stipulated Instruction No. 16 Re Expert Opinion**

You have heard testimony from expert witnesses who testified to opinions and the reasons for their opinions. This opinion testimony is allowed because of the education or experience of this witness.

Such opinion testimony should be judged like any other testimony. You may accept it, reject it, or give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

*Authority*: Ninth Circuit Manual of Model Civil Jury Instructions, Instr. 2.13 (2017).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Stipulated Instruction No. 17 Re Charts and Summaries**

During trial, certain charts and summaries have been shown to you in order to help explain the contents of books, records, documents, or other evidence in the case. Some of those charts or summaries came into evidence, while others did not. Charts and summaries are only as good as the underlying evidence that supports them. You should, therefore, give them only such weight as you think the underlying evidence deserves.

*Authority*: Ninth Circuit Manual of Model Civil Jury Instructions, Instr. 2.14 and Instr. 2.15 (2017).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Stipulated Instruction No. 18 Re Stipulations of Fact**

The parties have agreed to certain facts [to be placed in evidence as Exhibit ___] [that will be read to you]. You must therefore treat these facts as having been proved.

*Authority*: Ninth Circuit Manual of Model Civil Jury Instructions, Instr. 2.2 (2017).

**Stipulated Instruction No. 19 Re Judicial Notice**

The court has accepted as proved the following facts: [state fact]. You must accept these facts as true.

*Authority*: Ninth Circuit Manual of Model Civil Jury Instructions, Instr. 2.3 (2017).

**Disputed Instruction No. 20 Re Failure to Call Available Witness Offered by DPPs**

If a party fails to call a person as a witness who has knowledge about the facts in issue, and who is reasonably available to the party, and who is not equally available to the other party, then you may infer that the testimony of that person is unfavorable to the party who could have called the witness and did not.

*Authority*: *Singh v. Holder*, 638 F.3d 1264, 1272-73 (9th Cir. 2011) ("We ordinarily instruct juries that '[i]f a party fails to call a person as a witness who has knowledge about the facts in issue, and who is reasonably available to the party, and who is not equally available to the other party, then you may infer that the testimony of that person is unfavorable to the party who could have called the witness and did not'"); *Jones v. Otis Elevator Co.*, 861 F.2d 655, 658 (11th Cir. 1988) (approving instruction where "[t]he judge charged: 'If a party fails to call a person who possesses knowledge about the facts in issue and who is reasonably available to him and who is not equally available to the other party, then you may infer that the testimony of that witness is unfavorable to the party who could have called that witness and did not do so.'"); *Int'l Union United Auto., Aerospace & Agr. Implement Workers of Am. (UAW) v. N.L.R.B.*, 459 F.2d 1329, 1336-38 (D.C. Cir. 1972); *see also Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 226 (1939) ("The failure under the circumstances to call as witnesses those officers who did have authority to act for the distributors and who were in a position to know whether they had acted in pursuance of agreement is itself persuasive that their testimony, if given, would have been unfavorable to appellants."); *United States v. Wellington*, 754 F.2d 1457, 1463 (9th Cir. 1985) ("The district court has broad discretion in formulating the instructions").

1

**Disputed Instruction No. 20: Failure to Call Available Witness**

2

[Defendants object to this instruction in its entirety]

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DPP's Argument re Disputed Instruction No. 20 Re Failure to Call Available Witness**

DPPs will adduce evidence to justify their proposed "missing witness" jury instruction. It would be premature to reject the instruction before presentation of that evidence. Further, DPPs have reason to believe that certain witnesses under the control of defendants who testified previously at the March 2020 trial are no longer intending to come to present testimony at the present trial, including witnesses who previously petitioned the Court to revoke their Fifth Amendment testimony in order to provide testimony to a jury. Defendants should not benefit because they are no longer making available a witness who previously provided testimony in March 2020.A missing witness instruction is particularly appropriate here where a witness, Noriaki Kakizaki testified in the March 2020 trial is no longer being produced. There is nothing in the record indicating he is not reasonably available to testify.

Further, DPPs' precise formulation was approved in *Jones v. Otis Elevator Co.*, 861 F.2d 655, 659 (11th Cir. 1988) and reproduced in O'Malley, Grenig & Lee, Federal Jury Practice and Instructions § 104:25 (6th ed., Aug. 2019 update). The Ninth Circuit has approved "missing witness" instructions, noting courts "ordinarily instruct juries that '[i]f a party fails to call a person as a witness who has knowledge about the facts in issue, and who is reasonably available to the party, and who is not equally available to the other party, then you may infer that the testimony of that person is unfavorable to the party who could have called the witness and did not." *Singh v. Holder*, 638 F.3d 1264, 1272-73 (9th Cir. 2011). Courts have noted that "when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him." *Int'l Union United Auto., Aerospace & Agr. Implement Workers of Am. (UAW) v. N.L.R.B.,* 459 F.2d 1329, 1336 (D.C. Cir. 1972). "The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse." *Interstate Circuit v. United States*, 306 U.S. 208, 226 (1939). "[T]he applicability of the rule in no way depends on the existence of a subpoena compelling production of the evidence in question." *UAW*, 459 F.2d at 1338. "If evidence within the party's control would in fact strengthen his case, he can be expected to introduce it even if it is not subpoenaed. Conversely, if such evidence is not introduced, it may be inferred that the evidence is unfavorable to the party suppressing it." *Id.* at 1338.

Defendants include Japanese companies. The relevant witnesses—high-level executives who possess formal and practical authority over day-to-day operations of their corporations—are in places beyond the subpoena power, including in Japan. DPPs and the Court cannot compel their appearance. Defendants therefore can pick and choose the executives and managing agents under their control for trial. The jury should know the Defendants have done so. Many of the missing witnesses were direct participants in illegal meetings (as documented by Defendants' own records), had illicit contacts with other co-conspirators, and directed others to engage in illegal price fixing. Many were indicted and remain fugitives. Others were high-level executives who retired the moment the conspiracy was brought to light. *Cf. In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 776 F. Supp. 838, 839 (S.D.N.Y. 1991) ("[Employer's] argument that [former employee] is not in its control rings hollow" as the witnesses who refused to appear and those who appeared for the defendant are "indistinguishable one from the other.").

Defendants should not be able to benefit by keeping some of their employees with managerial authority overseas, or through retirement, keeping DPPs from evidence and hampering DPPs in making their case. *See Chi. Coll. of Osteopathic Med. v. George A. Fuller Co.*, 719 F.2d 1335, 1353 (7th Cir. 1983) ("An employee-employer relationship is such that where an employee who could give important testimony relative to issues in litigation is not present and his absence is unaccounted for by his employer, who is a party to the action, the presumption arises that the testimony of such employee would be unfavorable to his employer.") (internal quotation marks omitted); *see also Gulf Oil/Cities Serv.*, 776 F. Supp. at 839 ("If he elects to absent himself during plaintiffs' case, he will not testify at all, and plaintiffs will be free to comment upon his absence.").

Indeed, Defendants have already told DPPs that certain of their witnesses who provided testimony at the prior trial are no longer coming. The jury should be instructed about these witnesses' absence.

**Defendants' Brief on Disputed Instruction No. 20: Failure to Call Available Witness**

For the reasons discussed below, Defendants do not believe that a missing witness instruction is appropriate or justified given the facts and circumstances of this case. However, should the Court disagree and believe that a missing witness instruction should be given, Defendants do not object to the language that DPPs have proposed.

DPPs' proposed "missing witness" instruction is not included in the Ninth Circuit's Model Civil Jury Instructions and DPPs do not identify a single civil case in this Circuit where it has been given. *See Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 2012 WL 3536797, at *2 (N.D. Cal. Aug. 13, 2012) (noting "the parties have not cited, and the Court has not found, any Ninth Circuit authority governing the applicability of the uncalled-witness rule in civil trials"). Furthermore, from a practical standpoint, DPPs have not shown why such an instruction would apply to the circumstances in this case.

The Ninth Circuit Jury Instructions Committee notes the prejudice that ordinarily flows from a missing witness instruction and, even in criminal cases, "recommends ***against*** giving instructions on matters such as . . . a missing witness," which "are generally better left to argument of counsel as examples of circumstantial evidence from which the jury may find another fact." Model Criminal Jury Instructions (2010 ed.), at 42 (emphasis added). The Committee "cautions that a missing witness instruction will be appropriate only in limited circumstances, such as when the government deports an alien witness knowing that the witness would testify favorably for the defense." *Id.* at 76 (citing *United States v. Leal-Del Carmen*, 697 F.3d 964, 975 (9th Cir. 2013)).

Those "limited circumstances" are not present here: DPPs have not identified a single witness whose absence from trial would be the appropriate subject of a missing witness instruction. In fact, as of the date of this filing, DPPs have not even identified their live witnesses. The witness list they served on Defendants November 11, 2021 listed *both* live witnesses *and* witnesses whose depositions will have designated testimony played to the jury. Because DPPs still have not even identified the witnesses they intend to call, they cannot make a showing that a missing witness instruction would be appropriate as to any witness. That is especially true because the Court has already ruled that "no

'missing witness' instruction will be given" for "any witness who is more than 100 miles from the trial or is outside the United States"—which, to Defendants' knowledge, applies to every potential witness in this case.  *See* Pretrial Order No. 2, ECF No. 2559.

Moreover, DPPs have available to them deposition testimony of many witnesses, including those they argue are beyond the subpoena power of the Court to appear live at trial.  DPPs inevitably will choose to present only some of those witnesses' deposition testimony.  As a result, the proposed instruction would confuse the jury and prejudice Defendants by misleading the jury into believing that witnesses whose deposition testimony DPPs choose not to present was somehow unfavorable to Defendants, when in reality it was either favorable or simply not relevant or necessary for the trial.  The same is true for witnesses DPPs have the power to call live at trial pursuant to the cooperation obligations they negotiated with the Settling Defendants.  It would confuse the jury and prejudice Defendants for the jury to conclude that the testimony of any such witness DPPs choose not to call is somehow unfavorable to Defendants.  Lastly, the proposed instruction would be particularly inappropriate for this trial given the ongoing global pandemic and its resulting health, travel, and family concerns.

**Disputed Instruction No. 21 Re Overview of Antitrust Claims Offered by DPPs**

The DPPs allege that Defendants violated the antitrust laws by agreeing, conspiring, contracting, or combining to fix prices, rig bids, or otherwise suppress competition in the markets for aluminum, film and tantalum capacitors and that this conspiracy caused an increase in the prices of aluminum, film and tantalum capacitors that were billed to or shipped to the United States. DPPs assert that this increase in prices caused them injury.

To establish a violation of the antitrust laws, the DPPs must prove the following by a preponderance of the evidence:

(1) the existence of a contract, combination, or conspiracy between or among at least two entities to set, fix, raise, maintain, or stabilize prices, rig bids, or otherwise suppress competition in the markets for aluminum, film and tantalum capacitors;

(2) that each defendant knowingly became part of that conspiracy, contract, or combination;

(3) that the alleged conspiracy, contract, or combination occurred in or affected interstate or import commerce; and

(4) the anticompetitive conduct caused DPPs to pay more for aluminum, film and tantalum capacitors billed to or shipped to the United States than they otherwise would have.

If you find that the evidence is insufficient to prove any one or more of these elements as to a particular Defendant, then you must find for that Defendant and against DPPs on DPPs' price-fixing claim. If you find that the evidence is sufficient to prove all four elements as to a particular Defendant, then you must find for DPPs and against that Defendant on DPPs' price-fixing claim.

*Authority*: Adapted from ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 1 Instr. 2 and Ch. 2 Instr. 1 (2016); 3 Kevin O'Malley, et al., Fed. Jury Prac. & Instr. § 150:20 (6th ed. 2012).

**Disputed Instruction No. 21 Re Overview of Antitrust Claims Offered by Defendants**

The DPPs allege that Defendants violated the antitrust laws by joining the alleged conspiracy to fix prices, rig bids, or otherwise suppress competition in the markets for aluminum, tantalum and film capacitors, and that this conspiracy caused an increase in the prices of aluminum, tantalum, and/or film capacitors that were billed to or shipped to the United States between January 1, 2002 and December 31, 2013.  DPPs assert that this increase in prices caused them injury.

To establish a violation of the antitrust laws, the DPPs must prove, as to each particular Defendant, each of the following elements by a preponderance of the evidence:

(1)  the existence of the alleged conspiracy among or between competitors to set, fix, raise, maintain, or stabilize prices, rig bids, or otherwise suppress competition in the markets for aluminum, tantalum, and film capacitors;

(2)  that each Defendant knowingly—that is, voluntarily and intentionally—became part of that conspiracy;

(3)  that the alleged conspiracy occurred in or affected interstate or import commerce; and

(4)  that the alleged conspiracy caused DPPs to pay more for aluminum, tantalum, and/or film capacitors billed to or shipped to the United States than they otherwise would have.

If you find that the evidence is insufficient to prove any one or more of these elements as to a particular Defendant, then you must find for that Defendant and against DPPs on DPPs' price-fixing claim. If you find that the evidence is sufficient to prove all four elements as to a particular Defendant, then you must find for DPPs and against that Defendant on DPPs' price-fixing claim.

*Authority*: ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 1 Instr. 2 and Ch. 2 Instr. 1 (2016); adapted from *In re Korean Ramen Antitrust Litig.*, Jury Instructions, No. 3:13-cv-04115-WHO (N.D. Cal. Dec. 13, 2018) (Doc. 907); 3 Kevin O'Malley, et al., Fed. Jury Prac. & Instr. § 150:20 (6th ed. 2012).

**DPP's Argument re Disputed Instruction No. 21: Overview of Antitrust Claims**

DPPs' proposed instruction closely tracks ABA Model Civil Jury Instructions, Chapter 1, Instruction 2, based on the elements of a Section 1 claim under the Sherman Act, and Chapter 2, Instruction 1. DPPs' instruction explains the elements of a Section 1 claim in plain, simple English without extraneous language or duplication

*Description of the Alleged Conspiracy, Products Affected, and Anticompetitive Conduct.* As the ABA Model Instructions suggest, *see* Ch. 2 Instr. 1, DPPs' instruction identifies the conduct and trade restraints at issue. As discussed in the Pretrial Statement, DPPs intend to prove that Defendants agreed, conspired, and combined to fix prices, rig bids, and otherwise suppress competition in the markets for electrolytic and film capacitors in the United States, which caused an increase in prices for such capacitors that were billed or shipped to the United States. Defendants, however, would limit DPPs to the wording used in a complaint filed years ago, a complaint that was not intended to be the final word on DPPs' position, but to put the Defendants on notice of DPPs' claims. At this point, the descriptions in the final pretrial order control. *Rogers v. Raymark Indus.*, *Inc.*, 922 F.2d 1426, 1432 (9th Cir. 1991) ("a final pretrial order controls the subsequent course of action in a trial[.]").

*Proving All Elements as to "Each Particular Defendant."* DPPs do not need to reprove their case as to "each particular defendant." Neither the ABA's Model nor Defendants' citations require that the *conspiracy* be proven repeatedly. *See* ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 1, Instr. 2 ("To establish a violation of Section 1 of the Sherman Act, plaintiff must prove the following: [¶] (1) the existence of *a* . . . conspiracy between or among at least two separate entities." (emphasis added)); DPPs Argument re Disputed Instr. No. 22A Offered by Defs (Single v. Multiple Conspiracies). Nor does the interstate or import commerce requirement vary by Defendant— Defendants' own instruction on Import Commerce, Disputed Instr. No. 29B, instructs only that the "agreement… had a direct, substantial, and reasonably foreseeable effect" on U.S. or import commerce." Causation and damages similarly do not vary by Defendant, as all conspirators are jointly and severally liable. *See William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co., Inc.,* 668 F.2d 1014, 1052–53 (9th Cir.1981).

"*Conspiracy, contract, or combination*." Defendants would omit this phrase drawn directly from the Sherman Act. *See* 15 U.S.C. § 1 (outlawing "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade"). It is appropriate to charge the jury with the language of the statute and allow the jury to decide if Defendants violated it.

*Intent.* The Court should charge the jury that a conspirator can be held liable if it joined the conspiracy "knowingly" in accord with the ABA model instruction in Chapter 2, A(1) (page 13) which omits the "voluntary and intentionally" language. DPPs request the Court give that language.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Defendants' Brief on Disputed Instruction No. 21: Overview of Antitrust Claims**

Defendants' proposed instruction hews more closely with DPPs' Third Amended Complaint and with definitions provided by the ABA Model Jury Instructions in Civil Antitrust Cases.  The Model Instructions provide that different terms are used to describe an arrangement among defendants, but that the specific terminology used in this instruction should be adjusted to fit the facts of a particular case. *See* ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 2 Instr. 1, Notes.  To this end, Defendants' proposal is more straightforward and easier for a jury to understand, while also hewing more closely to the allegations in the Third Amended Complaint and the ABA Model Jury Instructions.

**Stipulated Instruction No. 22 Re Conspiracy, Contract, or Combination**

DPPs allege that Defendants participated in a conspiracy to restrain trade by fixing, raising, maintaining, and stabilizing the price of aluminum, film and tantalum capacitors. A conspiracy is an agreement or understanding between two or more persons to restrain trade by fixing, raising, maintaining, and stabilizing the price of aluminum, film and tantalum capacitors. DPPs must prove both of the following elements by a preponderance of the evidence:

(1)  that the alleged conspiracy existed; and

(2)  that one or more Defendants knowingly participated in that conspiracy. To act knowingly means to participate voluntarily or intentionally, and not because of mistake or accident or other innocent reason.

The basis of a conspiracy is an agreement or understanding between two or more persons. An agreement or understanding between two or more persons exists when they share a commitment to a common scheme. To establish the existence of a conspiracy, the evidence need not show that its members entered into any formal or written agreement. The agreement or understanding itself may have been entirely unspoken.

A person can become a member without full knowledge of all of the details of the conspiracy, the identity of all of its members, or the parts such members played in the charged conspiracy. The members need not have agreed on the details of the conspiracy, so long as they agreed on or mutually understood the essential nature of the plan. The members of the conspiracy need not necessarily have met together, directly stated what their object or purpose was to one another, or stated the details or the means by which they would accomplish their purpose. To prove a conspiracy existed, the evidence must show that the alleged members of the conspiracy came to an agreement or understanding among themselves to accomplish a common purpose.

A conspiracy may be formed without all parties coming to an agreement the same time. Similarly, it is not essential that all persons acted exactly alike, nor is it necessary that they all possessed the same motive for entering the agreement or understanding. It is also not necessary that all of the means or methods claimed by DPPs were agreed upon to carry out the alleged conspiracy, nor

that all of the means or methods that were agreed upon were actually used or put into operation, nor that all the persons alleged to be members of the conspiracy were actually members. It is the agreement to set, fix, raise, maintain or stabilize the price of aluminum, film and tantalum capacitors that constitutes a conspiracy. Therefore, you may find a conspiracy existed regardless of whether it succeeded or failed.

DPPs may prove the existence of the alleged conspiracy through direct evidence, circumstantial evidence, or both. Direct evidence is explicit and requires no inferences to establish the existence of the alleged conspiracy.

Direct evidence of an agreement may not be available, and therefore a conspiracy also may be shown through circumstantial evidence. You may infer the existence of a conspiracy from the circumstances, including what you find the alleged members actually did, and the words they used. Mere similarity of conduct among various persons, however, or the fact that they may have associated with one another and may have met or assembled together, does not by itself establish the existence of a conspiracy.

In determining whether an agreement or understanding between two or more persons has been proved, you must view the evidence as a whole and not piecemeal.

*Authority*: Adapted from ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 2 Instr. 1, pp.13-14 (2016); 3 Kevin O'Malley, et al., Fed. Jury Prac. & Instr. § 150:43 (6th ed. 2012),

**Disputed Instruction No. 22A Re Single v. Multiple Conspiracies Offered by Defendants**

You must decide whether the conspiracy [alleged by DPPs] existed, and, if it did, who [each] of its members were. If you find that the conspiracy alleged did not exist, then you must return [a verdict for Defendants], even though you may find that some other conspiracy existed. Similarly, if you find that any defendant was not a member of the [alleged] conspiracy, then you must find that defendant not [liable], even though that defendant may have been a member of some other conspiracy.

*Authority*:  Adapted from Ninth Circuit Criminal Model Instruction No. 8.22.

**DPP's Argument re Defendants' Proposed Jury Instruction No. 22A: Single v. Multiple Conspiracies**

Defendants' proposed instruction applies in *criminal* cases. *See* Ninth Circuit Model Criminal Instructions 8.22; *cf. also* Sixth Circuit Pattern Jury Instructions 3.09. This instruction, and those like it, are pertinent when the government charges a single *criminal* conspiracy but may prove only a smaller conspiracy:

> It is common practice, especially in drug cases, for the government (because of various procedural advantages that inhere) to charge a single large conspiracy. In turn, defendants often claim that, at worst, only smaller (often uncharged) conspiracies existed. Where requested, trial courts may then give a so-called multiple conspiracies charge, inviting the jury to consider the possibility that only smaller conspiracies have been shown.

*United States v. Oreto*, 37 F.3d 739, 748 (1st Cir. 1994) (citations omitted); *see also United States v. Anguiano*, 873 F.2d 1314, 1317 (9th Cir. 1989) ("A multiple conspiracies instruction is generally required where the indictment charges several defendants with one overall conspiracy, but the proof at trial indicates that a jury could reasonably conclude that some of the defendants were only involved in separate conspiracies unrelated to the overall conspiracy charged in the indictment."). In any event, DPPs have alleged and will prove a global price-fixing conspiracy to fix, raise and stabilize the price of capacitors, and the evidence at trial will show not many conspiracies but a single one. A multiple conspiracy instruction would be inappropriate here and would confuse the jury.

Defendants' proposed instruction is also misleading, confusing and duplicative. DPPs allege a conspiracy to raise, fix or stabilize capacitor prices. By inserting "multiple" into the title, Defendants invite jurors to erroneously compartmentalize the factual components of the conspiracy, as the Supreme Court warned. *Cont'l Ore v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962) ("[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole, and in a case like the one before us, the duty of the jury was to look at the whole picture and not merely at the individual figures in it.") (internal quotation marks and citations omitted)).

Further, Defendants' proposed instruction is both redundant and confusing. The agreed upon language in Disputed Instruction No. 22 Re Conspiracy, Contract, or Combination highlights this. DPPs and Defendants agreed on the language "nor is it necessary that they [the conspirators] all possessed the same motive," yet Defendants wish to state in the jury in the very next instruction, "Where the participants in separate agreements are not so joined, they are not members of a single, overarching conspiracy, even though the separate agreements . . . may have similar goals." The instructions as Defendants want them would tell the jury a conspiracy does not require that all members possess the same "motive" but that non-conspirators may have similar "goals." This hair-splitting between motives and goals would be inscrutable to a lay juror. *See Motive*, Shorter Oxford English Dictionary Vol. 1 1840 (5th ed., 2002) (defining motive as "A factor or circumstance inducing a person to act in a certain way; an emotion, reason, or *goal*, etc., . . ." (emphasis added)).

Further, Defendants' proposed instruction has no support in the law. The cases they cite all involved issues to be decided by a judge—not by a jury. The jury weighs facts proven at trial. It should not be instructed based on the legal standards that govern motions to dismiss, *e.g.*, *In re Copper Antitrust Litig.*, 98 F.Supp.2d 1039 (W.D. Wis. 2000), to consolidate, *e.g., In re Auto. Parts Antitrust Litig.*, No. 12-cv-00203, 2016 WL 8200512 (E.D. Mich. Apr. 13, 2016), or to certify a class. *E.g., In re Air Cargo Shipping Services Antitrust Litig.*, No. 06-MD-1175 JG VVP, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014).

**Defendants' Brief on Disputed Instruction No. 22A Re Single v. Multiple Conspiracies**

It is Plaintiffs' burden to prove both the existence of the conspiracy alleged in the Complaint and that individual defendants joined that particular conspiracy.  *In re Auto. Parts Antitrust Litig.*, No. 12-md-02311, 2016 WL 8200512, at *4 (E.D. Mich. Apr. 13, 2016) (explaining that the "mere overlap of some of the defendants in some of the transactions is, on its own, insufficient to establish an overarching agreement" (citations omitted)).  Because the Defendants dispute the existence of the single conspiracy charged in the Complaint—and because the DPPs intend to introduce evidence of various bilateral and trilateral agreements as evidence of a single overarching conspiracy—the jury should be instructed on the requirement that Plaintiffs prove both the existence of the specific conspiracy alleged and each individual Defendant's participation in it.  For this reason, Defendants have proposed an instruction about single and multiple conspiracies, which is taken nearly verbatim from Ninth Circuit Criminal Model Instruction No. 8.22.

Caselaw makes clear, both in the civil and criminal contexts, that where an antitrust conspiracy is alleged, it is the role of the jury to determine that there was a single overarching conspiracy as opposed to multiple discrete events.  *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-CV-5944-JST, 2016 WL 5871243, at *7 (N.D. Cal. Oct. 7, 2016) (explaining that the jury must determine whether "there was a single conspiracy to fix the prices"); *In re Copper Antitrust Litig.*, 98 F. Supp. 2d 1039, 1055 (W.D. Wis. 2000) ("Whether a conspiracy is single or multiple is a question of fact appropriately determined by a jury."); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 JG VVP, 2014 WL 7882100, at *38 (E.D.N.Y. Oct. 15, 2014), report and recommendation adopted, No. 06-MD-1775 JG VVP, 2015 WL 5093503 (E.D.N.Y. July 10, 2015) (explaining that "[w]hether the plaintiffs' proof of [a global] conspiracy is more or less compelling than the defendants' alternative theory [of smaller conspiracies] is a question of fact for the jury"); *United States* v.

*Dicesare*, 765 F.2d 890, 900 (9th Cir. 1985) ("The existence of separate conspiracies is a question of fact, not of law, to be determined by the jury.").

Because it is the jury's role to decide whether DPPs have proven a single overarching conspiracy, it is important to provide them proper instruction that would allow them to distinguish between a series of separate agreements and a single overarching conspiracy.

**Disputed Instruction No. 23 Re Participation and Intent Offered by DPPs**

Before you can find that a defendant was a member of the conspiracy alleged by plaintiffs, the evidence must show that that defendant knowingly joined in the unlawful plan at its inception or at some later time with the intent to further some object or purpose of the conspiracy.

To act knowingly means to participate deliberately, and not because of mistake, accident, or other innocent reason. A person may become a member of a conspiracy without full knowledge of all the details of the conspiracy, the identity of all its members, or the parts they played. Knowledge of the essential nature of the plan is enough. On the other hand, a person who has no knowledge of a conspiracy, but happens to act in a way that furthers some object or purpose of the conspiracy, does not thereby become a conspirator.

A company or a person that knowingly joins an existing conspiracy, or who participates only in part of a conspiracy with knowledge of the overall conspiracy, is just as responsible as if it had been one of those who formed or began the conspiracy and participated in every part of it.

In determining whether a defendant was a member of the alleged conspiracy, you should consider only the evidence about that particular Defendant's statements and conduct, including any evidence of that Defendants' knowledge and participation in the events involved and any other evidence of that particular Defendants' participation in the conspiracy alleged. The fact that a defendant plays a minor role in the conspiracy does not preclude that Defendants' liability. You may find that a defendant or alleged co-conspirator participated in or joined a conspiracy if a preponderance of the evidence shows that the defendant or alleged co-conspirator knowingly made even a single statement or engaged in a single act that demonstrates an intent by that defendant to participate in the unlawful agreement. Once there is proof of a conspiracy, DPPs only need to show a Defendants' slight connection to the conspiracy to establish liability.

You may not find that a defendant was a member of a conspiracy based only on its association with or knowledge of wrongdoing, but it is a factor you may consider to determine whether a defendant was a member of the alleged conspiracy.

If you find that the alleged conspiracy existed, then the acts and statements of the conspirators are binding on all of those whom you find were members of the conspiracy.

Once you have found that a Defendant is a member of a conspiracy, it is presumed to remain a member and is responsible for all actions taken by all coconspirators during and in furtherance of the conspiracy until it is shown that the conspiracy has been completed. or abandoned.

*Authority*: Adapted from ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 2(A) Instr. 4; 3 Kevin O'Malley, et al., Fed. Jury Prac. & Instr. § 150:43 (6th ed. 2012); *see also United States v. Foster*, 985 F.2d 466, 469 (9th Cir. 1993) ("Once there if proof of a conspiracy, 'evidence of only a slight connection to the conspiracy' is sufficient to convict for participation in the conspiracy."); *United States v. Dicesare*, 765 F.2d 890, 900 (9th Cir. 1985) (co-conspirator who joins pre-existing conspiracy bound by all that has gone on before in the conspiracy); *Beltz Travel Serv. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1366-67 (9th Cir. 1980).

**Disputed Instruction No. 23 Re Participation and Intent Offered by Defendants**

Before you can find that a defendant was a member of the conspiracy alleged by Plaintiffs, the evidence must show that the Defendant in question knowingly joined in the unlawful plan at its inception, or at some later time, with the intent to advance or further some object or purpose of the conspiracy.

To act knowingly means to participate deliberately and not because of mistake, accident, or other innocent reason. A person may become a member of a conspiracy without full knowledge of all the details of the conspiracy, the identity of all its members, or the parts they played. Knowledge of the essential nature of the plan is enough. On the other hand, a person who has no knowledge of a conspiracy, but happens to act in a way that furthers some object or purpose of the conspiracy, does not thereby become a conspirator. A company that knowingly joins an existing conspiracy, or who participates only in part of a conspiracy with knowledge of the overall conspiracy, is just as responsible as if it had been one of those who formed or began the conspiracy and participated in every part of it.

In determining whether a Defendant was a member of the alleged conspiracy, you should consider only the evidence about that particular Defendant's statements and conduct, including any evidence of that Defendant's knowledge, understanding and participation in the events involved and any other evidence of that particular Defendant's participation in the conspiracy alleged. You may not find that a Defendant was a member of a conspiracy based only on its association with or knowledge of wrongdoing, but it is a factor you may consider to determine whether a Defendant was a member of the alleged conspiracy.

If you find that the alleged conspiracy existed, then the acts and statements of the conspirators are binding on all of those whom you find were members of the conspiracy.

Once you have found that a Defendant is a member of a conspiracy, it is presumed to remain a member and is responsible for all actions taken by all coconspirators during and in furtherance of the conspiracy until it is shown that the conspiracy has been completed or abandoned or that the person has withdrawn from the conspiracy.

*Authority*: Adapted from ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 2(A), Instr. 4.

**DPP's Argument re Disputed Instruction No. 23: Participation and Intent**

*Description of conspiracy and products affected.* DPPs' incorporate by reference their argument in Disputed Instruction No. 21 (Overview of Antitrust Claims).

DPPs' proposed instruction charges the jury to consider the evidence as to whether a defendant participated in the conspiracy, thus avoiding any concerns about mass trials. However, Defendants' proposed instruction omits several points of governing law:

*Participation Via Minor Role.* The jury should be instructed that a Defendant need not play a major or dominant role in the conspiracy to be liable. *See United States v. Hamilton*, 587 F.3d 1199, 1207 (10th Cir. 2009) ("Even a single overt act by the defendant can be sufficient to connect him to the conspiracy if that act leads to a reasonable inference of intent to participate"). Even if a defendant did not have full knowledge of all of the details of the conspiracy, it is still liable for all conspiratorial conduct. *United States v. Diaz*, 190 F.3d 1247, 1264 n.17 (11th Cir. 1999); *United States v. Magee*, 821 F.2d 234, 240 (5th Cir. 1987); *Fontenot*, 483 F.2d at 323; Jury instructions, *In re High Pressure Laminates*, No. 00-md-1368 (S.D.N.Y. May 23, 2006), at 2318.

*Slight connection.* Similarly, controlling Ninth Circuit precedent has provided that even if a party has only a slight connection to the conspiracy, it is still fully liable for the conspiracy. *United States v. Perlaza*, 439 F.3d 1149, 1177 (9th Cir. 2006) (quoting *United States v. Wright*, 215 F 3d 1020, 1028 (9th Cir. 2000)) ("It is well-settled in this circuit that, once the existence of a conspiracy is established, a defendant may be convicted of knowing participation therein if the evidence establishes, 'even a slight connection' between the defendants and the conspiracy."); *United States v. Reed*, 575 F.3d 900, 924 (9th Cir. 2009); *United States v. Herrera-Gonzalez*, 263 F.3d 1092, 1095 (9th Cir. 2001); *see also In re Vitamins Antitrust Litig.*, 320 F. Supp. 2d 1, 15 n.28 (D.D.C. 2004) (noting the substantive legal standards for determining the scope of and participation in a conspiracy are the same in civil and criminal cases); *Apex Oil Co. v. DiMauro,* 822 F.2d 246, 257 (2d Cir. 1987) (reversing summary judgment based on evidence of slight connection to conspiracy). DPPs' language is drawn directly from controlling Ninth Circuit caselaw. The jury should be so informed.

*Withdrawn from the conspiracy*. This language is optional language from ABA Model Jury Instruction, Chapter 2(A), Instruction 4 (Participation and Intent). Defendants presented no evidence that any of them withdrew from the conspiracy, nor do DPPs understand that Defendants intend to present evidence that they withdrew from the conspiracy. Absent any argument or evidence regarding withdrawal, the insert should not be given.

1

2

**Defendants' Brief on Disputed Instruction No. 23:
Participation and Intent**

3

Defendants propose an instruction that is virtually verbatim from the ABA Model Jury

4

Instructions in Civil Antitrust Cases.  DPPs' proposal, by contrast, seeks to incorporate language that is

5

absent from the model instructions and was never given as a jury instruction in any case that DPPs cite.

6

The Court should reject DPPs' efforts.

7

DPPs propose the following language in the second half of the fourth paragraph: "The fact that a

8

defendant plays a minor role in the conspiracy does not preclude that Defendants' liability. You may

9

find that a defendant or alleged co-conspirator participated in or joined a conspiracy if a preponderance

10

of the evidence shows that the defendant or alleged co-conspirator knowingly made even a single

11

statement or engaged in a single act that demonstrates an intent by that defendant to participate in the

12

unlawful agreement. Once there is proof of a conspiracy, DPPs only need to show a Defendants' slight

13

connection to the conspiracy to establish liability."  This language is not in the ABA Model Jury

14

Instructions, misstates the law, and was not included in any instruction given in any of the cases that

15

DPPs cite.  Accordingly, there is no basis for including this language, which would mislead the jury and

16

prejudice Defendants, and so Defendants have struck it in their modifications.

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### Disputed Instruction No. 24 Re Good Intent Not a Defense Offered by DPPs

If you find that a defendant engaged in a price-fixing conspiracy, it is not a defense for that defendant that it acted with good motives or thought its conduct was legal, or that the conduct may have had some good results.

*Authority*: ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 2(B) Instr. 3.

1

**Disputed Instruction No. 24 Re Good Intent Not a Defense**

2

[Defendants object to this instruction in its entirety.]

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DPP's Argument re Disputed Instruction No. 24: Good Intent Is Not a Defense Offered by DPPs**

DPPs' proposed instruction is taken verbatim from the ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 2, Instr. 3—that it is not a defense for a price-fixer to have acted with good motives. As the official comments state, "This instruction is appropriate where the court determines that the alleged restraint, if proven is illegal per se." *See id.*, Notes. DPPs claim precisely such a per se violation here. Therefore, no such excuse is admissible at trial As the Supreme Court has held: "Whatever economic justification particular price-fixing agreements may be thought to have, the law does not permit an inquiry into their reasonableness. They are all banned because of their actual or potential threat to the central nervous system of the economy." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224-25 (1940); *White Motor Co. v. United States*, 372 U.S. 253, 260 (1963) ("Price-fixing arrangements . . . have . . . been held to be per se violations of the antitrust laws; and a trial to show their nature, extent, and degree is no longer necessary" (citations omitted)); *see also United States v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206, 1208 (9th Cir. 1992) ("Price fixing is illegal regardless of pro-competitive justifications offered therefor: '[I]t is not our task to pass upon the social utility or political wisdom of price-fixing agreements . . . . Every such horizontal arrangement among competitors poses some threat to the free market.") (quoting *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 421-22, 434 (1990) (first alteration in original)). Because price fixing is condemned per se, any evidence tending to prove Defendants' conduct was justified or reasonable is irrelevant and inadmissible. *See, e.g.*, *United States v. Joyce*, 895 F.3d 673, 677 (9th Cir. 2018) ("Joyce's assertion that the district court erred by not allowing him to present evidence to the jury regarding the actual effect his conduct had on the market for foreclosed properties is misplaced. The per se rule eliminates the need to inquire into the specific effects of certain restraints of trade."); *United States v. Kahan & Lessin Co.*, 695 F.2d 1122, 1125 (9th Cir. 1982) (affirming district court's rejection of argument that "per se rule should not apply if the price fixing can be shown to have procompetitive justifications.").

Defendants, however, apparently plan to present evidence that the restraints were reasonable and efficient based on good motives or may have produced good results. *See, e.g.*, DPPs' Motion *in*

*Limine* No. 7. In meet and confer sessions, DPPs offered to withdraw this instruction if Defendants would agree not to make any such defense. Defendants have not accepted that proposal, so the need for this instruction remains: no such explanation or justification is allowed.

To the extent Defendants argue that a motion *limine* already precludes evidence that price-fixing has pro-competitive or pro-consumer effects, a motion *in limine* is distinct from a jury instruction. Jurors are not instructed on motions *in limine*. Additionally, "good intent" is broader than pro-competitive or pro-consumer justifications. As the instruction indicates, good motives or believing conduct is legal is not a defense for engaging in a price-fixing conspiracy. The jury should be so informed.

**Defendants' Brief on Disputed Jury Instruction No. 24:**
**Good Intent Not a Defense**

For the reasons discussed below, Defendants do not believe that an instruction about good faith not being a defense is appropriate or justified given the facts and circumstances of this case.  However, should the Court disagree and believe that such an instruction should be given, Defendants do not object to the language that DPPs have proposed.

Defendants do not believe DPPs' proposed instruction is necessary or applicable to this case. No Defendant will argue at trial, or has ever argued in this litigation, that even if the jury finds that it engaged in the price-fixing conspiracy alleged by DPPs, it should not be held liable because it "acted with good motives or thought its conduct was legal, or that the conduct may have had some good results."  DPPs' citation to their own Motion in Limine No. 7, which relates to procompetitive effects of restraints of trade, is inapposite and does not contradict Defendants' assertion that they have no intention of making good-faith arguments at trial.  The Court has already granted that motion in limine so no evidence or argument could be presented that price fixing has pro-competitive or pro-consumer benefits.  *See* Pretrial Order No. 2, ECF No. 2559.

The "no good faith defense" instruction is not given in every *price*-fixing case.  It was not given in the *Korean Ramen* trial, the most recent analogous price-fixing trial in this district.  *See In re Korean Ramen Antitrust Litig.,* Jury Instructions, No. 3:13-cv-04115-WHO (N.D. Cal. Dec. 13, 2018) (Doc. 914).  That is because good faith was not a defense raised by the defendants in that case.  The same is true here.

**Disputed Instruction No. 25 Re Corporations and Agency Offered by DPPs**

Under the law, a corporation is considered a person, but it can only act through its employees, agents, directors, and officers. Therefore, a corporation is responsible for the acts of its employees, agents, directors and officers performed within the scope of authority. A corporation is not capable under the law of conspiring with its own agents, unincorporated divisions, or wholly-owned subsidiaries because they are treated as a single entity. Through its agents, however, a corporation is capable of conspiring with other persons or independent corporations.

A corporation is legally bound by the acts and statements of its agents or employees done or made within the scope of the agent's employment or apparent authority. Any act or omission of a corporation's agent within the scope of authority is the act or omission of the corporation. In particular, those who act with the apparent authority of the principal are held to be agents of that principal, and the conduct of those agents will be attributed to the principal in order to establish liability.

Acts done within the scope of employment are acts performed on behalf of a corporation and directly related to the performance of the duties the agent has general authority to perform. Apparent authority is the authority that persons outside the corporation could reasonably believe the agent would have, judging from his or her position with the company, the conduct of the company, the responsibilities previously entrusted to the person or the office, and the circumstances surrounding his or her past conduct. An agent can have apparent authority even when, despite these appearances, the agent is actually acting in a dishonest, fraudulent, illegal or anticompetitive manner. If apparent authority has been established, the corporation is liable for the acts of the apparent agent just as if the corporation had authorized the agent from the outset.

The fact that a corporation has instructed its agents not to violate the antitrust laws does not excuse the corporation from responsibility for the unlawful acts of its agents done within the scope of their employment or apparent authority.

*Authority*: Ninth Circuit Manual of Model Civil Jury Instructions, Instr. 4.2, 4.6 , 4.8 (2017); ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 2(A) Instr. 3; *see also Am. Soc. Of Mech.*

*Engineers v. Hydrolevel Corp.*, 456 U.S. 556, 565-66, 572-74 (1982) (a principal "may be held liable [under the antitrust law] for the acts of [its] agents even though the organization never ratified, authorized or derived any benefit whatsoever from the fraudulent activity of the agent and even though the agent acted solely for his private employer's gain.").

### Disputed Instruction No. 25 Re Corporations or Agency Offered by Defendants

Under the law, a corporation is a person, but it acts only through its agents. A corporation's agents include its directors, officers, employees, or others acting on its behalf. A corporation is not capable under the law of conspiring with its own agents, unincorporated divisions, or wholly owned subsidiaries. Through its agents, however, a corporation is capable of conspiring with other persons or independent corporations.

A corporation is legally bound by the acts and statements of its agents or employees done or made within the scope of the agent's employment or apparent authority.

Acts done within the scope of employment are acts performed on behalf of a corporation and directly related to the performance of the duties the agent has general authority to perform. Apparent authority is the authority that persons outside the corporation could reasonably believe the agent would have, judging from his or her position with the company, the responsibilities previously entrusted to the person or the office, and the circumstances surrounding his or her past conduct. An agent can have apparent authority even when, despite these appearances, the agent is actually acting in a dishonest, fraudulent, or anticompetitive manner.

To summarize, for a corporation to be legally responsible for the acts or statements of its agents, you must find that the agent was acting within the scope of his or her employment with apparent authority.

The fact that a corporation has instructed its agents not to violate the antitrust laws does not excuse the corporation from responsibility for the unlawful acts of its agents done within the scope of their employment or apparent authority.

A corporation is entitled to the same fair trial as a private individual. The acts of a corporation are to be judged by the same standard as the acts of a private individual, and you may hold a corporation liable only if such liability is established by the preponderance of the evidence. All persons, including corporations, are equal before the law.

*Authority*: Adapted from ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 2(A) Instr. 3

**DPP's Argument re Disputed Instruction No. 25: Corporations or Agency**

DPP's instruction combines verbatim language from Ninth Circuit Model Instructions on Agency with helpful additions on corporate law principles from the ABA Model Jury Instructions in Civil Antitrust Cases (2016 ed.), Ch. 2, Instruction 3: Corporations.

*Under the law, a corporation is considered a person, but it can only act through its employees, agents, directors, and officers. Therefore, a corporation is responsible of the acts of its employees, agents, directors and officers performed within the scope of authority*. DPPs' proposed language is Ninth Circuit Model Civil Instruction 4.2 Liability of Corporations in its entirety. It is also consistent with the Supreme Court decision in *Am. Soc. of Mech. Engineers v. Hydrolevel Corp.*, 456 U.S. 556 and the Ninth Circuit's decision in *Arandell Corp. v. Centerpoint Energy Services*, 900 F.3d 623 (9th Cir. 2018).

*Any act or omission of a corporation's agent within the scope of authority is the act or omission of the corporation.* DPPs' proposed language is Ninth Circuit Model Civil Instruction 4.8 Act of Agent is Act of Principal in its entirety.

*If apparent authority has been established, the corporation is liable for the acts of the apparent agent just as if the corporation had authorized the agent from the outset*. DPPs' proposed language is drawn from Ninth Circuit Model Civil Instruction 4.6 Apparent Agency. Combined with language from the ABA Model Instruction, DPPs instruction succinctly states the principle of apparent authority in easy to understand language. *Hydrolevel*, 456 U.S. at 565-66.

*In particular, those who act with the apparent authority of the principal are held to be agents of that principal, and the conduct of those agents will be attributed to the principal in order to establish liability.* DPPs add this language as it highlights that agents need not act only in their actual authority to render a principal liable. It introduces the jury in easy to understood fashion to the concept of apparent authority which may not be intuitive to lay jurors.

DPPs also propose a small but important addition to the ABA Model Instruction's treatment of *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984). *Copperweld* established that when a corporation and its subsidiaries engage in "coordinated activity," they are treated as a "single

enterprise" and thus cannot, as a matter of law, be found to have conspired with each other. *Id.* at 771. The Model Instruction states the *Copperweld* rule, but does not provide important context or explanation. Such context and explanation must be given here as many Defendants or co-conspirators are different entities within the same corporate family, including UCC, which is wholly-owned by its corporate parent, NCC, and is one of the only remaining Defendants in this case. As discussed in more detail below with respect to Instruction No. 25, that certain corporate families are treated as a "single enterprise" under the antitrust law is key to understanding the evidence in this case. Accordingly, DPPs propose to add the italicized language, as follows: "A corporation is not capable under the law of conspiring with its own agents, unincorporated divisions, or wholly-owned subsidiaries *because they are treated as a single entity*." This additional language elucidates this legal concept and will provide important context for Instruction No. 25, which addresses the relationship between parent and subsidiary corporations.

DPPs object to Defendants' insertion of the paragraph "To summarize . . ." The Model ABA instruction is duplicative with the language DPPs inserted from the Ninth Circuit Model Civil Instructions on Agency principles. The redundancy is also unnecessary and confusing.

DPPs object to Defendants' insertion of the last paragraph. It is duplicative with Instruction No. 5. That instruction already instructs the jury that corporations are "entitled to the same fair" consideration as any other party. That liability is only established in this case by a preponderance of the evidence is duplicative with Instruction No.2 (Burden of Proof). That corporations are "equal before the law" is again duplicative with the principle in Instruction 5 that corporations are entitled to the same fair consideration as any other party. The redundance is also unnecessary and confusing.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### Defendants' Brief on Disputed Instruction No. 25:
### Corporations or Agency

Defendants' proposal is taken verbatim from the ABA Model Jury Instructions in Civil Antitrust cases, per the Court's Order, while the DPPs' proposal departs from it. The Court should decline to depart from the Model and instead adopt the Defendants' proposal.

There are several reasons why DPPs' proposal is inappropriate. First, although DPPs cite to an ABA Model for Civil Antitrust Cases (A-3), DPPs' proposal departs from the model instruction without justification. These departures introduce legal error. For example, DPPs' proposed instruction adds the clause "because they are treated as a single entity" to the sentence from the model instruction that otherwise reads, "[a] corporation is not capable under the law of conspiring with its own agents, unincorporated divisions, or wholly owned subsidiaries." This addition is an incorrect statement of the law in that it suggests that a corporation and its agents, unincorporated divisions, or wholly owned subsidiaries are treated as a single entity for all purposes. The model instruction, by contrast, accurately reflects the law as articulated in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984) (establishing that a corporation and its wholly owned subsidiaries "are incapable of conspiring with each other for purposes of § 1 of the Sherman Act"), and in *American Needle, Inc. v. NFL*, 560 U.S. 183, 191 (2010) (reiterating that whether conduct is concerted, and thus within the purview of Section 1 does not turn on formal legal distinctions but rather on a "functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate"), and therefore requires no modification. Moreover, for the reasons explained in Defendants' Brief on Disputed Instruction No. 26, there is no reason to include any references to the "single entity" theory. In any event, the reason a corporation is not capable of conspiring with its own agents, unincorporated divisions, or wholly owned subsidiaries is irrelevant to the jury's charge. Adding this language, then, will only cause juror confusion.

Second, DPPs' seek to add superfluous language to the third paragraph of the model instruction that unnecessarily lengthens and complicates the model instruction. This duplicative language should be stricken.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Finally, DPPs' proposed instruction is incomplete because it fails to include the model instruction's summary paragraph and fails to cover the rights of a corporation.  Omission of the former would cause confusion, and omission of the latter would be prejudicial to Defendants.

Accordingly, DPPs' proposed instruction should be struck and ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 2(A) Instr. 3 should be utilized instead.

**Disputed Instruction No. 26 Re Subsidiary Purpose Offered by DPPs**

If a person is injured by purchasing goods from a subsidiary company of a parent company which took part in a conspiracy to set, fixed, raised, maintained, or stabilized prices, the law permits that person to recover from the parent.

A parent company and its wholly-owned subsidiary company always share a complete unity of purpose or common design. They share a common purpose and objectives whether or not the parent keeps a tight rein over the subsidiary or is aware of every act by the subsidiary. The coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise. Where there is substantial common ownership, individual firms function as an economic unit and are generally treated as a single entity. A subsidiary cannot innocently advance an anticompetitive scheme for a legitimate business purpose while its parent or its sister subsidiary companies advance the same scheme for an illegal, anticompetitive purpose.

Because a parent company and its subsidiaries share a unity of purpose, it is not necessary to find that the subsidiary knew of the existence of the conspiracy entered into by its parent and/or commonly owned affiliates if it sold a product whose price was fixed by its parent. A wholly owned subsidiary always acts for the benefit of the parent, which is its sole shareholder.

*Authority*: *Arandell Corp. v. Centerpoint Energy Services, Inc.*, 900 F.3d 623, 631-32 (9th Cir. 2018) ("*Copperweld* supports the following rule: A wholly owned subsidiary that engages in coordinated activity in furtherance of the anticompetitive scheme of its parent *and/or* commonly owned affiliates is deemed to engage in such coordinated activity with the purposes of the single 'economic unit' of which is it a part" (emphasis added)); *Royal Printing Co. v. Kimberly Clark Corp.*, 621 F.2d 323, 326 & n. 6 (9th Cir. 1980); *see also Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984); *Lenox MacLaren Surgical Corp. v. Medtronic*, 847 F.3d 1221 (10th Cir. 2017).

1

**Disputed Instruction No. 26 Re Affiliated Corporate Parties Offered by Defendants**

2

A subsidiary is a company that is owned or controlled by another company, often called a

3

parent company.  Because a parent company and its subsidiary (or subsidiaries) are separate entities,

4

the mere fact of ownership does not make a parent company liable for the acts of its subsidiary or a

5

subsidiary liable for the acts of its parent company.  For this reason, you must evaluate the actions of

6

each Defendant separately as you consider whether DPPs have met their burden of proof with respect

7

to the conspiracy alleged.

8

9

*Authority*: Adapted from *United States v. Bestfoods*, 524 U.S. 51, 68 (2003) ("It is a general principle

10

of corporate law deeply ingrained in our legal system that a corporation is not liable for the acts of its

11

subsidiaries."); *Lenox MacLaren Surgical Corp. v. Medtronic*, 847 F.3d 1221, 1237 (10th Cir. 2017)

12

("[N]othing in our prior discussion should be read to suggest that a corporation can be held liable under

13

§ 2 for the anticompetitive conduct of one or more related entities, merely by virtue of its place in the

14

same corporate family."); *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th Cir. 1999) (rejecting the

15

claim that "a subsidiary and its parent, or a subsidiary and a sister subsidiary, can be considered one

16

entity for all § 1 purposes, and either one can be liable for conspiring to restrain trade, even where there

17

is no evidence that both were involved in the challenged conduct."); *In re Ins. Brokerage Antitrust*

18

*Litig.*, 618 F.3d 300, 341 n.44 (3d Cir. 2010) ("[A] subsidiary is a distinct legal entity and is not liable

19

for the actions of its parent or sister corporations simply by dint of the corporate relationship."); *In re*

20

*Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 904 (N.D. Cal. 2008)

21

("Plaintiffs will need to provide evidence of each Defendant's participation in any conspiracy."); *In re*

22

*Capacitors Antitrust Litigation*, No. 14-cv-3264 (N.D. Cal. May 26, 2015), Doc. 710 at 19 (ruling that

23

a parent "is not liable for the acts of its subsidiaries" (*quoting In re Cal. Title Ins. Antitrust Litig.*, No. C

24

08-01341 JSW, 2009 WL 1458025, at *7 (N.D. Cal. May 21, 2009)); *In re Capacitors Antitrust*

25

*Litigation*, No. 14-cv-3264 (N.D. Cal. June 11, 2015), Doc. 738 at 4 ("The Court agrees with NCC that

26

jurisdiction over it cannot be traced through UCC under an agency or alter ego theory, and the Court

27

declines plaintiffs' arguments to the contrary.").

28

**DPP's Argument re Disputed Instruction No. 26: Subsidiary Purpose/Affiliated Corporate Parties**

DPPs' proposed instruction reflects controlling Ninth Circuit law. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984), held that when a corporation and its subsidiaries engage in "coordinated activity" they are treated as a "single enterprise." As such, a corporation and its wholly-owned subsidiaries cannot be held liable under the antitrust laws for agreements between them. *Id.* at 771. *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623 (9th Cir. 2018), recognized the corollary to *Copperweld*: "A wholly owned subsidiary that engages in coordinated activity in furtherance of the anticompetitive scheme of its parent and/or commonly owned affiliates is deemed to engage in such coordinated activity with the purposes of the single 'economic unit' of which is it a part." *Id.* at 631-32. In other words, "Defendants cannot have the *Copperweld* doctrine both ways. It would be inconsistent to insist both (1) that two affiliates are incapable of conspiring with each other for purposes of Section 1 of the Sherman Act because they 'always' share 'unity of purpose,' and (2) that one affiliate may escape liability for its own conduct—conduct necessary to accomplish the illegal goals of the scheme—by disavowing the anticompetitive intent of the other, even where the two acted together." *Id.* at 630–31.

Nonetheless, Defendants seek to instruct the jury that "you must evaluate the actions of each Defendant separately as you consider whether DPPs have met their burden of proof with respect to the conspiracy alleged," while at the same time seeking the benefits of *Copperweld* to be treated as a "single entity." This is illogical and inconsistent. As held by the Ninth Circuit, Defendants cannot have it both ways. Their proposed instruction misstates the law.

What is more, Defendants' proposed instruction on this point fails to cite any Ninth Circuit authority and does not mention *Arandell*. Furthermore, the authority they do cite aligns with giving DPPs' instruction. Defendants cite to *Lenox MacLaren Surgical Corp. v. Medtronic*, 847 F.3d 1221, 1237 (10th Cir. 2017) to argue that it is it is contrary to *Arandell*. It is not; the two are consistent. *Arandell*, 900 F.3d at 631 ("The Tenth Circuit, so far the only Court of Appeals squarely to consider such an application of *Copperweld*, recently reached the *same conclusion* in" *Lenox*) (emphasis added)); *see also Lenox*, 847 F.3d at 1235 ("[W]e agree with Lenox that Defendants—three of which

(MSD Japan, PS Medical, and MSD, Inc.) are wholly owned subsidiaries of the fourth (Medtronic, Inc.)—should be treated as a single enterprise for purposes of the Sherman Act's conspiracy prohibitions."). In any event, the Ninth Circuit's decision in *Arandell* controls.

*Arandell* held that a wholly-owned subsidiary's sale of price-fixed goods at inflated prices constituted "coordinated activity" that was "critical" to the conspiracy, and the parent and subsidiary must be treated as a single entity under *Copperweld*. *Arandell*, 900 F.3d at 635. Defendants' proposed Instruction No. 25 would mislead the jury into believing that there is never a circumstance in which related entities should be treated as a single entity, a position that is contrary to controlling law and plain error.

The better course is to follow DPPs' proposed instruction, which builds on the instruction on this issue given in *Ramen Noodles*, the only price-fixing case that has gone to trial in this District since *Arandell* was decided. *See In re Korean Ramen Antitrust Litig.*, Jury Instructions, No. 3:13-cv-04115-WHO (N.D. Cal. Dec. 13, 2018) (Doc. 907). DPPs' instruction conforms with controlling law in Ninth Circuit.

**Defendants' Brief on Disputed Instruction No. 26: Affiliated Corporate Parties**

Defendants object to DPPs' proposed instruction—which is aimed at imposing liability on United Chemi-Con for the alleged conduct of its Japanese affiliate—because it is unsupported by evidence and not an accurate description of the law.  DPPs cite *Arandell Corp. v. CenterPoint Energy Servs., Inc.*, 900 F.3d 623 (9th Cir. 2018), as a source of the proposed instruction.  But *Arandell* is wholly inapplicable.  In *Arandell*, the Ninth Circuit endorsed a "single entity" theory based on uncontested evidence that "[t]he officers and directors of the Reliant *parent* orchestrated [the price-fixing] scheme," by directing one subsidiary to manipulate prices and instructing a second subsidiary to send its illegal profits back to the parent.  *Id.* at 628 (emphasis added).  Moreover, the parent company in *Arandell* could only sell gas into Wisconsin through a subsidiary and thus, the activities of the parent, the subsidiary, and the sister companies were necessarily completely interlocking and coordinated.  *Id*. at 627.

Capacitor sales require no such coordination, and no evidence akin to that present in *Arandell* exists here.  With respect to UCC, there is no evidence that it knew of the alleged conspiracy or that NCC instructed it to fix prices or funnel ill-gotten profits back to NCC.  The absence of this kind of evidence distinguishes *Arandell* and defeats DPPs' reliance on a "single entity" theory.

For these reasons, Defendants struck DPPs' proposed instruction and instead offered an instruction about corporate separateness, "a general principle of corporate law deeply ingrained in our legal system," *United States v. Bestfoods*, 524 U.S. 51, 68 (2003), and a principle already endorsed by this Court.  (ECF No. 710 at 19 (ruling that a parent "is not liable for the acts of its subsidiaries" quoting *In re Cal. Title Ins. Antitrust Litig.*, 2009 WL 1458025, at *7 (N.D. Cal. May 21, 2009)).  To the extent the Court believes an *Arandell* instruction is necessary, Defendants object to DPPs' instruction because it does not accurately state the law.  Indeed, *Arandell* is explicit: "commonly-owned-but-legally-distinct entities are considered a 'single entity' for antitrust purposes ***[only] where they engage in 'coordinated activity***,'" not simply because one entity is wholly owned by another, as DPPs' proposed instruction wrongly states.  *Arandell*, 900 F.3d at 633 (emphasis added); *see also id.* at 633 n.10 (explaining that "single entity" liability cannot be imposed "[i]n the absence of any ***specific***

*evidence of coordinated activity*" (quoting *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th Cir. 1999) (emph. added)).  Accordingly, if an *Arandell* instruction is given, Defendants propose:

> A subsidiary company, however, shares a unity of purpose with its parent company whenever the two engage in "coordinated activity."  Coordinated activity occurs where the parent and subsidiary act together in furtherance of the same price-fixing scheme.  For example, courts have found coordinated activity when officers and directors of the parent orchestrated the scheme by directing the subsidiary to manipulate prices and funnel the illegal profits back to the parent.

Defendants' proposed instruction is a restatement of the precise rule the Ninth Circuit said it was recognizing in *Arandell*, *see* 900 F.3d at 632 ("A wholly owned subsidiary that engages in coordinated activity in furtherance of the anticompetitive scheme of its parent and/or commonly owned affiliates is deemed to engage in such coordinated activity with the purposes of the single 'economic unit' of which it is a part."), and provides an example of what has been found sufficient in order to help the jury, *id.* at 634.

**Stipulated Instruction No. 27 Re Evidence of Information Exchange**

Evidence has been introduced concerning the exchange of proprietary, confidential information among Defendants about their prices for aluminum, tantalum, and film capacitors. DPPs have alleged that such exchanges were part of and made in furtherance of a conspiracy to fix prices.

The fact that Defendants exchanged price information by itself is not illegal and does not necessarily establish an agreement to fix prices. There may be other, legitimate reasons that would lead competitors to exchange price information, and the law recognizes that exchanges of pricing and other proprietary information may enhance competition and benefit consumers. On the other hand, if you find that confidential information was exchanged, and that Defendants offer no reasonable explanation as to why they were exchanging that information, you may consider whether it was being exchanged as part of an agreement to fix prices, along with all of the other evidence bearing on whether there was an agreement to fix prices.

*Authority*: ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 2(B) Instr. 8. & Notes.

**Stipulated Instruction No. 28 Re Evidence of Prices Charged**

Evidence of the prices actually charged by Defendants for aluminum, tantalum, and film capacitors has been admitted to assist you in deciding whether Defendants agreed to fix prices, as claimed by DPPs. Such evidence may lead you to conclude that Defendants never entered into the alleged price-fixing conspiracy.  Or it may lead you to conclude that Defendants made an agreement but undercut one another, offered prices different from those agreed upon to certain customers, or at certain times failed to live up to the agreement.  If you find that Defendants agreed or conspired to fix prices, the fact that they did not stick to their agreement on every occasion or for every customer is not a defense.

*Authority*: ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 2(B) Instr. 6.

1

**Stipulated Instruction No. 29 Re Evidence of Competition**

2

Evidence that Defendants actually engaged in price competition with each other in some

3

manner has been admitted to assist you in deciding whether they entered into the alleged conspiracy to

4

set, fix, raise, maintain, or stabilize prices. If you find that such a conspiracy existed, it is no defense

5

that Defendants actually competed with each other in some respects, or failed to eliminate all

6

competition between themselves. Similarly, a price-fixing conspiracy between competitors is unlawful

7

even if it did not extend to all products sold by Defendants or did not affect all of their customers or

8

transactions.

9

10

*Authority*: ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 2(B) Instr. 5 at p.31 (2016).

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 29A Re Evidence of Similarity Offered by Defendants**

In support of its allegation of a conspiracy, plaintiff has alleged that defendants increased prices at or near the same time. Evidence that Defendants may have charged identical prices for the same goods, or engaged in identical or similar business practices, does not alone establish an agreement to fix prices. Such practices may be consistent with lawful, ordinary, and proper competitive behavior in a free and open market.

The Sherman Act prohibits conspiracies between two or more competitors to fix prices. It does not prohibit independent behavior even if such behavior is similar or identical to that of competitors; such behavior may be no more than the result of the exercise of independent judgment in response to identical or similar market conditions.  Thus, a Defendant may charge prices identical to those charged by its competitors without violating the Sherman Act.  A Defendant may even copy the prices of a competitor or follow and conform exactly to the price policies and price changes of its competitors. Likewise, a Defendant does not violate the Sherman Act by taking some action in the hope or belief that its competitors will follow, so long as it has not reached an agreement with its competitors. Parallel conduct, without more, does not violate the law.

You should consider all of the evidence as a whole in determining whether any similarity or identity of prices or conduct resulted from the independent business judgment of the individual Defendants freely competing in the open market, or whether it resulted from an agreement between two or more of them.

*Authority*: ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 2(B) Instr. 7 (2016).

**Disputed Jury Instruction No. 29A: Re Evidence of Similarity Offered by Defendants**

[DPPs object to this instruction in its entirety]

**DPP's Argument re Disputed Instruction No. 29A: Evidence of Similarity Offered by Defendants**

Defendants' proposed instruction is misleading, confusing and raises an irrelevant legal theory. DPPs have direct evidence of an agreement to fix prices—a *per se* violation of section 1 of the Sherman Act. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940) ("'Agreements for price maintenance of articles moving in interstate commerce are, without more, unreasonable restraints within the meaning of the Sherman Act'"). That evidence includes numerous guilty pleas. As a result, the jury need not infer the existence of a conspiracy from parallel conduct or conscious parallelism. *See In re Baby Food Antitrust* Litig., 166 F.3d 112, 118 (3d Cir. 1999) ("[W]ith direct evidence 'the fact finder is not required to make inferences to establish facts'").

Beyond the guilty pleas, the ACPERA applicant admitted to a price-fixing conspiracy to the DOJ and Defendants and their high-level employees regularly met to expressly fix prices. These meetings were memorialized in minutes, correspondence, and other documents. This is not a plus factors case requiring inferences from circumstantial evidence. Instructing the jury about parallel conduct would only confuse the jury about DPPs' burden to prove a conspiracy. *See Socony-Vacuum*, 310 U.S. at 218 ("price fixing agreements are unlawful per se under the Sherman Act and [ ] no showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense"); *see also In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 62 (2d Cir. 2012) ("Conscious parallelism *alone*, however, does not establish an antitrust violation" (emphasis added)).

Defendants' proposed instruction should also be rejected as duplicative. Both DPPs and Defendants propose that Disputed Instruction No. 28 re Evidence of Prices Charged should state, "Evidences of the prices actually charged by Defendants . . . has been admitted to assist you in deciding whether Defendants agreed to [stabilize or raise/fix] prices." This language accomplishes the same purpose as Defendants' proposed instruction without the insertion of an inapplicable legal theory into the jury's deliberations and otherwise sowing confusion.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The jury can consider prices, but it does not need to rely on inferences to decide whether prices were set in parallel as a coincidence or whether they were caused by price fixing, because numerous conspirators have already admitted to price fixing and there is other direct evidence of price fixing.

**Defendants' Brief on Disputed Instruction No. 29A Re Evidence of Similarity**

Defendants' proposed instruction is taken almost verbatim from the ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 2(B) Instr. 7. The Notes to this model instruction, which cite three Supreme Court cases and numerous others, do not suggest that this instruction should only be given in certain cases.

DPPs stated during a meet-and-confer that they did not think this instruction was necessary because this is not a "plus factor case." But Defendants dispute the existence of the broadly-constructed conspiracy alleged by DPPs in the Third Amended Complaint, and are entitled to argue that mere similarity of prices is not the equivalent of an illegal price-fixing agreement. In particular, Defendants will point out that the minutes from industry meetings show the exchange of limited price information and speak in generalities about market trends and demand, but they do not, on their face, speak to an overarching agreement to fix the price of all aluminum, tantalum, and film capacitors worldwide. Nevertheless, DPPs will introduce evidence of the prices Defendants charged their customers and ask the jury to infer an overarching agreement from the mere similarity of prices. Thus, the jury must be educated by the Court that evidence of similarity of prices, in and of itself, is not illegal. Without this instruction, the jury is likely to conclude that the similarity of prices is illegal, which it is not.

The *TFT-LCD* case is instructive. There, the court gave an "evidence of similarity" instruction even though there was extensive evidence of "crystal meetings" at which "agreements were reached to fix the price of TFT-LCD to be sold in the United States and elsewhere." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, Jury Instructions, No. 3:07-md-01827-SI (N.D. Cal.) (Doc. 6036), at 11–12 (Horizontal Price Fixing – Evidence of Similarity), 15 (Stipulation re: Guilty Pleas). Given the fact that there is no such evidence of the overarching agreement alleged by the DPPs in this case, an evidence of similarity instruction is even more necessary. The Court should adopt Defendants' proposed instruction, which is taken almost verbatim from the ABA model.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Disputed Instruction No. 29B Re Import Commerce – Intent; Substantial Effect**
**Offered by Defendants**

The Sherman Act applies only to conduct that affects interstate or foreign commerce. In this case, plaintiff contends that defendant's conduct affects foreign commerce. Foreign commerce refers to transactions in goods or services between one or more persons in the United States and one or more persons in a foreign nation.

To sustain its claim, plaintiff must prove that the agreement to fix prices for aluminum, tantalum, and/or film capacitors had a direct, substantial, and reasonably foreseeable effect on commerce within the United States, on imports into the United States, or on the export opportunities of a United States person. It is not necessary that the challenged conduct occurs within the United States. It is necessary, however, that the effect of the challenged conduct be felt by persons or firms within the United States. It also is necessary that the effect within the United States be more than indirect, remote, or unpredictable. An effect on the exports or export opportunities of a United States person, however, may be sufficient even if the effect was felt mostly by persons outside the United States.

In determining whether the effect within the United States of the agreement to fix prices for aluminum, tantalum, and/or film capacitors was reasonably foreseeable, you may consider a number of factors, including defendant's intent and the likely or probable consequences of the agreement to fix prices of aluminum, tantalum, and/or film capacitors. No one factor, however, is conclusive on this issue.

*Authority*: ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 1(E) Instr. 5(2016).

**DPP's Argument re Disputed Instruction No. 29B: Import Commerce – Intent; Substantial Effect Offered by Defendants**

Defendants' proposed instruction improperly invites the jury to resolve a legal issue already determined by the Court. DPPs seek to recover damages only for Defendants' overcharges for capacitors billed or shipped to the United States. DPPs' damages analysis takes only sales of those capacitors into account. The Court itself has determined that capacitors billed or shipped to the United States are within the import exception of the Foreign Trade Antitrust Improvements Act of 1982. The DPPs Class as certified by this Court includes only capacitors billed or shipped to the United States. Dkt. 2282. For that reason, the Court did not need to determine whether additional sales could satisfy the domestic effects exception. Dkt. 1302 at 8; *see United States v. Hsiung*, 778 F.3d 738, 754-55 (9th Cir. 2015) ("Although our circuit has not defined 'import trade' for purposes of the FTAIA, not much imagination is required to say that this phrase means precisely what it says."); *F. Hoffman-La Roche Ltd. V. Empagran S.A.*, 542 U.S. 155, 162 (2004) (FTAIA removes foreign conduct from Sherman Act's reach "*unless* those activities adversely affect . . . *imports* to the United States" (second emphasis added)).

The Court has already answered the pure question of law—this case involves import commerce. *See United States v. Estrada-Lucas*, 651 F.2d 1261, 1263-64 (9th Cir. 1980) ("A decision of law in a case, once made, becomes the 'law of the case,' and should not be changed absent clear error in the original ruling or a change in the relevant circumstances."). Defendants' instruction is an attempt to have the jury resolve a legal question that has been resolved here, and the instruction should be rejected.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Defendants' Brief on Disputed Instruction No. 29B Re Import Commerce – Intent; Substantial Effect**

Defendants' proposed instruction is taken virtually verbatim from the ABA model, and it must be included as it is an affirmative element of Plaintiffs' Sherman Act claim.  Plaintiffs' limitation of their damages recovery, and their expert's damages calculation, to sales of capacitors that were "billed to" or "shipped to" entities in the United States does not obviate their burden to prove the applicability of the FTAIA to this case.  Moreover, the Court's previous threshold finding (in the context of examining the scope of relevant commerce under the FTAIA) that capacitors "billed to" or "shipped to" the United States were within the scope of import trade or commerce does not alleviate Plaintiffs of their burden to prove each element of their claims.

The FTAIA provides that the Sherman Act does not apply to anticompetitive conduct involving trade or commerce (other than import trade or import commerce) with foreign nations, unless that conduct meets the requirements of the domestic effects exception.  15 U.S.C. § 6a.  To meet that exception, Plaintiffs must prove that the alleged foreign anticompetitive conduct was intended to and did in fact produce a "direct, substantial, and reasonably foreseeable effect" on domestic commerce that gives rise to Plaintiffs' claims.  *See Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 (1993) ("the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States"); *F. Hoffmann-LaRoche Ltd. v. Empagran, S.A.*, 542 U.S. 155, 160-62 (2004).

In similar cases, courts have required that the plaintiffs satisfy their burden to show that the alleged foreign anticompetitive conduct met the FTAIA's "domestic effects" exception, even where conspirators were found to have engaged in import commerce.  *See, e.g.*, *Dee-K Enterprises, Inc. v. Heveafil SDN. BHD.*, 299 F.3d 281, 292-93 (4th Cir. 2002) (noting that "courts have consistently required a showing of effect on United States commerce even in cases involving price fixing on imports" and rejecting plaintiff's "contention that *Hartford Fire* never applies when a conspiracy involves price-fixed goods sold directly into United States commerce").  Furthermore, even where courts in the Ninth Circuit have concluded that conduct constituted import commerce, they have required the inclusion of "domestic effects" exception jury instructions, making clear that this remains

an issue for the jury.  *See, e.g.*, *In re Korean Ramen Antitrust Litigation*, Case No. 3:13-cv-04115-WHO, ECF Nos. 115, 906, 907 (N.D. Cal. 2014) (holding that the conduct at issue involved import commerce but still including a jury instruction titled "Substantial Effects Test":  "Where conduct primarily or wholly occurs outside of the United States, United States antitrust laws only apply to that conduct where the conspiracy to fix the prices was intended to have and had a substantial effect in the United States.").

**Disputed Instruction No. 30 Re Testimony of Witnesses Involving Special Circumstance—
Leniency Offered by DPPs**

You have heard testimony from [name of witnesses], witnesses whose employer, Panasonic/SANYO, entered into a leniency agreement with the United States Department of Justice. This means that Panasonic/SANYO voluntarily reported its involvement in an illegal antitrust conspiracy to the government in exchange for lenient treatment in the government's prosecution of the conspiracy.

For this reason, in evaluating the testimony of [name of witness], you should consider the extent to which or whether his or her testimony may have been influenced by this factor. In addition, you should examine the testimony of [name of witness] with greater caution than that of other witnesses.

*Authority*: Adapted from Ninth Circuit Manual of Model Criminal Jury Instructions, Instr. 4.9 (2010).

**Disputed Instruction No. 30 Re Testimony of Witnesses Involving Special Circumstance—Leniency Offered by Defendants**

You have heard testimony from [name of witnesses], witnesses whose employer, Panasonic/SANYO obtained amnesty for itself and its employees under the Department of Justice's Corporate Leniency Program.  In doing so, Panasonic admitted to violating the U.S. antitrust laws and agreed to cooperation obligations with the DOJ's investigation of the capacitors industry similar to those agreed to by the entities and persons who pled guilty.

For this reason, in evaluating the testimony of [name of witnesses], you should consider the extent to which or whether their testimony may have been influenced by this factor. In addition, you should examine the testimony of [name of witnesses] with greater caution than that of other witnesses.

*Authority*: Adapted from Ninth Circuit Manual of Model Criminal Jury Instructions, Instr. 4.9 (2010); *see also* Preliminary Instructions No. 9 ¶ 10.

1

2

**DPP's Argument re Disputed Instruction No. 30 Re Testimony of Witnesses Involving Special Circumstance—Leniency**

3

DPPs' proposed instruction accurately describes in plain English Panasonic/SANYO's status as

4

the ACPERA applicant, including the predicate admission to the U.S. Department of Justice of

5

participating in a price-fixing conspiracy in exchange for leniency.

6

Defendants' alternative inaccurately and misleadingly describes Panasonic/SANYO's status as

7

the ACPERA applicant. ACPERA applicants do not receive immunity from DOJ, but rather leniency.

8

*See* Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. No. 108-237

9

("ACPERA"); *In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*, No. 09 MDL2007, 2013 WL

10

4536569, at *4-5 (N.D. Cal. Aug. 26, 2013). Even after Panasonic/SANYO's ACPERA obligations are

11

met in this case as determined by the Court, *see* ACPERA, § 213(b), Panasonic/SANYO would still not

12

be immunized; it is only no longer jointly and severally liable and its damages would not be trebled.

13

*See In re Polyurethane Foam Antitrust Litig.*, No. 1:10 MD 2196, 2014 WL 6461355, at *68 (N.D.

14

Ohio Nov. 17, 2014). DPPs' use of leniency—as opposed to immunity—is more accurate than

15

Defendants' proposed instruction.

16

17

18

19

20

21

22

23

24

25

26

27

28

**Defendants' Brief on Disputed Instruction No. 30:**
**Testimony of Witnesses Involving Special Circumstance—Leniency**

Both parties agree that the jury should be instructed that they may consider

Panasonic/SANYO's amnesty agreement.  Defendants' proposal adopts verbatim the key language from

Preliminary Instruction 9 that the Court will give at the beginning of the trial.  *See* Nov. 12, 2021

Preliminary Jury Instructions No. 9 ¶ 10 (MDL ECF No. 1597) (Panasonic/SANYO obtained "amnesty

for itself and its employees under the DOJ's Corporate Leniency Program.  In doing so, Panasonic

admitted to violating the U.S. antitrust laws and agreed to cooperation obligations with the DOJ's

investigation of the capacitors industry similar to those agreed to by the entities and persons who pled

guilty.").  Giving a different instruction at the end of the trial could only serve to confuse the jurors and

DPPs have pointed to no good reason to deviate from the Court's Preliminary Instruction.  It is also

notable that DPPs have already stipulated to this exact language in the Preliminary Instruction and, in

fact, include it as part of their proposal for the very next Jury Instruction (No. 31).

**Disputed Instruction No. 31 Re Guilty Pleas and Convictions Offered by DPPs**

        The parties have agreed to certain facts that I will now read to you. They have stipulated that certain electrolytic capacitor manufacturers -- but not others -- were convicted of violating the United States antitrust laws. You must treat these facts as having been proved:

**Matsuo Electric Co., Ltd.**

    1.    Defendant **Matsuo Electric Co., Ltd.** pled guilty to participating in "a conspiracy to suppress and eliminate competition by fixing prices and rigging bids of certain electrolytic capacitors in the United States and elsewhere, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1."

        a.    For purposes of Matsuo's guilty plea, the "relevant period" is the period beginning at least as early as November 2001 until in or about January 2014. During the relevant period, Matsuo was a corporation organized and existing under the laws of Japan. Matsuo had its principal place of business in Osaka, Japan. During the relevant period, Matsuo manufactured tantalum electrolytic capacitors and was engaged in the sale of such electrolytic capacitors in the United States and elsewhere. Electrolytic capacitors are a major subcategory of capacitors, fundamental components of electrical circuits used primarily to store and regulate electrical current. Tantalum capacitors are a type of electrolytic capacitor.

        b.    During the relevant period, Matsuo, through its officers and employees, including high-level personnel of Matsuo, participated in a conspiracy among manufacturers of electrolytic capacitors, the primary purpose of which was to fix prices and rig bids of certain electrolytic capacitors sold in the United States and elsewhere. In furtherance of the conspiracy, Matsuo, through its officers and employees, at times engaged in discussions and attended meetings with representatives of other manufacturers of electrolytic capacitors. During certain of these discussions and meetings, the conspirators agreed to fix the price and/or rig bids of certain electrolytic capacitors to be sold in the United States and elsewhere.

        c.    During the relevant period, Matsuo and its coconspirators manufactured certain electrolytic capacitors outside the United States and sold them in the United States or for delivery to the

United States. During the relevant period, certain electrolytic capacitors sold by one or more of the conspirator firms traveled in interstate commerce.

d.      Acts in furtherance of this conspiracy were carried out within the Northern District of California. Certain electrolytic capacitors that were the subject of this conspiracy were sold by one or more of the conspirators to customers in this District.

e.      Matsuo employee Satoshi Okubo also pled guilty.

**Nippon Chemi-Con Corporation**

2.      Defendant **Nippon Chemi-Con Corporation** pled guilty to participating in "a conspiracy to suppress and eliminate competition by fixing prices and rigging bids of electrolytic capacitors sold in the United States and elsewhere in violation of the Sherman Antitrust Act, 15 U.S.C. § 1."

a.      For purposes of NCC's guilty plea, the "relevant period" is that period beginning at least as early as November 2001 until in or about January 2014. During the relevant period, NCC was a corporation organized and existing under the laws of Japan. NCC had its principal place of business in Tokyo, Japan. During the relevant period, NCC manufactured electrolytic capacitors and was engaged in the sale of such electrolytic capacitors in the United States and elsewhere. Electrolytic capacitors are a major subcategory of capacitors, fundamental components of electrical circuits used primarily to store and regulate electrical current.

b.      During the relevant period, NCC, through its officers and employees, including high-level personnel of NCC, participated in a conspiracy among manufacturers of electrolytic capacitors, the primary purpose of which was to fix prices and rig bids of certain electrolytic capacitors manufactured outside of the United States and sold in the United States and elsewhere. In furtherance of the conspiracy, NCC, through its officers and employees, at times engaged in discussions and attended meetings with representatives of other manufacturers of electrolytic capacitors. During these discussions and meetings, the conspirators agreed to fix the price and/or rig bids of certain electrolytic capacitors manufactured outside of the United States to be sold in the United States and elsewhere.

c.       During the relevant period, NCC and its coconspirators manufactured electrolytic capacitors outside the United States and sold them in the United States or for delivery to the United States. During the relevant period, electrolytic capacitors sold by one or more of the conspirator firms traveled in, and substantially affected, interstate commerce.

d.       Acts in furtherance of this conspiracy were carried out within the Northern District of California. Electrolytic capacitors that were the subject of this conspiracy were sold by one or more of the conspirators to customers in this District.

e.       United Chemi-Con did not plead guilty.

3.       Six other manufacturers of electrolytic capacitors who are not parties to this lawsuit also pled guilty.

**ELNA Co., Ltd.**

4.       ELNA Co., Ltd., which is not a defendant, pled guilty to participating in "a conspiracy to suppress and eliminate competition by fixing prices and rigging bids of certain electrolytic capacitors in the United States and elsewhere, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1."

a.       For purposes of ELNA's guilty plea, the "relevant period" is the period beginning at least as early as August 2002 until in or about January 2014. During the relevant period, ELNA was a corporation organized and existing under the laws of Japan. ELNA had its principal place of business in Yokohama, Japan. During the relevant period, ELNA manufactured electrolytic capacitors and was engaged in the sale of such electrolytic capacitors in the United States and elsewhere. Electrolytic capacitors are a major subcategory of capacitors, fundamental components of electrical circuits used primarily to store and regulate electrical current.

b.       During the relevant period, ELNA, through its officers and employees, including high-level personnel of ELNA, participated in a conspiracy among manufacturers of electrolytic capacitors, the primary purpose of which was to fix prices and rig bids of certain electrolytic capacitors sold in the United States and elsewhere. In furtherance of the conspiracy, ELNA, through its officers and employees, at times engaged in discussions and attended meetings with representatives of other manufacturers of electrolytic capacitors. During certain of these discussions and meetings, the

conspirators agreed to fix the price and/or rig bids of certain electrolytic capacitors to be sold in the United States and elsewhere.

        c.     During the relevant period, ELNA and its coconspirators manufactured certain electrolytic capacitors outside the United States and sold them in the United States or for delivery to the United States. During the relevant period, certain electrolytic capacitors sold by one or more of the conspirator firms traveled in interstate commerce.

        d.     Acts in furtherance of this conspiracy were carried out within the Northern District of California. Certain electrolytic capacitors that were the subject of this conspiracy were sold by one or more of the conspirators to customers in this District.

        e.     ELNA America, Inc. did not plead guilty.

        f.     ELNA employee Tokuo Tatai and former employee Satoshi Okubo also pled guilty.

**Hitachi Chemical Co., Ltd.**

5.     **Hitachi Chemical Co., Ltd.**, which is not a defendant, pled guilty to participating in "a conspiracy to suppress and eliminate competition by fixing prices and rigging bids of certain electrolytic capacitors in the United States and elsewhere, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1."

        a.     For purposes of Hitachi's guilty plea, the "relevant period" is the period beginning at least as early as August 2002 until at least as late as March 2010. During the relevant period, Hitachi was a corporation organized and existing under the laws of Japan. Hitachi had its principal place of business in Tokyo, Japan. During the relevant period, Hitachi manufactured aluminum and tantalum electrolytic capacitors and was engaged in the sale of aluminum and tantalum electrolytic capacitors in the United States and elsewhere through certain current and former subsidiaries, including entities known during the relevant time period as Hitachi AIC, Inc. (a corporation organized and existing under the laws of Japan, with its principal place of business in Tochigi Prefecture, Japan) and Hitachi Chemical Electronics Co. Ltd. (a corporation organized and existing under the laws of Japan, with its principal place of business in Ibaraki Prefecture, Japan). At a

certain point after the relevant period, Hitachi assumed responsibility for the sale of electrolytic capacitors from subsidiary Hitachi AIC, Inc. Electrolytic capacitors are a major sub-category of capacitors, fundamental components of electrical circuits used primarily to store and regulate electrical current. Aluminum and tantalum capacitors are types of electrolytic capacitors.

b.      During the relevant period, Hitachi, through its officers and employees, including high-level personnel of Hitachi, participated in a conspiracy among manufacturers of electrolytic capacitors, the primary purpose of which was to fix prices and rig bids of certain electrolytic capacitors sold in the United States and elsewhere. In furtherance of the conspiracy, Hitachi, through its officers and employees of certain current and former subsidiaries, at times engaged in discussions and attended meetings with representatives of other manufacturers of electrolytic capacitors. During certain of these discussions and meetings, the conspirators agreed to fix the price and/or rig bids of certain electrolytic capacitors to be sold in the United States and elsewhere.

c.      During the relevant period, Hitachi and its coconspirators manufactured certain electrolytic capacitors outside the United States and sold them in the United States or for delivery to the United States. During the relevant period, certain electrolytic capacitors sold by one or more of the conspirator firms traveled in interstate commerce.

d.      Acts in furtherance of this conspiracy were carried out within the Northern District of California. Certain electrolytic capacitors that were the subject of this conspiracy were sold by one or more of the conspirators to customers in this District.

**Holy Stone Holdings Co., Ltd.**

6.      **Holy Stone Holdings Co., Ltd.**, which is not a defendant, pled guilty on behalf of its former subsidiary, Holy Stone Polytech Co., Ltd. ("HPC"), to participating in "a conspiracy to suppress and eliminate competition by fixing prices and rigging bids of certain electrolytic capacitors in the United States and elsewhere, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1."

a.      For purposes of Holy Stone Holdings' guilty plea, the "relevant period" is the period from in or about April 2010 until in or about January 2014. During the relevant period, Holy Stone Holdings was a corporation organized and existing under the laws of Samoa, with its principal

place of business in Apia, Samoa. During the relevant period, Holy Stone Holdings' wholly owned

subsidiary, Holy Stone Polytech Co., Ltd. ("HPC"), was a manufacturer of tantalum electrolytic

capacitors headquartered in Miharu, Fukushima, Japan, and was engaged in the sale of such capacitors

in the United States and elsewhere. Electrolytic capacitors are a major subcategory of capacitors,

fundamental components of electrical circuits used primarily to store and regulate electrical current.

Tantalum capacitors are a type of electrolytic capacitor.

b.       During the relevant period, HPC, through its officers and employees, including

high-level personnel of HPC, participated in a conspiracy among manufacturers of electrolytic

capacitors, the primary purpose of which was to fix prices and rig bids of certain electrolytic capacitors

sold in the United States and elsewhere. In furtherance of the conspiracy, HPC, through its officers and

employees, at times engaged in discussions and attended meetings with representatives of other

manufacturers of electrolytic capacitors. During certain of these discussions and meetings, the

conspirators agreed to fix the price and/or rig bids of certain electrolytic capacitors to be sold in the

United States and elsewhere.

c.       During the relevant period, HPC and its coconspirators manufactured certain

electrolytic capacitors outside the United States and sold them in the United States or for delivery to the

United States. During the relevant period, certain electrolytic capacitors sold by one or more of the

conspirator firms traveled in interstate commerce.

d.       Acts in furtherance of this conspiracy were carried out within the Northern

District of California. Certain electrolytic capacitors that were the subject of this conspiracy were sold

by one or more of the conspirators to customers in this District.

e.       Holy Stone Enterprise Co., Ltd., Milestone Global Technology, Inc., doing

business as Holy Stone International, and Vishay Polytech Co., Ltd. did not plead guilty.

**NEC TOKIN Corporation**

7.       **NEC TOKIN Corporation**, which is not a defendant, pled guilty to participating in "a

conspiracy to suppress and eliminate competition by fixing prices and rigging bids of certain

electrolytic capacitors in the United States and elsewhere, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1."

      a.      For purposes of NEC TOKIN's guilty plea, the "relevant period" is the period beginning at least as early as April 2002 until in or about December 2013. During the relevant period, NEC TOKIN was a corporation organized and existing under the laws of Japan. NEC TOKIN had its principal place of business in Tokyo, Japan. During the relevant period, NEC TOKIN was a manufacturer of tantalum electrolytic capacitors and was engaged in the sale of tantalum electrolytic capacitors in the United States and elsewhere. Electrolytic capacitors are a major sub-category of capacitors, fundamental components of electrical circuits used primarily to store and regulate electrical current. Tantalum capacitors are a type of electrolytic capacitor.

      b.      During the relevant period, NEC TOKIN, through its officers and employees, including high-level personnel of NEC TOKIN, participated in a conspiracy among manufacturers of electrolytic capacitors, the primary purpose of which was to fix prices and rig bids of certain electrolytic capacitors sold in the United States and elsewhere. In furtherance of the conspiracy, NEC TOKIN, through its officers and employees, at times engaged in discussions and attended meetings with representatives of other manufacturers of electrolytic capacitors. During certain of these discussions and meetings, the conspirators agreed to fix the price and/or rig bids of certain electrolytic capacitors to be sold in the United States and elsewhere.

      c.      During the relevant period, NEC TOKIN and its coconspirators manufactured certain electrolytic capacitors outside the United States and sold them in the United States or for delivery to the United States. During the relevant period, certain electrolytic capacitors sold by one or more of the conspirator firms traveled in interstate commerce.

      d.      Acts in furtherance of this conspiracy were carried out within the Northern District of California. Certain electrolytic capacitors that were the subject of this conspiracy were sold by one or more of the conspirators to customers in this District.

**Nichicon Corporation**

8.  **Nichicon Corporation**, which is not a defendant, pled guilty to participating in "a conspiracy to suppress and eliminate competition by fixing prices and rigging bids of certain electrolytic capacitors in the United States and elsewhere, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1."

a.  For purposes of Nichicon's guilty plea, the "relevant period" is the period beginning at least as early as November 2001 until in or about December 2011. During the relevant period, Nichicon was a corporation organized and existing under the laws of Japan. Nichicon had its principal place of business in Kyoto, Japan. During the relevant period, Nichicon manufactured aluminum and tantalum electrolytic capacitors and was engaged in the sale of such electrolytic capacitors in the United States and elsewhere. Electrolytic capacitors are a major subcategory of capacitors, fundamental components of electrical circuits used primarily to store and regulate electrical current. Aluminum and tantalum capacitors are both types of electrolytic capacitors.

b.  During the relevant period, Nichicon, through its officers and employees, including high-level personnel of Nichicon, participated in a conspiracy among manufacturers of electrolytic capacitors, the primary purpose of which was to fix prices and rig bids of certain electrolytic capacitors sold in the United States and elsewhere. In furtherance of the conspiracy, Nichicon, through its officers and employees, at times engaged in discussions and attended meetings with representatives of other manufacturers of electrolytic capacitors. During certain of these discussions and meetings, the conspirators agreed to fix the price and/or rig bids of certain electrolytic capacitors to be sold in the United States and elsewhere.

c.  During the relevant period, Nichicon and its coconspirators manufactured certain electrolytic capacitors outside the United States and sold them in the United States or for delivery to the United States. During the relevant period, certain electrolytic capacitors sold by one or more of the conspirator firms traveled in interstate commerce.

d.      Acts in furtherance of this conspiracy were carried out within the Northern District of California. Certain electrolytic capacitors that were the subject of this conspiracy were sold by one or more of the conspirators to customers in this District.

**Rubycon Corporation**

9.      **Rubycon Corporation**, which is not a defendant, pled guilty to participating in "a conspiracy to suppress and eliminate competition by fixing prices and rigging bids of certain electrolytic capacitors in the United States and elsewhere, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1."

a.      For purposes of Rubycon's guilty plea, the "relevant period" is the period beginning at least as early as August 2002 until in or about January 2014. During the relevant period, Rubycon was a corporation organized and existing under the laws of Japan. Rubycon had its principal place of business in Ina, Japan. During the relevant period, Rubycon manufactured aluminum electrolytic capacitors and was engaged in the sale of such electrolytic capacitors in the United States and elsewhere. Electrolytic capacitors are a major subcategory of capacitors, fundamental components of electrical circuits used primarily to store and regulate electrical current. Aluminum capacitors are a type of electrolytic capacitor.

b.      During the relevant period, Rubycon, through its officers and employees, including high-level personnel of Rubycon, participated in a conspiracy among manufacturers of electrolytic capacitors, the primary purpose of which was to fix prices and rig bids of certain electrolytic capacitors sold in the United States and elsewhere. In furtherance of the conspiracy, Rubycon, through its officers and employees, at times engaged in discussions and attended meetings with representatives of other manufacturers of electrolytic capacitors. During certain of these discussions and meetings, the conspirators agreed to fix the price and/or rig bids of certain electrolytic capacitors to be sold in the United States and elsewhere.

c.      During the relevant period, Rubycon and its coconspirators manufactured certain electrolytic capacitors outside the United States and sold them in the United States or for delivery to the

United States. During the relevant period, certain electrolytic capacitors sold by one or more of the conspirator firms traveled in interstate commerce.

              d.      Acts in furtherance of this conspiracy were carried out within the Northern District of California. Certain electrolytic capacitors that were the subject of this conspiracy were sold by one or more of the conspirators to customers in this District.

**Panasonic and Sanyo**

      10.     Neither **Panasonic/SANYO** nor any of its employees was indicted or convicted of violating the U.S. antitrust laws. In 2015, Panasonic applied for and was granted amnesty for itself and its employees under the DOJ's Corporate Leniency Program. In doing so, Panasonic admitted to violating the U.S. antitrust laws and agreed to cooperation obligations with the DOJ's investigation of the capacitors industry similar to those agreed to by the entities and persons who pled guilty.

*Authority*: March 3, 2020 Preliminary Jury Instructions (MDL ECF No. 1216) (as given).

**Disputed Instruction No. 31: Re Guilty Pleas and Convictions Offered by Defendants**

During the trial, I read to you an instruction agreed to by the DPPs and Defendants, describing for you the specific plea agreements/criminal convictions of Defendants Matsuo Electric Co., Ltd., and Nippon Chemi-Con.

*Authority*:  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, Jury Instructions, No. 3:07-md-01827-SI (N.D. Cal. July 28, 2012) (Doc. 8543).

**DPP's Argument re Disputed Instruction No. 31: Guilty Pleas and Convictions**

DPPs' instruction on Defendants' guilty pleas and criminal convictions is identical to the instruction given by the Court in its preliminary instructions during the March 2020 trial. This instruction was stipulated by and amongst the parties. Defendants now seek to walk back their agreement and offer a short and imprecise instruction in an attempt to obscure the effect of their criminal pleas.

DPPs' instruction is adapted from pattern antitrust instructions, *see* 3 O'Malley et al., Fed. Jury Prac. & Instr. § 150.72 (6th ed.), and the instructions delivered by Judge Illston in the *TFT-LCD* opt-out trial. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-md-01827-SI (N.D. Cal.), ECF No. 8543 at 27. It properly summarizes the plea agreements as establishing—pursuant to 15 U.S.C. § 16a—the core facts admitted by the pleading Defendants: there was a conspiracy that violated the Sherman Act; each convicted Defendant knowingly participated in the conspiracy that violated the Sherman Act; and the conspiracy identified in the plea agreements had a substantial effect on U.S. import trade, involved sales directly in the United States, or involved acts in furtherance of the conspiracy which took place in the Northern District of California. DPPs' instruction further advises that the jury "may use such convictions and findings of fact, without more, to resolve issues in this case" and that the Defendants' guilty pleas "establish the floor" of those Defendants' liability. Further, these are subject to judicial notice under Federal Rule of Evidence 201. Similarly, a pattern Sherman Act instruction explains a conviction "is prima facie evidence that, during the period charged in the indictment, the defendants engaged in a conspiracy to violate the antitrust laws" and that "[p]rima facie evidence is evidence that in and of itself is sufficient to establish the facts alleged." 3 O'Malley et al., Fed. Jury Prac. & Instr. § 150.72 (6th ed.). Defendants would omit this explanatory language, substituting portions from each of their plea agreements. Defendants' proposal also is overly suggestive in stating that "certain capacitor manufacturers—but not others—were convicted," rather than simply stating which Defendants were convicted, and in including self-serving references like "United Chemi-Con did not plead guilty."

The Court should adhere to the relevant models and deliver DPPs' proposed instruction.

**Defendants Brief re Disputed Instruction No. 31 Re Guilty Pleas and Convictions**

DPPs propose that the Court read to the jury the lengthy, 11-page summary of the plea agreements that the Court will have already read to the jury during the Court's preliminary instructions. This is an improper attempt to emphasize certain evidence over others to the jury.  Defendants' proposed instruction, on the other hand, reminds the jury of the guilty pleas but does not repeat the full stipulation.  This is similar to what the Court did in *TFT-LCD*, where the Court referred to the guilty pleas rather than reciting them for the jury during the final instructions.  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 3:07-md-01827-SI (N.D. Cal. Aug. 28, 2013) (Doc. 8543).   Finally, not only is the DPPs' proposed instruction prejudicial, but it also is exceptionally long, violating the general guidance that jury instructions should be "succinct" and that courts should try to avoid "unnecessarily long charges, [which] are confusing to a jury."  *United States* v. *Assi*, 748 F.2d 62, 65 (2d Cir. 1984).

**Disputed Instruction No. 31A Re Limited Purpose of Guilty Pleas In This Case
Offered by Defendants**

The guilty plea of one Defendant cannot be used to establish the liability of any other Defendant.

With respect to each of the Defendants that pled guilty, its plea agreement is evidence only of the facts specifically admitted in its plea agreement.  The plea agreement is not evidence that any particular price was agreed upon, that any particular price-fixing conspiracy was actually implemented or effective, that DPPs paid higher prices, that any particular price-fixing conspiracy covered specific products, or that a price-fixing conspiracy existed at any time not covered by the specific terms of the plea agreement.

You are the sole judges of whether the DPPs have proved by a preponderance of the evidence that they are entitled to a verdict in their favor. You must determine from all of the evidence in this case whether the Defendants engaged in the conduct alleged by the DPPs and whether the DPPs have proved all of the required elements of their claim.

The Defendants have offered evidence in this case to refute DPPs' allegations.  If, after consideration of the evidence presented by all parties, you conclude that the DPPs have not proved all of the required elements of their claims, then you may not find the Defendants liable in this case.


*Authority*: *See United States v. Halbert*, 640 F.2d 1000, 1006-1007 (9th Cir. 1981) (finding error where court failed to instruct the jury that evidence of coconspirator's guilty plea "can be used only to assess credibility" of the witness, and for failing to tell the jury "in unequivocal language that the plea may not be considered as evidence of a Defendant's guilt."); *United States v. Harris*, 738 F.2d 1068, 1071-72 (9th Cir. 1984) (same); *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988) (approving limiting instruction that the conviction of one defendant "could not be used against any other defendant for any purpose whatever"); *United States v. Gullo*, 502 F.2d 759, 761 (3d Cir. 1974) (as a general rule, "evidence of a guilty plea by a co-conspirator is not admissible"); *United States v. Newman*, 490 F.2d 139, 143 (3d Cir. 1974) ("guilty pleas and convictions of codefendants are not admissible to demonstrate the guilt of defendants"); *United States v. Werme*, 939 F.2d 108, 114 (3d Cir.

1991) ("Because evidence of a co-conspirator's guilty plea is extremely prejudicial to the defendant on trial absent [a limiting] instruction, compliance with the mandatory duty imposed by Rule 105 is particularly important."); *United States v. Sanders*, 95 F.3d 449, 454 (6th Cir. 1996) (guilty pleas of coconspirators may only be admitted to assess the witnesses' credibility and must be accompanied by "a cautionary instruction to the effect that the jury may use the conviction or guilty plea only to determine the testifying witness's credibility"); *Emich Motors Corp. v. Gen. Motors Corp.*, 340 U.S. 558, 569 (1951) (a prior judgment of conviction may be used as prima facie evidence in a subsequent civil suit against the defendant only with respect to matters of fact or law "necessarily decided by the conviction and the verdict on which it was based"); *United States v. Real Prop. Located at Section 18*, 976 F.2d 515, 518-19 (9th Cir. 1992) (guilty plea could not be used to establish issues that were not decided in the plea agreement); *Int'l Shoe Mach. Corp. v. United Shoe Mach. Corp.*, 315 F.2d 449, 454 (1st Cir. 1963) (applying collateral estoppel rules to § 5 of the Clayton Act, and restricting its scope to questions "'distinctly put in issue and directly determined'"); *In re Homestore.com, Inc.*, CV 01-11115 RSWL (CWx), 2011 WL 291176, at *3 (C.D. Cal. Jan. 25, 2011) (the defendant's criminal guilty plea for securities violations could not be used by plaintiff to establish the defendant's civil liability for securities claims, because it did not meet "all of the criteria that must be satisfied in order to enable Plaintiff to utilize the collateral estoppel doctrine" where the plea agreement bore only on issue of liability, and "did not address all the required elements in Plaintiff's [civil] claim, such as reliance or economic loss"); Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), as amended in 1980; ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 7(C) Instr. 1 (2016) (modified); Fed. R. Evid. 403 (excluding evidence, among other things, "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury . . ."); Fed. R. Evid. 608 (limiting character evidence).

**DPP's Argument re Disputed Instruction No. 31A: Limited Purpose of Guilty Pleas in This Case Offered by Defendants**

Defendants attempt to artificially circumscribe the effect of their guilty pleas by asking the Court to instruct the jury, "The guilty plea of one Defendant cannot be used against any other Defendant *for any purpose whatsoever*." (Emphasis added). That is not the law. DPPs agree that the jury should be instructed that, in determining each Defendants' culpability, "you should consider only the evidence about that particular Defendants' statements and conduct." Disputed Instr. No. 23: Participation and Intent (Offered by DPPs). But that does not mean that a guilty plea by one Defendant cannot be used against another at trial for *any* purpose. Defendants' rigid construction of their pleas is both impractical and unrealistic.

Defendants' admissions of criminal price-fixing establish the existence of and their participation in a price-fixing conspiracy. Their guilty pleas are party admissions and probative of DPPs' allegation that there was a conspiracy that restrained U.S. trade in the relevant products. Telling the jury to view the pleas in strict isolation would impose an artificial constraint given the admissions of illegal conduct in furtherance of the same conspiracy. *See Cont'l Ore v. Union Carbide*, 370 U.S. 690, 698-99 (1962) ("[P]laintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.").

The pleas may be properly used against non-pleading and pleading Defendants, for instance to cross-examine a witness who asserts the market was competitive or that his company did not price fix based on an agreement or understanding with other companies. *See U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 608 F.3d 871, 891-93 (D.C. Cir. 2010) (admission of antitrust guilty plea in *qui tam* suit against other defendants who were not the co-conspirators noted in the plea and despite their contention that admitting the plea "would improperly impute" the pleading company's conduct to them). There will be no unfair prejudice if the Court instructs the jury to assess whether each Defendant is liable only by reference to the evidence of what that Defendant said and did. *See* DPPs' Disputed Instr. No. 23: Participation and Intent.

Defendants' proposed instruction depends on the flawed position that simply because one Defendants' guilty plea does not have estoppel effect as to another Defendants' civil liability, that plea

is usable at the civil trial only against the pleading Defendant. But each plea tends to make the conspiracy more probably and is relevant to DPPs' claims against all alleged co-conspirators and may be fairly used at trial. In *SEC v. Hilsenrath*, Judge Alsup held that a guilty plea in a criminal securities fraud case was admissible as evidence of violation in a parallel civil suit. Though the plea could not be given full preclusive effect because it covered a more limited time period, it was "still extremely probative as a party admission and evidence." No. C 03-03252, 2008 WL 2225709, at *4 (N.D. Cal. May 29, 2008). Another court noted that the guilty pleas of two executives "would likely have been probative on one or more issues relevant to" plaintiffs' claims under the federal securities laws, had the claims not been settled, even though the pleas were not to securities fraud. *In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491, 504-05 (W.D. Pa. 2003). Estoppel effect, relevancy and probative value should not be conflated.

Defendants also cite a series of criminal cases in support of their proposed instruction, but those cases involve a constitutionally-based criminal rule that "safeguards the criminal Defendants' right to a fair trial by preventing the jury from 'infer[ring] that the defendant on trial is more likely to be guilty' simply because the Defendants' co-conspirator was convicted." *United States v. Sitzmann*, 893 F.3d 811, 830 (D.C. Cir. 2018) (citing *United States v. Johnson*, 26 F.3d 669, 677 (7th Cir. 1994)); *see also Bisaccia v. Attorney Gen. of State of N.J.*, 623 F.2d 307, 312 (3d Cir. 1980) ("We ground this conclusion on the concept of fundamental fairness inherently required in every criminal trial."). The trial here, of course, does not implicate Defendants' Sixth Amendment rights. The rule they rely on therefore does not apply.

DPPs do not object to the second-to-last paragraph of Defendants' proposed instruction, which, except for a single clause, is identical to a paragraph in DPPs' proposed instruction regarding Defendants' guilty pleas. (*See* Disputed Instr. No. 31.) DPPs do object, however, to the second and final paragraphs of Defendants' instruction, which contains language slanted in their favor—*e.g.*, the jury would be informed that the guilty pleas do not tend to show "a price-fixing agreement existed at any time not covered by the specific terms of the plea agreement," and "you may not find the Defendants liable in this case." More neutral language is more appropriate.

## Defendants' Brief on Disputed Instruction No. 31A Re Limited Purpose of Guilty Pleas In This Case

As evidence regarding the guilty pleas has been introduced at trial, the law requires that the jury be told the limited purpose for which it may use this evidence.  Defendants' proposed instruction does this.

Indeed, the Ninth Circuit and other courts have long made clear that guilty pleas, if admitted at all, are only admissible for certain purposes—but not others—and that under the Federal Rules of Evidence, "[i]f the court admits evidence that is admissible against a party or for a purpose — but not against another party or for another purpose — the court, on timely request, ***must*** restrict the evidence to its proper scope and ***instruct the jury accordingly***."  Fed. R. Evid. 105 (emphasis added); *see United States v. Halbert*, 640 F.2d 1000, 1006-07 (9th Cir. 1981) (finding error where court failed to instruct the jury that evidence of co-conspirator's guilty plea "can be used only to assess credibility" of the witness, and for failing to tell the jury "in unequivocal language that the plea may not be considered as evidence of a defendant's guilt."); *United States v. Harris*, 738 F.2d 1068, 1071-72 (9th Cir. 1984) (same); *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988) (approving limiting instruction that the conviction of one defendant "could not be used against any other defendant for any purpose whatever"); *United States v. Gullo*, 502 F.2d 759, 761 (3d Cir. 1974) (as a general rule, "evidence of a guilty plea by a co-conspirator is not admissible"); *United States v. Newman*, 490 F.2d 139, 143 (3d Cir. 1974) ("guilty pleas and convictions of codefendants are not admissible to demonstrate the guilt of defendants"); *United States v. Werme*, 939 F.2d 108, 114 (3d Cir. 1991) ("Because evidence of a co-conspirator's guilty plea is extremely prejudicial to the defendant on trial absent [a limiting] instruction, compliance with the mandatory duty imposed by Rule 105 is particularly important."); *United States v. Sanders*, 95 F.3d 449, 454 (6th Cir. 1996) (guilty pleas of coconspirators may only be admitted to assess the witnesses' credibility and must be accompanied by "a cautionary instruction to the effect that the jury may use the conviction or guilty plea only to determine the testifying witnesses' credibility"); Fed. R. Evid. 403 (excluding evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury"); Fed. R. Evid. 608 (limiting character evidence).

DPPs do not propose any alternative instruction on this topic. Because the law requires that the jury is told the limited purpose for which it may use evidence related to the guilty pleas, the Court should adopt Defendants' proposed instruction.

1

**Instruction No. 32**

2

[Instruction previously removed by agreement of the parties]

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Instruction No. 33**

[Instruction previously removed by agreement of the parties]

**Disputed Instruction No. 34 Re Invocation of the Fifth Amendment—by a Party or Witness Identified with a Party Offered by DPPs**

Any person who becomes a witness, including a party, is required to answer all proper questions unless the Court rules that the witness may decline to testify or answer.

Under the Constitution, a person has the right to refuse to testify or answer questions which may tend to incriminate him in criminal activity.

During this case, [present or former employee identified with a party] refused to testify or to answer certain questions by exercising [his or her] privilege against self-incrimination. With respect to [witness'] refusal to testify or answer, you may decide whether or not to infer that this testimony or answer would have been unfavorable to the [party or witness identified with the party].

*Authority*: ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 7(B) Instr. 1 at p. 348 (2016).

1

**Disputed Instruction No. 34 Re Invocation of the Fifth Amendment—by a Party or Witness Identified with a Party Offered by Defendants**

2

[Defendants object to this instruction in its entirety]

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DPP's Argument re Disputed Instruction No. 34: Invocation of the Fifth Amendment—by a Party or Witness Identified with a Party Offered by DPPs**

During the parties' meet and confer discussions, Defendants raised no objections to the language of DPPs' proposed jury instruction concerning the jury's ability to draw a negative inference from a witness asserting the Fifth Amendment privilege to refuse to respond to questions. Instead, Defendants objected that this instruction is unnecessary or impermissible *in toto*, asserting that DPPs have neither identified any admissible Fifth Amendment testimony nor have they provided a legal basis for an adverse inference instruction. Both assertions are without merit.

Defendants' first assertion—about identifying admissible Fifth Amendment testimony—places the cart before the horse. It is only at trial that DPPs will offer specific Fifth Amendment testimony into evidence. The Court can then assess the admissibility of the proffered testimony based on the facts and circumstances before it, and upon the factual and legal arguments of the parties. Defendants may believe they will successfully oppose the introduction of all such testimony, but for present purposes, there is no basis upon which the Court should refuse a proposed jury instruction for which Defendants raise no objections to the language itself.

Defendants' second assertion—that there is no legal basis for a Fifth Amendment adverse inference instruction—is wrong. The Supreme Court instructs that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). It is within the district court's discretion to allow the jury to draw such an adverse inference. *Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 911 (9th Cir. 2008). In exercising that discretion, the court should "analyz[e] each instance where the adverse inference was drawn, or not drawn, on a case-by-case basis under the microscope of the circumstances of that particular civil litigation . . . . In each particular circumstance, the competing interests of the party asserting the privilege, and the party against whom the privilege is invoked must be carefully balanced." *S.E.C. v. Jasper*, 678 F.3d 1116, 1125 (9th Cir. 2012) (quoting *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000)). An adverse inference may be drawn "when there is independent evidence of the fact about which the party refuses

1    to testify." *Nationwide*, 541 F.3d at 912. Contrary to Defendants' assertion, the trial court should use its

2    discretion whether to permit a jury to draw adverse inferences from Fifth Amendment testimony.

3          To the extent Defendants were asserting that DPPs have not provided a legal basis to draw an

4    adverse inference from any specific Fifth Amendment testimony that DPPs may use as evidence, that

5    too is placing the cart before the horse. The law governing Fifth Amendment adverse inferences

6    instructs that the court should conduct a balancing test for the proffered testimony based on the

7    circumstances of each case. That kind of analysis cannot be done prophylactically or ad hoc without

8    regard to other evidence and issues in the case. Indeed, the Court has already allowed Fifth Amendment

9    testimony to be played during the March 2020 trial.

10          The Court should give a Fifth Amendment adverse inference instruction for another reason. The

11    individuals who asserted the Fifth Amendment at their depositions were high-level executives who

12    wielded managerial power and had the authority to make decisions binding their companies. They were

13    officers, directors and managing agents of Defendants or their co-conspirators and their testimony is

14    admissible. Fed. R. Civ. P. 32(a)(3). The jury should be instructed that it can draw adverse inferences

15    from their Fifth Amendment testimony. *Iantosca v. Benistar Admin. Services, Inc.*, 567 Fed.App'x 1, 6-

16    7 (1st Cir. 2014) (approving adverse inference instructions where corporate officers invoked the Fifth

17    Amendment). Indeed, DPPs understand that Mr. Kakizaki—who revoked his prior Fifth Amendment

18    invocations previously so that he would be permitted to testify at trial—has now changed his mind and

19    decided not to come to trial. In light of this, DPPs have every right to play to the jury Fifth Amendment

20    invocations by Mr. Kakizaki, as well as his prior substantive testimony.

21          For the above reasons, and those discussed in DPPs' oppositions to Defendants' motions *in*

22    *limine* (*see* MDL Dkt. Nos. 1043, 1069; DPPs' Opp. To Defs' MIL No. 3), Defendants' challenge to

23    DPPs' proposed Instruction No. 34 should be rejected. To the extent there was any disagreement on the

24    language of the proposed instruction, any such concern should be alleviated as DPPs' language is

25    drawn verbatim from the ABA Model Jury Instructions in Civil Antitrust Cases.

26

27

28

1

2

### Defendants' Brief on Disputed Jury Instruction No. 34:
### Fifth Amendment Adverse Inference

3

4

For the reasons discussed below, Defendants do not believe that an instruction about adverse

5

inferences being drawn from Fifth Amendment invocations is appropriate or justified given the facts and

6

circumstances of this case.  However, should the Court disagree and believe that such an instruction

7

should be given, Defendants do not object to the language that DPPs have proposed.

8

Fifth Amendment deposition testimony is of low probative value, unfairly prejudicial,

9

misleading, cumulative, and cannot be imputed to most or all Defendants.  *See In re 650 Fifth Ave. &*

10

*Related Props.*, 934 F.3d 147, 172 (2d Cir. 2019) (district court erred by admitting "parade of

11

videotapes … strategically spread out across multiple days of trial" that were "substantially more

12

prejudicial and redundant than probative").  And even if the Court decides that Fifth Amendment

13

*testimony* is admissible, the Court need not—and should not—give an adverse inference instruction.

14

*See Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1266 (9th Cir. 2000) (courts must "analyz[e]

15

each instance where the adverse inference was drawn, or not drawn, on a case-by-case basis under the

16

microscope of the circumstances of that particular civil litigation . . . .").

17

The specific circumstances of this case weigh strongly against adverse inference instructions.

18

As an initial matter, the Fifth Amendment invocations cannot be imputed to most or all Defendants

19

under the factors set forth in *LiButti v. United States*, 107 F.3d 110 (2d Cir. 1997); *see In re TFT-LCD*

20

*Antitrust Litig.*, No. 07-md-1827 (N.D. Cal.) (Illston, J.), Dkt. 5597 (granting Toshiba's motion to

21

exclude adverse inferences from Fifth Amendment deposition of its former employee).  And because

22

DPPs asked overbroad questions at the depositions, the adverse inferences are untethered to any

23

specific underlying facts in this case.  *See Ullman-Briggs, Inc. v. Salton/Maxim Housewares, Inc.*, 1996

24

WL 535083, at *17 (N.D. Ill. Sept. 17, 1996) (precluding adverse inference instruction where counsel

25

asked "questions in such a way as to be able to create the most damaging testimony through negative

26

inference, 'safe from any contradiction by the witness no matter what the actual facts'").

27

Defendants reserve the right to challenge the admissibility Fifth Amendment testimony, and

28

adverse inference instructions therefrom, on a question-by-question basis through the deposition

designation and objection process.  *See SEC* v. *Jasper*, 678 F. 3d 1116, 1127-28 (9th Cir. 2012) (affirming district court that "dealt with the evidence of invocation of the Fifth Amendment privilege at a high level of generality, and it instructed the jury to do the same" in part because *Jasper* did not bring question-by-question objections at the district court level).  But if the Court is inclined to give an adverse inference instruction, Defendants request that it be the carefully-worded instruction approved by the Ninth Circuit in *Jasper*: "in civil cases, you are permitted, but not required, to draw the inference that the withheld information would have been unfavorable for the defendant.  Any inference you may draw should be based upon all of the facts and circumstances in this case as you find them."  *Id.* at 1125 (emphasis added).

Defendants do not agree that DPPs have "every right to play to the jury Fifth Amendment invocations by Mr. Kakizaki, as well as his prior substantive testimony" and this issue was separately briefed and decided.  *See* Order (Nov. 26, 2021), ECF. No. 2867.

### Disputed Instruction No. 34A Re Invocation of the Fifth Amendment—by a Nonparty Witness Offered by DPPs

Under the Constitution, a person has the right to refuse to answer questions that may tend to incriminate him or her in criminal activity.

During this case, [witnesses] refused to testify by exercising his privilege against self-incrimination. With respect to [the witness'] refusal to testify, you may, but are not required to, infer that this testimony would have been unfavorable to the [party associated with the witness] if and only if you find that the witness is sufficiently associated with [that party] so as to justify the adverse inference. Whether the witness is sufficiently associated with a party to justify an adverse inference depends upon the total circumstances of the case. For example, a witness who is a past or present employee, officer or agent of a party may be, but is not necessarily, sufficiently associated with that party to justify an adverse inference. Likewise, a coconspirator may be sufficiently associated with a party to permit the drawing of an inference adverse to the party if the coconspirator refuses to testify.

If, however, you find that the witness is not sufficiently associated with [party], you are instructed that you are not to attach any significance to [the witness'] refusal to testify. In other words, you should not make any assumption or speculate why [the witness] chose to exercise his constitutional privilege. In addition, if [the witness] is not sufficiently associated with the parties, you are not to infer anything adverse or unfavorable to the party in the case because [the witness] refused to testify.

*Authority*: ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 7(B) Instr. 2 at p. 350 (2016).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 34A Re Invocation of the Fifth Amendment—by a Nonparty Witness Offered by Defendants**

[Defendants object to this instruction in its entirety]

**DPP's Argument re Disputed Instruction No. 34A: Invocation of the Fifth Amendment—by a Nonparty Witness Offered by DPPs**

DPPs incorporate by reference their argument for Disputed Instruction 34.

This case involves numerous witnesses who have invoked the Fifth Amendment including from witnesses from corporate defendants which have settled. This instruction, drawn verbatim from the ABA Model Instructions in Civil Antitrust Cases, is appropriate to inform the jury that they can draw the adverse inference against the non-settled Defendants if they are sufficiently associated with each other, including as coconspirators.

1
2

### Defendants' Brief on Disputed Jury Instruction No. 34A:
### Invocation of the Fifth Amendment—by a Nonparty Witness Offered by DPPs

3          For the reasons discussed below, Defendants do not believe that an instruction about adverse

4   inferences being drawn from Fifth Amendment invocations is appropriate or justified given the facts and

5   circumstances of this case.  However, should the Court disagree and believe that such an instruction

6   should be given, Defendants do not object to the language that DPPs have proposed.

7          Fifth Amendment deposition testimony is of low probative value, unfairly prejudicial,

8   misleading, cumulative, and cannot be imputed to most or all Defendants.  *See In re 650 Fifth Ave. &*

9   *Related Props.*, 934 F.3d 147, 172 (2d Cir. 2019) (district court erred by admitting "parade of

10  videotapes . . .  strategically spread out across multiple days of trial" that were "substantially more

11  prejudicial and redundant than probative").  And even if the Court decides that Fifth Amendment

12  ***testimony*** is admissible, the Court need not—and should not—give an adverse inference instruction.

13  *See Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1266 (9th Cir. 2000) (courts must "analyz[e]

14  each instance where the adverse inference was drawn, or not drawn, on a case-by-case basis under the

15  microscope of the circumstances of that particular civil litigation..").

16         The specific circumstances of this case weigh strongly against adverse inference instructions

17  because the Fifth Amendment invocations cannot be imputed to most or all Defendants under the

18  factors set forth in *LiButti v. United States*, 107 F.3d 110 (2d Cir. 1997); *see In re TFT-LCD Antitrust*

19  *Litig.*, No. 07-md-1827 (N.D. Cal.) (Illston, J.), Dkt. 5597 (granting Toshiba's motion to exclude

20  adverse inferences from Fifth Amendment deposition of its former employee).  Indeed, *LiButti* and

21  *TFT-LCD* make clear that the issue of imputation is a question of law for the Court to decide—not a

22  question of fact to be left to the jury.

23         Moreover, because DPPs asked overbroad questions at the depositions, the adverse inferences

24  are untethered to any specific underlying facts in this case.  *See Ullman-Briggs, Inc. v. Salton/Maxim*

25  *Housewares, Inc.*, 1996 WL 535083, at *17 (N.D. Ill. Sept. 17, 1996) (precluding adverse inference

26  instruction where counsel asked "questions in such a way as to be able to create the most damaging

27  testimony through negative inference, safe from any contradiction by the witness no matter what the

28  actual facts").

Defendants reserve the right to challenge the admissibility Fifth Amendment testimony, and adverse inference instructions therefrom, on a question-by-question basis through the deposition designation and objection process.  *See SEC v. Jasper*, 678 F. 3d 1116, 1127-28 (9th Cir. 2012) (affirming district court that "dealt with the evidence of invocation of the Fifth Amendment privilege at a high level of generality, and it instructed the jury to do the same" in part because Jasper did not bring question-by-question objections at the district court level).

**Disputed Instruction No. 35 Re Causation and Injury Offered by DPPs**

If you find that Defendants have violated the Section 1 of the Sherman Act, then you must decide if DPPs are entitled to recover damages from Defendants.

DPPs are entitled to recover damages for an injury to its business or property if they can establish three elements of injury and causation:

(1)    DPPs were in fact injured as a result of Defendants' alleged violations of the antitrust laws;

(2)    Defendants' alleged illegal conduct was a material cause of DPPs' injury; and

(3)    DPPs' injury is an injury of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For DPPs to establish that they are entitled to recover damages, they must prove that they were injured as a result of Defendants' alleged violations of the antitrust laws. Proving the fact of damages does not require DPPs to prove the dollar value of their injury. It requires only that DPPs prove that they were in fact injured by Defendants' alleged antitrust violations. If you find that DPPs have established that they were in fact injured, you may then consider the amount of DPPs' damages. It is important to understand, however, that injury and amount of damage are different concepts and that you cannot consider the amount of damage unless and until you have concluded that DPPs have established that they were in fact injured.

DPPs must also offer evidence that establishes by a preponderance of the evidence that Defendants' alleged illegal conduct was a material cause of DPPs' injury. This means that DPPs must have proved that some damage occurred to them as a result of Defendants' alleged antitrust violations, and not some other cause. DPPs are not required to prove that Defendants' alleged antitrust violations were the sole cause of their injury; nor need DPPs eliminate all other possible causes of injury. It is enough if DPPs have proved that the alleged antitrust violation was a material cause of their injury.

Finally, DPPs must establish that their injury is the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If DPPs' injuries were caused by a reduction in competition, or acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then DPPs' injuries are antitrust injuries. On the other hand, if DPPs'

injuries were caused by heightened competition or the competitive process itself, then DPPs' injuries are not antitrust injuries and DPPs may not recover damages for those injuries under the antitrust laws.

In summary, if DPPs can establish that they were in fact injured by Defendants' conduct, that Defendants' conduct was a material cause of their injury, and that their injury was the type that the antitrust laws were intended to prevent, then DPPs are entitled to recover damages for the injury to their business or property.

*Authority*: ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 6(A) Instr. 1, at 300-1 (2016).

**Disputed Instruction No. 35 Re Causation and Injury Offered by Defendants**

If you find that Defendants have violated Section 1 of the Sherman Act, then you must decide if DPPs are entitled to recover damages from Defendants. To recover damages, DPPs bear the burden of proving, under Section 4 of the Clayton Act, that "all or nearly all" class members "suffer[ed] a cognizable injury."

DPPs are entitled to recover damages for an injury to their business or property if they can establish three elements of injury and causation:

(1)     All or nearly all DPPs were in fact injured as a result of Defendants' alleged violations of the antitrust laws;

(2)     Defendants' alleged illegal conduct was a material cause of all or nearly all DPPs' injury;  and

(3)     DPPs' injury is an injury of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For DPPs to establish that they are entitled to recover damages, they must prove that all or nearly all DPPs were injured as a result of Defendants' alleged violations of the antitrust laws. That is, DPPs must prove that each purchaser within the class suffered at least some injury as the result of Defendants' alleged antitrust violation. Proving the fact of injury does not require DPPs to prove the dollar value of their injury. It requires only that DPPs prove that all or nearly all DPPs were in fact injured by Defendants' alleged antitrust violations. If you find that DPPs have established that all or nearly all DPPs were in fact injured, you may then consider the amount of DPPs' damages.  It is important to understand, however, that injury and amount of damage are different concepts and that you cannot consider the amount of damage unless and until you have concluded that DPPs have established that they were in fact injured.

DPPs must also offer evidence that establishes by a preponderance of the evidence that Defendants' alleged illegal conduct was a material cause of DPPs' injury. This means that DPPs must have proved that some damage occurred to them as a result of Defendants' alleged antitrust violations, and not some other cause. DPPs are not required to prove that Defendants' alleged antitrust violations

were the sole cause of their injury; nor need DPPs eliminate all other possible causes of injury. It is enough if DPPs have proved that the alleged antitrust violation was a material cause of their injury.

Finally, DPPs must establish that their injury is the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If DPPs' injuries were caused by a reduction in competition, or acts that would otherwise harm consumers, then DPPs' injuries are antitrust injuries. On the other hand, if DPPs' injuries were caused by heightened competition or the competitive process itself, or by acts that would benefit consumers, then DPPs' injuries are not antitrust injuries and DPPs may not recover damages for those injuries under the antitrust laws.

In summary, if DPPs can establish that all or nearly all DPPs were in fact injured by Defendants' conduct, that Defendants' conduct was a material cause of their injury, and that their injury was the type that the antitrust laws were intended to prevent, then DPPs are entitled to recover damages for the injury to their business or property.

*Authority*: Adapted from ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 6(A) Instr. 1; *see also In re Korean Ramen Antitrust Litig.*, Jury Instructions,  No. 3:13-cv-04115-WHO (N.D. Cal. Dec. 13, 2018) (Doc. 907); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, Jury Instructions, No. 3:07-md-01827-SI (N.D. Cal. Aug. 28, 2013) (Doc. 8543);  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114, n. 9 (1969).

**DPP's Argument re Disputed Instruction No. 35: Causation and Injury**

DPPs' proposed instruction is identical to ABA Model Jury Instruction Chapter 6(A), Instruction 1 (Injury and Causation). Defendants' proposed additions depart from the model in an attempt to have the jury relitigate questions of law the Court has already repeatedly determined.

*Defendants' Additions: "All or nearly all."* Defendants repeatedly add that DPPs must prove that "all or nearly all class members" or "each purchaser" were injured. Defendants cite neither case law nor a model instruction that directs a jury to find injury to "all or nearly all" class members—for good reasons. *First*, "all or nearly all" is the wrong test—DPPs need only show "class-wide impact." *In re Capacitors Antitrust Litig.*, No. 17-md-02801-JD, 2018 WL 5980139, at *7 (N.D. Cal. Nov. 14, 2018) ("*Capacitors Class Op.*"). The Ninth Circuit has held class certification is appropriate so long as a class does not contain "large numbers of class members who were never *exposed* to the challenged conduct to begin with" and "even a well-defined class may inevitably contain some individuals who have suffered no harm as a result of a Defendants' unlawful conduct." *Torres v. Mercer Canyons Inc.,* 835 F.3d 1125, 1136 (9th Cir. 2016). This Court noted this, at most, presents an issue as to damages. *Capacitors Class Op.* at *9 (*citing Torres*, 835 F.3d at 1136); *see also Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1047 (2016) (issue of uninjured class members was not "fairly presented by this case because the damages award has not yet been disbursed."). Further, in this case, as DPPs' experts measured damages on an aggregate basis, whether any class members were injured would affect only the allocation of damages, not the total liability of the conspirators.

*Second*, Defendants attempt to shoehorn the issue of predominance under Rule 23(b)(3) into an element to be proved or the findings for the jury. *See Brown v. Wal–Mart Stores, Inc.*, 651 F. App'x 672, 674 (9th Cir. 2016) ("*the district court* did not abuse its discretion by concluding that the proposed class met Rule 23(b)(3)'s predominance requirement."). Such tests, designed for a judge's analysis of pretrial procedural matters, are for the Court, not for the jury. *See, e.g., City of Long Beach v. Standard Oil Co. of Cal.*, 46 F.3d 929, 933 (9th Cir. 1995) (questioning whether summary judgment tests are appropriate for charging the jury). The jury need not be asked—or conclude—that procedural requirements of Rule 23 are satisfied at trial. This Court has found predominance based on an extensive

factual record and length briefing. *See Capacitors Class Op.* at *5-8; *see also Chip-Tech, Ltd. v. Taitsu Am.*, No. 18-80173 (9th Cir. Feb. 27, 2019) ECF No. 10 (declining to review class certification). Further, DPPs' experts have calculated to the total aggregate overcharges, so that proof that any class members were uninjured would affect only the allocation of damages, not the total amount of damages.

Defendants cite no cases instructing a jury to find injury as to "all or nearly" all class members. Those cases arose in other procedural contexts, such as summary judgment, *see, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986) (summary judgment); *Rebel Oil*, 51 F.3d at 1435 (same); *In re eBay Seller Antitrust Litig.*, No. C 07-01882, 2010 WL 760433, at *14 (N.D. Cal. Mar. 4, 2014) (granting summary judgment where plaintiffs failed to adduce "any actual proof of antitrust injury . . . on an individual or a classwide level."); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.,* 632 F. Supp. 2d 42, 55 (D. Me. 2009),[1] or class certification. *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 311 (N.D. Cal. 2010); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. C 07-01819, 2008 WL 4447592, at *5 (N.D. Cal. Sept. 29, 2008).

---

[1] *New Motor Vehicles*, which in dicta suggested proof would be required as to *all* class members, conflicts with Ninth Circuit precedent and is no longer good law. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014) (permitting certification even where evidence may not support recovery as to some class members).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Defendants' Brief on Disputed Instruction No. 35:**
**Causation and Injury**

Defendants' proposed instruction on "Causation and Injury" makes minor changes to the ABA Model in order to reflect that this is a class action trial. This ABA Model instruction is not written for class actions, and therefore must be modified to reflect DPPs' burden of showing "all (or nearly all)" class members were injured.

Defendants' proposal includes words to the effect that plaintiffs must prove harm to "all (or nearly all)" members of the class. Defendants have done so because the ABA Model does not address injury in the class action context, and the law is clear that antitrust injury to all (or nearly all) members of the class is required in order to prove a violation of Section 1 of the Sherman Act. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 311 (N.D. Cal. 2010) (plaintiffs were required to establish that "all (or nearly all) members of the class suffered damage as a result of Defendants' alleged anti-competitive conduct") (quoting "all (or nearly all)" class-wide injury test from *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. C 07-01819-CW, 2008 WL 4447592, at *5 (N.D. Cal. Sept. 29, 2008)), abrogated on other grounds by *In re ATM Fee Antitrust Litig.*, 686 F.3d 741 (9th Cir. 2012).

The requirement that plaintiffs prove antitrust injury to all or nearly all of its class members was recently reaffirmed in *In re Rail Freight Fuel Surcharge Antitrust Litig.*, where the court found that "5% to 6% constitutes the outer limits" of the number of "uninjured class members" that various courts have permitted in a class. 292 F. Supp. 3d 14, 137-38 (D.D.C. 2017); *see also In re Pre-Filled Propane Tanks Antitrust Litig.*, MDL No. 2567, ECF No. 607, slip op. at 8 (W.D. Mo. Nov. 9, 2021) (denying class certification based on predominance and observing that "[p]redominance is lacking in circumstances where a plaintiff's common proof of impact fails to show that ***all or nearly all*** class members were in fact injured") (emphasis added). The D.C. Circuit in *Rail Freight* emphasized the need for a reliable metric to determine antitrust injury for large classes. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 255 (D.C. Cir. 2013). The requirement that plaintiffs prove injury to "all (or nearly all)" class members is not limited to the evaluation of a class for purposes of class certification. It is rather an accepted requirement for proving an antitrust violation. *In re eBay*

*Seller Antitrust Litig.*, No. C 07-01882-JF, 2010 WL 760433, at *14 (N.D. Cal. Mar. 4, 2014) (granting summary judgment where plaintiffs could not point to "any actual proof of antitrust injury . . . on an individual or a classwide level"); *See, e.g.*, *In re New Motor Vehicles*, 632 F. Supp. 2d at 56 (granting summary judgment where plaintiffs failed to "show that every member of the putative class was in fact injured by paying a higher transaction price than he or she would have paid without the restraint").

**Stipulated Instruction No. 36 Re Trade Associations**

In this case, DPPs claim that capacitor manufacturers participated in industry meetings and used those meetings to conspire to fix prices, specifically to control and set the prices of their aluminum, tantalum and film capacitors sold to United States purchasers and purchasers worldwide.

Businesses that are actual or potential competitors, such as some of the Defendants here, may lawfully form into trade, industry, or professional associations or similar organizations ("trade associations") to advance common interests, and may communicate or meet with one another in furtherance of lawful trade association activities. The law does not prohibit persons who are otherwise competitors from joining together to carry out lawful and legitimate activities. For example, trade associations may lawfully keep members informed and hold meetings among their members for topics such as new or changed services, technology, standard practices, or legislation and regulations in the industry. But members of such organizations who compete with each other are not permitted to use membership in their organizations to restrain competition.

Mere membership in a trade association does not establish liability, even if that association is being used for an illegal purpose. No inference that the charged conspiracy was formed or existed may be drawn from the mere fact that there is a trade association, that a Defendant was a member of a trade association, or that certain of Defendants' officers/employees attended meetings of the trade association.

Nevertheless, you may consider trade association membership, meetings, and discussions along with all the other evidence, in determining whether a defendant entered into the alleged conspiracy.

The issue you must decide is whether DPPs proved that Defendants used the industry meetings and its challenged practices to conspire to fix prices.

In deciding whether this was an antitrust violation, you are to follow the instructions I have given concerning whether the alleged conduct constituted an illegal conspiracy.

*Authority*: ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 2(C) Instr. 10 (2016); ABA Model Jury Instructions in Criminal Antitrust Cases (2009) at 103 (Specific Issue Instructions, Instruction 4, Trade Associations); Third Amended Class Action Complaint, at ¶ 13.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Stipulated Instruction No. 37 Re Statute of Limitations**

The statute of limitations for the antitrust laws does not permit recovery of damages for any injuries sustained by DPPs prior to [July 18, 2010].

If you find that DPPs suffered injuries spanning both before and after [July 18, 2010], then you must apportion the damages between the two periods and you may award damages only for the portion of the injuries suffered after [July 18, 2010]. When apportioning the damages between the two periods, you should be guided by the same principles I explained to you earlier. That is, you are permitted to make just and reasonable estimates in apportioning DPPs' damages. You are not required to apportion damages with absolute mathematical certainty or precision. However, the apportionment of damages must have a reasonable basis in the evidence. If you find that you cannot apportion damages between the two periods without relying on guesswork or speculation, then you may not award damages at all.

*Authority*: ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 7 Instr. 1;

**Stipulated Instruction No. 38 Re Statute of Limitations—Fraudulent Concealment**

The statute of limitations bars any recovery by DPPs for injuries that occurred before July 18, 2010, which is four years prior to the date DPPs filed this lawsuit. However, there is an exception to this rule called fraudulent concealment. If DPPs proves that the price fixing conspiracy was fraudulently concealed, DPPs may recover for injuries that occurred before July 18, 2010.

To establish fraudulent concealment, DPPs must prove each of the following three elements by a preponderance of the evidence:

(1) Defendants or any member of the conspiracy actively concealed the price fixing that caused DPPs' injuries;

(2) DPPs did not discover the alleged conduct before July 18, 2010; and

(3) DPPs exercised reasonable diligence in the circumstances and still did not discover the alleged conduct.

To establish the first element of fraudulent concealment—active concealment—DPPs must show affirmative acts of concealment. Mere silence does not constitute fraudulent concealment. Rather, DPPs must prove that Defendants took affirmative steps to prevent DPPs from learning about the price-fixing conspiracy. DPPs allege that Defendants and their coconspirators committed the following types of affirmative acts to conceal the alleged conspiracy: held secret meetings at hotels; destroyed documents, notes and emails; instructed others to destroy emails after reading; announced price increases as a pretext rather than disclosing the conspiracy itself; informed others to not share contents of communications, and used codes to hide company identities, among other things.

Defendants are responsible for their own acts of concealment as well as any acts of concealment committed by coconspirators as long as the act of concealment occurred during the course and in furtherance of the conspiracy. DPPs need not establish concealment on a victim-by-victim basis; affirmative acts of concealment generally are considered to have an industry-wide effect.

In considering the third element of fraudulent concealment, if facts were reasonably available to DPPs that should have aroused suspicion that the price-fixing conspiracy had occurred, DPPs must have made a reasonable investigation to discover the price-fixing conspiracy. Parallel conduct or parallel pricing by itself does not give rise to the duty to investigate. If you conclude that a reasonable investigation would not have uncovered the price-fixing conspiracy, then you must find that the third element has been established. If, under all the circumstances of the case, no suspicious facts were reasonable available to DPPs, no investigation was required, and you must find that the third element has been established.

If you find that DPPs have proved all three elements of fraudulent concealment, then DPPs are entitled to recover for injuries that occurred before July 18, 2010. If you find that DPPs have failed to prove any one of the three elements, then DPPs may not recover for injuries that occurred before July 18, 2010.

*Authority*: Adapted from ABA Model Jury Instructions in Civil Antitrust Cases (2016) at 333-32; *see In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-SC, 2016 WL 8669891, at *9 (N.D. Cal. Aug. 22, 2016) ("[A]ttend[ing] secret meetings in hotels, record[ing] information on a blackboard instead of committing it to paper, instruct[ing] recipients of emails to destroy them after reading them, and us[ing] codes in correspondence" affirmative acts for fraudulent concealment purposes); *see also Carrier Corp.  v. Outokompu Oyj*, 673 F.3d 430, 447, n.8 (6th Cir. 2012) ("'[F]raudulent concealment . . . may be established through the acts of co-conspirators'"); *New York v. Hendrikson Bros., Inc.*, 840 F.2d 1065, 1085-84 ("[T]he trial court properly instructed the jury that if it found that the bid-rigging conspiracy continued in existence at the time of the . . . defendants' coverup activities, it could find that those activities were also attributable to the other members of the conspiracy."); *Hobson*

1  *v. Wilson*, 737 F.2d 1, 34-35 (D.C. Cir. 1984) ("The deception may be as simple as a single lie . . . so

2  long as the defendants conceal 'not only their involvement, but the very conduct itself'"), overruled on

3  other grounds by *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S.

4  163 (1993).

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Stipulated Instruction No. 39 Re Damages—Introduction and Purpose Offered by DPPs**

If you find that Defendants violated the antitrust laws and that this violation caused injury to the DPPs, then you must determine the amount of damages, if any, DPPs are entitled to recover. The fact that I am giving you instructions concerning the issue of DPPs' damages does not mean that I believe DPPs should, or should not, prevail in this case. If you reach a verdict for Defendants on the issue of liability, you should not consider the issue of damages, and you may disregard the damages instruction that I am about to give.

The law provides that DPPs should be fairly compensated for all damages that were a direct result or likely consequence of the conduct that you have found to be unlawful.

Antitrust damages are only compensatory, meaning their purpose is to put an injured plaintiff as near as possible in the position in which it would have been had the alleged antitrust violation not occurred. The law does not permit you to award damages to punish a wrongdoer—what we sometimes refer to as punitive damages—or to deter particular conduct in the future. Furthermore, you are not permitted to award to DPPs an amount for attorneys' fees or the costs of maintaining this lawsuit.

*Authority*: ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 6(B) Instr. 1.

1

**Stipulated Instruction No. 40 Re Calculation of Damages**

2      You are permitted to make just and reasonable estimates in calculating DPPs' damages. You are

3  not required to calculate damages with mathematical certainty or precision. However, the amount of

4  damages must have a reasonable basis in the evidence and must be based on reasonable, non-

5  speculative assumptions and estimates. Damages may not be based on guesswork or speculation. DPPs

6  must prove the reasonableness of each of the assumptions upon which the damages calculation is

7  based.

8      If you find that DPPs have provided a reasonable basis for determining damages, then you may

9  award damages based on a just and reasonable estimate supported by the evidence.

10      If you find that DPPs have failed to carry their burden of providing a reasonable basis for

11  determining damages, then you may not award damages or you may award nominal damages, not to

12  exceed one dollar.

13

14      *Authority*:  ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 6(B) Instr. 3.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Stipulated Instruction No. 41 Re Nominal Damages**

The law that applies to this case authorizes an award of nominal damages. If you find for DPPs but you find that DPPs have failed to prove damages as defined in these instructions, you must award nominal damages. Nominal damages may not exceed one dollar.

*Authority*: *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 3:07-md-01827-SI (N.D. Cal. Aug. 28, 2013) (Doc. 8543); Ninth Circuit Manual of Model Civil Jury Instructions, Instr. 5.6 (2017); *see also U.S. Football League v. NFL*, 842 F.2d 1335, 1376-77 (2d Cir. 1988).

**Disputed Instruction No. 42 Re Calculation of Damages Offered by DPPs**

If you have determined that there was an unlawful agreement among competitors to set, fix, raise, maintain, or stabilize prices that caused some injury to DPPs, you must now determine the amount of damages to award to DPPs. The proper way to calculate DPPs' damages is to determine the difference between the prices plaintiffs actually paid for aluminum, film and tantalum capacitors and the prices plaintiffs would have paid had there been no agreement to fix, raise, maintain, or stabilize prices. This is referred to as the overcharge.

DPPs are seeking to recover damages on behalf of a class of purchasers that includes [all persons that purchased capacitors directly from any of the Defendants from January 1, 2002 to December 31, 2013 (the "Class Period"). To award damages for the class, you do not need to determine the overcharge paid by each class member with absolute mathematical certainty or precision. It is sufficient for you to determine the average overcharge paid by class members or estimate the overcharge paid by class members, as long as the estimate is based on evidence and reasonable inferences. You may not base your damages award on guesswork or speculation. If determining the amount of damages requires you to guess or speculate, or make speculative assumptions or inferences, you may not award damages.

*Authority*: Adapted from ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 6(B) Instr. 5 and 7 at pp. 312, 314 (2016).

**Disputed Instruction No. 42 Re Damages for Purchasers – Class Offered by Defendants**

If you have determined that there was an unlawful conspiracy among competitors to fix prices that caused some injury to DPPs, you must now determine the amount of damages to award DPPs. The proper way to calculate DPPs' damages is to determine the difference between the prices DPPs actually paid for aluminum, tantalum, and/or film capacitors and the prices DPPs would have paid had there been no conspiracy to fix prices.  This is referred to as the overcharge.

DPPs are seeking to recover damages on behalf of a class of purchasers that includes all persons that purchased capacitors directly from any of the Defendants from January 1, 2002 to December 31, 2013 (the "Class Period"), where such persons are: (a) inside the United States and were billed or invoiced for capacitors by one or more Defendant Entities during the Class Period (i.e., where capacitors were "billed to" persons within the United States); or (b) outside the United States and were billed or invoiced for capacitors by one or more Defendant Entities during the Class Period, where such capacitors were imported into the United States by one or more Defendant Entities (i.e., where the capacitors were "billed to" persons outside the United States but "shipped to" persons within the United States).  To award damages for the class, you do not need to determine the overcharge paid by the class with mathematical certainty or precision.  It is sufficient for you to determine the average of the overcharge paid by class members, as long as the average or estimate is based on evidence and reasonable inferences.  You may not base your damages award on guesswork or speculation. If determining the amount of damages requires you to guess or speculate, or make speculative assumptions or inferences, you may not award damages.

*Authority*: ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 6(B) Instr. 5 and 7.

**DPP's Argument re Disputed Instruction No. 42: Calculation of Damages**

*Description of Conspiracy and Affected Products.* DPPs incorporate by reference their briefing on Instruction No. 21. The instructions should reflect DPPs' theory of the case and the evidence DPPs will produce at trial.

"*Conspiracy.*" Conspiracy is the proper way to describe the conduct here; calling it an "agreement" (as Defendants suggest) improperly suggests some innocuous formal undertaking, which the law does not require. *See* DPPs Argument to Instr. 22.

*It Is Sufficient for the Jury to Determine Class Members' "Total Overcharge."* DPPs need not calculate the precise overcharge sustained by each class member; proving the total (or aggregate) overcharge suffices. *See also, e.g., In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1251 & n.3 (10th Cir. 2014); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 534 (6th Cir. 2008); *see also Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 560-61 (1931) ("The wrongdoer is not entitled to complain that [damages] cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.").

*Defendants' Addition: Incorrect Class Definition.* Defendants propose inserting an incorrect definition of the class. DPPs provided the exact class definition as certified by the Court (*see* ECF No. 493), albeit in the instruction describing the parties where it makes more logical sense (Instruction No. 4), and hence DPPs do not repeat it here. As the jury's finding will resolve the claims of all the class members, the wisest course is to use the precise definition of the certified class, the members of which received notice.

*Defendants' Addition: "All or Nearly All."* DPPs incorporate by reference their briefing on Instruction No. 35. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1050 (2016) (affirming in favor of a class with potentially uninjured class members because "damages award ha[d] not yet been disbursed, nor does the record indicate how it will be disbursed" and on the record, resolving issue of allocation of damages was "premature").

1

**Defendants' Brief on Disputed Instruction No. 42: Calculation of Damages**

2       Defendants propose an instruction that is taken verbatim from ABA Model Jury Instructions in

3   Civil Antitrust Cases, Ch. 6(B) Instr. 5 and 7.  DPPs propose an instruction that deviates from the ABA

4   Model.   First, DPPs omit the full class definition from their proposal—choosing to include just part of

5   the class criteria—even though the ABA Model includes the sentence "Plaintiff is seeking to recover

6   damages on behalf of a class of purchasers that includes [*class definition*]" (brackets in original).

7   Second, while the model gives three choices—"[fix prices, restrict output, or allocate markets]"

8   (brackets in original)—DPPs replace the model's simple and easy to understand language with the

9   necessarily confusing and prejudicial phrase "set, fix, raise, maintain, or stabilize."  The Court should

10  decline to deviate from the ABA Model or allow DPPs to unilaterally change the class definition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed Instruction No. 43 Re No Pass-On Consideration Offered by DPPs**

Under the antitrust laws, DPPs suffer injury when they pay an illegal overcharge. Whether or not DPPs passed on to their customers the higher prices they paid for aluminum, film and tantalum capacitors as a result of the alleged conspiracy is irrelevant to your calculation. You are not to consider whether DPPs passed on any overcharges to their customers when calculating damages.

*Authority*: Adapted from *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 3:07-md-01827-SI (N.D. Cal. Aug. 28, 2013) (Doc. 8543); *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 488-89 (1968); *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946).

**Disputed Instruction No. 43 Re No Pass-On Consideration**

[Defendants object to this instruction in its entirety]

**DPP's Argument re Disputed Instruction No. 43: No Pass-On Consideration Offered by DPPs**

Black letter law prohibits any consideration of whether some or all of DPPs' overcharges were passed on to downstream customers. Even if direct purchasers passed on some or all of an antitrust overcharge, that does not vitiate a finding of injury or reduce damages. The Supreme Court has held that a "direct purchaser suing for treble damages under § 4 of the Clayton Act is injured within the meaning of § 4 by the *full amount* of the overcharge" and an antitrust defendant is "not permitted to introduce evidence that indirect purchasers were in fact injured by the illegal overcharge." *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 724-25 (1977). *See also Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 494 (1968) (defendant "was not entitled to assert a passing on defense"); *Illinois Brick*, 431 U.S. 729-30; *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008) (Courts are not permitted to determine "what portion of [an] illegal overcharge was 'passed on' . . . and what part was absorbed by the middlemen" because such an analysis would "involve all the evidentiary and economic complexities that *Illinois Brick* clearly forbade."); *Meijer, Inc. v. Abbott Labs.*, 251 F.R.D. 431, 433 (N.D. Cal. 2008) ("[W]hen a seller overcharges a buyer . . . , the fact that the buyer raises the price for its own product, thereby passing on the overcharge to its customers and avoiding a loss in profit, has no bearing on the issue of whether the buyer has suffered an injury . . . . [D]amages are appropriate to the extent the buyer was overcharged, and must be measured accordingly."); *Apple iPod iTunes Antitrust Litig.*, No. C 05-00037, 2011 WL 5864036, at *4 (N.D. Cal. Nov. 22, 2011) (in antitrust action, rejecting Defendants' pass-on-overcharge defense on motion for class certification); *Braintree Labs. v. McKesson Corp.*, No. 11-80233, 2011 WL 5025096, at *3 (N.D. Cal. Oct. 20, 2011) ("a plaintiff's alleged benefit from a Defendants' anti-competitive behavior because the plaintiff 'passed on' any overcharge is not relevant to whether the plaintiff suffered a cognizable antitrust injury."). The Supreme Court reaffirmed the direct purchaser rule just last term. *See Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1525 (2019).

The *Illinois Brick* rule was intended to reduce the complexity of direct purchaser actions by barring analysis of downstream effects. *See Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1212 (9th Cir. 1984). The law is indisputable and clear. Defendants do not argue otherwise.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jurors are unlikely to know this basic rule, however, and must be instructed lest they improperly consider pass-on effects when considering DPPs' injuries. Thus, the instruction should be given to prevent legal error from contaminating jury deliberations (whether or not such a defense is overtly raised by Defendants). Courts have given such instructions in the past. *See*, *e.g.*, Jury Instructions at 24, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 3:07-md-01827-SI (N.D. Cal. Aug. 28, 2013) (Doc. 8543) ("Whether or not the plaintiffs passed on any overcharges to its customers is irrelevant to your calculation of damages under federal law."); Reporter's Transcript of Proceedings at 188-89, *Safeway, Inc. v. Abbott Labs.*, Civ. A. No. 4:07-cv-05470-CW (N.D. Cal. Feb. 28, 2011) (Doc. 400, filed Dec. 5, 2011) ("Customer Plaintiffs allege that they were injured in their property because they paid higher prices for Norvir and Kaletra as a result of Abbott's alleged violations of the Sherman Act. Such overcharges resulting from higher prices caused by anticompetitive conduct may be found to be the type of injury the Sherman Act was intended to prevent. You are not to consider whether any customer plaintiff passed on any alleged overcharge to its own customers in determining whether and to what degree a Customer Plaintiff was injured."). This Court should do so as well.

**Defendants' Brief on Disputed Instruction No. 43: No Pass-On Consideration**

Defendants object in full to this instruction as it is inappropriate and unnecessary.  This Court has already ruled that Defendants may not attempt to introduce evidence or argue "that plaintiffs were not injured or suffered reduced damages because they could pass on any overcharges to their customers."  Pretrial Order No. 2 (Feb. 14, 2020), ECF. No. 2559 at 3.  Because DPPs successfully argued that Defendants may not introduce such evidence and Defendants certainly do not intend to violate the Court's order, there is no need for the jury to be instructed to ignore evidence that it will never hear.  To instruct the jury otherwise will merely confuse the jurors..

Further, neither the Ninth Circuit nor the ABA model jury instructions include an instruction on plaintiffs' ability to pass on overcharges.  This is not surprising because it is settled law that under the Sherman Act, a defendant cannot raise a defense based on a plaintiffs' ability to pass along any overcharges to its customers.  Accordingly, defendants—both generally and in this case—do not raise pass-on defenses.  An instruction along the lines of that proposed by DPPs is thus unnecessary and would only confuse and mislead the jury.  Defendants note that while the ABA model instructions do acknowledge that, in certain circumstances, such an instruction would be appropriate, no such circumstances exist here.  ABA Model Jury Instructions in Civil Antitrust Cases B-304, Notes.  Plaintiffs cite the TFT-LCD case as authority, but that case demonstrates precisely why such an instruction is only appropriate in certain circumstances, which are not present here.  That case involved state law claims, which did allow juries to consider evidence of a plaintiff's ability to pass on overcharges in determining the amount of damages.  *See* Jury Instructions, In re: TFT-LCD (Flat Panel) Antitrust Litigation, No. 07-MD-1827-SI (N.D. Cal. Aug. 28, 2013), ECF No. 8543 at 4.  Thus, the instruction was required to clarify that, for the federal claims, the pass-on defenses were irrelevant.

1

**Stipulated Instruction No. 44 Re Joint and Several Liability**

2
3
4
5
6

Each participant in a conspiracy that violates the antitrust laws is jointly and severally liable for all of the damages resulting from the conspiracy. This means that each conspirator is fully liable for all of the damages caused by the conspiracy and not solely for damages caused by an individual conspirator. One who knowingly joins an ongoing conspiracy is liable for the previous acts of the other conspirators in furtherance of the conspiracy.

7
8
9
10

If you find that plaintiff has proven the existence of the alleged conspiracy, that defendant participated in the conspiracy, and that plaintiff is entitled to recover damages based on the other instructions in this case, then defendant would be liable for all damages caused by the conspiracy including any overcharges on purchases of the product.

11
12
13
14
15

Thus, in that event, Defendants would be liable for overcharges on all purchases of aluminum, tantalum, and/or film capacitors by DPPs from all members of the conspiracy, and not merely on purchases from a Defendant. If, however, you find that any of the other alleged conspirators were not a member of the conspiracy, then defendant would not be liable for damages based on plaintiff's purchases from those alleged conspirators.

16

*Authority*: ABA Model Jury Instructions in Civil Antitrust Cases, Ch. 6(B) Instr. 17.

17
18
19
20
21
22
23
24
25
26
27
28

**Disputed Instruction No. 45 Re Settlement Agreements of Settling Defendants Offered by DPPs**

Certain capacitor manufacturers — who were formerly defendants in this matter — reached settlements with the DPPs prior to trial. The existence of these settlement agreements should not influence your consideration of this case.

*Authority*: Adapted from *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 3:07-md-01827-SI (N.D. Cal. Aug. 28, 2013) (Doc. 8543).

**Disputed Instruction No. 45 Re Settlement Agreements of Settling Defendants
Offered by Defendants**

Certain capacitor manufacturers — who were formerly defendants in this matter — reached settlements with the DPPs prior to trial. Some of these settlement agreements generally require the settling Defendants to cooperate with the DPPs in pursuing DPPs' claims as to the other Defendants. The fact that a party has settled does not establish its membership in the alleged conspiracy. The existence of these settlement agreements should not influence your consideration of this case, but you may consider the cooperation obligations in evaluating the bias and credibility of witnesses associated with the settling Defendants.

*Authority*: Adapted from *In re TFT-LCD (Flat Panel) Antitrust Litig.*, Jury Instructions, No. 3:07-md-01827-SI (N.D. Cal. Aug. 28, 2013) (Doc. 8543).

**DPP's Argument re Disputed Instruction No. 45 Settlement Agreements of Settling Defendants**

DPPs' proposed instruction succinctly informs the jury that the existence of settlement agreements should not color their factfinding. Defendants' proposed instruction on the other hand is misleading and duplicative. The jurors will already be informed how to assess the credibility of witnesses in Stipulated Instruction No. 12 (Credibility of Witnesses). That instruction instructs the jury to consider "the witness's bias." And the catchall provision of that instruction adequately warns the jury to consider any other factors that may bear on a witnesses' credibility. *See id.* ("any other factors that bear on believability"). Defendants are free to test the credibility of witnesses affiliated with settled Defendants without pointing a spotlight on the existence of a few settlement agreements containing cooperation obligations.

Defendants' proposed instruction is overly broad and misleading. They paint with broad strokes without specificity that some of the settlement agreements require settling Defendants' cooperation. This may lead jurors to improperly speculate as to why certain settling Defendants were required to cooperate and why others were not. The Court should not invite such jury speculation. Parties may settle for many reasons, such as risk-aversion or actual culpability. Cooperation agreements are one of the considerations the parties make when settling, perhaps in lieu of higher monetary consideration. DPPs' proposed instruction cleanly instructs the jury that the mere fact that some parties have settled their claims should not influence the jury's factfinding.

Defendants' instruction should be rejected for another reason. DPPs have reached a settlement agreement with the ACPERA applicant. Defendants' would instruct that "[t]he fact a party has settled does not establish its membership in the alleged conspiracy," but this sentence would become counterfactual should DPPs and the ACPERA applicant settle. Afterall, the ACPERA applicant admitted that a price-fixing conspiracy existed, and by definition, must have participated in that conspiracy. *See* Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. No. 108-237

**Defendants' Brief on Disputed Instruction No. 45: Settlement Agreements of Settling Defendants**

DPPs' proposed instruction would remove critical portions of the instructions given in *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 3:07-md-01827-SI, Dkt. No. 8543 (N.D. Cal. Aug. 28, 2013).  Defendants merely propose reinserting language to bring the instructions back in line with those given in *In re TFT-LC (Flat Panel) Antitrust Litigation*.

Even more so in a conspiracy case, the relationships, or lack thereof, between the parties lie at the heart of the claims.  As such, it is vitally important that the jury understand that certain settlement agreements may have cooperation requirements, and that the testimony of a witness for the DPPs may result from such an agreement, rather than an endorsement of the DPPs' case theory.  Defendants' proposed language is consistent with the instructions given in *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 3:07-md-01827-SI, Dkt. No. 8543 (N.D. Cal. Aug. 28, 2013) and should be adopted.

**Stipulated Instruction No. 46 Re Duty to Deliberate**

Before you begin your deliberations, elect one member of the jury as your foreperson. The foreperson will preside over the deliberations and serve as the spokesperson for the jury in court.

You shall diligently strive to reach agreement with all of the other jurors if you can do so. Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to their views.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not be unwilling to change your opinion if the discussion persuades you that you should. But do not come to a decision simply because other jurors think it is right, or change an honest belief about the weight and effect of the evidence simply to reach a verdict.

*Authority*: Ninth Circuit Manual of Model Civil Jury Instructions, Instr. 3.1 (2017).

1

**Stipulated Instruction No. 47 Re Consideration of the Evidence—Conduct of the Jury**

2

Because you must base your verdict only on the evidence received in the case and on these

3

instructions, I remind you that you must not be exposed to any other information about the case or to

4

the issues it involves. Except for discussing the case with your fellow jurors during your deliberations:

5

Do not communicate with anyone in any way and do not let anyone else communicate with you

6

in any way about the merits of the case or anything to do with it. This includes discussing the case in

7

person, in writing, by phone, tablet, or computer, or any other electronic means, via email, via text

8

messaging, or any internet chat room, blog, website or application, including but not limited to

9

Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat, TikTok or any other forms of social

10

media. This applies to communicating with your family members, your employer, the media or press,

11

and the people involved in the trial. If you are asked or approached in any way about your jury service

12

or anything about this case, you must respond that you have been ordered not to discuss the matter and

13

to report the contact to the court.

14

Do not read, watch, or listen to any news or media accounts or commentary about the case or

15

anything to do with it; do not do any research, such as consulting dictionaries, searching the Internet, or

16

using other reference materials; and do not make any investigation or in any other way try to learn

17

about the case on your own. Do not visit or view any place discussed in this case, and do not use

18

Internet programs or other devices to search for or view any place discussed during the trial. Also, do

19

not do any research about this case, the law, or the people involved—including the parties, the

20

witnesses or the lawyers—until you have been excused as jurors. If you happen to read or hear

21

anything touching on this case in the media, turn away and report it to me as soon as possible.

22

These rules protect each party's right to have this case decided only on evidence that has been

23

presented here in court. Witnesses here in court take an oath to tell the truth, and the accuracy of their

24

testimony is tested through the trial process. If you do any research or investigation outside the

25

courtroom, or gain any information through improper communications, then your verdict may be

26

influenced by inaccurate, incomplete or misleading information that has not been tested by the trial

27

process. Each of the parties is entitled to a fair trial by an impartial jury, and if you decide the case

28

based on information not presented in court, you will have denied the parties a fair trial. Remember, you have taken an oath to follow the rules, and it is very important that you follow these rules.

A juror who violates these restrictions jeopardizes the fairness of these proceedings and a mistrial could result that would require the entire trial process to start over. If any juror is exposed to any outside information, please notify the court immediately.

*Authority*: Ninth Circuit Manual of Model Civil Jury Instructions, Instr. 3.2 (2017) (revised 2020).

**Stipulated Instruction No. 48 Re Taking Notes**

You may have taken notes to help you remember the evidence. If you did take notes, please keep them to yourself until you go to the jury room to decide the case. When you leave, your notes should be left in the jury room. No one will read your notes.

Whether or not you took notes, you should rely on your own memory of the evidence. Notes are only to assist your memory. You should not be overly influenced by your notes or those of other jurors.

*Authority*: Ninth Circuit Manual of Model Civil Jury Instructions, Instr. 1.18 (2017).

1

**Stipulated Instruction No. 49 Re Communication with Court**

2        If it becomes necessary during your deliberations to communicate with me, you may send a

3    note through the Clerk, signed by any one or more of you. No member of the jury should ever attempt

4    to communicate with me except by a signed writing. I will not communicate with any member of the

5    jury on anything concerning the case except in writing or here in open court. If you send out a question,

6    I will consult with the lawyers before answering it, which may

7    take some time. You may continue your deliberations while waiting for the answer to any question.

8    Remember that you are not to tell anyone—including the court—how the jury stands, whether in terms

9    of vote count or otherwise, until after you have reached a unanimous verdict or have been discharged.

10

11    *Authority*: Ninth Circuit Manual of Model Civil Jury Instructions, Instr. 3.3 (2017).

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Stipulated Instruction No. 50 Re Return of Verdict**

A verdict form has been prepared for you. [Explain verdict form as needed.] After you have reached unanimous agreement as to each question on the form, your foreperson should complete the verdict form according to your deliberations, sign and date it, and advise the Clerk that you are ready to return to the courtroom.

*Authority*: Ninth Circuit Manual of Model Civil Jury Instructions, Instr. 3.5 (2017).